**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JANE DOE, a minor, by and through her
mother and next friend, MOTHER DOE,

       Plaintiff,

     v.

ACADEMIR CHARTER SCHOOLS, INC.,
and SUPERIOR CHARTER SCHOOL
SERVICES, INC.

       Defendants.

_____/

CASE NO.:

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, JANE DOE ("Plaintiff" and/or "Jane"),[1] by and through her mother and next friend, MOTHER DOE ("Mother Doe"), hereby complains of Defendants, ACADEMIR CHARTER SCHOOLS, INC. and SUPERIOR CHARTER SCHOOL SERVICES, INC. (collectively, "Defendants" and/or "ACS"), and alleges as follows:

## INTRODUCTION

1. This is an action for damages caused to a five-year-old girl who was sexually assaulted by a classmate on school grounds, during school hours, at Academir Charter School West Primary Learning Center in Miami-Dade County, Florida.

2. When Jane reported the sexual assault she had experienced to her one of her teachers, and school officials learned of the incident on or around January 20, 2023, rather than coming to Jane's aid, the Defendants failed to adequately and equitably respond and investigate

---

[1] "Jane Doe" has been substituted for Jane's name in this complaint to protect her identity. Jane was a minor at the time of the sexual assault and aftermath which form the basis of this complaint.

the allegations, engaged in a cover-up of the sexual assault, and refused to take any meaningful corrective action.

3. In their wholly unreasonable response to the sexual harassment experienced by Jane, the Defendants violated federal and state laws intended to protect the safety and welfare of students committed to their care.

4. Jane seeks monetary relief to redress Defendants' unlawful deprivation of Jane's personal dignity and her civil right to equal access to educational opportunities and benefits, in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and Florida common law.

## PARTIES

5. Plaintiff, JANE DOE, is a minor female individual and a resident of Miami-Dade County, Florida, who was five years old at all times relevant to this action.

6. MOTHER DOE is the mother and next friend of Jane. She is a resident of Miami-Dade County, Florida, over the age of eighteen years, and otherwise *sui juris*.

7. Defendant, ACADEMIR CHARTER SCHOOLS, INC. d/b/a ACADEMIR CHARTER SCHOOL WEST ("Academir"), is a Florida not-for-profit corporation doing business in Miami-Dade County, Florida. Academir conducts operations as a charter school pursuant to Florida Statute § 1002.33 and as a component unit of the School Board of Miami-Dade County, Florida.

8. Defendant, SUPERIOR CHARTER SCHOOL SERVICES, INC. ("SCSS"), is a Florida for-profit corporation doing business in Miami-Dade County, Florida. SCSS is a charter school management company contracted to manage and operate Academir school locations.

9.     At all times material hereto, Defendant Academir and Defendant SCSS owned, operated, managed and/or controlled Academir Charter School West Primary Learning Center located at 2636 SW 144th Avenue, Miami, Miami-Dade County, Florida (the "School").

10.     Jane provided a pre-suit notice of claim to Defendant Academir as required under § 768.28(6)(a), Fla. Stat.

11.     Jane has complied with all conditions precedent in accordance with § 768.28, Fla. Stat.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

13.     Venue is proper under 28 U.S.C. § 1391 because the events giving rise to this action were committed within the jurisdiction of the United States District Court for the Southern District of Florida.

## FACTUAL ALLEGATIONS

### January 20, 2023 – Jane is Sexually Assaulted

14.     On or about January 20, 2023, one of Jane's classmates, L.R. ("L.R."), an individual male minor, similar in age to Jane, kissed Jane on the mouth and licked her chest, genitals, and buttocks, all without Jane's consent and against her will. This event is referred to as the "Sexual Incident" hereinafter.

15.     The Sexual Incident occurred in a school classroom, during school hours, and occurred while Jane was a student and invitee on the premises of the School.

16.     Upon information and belief, the Sexual Incident was captured on camera by security camera footage.

17.     Despite her young age, Jane knew that L.R. had acted inappropriately, and she proceeded to report the Sexual Incident to school officials.

18.     On or about January 20, 2023, Jane informed her physical education teacher, whom she referred to as "Ms. M," that her classmate, L.R., had made inappropriate sexual contact with her.

19.     Later that same day, ACS' secretary Ms. Zoley Castellon ("Ms. Castellon") called Jane's mother, Mother Doe, via telephone. Ms. Castellon stated that Jane reported that her classmate, L.R., had told Jane that he intended to "suck her breasts and genitals."

20.     Ms. Castellon described the incident as merely verbal and did not convey that any sexual contact had occurred, in an attempt to downplay the incident. Ms. Castellon added that ACS had already informed L.R.'s parents about the Sexual Incident.

21.     Later that same day, Jane and her mother spoke about the Sexual Incident at home. Jane told her mother candidly that L.R. did not just verbally threaten to touch her sexually, but in fact, had kissed her on the mouth and licked her breasts, genitals, and buttocks.

22.     Mother Doe was frozen in shock when she learned what had occurred. As Jane's mother, she had entrusted the care and protection of her daughter to ACS.

23.     On or about January 21, 2023, Mother Doe contacted Jane's homeroom teacher, Ms. Hira Chaudry ("Ms. Chaudry"), to arrange a meeting to discuss what her daughter had shared with her. Mother Doe and Ms. Chaudry agreed to meet on January 24th.

