UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JANE DOE, a minor, by and through
Her mother and next friend, MOTHER DOE,

      Plaintiff,

v.                                Case No.: 1:23-cv-23004

ACADEMIR CHARTER SCHOOLS, INC.,
and SUPERIOR CHARTER SCHOOL
SERVICES, INC.,

      Defendants.

_____/

## DEFENDANT ACADEMIR CHARTER SCHOOLS, INC. AND SUPERIOR CHARTER SCHOOL SERVICES, INC'S AMENDED RESPONSE TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND FOR SANCTIONS

COMES NOW, Defendant, ACADEMIR CHARTER SCHOOLS, INC. ("Academir"), and Defendant, SUPERIOR CHARTER SCHOOL SERVICES, INC. ("Superior"), by and through the undersigned counsel and respectfully submits their Amended[1] Response in Opposition to Plaintiff's Motion for Default Judgment and for Sanctions, and in opposition thereto, states as follows:

---

[1] Amended to correct to the proper request for attorney's fees and costs pursuant to FRCP Rule 37(a)(5)(B) and to include supplemental exhibits.

<u>EXECUTIVE SUMMARY</u>

Plaintiff's contentions in the Motion for Default Judgment and for Sanctions [D.E. 34] are wholly unsupported and are not based on actual evidence. Plaintiff argues that the Defendants are perpetrating a fraud in discovery, however the testimony in this case has been consistent – by both current and former employees of the Defendants – that Defendants had in place written policies and procedures regarding Title IX. In support of her motion, Plaintiff presents an unsworn expert report of a so-called IT expert who concludes that the PDF documents he reviewed, which were produced in discovery, were created long after the incident which gave rise to the litigation and, in fact, were created during this litigation. This expert bases his conclusions on his review of the Metadata of the documents which accurately shows that the PDF document was created recently.

Defendants do not dispute that the versions of the PDF files reviewed by Plaintiff and her expert were created during the pendency of this litigation. However, that does not mean that the source documents themselves were not in existence prior to the subject incident. Indeed, the testimony of Defendants consistently demonstrated that the subject policies were in existence well before the depositions. In fact, for more than a month, Defendants have offered to allow Plaintiff and her expert to examine the computer files maintained by Defendant to enable them to access the actual Metadata demonstrating when

the original documents were created – not the duplicate PDF files produced in discovery. Plaintiff's counsel has ignored these offers to review the source data and instead has filed the instant Motion for Default and for Sanctions based on alleged fraud that does not exist.

Plaintiff's motion alleging document fabrication and fraud on the part of the Defendants is reckless, disingenuous, and baseless. Plaintiff's Motion should be denied, and Defendants should be awarded attorney's fees and costs pursuant to FRCP Rule 37(a)(5)(B) for having to oppose this frivolous motion.

<u>STATEMENT OF FACTS</u>

1.    Plaintiff has conducted numerous depositions in this matter, including those of Rolando Mir, Olivia Bernal, Susie Bello, Melissa Valladares, Hira Chaudry and Rosemarie Mortazavi.  Ms. Chaudry and Ms. Mortazavi are former employees of Academir.

2.    In each of these depositions, the deponents testified to the existence of policies and procedures relating to Title IX that predated the depositions. The testimony clearly indicated that the employees received sexual harassment training and obtained certificates upon completing the training. (A true and correct copy of the certificates at issue are attached hereto and incorporated herein as Defendants' **Exhibit "A"**.)

3.    The evidence unequivocally demonstrates that the Defendant, Academir, had Title IX and sexual harassment policies and procedures in place

at the time of Plaintiff's enrollment in the subject charter school. (See evidence of the original file creation date of the subject policies and procedures, attached hereto and incorporated herein as Defendants' **Exhibit "B"** and Declaration of Habib Hasbun, of Syntech, attached hereto and incorporated herein by reference as Defendants' **Exhibit "C"**.)