<u>January 24, 2023 – Meeting Between Jane's Parents and Assistant Principal</u>

24.     On or about January 24, 2023, Jane's parents, Ms. Chaudry, and Assistant Principal Ms. Melissa Valladares ("Ms. Valladares") held a meeting to discuss the Sexual Incident and Mother Doe's concerns.

25.     In the meeting, Mother Doe shared that the interaction between Jane and L.R. was not merely verbal, and that a sexual assault had occurred. In response, Ms. Valladares disagreed and stated that the relevant interaction between Jane and L.R. had been merely verbal and involved no physical contact.

26.     Due to the glaring discrepancy in what her daughter had shared and what school officials said had occurred, Mother Doe insisted that an investigation be launched and that the respective classroom surveillance video footage be reviewed. Mother Doe also demanded that Jane and L.R. be separated into different classrooms while an investigation was conducted.

27.     Ms. Valladares stated that it was not "convenient" to place Jane and L.R. in separate classrooms at that time and declined to separate Jane from her harasser.

28.     Upon learning of the Sexual Incident, school officials failed to launch an investigation, failed to advise Jane's parents of their rights and the resources available to them under Title IX, and failed to implement any remedial measures to protect Jane.

29.     School officials also failed to notify the Florida Department of Children and Families ("DCF") of the Sexual Incident, in direct violation of their legal obligation under § 39.101(1), Fla. Stat.

30.     Instead, school officials attempted to downplay the Sexual Incident—and to minimize the seriousness of even a verbal threat of sexual contact—with Ms. Valladares stating that it is normal for little children to "explore their bodies." "It's adults who read evil into such behavior," she said.

31.     Ms. Valladares and Ms. Chaudry merely stated they would review the surveillance footage within the next day and would speak with Jane's parents afterwards. Jane's parents were

left to wait and in the interim, asked that at a minimum, school officials not discuss the Sexual Incident any further with Jane until the footage had been reviewed.

32.     Later that same day, despite the clear request from Jane's parents, ACS' student counselor Ms. Stephanie Ruiz questioned Jane about the details of the Sexual Incident. This questioning occurred unbeknownst to Jane's parents and against their wishes.

33.     Shortly thereafter, Ms. Ruiz called Mother Doe and told her that Jane had described the Sexual Incident to her as being purely verbal. Ms. Ruiz continued to emphasize that the student L.R. only threatened to make sexual contact with Jane but did not actually assault Jane.

34.     On the call, Ms. Ruiz also stated that she had reviewed the relevant video footage but declined to allow Jane's parents to review the footage.

35.     Later that same day, Mother Doe discussed the Sexual Incident again with her daughter, this time recording the conversation. Jane reiterated the sexual assault that she had experienced and stated yet again that L.R. kissed her on the mouth and licked her chest, genitals, and buttocks at the School.

January 25, 2023 – ACS Refuses to Take Remedial Action

36.     On or about January 25, 2023, after another one of a series of sleepless nights since the Sexual Incident, Jane's father went to the School and asked to speak with Ms. Valladares. Jane's father played the audio recording of his daughter recounting the Sexual Incident, which clearly challenged ACS' version of the events.

37.     Astonishingly, even after hearing the recording, Ms. Valladares continued to assert that L.R.'s interaction with Jane during the Sexual Incident was merely verbal.

38.     Jane's father begged and pleaded with Ms. Valladares to show him the school surveillance video footage to determine what had actually occurred, but she continued to refuse.

39.     That same day, a telephone conference was held between Jane's father, ACS' principal Ms. Susie Bello ("Ms. Bello"), Ms. Valladares, Ms. Ruiz, and Ms. Castellon.

40.     Ms. Bello said that she had viewed the relevant security footage and that the footage showed nothing remarkable, and she maintained that the children's interaction was merely verbal.

41.     Jane's parents reiterated their request to separate L.R. and Jane, and Ms. Bello refused. Jane's parents insisted that if no corrective action was going to be taken, that they at least be shown the surveillance footage or some other definitive proof that their daughter had not been sexually assaulted.

42.     In response, Ms. Bello refused to take any further action and stated that if Jane's parents do not agree with ACS' decision, then they should transfer Jane to another school.

43.     A few hours later, Jane's father, prompted by ACS' callous indifference to the known sexual harassment of his daughter, contacted law enforcement officials and reported the sexual assault that had occurred.

44.     Shortly thereafter, a police officer met with Jane's father at the School campus. The police officer spoke with Jane's father and Ms. Bello separately, at the conclusion of which, the officer advised Jane's father that police lacked authority to remove L.R. from the School.

45.     By January 25, 2023, at least six ACS officials, teachers, employees and/or agents, including Ms. Bello, Ms. Valladares, Ms. Chaudry, Ms. Ruiz, Ms. M, and Ms. Castellon, were on notice of Jane's sexual assault by her classmate.

46.     Nevertheless, neither Ms. Bello, Ms. Valladares, Ms. Chaudry, Ms. Ruiz, Ms. M, Ms. Castellon, nor any other ACS official, teacher, employee and/or agent reported the Sexual Incident to the Florida Department of Children and Families at any time.