4.      For example, On May 15, 2024, Plaintiff's counsel conducted the deposition of Hira Chaudry, a former employee and kindergarten teacher Academir. Ms. Chaudry testified that she underwent extensive training at Academir, including Title IX training through ADP HR modules and webinars, conducted at the beginning of each school year. She testified that the yearly training included sexual harassment training, for which she received a certificate upon completion.

5.      On May 16, 2024, Plaintiff's counsel conducted the deposition of Rosemarie Mortazavi, a former employee and PE teacher Academir. Ms. Mortazavi testified that she received training while at Academir, including training on the code of student conduct.

6.      On May 13, 2024, Plaintiff's counsel conducted the deposition of Susie Bello, Academir's Principal. Ms. Bello testified that she attends harassment training with ADP, which includes Title IX training and that all employees of Academir attend this yearly. Ms. Bello testified that she collects the completion certificates for the training in order to make sure that the

employees that report to her attended as required. Ms. Bello testified that Academir has a Title IX manual, and that while she doesn't know when it was created, she believes that most policies for the school are updated yearly. She specifically testified that Academir has always had a Title IX manual and in fact that she last reviewed the manual the weekend prior to this deposition. She testified that policies are sometimes distributed at board meetings.

7.     On May 15, 2024, Plaintiff's counsel conducted the deposition of Melissa Valladares, Academir's Assistant Principal. Ms. Valladares testified that there is a whole binder of policies for the school which includes Title IX. She also testified that training on sexual harassment is through ADP.

8.     On May 9, 2024, Plaintiff's counsel took the nearly seven-hour deposition of Olivia Bernal.  Ms. Bernal testified that the written procedures were kept in compliance binders in the offices of each school campus principal and provided the following specific details:

Q.     Does Academir have any written Title IX policies?
A.     We do.
Q.     And what are those policies?
A.     So, like I was explaining, we give a description, and then who is responsible for what. What are the steps? Number one, they report it to the principal. Well, they make sure that the child or the employee is safe, right. If there is an issue, right away you call 911, but then you start the process. The principal, you start the investigation. You handle it accordingly, whether its calling the police or the Department of Children and Families, however the steps may be depending on each case. Then it's definitely reported to us. We have policies in place also that we have to communicate with our LEA. So, the Office of Civil Rights and all that does not apply to us because we are not Dade County Public School

employees. So, we have to follow our own procedures, but we do communicate with the charter school office in case there is something major or big happening. And depending on the level of severity, we do have to take next steps of reporting to the state, of reporting to the county, uploading specific information, obtain different - - completing different steps in the process, but it just depends. There is a slew of different steps that are required depending on each case.
<u>Depo of Bernal</u>, P. 42, l. 8-25– P. 43, l. 1-15.

Q.      And these policies that you described that are written, where are they located?
A.      We have them here in HR, and the principals have access to it. They have it in their Dropbox. Everybody has that. And its talked about and explained at the opening of schools on an annual basis.
Q.      And when you say the policies are in HR, what do you mean? Where are they physically stored?
A.      So, we obviously have our copy and we follow the procedures. We have - - our HR department handles anything dealing with employees. I handle things dealing with parts and students…
Q.      Okay. Where is the policy for Title IX compliance relating to students located?
A.      Every single principal has a compliance binder. Within that they have all of the policies and procedures. We have our policies and procedures, obviously here, a copy and they have it in the schools. And in addition, they go over all the policies and procedures with their staff.
Q.      Okay, so each principal in the respective Academir Charter Schools has a compliance binder?
A.      Yes.
<u>Depo of Bernal</u>, P. 44, l. 22-25;  P. 45, l. 1-25.

Q.      And within that binder is Academir's policies pertaining to Title IX procedures - -
A.      Pertaining to all policies. They have all policies in their possession…
Q.      And those policies and procedures are also separate from the Miami-Dade County School's policies?
A.      That is correct.
<u>Depo of Bernal</u>, P. 47, l. 16-19.