47.    Neither Ms. Bello, Ms. Valladares, Ms. Chaudry, Ms. Ruiz, Ms. M, Ms. Castellon, nor any other ACS official, teacher, employee and/or agent reported the Sexual Incident to the Miami-Dade County Public Schools Office of Civil Rights Compliance ("CRC") at any time.

48.    Neither Ms. Bello, Ms. Valladares, Ms. Chaudry, Ms. Ruiz, Ms. M, Ms. Castellon, nor any other ACS official, teacher, employee and/or agent reported the Sexual Incident to Miami-Dade Schools Police at any time.

49.    ACS never reprimanded L.R., referred L.R. to a behavior plan, reassigned L.R. to another classroom or teacher, suspended L.R., or otherwise took a disciplinary action on L.R.

50.    ACS never required L.R. to receive therapy or counseling for his actions as a condition of continued enrollment at ACS.

51.    ACS never conducted a formal Title IX investigation into Jane's complaint, nor advised Jane (or Jane's parents) of Jane's rights under Title IX.

52.    ACS never informed Jane (or Jane's parents) how to contact the ACS' Title IX coordinator, how to file a report with law enforcement agencies, or how to obtain academic accommodations and support services to ensure equal access to educational opportunities and benefits, despite the sexual harassment Jane had experienced.

53.    ACS never informed Jane (or Jane's parents) of what changes, if any, ACS would make to Jane's school environment to ensure that Jane was safe and protected in school.

<u>January 27, 2023 – Jane's Parents Establish Contact with Rolando Mir</u>

54.    Jane's parents felt a mix of confusion, sadness, and helplessness in the wake of ACS' negligent response to the Sexual Incident.

55.    On January 27, 2023, Jane's parents contacted Mr. Rolando Mir ("Mr. Mir"), the President of SCSS and the namesake of Academir, in a desperate attempt to get some form of

assistance for their daughter. In response, Mr. Mir agreed to meet with Jane's parents on January 30, 2023, at 3:00 PM.

56.     On or about January 30, 2023, shortly before the scheduled meeting, Mother Doe texted Mr. Mir to determine where they were going to meet, but she received no immediate response.

57.     Soon thereafter, Mother Doe called the School and spoke with Ms. Castellon, who stated that she did not know where Mr. Mir was or about his scheduled meeting with Jane's parents.

58.     Jane's parents went to Academir's main campus, where the office staff also denied any knowledge of Mr. Mir's whereabouts.

59.     Hours after their scheduled meeting, Mr. Mir finally responded at 7:34 PM, stating that "I only saw your message now […] I was in meetings all day and called the school to find out if you were in the school."

60.     Mr. Mir claimed that he had waited in "the office" until 4:00 PM, despite the fact that Academir's own office staff denied knowledge of Mr. Mir's whereabouts at the time of the meeting. Mr. Mir ultimately never discussed the Sexual Incident with Jane's parents.

61.     It was clear to Jane's parents that Mr. Mir was avoiding them and did not want to discuss the sexual assault their daughter had experienced.

62.     Mr. Mir also never reported the Sexual Incident to the DCF, the CRC, or Miami-Dade Schools Police.

### January 31, 2023 – Jane's Parents Report the Sexual Incident to DCF

63.     On or about January 31, 2023, Jane's parents took it upon themselves to contact DCF to report the sexual abuse perpetrated on their child.

64.     On or about February 1, 2023, a DCF investigator visited Jane's home and interviewed Jane about the Sexual Incident.

65.     Jane again recounted the events of the Sexual Incident, this time to the DCF investigator.

66.     During the interview, when the DCF investigator asked Jane the number of times that she had been a victim of the unwelcome sexual touching at school, Jane answered, "Twice."

67.     Due to ACS' negligent response, Jane's parents were unable to adequately determine if Jane had been sexually assaulted more than once.

<u>Jane is Forced to Transfer Schools</u>

68.     As a direct and proximate result of ACS' failure to adequately prevent, investigate, remediate, and report the sexual harassment that Jane experienced, Jane's parents had no choice but to withdraw Jane's enrollment at ACS to protect Jane from further harm.

69.     On or about January 31, 2023, Jane was forced to transfer to another school.

70.     As a result of the school transfer, Jane lost access to the educational programs and opportunities available to her at ACS, including counseling opportunities. She also lost progress on her academics and lost her social connections to her established classmates.

71.     As a direct and proximate result of the Defendants' unlawful conduct described herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

72.     As a direct and proximate result of Defendants' unlawful conduct described herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

## CAUSES OF ACTION
### COUNT I
### 20 U.S.C. § 1681
### Deliberate Indifference to Sexual Harassment in Violation of Title IX
### (Jane Doe as Against Defendant Academir)

73. Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

74. Title IX of the Education Amendments of 1972 provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

75. At all times material hereto, ACADEMIR received federal financial assistance for its educational program and is therefore subject to the provisions of Title IX.

76. As a female student and "person" under the Title IX statutory language, seeking equal access to educational programs and activities at the School, Jane is a member of a protected class covered by Title IX.

77. Beginning January 20, 2023, ACADEMIR had actual knowledge of Jane's sexual harassment at the hands of her classmate L.R.