Q.      Do you have that policy and procedure with you, Ms. Bernal?
A.      I have sections on it based on what I just printed…

Q.   Did you review those policies and procedures before your deposition today?
A.   I did.
<u>Depo of Bernal</u>, P. 48, l. 16-25

Q.   Okay. And when were those policies first created specific to the Title IX student policies and procedures?
A.   There was policies already in place when I came aboard because that is part of the HR, especially when, you know, it pertains to employees. So I can't tell you when they were established. I know when I came aboard we made some adjustments because of the requirements from Dade County, so probably about two or three years ago.
Q.   Now, you mentioned HR as it pertains to employee policies. I'm asking specifically about Title IX student procedures. When were those created?
A.   We've always had procedures in place even before I came along. We have to follow those procedures. So I don't know when and who created them because I came and they were already established, what we do on an annual basis…
<u>Depo of Bernal</u>, P. 51, l. 6-25

Q.   And what changes did you make this year?
A.   Just making the form digital and I know that one of the items that we added were the vendor ones, because typically we just worry about the employees and the students, parents making complaints. We also added the vendors this past fiscal year.
<u>Depo of Bernal</u>, P. 51, l. 25; P. 53, l. 1-6.

Q.   So, going back to the procedures that you mentioned that are in this compliance binder, those have existed for at least more than a year; correct?
A.   Yes.
Q.   And at any point did you all gather documents for this case?
A.   I did not.
<u>Depo of Bernal</u>, P. 55, l. 14-21.

Q.   What is that document titled?
A.   It's just based on my notes, but I mean, I would have to leave the meeting and go and try to tell them to send it to you…
Q.   Do you have the policy or procedure that you were just referencing in front of you? Yes or no?

A.      I do. I do.

Q.      What is the document titled?

A.      It's called "Fiscal Policies and Procedures." So, under the fiscal policies and procedures, it's one section. And those one is just the steps for - - the steps you can follow when   a sexual harassment is made or a sexual, you know, in this case is made.

<u>Depo of Bernal</u>, P. 55, l. 14-21.

Q.      The document that you showed to the camera and that you had in front of you was, I believe, the compliance manual, Title IX Compliance Manual for Miami-Dade County Public Schools; is that right?

A.      Uh huh.

Q.      And that was not a document of Academir Charter Schools' policies; is that right?

A.      That policy is the same policy we have in our manual, in our manual for students. That is the same policy because we have to follow that same policy for students with the exception of reporting it to the Miami-Dade cops and reporting it to the Civil Rights Office because we have our own contact person here at Superior for the Title IX, and the police officers we contact are our safe-school officers.

Q.      And earlier when you were testifying about the principal's compliance manual that they have in their offices, and you referred to Title IX policies, were you referring to the Miami-Dade County Schools' policies?

A.      No, I was referring to - - there's a combination. We have to - - there are certain slides - - there's certain information that we have to have in our policy that encumbers everything that Miami-Dade has with the support services that we have, but we have to follow those things.  We have to follow making sure that they are safe, if there is nothing that we need to notify the policy. We have to follow those things according to Miami-Dade public schools. Now, when our guidelines are done, like I told you, there is a training, there is a meeting, they tell us, you have to insert all of these things and then plug in all of the additional information that you have for your organization, who to contact, who to call, who is responsible for this type of grievance, this type of grievance, and this type of grievance. And that is what we have to do,. So, it's basically what they have and what we need to add to our policy. And that is what we - - that is what we have to upload into our policy plan. So we have - - all our policies are pretty much like that because you have to align with the district, especially if we opt in to use their student code of conduct, their student progression plan, their reading plan,. All of the

policy that's in there has to be Miami-Dade policy because that is the one we opt in to use.

Q.    But earlier you referenced a compliance binder that each principal has; correct?

A.    Correct.

Q.    And in that compliance binder, you stated there was a section on handling Title IX student complaints; is that right?