78. The sexual harassment to which Jane was subjected was severe, pervasive, and objectively offensive, consisting of multiple acts of physical sexual assault and a sexual battery.

79. At all relevant times, ACADEMIR exercised substantial control over Jane's harasser who, at all relevant times, was a student enrolled at the School.

80. Upon receipt of actual notice of the Sexual Incident, ACADEMIR's officials, employees, and/or agents, who had authority to do so, failed to initiate and/or conduct an investigation into Jane's allegations and to take prompt and effective steps reasonably calculated

to prevent a recurrence of L.R.'s sexual misconduct and to remedy the effects of the harassment already perpetrated on Jane.

81.    ACADEMIR's failure to conduct a formal investigation and take steps to protect Jane from further sexual harassment was clearly unreasonable in light of the known circumstances.

82.    ACADEMIR acted with deliberate indifference to the sexual harassment to which it had actual notice that Jane was subjected, by engaging in conduct including without limitation:

a.    ACADEMIR's deliberate decision not to inform Jane (or Jane's parents) of Jane's right to make a formal Title IX complaint;

b.    ACADEMIR's deliberate decision to conduct no Title IX investigation into Jane's claim of sexual harassment to ensure that any ongoing harassment was terminated, that the risk of recurrence was fully mitigated, and that the effects of harassment already sustained were remedied;

c.    ACADEMIR's deliberate decision to deny Jane's claim of physical sexual assault or otherwise falsely portray L.R.'s misconduct as consisting merely of a threat of sexual contact;

d.    ACADEMIR's deliberate decision not to provide Jane with safety measures and accommodations following her complaint, such as reassigning L.R. to a separate classroom;

e.    ACADEMIR's failure to protect Jane from potential future harassment by L.R.;

f.    ACADEMIR's deliberate decision to implement no meaningful action intended or designed to protect Jane from the risk of sexual misconduct posed by L.R.;

g.    ACADEMIR's deliberate decision not to comply with its own polices on discrimination and sexual harassment against students; the provisions of the Code of Student

Conduct of Miami-Dade County Public Schools ("CSC"); Policy Nos. 1362 and 5517 of the School Board of Miami-Dade County; the policy of zero tolerance for crime and victimization enshrined in § 1006.13, Fla. Stat.; the mandatory reporting requirements of § 39.201, Fla. Stat.; and the legal requirements of Title IX;

        h.     ACADEMIR's deliberate decision not to inform Jane (or Jane's parents) of the changes, if any, that would be made to Jane's school environment to ensure that Jane was safe and protected in school, violating § 1006.13, Fla. Stat., and CSC provisions;

        i.     ACADEMIR's failure to refer Jane's allegations of sexual harassment to a law enforcement agency;

        j.     ACADEMIR's deliberate decision not to inform Jane (or Jane's parents) that Jane had a right to report the allegations to the Miami-Dade Police Department and the CRC;

        k.     ACADEMIR's deliberate decision not to inform the CRC or Miami-Dade Schools Police about Jane's alleged sexual harassment, in violation of the provisions of the CSC;

        l.     ACADEMIR's deliberate decision not to inform the DCF about Jane's alleged sexual harassment, in violation of the provisions of § 39.201, Fla. Stat., the provisions of the CSC, and Policy No. 8462 of the School Board of Miami-Dade County.

        m.     ACADEMIR's failure to strictly supervise and monitor L.R. to ensure that he did not have further inappropriate contact with Jane or other female students;

        n.     ACADEMIR's deliberate decision to levy no meaningful disciplinary or corrective measures on Jane's harasser after he sexually assaulted Jane;

        o.     ACADEMIR's deliberate decision to take no meaningful action to address the effects of the Sexual Incident on Jane; and

p.    ACADEMIR's deliberate decision to force Jane to either continue to study alongside her harasser, and thereby risk potential future harassment, or withdraw from the School.

83.    ACADEMIR's decision to maintain the status quo, without instituting any meaningful corrective and/or preventive measures, was an official decision to ignore the danger of sexual harassment to Jane.

84.    At all times material, ACADEMIR had actual knowledge that allowing ongoing exposure of Jane to L.R., absent any corrective and/or preventive measures, would result in a sexually harassing environment and inflict substantial harm on Jane.

85.    The harassment perpetrated on Jane so undermined her educational experience as to effectively bar her access to the School's educational programs and  opportunities in violation of Title IX.

86.    ACADEMIR's deliberate indifference to L.R.'s sexually harassing misconduct against Jane, and its gross failure to act in accord with duties imposed by Title IX, created an intimidating, hostile, offensive, and abusive educational environment for Jane in violation of Title IX.

87.    The harassment perpetrated on Jane thus had a concrete, negative, and systemic effect on Jane's ability to receive an education and/or enjoy equal access to educational programs and opportunities at the School.

88.    As a direct and proximate result of ACADEMIR's violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

89.    Jane further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT II**
**20 U.S.C. § 1681**
**Deliberate Indifference to Sexual Harassment in Violation of Title IX**
**(Jane Doe as Against Defendant SCSS)**

90.     Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

91.     Title IX of the Education Amendments of 1972 provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

92.     At all times material hereto, SCSS received federal financial assistance for its educational program and is therefore subject to the provisions of Title IX.