A.    Correct.

Q.    And that policy specifically, is a policy that pertains specifically to Academir Charter Schools or is it the Miami-Dade County Schools' policies on Title IX?

A.    It is a combination. You have the policy. You have to follow the policy of Miami-Dade County. You have to include that, especially when it deals with children because you have to follow their student code of conduct. I can't reinvent the student code of conduct and the steps that they require for students. And what changes in our policy is who to contact, how to go about to complete the form, what steps to take for employees, and what steps to take for vendors, but the student section has to be reflective of what they do with the exception of the cops because we don't report to their cops. What we do is we report it to Dade County Public Schools Charter office and who to contact at our office that is in charge of the Title IX grievances. Those are the two things that changed or three things that changed within our policy, but it has to reflect and mirror that of Miami-Dade County Public Schools.

…

Q.    So, besides those changes that you just mentioned, it is otherwise identical to the Miami-Dade County Schools' policies that you were reading off of earlier?

A.    Yeah, that is correct.

<u>Depo of Bernal</u>, P. 72, l. 3-25; P. 73, l. 1-25; P. 74, l. 1-25; P. 75, l. 1-10; l. 24-25; P. 76, l. 1-3.

9.    Oliva Bernal gave testimony based upon notes that she created, which were comprised of printed items, such as a portion of the policies and procedures manual. The testimony clearly showed that Defendant's policies include content from the Miami Dade County Public Schools Title IX Manual. However, Plaintiff's counsel argues that "Ms. Bernal had been reading Miami-

Dade County policies and attempting to pass them off as Defendants' policies." Plaintiff's counsel attempts to take the above testimony out of context and accuses Ms. Bernal of blatantly lying under oath. *See* the above cited testimony. These allegations perpetuated by Plaintiff's counsel are wholly speculative and unsupported.

10.     As testified to by Ms. Bernal, the Title IX and sexual harassment policies and procedures at issue were originally created by Miami Dade County Public Schools. Thereafter, on August 10, 2022, Academir cut and pasted from those policies to create its own version, incorporating the Miami Dade County Public Schools policies and making the document more specific to Academir. See photograph of Title IX Policies and Procedures metadata taken by Academir's IT consultant, (attached as **Exhibit "B"** hereto), showing that the document was created August 10, 2022. Notably, every time the document is opened, it changes the date on the document as if the document were "modified." Additionally, when the documents were scanned for production, the metadata reflected the date the documents were scanned, and not the date the documents were actually created.

11.     Defendant is not a computer expert and is not versed in metadata or how to transfer documents in order to ensure that metadata remains intact. The scanning of Defendant's documents caused the error. Defendant contacted its IT consultant, Habib Hasbun from Syntech, who personally traveled to

Defendant's location, inspected Olivia Bernal's computer system, and created screenshots showing the date the policies were created. (See Defendants' **Exhibit "B"**.)

12.     Plaintiff's counsel attempts to misconstrue Ms. Bernal's testimony about investigations by confusing "Title IX investigations" with what Ms. Bernal testified did not entail launching or going through an actual investigation. See Depo of Bernal; P. 125, l. 10-25; P. 126, l. 1 ,P. 134, l. 4-21; P. 139, l. 10-25.  This confusion stems from the deponent's understanding of what constitutes an official Title IX investigation, which impacted Defendants' responses to Plaintiff's initial discovery requests as well as Ms. Bernal's deposition testimony.

13.     When Plaintiff's counsel raised concerns about the authenticity and creation date of the document, Defendant's counsel voluntarily produced all requested information and data and offered for Plaintiff to inspect the physical computer. See the copy of correspondence from Defendant's prior counsel, complying with numerous information and document requests to demonstrate the authenticity of the documents produced. A copy is attached hereto and incorporated herein by reference as Defendants' **Exhibit "D"**)

14.     Defendant has consistently offered to make its computer system available to Plaintiff's expert to verify the creation date and modification dates of the policies in question. Rather than conduct such an inspection, Plaintiff

ignored the offer for their expert to inspect Ms. Bernal's computer and instead chose to have its expert rely upon printouts and documents which do not display the accurate metadata due to the method in which the documents were saved and scanned.