93.     As a female student and "person" under the Title IX statutory language, seeking equal access to educational programs and activities at the School, Jane is a member of a protected class covered by Title IX.

94.     Beginning January 20, 2023, SCSS had actual knowledge of Jane's sexual harassment at the hands of her classmate L.R.

95.     The sexual harassment to which Jane was subjected was severe, pervasive, and objectively offensive, consisting of multiple acts of physical sexual assault and a sexual battery.

96.     At all relevant times, SCSS exercised substantial control over Jane's harasser who, at all relevant times, was a student enrolled at the School.

97.     Upon receipt of actual notice of the Sexual Incident, SCSS' officials, employees, and/or agents, who had authority to do so, failed to initiate and/or conduct an investigation into Jane's allegations and to take prompt and effective steps reasonably calculated to prevent a

recurrence of L.R.'s sexual misconduct and to remedy the effects of the harassment already perpetrated on Jane.

98.     SCSS' failure to conduct a formal investigation and take steps to protect Jane from further sexual harassment was clearly unreasonable in light of the known circumstances.

99.     SCSS acted with deliberate indifference to the sexual harassment to which it had actual notice that Jane was subjected, by engaging in conduct including without limitation:

a.      SCSS' deliberate decision not to inform Jane (or Jane's parents) of Jane's right to make a formal Title IX complaint;

b.      SCSS' deliberate decision to conduct no Title IX investigation into Jane's claim of sexual harassment to ensure that any ongoing harassment was terminated, that the risk of recurrence was fully mitigated, and that the effects of harassment already sustained were remedied;

c.      SCSS' deliberate decision to deny Jane's claim of physical sexual assault or otherwise falsely portray L.R.'s misconduct as consisting merely of a threat of sexual contact;

d.      SCSS' deliberate decision not to provide Jane with safety measures and accommodations following her complaint, such as reassigning L.R. to a separate classroom;

e.      SCSS' failure to protect Jane from potential future harassment by L.R.;

f.      SCSS' deliberate decision to implement no meaningful action intended or designed to protect Jane from the risk of sexual misconduct posed by L.R.;

g.      SCSS' deliberate decision not to comply with its own polices on discrimination and sexual harassment against students; the provisions of the Code of Student Conduct of Miami-Dade County Public Schools ("CSC"); Policy Nos. 1362 and 5517 of the School Board of Miami-Dade County; the policy of zero tolerance for crime and victimization

enshrined in § 1006.13, Fla. Stat.; the mandatory reporting requirements of § 39.201, Fla. Stat.; and the legal requirements of Title IX;

h.      SCSS' deliberate decision not to inform Jane (or Jane's parents) of the changes, if any, that would be made to Jane's school environment to ensure that Jane was safe and protected in school, violating § 1006.13, Fla. Stat., and CSC provisions;

i.      SCSS' failure to refer Jane's allegations of sexual harassment to a law enforcement agency;

j.      SCSS' deliberate decision not to inform Jane (or Jane's parents) that Jane had a right to report the allegations to the Miami-Dade Police Department and the CRC;

k.      SCSS' deliberate decision not to inform the CRC or Miami-Dade Schools Police about Jane's alleged sexual harassment, in violation of the provisions of the CSC;

l.      SCSS' deliberate decision not to inform the DCF about Jane's alleged sexual harassment, in violation of the provisions of § 39.201, Fla. Stat., the provisions of the CSC, and Policy No. 8462 of the School Board of Miami-Dade County.

m.      SCSS' failure to strictly supervise and monitor L.R. to ensure that he did not have further inappropriate contact with Jane or other female students;

n.      SCSS' deliberate decision to levy no meaningful disciplinary or corrective measures on Jane's harasser after he sexually assaulted Jane;

o.      SCSS' deliberate decision to take no meaningful action to address the effects of the Sexual Incident on Jane; and

p.      SCSS' deliberate decision to force Jane to either continue to study alongside her harasser, and thereby risk potential future harassment, or withdraw from the School.

100.    SCSS' decision to maintain the status quo, without instituting any meaningful corrective and/or preventive measures, was an official decision to ignore the danger of sexual harassment to Jane.

101.    At all times material, SCSS had actual knowledge that allowing ongoing exposure of Jane to L.R., absent any corrective and/or preventive measures, would result in a sexually harassing environment and inflict substantial harm on Jane.

102.    The harassment perpetrated on Jane so undermined her educational experience as to effectively bar her access to the School's educational programs and  opportunities in violation of Title IX.

103.    As a direct and proximate result of SCSS' violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

104.    Jane further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT III
**20 U.S.C. § 1681**
**Retaliation in Violation of Title IX**
**(Jane Doe as Against Defendant Academir)**

105.    Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

106.    Title IX of the Education Amendments of 1972 provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

107. At all times material hereto, ACADEMIR received federal financial assistance for its educational program and is therefore subject to the provisions of Title IX.

108. As a female student and "person" under the Title IX statutory language, seeking equal access to educational programs and activities at the School, Jane is a member of a protected class covered by Title IX.

109. Title IX and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

110. Jane was subjected to sexual harassment, including physical sexual assault and a sexual battery, by her classmate L.R.