15.    Metadata was produced in the way that the Defendant knew how to do so, with the assistance of their IT consultant. Despite this, Plaintiff's counsel labels the document as "suspicious" and seeks to determine its falsity without justification. This is a deliberate scheme by Plaintiff's counsel to allege a fraud on the part of the Defendants that does not exist.

16.    Defendant signed Plaintiff's requested declarations; yet, despite this, Plaintiff still asserts that the documents were somehow fraudulently created. See copies of the subject Declarations of Academir and Superior, attached hereto as Defendants' **Exhibits "E" and "F."**

17.    Plaintiff's expert incorrectly and without legitimate evidence opines that Defendants created the document in May of 2024 and backdated and misrepresented documents. Plaintiff's contentions that Defendants have "defrauded the court" are egregious and disingenuous and are wholly untrue.

18.    Plaintiff's counsel correctly points out that he learned of the existence of the manual during the deposition. The school had been using the MDCPS manual and counsel did not realize that this manual had been cut and pasted into a new version so that it was technically correct as to Academir.

Upon learning this, counsel immediately had Academir produce the version of the manual in their possession.

19.     Plaintiff correctly points out that the interrogatory responses indicated that there were no revisions to the policy in the past five years. There were no substantive revisions to the policy, however as Ms. Bernal testified to, she did make some minor changes including updating the date, etc.

20.     To further support the fact that Academir's policies and procedures related to Title IX were created prior to this litigation, on July 22, 2024, Plaintiff's counsel deposed Alexander Casas, Chairman of the Board of Directors for Academir. He testified that the policies and procedures were established around 2021 or 2022 and closely mirror those of Miami-Dade County.

21.     In furtherance of Plaintiff's wrongful attempts to demonstrate fraud by Defendant, Plaintiff's counsel has doubled down on his accusations and since the filing of the subject motion, has now contended that the training certificates provided in discovery were fraudulent, however as it turned out, Plaintiff subpoenaed the wrong entity. These tactics – such as alleging fraud after subpoenaing the wrong entity – reveal Plaintiff's true motive: to harass Defendants and turn this case into a series of baseless fraud claims. (A copy of Plaintiff's counsel's correspondence is attached hereto as Defendants'

Exhibits **"G"**; A copy of ADP's correspondence as to the correct entity is attached hereto as Defendants' **Exhibits "H".**)

LEGAL STANDARD

The Middle District of Florida in *Grant v. Regal Automotive Group, Inc.*, 2020 WL8224608 (M.D. Fla. 2020) considered a motion for sanctions filed by the plaintiff for purported perjury and fabrication of evidence and sought sanctions which included striking Defendant's pleadings as well as monetary sanctions. The court in Grant found that "In appropriate cases, a district court may dismiss a case or enter default judgment as a sanction." *Id.* citing *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126–27 (S.D. Fla.1987).

The court in Grant stated "When ordering a sanction of default judgment, the Court should find by clear and convincing evidence that (1) a defendant acted in bad faith, (2) the plaintiff was prejudiced by this conduct, and (3) lesser sanctions would not adequately serve the goals of punishment and deterrence. *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1338 (S.D. Fla. 2007); *Quiroz v. Superior Bldg. Maint., Inc.*, No. 06–21594, 2008 WL 3540599 at *5 (S.D. Fla. Aug. 12, 2008). "Bad faith exists when the court finds that a fraud has been practiced upon it, ... or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah Servs., Inc.*, 372 F. Supp. 2d at 1373.

"Generally speaking, only the most egregious misconduct, such as ... the fabrication of evidence by a party in which an attorney is implicated, will constitute fraud upon the court." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978). The Eleventh Circuit has "consistently held that a fraud between parties is not fraud on the court." *Patterson v. Lew*, 265 Fed. Appx. 767, 769 (11th Cir. 2008). "We even declared in that case that perjury does not constitute fraud on the court." *Id.* (citing *S.E.C. v. ESM Group, In.*, 835 F.2d 270 (11th Cir. 1988)).