111. Jane engaged in an activity protected by Title IX when she made a complaint against L.R. for sexually assaulting her.

112. ACADEMIR deliberately and intentionally subjected Jane to adverse and retaliatory actions because she engaged in this protected activity.

113. ACADEMIR's adverse and retaliatory actions against Jane included, without limitation, failing to initiate and/or conduct a formal investigation into Jane's claim of sexual harassment under Title IX; neglecting to take action to protect Jane from a potential recurrence of sexual harassment; ignoring the repeated requests of Jane's parents, on behalf of Jane, for access to the school surveillance video; allowing L.R. to remain in the same classroom as Jane; downplaying at all times the abusive and harassing nature of the Sexual Incident; during the January 24th meeting with parents, drawing conclusions about the nature of the Sexual Incident *even prior* to reviewing the relevant school surveillance video; neglecting to address the effects of the harassment on Jane; putting other concerns, such as convenience, ahead of Jane's safety;

forcing Jane to continue being subjected to unchecked sexual harassment or go study somewhere else; and denying Jane a harassment-free and retaliation-free educational environment and opportunity.

114. At all relevant times, ACADEMIR cultivated a culture of silence by failing to report a credible complaint of sex/gender-based discrimination, initiate and/or conduct an investigation or grievance procedure under Title IX, and ensure that a victimized student had equal access to the educational opportunities and benefits afforded by the School.

115. Any reasonable student in Jane's position would be dissuaded from reporting sexual harassment if they knew that they would be subjected to the kind of treatment that Jane was forced to endure.

116. As a direct and proximate result of ACADEMIR's violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

117. Jane further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT IV**
**20 U.S.C. § 1681**
**Retaliation in Violation of Title IX**
**(Jane Doe as Against Defendant SCSS)**

118. Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

119. Title IX of the Education Amendments of 1972 provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

120.     At all times material hereto, SCSS received federal financial assistance for its educational program and is therefore subject to the provisions of Title IX.

121.     As a female student and "person" under the Title IX statutory language, seeking equal access to educational programs and activities at the School, Jane is a member of a protected class covered by Title IX.

122.     Title IX and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

123.     Jane was subjected to sexual harassment, including physical sexual assault and a sexual battery, by her classmate L.R.

124.     Jane engaged in an activity protected by Title IX when she made a complaint against L.R. for sexually assaulting her.

125.     SCSS deliberately and intentionally subjected Jane to adverse and retaliatory actions because she engaged in this protected activity.

126.     SCSS' adverse and retaliatory actions against Jane included, without limitation, failing to initiate and/or conduct a formal investigation into Jane's claim of sexual harassment under Title IX; neglecting to take action to protect Jane from a potential recurrence of sexual harassment; ignoring the repeated requests of Jane's parents, on behalf of Jane, for access to the school surveillance video; allowing L.R. to remain in the same classroom as Jane; downplaying at all times the abusive and harassing nature of the Sexual Incident; during the January 24th meeting with parents, drawing conclusions about the nature of the Sexual Incident *even prior* to reviewing the relevant school surveillance video; neglecting to address the effects of the harassment on Jane; putting other concerns, such as convenience, ahead of Jane's safety; forcing Jane to continue being

subjected to unchecked sexual harassment or go study somewhere else; and denying Jane a harassment-free and retaliation-free educational environment and opportunity.

127.     At all relevant times, SCSS cultivated a culture of silence by failing to report a credible complaint of sex/gender-based discrimination, initiate and/or conduct an investigation or grievance procedure under Title IX, and ensure that a victimized student had equal access to the educational opportunities and benefits afforded by the School.

128.     Any reasonable student in Jane's position would be dissuaded from reporting sexual harassment if they knew that they would be subjected to the kind of treatment that Jane was forced to endure.

129.     As a direct and proximate result of SCSS' violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

130.     Jane further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT V
### Negligence
### (Jane Doe as Against Defendant Academir)

131.     Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

132.     ACADEMIR had a duty to exercise reasonable care to protect the safety, care, well-being, and health of Jane while she was under the care and custody of ACADEMIR.

133.     ACADEMIR owed a duty to Jane to create and maintain a safe and secure environment in which Jane could pursue her education free from sex-based harassment.

134.     ACADEMIR also had a duty to supervise the activities of students in its care and to conduct reasonable investigations in response to any complaint of student-on-student sexual abuse or sexual harassment.

135.     As detailed above, Jane was subjected to sexual harassment, including acts of physical sexual assault and a sexual battery, during the Sexual Incident.

136.     Prior to the Sexual Incident, ACADEMIR breached the aforesaid duties of care in one or more of the following ways, including without limitation:

a.     failing to protect Jane from sexual harassment while she was present on School grounds, during school hours or during school-related activities;

b.     failing to provide adequate oversight or supervision over Jane while on School grounds;

c.     failing to provide a safe environment for Jane while on School grounds;

d.     failing to adequately train its employees in the supervision of children and in protecting children from student-on-student sexual misconduct; and

e.     failing to provide reasonable measures or procedures to guard against or prevent harm such as that suffered by Jane.