The discrepancies at issue present credibility issues best decided by a jury rather than on a motion for sanctions. *Suppa v. Costa Crociere S.p.A.*, No. 07–60526, 2008 WL 936903, at *2 (S.D. Fla. Apr. 7, 2008) ("While it may be the case that Ms. Suppa intentionally attempted to conceal her prior treatment in an effort to make her damages appear more severe, this is a question of credibility that is best left to the jury's consideration. The Court concludes, therefore, that dismissal of the action is too severe a sanction to impose, given all the facts."); *see also Hughes v. Matchless Metal Polish Co.*, No. 2:04–CV–485–FTM–29DN, 2007 WL 2774214, at *3 (M.D. Fla. Sept. 24, 2007) ("Dismissal because of discrepancies between a party's discovery responses and the evidence developed by the opposing party in its investigation should be made only on a clear showing of egregious conduct.... Short of that, allegations of inconsistency, non-disclosure, even falseness, can be brought to the jury's

attention through cross-examination or impeachment.") (internal quotation marks and citation omitted).

Before imposing sanctions, a court must afford due process to the party to be sanctioned by providing a sufficient opportunity to be heard regarding the type and amount of sanctions. See *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1522 (11th Cir. 1986). However, a court possesses discretion in deciding whether to conduct an evidentiary hearing on a motion for sanctions. See, e.g., *Baker v. Alderman*, 158 F.3d 516, 526 (11th Cir. 1998)

<u>CONCLUSION</u>

In conclusion, Plaintiff's persistent attempts to distort the facts, coupled with unfounded accusations and speculative assertions, underscore a clear intention to harass Defendants rather than seek justice. The evidence unequivocally demonstrates the legitimacy of Defendants' policies and procedures. Plaintiff's repeated efforts to misrepresent testimony and impugn the integrity of the documents are nothing more than a ploy to fabricate a baseless fraud claim. Defendants have consistently acted in good faith, providing all necessary information and offering full transparency, which Plaintiff's counsel has deliberately ignored. This conduct, to manipulate this case, must be rejected by this Honorable Court. Defendants submit that in accordance with Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure, they

should be awarded attorney's fees and costs for having to respond to this motion.

WHEREFORE, Defendant, ACADEMIR CHARTER SCHOOLS, INC., and Defendant, SUPERIOR CHARTER SCHOOL SERVICES, INC., respectfully request this Honorable Court deny Plaintiff's motion for sanctions, along with any further relief this Court deems just and proper.

Dated: July 22, 2024                     Respectfully Submitted,

/s/ Julie B. Karron
JULIE B. KARRON, ESQ.
Kelly Kronenberg
Fla. Bar No.:  14683
10360 West State Road 84
Fort Lauderdale, FL  33324
Telephone: (954) 370-9970
Facsimile:  (954) 382-1988
Attorneys for Defendant, Academir
Charter Schools, Inc.
jkarron@kelleykronenberg.com
*Counsel for Academir Charter Schools, Inc.*

/s/ Scott P. Yount
Scott P. Yount, FBN: 0021352
Julie C. McHaffie, FBN: 1025567
Garrison, Yount, Forte & Mulcahy, L.L.C.
601 Bayshore Blvd., Suite 800
Tampa, Florida 33606
Phone: 813-275-0404
Fax: 813-275-0304
Email: syount@garrisonyount.com
Email: jmchaffie@garrisonyount.com
*Counsel for Superior Charter School Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on July 22, 2024, a true and correct copy of

the foregoing was electronically filed with the Clerk of Court via the CM/ECF

which will serve the parties by email on the service list below.


Kyle T. MacDonald, Esq.
FBN: 1038749
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Kyle@dereksmithlaw.com
*Counsel for Plaintiff*