137.     After the Sexual Incident, ACADEMIR breached its aforesaid duties in one or more of the following ways, including without limitation:

a.     failing to act timely to protect Jane from future potential sexual harm or to mitigate the known risk of future sexual harm to Jane;

b.     failing to act timely in response to known harm to Jane;

c.     failing to conduct a formal investigation into Jane's claim of sexual harassment;

d.     failing to comply with its responsibilities as mandated by Title IX;

e.     failing to report the sexual abuse of Jane to the Florida Department of Children and Families pursuant to Florida Statute § 39.201(1)(a)(2); and

f.     failing to deter L.R.

138.    As a direct and proximate result of the aforementioned negligence, Jane was sexually assaulted by L.R. and exposed to future potential harm following the Sexual Incident.

139.    As a direct and proximate result of ACADEMIR's violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

140.    As a direct and proximate result of ACADEMIR's violations of law detailed herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

141.    Jane further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VI**
**Negligence**
**(Jane Doe as Against Defendant SCSS)**

142.    Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

143.    SCSS had a duty to exercise reasonable care to protect the safety, care, well-being, and health of Jane while she was under the care and custody of SCSS.

144.    SCSS owed a duty to Jane to create and maintain a safe and secure environment in which Jane could pursue her education free from sex-based harassment.

145.    SCSS also had a duty to supervise the activities of students in its care and to conduct reasonable investigations in response to any complaint of student-on-student sexual abuse or sexual harassment.

146.    As detailed above, Jane was subjected to sexual harassment, including acts of physical sexual assault and a sexual battery, during the Sexual Incident.

147.    Prior to the Sexual Incident, SCSS breached the aforesaid duties of care in one or more of the following ways, including without limitation:

a.      failing to protect Jane from sexual harassment while she was present on School grounds, during school hours or during school-related activities;

b.      failing to provide adequate oversight or supervision over Jane while on School grounds;

c.      failing to provide a safe environment for Jane while on School grounds;

d.      failing to adequately train its employees in the supervision of children and in protecting children from student-on-student sexual misconduct; and

e.      failing to provide reasonable measures or procedures to guard against or prevent harm such as that suffered by Jane.

148.    After the Sexual Incident, SCSS breached its aforesaid duties in one or more of the following ways, including without limitation:

a.      failing to act timely to protect Jane from future potential sexual harm or to mitigate the known risk of future sexual harm to Jane;

b.      failing to act timely in response to known harm to Jane;

c.      failing to conduct a formal investigation into Jane's claim of sexual harassment;

d.   failing to comply with its responsibilities as mandated by Title IX;

e.   failing to report the sexual abuse of Jane to the Florida Department of Children and Families pursuant to Florida Statute § 39.201(1)(a)(2); and

f.   failing to deter L.R.

149.   As a direct and proximate result of the aforementioned negligence, Jane was sexually assaulted by L.R. and exposed to future potential harm following the Sexual Incident.

150.   As a direct and proximate result of SCSS' violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

151.   As a direct and proximate result of SCSS' violations of law detailed herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

152.   SCSS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against SCSS.

153.   Jane further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VII**
**Negligent Failure to Train**
**(Jane Doe as Against Defendant Academir)**

154.   Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

155.   Jane alleges negligent failure to train by ACADEMIR in its response to Jane complaint of L.R.'s sexual misconduct.

156.     At the time of the Sexual Incident, Jane was a student at Academir Charter School West Primary Learning Center, a charter school owned, operated, managed and/or controlled by ACADEMIR.

157.     ACADEMIR owed a duty to Jane to exercise reasonable care to protect the safety, care, well-being, and health of Jane while she was under the care and custody of ACADEMIR.

158.     ACADEMIR owed a duty to Jane to properly supervise, train, and monitor its employees to ensure its employees' compliance with all applicable statutes, laws, regulations, School Board policies, and School policies.

159.     ACADEMIR owed a duty to Jane to adequately train school officials and staff on how to recognize, prevent, and address student-on-student sexual harassment; on handling reports of sexual harassment and abuse; and on informing victims of their rights under Title IX, Florida statutes, and School Board policies.

160.     ACADEMIR breached the above-described duties by failing to properly train school officials, including but not limited to, Ms. Bello, Ms. Valladares, Ms. Chaudry, Ms. Ruiz, Ms. M, and Ms. Castellon, as evidenced by the following:

    a.     School officials failed to supervise L.R. and Jane during the Sexual Incident;

    b.     School officials failed to protect Jane from student-on-student sexual harassment prior to the Sexual Incident;

    c.     School officials failed to conduct a formal investigation into Jane's claim of sexual harassment;

    d.     School officials failed to take steps to protect Jane from further sexual harassment;

e.　School officials failed to inform Jane (or Jane's parents) of Jane's right to make a formal Title IX complaint;

f.　School officials failed to provide Jane with safety measures and accommodations in the aftermath of her alleged harassment;

g.　School officials failed to immediately report to a law enforcement agency the alleged sexual battery and physical sexual assault; and

h.　School officials failed to report Jane's allegations to the CRC.

161.　Upon information or belief, by January 27, 2023, ACADEMIR knew or in the exercise of reasonable care should have known of the negligent conduct of school officials, and it failed to take further action, such as investigation, discharge, or reassignment.

162.　As a direct and proximate result of ACADEMIR's violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

163.　As a direct and proximate result of ACADEMIR's violations of law detailed herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

164.　Jane further requests that her attorney's fees and costs be awarded as permitted by law.

**<u>COUNT VIII</u>**
**Negligent Failure to Train**
**(Jane Doe as Against Defendant SCSS)**

165.　Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

166.     Jane alleges negligent failure to train by SCSS in its response to Jane's complaint of L.R.'s sexual misconduct.

167.     Jane was a student at Academir Charter School West Primary Learning Center, a charter school owned, operated, managed and/or controlled by SCSS at the time of the Sexual Incident.

168.     SCSS owed a duty to Jane to exercise reasonable care to protect the safety, care, well-being, and health of Jane while she was under the care and custody of SCSS.

169.     SCSS owed a duty to Jane to properly supervise, train, and monitor its employees to ensure its employees' compliance with all applicable statutes, laws, regulations, School Board policies, and School policies.

170.     SCSS owed a duty to Jane to adequately train school officials and staff on how to recognize, prevent, and address student-on-student sexual harassment; on handling reports of sexual harassment and abuse; and on informing victims of their rights under Title IX, Florida statutes, and School Board policies.

171.     SCSS breached the above-described duties by failing to properly train school officials, including but not limited to, Ms. Bello, Ms. Valladares, Ms. Chaudry, Ms. Ruiz, Ms. M, and Ms. Castellon, as evidenced by the following:

      a.     School officials failed to supervise L.R. and Jane during the Sexual Incident;

      b.     School officials failed to protect Jane from student-on-student sexual harassment prior to the Sexual Incident;

      c.     School officials failed to conduct a formal investigation into Jane's claim of sexual harassment;

d. School officials failed to take steps to protect Jane from further sexual harassment;

e. School officials failed to inform Jane (or Jane's parents) of Jane's right to make a formal Title IX complaint;

f. School officials failed to provide Jane with safety measures and accommodations in the aftermath of her alleged harassment;

g. School officials failed to immediately report to a law enforcement agency the alleged sexual battery and physical sexual assault; and

h. School officials failed to report Jane's allegations to the CRC.

172. Upon information or belief, by January 27, 2023, SCSS knew or in the exercise of reasonable care should have known of the negligent conduct of school officials, and it failed to take further action, such as investigation, discharge, or reassignment.

173. As a direct and proximate result of SCSS' violations of law detailed herein, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

174. As a direct and proximate result of SCSS' violations of law detailed herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

175. SCSS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against SCSS.

176. Jane further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT IX
## Negligent Supervision
## (Jane Doe as Against Defendant Academir)

176.    Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

177.    Jane alleges negligent supervision by ACADEMIR.

178.    At the time of Sexual Incident, Jane was a student at Academir Charter School West Primary Learning Center, a charter school owned, operated, managed and/or controlled by ACADEMIR.

179.    At the time of the Sexual Incident, there was a teacher-student relationship between Jane and ACADEMIR teachers Ms. M and Ms. Chaudry.

180.    By virtue of its teacher-student relationship with Jane, ACADEMIR owed a legal duty to Jane to supervise the students in ACADEMIR's care and custody, including Jane and L.R., while such students were under the care and custody of ACADEMIR.

181.    ACADEMIR breached the above-described duty by failing to provide adequate oversight or supervision over Jane while on School grounds.

182.    ACADEMIR's negligent supervision was a but-for cause of L.R.'s sexual harassment of Jane.

183.    As a direct and proximate result of ACADEMIR's negligence, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

184.    As a direct and proximate result of the ACADEMIR's violations of law detailed herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe

emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

185.    ACADEMIR's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against SCSS.

186.    Jane further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT X
### Negligent Supervision
### (Jane Doe as Against Defendant SCSS)

187.    Jane reincorporates the factual allegations in Paragraphs 14 through 72 as if fully stated herein.

188.    Jane alleges negligent supervision by SCSS.

189.    At the time of Sexual Incident, Jane was a student at Academir Charter School West Primary Learning Center, a charter school owned, operated, managed and/or controlled by SCSS.

190.    At the time of the Sexual Incident, there was a teacher-student relationship between Jane and SCSS teachers Ms. M and Ms. Chaudry.

191.    By virtue of its teacher-student relationship with Jane, SCSS owed a legal duty to Jane to supervise the students in SCSS' care and custody, including Jane and L.R., while such students were under the care and custody of SCSS.

192.    SCSS breached the above-described duty by failing to provide adequate oversight or supervision over Jane while on School grounds.

193.    SCSS's negligent supervision was a but-for cause of L.R.'s sexual harassment of Jane.

194. As a direct and proximate result of SCSS' negligence, Jane was forced to transfer schools and suffered damages, including but not limited to, loss of educational opportunity, educational injury, significant academic harm, and future losses.

195. As a direct and proximate result of the SCSS' violations of law detailed herein, Jane has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

196. SCSS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against SCSS.

197. Jane further requests that her attorney's fees and costs be awarded as permitted by law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests this Court enter judgment against the Defendants for all damages suffered by the Plaintiff, including emotional distress damages, punitive damages, liquidated damages, statutory damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of Defendants' conduct in violation of Title IX and Florida law.

Dated:  Miami, Florida
   August 9, 2023,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

*/s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com