EXHIBIT "C"

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3    JANE DOE, a minor, by and through her
      mother and next friend, MOTHER DOE,
 4

 5           Plaintiff,              CASE NO.:  1:23-cv-23004-WPD

 6    vs.

 7    ACADEMIR CHARTER SCHOOLS, INC.,
      and SUPERIOR CHARTER SCHOOL
 8    SERVICES, INC.,

 9           Defendants.

10    _____

11    DEPOSITION OF:   SUSIE BELLO

12    DATE TAKEN:      May 13, 2024

13    TIME:            10 a.m. - 3:29 p.m.

14    PLACE:           Everyone appeared remotely
                       via Zoom
15
      REPORTED BY:     MELISSA FERNANDEZ
16                     Court Stenographer

17
      _____
18

19

20

21

22

23

24

25
```

```
1   APPEARANCES:

2        KYLE T. MACDONALD, ESQUIRE
         Derek Smith Law Group
3        Suite O-301
         520 Brickell Key Drive
4        Miami, Florida  33131
         (305) 946-1884
5        kyle@dereksmithlaw.com
         (Appeared via Zoom)
6
         APPEARED ON BEHALF OF THE PLAINTIFF
7
         JULIE KARRON, ESQUIRE
8        Freeman Mathis & Gary, LLP
         Suite 250
9        301 East Las Olas Boulevard
         Fort Lauderdale, Florida  33301
10       (954) 406-5674
         julie.karron@fmglaw.com
11       (Appeared via Zoom)

12       APPEARED ON BEHALF OF THE DEFENDANTS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   TESTIMONY OF SUSIE BELLO

 2        Direct Examination by Mr. MacDonald          4

 3   CERTIFICATE OF OATH                       141

 4   CERTIFICATE OF REPORTER                     142

 5                        - - -

 6            S T I P U L A T I O N S

 7   It is hereby agreed and so stipulated by and between

 8   the parties hereto, through their respective counsel,

 9   that the reading and signing of the transcript is

10   expressly waived by the Deponent.

11                      - - - - -

12            E X H I B I T S
```

```
13   PLAINTIFF'S EXHIBIT 1
         Title IX Manual                         57
14   PLAINTIFF'S EXHIBIT 2
         Student Services Form, Bates label 288    93
15   PLAINTIFF'S EXHIBIT 3
         Disciplinary Student Case Management Referral   96
16   PLAINTIFF'S EXHIBIT 4
         Accident/Incident Report                 101
17   PLAINTIFF'S EXHIBIT 5
         Code of conduct for elementary,
18       Bates label 153 - 247                    115
```

```
19

20

21

22

23

24

25
```

 1          The deposition of SUSIE BELLO, was taken pursuant to

 2     notice by counsel for the Plaintiff on the 13th day of May,

 3     2024, commencing at 10 a.m.  Said deposition was reported by

 4     Melissa Fernandez, Court Reporter, Notary Public, State of

 5     Florida at Large.

 6                           *   *   *   *   *

 7                          SUSIE BELLO,

 8       having been duly sworn, was examined and testified upon her

 9                        oath as follows:

10                   THE WITNESS:  I do.

11                       DIRECT EXAMINATION

12     BY MR. MACDONALD:

13          Q    Good morning.  My name is Kyle MacDonald and I

14     represent Jane Doe in her lawsuit against AcadeMir Charter

15     Schools, Inc., and Superior Charter School Services, Inc.

16     Thank you for being here today.

17          A    Thank you.  You're welcome, I should say.

18          Q    Could you please start by stating your full name for

19     the record, please?

20          A    My name is Susie Bello.

21          Q    Have you ever been deposed before, Ms. Bello?

22          A    Never.  This is my first time.

23          Q    Okay.  Since this is your first deposition I'm going

24     to go over a few things just so we're both on the same page.

25     Okay?

```
 1        A    Okay.

 2        Q    Do you understand that you've been placed under oath

 3   and you have an obligation to testify truthfully here today?

 4        A    Yes, I do.

 5        Q    And do you understand that even though we're

 6   conducting this deposition via Zoom your testimony has the same

 7   force and effect as if you were testifying in a court of law

 8   before a judge and jury?

 9        A    Yes.

10        Q    Now, the court reporter cannot transcribe inaudible

11   responses like a gesture or a shrug, so just please make sure

12   to respond clearly just as you have been.  Okay?

13        A    Okay.

14        Q    Now, the court reporter also cannot accurately

15   reflect your responses if we speak at the same time, so I'll

16   wait for you to finish your answer and I'll ask that you wait

17   until I finish my questions.  Okay?

18        A    Understood.

19        Q    Now, we want to ensure that we get your best

20   testimony in this lawsuit so if there's anything you don't

21   understand or a question is confusing, just let me know and I'm

22   happy to try the rephrase it for you.  Okay?

23        A    Perfect.  I'm sorry, something on the Zoom -- okay.

24   I got it off.  Something popped up about saving to my PC and I

25   couldn't get rid of it.  I finally got it off.  Okay.
```

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1        Q     Okay.  Now, on the same note, if you do not say

 2   anything I'm going to assume that you understand the question

 3   as asked.  Okay?

 4        A     Okay.

 5        Q     If you need to take a break at any point, to go to

 6   the bathroom, get a drink of water, just let me know and I'm

 7   happy to do so.  Okay?

 8        A     Okay.

 9        Q     Is there anything that would prevent you from

10   thinking clearly and testifying truthfully here today?

11        A     No.

12        Q     Now, for the purposes of today's deposition I'm going

13   to refer to AcadeMir Charter Schools, Inc. as simply AcadeMir,

14   if that's okay with you?

15        A     Sure.

16        Q     Now, on the same note, I'm going to refer to my

17   client, ████████████, as Jane to help protect her identity, if

18   that's okay with you.

19        A     Okay.  So when I talk about her I have to say Jane?

20        Q     If you're able to.  It's not a big deal.  It's more

21   for my questions are going to refer to Jane and so I want you

22   to understand who that's referring to.  Okay?

23        A     Okay.

24        Q     Where are you conducting today's deposition from?

25        A     I'm in my office.
```

1    Q    And where is your office located?

2    A    Inside of the school building, AcadeMir Charter

3  School West.

4    Q    And what's the address there?

5    A    14880 Southwest 26th Street, Miami, Florida 33185.

6    Q    Okay.  Is anyone in the room with you?

7    A    No.

8    Q    Do you have any documents in front of you?

9    A    I have the reports.  I have the Complaint.  I have

10  the study from USF, and I have my reports that I have filed

11  here in the school.

12   Q    Okay.

13   A    Like the incident report, the SCAM, and then I just

14  have the file from DSIS of when she was withdrawn.

15   Q    What was that last one, the file from DSIS you said?

16   A    Yeah, that just says when she entered my school and

17  when she was withdrawn from my school.  It has like the

18  withdrawal date of January 31st.

19   Q    Okay.  What did you do to prepare for today's

20  deposition?

21   A    I met with Julie, my attorney.

22   Q    Okay.  And you don't have to tell me what you spoke

23  about with Julie, but did you speak to anyone else about your

24  deposition today?

25   A    No.  I spoke with Julie.

```
 1        Q     Did you speak with anyone from AcadeMir about your

 2   deposition here today?

 3        A     Okay.  I'm sorry, you said when you talk about

 4   AcadeMir, you're talking about AcadeMir Charter School, Inc.,

 5   correct?

 6        Q     Correct.

 7        A     Okay.  Yeah.  No.  No, I spoke with Julie.  I've

 8   never done a deposition so she just explained to me what it's

 9   like.

10        MS. KARRON:  Don't talk about what we talked about.

11        THE WITNESS:  Huh?

12        MS. KARRON:  We're not supposed to discuss what we

13     talked about.

14   By MR. MACDONALD:

15        Q     Did you speak to anyone that's affiliated with the

16   AcadeMir, like any employees of Superior Charter School

17   Services, Inc.?

18        A     No.

19        Q     Did you review any documents besides those documents

20   that you just referenced that you have in front of you?

21        A     The only other document I did review was the police

22   report, which I might have a copy of that too.  Actually, yes,

23   I do.  Sorry, I didn't realize that.  It's here with my

24   reports.

25        Q     Okay.  You have a copy of the police report as well
```

```
 1    from Miami-Dade County?

 2         A    Correct.

 3         Q    What is your current home address?

 4         A    10965 Southwest 38th Street, Miami, Florida 33165.

 5         Q    Okay.  And how long have you lived at that address?

 6         A    Thirteen years.

 7         Q    Have you ever been arrested before?

 8         A    No.

 9         Q    Have you ever been a party to a civil lawsuit before?

10         A    No.

11         Q    Have you ever been a witness to any other lawsuit

12    before?

13         A    No.

14         Q    Did you attend college?

15         A    Yes.

16         Q    And where did you attend college?

17         A    My bachelor's was from Florida International

18    University, and my master's is from Grand Canyon University.

19         Q    And when did you obtain your bachelor's from FIU?

20         A    1989.

21         Q    And what was your degree in, specifically?

22         A    Marketing and international business.  I had a double

23    major.

24         Q    And when did you earn your degree from Grand Canyon

25    University?
```

1        A     2011.

2        Q     And what degree did you earn there?

3        A     I obtained a master's in education administration.

4        Q     Do you have any professional certifications?

5        A     I have my certifications with the Florida Department

6  of Education, yes.

7        Q     And what certifications are those?

8        A     Educational leadership, K-12, ESOL, K-12, and

9  Elementary Education K-6.

10        Q     Are you a member of any professional organizations or

11  associations?

12        A     No.

13        Q     Where do you currently work?

14        A     Excuse me?

15        Q     Where do you currently work?

16        A     AcadeMir Charter School West.

17        Q     And what position do you hold there?

18        A     I am the school principal.

19        Q     And what are your roles and responsibilities as

20  school principal?

21        A     Well, I mean, they're quite extensive.  Obviously,

22  day-to-day operation, you know, managing staff, you know

23  students, you know, dealing with all the stakeholders.  We have

24  a lot of requirements from the State of Florida in regards to

25  curriculum, testing.  Obviously, I have to uphold all of those.

1   Of course, we have other things that we have to uphold through

2   the Department of Education.  So, basically, overseeing all of

3   that, upholding all of that, managing the staff.  You know,

4   day-to-day operations, I guess is the best way I can sum it up.

5        Q     Do you supervise any employees as principal?

6        A     Yes.

7        Q     And what employees do you supervise?

8        A     I supervise all the teachers.  I supervise all the

9   office staff.  I supervise the custodial staff, maintenance

10  staff, you know, basically all the faculty and staff members

11  that work in the building.

12       Q     How long have you been principal at AcadeMir Charter

13  School West?

14       A     At West I've been principal since December of '21,

15  '22.  I'm trying to remember now when I moved here.  I think it

16  was 2021.  I'm sorry, go ahead.  I've been a principal longer,

17  but at West it's been since December 2021 I'm almost positive.

18       Q     And what position did you hold prior to December of

19  2021?

20       A     I was the principal of a different AcadeMir school.

21       Q     And what school was that?

22       A     AcadeMir Charter School of Math and Science.

23       Q     And what grades does that school specifically

24  include?

25       A     At the time it was a K-5.

1    Q    And what prompted your transition from that school to

2    your current school?

3    A    I was transferred to this location.

4    Q    And who made the decision to transfer you?

5    A    Our board.

6    Q    And who is the board?

7    A    Our board of directors.  We have a board chair and

8    then there's members of the board, so they basically, you know,

9    govern the school.  Since we are a charter school we have our

10   own board.

11   Q    And does the board oversee all of the AcadeMir

12   schools?

13   A    Correct.  Well, at least the ones in Miami.

14   Q    And how long were you a principal for at that

15   previous school?

16   A    I started there in June of 2020.  Yeah, it was during

17   the pandemic.

18   Q    And what position did you hold prior to June of 2020?

19   A    I was the assistant principal of AcadeMir Charter

20   School Middle and AcadeMir Preparatory Academy.  It's on the

21   same campus, but it was two schools.

22   Q    And how long did you hold that role for as assistant

23   principal?

24   A    I started with AcadeMir in December of 2017.

25   Q    What is the relationship between Superior Charter

1   School Services, Inc. and AcadeMir?

2        A    They're a management company so it's what we call an

3   education service provider.

4        Q    And what kind of things does Superior handle for the

5   school?

6        A    They handle our financials.  They handle our -- I

7   mean, it's quite a bit.  They handle our financials, they

8   handle opening up new schools, our contracts, all of that.

9   They handle vendors.  They handle like basically like grant

10  writing, grants.  They handle our ordering of furniture.  They

11  handle, you know, a lot of management, I guess, criteria, if

12  you will.

13       Q    And who is your point of contact for Superior?

14       A    I mean, it depends on what I'm contacting them for.

15       Q    How does it depend?

16       A    It depends if I need to talk to HR or accounts

17  payable or accounts receivable.  You know, it depends which

18  department I need to get in touch with.

19       Q    How often do you interact with Rolando Mir?

20       A    Not that often.  You know, I see him from time to

21  time.  He does visit sometimes, you know, at the school or I

22  see him at board meetings.

23       Q    Would you say you speak with him at least once a

24  month?

25       A    I didn't say that.  I said not that often.

```
 1      Q    Well, I'm asking you, would you say that you speak

 2  with him --

 3      A    Oh, I'm sorry, I didn't hear you.

 4      Q    That's okay.

 5      A    I don't know, to be quite honest.  I wouldn't put an

 6  average on it.

 7      Q    And what is Mr. Mir's responsibilities in terms of

 8  the school?

 9      A    Well, you know, I'm not quite certain all of his

10  responsibilities.  I don't hold his role.  However, he's the

11  CEO.  He's the president, CEO of Superior.

12      Q    And are you familiar with someone by the name of

13  Olivia Bernal?

14      A    Yes.

15      Q    Who is that?

16      A    She is our COO.

17      Q    And when you say "our" who are you referring to?

18      A    Our like AcadeMir schools.

19      Q    And what does Ms. Bernal do as COO for AcadeMir?

20      A    She handles a lot of overseeing operations, that's in

21  her title, so a lot of charter applications, finding school

22  sites, opening up school sites.  She's -- she also attends our

23  board meetings.  She, you know, anything to do with an

24  operational, whether it's perhaps, you know, facilities or

25  something, she would oversee that.  I know she, you know -- I'm
```

1    sure -- again, I apologize, but I'm sure she has a lot of

2    responsibilities that I'm probably unaware of as well.

3        Q    Does Ms. Bernal work for AcadeMir full time?

4        A    I honestly don't know.

5        Q    Does Ms. Bernal also work for Superior Charter School

6    Services, Inc.?

7        A    I believe so.  I believe she works for both.

8        Q    And how often do you interact with Ms. Bernal in her

9    role?

10       A    Not often either, to be quite honest.  Of course, if

11   I need something I can reach out to her, but, you know, when I

12   have stuff due for grants and stuff like that, she'll send them

13   to me.  If I have a question on one of those, sometimes we'll

14   talk about what we're going to include in our grants, what does

15   the school need, things like that, but it's not -- it's

16   definitely not often.  It's not on a day-to-day or weekly or

17   anything like that.  It's more on an as-needed basis.

18   Obviously, if she needs something she will contact me.

19       Q    Who is responsible for handling compliance with state

20   and federal law for AcadeMir?

21       A    Any state and federal law?

22       Q    Any employee that handles compliance with state and

23   federal law for AcadeMir.

24       A    I would say it would be Ms. Bernal.

25       Q    And what does Ms. Bernal handle in that respect?

```
 1        A     She would handle, I mean, like a lot of our funding
 2   to ensure, you know, that we have all our compliance documents
 3   in place.  If we receive a grant for a new school opening, it's
 4   called a CSP grant, she would assist.  Again, this school is
 5   not new so I didn't have that experience.  But she would assist
 6   with that.  And she would assist with, you know, Title IX.  She
 7   would assist with -- pretty much she's our compliance person,
 8   yes.
 9        Q     You said Ms. Bernal assists with Title IX?
10        A     Uh-huh.
11        Q     And what does Ms. Bernal do with respect to Title IX?
12        A     She would receive the complaints and then from there
13   take whatever steps she would need for them after that.
14        Q     What do you mean that she would receive complaints?
15        A     Well, if there's an employee with a complaint, that
16   would go to our HR department.  If there's a student or parent
17   with a complaint, they would actually file a Title IX
18   complaint.  That would be sent to her.
19        Q     Are you looking at something when you were just
20   giving me your response there?
21        A     No.  No.  No.  No, I'm sorry.  I'm just nervous.
22        Q     You don't have any documents or notes visible on your
23   computer, right?
24        A     No.
25        Q     Okay.  Now, you were saying Ms. Bernal is responsible
```

```
 1   for what kind of Title IX complaints?

 2        A    Student or parents.

 3        Q    And so if a student or a parent has a Title IX

 4   complaint they are supposed to go to Ms. Bernal; is that right?

 5        A    Correct.  They could go to her, yeah.

 6        Q    Is there anyone else that they could go to if a

 7   student or a parent has a Title IX complaint?

 8        A    Sure.  They could come to me and then I could pass it

 9   on to her.  I wouldn't actually -- I'm not the Title IX

10   investigator, if you will.

11        Q    Is there a designated Title IX investigator for

12   AcadeMir?

13        A    Well, like I said, if it's an employee with a

14   complaint, I know that our HR department does that with ADP.

15   And if it's a student or a parent, then it would be Ms. Bernal.

16        I'm not sure where you want me to look.  I don't want you

17   to get confused.  I'm looking at you but I'm trying to look at

18   my camera.  Sorry.

19        Q    And what is your understanding of Title IX?

20        A    So, I guess, my understanding of Title IX is that it

21   is a federal law, you know -- sorry, a federal civil rights law

22   and it's, I guess, created, if you will, I'm not a lawyer, but

23   it was created to prevent, you know, discrimination based on

24   sex, gender, you know, things like that, to give people, I

25   guess, equal opportunities to the same experiences that way you
```

 1  couldn't be, I guess, isolated or not.  I'm not sure of the

 2  right verbiage, not included due based just off of, your know,

 3  sex and stuff.

 4       Q    And what is your understanding of AcadeMir's

 5  responsibilities under Title IX?

 6       A    Well, at the beginning of the year we attend a

 7  training with ADP.  It's a harassment training and Title IX is

 8  part of that.  And all the employees have to attend it every

 9  year.  So I ensure that everybody attends it.  You know, I

10  collect the certificates.  And then AcadeMir, per se, I guess,

11  it's a -- we have to follow the -- obviously, it's a federal

12  law, so we have to follow Title IX laws.  And if it's a student

13  our students are still considered part of Miami-Dade County

14  Public Schools.  So Miami-Dade County Public Schools has a

15  Title IX Manual and we also have a Title IX Manual.  So we're

16  kind of under Miami-Dade County Public Schools even though

17  we're a charter.  We have our own board.  A lot of it is still

18  under them.  So, basically, we have to abide by those

19  requirements.

20       Q    Have you ever received training on Title IX?

21       A    We receive the ADP training every year at the

22  beginning of the year.

23       Q    Every employee of AcadeMir receives that training

24  from ADP you said?

25       A    Correct.

```
 1        Q     And do you participate in that training every year --

 2        A     I do.

 3        Q     -- or is it just once?

 4        A     No, it's every year.  Every year we have to get an

 5   updated certificate.

 6        Q     And when you say ADP, are you referring to the

 7   payroll company, I'm guessing?

 8        A     Correct.

 9        Q     And is that training done online or is that in

10   person?

11        A     It's online.

12        Q     And do you know what the name of that training is?

13        A     Honestly, I don't remember.  I know it's some type of

14   harassment certificate, but I don't remember the official

15   title.

16        Q     And what kind of topics does that training cover?

17        A     I do it at the beginning of the school year so I

18   can't tell you that I remember all of it, but I do remember

19   like, you know, like, you know, they give you scenarios, so

20   like if this were to happen to you in the workplace or if this

21   were to happen to you in the school or wherever, would you

22   report, would you not report.  Sometimes it gives you a

23   scenario of like sometimes it's better to say something to the

24   other person before reporting because perhaps it wasn't, I

25   guess, to the severity, you know.  I don't know.  They give
```

1   you -- it's a lot of different -- like you have to read, of

2   course, and then they give you scenarios and then in the

3   scenarios you have to answer questions.  And then if you get

4   the wrong answer then it gives you the right answer and it

5   tells you why.  And you have to pass.  I forgot what the

6   percentage is, but you have to pass with getting a certain

7   amount of questions correct to get your certificate.

8        Q    And does that training cover Title IX specifically?

9        A    I guess it's part of it.  I don't know if there's a

10  certain section just for Title IX.  It goes over a lot of

11  things.  Some of it, I guess, would be scenarios that I guess

12  would fall under Title IX.

13       Q    Does the training use the words "Title IX" in it?

14       A    I wouldn't remember that.  I do it at the beginning

15  of the school year.

16       Q    Does that training cover AcadeMir's responsibilities

17  as an educational institution under Title IX?

18       A    I mean, it does talk about reporting.

19       Q    What does it talk about in regards to reporting?

20       A    Reporting to your supervisor if you felt harassed.

21       Q    You said reporting to your supervisor?

22       A    Uh-huh.  Or you could report directly to HR or to

23  ADP.

24       Q    And what else does that training cover in regards to

25  Title IX?

```
 1        A    I don't remember.

 2        Q    Does that training cover investigations related to

 3   Title IX?

 4        A    You mean like for me to conduct an investigation?

 5        Q    Does the training cover the topic of investigations

 6   relating to Title IX?

 7        A    I don't remember.

 8        Q    Does that training cover accommodations that can be

 9   offered to students for Title IX?

10        A    Honestly, I don't remember.

11        Q    Is there anything that you recall in regards to Title

12   IX that you covered in that training?

13             MS. KARRON:  Object to form.

14   BY MR. MACDONALD:

15        Q    You can answer unless she instructs you not to, just

16   for reference.

17        A    I'm sorry.  I'm confused.  What just happened?  I

18   could barely hear.

19        Q    Okay.  The attorney for AcadeMir might object from

20   time to time, but you still have to answer the question unless

21   she instructs you not to answer the question.  So she just

22   objected to the question.

23        A    Honestly, when she speaks I can barely hear her.  I

24   can hear you.  When she speaks I can barely hear her so I

25   wasn't sure.  Okay.  I'm sorry, repeat your question again.
```

```
 1        Q     What do you recall in regards to Title IX that's

 2   covered in that training?

 3        A     I mean, I just recall that they go over a lot.  It's

 4   a long -- I guess that's an opinion.  I just remember them

 5   reviewing a lot of like different scenarios of possible

 6   harassment and stuff like that, and, you know, your rights,

 7   things like that.

 8        Q     But do you recall any topics related to Title IX

 9   specifically that are covered in that training?

10        A     I don't remember.

11        Q     Okay.  Have you ever received any other Title IX

12   training besides that training from ADP?

13        A     Yeah.  When we go to district principal meetings they

14   cover Title IX.  Not every time, but from time to time they

15   cover it, you know, remind us of the Office of Civil Rights

16   Compliance, you know, Title IX, actual -- I'm sorry, let me to

17   look at the camera.  Title IX actual like complaints, like if

18   you receive an actual complaint, to ensure that you -- like if

19   there's an actual Title IX complaint I guess form or whatever.

20   So like if you actually get one to make sure you report, things

21   like that.  They just go over the fact that it is a law, you

22   know.  It's like, I guess, a refresher, if you will, of Title

23   IX laws and requirements.

24        Q     And when are those trainings given?

25        A     No, that's not a set schedule.  So we attend -- as a
```

```
 1   principal I attend four meetings a year with Miami-Dade County

 2   Public Schools.  And sometimes in one of those things there

 3   will be a Title IX refresher.  They go over a lot of different

 4   things in every single one.  So it definitely wouldn't be in

 5   all.  It might be in one a year.

 6        Q    And what are those meetings called?

 7        A    Charter school principals meeting.

 8        Q    And those are hosted by Miami-Dade County Public

 9   Schools?

10        A    That is correct.

11        Q    And you said that sometimes those meetings will have

12   refreshers of Title IX topics but the meetings are not

13   dedicated to Title IX; is that right?

14        A    That is correct.

15        Q    Okay.  Besides those meetings and the ADP training,

16   is there any other Title IX training?

17        A    No.

18        Q    Are any employees of AcadeMir required to attend

19   those Miami-Dade County charter school meetings?

20        A    No.  The County only invites the principals to the

21   meetings.

22        Q    And when is the last time that one of those meetings

23   covered a Title IX topic that you're aware of?

24        A    I don't know.  Like I said, usually on an average, if

25   you want an average, it's once a year that they'll cover it.
```

```
 1    Like the ones that we just had a few weeks ago, it didn't cover

 2    Title IX.

 3         Q    Okay.  So for most employees of AcadeMir they only

 4    receive that ADP training relating to Title IX; is that right?

 5         A    Correct.

 6         Q    And that has to be done by every employee on an

 7    annual basis, correct?

 8         A    On an annual basis.

 9         Q    And every employee who completes that training, they

10    receive a certificate or some kind of record, I imagine?

11         A    Correct.

12         Q    Does AcadeMir have any Title IX policies?

13         A    Yes, we have a manual.

14         Q    AcadeMir has a manual?

15         A    Yeah, a Title IX Manual.

16         Q    When was that manual created?

17         A    I don't know.  Most of our policies and procedures

18    and things like that get updated on a yearly basis.  When it

19    was originally, I don't know.

20         Q    Okay.  Well, when is the first time that you reviewed

21    that Title IX Manual?

22         A    I don't know.  I mean, I don't know.  Like the actual

23    manual like from front to finish, I don't know.  I know that

24    Miami-Dade County Public Schools has a manual.  I know we have

25    our own manual.  I don't remember when is the first time I
```

 1   reviewed it.

 2        Q    Well, did that manual exist when you first started at

 3   AcadeMir Charter School West?

 4        A    Oh, West, yeah.  I mean, I would say so.  There's a

 5   lot of manuals, a lot of policies and procedures so I don't --

 6   most of the time, honestly, if something gets reported to me, I

 7   just forward it on to the right individuals.  I don't remember

 8   when it was -- if you wanted a date of like when it was

 9   officially created, I really can't remember.  I'm sorry.

10        Q    Well, when you first started as principal at AcadeMir

11   Charter School West do you know if that Title IX Manual was in

12   existence?

13        A    No, I don't.  I believe we've always had one.  I

14   mean, we've -- I believe we've always -- I mean, it's been a

15   lot longer than we've been open so I'm assuming we've always

16   had it.

17        Q    When is the last time you reviewed that manual?

18        A    I reviewed it this weekend.

19        Q    This weekend you said?

20        A    Yes.

21        Q    And how did you review it?

22        A    I just read certain parts of it.

23        Q    And where was that manual located when you went to go

24   review it this weekend?

25        A    Oh, well, you know, I keep it here in my office in a

1   binder right behind me.  You see a bunch of binders?  That's

2   one of my binders and the policies.

3        Q    And that's where the manual was located?

4        A    That's where the manual is located, yes.

5        Q    And those are your binders that you referenced in the

6   room there?

7        A    Right.  They're principal binders.  We have binders

8   for different reasons.  One of them is a policy binder.

9        Q    And who created those binders or put them together?

10       A    It depends on the binder.

11       Q    What about the binder that has the Title IX Manual?

12       A    I mean, we're told like basic things that are

13  supposed to be in it, but then they get updated yearly.  So, I

14  mean, we're guided on what should be in it, but, then,

15  obviously, if there's a new version we'll print it out and put

16  it in.

17       Q    Okay.  But how did the binder that contains the Title

18  IX Manual come together?  Did you put it together or did

19  someone else put it together?

20       A    Well, I haven't been the principal in this building

21  since it opened so I don't know who originally put it together.

22  Since I've been here if a version is updated I put the new copy

23  in.

24       Q    Okay.  When is the last time you put a new copy into

25  the binder that contains the Title IX Manual?

```
 1        A    Basically at the beginning of the school year when we
 2   get the new handbooks, the new -- I'd have to pull it to see
 3   everything that's in it, but our safety plan, you know, all the
 4   things we have to upload to the school district at the
 5   beginning of the school year.  So as I'm uploading I'm also
 6   printing and replenishing, if you will, the older version with
 7   the newer version in the binder.
 8        Q    And you do that at the beginning of this year?
 9        A    I do.  We see some changes throughout the year.  I
10   will audit.  Like in April we got a letter from the state of
11   Florida about some changes to Title IX.  I printed out the
12   letter and I put it in there.
13        Q    Before we get to that letter, when did you update it
14   this year?  You mentioned you do it on an annual basis.  When
15   specifically did you do that this year?
16        A    It's usually like in August.  Like I said, I have
17   things are due like my SIP, my School Improvement Plan is in
18   there.  That's not due until a little bit later.  So it all
19   depends on when the document is due for an upload, whether to
20   the State of Florida or to the school district.  And if I see
21   there's a new one I will replace it.
22        Q    Okay.  But you did update that binder that contains
23   the Title IX Manual in August of 2023?
24        A    I don't remember the exact -- whenever I get a new
25   version I update.
```

```
 1       Q    And who sends you a new version?

 2       A    Of what?

 3       Q    Well, you said that you update that binder whenever

 4  there's a new version.  Who would send you a new version?

 5       A    It depends.  Which policy?  There's a lot of policies

 6  in there so which policy?

 7       Q    Okay.  Who would send you an update to the Title IX

 8  policy specifically?

 9       A    Bernal, Ms. Bernal.

10       Q    And when did she last send you one of those updates

11  to the Title IX policy?

12       A    I don't remember.

13       Q    You don't remember if she sent you one in August of

14  last year?

15       A    No.  The beginning of the year is very chaotic.

16  There's a millions of things to get a building up and opened

17  and a million deadlines between the state and the district.

18  We're just working around the clock, to be quite honest.  I

19  can't remember specifically when, but everything that's due is

20  always turned in, of course, on time and then updated after the

21  fact.

22       Q    And Ms. Bernal, she sent you those updates via email,

23  I'm guessing?

24       A    Not always.  Sometimes we'll go to a board meeting

25  and we'll get a physical copy.  Sometimes we get it through
```

```
 1   email.  It really depends.  Not everything is always through

 2   email because sometimes things get signed into -- I mean, I'm

 3   not a board member, but I guess, whatever, approved by the

 4   board so then it becomes effective there.

 5        Q    What about in August of last year, was that via email

 6   or did you get that at a board meeting, that update?

 7        A    I don't remember; it was too long ago.

 8        Q    Do you remember what was updated specifically last

 9   year?

10        A    For Title IX?

11        Q    Yes.  As part of the Title IX policies for AcadeMir,

12   what was updated?

13        A    Like if something within the document was updated, I

14   don't know.  Obviously, the year changes on the manual.  I

15   don't know if something else was updated.

16        Q    Okay.  You don't recall anything that was updated in

17   that manual?

18        MS. KARRON:  Objection to form.

19   BY MR. MACDONALD:

20        Q    You can answer.

21        A    No, I don't.

22        Q    And you also mentioned that you sometimes get updates

23   to the Title IV policies from the board; is that right?

24        A    No.  No.  No.  You had said that is it always email

25   and I said, no, sometimes I get a physical copy at a board
```

1   meeting because it will go into effect once the board approves

2   it.  I don't know if the board actually has anything to do with

3   that.  I don't know.

4        Q    You'll get a physical copy of the updates to the

5   policies at a board meeting?

6        A    Sometimes.  Sometimes we get -- sometimes we leave

7   the board meeting with tangible papers, if you will.  Sometimes

8   we get an email.  It really depends.

9        Q    When is the last time you got a physical copy of a

10  policy update for Title IX in person at a board meeting?

11       A    I don't remember.

12       Q    When is the last time you got Title IX policy update

13  in person at a board meeting?

14       A    I think I answered that.  I don't remember.  I don't

15  remember.  I deal with a lot of policies.  This is just one of

16  them, if you will.  So I don't -- I can't remember when I got

17  the handbook versus when I got the Title IX versus when I got

18  the, you know, mental health plan, so I don't remember.

19       Q    You don't ever recall a specific instance of getting

20  a Title IX policy update in person at a board meeting?

21       A    I don't recall.

22       Q    Do you recall who gave you that policy update at the

23  board meeting?

24       A    No, because I don't recall getting it.  No.

25       Q    Now, those board meetings that you referenced, those

```
 1   are public meetings, correct?

 2       A    Correct.

 3       Q    And the records are retained for those meetings where

 4   those policies are approved, I imagine, right?

 5       A    I don't know.  I attend the board as a principal.

 6   I'm not a voting member nor do I, you know --

 7       Q    And do you know -- do you know if the records from

 8   those board meetings would include the policy updates that you

 9   referenced?

10       A    I don't know that.

11       Q    Now, what was the last time you recall looking at

12   those Title IX policies prior to August of last year?

13            MS. KARRON:  Objection to form.

14   BY MR. MACDONALD:

15       Q    You can answer.

16       A    When is the last time I looked at Title IX prior to

17   August of last year?

18       Q    When is the last time that you looked at the binder

19   that you referenced that contains Title IX policies prior to

20   last year?

21       A    Oh, the binder, okay.  That's a very difficult

22   question for me to answer because, honestly, although the

23   majority of the stuff gets updated at the beginning of the

24   school year, not necessarily is that always the case.  For

25   instance, my school improvement plan, I do it at the beginning
```

1    of the year because I have a reflection component.  So as the

2    year goes on any policy that would need to be in that binder if

3    it were ever updated for whatever reason, I would put it in,

4    you know.  And then throughout the year if I get asked a

5    question on any of the policies and I need to go back to refer

6    to it, I would.  So I can't say for exact certainty when I

7    looked at it.  It's really on an as-needed basis.

8         Q    When is the last time you referred back to those

9    policies prior to this weekend?

10        A    I don't know.  I really don't remember.  Like I said,

11   it's just, if I need to look at something, I just grab it and

12   read it.  So I don't know.

13        Q    You don't recall any instances where you had to go

14   back and read those policies?

15        A    I mean, stuff happens throughout the entire year.  So

16   like sometimes I'll have to go back to the Parent-Student

17   Handbook because the parents signed an agreement at the

18   beginning of the year that they will abide by the rules or

19   whatever, expectations in the handbook.  Sometimes they'll try

20   to tell me that wasn't in the handbook and I'll have to go back

21   and see, yes, it's on page whatever.  I can't think of a

22   specific example right now off the top of my head, but it's

23   really, like I said, on an as-needed basis that I would go back

24   to it.

25        Q    Now, you mentioned a letter in April that you

1    received.  What is that?

2         A    A what letter, I'm sorry?  I couldn't hear you.

3         Q    A letter in April you referenced.

4         A    We received a letter in April from, I can't remember

5    who sent the email.  It was probably somebody in the State of

6    Florida, basically stating that there was going to be some

7    changes to or additions, something like that, to Title IX, and

8    that I think it was going to go into effect in August, if I can

9    remember.  I have the letter in the binder, but I can't

10   remember right now.  I think that's what it said.  Something

11   like that to kind of just give us like a heads-up.

12        Q    And you received that letter in April of last year?

13        A    No, this year.

14        Q    I'm sorry, April of this year.

15        A    This year.

16        Q    And how did you receive that letter?

17        A    That I received through email.

18        Q    And do you know who it was sent by?

19        A    No, I can't remember.  I can look at my email if you

20   want me to, but I can't remember right now.

21        Q    And what did that letter state in it in regards to

22   Title IX?

23        A    Again, something to that effect, that there was going

24   to be some changes that it was either approved or being voted

25   on.  There would be some changes to Title IX policies and

1   especially in regards to education and that, I'm almost certain

2   that it said that it was going to into effect in August of this

3   year, 2024.

4        Q    And when you received that letter did you discuss it

5   with anyone?

6        A    Like actually talk, no.

7        Q    Did you share that letter with Ms. Bernal?

8        A    I would assume that I forwarded it to her since they

9   have the Title IX complaint.  I don't remember.  I would assume

10  I forwarded it to them.  I mean, I know I read it.  I printed

11  it out.  I'm not officially the Title IX investigator.  I would

12  assume that I had forwarded it on to them.  They might get it

13  also, I'm not sure, because it comes from the State of Florida

14  charter office.  Anybody can sign up to get updates from them.

15  I don't know if they do.

16       Q    Do you remember for a fact if you forwarded it to

17  Xenia and Ms. Bernal?

18       A    No, I can't remember that with certainty.

19       Q    Is that the first time you received correspondence

20  from the State of Florida regarding Title IX?

21       A    I don't know.  We get so many emails.  I read them,

22  of course.  I can't remember if that's the first time State of

23  Florida has ever sent anything.  I just know that it was an

24  update that they wanted to share with us.

25       Q    Do you recall what office that letter came from?

1      A    No.  It's obviously the State of Florida.  I would

2  assume something in charter schools, but I don't remember.

3      Q    Do you know for a fact if you've ever received

4  correspondence from the State of Florida like that regarding

5  Title IX in the past?

6      A    No, I don't know that for a fact.

7      Q    And you don't recall any other instances where you

8  received correspondence like that from the State of Florida

9  besides that one time?

10     A    Off the top of my head that I can remember, no.

11     Q    And do you normally receive these updates via email?

12     A    From that department, from that State of Florida

13  charter, whatever, I forgot the name of the actual organization

14  or whatever, yes.

15     Q    And those are sent to your work email, I'm guessing?

16     A    Correct.

17     Q    And what's your work email address?

18     A    Bello spelled B as in boy E-L-L-O@ and the domain is

19  long, academircharterschoolwest.com.

20     Q    Do you recall ever discussing any letters like that

21  regarding Title IX with Ms. Bernal besides that instance that

22  you described?

23     A    No.

24     Q    Is there something that made that particular instance

25  memorable in receiving that letter?

```
1        A    That they said there was going to be a change and

2    that they were informing us about the potential change and, you

3    know, that it will be going into effect at some point this

4    year.  That's what made it memorable to me.

5        Q    Did Ms. Bernal ever discuss that change with you?

6        A    No.

7        Q    Who was responsible for making sure that AcadeMir's

8    policies reflect changes like that update?

9        A    Ms. Bernal.

10       Q    Do you know that for a fact?

11       A    I mean, she's been handling, you know, all the

12   operations since she took over in that role, so any updates to,

13   I guess a policy, if you will, a manual like that, I would

14   assume, yeah, it would be her, uh-huh.

15       Q    And how long have you worked -- or sorry, strike

16   that.  What year did you begin working for AcadeMir?

17       A    2017.  I've been there for six and a half years.

18       Q    Has Ms. Bernal handled those Title IX policies during

19   the entire time that you've worked at AcadeMir?

20       A    No.

21       Q    Who handled them before Ms. Bernal?

22       A    When I started, I don't know of an official COO, but

23   at the time I was also not a principal.

24       Q    When you started you were an assistant principal,

25   right?
```

1      A     Correct.

2      Q     And who was responsible for Title IX policies?

3      A     I would have just reported anything to my principal.

4      Q     And who was your principal at the time?

5      A     I had two because there were two different school

6   names.  So AcadeMir Charter School Middle was Carla Rodriguez

7   and AcadeMir Preparatory Academy was Antonio Cejas.

8      Q     Were the Title IX policies for AcadeMir the same when

9   you started as they are now?

10      A     I don't know.  I could only assume.  I mean, I don't

11   know.  By then we used TriNet for our payroll and HR and stuff.

12   Now we have ADP.  Was it TriNet?  No.  What was it called?  I

13   think it was called TriNet.  It's been a while that we've had

14   ADP.

15      Q     When you started with AcadeMir did you receive

16   training on Title IX?

17      A     We used to do it, harassment training at the

18   beginning of the school year.  That was back then.  That was

19   actually in person and it was conducted by the school

20   principal.  And then once we switched to ADP, it was all done

21   through ADP.

22      Q     And which principal handled that training when you

23   first started at AcadeMir?

24      A     I want to say maybe Mr. Cejas did it, but I think

25   they both were involved, honestly.

1     Q     And you say that was Antonio Cejas.  Who was the

2   other person?

3     A     Carla Rodriguez.

4     Q     And was that a training that every employee went to?

5     A     Yes.  Well, I don't know all of the employees since I

6   wasn't the principal, but, I mean, at least when I attended it

7   definitely all faculty members were there.

8     Q     And how did they conduct the training?  Was it a

9   PowerPoint or what did they use?

10    A     They definitely had a presentation.  I don't remember

11  if it was PowerPoint or not.  They definitely had a

12  presentation, you know, went over different, again, scenarios,

13  things like that.

14    Q     And did that training cover Title IX topics?

15    A     I couldn't -- I mean, that was a very long time ago.

16  I honestly can't remember that.

17    Q     Do you recall if they trained you on the Title IX

18  Manual that you said AcadeMir has?

19    A     No, I can't recall.

20    Q     Have you ever received training on that Title IX

21  Manual specifically?

22    A     What do you mean by "training"?

23    Q     Well, do you understand what the term "training"

24  means?

25    A     Uh-huh.

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

 1      Q    All right.  And what do you understand the term

 2   "training" to mean?

 3      A    I mean, we get the Manual.  Obviously, we're supposed

 4   to read it, you know.  If we have questions, of course, we can

 5   ask.  It gets updated.  I mean, honestly, the training is

 6   always through ADP, the actual official training.

 7      Q    What I'm asking you is:  Have you ever received

 8   training on the AcadeMir Title IX Manual that you described?

 9      A    I just don't understand what we're trained on.  It's

10   reading a manual.

11      Q    You don't understand what you would receive training

12   on in regards to the Title IX Manual at the school?

13      A    Right.  We get a lot of manuals.  I get a new Parent

14   Handbook every year.  I don't receive training on that item.

15   I'm expected to read it.

16      Q    Okay.  So then you have not received training on the

17   AcadeMir Title IX Manual, I'm guessing?

18          MS. KARRON:  Objection to form.

19      A    I mean, I don't recall.

20   BY MR. MACDONALD:

21      Q    What don't you recall?

22      A    I don't recall if there's an official training.  I

23   don't know.  I mean, it's given to us.  It's discussed.  I

24   don't know what you would consider an official training.  You

25   know, obviously, we're told who we report to, you know.  I

```
 1   guess that could be considered a training.

 2        Q    Well, you previously mentioned ADP training, right?

 3        A    ADP does, yes.

 4        Q    And you understood training in that context, right?

 5        A    That's different, though.  There's a bunch of videos

 6   and scenarios we have to watch.

 7        Q    Okay.  Has anyone ever given you a presentation on

 8   AcadeMir's Title IX Manual?

 9        A    I mean, I don't remember if there's an official

10   presentation on it, no, I don't remember.

11        Q    Okay.  Do you recall ever watching any videos about

12   the Title IX Manual?

13        A    About the manual itself, no.

14        Q    And you said you're given a copy.  When were you

15   given a copy of the Title IX Manual?

16        A    I don't know.  I think I answered that already.  I

17   don't remember.  At the beginning of the year we have a lot of

18   manuals, a lot of policies and procedures.  We're updating them

19   throughout the year.  I don't remember.

20        Q    Well, you said employees are given a copy of the

21   Title IX Manual, correct?

22        A    Right.  It's public domain.  I mean, I have a copy,

23   yes, and I'm an employee.

24        Q    Are employees all given a copy of the Title IX

25   Manual?
```

1      A    I mean, employees, I don't know.  All the employees

2  attend the training.  All employees are advised of, you know,

3  their rights.  I don't know.

4      Q    Okay.  Well, when a new employee starts at AcadeMir I

5  imagine they receive some information, right, on how to perform

6  their job?

7      A    Uh-huh.

8      Q    Is that right?

9      A    Well, there's an on-boarding process definitely.

10     Q    Okay.  And are new employees given copies of policies

11  or handbooks when they start?

12     A    Well, I don't know because they sign their contract

13  with our HR department and our HR department reviews all kinds

14  of rules and expectations.  I don't handle that in the

15  principal's office.  So I don't know what they're given when

16  they go to the HR.

17     Q    So then you don't know if new employees are given

18  copies of the Title IX Manual?

19     A    I don't know.

20     Q    Do you know where the Title IX Manual is stored if an

21  employee wants to review it?

22     A    I have a copy here in my binder.

23     Q    Is it stored anywhere else?

24     A    I don't know.  I'm not sure.

25     Q    How are new employees aware of the policies and

```
 1   procedures in the Title IX Manual if you're not sure if they

 2   get a copy of it?

 3        A    Well, in the harassment training with ADP it talks

 4   about different scenarios and to report and all your rights so

 5   they definitely know that they exist, you know.  In opening of

 6   schools we discuss all kinds of reporting.

 7        Q    But how do employees learn the Title IX policies that

 8   are in that manual?

 9        A    I don't know.  Like I said, in opening schools we

10   discuss all types of reporting.  This is just one of them.  We

11   discuss all types of reporting with the teachers so they're

12   aware, and, like I said, when they sit with HR and they go over

13   all of everything, if you will.  I don't know all the manuals

14   that are given to them.  I don't know everything that is

15   discussed with them.

16        Q    Okay.  What about for students, how do students know

17   the policies and procedures contained in that Title IX Manual?

18        A    I don't know.  I know that for kids we're constantly

19   talking about it, I guess, more because of Marjory Stoneman

20   Douglas than anything else.  We're constantly advertising, if

21   you see something, say something; if you hear something, say

22   something, you know, reporting, you know, trying to do early

23   intervention, all of those types of things.  So it would apply

24   to any type of reporting.  So kids, students, are very well

25   aware that they report anything to a teacher, to a staff
```

1    member.

2         Q    But not speaking generally; I'm asking you

3    specifically about Title IX manual.  How do students learn

4    about those policies and procedures?

5         A    I don't know.  I don't know.

6         Q    Well, you said in that manual it states who the

7    students should go to for Title IX complaints; is that right?

8         A    Well, it also states -- yes, but it also states who I

9    go to if it's a student or a parent filing a Title IX

10   complaint, who I report it to.

11        Q    Right, but it says who a student or parent should go

12   to for a Title IX complaint, right?

13        A    I mean, on our website we also have our conflict

14   resolution person, so parents are very well aware of who they

15   can contact if there's a formal complaint of any kind.

16        Q    But I'm asking you specifically, that manual states

17   who a student or parent can go to for a Title IX complaint; is

18   that right?  That's what you testified to earlier.

19        A    The manual is long.  I'd have to re-read the whole

20   thing.  I don't want to be under oath and state something that

21   I'm not certain with.  But it talks about who you can report

22   to, sure.

23        Q    Okay.  And so how does a student know who to report

24   to?

25             MS. KARRON:  You've asked her five times and she's

```
 1         answered that she doesn't know.

 2              MR. MACDONALD:  She has not answered.

 3              MS. KARRON:  We can read it back if you want.

 4              MR. MACDONALD:  Your objection is noted.

 5    BY MR. MACDONALD:

 6         Q    How do students know who to report to for Title IX

 7    purposes?

 8              MS. KARRON:  You can just certify the question and

 9         move on.

10              MR. MACDONALD:  Certify what aspect of the question,

11         Julie?

12              MS. KARRON:  You've already asked her the question.

13         She's testified repeatedly that she doesn't know what

14         specifically you're asking.  I mean, I'm not trying to

15         speak on your record, but she said she doesn't know.

16    BY MR. MACDONALD:

17         Q    Let me rephrase the question.  How does a new student

18    at AcadeMir learn of the rights under Title IX?

19         A    I don't know.  I know that in our handbook we have an

20    anti-discrimination policy and all parents have a copy of that,

21    so do students.

22         Q    Now, that Title IX Manual you mentioned, you said

23    it's kept in your office in a binder; is that right?

24         A    The actual AcadeMir Manual, yes.

25         Q    Are there any other policies in that specific binder?
```

```
 1        A     Yes.

 2        Q     And what other policies are contained in that binder?

 3        A     There's a lot.  Off the top of my head, Employee

 4  Handbook, Parent-Student Handbook, Mental Health Plan, School

 5  Improvement Plan.  There's a lot.

 6        Q     Okay.  And besides that location in your office in

 7  the binder, where else can that Title IX Manual be found that

 8  you're aware of?

 9        A     I don't know.

10        Q     Do you know if other AcadeMir principals also have a

11  copy of that manual?

12        A     Everybody should have a copy, yes.

13        Q     But do you know for a fact that other principals at

14  AcadeMir have that manual?

15        A     We all get a copy so I would assume.  I don't sit in

16  their office.

17        Q     And you said "we all receive a copy"; is that right?

18        A     Yes.  Sorry.

19        Q     And when did you receive your copy?

20        A     I already said it earlier, I don't remember.

21        Q     How do you know you were given a copy of a Title IX

22  Manual if you don't know --

23        A     Because it's in my binder.  Because it's in my

24  binder.

25        Q     But you know for a fact you were given that manual?
```

```
 1        A     Correct.

 2        Q     Do you know for a fact who gave you a copy of that

 3   manual?

 4        A     Olivia Bernal gave me a copy of the manual.

 5        Q     And when was that?

 6        A     I don't remember.

 7        Q     Now, outside of Title IX, does AcadeMir have any

 8   policies relating to sexual harassment generally or sex

 9   discrimination generally?

10        A     I mean, that's all part of the ADP training because

11   it goes over various types of harassment, so, yeah.

12        Q     Okay.  And do employees receive any training related

13   to sexual harassment or discrimination outside of that ADP

14   training that you're aware of?

15        A     No, they do not, or at least not that I'm aware of.

16        Q     Do employees of AcadeMir receive any training related

17   to child abuse or things of that nature that you're aware of?

18        A     I mean, everybody learns that in your schooling to

19   become a teacher.  And, of course, when we go over reporting at

20   the beginning of the school year, that's just one of the

21   reports we discuss.  We discuss a lot of different -- there's a

22   lot of reports, that's just one of them.

23        Q     You said that's discussed in a meeting that covers

24   reporting?

25        A     Yeah, in the opening of schools we discuss a lot of
```

```
 1   different areas of school, day-to-day operations, if you will.

 2   It's part of our on-boarding.  One of the areas we discuss is

 3   all the type of reporting.

 4        Q    And when you say "opening of schools" do you mean

 5   like the start of a school year or opening --

 6        A    Yes, the start of the school year.

 7        Q    And who has to attend that meeting at the beginning

 8   of the school year?

 9        A    The faculty, staff members of the school.

10        Q    And that's a mandatory meeting?

11        A    Correct.

12        Q    And what month does that take place in?

13        A    August.

14        Q    And who conducts that meeting?

15        A    I do.

16        Q    And where is that meeting held specifically?

17        A    It depends.  Every year it can change.  It can be in

18   the school.  It can offsite.  It depends.

19        Q    Where was the last meeting held in August?

20        A    August of 2023?

21        Q    Yes.  In August of 2023 where was that meeting held?

22        A    It was held at Miami-Dade College Kendall campus.

23        Q    And is there a name for this meeting where the

24   reporting is discussed?

25        A    It's opening of schools.
```

Deposition of Susie Bello                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    Q    And what kind of reporting was discussed in the last

2    meeting in August 2023?

3    A    We talk about our incident and accident reports.  We

4    talk about our concussion reports.  We talk about, of course,

5    you know, being a mandatory reporter of DCF.  We discuss -- I'm

6    trying to remember.  Just all kinds of reporting.  That's what

7    I can remember off the top of my head.

8    Q    What is covered in regards to the Department of

9    Children and Families in that meeting?

10   A    Mandatory reporting.  If you suspect abuse, neglect,

11   or abandonment of a child, you have the responsibility to call

12   DCF and report it.

13   Q    And in that meeting Title IX is not covered, correct?

14   A    I mean, I do tell them that they're going to have to

15   do the harassment training with ADP, kind of remind them it's

16   online on the portal and they have to complete it, of course,

17   and, you know, provide a certificate before the start of

18   school.

19   Q    Outside of that is there anything in regards to Title

20   IX referenced in that meeting?

21   A    I don't remember the specific things.  We talk about

22   all kinds of harassment.

23   Q    And when you conducted that meeting did you use like

24   a PowerPoint or anything like that?

25   A    It's an all-day thing.  Parts of it are PowerPoint;

1    parts of it is us talking; parts of it is us going through a

2    binder that they also get for all kinds of things.  Part of it

3    is us discussing lessons plans.  It's a whole day.  It's like

4    our welcome back, welcome opening of school meeting.  So not

5    everything is attached to a PowerPoint, but part of it is.

6         Q    Let's say for the DCF aspect of the training, is that

7    a PowerPoint?

8         A    No.

9         Q    Is that part just verbal?

10        A    Huh?

11        Q    Is that aspect of the training verbal?

12        A    Yes.

13        Q    And then reminding the employees about the ADP

14   training, is that in a PowerPoint?

15        A    No, that's also verbal.

16             MR. MACDONALD:  If we can go ahead and go off the

17        record.  We can take like a ten-minute break.  So we'll

18        return at 10:35.

19             (A recess was taken.)

20   BY MR. MACDONALD:

21        Q    Okay.  Now, would you say you're familiar with

22   AcadeMir's Title IX policies and procedures?

23        A    Yes, to an extent, uh-huh.

24        Q    So once an employee of AcadeMir receives a Title IX

25   complaint from a student, what is the first step?

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 51 of 143

Deposition of Susie Bello                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1       A    Well, I wouldn't necessarily say this is a Title IX

 2   complaint.  Any complaint from a student.  It depends.  These

 3   are small children.  They're complain about a plethora of

 4   things.  Teachers handle a lot of scenarios, obviously, in the

 5   classroom.  If it's, I guess, a more serious, if you will,

 6   whatever, that's defined as complaint, or I don't know if

 7   complaint is the right word, but whatever, they would, of

 8   course, escalate it to an administrator.

 9       Q    And what kind of complaint would you understand to be

10   a Title IX complaint?

11       A    I mean, anything that would deal with harassment or,

12   you know, I guess, I don't know if racism is the right word.

13   Anything that would keep a student -- like prevent a student

14   from being able to partake in the class or if the child felt,

15   you know, if the child -- you know, something like that.

16       Q    So if I understand you correctly, you believe a

17   complaint qualifies as a Title IX complaint if it prohibits a

18   student from being able to use an educational opportunity?

19       A    No.  I mean, I don't know.  I know you're really

20   wanting me to define what a Title IX complaint is versus

21   another complaint.  I handle all complaints equally, fairly, so

22   whether it's whatever type of complaint.  If a child -- you

23   know, I have children that come to us sometimes to tell us that

24   they don't feel safe going home.  That's a different type of

25   complaint.  So, I mean, I don't say specifically a Title IX
```

1  complaint.  Any complaint I would handle accordingly, whether

2  it was safety, harassment, bullying, anything like that.

3       Q    Well, then how do you know whether the Title IX

4  policies and procedures should be used for AcadeMir versus

5  other policies and procedures?

6       A    Well, for the students we follow the guidelines of

7  Miami-Dade County Public Schools.  Their manual is posted

8  online, public domain.  We obviously have a different reporting

9  way.  I don't report necessarily to their Office of Civil

10 Rights; I would report it to my office as I stated earlier.

11 So, I mean, that's public domain that any parent, student,

12 teacher could get.  And then if it would fall under civil

13 rights, I guess, is what I should say, that would be considered

14 to me as Title IX.

15      Q    What do you mean "if it falls under civil rights"?

16      A    Like if somebody is being like -- I don't know the

17 right word to use, but, basically, if it has to do with your

18 sex or gender, perhaps, the race, things like that, if it's,

19 you know, anything to do with, whether it's athletics or

20 anything to do with that, that they're being impeded I guess

21 from participating or from, you know, just due to their sex,

22 gender, things like that, I would say that that would be under

23 Title IX.

24      Q    And just to be clear, you're not looking at anything

25 on your screen when you gave me that last response, right?

1    A    No.  I'm trying to find like the words.

2    Q    And you don't have any computer programs open on your

3  computer besides Zoom?

4    A    I mean, behind you, obviously, my Google was open

5  when we started because I had to get the link to join.  I can

6  do a full screen.

7    Q    But now do you have any other programs open on your

8  computer?

9    A    No.  No.  No.  I still have the Google behind you.

10   Q    The Google what?

11   A    Like my gmail.  I can only see a part of it.  I

12 really can't see it because your Zoom is like this big.

13 (Witness indicating.)

14   Q    That's your gmail inbox that you have opened?

15   A    Correct, because I had to go to the link.  I had to

16 find the password to get in.

17   Q    Would you mind closing that gmail so the only thing

18 that's open is your Zoom?

19   A    Sure.  Hold on.  Now that I closed out a bunch of

20 stuff that was behind that that I couldn't see now it's not

21 there.  Okay.

22   Q    So then once an AcadeMir employee receives a Title IX

23 complaint what is the first step that they must take?

24   A    Well, any complaint gets handled on a case-by-case

25 basis.  If the parent files an official, or the student files

1    an official Title IX complaint, then, of course, they would

2    come to me or they could go straight to HR or ADP or Ms. Bernal

3    if they want.

4         Q    What is an official Title IX complaint?

5         A    I mean, there's like a complaint form that they can

6    fill out or they can just -- you know, it depends on the

7    allegation, honestly.  It depends on a kid saying so-and-so ate

8    my cookie, that's a complaint, but that's going to be handled a

9    different way than a child telling me I don't feel safe to go

10   home today.

11        Q    But when an employee receives a complaint that they

12   believe to fall under Title IX, what is the first step they

13   must take?

14        A    Well, if they feel, and I tell this to teachers at

15   the beginning of the school year, if you ever feel the child is

16   being abused, neglected, or abandoned, you don't have to tell

17   me.  You have mandatory reporting.  You call DCF.  So that is

18   not something you need to ask me for permission to do.  They

19   can do it on their own.  If it's something else, depending on,

20   like I said, like depending on how trivial or whatever, or

21   severe I guess the complaint is, if it's something minute,

22   teachers are handling stuff all day long in the classroom with

23   students, I'm sure you can imagine.  So, I mean, some things

24   get handled in the classroom, some things get escalated.  It

25   really depends on what is said and what is alleged.

```
1        Q    In what circumstances would the Title IX policies and

2    procedures for AcadeMir come into play with a complaint?

3        A    I mean, I don't know.  Like I said, if they file an

4    actual complaint, of course, we would escalate it.  If an

5    employee comes in and files an actual complaint, a harassment

6    complaint against another employee, I'm going to call Xenia,

7    you know, we're going to consult with ADP.  If it's a student

8    or a parent similar, then, of course, I would involve Ms.

9    Bernal if there was, you know, an official complaint with like,

10   I guess, an intent to, if you will, or something like that.

11   Honestly, we handle investigations here at the school.  So it

12   depends also on the findings of the investigation.  It's hard

13   for me to give you a broad example because it's really on a

14   case-by-case basis.

15       Q    You mentioned a Title IX form; is that right?

16       A    Yes.

17       Q    When is that form utilized specifically for students

18   at AcadeMir?

19       A    I've never received one until this day.

20       Q    And how long has that form existed for at AcadeMir?

21       A    Again, the students and parents fall under the

22   Miami-Dade Public School umbrella so that form is public domain

23   on the website.  That's been around since I was a teacher.  And

24   so, I mean, anybody can have access to it.

25       Q    Okay.  Once an employee does receive a formal Title
```

1    IX complaint like you mentioned, what is the first step there?

2        A    It would come to me.  But, again, I still have yet to

3    see a formal Title IX complaint.

4        Q    And what are you required to do once you receive that

5    formal complaint?

6        A    If it's an employee, I send it to Xenia.  If it's a

7    student or parent, I send it to Ms. Bernal.

8        Q    Okay.  And if it's a student you send it to

9    Ms. Bernal.  Does Ms. Bernal take over from that point or do

10   you have the --

11       A    Right.  She would take over just like Xenia takes

12   over.

13       Q    And then at that point who's responsible for

14   conducting an investigation?

15       A    Well, either of these two.

16       Q    So in the case of a student, would that be

17   Ms. Bernal?

18       A    Correct.

19       Q    Now, I understand you said there has never been a

20   formal Title IX complaint that you received.  Have you ever

21   received any type of Title IX complaint while you've been an

22   employee of AcadeMir?

23       A    I mean, it's been a long time.  I mean, there was an

24   alteration once like with two teachers when I was an assistant

25   principal.  They had a disagreement about something and they

1    came to report it to me.  I don't know if that's considered

2    Title IX or not.  They came to report it to me.  They had a

3    disagreement during dismissal.  I reported it then, of course,

4    to my principal at the time and they handled it from there.  I

5    don't know if that's considered -- I don't know.

6         Q    Have you ever received --

7         A    If a parent had sort of a concern about a teacher,

8    but it's not necessarily a Title IX.  There's just a lot of

9    different type of concerns.  Go ahead, I'm sorry.

10        Q    Have you ever received any student complaints

11   regarding Title IX?

12        A    No, not Title IX specifically.  For instance, safety

13   complaints, but I wouldn't say necessarily Title IX.

14        Q    So you've never had to utilize the AcadeMir's Title

15   IX policies and priors then?

16        A    Correct.

17        Q    And you've also never had to refer to anything to

18   Ms. Bernal as part of that Title IX policies and procedures

19   then?

20        A    Well, I mean, like the official complaint form, no.

21        Q    Are there other kinds of Title IX complaints that

22   you've received and given to Ms. Bernal?

23        A    No.

24        Q    Have you ever received any complaints of sexual

25   harassment generally in your time at AcadeMir?

1      A    From an employee or from a student?

2      Q    Student.  From a student.

3      A    No.  Again, safety concerns that sometimes might be

4  sexual in nature, but not an actual sexual harassment, no.

5      Q    I'd like to show you a document.  I'm going to share

6  my screen with you.  There's several pages to it, but I'll just

7  give you an opportunity to look at the first page here at

8  least.  Just let me know when you've had a chance to look at

9  it.

10         (Whereupon, Plaintiff's Exhibit 1 was marked for

11     identification.)

12     A    Yes, I see it.

13  BY MR. MACDONALD:

14     Q    Do you recognize this document?

15     A    Yes, that's our manual, uh-huh.

16     Q    And just to be clear, you don't recall when this

17  specific Title IX Manual came into effect, correct?

18     A    That's correct.

19     Q    And based on looking at this document, is this the

20  same one that's contained in the binder in your office

21  regarding Title IX?

22     A    Yes, I believe so, yes.

23     Q    Now, there's an online complaint form referenced in

24  this document.  Do you see that?

25     A    Uh-huh.  Yeah, online complaint form.

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1        Q    Do you know what that's referring to?

 2        A    The complaint form.  If you want to file a Title IX

 3   complaint.  I'm going to look this way because you guys are

 4   here and the documents are here.  I just want to state that

 5   because I know you keep asking me about it.

 6        Q    And where can that online complaint form be found?

 7        A    I would assume it's on the website.

 8        Q    Have you seen that form before?

 9        A    Yeah, it's part of the manual, but, I mean, I have

10   never had to go online myself to try to find it.

11        Q    And do you know who receives those responses to that

12   online form?

13        A    No.  I could assume the Title IX coordinator, but I

14   don't know.

15        Q    Now, I know you also mentioned Miami-Dade County

16   Title IX policies; is that right?

17        A    Correct.

18        Q    Are AcadeMir employees required to follow this manual

19   or the Miami-Dade County Title IX Manual?

20        A    No, our employees follow this manual.

21        Q    Do AcadeMir employees utilize the Miami-Dade Title IX

22   Manual at all?

23        A    I mean, I don't know.  Like I said, it's public

24   domain.  You're allowed to look at it, you know.  A lot of

25   policies, procedures fall under, whether it be the state or the
```

```
 1   district since we are a public charter.

 2        Q    But are AcadeMir employees required to follow the

 3   Miami-Dade Title IX Manual?

 4        A    No, just because it has a different person that you

 5   report to.

 6        Q    Are you familiar with my client, Jane?

 7        A    Yes.

 8        Q    And how long -- or, sorry.  Was she enrolled as a

 9   student at AcadeMir?

10        A    Was she enrolled?

11        Q    As a student at AcadeMir?

12        A    Yes.

13        Q    And when did she start her enrollment at AcadeMir?

14        A    I don't know exactly when she started.  I know she

15   was there for pre-K-4, and she was there for a part of

16   kindergarten.  I don't know if she started before.  In regards

17   to kindergarten, she was enrolled from the first day of school

18   until the day she was withdrawn.

19        Q    And did she have any disciplinary issues during her

20   enrollment?

21        A    Disciplinary, no.

22        Q    Any behavioral issues during her enrollment?

23        A    Yeah.  She was -- she was kind of sensitive.  She

24   cried whenever she had to do something that she didn't want to

25   do or didn't get her way or like a transition.  A lot of times
```

 1   she would have like an outburst or a tantrum, if you will,

 2   about it.  Something as simple as changing activities, to like

 3   a tear in her tights, in her leggings, whatever, she would

 4   start screaming.  The teacher would have to, of course, calm

 5   her down.  I believe it wasn't an every day thing or anything

 6   like that, but she was known to be a little bit emotional,

 7   sensitive.

 8        Q    How do you know that?

 9        A    Because I do -- obviously, I do walk-throughs.  I do

10   data chats with my teachers.  I speak with the counselor.  I

11   speak with the assistant principal.  I mean, I also walk the

12   buildings.  I know the kids.  I see the kids.  I'm constantly,

13   I guess, just out and about.  Through conversations, you know.

14        Q    Who told you that Jane was sensitive in the manner

15   that you described?

16        A    Her teacher.  Her kindergarten teacher.

17        Q    What was her teacher's name?

18        A    Ms. Chaudry.

19        Q    When was the first time Ms. Chaudry told you that?

20        A    I don't remember, but her VPK teacher from the year

21   prior was Ms. Gomez and she would also sometimes talk about

22   like something as simple as when her dad would pick her up from

23   aftercare, she would run and hide and cry, like I don't want to

24   go with him, I don't want to go with him, like things like

25   that.  It was, you know, it was kind of like she just didn't

 1    want to go home.  And Ms. Chaudry I know at one point had a

 2    parent-teacher conference, I don't know the date, with the

 3    parents about that, about her emotions.

 4         Q     And how many times did those issues come up in

 5    conversation with Ms. Chaudry or Ms. Gomez?

 6         A     With me personally, just a few times.  I mean, there

 7    wouldn't be a scenario where I would ask a teacher every single

 8    day about all their kids.

 9         Q     But it was several times that it came up?

10         A     A few times.

11         Q     And were these conversations that you had in person

12    with Ms. Chaudry?

13         A     I mean, most, yeah, I would say probably.

14         Q     And when was the first time Ms. Chaudry told you

15    that, if you recall?

16         A     No, I don't.  I don't recall.

17         Q     Do you recall what prompted Ms. Chaudry to bring that

18    up?

19         A     No.  I don't know if it was maybe the first day where

20    we talk about the kids, you know, things like that.  And, of

21    course, I'm always offering support to the teachers if they

22    need.  I don't remember why.

23         Q     Do you recall what had occurred specifically that

24    gave rise to the first incident where Ms. Chaudry told you

25    about this?

Deposition of Susie Bello                              Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1      A     No, I don't.  I don't know if it was because of an

 2   academic.  I don't remember, honestly, no.

 3      Q     And then you said Ms. Gomez, she was a teacher as

 4   well at AcadeMir?

 5      A     Yeah.  When ████ was -- I'm sorry, Jane.  When Jane

 6   was in VPK Ms. Gomez was her teacher.  She's now a kindergarten

 7   teacher but back then she was a VPK teacher.

 8      Q     And did Ms. Gomez tell you issues similar to what you

 9   described about Jane as well?

10      A     No.  Ms. Gomez was the one that shared about the, you

11   know, the whole crying when she didn't want to go home with her

12   dad, she wanted her mom to pick her up, things like that.  And

13   I would share it after.  Ms. Chaudry shared it first, which

14   then prompted us to ask Ms. Gomez did you ever experience

15   something similar, and she said, oh, yes, sometimes.  She has a

16   difficult time with something she doesn't want to do.

17      Q     And you said "prompted us."  Was that with someone

18   else?

19      A     Ms. Valladares, my assistant principal.

20      Q     Now, you mentioned a few examples, I believe, of

21   incidents with Jane.  What were those again?  Something with

22   tights or something?

23      A     I remember one day in class, I can't remember,

24   honestly, she got very upset about -- I don't remember if it

25   had something to do with like one of her supplies or change in
```

1   the activity or something like that that she started crying a

2   lot.  Another day it was like something -- I don't remember if

3   it was in the hallway.  Something happened that her tights or

4   leggings had like a tiny tear or something, I don't know.  She

5   had a complete outburst and a tantrum about it.  The teacher

6   had to calm her down, it's okay.  Those are the only ones I can

7   think of right now off the top of my head.

8        Q    And this would have been when Jane was in

9   kindergarten; is that right?

10       A    Correct.

11       Q    When you learned of those incidents what prompted you

12   to speak with Ms. Gomez?

13       A    I can't remember right now if it was myself or

14   Ms. Valladares who spoke to Ms. Gomez.  I think it was both of

15   us.  I'm almost certain it was both of us.  It was a while ago.

16   Just because since Ms. Chaudry was explaining that it was

17   happening and that she was going to meet with the parents about

18   her emotions, you know, like to try to figure out more of like

19   a baseline behavior of the child.  So I just asked Ms. Gomez if

20   she experienced -- it was either me or both of us, I can't

21   remember, but one of us spoke to her or both of us.  And then

22   we talked about it after.  She said that she had some like

23   usual -- the beginning of the school year she was kind of, I

24   guess, crying to go inside to class, but she acclimated.  That

25   was one of specific things she could remember about, like when

1   the dad would pick her up she would tell him, no, I want my

2   mom, I don't want you.  It's just like another scenario of like

3   her kind of struggling when it's not something she wants

4   personally.

5        Q    What do you mean "struggling when it's not something

6   she wants"?

7        A    Because I guess she wanted her mom to pick her up

8   instead of her dad.

9        Q    Did she say that?

10       A    No.  No.  No.  We were just talking about like she

11   would tell the dad, no, I don't want you, I want my mom,

12   whatever, in Spanish.

13       Q    And you said this was in the beginning of the school

14   year?

15       A    No, that was in VPK, in kindergarten.  I don't know

16   if that ever happened in aftercare.  She did attend aftercare.

17   I do know that she had some tantrums like within the school

18   setting, whether it was in the classroom, things like that.

19       Q    And when you learned of this, was this abnormal for a

20   kindergartner?

21       A    I think the beginning of the year, as per any

22   student, especially for a young child, can be full of emotions,

23   however, I don't think it should continue through the year.

24   Eventually, children calm down, become acclimated.  It's not

25   like it was a new building for her.  It was the same building.

1   She continued to have tantrums when she had do to something she

2   didn't want to do, moving on from an assignment, whatever, like

3   I said.  I know that Ms. Chaudry would have to kind of like

4   approach her, calm her down, have a conversation with her.  It

5   would take some effort, but then she would, she would calm

6   down.  So I think that is normal to start here like that, not

7   necessarily normal to continue throughout the year like that.

8        Q    And did you ever refer Jane to a guidance counselor

9   or anything like that?

10       A    I did.

11       Q    When did you refer her to the guidance counselor?

12       A    On Tuesday, the Tuesday after the holiday.  I don't

13  remember the day, off the top of my head.  It was in January.

14       Q    At what holiday?

15       A    We had a teacher planning day on that one day.

16  January, and it was a Monday, so probably Martin Luther King.

17  We had a teacher planning day that Monday.  That Tuesday I did

18  refer the counselor to see Jane.

19       Q    And how did you refer her?  Was that an email?

20       A    No.  I told the counselor to go to the PLC building

21  and go speak to ██████.

22       Q    And what did you tell the counselor that that issue

23  was about?

24       A    That issue was about the father's new allegations.

25  So I explained to the counselor what had happened on Friday,

1   what had been reported, how ███████ had told the other staff

2   members, but now the dad is coming in with a new story, so

3   therefore, I told her you need to go speak to, obviously, both

4   students, but definitely to Jane, you know, talk to her and see

5   what she tells you, you know.

6        Q    So we can go back to that later on.  Sorry, if I

7   wasn't clear.  Did you ever refer Jane to a guidance counselor

8   for these issues regarding the sensitivity that you described?

9        A    I did not.

10       Q    Did you take any kind of action in response to those

11  issues relating to the sensitivity?

12       A    No, because I always asked my assistant principal,

13  Ms. Valladares or Ms. Chaudry or whoever.  When I talk to -- I

14  have over 700 students.  I don't talk about every single

15  student every single day but if it ever came up I would ask,

16  you know, how it was handled, how did it go, and there was

17  always a positive outcome, you know.  I asked, of course, if

18  they informed the parents so parents are aware.  They said yes.

19  So, no, not for me.

20       Q    And do you know if Ms. Chaudry or Ms. Valladares did

21  anything in response to these issues relating to the

22  sensitivity?

23       A    I know that they spoke to her often.  How or what

24  they said, I don't.

25       Q    And they notified Jane's parents of these issues?

1      A    I know that, yes, Ms. Chaudry definitely did because

2    I know that she had a conference with them about, you know,

3    emotions, if you will.

4      Q    And do you know when that conference took place?

5      A    No, I don't remember.

6      Q    Would there be a record of that conference between

7    Ms. Chaudry and the parents?

8      A    We have a Parent-Teacher Conference Form that

9    teachers fill out when they have them, but do we keep them from

10   year to year, no.

11     Q    Would Ms. Chaudry have been required to fill that

12   form out?

13     A    Any conference they should fill out the form.

14     Q    Do you know if AcadeMir has a Parent-Teacher

15   Conference Form for that specific meeting?

16     A    No, I do not.

17     Q    Were any of those issues relating to the sensitivity

18   that you described documented?

19     A    I don't know.

20     Q    Are behavioral issues like that required to be

21   documented?

22     A    No.  If a counselor speaks to a child, it is

23   documented.  So like that Tuesday that the counselor did talk

24   to her, that is documented.

25     Q    But not the issues relating to the sensitivity or

1   crying that you described?

2        A    I mean, like I said, if the counselor was asked to

3   speak with her, it would have been documented, but, I mean, a

4   teacher just writing down sensitivity, no, that's not a

5   requirement, unless the child is on a behavioral plan and we're

6   tracking data, which she was not.

7        Q    Would there be any record of the conversations

8   between you and Ms. Valladares or Ms. Chaudry pertaining to

9   this issue?

10       A    No.

11       Q    And you said that had to do with -- those issues had

12  to do with changes that Jane would be dealing with or had going

13  on?

14       A    I'm not the classroom teacher so she would be the

15  best to ask, however, from what I gathered, it was pretty much

16  when she had to do something she didn't want to do or changes.

17       Q    And you said changes as well?

18       A    Yeah.  I don't know.  I mean, it was just like she

19  was -- she still had tantrums, basically, when something didn't

20  go her way, she didn't like something, you know.

21       Q    And these issues weren't documented in Jane's student

22  files either?

23       A    No.  As I said, if the teachers have conferences,

24  they do fill out a conference form, the parents do sign,

25  however, those do not get kept from year to year to year, no.

1    Q    The Parent-Teacher Conference Forms aren't kept after

2  the end of the school year?

3    A    Correct.

4    Q    And why is that?

5    A    We don't have space.  The only thing we keep is

6  what's official, what goes on the record.  That goes in DSIS.

7  That goes into the student's folder.

8    Q    And before those records are destroyed where are they

9  kept, those forms?

10   A    In the teacher's classroom.

11   Q    Did Jane ever report sexual harassment during her

12  enrollment at AcadeMir?

13   A    No.  She reported a verbal comment that was made to

14  her.

15   Q    And what verbal comment did Jane report?

16   A    She reported that a boy told her that he wanted to

17  touch her tetitas and cuca.

18   Q    And I'm guessing those terms refer to her breasts and

19  then her vagina as well; is that right?

20   A    I mean, the tetitas are definitely the breasts.  The

21  other word I had honestly never heard of before, but I would

22  assume, yes, uh-huh.

23   Q    And what was the other word besides tetitas?

24   A    It was cuca or cuco, something like that.  I think it

25  was cuca, something like that.

```
 1        Q    And when did you first learn of that report?

 2        A    I learned about that on Friday, on January 20th,

 3   right?  Yeah, it was Friday, January 20th I heard about that

 4   after school.

 5        Q    And who told you?

 6        A    Ms. Valladares.

 7        Q    And where were you when she told you about this?

 8        A    I was in my office.

 9        Q    And what time of day was it, roughly?

10        A    I don't know.  It was after school.  The incident had

11   all occurred right before dismissal time.  So, then, of course,

12   dismissal occurred, and then, you know, we spoke.  She

13   explained to me what Jane stated.  I asked her to who.  She

14   told me to who.  I asked her what happened after.  She ran me

15   through the events.  I asked her what did Jane said.  She told

16   me again.  I asked her if her parents were notified.  She told

17   me that teacher spoke with the boy's parents, I believe, at

18   dismissal.  And the girl's parents, because the girl stays at

19   after care, they were being called to report what was stated.

20        Q    What did Ms. Valladares say in regard to how she

21   learned of this information?

22        A    So, basically, Jane told her PE teacher,

23   Ms. Mortazavi, oh, so-and-so said they want to touch the words

24   I used earlier.  Ms. Mortazavi spoke with her, you know, asked

25   her what happened.  She said, no, he said it to me.  Then
```

```
 1    Ms. Mortazavi tells Ms. Chaudry when Ms. Chaudry picks them up

 2    from PE.  This Ms. Chaudry, of course, asked -- I know she

 3    spoke with both students.  In the order which, I don't know,

 4    but she did speak with both students.  When she spoke with Jane

 5    she asked her what happened.  She told her again.  She asked

 6    her if she was okay.  She asked her something -- I mean, I'm

 7    rephrasing here because it was a long time ago.  Something

 8    along those lines.  She asked her if she was okay.  She asked

 9    her if he actually did indeed touch her.  She said no, he only

10    said it.  Ms. Mortazavi had already asked that as well.  And

11    then, of course, she told ████, you know, why would you say

12    that, or sorry, I don't know what his name is in this.  John, I

13    guess.  She's Jane and he's John.

14         Q    You can refer to him as L.R.

15         A    Okay.  L.R.  So she asked L.R., you know, why would

16    you say that, blah, blah, blah.  He explained to her those are

17    just words he heard at home and that he was sorry.  And then

18    when -- you know, then, of course, she talked to ████, all of

19    that.  I'm sorry, Jane.  And then she took her to the front

20    desk to call the mom.  The mom only speaks Spanish.  I think

21    the dad predominately only speaks Spanish as well.  So

22    Ms. Chaudry doesn't speak Spanish so she needed our front desk

23    office lady to -- she was standing next to her but she needed

24    to call the parents just because, you know.

25         She did get to speak to L.R.'s parents during dismissal,
```

```
 1   the mother.  And, of course, she was embarrassed and
 2   apologized.  She said, oh, yes, he's definitely heard that at
 3   home, I'm so sorry, blah, blah, blah, I'm going to talk to him,
 4   you know, whatever, blah, blah, blah.  She goes to Solay,
 5   (phonetic) "We've got to call Jane's parents to explain what
 6   happened."  Solay asked Jane again just in case Jane felt more
 7   comfortable saying in it in Spanish.  They speak fluent
 8   Spanish.  So she asked Jane again what happened.  Jane again
 9   repeated that he told her that.  Solay again asked was it said
10   to you, did anything happen.  And, again, she said, no, he only
11   said it, he didn't touch me.
12        So when Solay called, I want to say on Friday she spoke
13   with the mom.  When she called mom, yeah, it was mom, she told
14   her the incident and how it unfolded, how Jane said it.  She
15   was asked three different times if anything else occurred and
16   that Jane kept stating it was verbal only.  She doesn't use the
17   word verbal; she's a little girl.  But she kept stating, you
18   know, it was said to me.  And then the mom, I don't know how
19   the mom responded.  You know, I'm sure something like, you
20   know, okay.
21        But Jane that day stayed in aftercare.  And I think, I
22   don't know exactly off the top of my head, but, I mean, I think
23   she was picked up at her regular time which is usually around
24   five, 5:30 by the dad.  Ms. Valladares did call me and report
25   it to me.
```

Deposition of Susie Bello                          Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1      Q      Stepping back a little.  You said originally Jane

2   reported it to her PE teacher; is that right?

3      A      Correct.

4      Q      And what was that PE teacher's name again?

5      A      Ms. Mortazavi.

6      Q      And then after that Ms. Mortazavi reported what Jane

7   had said to Ms. Chaudry; is that right?

8      A      Correct, which is her kindergarten teacher.

9      Q      And then who notified Ms. Valladares of what had

10  occurred?

11     A      I don't know.  I would assume it would have been -- I

12  don't know.  I shouldn't assume anything.  I don't know.

13     Q      And when in the day was this conversation?  Was this

14  after, let's say aftercare, at 5 or 5:30 that you spoke to

15  Ms. Valladares?

16     A      No.  No.  No.  It was before that.

17     Q      Do you know approximately when you spoke to her?

18     A      No.  It was just sometime in the afternoon.  It all

19  happened very quickly.  She explained to me right before

20  dismissal, so, of course, they wanted to handle the incident.

21  You know, Ms. Chaudry wanted to handle the incident before the

22  students went home.  It was a Friday.  It was a long weekend.

23  And then dismissal happened.  But I definitely spoke to

24  Ms. Valladares before Jane was picked up.

25     Q      And what time is dismissal normally?

```
 1        A     For kindergarten dismissal is at 2:30.

 2        Q     Now, you also mentioned that the school spoke with

 3   L.R.'s parents; is that right?

 4        A     Uh-huh.

 5        Q     And you said that happened at dismissal; is that

 6   right?

 7        A     Ms. Chaudry spoke with mom at dismissal because he

 8   was parent pick-up, uh-huh.

 9        Q     And during that conversation Ms. Chaudry informed

10   L.R.'s mother of the reports by Jane regarding the conduct?

11        A     She reported what was stated to be said out loud,

12   yes.

13        Q     And you said that L.R.'s mom said that he's

14   definitely heard things like that at home?

15        A     Well, I don't know exactly what she said.  I don't

16   want to paraphrase anybody -- I don't want to like quote

17   anybody, excuse me, but, basically, he expressed to the teacher

18   that he's heard those words at home, and then the mom was, you

19   know, in agreement with it, and, you know, of course then

20   apologized and was embarrassed.

21        Q     L.R. also said he heard those words at home?

22        A     Huh?

23        Q     L.R. also said that he heard those words at home?

24        A     That's what L.R. reported to Chaudry, uh-huh.

25        Q     And did that conversation with L.R.'s parents occur
```

```
 1   before or after your conversation with Ms. Valladares?

 2        A    No, that conversation that Chaudry had with L.R.'s

 3   parents happened before my conversation with Valladares because

 4   it was right at dismissal.

 5        Q    What was your reaction when you learned of this from

 6   Ms. Valladares?

 7        A    My reaction was that it was, you know, inappropriate,

 8   but a lot of kids, especially when they're younger, they just

 9   say things they hear and they have no idea what they're even

10   saying.  So I did issue a disciplinary referral on L.R. for

11   stating inappropriate words because it definitely was

12   inappropriate.  I also spoke with L.R.'s mother.  I don't

13   remember if I spoke with her on Friday.  I'm trying to

14   remember.  I can't.  It was through the phone.  I can't

15   remember that.  But I did speak with her to let her know that,

16   you know, obviously it was inappropriate, that she had to, you

17   know, have a conversation with him about, you know,

18   appropriateness in school.  And I know sometimes children when

19   they're younger they blurt out words, they don't understand the

20   meaning, however, that that could never happen again.  He could

21   never say something like that again.  She understood.  And,

22   again, she apologized and all of that.

23        Q    You said that it was inappropriate what he had said,

24   right?

25        A    Yes.
```

```
 1        Q     Why was it inappropriate?

 2        A     Because the language is inappropriate.  You don't say

 3   those words in a school setting.

 4        Q     Now L.R. was in the same grade as Jane; is that

 5   right?

 6        A     Correct.

 7        Q     And that was kindergarten, correct?

 8        A     Correct.

 9        Q     And was L.R. five years old?

10        A     I mean, they're all five.  At what point they turn

11   six, I honestly don't remember.

12        Q     So five or six, give or take?

13        A     Correct.  Yeah, all the kindergartners are five.

14   They all turn six within the year or in the summer.  I don't

15   know -- I don't remember either one of their birthdays.

16        Q     Now, had L.R. ever had any disciplinary issues during

17   his enrollment?

18        A     No.

19        Q     Did L.R. ever have any behavioral issues during his

20   enrollment?

21        A     No, I mean, not really.  No, L.R. is still in the

22   school.  He has one disciplinary referral on his record and it

23   was from this one incident.

24        Q     So L.R. never had any issues that you're aware of

25   prior to this incident involving Jane; is that right?
```

```
 1        A    I mean, just like I know she was emotional, I know he

 2   was very excited.  He's a very excited kid.  He's very smart.

 3   He has no problem talking to people just like Jane had no

 4   problem talking to people.  If she ever had a thought in her

 5   head and she wanted somebody to know about it, she would make

 6   sure that they know about it.  She wasn't shy.  Just like he's

 7   not shy.

 8        Q    Was that your first time speaking to L.R.'s parents?

 9        A    Other than like the normal like good morning and

10   seeing them in orientation and things like that.  About an

11   actual issue, yes.

12        Q    What's L.R.'s mother's name?

13        A    I don't know.

14        Q    You don't know her name?

15        A    No.  I have to learn over 700 kids' names.  I

16   honestly do not learn the parents' names.

17        Q    And do you know L.R.'s father's name?

18        A    I honestly call them Mr. or Mrs. ███████  I don't

19   know their first names.

20        Q    Do you know what they do for work?

21        A    Mom?  Does mom work?  I'm not sure if mom works, to

22   be quite honest.  Dad is something in the law enforcement.

23        Q    And what does the father do in law enforcement?

24        A    I don't know.  Unless the parents come in for a

25   career day, you know, or something like that, I really don't
```

```
 1    know.  I don't know what they do, just like I don't know what

 2    Jane's parents did.  I don't know.

 3         Q    And you're not sure if L.R.'s mother worked?

 4         A    I'm not sure.

 5         Q    How do you know L.R.'s father works in law

 6    enforcement?

 7         A    I don't know.  A lot of things just get brought up in

 8    conversation.  L.R.'s sister is here.  She's older.  She's been

 9    with us longer than him.  Obviously she's older.  I don't know

10    how it came up.  Maybe -- I don't know.  I don't want to -- I

11    honestly don't know how it came up.

12         Q    And you said L.R. has a sister that goes to the

13    school?

14         A    Uh-huh.

15         Q    What grade is she in?

16         A    She's in third grade.

17         Q    Have you met L.R.'s mother and father personally?

18         A    Have I ever seen them personally, yes.

19         Q    Okay.  So you've spoken to both of them before,

20    correct?

21         A    I speak to all the parents, uh-huh.

22         Q    Do you know if L.R.'s father works for Miami-Dade

23    County Police?

24         A    No, I don't.  He's never talked to me about his job.

25    I've never spoken to him about his job.  I don't know.
```

Deposition of Susie Bello                            Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1        Q    And L.R.'s sister, what's her name?

 2        A    I mean, are we allowed to say that?

 3        Q    Yes, you are allowed to say that.

 4        A    ████████

 5        Q    What is it?

 6        A    ████████

 7        Q    Has ████ ever had any disciplinary issues?

 8        A    No.

 9        Q    And I'll refer her to E.R. to make things simpler and

10   protect her identity.  Has ██████ ever had any behavioral issues?

11        A    No.

12        Q    Did you inform L.R.'s parents about this lawsuit --

13        A    I have not talked to any of them about this,

14   absolutely not.

15        Q    And does L.R. have any other relatives that attend

16   the school?

17        A    I don't believe so, but Jane does.

18        Q    And what are you referring to?

19        A    Jane has cousins that are in my school.

20        Q    Does L.R. have any relatives that work for AcadeMir?

21        A    No.

22        Q    And do you know of any of L.R.'s relatives besides

23   his sister and his two parents?

24        A    No, I don't know.

25        Q    Okay.  Now, going back you said that you spoke with
```

1    L.R.'s parents on the telephone at one point; is that right?

2        A    I spoke with the mom.

3        Q    And that was a call that you placed to his mother?

4        A    Yeah.  It was either a call that I placed or my

5    secretary called for me and transferred the call, one of the

6    two, yeah.

7        Q    And do you know if that was made from your personal

8    phone or your work phone?

9        A    I don't make any work calls from my personal phone.

10       Q    And what exactly did you say when you spoke to L.R.'s

11   mother?

12       A    I think I already said that.  Basically.  What he

13   said, what the girl said he said, how it was inappropriate, she

14   needs to have the conversation with him about what he should

15   not be saying in the school setting, things like that.

16       Q    And what day did you say that phone call took place?

17       A    I don't remember.

18       Q    And this was a Friday when you initially learned of

19   the incident from Ms. Valladares; is that correct?

20       A    Correct.

21       Q    Did you speak to anyone after you learned of this

22   incident by Ms. Valladares?

23       A    That day?

24       Q    That day.

25       A    That day her and I spoke about it.

```
 1        Q     You didn't speak with anyone else that day about it?

 2        A     No.  I don't remember.  I don't think so.

 3        Q     You said that Jane's parents were notified that day,

 4   correct?

 5        A     Solay called them that day via phone, uh-huh.

 6        Q     And do you know what they said when Ms. Solay spoke

 7   with Jane's parents?

 8        A     No.  It's on the incident report.  I have it here.

 9   Do you want me to look at it?

10        Q     No.  I'd just like you to tell me from your

11   recollection, please.

12        A     Okay.  To the best of my recollection she told them

13   what happened.  She told them the same thing, that she repeated

14   it three times to, you know, three adults.  She kept saying it

15   was only said to her.  She spoke with mom.  That's all I can

16   honestly remember.  I wasn't part of the conversation.

17        Q     And those three adults, that would be Ms. Mortazavi,

18   Ms. Chaudry, and then would Ms. Solay be the third person?

19        A     That is correct, yes.

20        Q     When you learned of that complaint made by Jane did

21   you consider that to be a complaint of sexual harassment?

22        A     No.

23        Q     Why not?

24        A     Because it was a five-year-old or a six-year-old.

25   Like I told you, I don't remember his age.  It's a
```

```
 1   kindergartner who blurted out some words that he repeated.  He

 2   didn't understand.  There was no intent to do it.  The little

 3   girl herself confirmed multiple times that it was only said to

 4   her, that nothing was done.  And, honestly, children,

 5   especially small children, say the darndest things, they really

 6   do.  When the teacher spoke to the mom, the mom confirmed,

 7   yeah, that's something he probably would have heard at home,

 8   you know.  It's very normal for children that age to repeat

 9   things that they've heard without knowing what it really means.

10        Q     At any point did Jane report that L.R. had stated

11   that he wanted to perform those acts on her?

12        A     What she reported to the PE teacher was that he told

13   her that he wanted to touch her, uh-huh.

14        Q     That he wanted to touch her tetitas and then I think

15   cuca was the word?

16        A     Right, uh-huh.

17        Q     When you learned of that complaint by Jane did you

18   consider it to be a Title IX complaint?

19        A     No.

20        Q     Why not?

21        A     Because of what I just said, that there was no intent

22   to do it.  The little girl repeatedly said over and over that

23   it was verbally said to her.  The child was blurting out

24   something he heard.  I did not feel that that child knew what

25   he was saying.  The child also didn't have any type of pattern
```

Deposition of Susie Bello                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1   of behavior of saying these things to anybody in the past, much

 2   less her.  There was no intent to act upon it.  So, no, I did

 3   not.

 4        Q    You said there was no intent to act upon it?

 5        A    Yeah.  He didn't know what he was saying.  So, no, I

 6   don't.

 7        Q    How do you know there was no intent?

 8        A    I guess I don't.  I guess I don't, but as I

 9   mentioned, he never had a history of it, never had a history of

10   neither saying things to people nor touching people and he

11   right away was honest, admitted that he said it.  He wasn't

12   trying to deny it.  He told the teacher that he heard that at

13   home.  The mother stated that, yeah, he probably did.  And the

14   little girl told three different people that it was stated to

15   her only and that it wasn't done.

16        Q    Did Jane's complaint include any statements by L.R.

17   about him putting his mouth on any part of her body?

18        A    No, not to me.

19        Q    Are you aware of if the complaint included acts of

20   that nature to other employees?

21        A    No, I don't recall that ever being said.

22        Q    At any point were you concerned that L.R. may be

23   subjected to inappropriate material or acts that would lead him

24   to say something like that?

25        A    No.
```

1    Q    And why is that?

2    A    Because he never said it before.  He said it that one

3  time.  To this day he still hasn't said it again.  So, I mean,

4  no.

5    Q    In your experience as principal at AcadeMir, would

6  you say that it's normal for a five-year-old student to discuss

7  sex acts?

8    A    No.  What I believe is normal is that they blurt out

9  things that they hear without knowing what they're saying.

10  That is actually very normal for five-year-olds,

11  kindergartners, if you will, to blurt out whatever they hear.

12    Q    Do you believe it's normal for five-year-olds to

13  blurt out sex acts?

14    A    I don't believe that he thought of it as that.  I

15  just think that he heard it, he repeated it, and that was it.

16    Q    But regardless of whether he knew what he meant, is

17  it normal in your experience as principal for a five-year-old

18  to make comments about sex acts?

19         MS. KARRON:  Objection to form.  Asked and answered.

20  BY MR. MACDONALD:

21    Q    You can answer.

22    A    I already answered that question.

23    Q    Well, I can have the court reporter read it back, but

24  you didn't answer my question.  You said that it's normal for

25  kids to blurt things out, and I'm just asking you:  Regardless

1    of whether he knew what he was saying, in your experience as

2    principal is it normal for a five-year-old to make comments

3    that are of a sexual nature like that?

4            MS. KARRON:  Objection to form.

5       A    It depends on what you think sexual is because little

6    kids talk about their body parts all the time not realizing

7    that it's supposed to be private.  So, I mean, anything can be

8    construed as a sexual act, if you will.  He's just blurting out

9    something he heard at home.

10   BY MR. MACDONALD:

11      Q    Well, you'd agree that wanting to touch another

12   student's vagina is a sexual act, right?

13      A    Well, he never said that, but, yeah.

14      Q    Well, correct me if I'm wrong, didn't L.R. say he

15   wanted to touch her --

16      A    According to her, yes, he said he wanted to touch

17   that, but I don't even know that he knows that cuca meant

18   vagina, to be very honest.

19      Q    Well, regardless of whether he knew what it meant,

20   wouldn't you agree that that is describing a sexual act?

21      A    I mean, to an extent, sure.

22      Q    To what extent?

23            MS. KARRON:  Objection to form.

24      A    I don't know.  I mean, I think if a fifth grader says

25   that, sure, they know it's a sexual act, or even a middle

1   schooler.  I don't know about a kindergartner.  They don't have

2   that in their brain.

3   BY MR. MACDONALD:

4       Q    In your time working at AcadeMir have you ever had a

5   student, let's say at a similar age, five years old, report any

6   sexual material or allegations like this?

7       A    I mean, this specific example, no, but, I mean, other

8   things like they go to the bathroom and they want to show each

9   other their pee-pees because they don't know it's supposed to

10  be private, you know.  Like little kids do all kinds of things.

11  We're adults so we deem them as sexual.  Little kids don't deem

12  them like that.

13      Q    Was an investigation launched once you learned of

14  these allegations by Jane?

15      A    On Friday when it was reported since she kept

16  consistent with her story we informed both parents.  As I

17  mentioned, we wrote the incident report for Jane.  I wrote the

18  disciplinary referral for L.R.  And that was pretty much done

19  because she herself admitted three times it was only said.  On

20  Tuesday when the parents came in with a different story then,

21  yes, we did an investigation.

22      Q    Okay.  So up until Tuesday you did not feel the need

23  to launch an investigation?

24      A    There was no school Saturday, Sunday, or Monday, so,

25  no.

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 88 of 143

Deposition of Susie Bello                           Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1         Q    And on Friday you had no plans at that point of

 2    launching an investigation pertaining to those allegations?

 3         A    No, because she herself stated three times that it

 4    was said to her only.  He admitted to saying something.  He

 5    apologized.  We notified both parents.  As I mentioned multiple

 6    times, kindergartners sometimes blurt out strange things.

 7              MR. MACDONALD:  Okay.  We can go ahead and go off the

 8         record.

 9              (A recess was taken.)

10              MR. MACDONALD:  Back on the record.

11    BY MR. MACDONALD:

12         Q    Ms. Bello, before the break I was asking you some

13    questions regarding what happened after Jane's complaints.  Do

14    you recall that?

15         A    I was fixing the Zoom.  I believe we left off with

16    you telling me or asking me whatever about Friday, right?

17         Q    Well, do you recall me asking you questions about

18    what happened after Jane's complaint generally?

19         A    More or less, yeah.

20         Q    Now, you told me that at some point you referred Jane

21    to the school counselor; is that right?

22         A    Correct.

23         Q    And when did that happen?

24         A    On Tuesday.

25         Q    And what prompted that referral on Tuesday?
```

1     A    On Monday was teacher planning day, like I mentioned,

2   so there was no school.  So Tuesday -- the parents had

3   requested on Monday through, I guess, the messaging chat or

4   something, I don't know, they had requested to the teacher that

5   they wanted a parent-teacher conference.  So then on Tuesday

6   Ms. Chaudry and Ms. Valladares had a parent-teacher conference

7   with both mom and dad.  And in that parent-teacher conference

8   again they went over the story for Friday and they stated that

9   she was indeed touched.  Or that's what they felt, right?  We

10  don't know.  So that's what they felt.

11      So my staff explained to them -- I'm looking at you this

12  way now because now you moved to that part of my screen.  I

13  just want to make sure that we all understand that.  Okay.  So

14  my staff explained to them again what happened Friday, how she

15  told three different adults, all she kept saying was verbal

16  only and blah, blah, blah.  And the guy is like, no, over the

17  weekend, she told us, I don't know what day it was, but

18  basically over the weekend she told us that she was touched,

19  that it wasn't just said, it was touched.  So then -- and that

20  it was in the classroom.

21      So then, you know, they explained to the parents how on

22  Fridays it's testing day and the kids are there with dividers,

23  obviously, some separation for testing environment.  And, you

24  know all, of that stuff, how she was wearing jeans, all those

25  things.  So the dad said, no, you know -- I wasn't part of the

 1   meeting, but, basically, from what I can remember from what

 2   they told me the dad was demanding to see the video footage.

 3   And, of course, you know, my assistant principal had to tell

 4   them due to the privacy of other students we cannot do that,

 5   but that we would definitely view it ourselves.

 6        So my assistant principal explained to him that we would

 7   view the footage and, you know, that something like that, we'll

 8   review the footage and, of course, we'll investigate further.

 9   So the parents left.  They signed the incident report which is

10   our internal document that I was referring to earlier just

11   stating that an incident had occurred.  They left her in

12   school.  Jane was fine.

13        We had our literacy walk that week for our literacy week,

14   to promote literacy.  So every day we have a different theme

15   and she was dressed up in theme for, I don't know what the

16   event was that day, but she was dressed up in theme and she was

17   normal.  She was excited for the activities of the day.  We

18   did -- well, I wasn't there.  They did tell the dad that in

19   class the kids would be separated, you know, as an extra

20   precaution in case.  And then when the parents left, the little

21   girl stayed in school.  The parents left.  Then

22   Ms. Valladares called me to explain to me what happened with

23   the parent meeting.  And then I deployed my counselor to see

24   her because I told my counselor, okay, the father has changed

25   the story now so I need you to go talk to this little girl.

```
 1   She had to speak to the boy too because of his discipline.

 2        Q     And who was the counselor at that time?

 3        A     Stephanie Ruiz.

 4        Q     Was that the first time that Ms. Ruiz was informed of

 5   this incident?

 6        A     Yes, to the best of my recollection.  That's the

 7   first time I informed her was that Tuesday.

 8        Q     And how did you inform her?

 9        A     Verbally.  She was here in the building.  I called

10   her down.  I spoke to her.  I explained to her what happened on

11   Friday and how it had been reported to me, anyway, and what the

12   father was now claiming and that I needed her to go speak with

13   this little girl.  I needed her to try to confirm what

14   happened.

15        Q     And in regards to what Jane's father had reported,

16   when you say "physically" you mean that L.R. physically touched

17   Jane on her breast and her vagina based on what the father

18   reported?

19        A     I don't know if he used all those words.  I know he

20   said that it wasn't just said, she was actually touched.

21        Q     Do you know if he said if the touching involved her

22   genitals or not?

23        A     No, I don't know because I wasn't in the meeting.  I

24   just know that he said it was more than verbal, now it was, you

25   know, touched.
```

```
 1        Q    How many guidance counselors does AcadeMir have?

 2        A    My school has one.

 3        Q    And does Stephanie Ruiz still work at AcadeMir?

 4        A    No.  She's doing her -- something with the State of

 5   Florida.  I think it's her mental health licensure, something

 6   like that.  She's getting more certifications.  You have to be

 7   able to work a certain amount of hours doing that.  You can't

 8   hold a full time job while you're doing it.

 9        Q    When did Ms. Ruiz stop working for AcadeMir?

10        A    The last day of school.  It's always June, whether

11   it's June 5th, 6th, or 7th.  It's always around that time.  So

12   last year June whatever.  Whatever the last day of school was,

13   that was her last day.  Well, they work until that Friday so I

14   guess whatever that Friday is.

15        Q    And would you say Ms. Ruiz left AcadeMir on good

16   terms?

17        A    Yes.

18        Q    And do you know if she works anywhere now?

19        A    No, I don't.  I know she's doing all her clinical

20   hours for her mental health license.  That's what she was told

21   me she was doing when she left.

22        Q    Once you learned of what Jane's father had reported

23   to the school did you consider that complaint to be a complaint

24   of sexual harassment?

25        A    I definitely considered it a complaint that needed to
```

1    be investigated.  It didn't -- it kind of -- I don't know, we

2    had -- it kind of threw us for like a loop in a sense that we

3    weren't expecting that because the little girl herself had

4    stated to three different individuals the same exact story, so

5    when he said that it was kind of like, I don't know where this

6    comes from because now her whole story has changed so we

7    definitely need to investigate further, which is why we had the

8    counselor go talk to her.  We watched the videos, all of that,

9    to show the father that, of course, we're going to investigate

10   this.

11       Q    And when you learned of that complaint from Jane's

12   father did you consider that to be a Title IX complaint?

13       A    I don't know.  I don't know if I was thinking of it

14   in those terms.  I was thinking more of to investigate to see

15   what had happened for the safety of my students.

16       Q    And did you conduct an investigation?

17       A    Yes.  We watched the video footage and my counselor,

18   as I mentioned, spoke with Jane.  And then at the end of the

19   day, or I don't know when, I can't say the end of the day, I

20   honestly don't know when, I know Ms. Valladares called the

21   father to discuss our findings.

22       Q    Who was in charge of conducting the investigation?

23       A    It was a team effort.  I have two different buildings

24   so I cannot physically be in both buildings at the same time.

25       Q    Who was on the team to help conduct the

```
 1   investigation?

 2        A    Myself, my assistant principal, Ms. Valladares,

 3   I think Ms. Ruiz, because she has to speak with the students.

 4   That was the actual investigation.  Of course, spoke with the

 5   teacher again, you know, front desk again, asking everybody

 6   what exactly again happened on Friday, you know, that type of

 7   thing.

 8        Q    When Ms. Ruiz spoke with Jane did she document that

 9   interview?

10        A    Yes.

11        Q    And you know that for a fact?

12        A    Yeah.  It's one of your papers, the Student Services

13   Form, the report form.

14        Q    Are you referring to like the Student Case Management

15   Form or are you referring to something else?

16        A    There's two.  There's a Student Case Management for

17   discipline and then there's one for Student Services.  So the

18   one that's the author S. Ruiz is the one for the counselors.

19        Q    I'm going to show you a document.

20        A    Okay.

21        Q    This is Plaintiff's Exhibit 2, Defendant's Bates

22   label 288.

23             (Whereupon, Plaintiff's Exhibit 2 was marked for

24        identification.)

25   BY MR. MACDONALD:
```

```
 1          Q     Do you recognize this document?

 2          A     Yes.

 3          Q     And what is it?

 4          A     That's the Student Services Form that I was

 5   explaining that the counselors fill out when they interview

 6   children.

 7          Q     Did Ms. Ruiz fill out this form?

 8          A     Yes.  That's her handwriting, yes, uh-huh.

 9          Q     And do you see in the top right-hand corner where it

10   says computer reported?

11          A     Yes.

12          Q     What does that mean?

13          A     It went into DSIS.

14          Q     What is that?

15          A     DSIS is the online mainframe, I guess, if you will.

16   Like typical, like if a company operates off of Oracle or SAP

17   or something like that.  I mean, we have SAP also for like HR.

18   Well, the district does.  But DSIS is I guess -- I guess Oracle

19   is a bad example because that's more like financials or HR.

20   This is -- it's a really old mainframe, if you will.  I don't

21   know the right word to use for that.  It basically contains all

22   student information.  So it's similar to almost like an old MS

23   DOS where you have commands and stuff like that sometimes.  I'm

24   not that old, but anyway.  And, basically, we input grades,

25   attendance, discipline, student services, you know, if a child
```

 1   has an IEP or final forward, their accommodations, things like

 2   that.  It's owned by Miami-Dade County Public Schools and all

 3   the charters have access to it and we all input through the

 4   same system, through DSIS.

 5       Q    And what information would have to be inputted for a

 6   form like this?

 7       A    So the counselor would input the codes basically.

 8   Like you see the code there?  What does it say, L1, C6?  It's a

 9   letter?  I forgot.  I have to look at the code guide, if you

10   will.  You know, C6, student conference, parent conference.

11   There's all kind of codes.  So the counselor did speak with

12   parents after speaking with the child to also discuss her

13   findings.  I don't remember honestly if she spoke with mom or

14   dad, but I know she spoke with one of the parents.

15       Q    And under the comment section do you see where it

16   says, "Student felt uncomfortable due to a verbalized comment

17   in class at dismissal.  Student admitted it was only a verbal

18   comment"?

19       A    Correct, uh-huh.

20       Q    Was the comment made in class?

21       A    I don't know.  It was reported.  I don't know when it

22   was made.  I don't think the students could ever answer that

23   either.

24       Q    And this would have been entered into that computer

25   system the same day as it was written?

```
 1        A     She wrote it on January 24th so I'm sure she probably

 2   put it in that day.  I mean, you don't have to do it the same

 3   day. But, yeah, I'm sure she probably put it in that same day.

 4        Q     Would there be any record of Ms. Ruiz's discussion

 5   with Jane outside of this form?

 6        A     No.  The counselors don't have to write anything,

 7   actually.  Their conversations are allowed to be confidential,

 8   unless, of course, they feel there's an intent to harm, the

 9   child has an intent to harm themselves or somebody else.  So,

10   no, they don't have to write anything under comments, to be

11   quite honest.  They could just write their codes.

12        Q     Did Ms. Ruiz ever discuss this situation with you

13   personally?

14        A     She discussed it after interviewing the child?

15        Q     And what did she say to you?

16        A     Basically, what's there, that she spoke with Jane,

17   you know, same thing, stated that Jane confirmed once again

18   that she was never touched and that it was only said to her.

19        Q     Okay.  I'd like to show you another form -- or

20   another document, rather.  We'll mark this as Plaintiff's

21   Exhibit 3.  I've give you a moment to review.

22            (Whereupon, Plaintiff's Exhibit 3 was marked for

23        identification.)

24        A     Okay.

25   BY MR. MACDONALD:
```

```
 1        Q    Do you recognize this document?

 2        A    That's a Disciplinary Student Case Management

 3   Referral.

 4        Q    Who created this document?

 5        A    That's given to me so I am the author of the

 6   document.

 7        Q    So you wrote everything on this document, right?

 8        A    Correct.

 9        Q    And looking at this it looks like it said it was

10   created -- or sorry, that the incident date was 1/20/23; is

11   that right?

12        A    Right, that's the date that they called me to tell me

13   what he had said and we wrote that, just being in different

14   buildings.  So it was reported on that day because of the fact

15   that the incident occurred on that day, and, yes, what he said

16   was inappropriate so we could give him a consequence.

17        Q    And the time on the form looks like 13:20 which would

18   be 1:20 in the afternoon; is that right?

19        A    Right, because it was sometime around, like I said,

20   they were in PE and then going to -- yeah, that was the time

21   they gave me when I asked what time, you know, they felt that

22   it was said or whatever.

23        Q    And do you recall if there was some kind of error

24   maybe made on this section here under the Parent Contact Form?

25        A    Maybe.  It looks like -- definitely it was verbal.
```

1    The writing was the report.  Maybe, yes, no.  Yeah, mom,

2    because the mom was the one that was contacted, uh-huh.  Yeah,

3    maybe it was an error, uh-huh.

4         Q    Now, this part of the form on the left-hand side,

5    this is referring to Jane, reaction taken in regards to her; is

6    that right?

7         A    No, that's L.R.  Jane did not receive a disciplinary

8    referral.

9         Q    Oh, I see.  I see.  So this section refers to L.R.

10   you said, right?

11        A    Right.

12        Q    And in the comments do you see where it says, "Mom

13   was notified via phone and in writing"?

14        A    Yeah.

15        Q    How did she contact L.R.'s mom in writing?

16        A    It would have had to have been the incident report,

17   the ones that we do for everything, you know, for school.  And

18   then it says, "Student was referred to students services."

19   That's because the counselor had to go have a conversation with

20   her like she did on Tuesday.

21        Q    You gave L.R.'s mom a copy of the incident report?

22        A    The parents don't get copies of the other students'

23   reports.  They only get copies of their child's.

24        Q    So then what day did L.R.'s mom get a copy of it?

25        A    It had to have been his report.  Solay writes the

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
1   reports at the other campus.  So it had to have been that

2   incident report.

3       Q    And is this a standard form that's used?

4       A    It's an internal document.  We use it for any --

5   well, not any.  we use it for accidents and incidents.

6       Q    And what's that document titled?

7       A    Incident/Accident Report.  Like AcadeMir's Charter

8   Schools or whatever.  Incident/Accident Report.

9       Q    And did you give that document to L.R.'s mom?

10      A    I personally did not.  I believe Solay did.

11      Q    Who did?

12      A    I spoke with mom via phone.  Ms. Chaudry spoke with

13  her in person.  I spoke with her via phone.

14      Q    So then how did you know that she received something

15  in writing?

16      A    That's what they told me.

17      Q    Who told you that?

18      A    I don't remember.  I don't remember if it was Solay.

19  I don't remember if it was Valladares.  I don't remember if it

20  was Chaudry.

21      Q    Have you ever emailed L.R.'s mother or father before?

22      A    I send emails as a principal to all the parents.

23      Q    But have you ever sent a message directly to L.R.'s

24  mom or father via email?

25      A    Only if they've asked a question and I respond.
```

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1   Parents nowadays communicate via email.  It would be impossible

 2   for me to remember all of them.  But I get parent emails and I

 3   respond.  And I also do like mass distribution emails

 4   notifying, you know, different things of the school.

 5        Q    Do you recall if you ever emailed L.R.'s mother or

 6   father about this incident specifically?

 7        A    No, I never emailed them anything about this

 8   incident.

 9        Q    Do you specifically recall ever emailing L.R.'s

10   mother or father personally in the past for any reason?

11        A    I honestly don't.  Again, if they've asked a question

12   and I've had to answer as a principal, then, yes, of course.

13        Q    And this section on the right, this refers to Jane;

14   is that right?

15        A    No, it still refers to L.R.

16        Q    And this section on the right that refers to L.R.,

17   was this completed by you?

18        A    No, that's my counselor.

19        Q    Do you know when Ms. Ruiz spoke to L.R. about the

20   incident?

21        A    On the 24th, Tuesday.

22        Q    And did she speak to you after she spoke with L.R.

23   about the incident?

24        A    She spoke to me after she spoke with both of the

25   students, yeah.
```

```
 1       Q    And did she say anything about L.R. specifically when

 2   she spoke to you?

 3       A    No.  I honestly don't remember that conversation as

 4   much, but it had to have been something along the lines as

 5   something similar to what I had already heard on Friday, which

 6   was he said it because he heard it, whatever.  She spoke with

 7   him and she had to follow up with his mom as well.

 8       Q    I'm going to show you another document.

 9       A    Okay.

10       Q    I'll mark this as Plaintiff's Exhibit 4.

11            (Whereupon, Plaintiff's Exhibit 4 was marked for

12       identification.)

13   BY MR. MACDONALD:

14       Q    I'll give you a moment to review.  Do you recognize

15   this document?

16       A    Yes.

17       Q    And what is it?

18       A    That's the Accident/Incident Report.

19       Q    And who completed this form?

20       A    I believe that there's different handwriting on form,

21   but it's probably Ms. Chaudry who initially started it.

22   Ms. Solay then keeps the records of that.  She's the one that

23   made the phone call.  So she's the one that wrote the parents'

24   response.  Obviously, there's signatures on the bottom of

25   different people.
```

Deposition of Susie Bello                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    Q    And did you sign this document?

2    A    I did.

3    Q    And who asked you to sign the document or who

4    presented the document to you?

5    A    Solay.  My front desk takes the documents and I sign

6    those.

7    Q    Now, would this be the accident or incident form that

8    was given to L.R.'s parents?

9    A    They would never get the one of Jane, but if there

10   was one created on L.R., yes, that would have a statement with

11   their child's name on it.

12   Q    Was there one filled out with L.R.?

13   A    I don't remember.

14   Q    I'll represent to you that no accident or incident

15   form for L.R. has been produced in this litigation.

16   A    It might be because he got a disciplinary referral,

17   whereas, obviously, this child didn't.

18   Q    So then what document would have been given to L.R.'s

19   parents in writing?

20   A    I don't know.  I was told that day when I was called

21   that they were going to give her the report so that's why I

22   wrote it.  Maybe that's why there was the change after.  I

23   don't know.  Because it was changed from yes to no on the

24   actual form.  Originally it was yes and then it was changed to

25   no.

```
 1        Q     At any point did you speak to Jane's parents
 2   personally?
 3        A     Yes.
 4        Q     And when did you first speak to them about this
 5   incident?
 6        A     Wednesday.
 7        Q     On Wednesday you said?
 8        A     Wednesday, uh-huh.
 9        Q     And was that a conversation in person?
10        A     No, it was over the phone.  I encouraged him to come
11   meet me in person, but he chose not to.
12        Q     And was that phone call made from your office on
13   Wednesday?
14        A     It was made from the school, uh-huh.
15        Q     And what did you say to Jane's father?
16        A     Well, on Tuesday when Ms. Valladares called him,
17   whenever it was that she called him to explain the video and
18   that the little girl spoke with, again, the counselor and
19   stated the same thing again that she had already said on
20   Friday, of course, the father was not happy, was not in
21   agreement.  Again, I wasn't part of that conversation so I
22   don't want to speculate.  I know he was not happy.  So -- but,
23   again, the little girl was in school.
24        Then come Wednesday, they bring her to school again.
25   She's dressed again in the theme of the day, which was a
```

1  different theme from Tuesday.  She entered the school. Nobody

2  told me that she entered in a different way than normal.  The

3  father in the lobby of the school was very irate and he was

4  screaming all kinds of obscenities, all kinds of obscenities.

5  I do arrival in this building.  Ms. Valladares does arrival in

6  that building.

7       So Ms. Valladares, you know, of course, rushed to the

8  lobby and was trying to calm him down, you know, diffuse the

9  scenario.  We had a lot of parents and students walking in and

10  out as you can imagine.  He just kept -- now he said that she

11  was touched.  So Tuesday it was touched, now it was touched and

12  licked. He was being very obscene.  He started calling her all

13  kinds of names.  I know the one that affected her the most

14  because he said it out loud in front of everybody was that he

15  called her a cunt.  She urged him to please come into the

16  office with her.  She was just trying to get him away from the

17  scene so that all the kids weren't listening to this.

18       He eventually walked into her office with her and that's

19  when he said -- she explained again the video footage, the

20  findings.  She went over all that.  And that's when he said to

21  her, I have a video of my daughter in the bathtub where she

22  said that she was touched and licked and I want you to watch

23  it.  And Ms. Valladares explained that, you know, obviously,

24  due to privacy and stuff like that she wasn't going to watch a

25  video of a child in the bathtub.  And he's like, no, but you

1    have to, you have to watch it.  And she's like, I can't, you

2    know, like that's not appropriate for me to watch that.  And

3    he's like, okay, well, I want you to at least listen to the

4    audio.  She said okay.  So she listened to the audio.

5        I wasn't there to hear the audio, but according to what

6    Ms. Valladares explained to me the audio was very probing and

7    leading.  So they were asking ██████, mom, dad, whoever, I can't

8    remember now, I think it was mom maybe, asking ██████, maybe the

9    dad, too, I don't remember, leading questions, basically

10   leading her to like an answer.  And the only reason I remember

11   that is because I remember Ms. Valladares specifically making

12   that statement, these are very leading questions.

13       At no time did she ever say anything to that nature on

14   school grounds.  And then he was again not happy, demanding to

15   see the videos again.  Basically, he didn't trust us, you know,

16   that everybody was lying.  And I don't remember if he asked to

17   speak with me or if she said you need to speak with the

18   principal.  It was one of the two.  I can't remember how that

19   started.

20       And then Ms. Valladares called me.  He left, right.  She

21   called me to explain.  I said, no problem, I'll call dad right

22   now.  And we did.  I called and I got him on the phone,

23   introduced myself to him, and, again, encouraged him to come to

24   the office to meet with me.  He didn't seem interested in that.

25   He started with -- I let him talk.  I let him talk for a while.

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 107 of
143
Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

 1   I listened and explained to him our findings from our

 2   investigation.  He didn't agree with me.  He asked me again to

 3   see the footage and I explained to him that I couldn't due to

 4   the privacy of the children.

 5       He kept repeating the same thing over and over, that he

 6   wanted me to see the video.  And I explained to him the same

 7   thing, I will not watch a video of your daughter in the

 8   bathtub.  That's the privacy of your own home.  That's the

 9   privacy of the bathroom.  I do not need to watch that.  He kept

10   telling me I'm going to email it to you.  It's in WhatsApp.  I

11   remember him saying it's in WhatsApp, it's in WhatsApp, I'm

12   going to email it to you.  And I said, please do not do so, I

13   will not view that video of your daughter in a bathtub for, you

14   know, all of the obvious reasons.  And he said -- how did he

15   word it.

16       He wanted me -- like in so many words he wanted me to kick

17   the kid out of school.  He kept telling me in Spanish, you

18   know, "botar de la escuela," like kick him out, kick him out,

19   kick him out.  And I explained to him that I could not do.  I

20   told him that I had to abide by the rules of students code of

21   conduct, that, you know, it was an offense that warranted a

22   disciplinary referral which the student did get.  What else.

23   You know, he just kept repeating the same thing over and over.

24   And I explained to him, look, my investigation has proven X, Y,

25   Z, which I think I've already said her.  So I told him that.  I

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 108 of
143
Deposition of Susie Bello                          Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1   said, have no -- I have nothing to continue on with this as

2   your own daughter even after a whole weekend on Tuesday

3   repeated the exact same story to my counselor.

4        And then he said that that's not what she told him, or him

5   and his wife, whatever.  And, I said, I understand that, but I

6   also don't understand where she's getting this from to tell you

7   guys this and she would tell us a completely different story.

8   I have explained to him on the video footage the children were

9   all sitting down with their test dividers.  They were taking a

10  test, you know.  I don't remember everything I said, but I went

11  over basically how the teacher did have control of the

12  classroom, you know, and that everybody was abiding by the

13  rules of the class.  He kept saying, you know, no, the teacher

14  wasn't -- I don't remember what he said about her, but,

15  whatever, something to those lines.  And I said -- and then I

16  tried to like -- obviously, I had to improvise with him and I

17  also tried to like give him another explanation.

18       So I said, okay, I mean, don't quote me because honestly

19  it was a long time ago, but something along the lines of, let's

20  say the teacher was sitting down at her desk on her phone,

21  let's say.  If you have a classroom of 18 kindergartners if

22  this was happening in the class there's just no way that 18

23  five-year-olds would stay silent.  There's no way that they

24  wouldn't gasp or call for help or run to the teacher or scream,

25  you know, what normal five-year-old kindergartners do.

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 109 of 143

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1        I go, there's just no way.  They don't know at that age to

 2   stay quiet.  They haven't been trained like that.  They

 3   literally say and do whatever they see.  Even his own daughter

 4   wouldn't just sit there and allow it to happen either.  It's

 5   just not normal behavior for kindergartners, especially a group

 6   of 18.  They have all different behaviors in there.  Somebody

 7   in there is going to scream for help if it would have occurred.

 8   He didn't want to listen to me.  He talked over me a lot.  And

 9   then he was like, I'm going to call the news, I'm going to call

10   the police, I'm going to get a lawyer, I'm going to call

11   Rolando Mir, all of those things.

12        I explained to him, you know, he has every right to do it,

13   you know.  I also explained to him that we had already

14   separated the children in the classroom, that they wouldn't be

15   paired up again to ever work like on a project or anything for

16   the remainder of the school year.  Again, he just kept saying

17   the same thing over and over, that he wanted the kid kicked out

18   of the school.  And I can't do that.  I have no cause to kick

19   or expel a child from a school for a comment, especially an

20   isolated incident like this.

21        He then kept saying that that wasn't enough.  And I

22   explained to him if you still feel uncomfortable, I am more

23   than willing to move ██████ to another class.  Granted, that's

24   not something I would normally do in the month of January,

25   especially with kindergarten, but since he was so persistent
```

```
 1    that he wanted more, you know.  He said, no, I'm not moving my

 2    daughter, she loves her teacher, she loves her class, I don't

 3    want her moved.  He wanted the boy out of the school.  And I'm

 4    like, I cannot do that.  It's not a justifiable reason for me

 5    to expel a child, you know.

 6         So I don't remember exactly how the whole conversation

 7    ended.  I know there was a lot of back and forth.  In the end

 8    he just kept threatening me that he was going to call

 9    everybody.  And I said, okay, you have to right to do that.

10    And then I don't remember how our conversation exactly ended.

11         Q    During that conversation you said you shared your

12    findings with him; is that right?

13         A    Yes.

14         Q    What were your investigative findings?

15         A    That his daughter stayed consistent with her story

16    that it was a verbal comment, that in no way, shape, or form

17    did she indicate that anybody actually touched her, or that

18    L.R. touched her.  Obviously, I didn't use his name on the

19    phone with the father.  That we watched the video footage, that

20    the class was in order, the students were indeed testing that

21    the teacher had attested to, that there was the test dividers

22    up, that I saw everybody sitting in their chairs, you know,

23    orderly.

24         I don't remember everything I said, but there was order in

25    the class.  That his daughter was wearing jeans and a T-shirt
```

 1  that day, that his daughter's desk where it was situated was

 2  even close to the teacher's desk, since he kind of was like the

 3  teacher was just hanging out and not doing anything.  What

 4  else?  You know, that we had no reason to believe that anything

 5  other than a verbal comment was made.  I also told him that the

 6  counselor spoke with her and that she also told the counselor

 7  the same thing.  And then that's when he told me that he didn't

 8  want his daughter talking to anybody else.  And I said, okay.

 9  And nobody else did talk to her the rest of that day.  He was

10  just very, like, I'm going to call the police and you're going

11  to see how they're going to do what I want.  I said, okay, you

12  have the right.

13       Q    Were your investigative findings documented anywhere?

14       A    No.  No.  I mean, we were just -- as we were

15  conducting it, you know, I might write down a note or something

16  to remind myself of something that somebody said or whatever,

17  but, no, not like a formal form that has to be documented or

18  anything.

19       Q    And you said Ms. Valladares listened to the audio

20  from the video that Jane's father had?

21       A    Correct.

22       Q    Did you listen to that audio?

23       A    No.  No, because he wanted to email it to me and I

24  kept telling him I would not view it.  I asked him multiple

25  times to please come in and meet with me in person and he

```
 1   didn't.

 2        Q    Why didn't you offer to listen to the audio after

 3   Ms. Valladares had listened to it?

 4        A    Because he was on the phone with me so he never --

 5   that wasn't even an option for him to play it while he was on

 6   the phone.  She heard it because he was in person.

 7        Q    And Ms. Valladares told you that she believed the

 8   questions were leading or probing on that audio?

 9        A    Right, yes.

10        Q    And when did she tell you that?

11        A    Wednesday after he left the building that she told me

12   he wanted to talk to me.

13        Q    Did you ever consider listening to the audio yourself

14   to see if they were leading or probing questions?

15        A    If he would have come in person and he would have

16   played it for me to listen, sure, I would have listened.

17        Q    At the time when this occurred did you think

18   Ms. Valladares had qualifications to determine if Jane's

19   parents were asking leading or probing questions?

20        A    Yes.

21        Q    You did think she was qualified to make that

22   determination?

23        A    Yes.  She's been in education for a very long time.

24        Q    What qualifications does Ms. Valladares have to make

25   that determination besides working in education for a long
```

1    period of time?

2         A    She has a master's.  She has current leadership

3    certification.  Part of our program there's a lot of things on

4    different laws, different policies, procedures, things like

5    that.  She's been working in a school for a very long time.

6    She had many conversations with students, parents, staff

7    members.

8         Q    Don't you think it would require someone more

9    qualified, like a child psychologist, let's say, to know

10   whether a child is being led to giving particular information?

11            MS. KARRON:  Objection to form.

12        A    No.

13   BY MR. MACDONALD:

14        Q    And why not?

15        A    First of all, schools don't have child psychologists

16   on staff.  That doesn't exist.  We have school psychologists

17   that we share.  It's for academic reasons; it's not for

18   behavioral reasons.

19        Q    Frankly, you could have referred Jane to a child

20   psychologist, I'm guessing, right?

21        A    No.  No.  We don't have -- like I said, school

22   psychologists are for academic reasons, like IQ evaluations,

23   things like that.  They're not here for behavioral reasons.

24   That would be private.

25        Q    What about someone from the county, would that have

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 114 of
143
Deposition of Susie Bello                                      Jane Doe v. AcadeMir Charter Schools, Inc., et al.

 1   been --

 2        A    There's mental health professionals, but that

 3   wouldn't be somebody -- they were never claiming anything about

 4   her mental health.  And my counselor did meet with the child,

 5   but, obviously, my counselor did not hear that.  And I don't

 6   think you have to have official training to hear a parent over

 7   and over with the same questions leading them to an answer.

 8        Q    So based on your understanding did Ms. Valladares say

 9   she didn't believe what Jane was saying because she was being

10   led?

11             MS. KARRON:  Objection to form.

12        A    No.  No, I never said she didn't believe her.  I said

13   that our investigation proved over and over again the little

14   girl kept the same story consistent with the four adults that

15   she spoke with.

16   BY MR. MACDONALD:

17        Q    Now, earlier when I asked you about documents you

18   reviewed, one of those documents were an expert witness report;

19   is that right?

20        A    Which document?

21        Q    Well, when I asked you what documents you had

22   reviewed I believe you held up a document that had a USF

23   heading that was from a --

24        A    Oh, yeah, that one, yeah.  I have it here.  That's

25   the one that I guess the examinee was Jane.

1      Q     All right.  Are you aware that was a report generated

2    by a child psychologist?

3           MS. KARRON:  Objection to form.

4      A     Right.

5    BY MR. MACDONALD:

6      Q     How do you think Ms. Valladares's qualifications

7    compare to a child psychiatrist in evaluating the questioning

8    of a child as it relates to sexual abuse allegations?

9           MS. KARRON:  Objection to form.  And I'm just going

10          to object to the question.  Her only knowledge of this

11          form was through me and through our attorney-client

12          privileged conversations.

13   BY MR. MACDONALD:

14     Q     You can answer.

15     A     I already forgot the question, and, honestly, I don't

16   have an answer.

17     Q     What do you mean you don't have an answer?

18     A     I already forgot the question.

19     Q     Well, I was asking you how Ms. Valladares's

20   qualifications compare to that of any child psychiatrist in

21   evaluating whether a child's answer in response to a question

22   were being led or probed by an adult?

23     A     I don't know.  I've never gone through child

24   psychiatry schooling to know the difference, so I don't know.

25     Q     Now, you also mentioned the student code of conduct;

```
 1    is that right?

 2        A     Correct.

 3        Q     And are you referring to Miami-Dade County code of

 4    student conduct?

 5        A     That's correct.

 6        Q     Does AcadeMir follow and enforce that Miami-Dade code

 7    of student conduct?

 8        A     Yes.

 9        Q     I'm going to show you another document.

10        MR. MACDONALD:  We'll mark this as Plaintiff's

11        Exhibit 5.  It's Defendant's Bates labeled 153-247.

12            (Whereupon, Plaintiff's Exhibit 5 was marked for

13        identification.)

14    BY MR. MACDONALD:

15        Q     Do you recognize this document?

16        A     Uh-huh.

17        Q     And what is it?

18        A     It's the code of conduct for elementary.

19        Q     Was this code of student conduct used in handling

20    Jane's allegations?

21        A     Yes.

22        Q     Now, I want to draw attention to the section titled

23    Sexual Harassment on page 43.  I'll give you a moment to

24    review.

25        A     Okay.  I read it.
```

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 117 of
143
Deposition of Susie Bello                                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1        Q     Does AcadeMir enforce that section on sexual

 2   harassment?

 3            MS. KARRON:  Objection to form.

 4        A     Do I continue?  I heard her object.

 5   BY MR. MACDONALD:

 6        Q     Yeah.  If she objects unless she instructs you not to

 7   answer you can answer the question.

 8        A     Okay.  Well, I mean, yeah, if there was -- for sure.

 9   This was an isolated incident.

10        Q     But, generally speaking, AcadeMir does enforce that

11   policy on sexual harassment?

12        A     Correct.

13        Q     So looking at this policy a little more in detail, do

14   you see that second sentence that says, "Upon receiving a

15   report of an incident sexual in nature," and then it goes on?

16        A     Uh-huh.  Yeah.

17        Q     Who are AcadeMir employees required to report

18   incidents sexual in nature to?

19        A     They have a right to report it to me.  They have the

20   right to report it to HR.  They obviously have a right to

21   report it to the Office of Civil Rights if they so wish.

22        Q     But are they required to report it to anyone?

23            MS. KARRON:  Objection to form.

24        A     If they feel that a child has been abused, if they

25   suspect abuse, neglect, or abandonment, yes, they are required
```

1    to report it to DCF, a hundred percent.  If they feel there was

2    a sexual harassment in the workplace, that's their -- I can't

3    force anybody to report that.  That's up to them if they want

4    to file a report and a complaint with HR and ADP.  If they feel

5    that a student was sexually harassed, then, yes, they would

6    report it to me.

7    BY MR. MACDONALD:

8        Q    What about in cases where a student has been involved

9    in an incident that is sexual in nature?

10            MS. KARRON:  Objection to form.

11       A    If it was, then, yes, of course, they would report

12   it.

13   BY MR. MACDONALD:

14       Q    Who are they required to report it to?

15       A    They're allowed to report it to me.  They're allowed

16   to report it to Ms. Bernal.

17       Q    You're saying that they're allowed to report it.  I'm

18   asking you:  Are AcadeMir employees required to report to

19   anyone when they learn of an incident sexual in nature?

20       A    Yes, if they hear -- if they learn about it and it's,

21   I mean, a harassment, then, yes, they are supposed to report

22   it.

23       Q    Okay.  That was not responsive to my question.  I'm

24   asking you -- I'm not saying the word "harassment."  I'm asking

25   you once an AcadeMir employee learns of an incident that is

1  sexual in nature involving a student, is there anyone to whom

2  they have to report that incident to?

3      A    They should report it to their supervisor, yes.

4      Q    You're saying they should.  I'm asking you are they

5  required to report that incident to anyone?

6      A    I mean, they're supposed to report it, yes.  I can't

7  control what people do, but, yes, they are supposed to report

8  it.

9      Q    Okay.  Who are AcadeMir employees supposed to report

10 incidents that are sexual in nature involving students to?

11     A    To an assistance principal or to me.

12     Q    And what are you basing that off of?  Is that written

13 anywhere?

14     A    Again, as I stated earlier, there's all kind of

15 complaints we can receive.  Some are minute; teachers can

16 handle them in the classroom.  Some we escalate depending on

17 the nature of the incident.  They know that.  We go over

18 reporting.  We go over all of that in opening the school.  So

19 they know that they are obliged to, required to, allowed to,

20 whatever terminology you want to use.  They know that

21 reporting.  Same thing with the students.  The students know if

22 they see something, they should say something.  That's how we

23 can help to prevent things hopefully.

24     Q    Was the Miami-Dade County Office of Civil Rights

25 Compliance ever contacted in relation to Jane's allegations?

```
 1        A     No.

 2        Q     Would you agree that Jane's allegations regarding

 3   verbal conduct were an incident sexual in nature?

 4        MS. KARRON:  Objection to form.  Calls for a legal

 5        conclusion.

 6        A     No.

 7   BY MR. MACDONALD:

 8        Q     Sorry, I didn't hear your response.  You said no?

 9        A     No.

10        Q     And why do you not believe that verbal conduct was

11   sexual in nature?

12        A     Well, as Julie just mentioned, I'm not an attorney,

13   number one.  Number two, I've already said this multiple times,

14   but I'll say it again, this was an isolated incident.  There

15   was no history.  The little girl herself repeated multiple

16   times it was only verbally said.  The little boy admitted that

17   he blurted out something that he learned from home.  The mother

18   helped to confirm that.  It's not something that -- I don't

19   believe he even knew what he was saying.  It has to lot to do

20   with their age.  A middle schooler stating they're going to do

21   that is very different from a kindergartner.

22        Same thing, when a kid says like they get upset, I'm going

23   to kill you, they don't know what that means.  The counselor

24   has to go.  They have to interview the child.  Obviously, we do

25   a risk assessment because of everything now with the laws.
```

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 121 of 143

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1   But, you know, a middle schooler saying it understands it a lot

 2   more than a kindergartner.  They don't understand their words,

 3   the severity of their words a lot of times.  You also have to

 4   handle things based off of age, based on behavior, things like

 5   that.

 6        Q    And at the bottom of this section you see where

 7   there's a reference to the District's Title IX coordinator?

 8        A    Yes.

 9        Q    Does AcadeMir have Title IX coordinator for students?

10        A    Yes, Olivia Bernal.

11        Q    Okay.  I'd like to show you another section.  I'd

12   like to draw your attention to the section entitled Sexual

13   Harassment on page 83.  I'll give you a moment to review.

14        A    Is this still part of the elementary code of conduct

15   or did you scroll into the secondary code of conduct?

16        Q    I believe this is the glossary.

17        A    Oh, it says elementary.  Okay.  I'm just making sure

18   because there's two.  Okay.  I read it.

19        Q    Does AcadeMir utilize this definition of sexual

20   harassment in your experience working as an employee there?

21        A    Yeah.

22        Q    Have you ever reviewed this definition of sexual

23   harassment in the past?

24        A    Uh-huh.

25        Q    When did you review it?
```

```
 1       A    I don't know.  Every year we get a new student code

 2  of conduct.  I skim through it.  I review it.  I've reviewed

 3  this before.  I don't remember.

 4       Q    And do you see where it says, examples may include,

 5  but are not limited to unwelcome touching, rabid verbal

 6  comments, sexual jokes, slurs, gestures, or pictures whether in

 7  person or through any other method including sexual cyber

 8  harassment?

 9       A    Uh-huh.

10       Q    Do you agree with the use of those examples as it

11  relates to AcadeMir's definition of sexual harassment?

12            MS. KARRON:  Hold on.  Hold on.  Objection to form.

13  Calls for an improper layperson conclusion.

14  BY MR. MACDONALD:

15       Q    Go ahead.

16       A    I also agree with the last example that the student

17  was suspended because he repeatedly talked about a female

18  student's private parts.  I also agree with the part that says,

19  a student that is severe or pervasive enough.  I agree with all

20  of it.

21       Q    Okay.  And do you see in this definition any

22  requirement that the conduct be repeated?

23       A    Well, that's literally the examples they're giving

24  the administrator to suspend a student.  So considering that we

25  are laypeople, as Julie mentioned, that is our example.
```

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 123 of 143

Deposition of Susie Bello                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1      Q     Right.  That's an example of what could constitute

2   sexual harassment?

3      A     Right.

4      Q     But in this definition do you see anything about

5   conduct being repeated?

6          MS. KARRON:  Objection to form.  Hold on.  Hold on,

7      please.  You're asking her to read it.  The document

8      speaks for itself and she can't give a lay opinion about

9      what it says.  The definition can be read into the record

10     exactly how it is.

11  BY MR. MACDONALD:

12     Q     Go ahead.

13     A     No, I agree with her.  I already read it.  Yes, I

14  agree that it also talks about that it needs to be intimidating

15  and hostile and offensive and all of that and the file just

16  doesn't do that.

17     Q     Do you see the word "repeated" in this definition?

18     A     I see the word "repeated" on the page.

19     Q     And that's in the example; is that right?

20     A     It's part of it, right.

21     Q     Do you see it anywhere else?

22     A     No.

23     Q     Have you ever utilized this code of student conduct

24  in the past for handling student issues?

25     A     Yes.  Every time the child gets a referral we have to

```
 1   go back to this to make sure we categorize it properly.

 2        Q    When is the last time that you used this code of

 3   student conduct in relation to a student issue?

 4        A    The last referral that I got on my desk.

 5        Q    And when was that?

 6        A    Maybe a week or two ago.

 7        Q    And how did you utilize this code of student conduct

 8   when that issue arose?

 9             MS. KARRON:  I'm going to object.  That's outside the

10        scope of the testimony for today.

11   BY MR. MACDONALD:

12        Q    You can answer.

13        A    I look it up to make sure I code the things properly,

14   all the consequences for whatever level offense it is.

15        Q    At any point did you meet with Jane's father in

16   person?

17        A    No, it was all over the phone. I encouraged him to

18   come in.  He did not.

19        Q    Now, I understand that at some point AcadeMir offered

20   Jane's father to have her removed from the classroom; is that

21   correct?

22        A    I did, because he didn't want -- he wasn't in

23   agreement with them being separated in class.  He wanted L.R.

24   to be thrown out of school and I explained I couldn't do that.

25        Q    At any point did you offer to have L.R. removed from
```

```
 1    the classroom to a different classroom?

 2        A    I don't know.  I wouldn't have discussed L.R. with

 3    the parent anyway what I would have done with him because

 4    that's not his business.  That's not his child.  I don't

 5    remember.  What I do remember is offering for Jane to be moved

 6    since the father wanted her even further away from L.R.

 7        Q    You don't recall if you ever offered to have L.R.

 8    moved to a different classroom?

 9        A    No, I don't.

10            MS. KARRON:  Objection to form.

11    BY MR. MACDONALD:

12        Q    Okay.  Did Jane's father ever ask that L.R. be moved

13    to a different classroom?

14        A    I don't remember that.  I remember him continuing to

15    say over and over and over that he wanted him kicked out of the

16    school.

17        Q    But you don't have --

18        A    No, normally you wouldn't remove a child for a

19    one-time comment or a one-time whatever.  Just like I normally

20    would never move a child in January.  They've already grown a

21    relationship with the teacher.  I offered that as an additional

22    whatever, suggestion, if you will, since the father wasn't

23    satisfied with them just being separated from one another in

24    the classroom.

25        Q    At any point did you ever speak to the police
```

```
 1   regarding this incident?

 2        A    Yes.  Yes.

 3        Q    When did you speak to the police?

 4        A    On Wednesday.

 5        Q    Did someone from AcadeMir contact the police?

 6        A    No, because the father did it first.

 7        Q    And the police came to AcadeMir, the actual school?

 8        A    Correct.

 9        Q    And what happened when they arrived?

10        A    They arrived at my kindergarten building.  I was

11   contacted by somebody in the office, I can't remember who, that

12   the police officer was there and wanted to speak with me or

13   Ms. Valladares.  Ms Valladares just so happened to be here in

14   the main building.  She travels back and forth.  So I said,

15   okay, we're on our way over.  So we both went.

16        Q    And did you end up speaking to a police officer when

17   you arrived?

18        A    Yes, I did.  The police officer was there waiting for

19   us.  She pretty much just informed me of like a traditional

20   informational report and she was contacted by Mr. █████ and

21   that he was upset about something he feels occurred in the

22   school and that he wanted her to remove the child from the

23   school.  And she had explained, according to her, what she told

24   me because I wasn't part of the conversation when she spoke

25   with him, she explained to him that she could not do that, she
```

1   didn't have jurisdiction to kick a child out of the school.

2        And then he also demanded for her to allow him to watch

3   the video footage.  She also explained to him that she equally

4   could not do that.  Then she did tell me that he started with

5   his claims of what he feels happened, and that she then tried

6   to stop him and said, oh, no, no, wait, if you feel this, you

7   need a detective.  I'm filing an informational report.  If you

8   feel this happened this needs to be done with a detective.  The

9   reason I remember this was because when she shared it with me

10  she told me that he said, no, no detectives, no detectives, and

11  then he continued filing the report.  And that stood out to me.

12       So she asked me then what happened.  I explained to her

13  our side, our investigation, our findings.  And that was it.

14  She documented it.  She asked me is ██████ staying in the

15  school, in the class.  I said she was in school both Tuesday

16  and Wednesday so I said I believe so, she's been coming in

17  every day as normal, you know, ready for our festivities,

18  participating in everything.  And she said okay.  And then she

19  gave her the case card.

20       Q    What did you say regarding your investigation or your

21  findings?

22       A    I don't remember everything I told her, but,

23  basically, the same thing I told you, that the little girl

24  repeated the same story four times, that it was verbal, that we

25  watched the footage, that nothing in the footage showed anybody

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 128 of 143

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    touching her, and that we didn't know where -- like I didn't

2    understand where the father was getting these claims from

3    considering that she's never told anybody in the school that.

4         Q    Did you discuss that audio recording with the police

5    officer at any point?

6         A    No.  I never heard the audio, so, no, I don't believe

7    I did.

8         Q    Did you discuss the Department of Children and

9    Families at all when you spoke with the police officer?

10        A    I don't remember.  I mean, if she asked I would have

11   told her the same thing I'm telling you, I never suspected

12   abuse, neglect, or abandonment, therefore, I didn't report it

13   to DCF.  But I don't remember if she asked me that specific

14   question.

15        Q    And when you spoke with the police officer at any

16   point did you discuss whether those questions in that audio

17   recording were probing or leading?

18        A    I just said I didn't discuss the audio, so, no.

19        Q    And when you spoke with the police officer did you

20   bring up how Jane's father had gotten upset at the school at

21   some point?

22        A    Yes, I did.  I did explain how he was upset, how he

23   was, you know, screaming obscenities in my office, insulting my

24   assistant principal, yeah.

25        Q    And how many police officers did you speak to?

```
 1        A     One.

 2        Q     And was it a male or female?

 3        A     Female.

 4        Q     Just a moment.  I'm going to show you an exhibit.

 5   I'm going to show you a video.

 6        A     Uh-huh.

 7        Q     Give me just a moment.  Let me know if you're able to

 8   hear this.  Just a note before I share this.  I'll show you the

 9   entire video and then ask you some questions after.  Okay?

10        A     Okay.

11              MS. KARRON:  Hey, Kyle, do we have this video?

12              MR. MACDONALD:  I don't think so, no.

13              MS. KARRON:  Would you mind emailing it to me?

14              MR. MACDONALD:  Yeah.  I have to give you a link.

15              MS. KARRON:  Yeah.  Yeah, however.

16              (The video was played.)

17   BY MR. MACDONALD:

18        Q     Do you recognize the video that I just showed you?

19        A     Yes.

20        Q     And is that you in the video --

21        A     Yes.

22        Q     -- speaking with the police officer?

23        A     Yes.

24        Q     And who is with you in that video?

25        A     Ms. Valladares.
```

1      Q    Now, in that video you made a couple of comments.

2   One of them was something to the effect that I'm not kicking

3   him out of school for that nor am I changing his class for

4   that.  Do you recall hearing a comment to that effect?

5      A    Yes.

6      Q    Is it true then that you never considered having L.R.

7   switched to a different classroom?

8      A    I don't know that it's true that I never considered

9   it, but after everything I determine that I wasn't going to

10  move him.  I would never normally -- like I said, I would never

11  move a student for one comment that is said, just like I never

12  would have wanted to move his daughter either.  She was already

13  very comfortable in the class.

14     Q    Now, in the video you also made a comment to the

15  effect that he needs to prove it, something about guilt.  Do

16  you recall that?

17     A    Yes.

18     Q    What did Jane's father need to prove exactly?

19          MS. KARRON:  Objection to form.

20     A    His complaints.

21  BY MR. MACDONALD:

22     Q    Go ahead.

23     A    His claims.  He wanted to have a contradictory story

24  than what our investigation proved.

25     Q    And who did Jane's father need to prove that to?

```
 1       A    I don't know.  The officer and I also said some other
 2   things that you couldn't hear because of her radio going off.
 3       Q    Like what?
 4       A    I don't remember, but I could tell because there was
 5   talking happening with the radio and I couldn't even hear.
 6       Q    In reference to what Jane's father needed to prove,
 7   are you saying that Jane's father needed to prove something to
 8   you or to someone else?
 9            MS. KARRON:  Objection to form.
10   BY MR. MACDONALD:
11       Q    You can answer.
12       A    To anybody.  To the police that he wanted to report
13   everything to.  To anybody.  I don't know.  We have very
14   different claims that what was proven in the school and what
15   his daughter stated.
16       Q    You said what Jane's father had alleged was literally
17   impossible; is that right?
18       A    I said that word at some point, uh-huh.
19       Q    What did you mean that what Jane's father had alleged
20   was literally impossible?
21       A    That a kindergarten student sitting in her chair in a
22   class would have her pants pulled down and be licked down there
23   and no nobody would react and nobody would do anything and
24   nobody would say anything and everybody would just act like it
25   was a normal day.  That is impossible in a kindergarten group,
```

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 132 of 143

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1   in a kindergarten class.

 2        Q    Did Jane's father ever state that he believed that no

 3   one reacted when this occurred?

 4        A    He believed that -- he didn't want to believe

 5   anybody.  He thought everybody was lying and that it happened

 6   and the school was not doing anything about it and he kept

 7   saying he needed more and more and more.

 8        Q    In that video did you threaten to file a report

 9   against Jane's father for harassment?

10        A    I didn't threaten.  I told the officer what I told --

11   I told the officer that I could equally file a harassment

12   complaint against him for harassing my assistant principal.

13        Q    And you're referring to when Jane's father was upset

14   and exchanged words with the assistant principal?

15        A    He didn't exchange words.  They were one way.  She

16   was trying to calm him down.  He was screaming obscenities and

17   called her all kinds of horrific names.

18        Q    And you believe that that constitutes harassment?

19        A    He's a grown adult.

20             MS. KARRON:  Objection to form.

21        A    He's a grown adult and he was acting very aggressive

22   and intimidating in a school lobby in front of a bunch of

23   minors.

24   BY MR. MACDONALD:

25        Q    And you believe that constituted harassment?
```

1      A    I believe it constituted inappropriate behavior and I

2  believe that he knew what he was doing and he was old enough to

3  know.

4      Q    I'm not asking if you believed it was inappropriate

5  behavior.  I'm asking if you believe that constituted

6  harassment?

7          MS. KARRON:  Objection to form.  Calls for a legal

8      conclusion.

9          MR. MACDONALD:  Those are her words.  That's not a

10     legal conclusion.

11     A    I never did it.  I was just explaining to the officer

12  that just like he could call them, we could call them.

13  BY MR. MACDONALD:

14     Q    For harassment, correct?

15     A    For anything.

16     Q    But in the video didn't you say that you could

17  call --

18     A    Due to his behavior I could have asked for him to

19  never be allowed on my campus again for the safety of my

20  employees.  I didn't, but I could have.

21     Q    But I'm asking you specifically about your use of the

22  term "harassment."  Did you believe that what Jane's father had

23  done in reference to the assistant principal constituted

24  harassment?

25     A    I don't know.  Like I was just saying, just like he

1  can file complaints, we can file complaints.  It was just an

2  example.

3       Q    And nothing that Jane reported you believe

4  constitutes harassment during her enrollment at AcadeMir; is

5  that right?

6            MS. KARRON:  Objection to form.

7       A    No, I already told you it was an isolated incident.

8  It happened once.  He's five.  He blurted out something he

9  heard.

10  BY MR. MACDONALD:

11      Q    Was the incident between Jane's father and the

12  assistant principal an isolated incident?

13           MS. KARRON:  Objection to form.  I'm not sure what

14      we're getting at with this.

15  BY MR. MACDONALD:

16      Q    You can answer.

17      A    No, it was the day before he also wasn't very

18  friendly.  He was just worse on Wednesday.

19      Q    Was that the first time that Jane's father had been

20  involved in an incident with the assistant principal like that?

21      A    This is a one-time incident, so, yes.  They spoke on

22  Tuesday; they spoke again on Wednesday.  And he was also very

23  irate over the phone.  So it's not -- he didn't do it once.  He

24  did it multiple times.

25      Q    Now, in that video you also reference the video that

```
1    Jane's father had; is that right?

2         A    I did after the fact, yes.  I forgot about that,

3    uh-huh.  Well, I never saw it or heard it, but my assistant

4    principal had reminded me of it when the officer went to write

5    her report.

6         Q    And do you recall that video saying something to the

7    effect of, I don't want to know what happens at your house, I'm

8    good?

9         A    Yeah, I told him that over the phone I did not need

10   to view that.  That's the privacy of his home.  Very private

11   video, very intimate.

12        Q    What does the fact that the video was taken at home

13   have to do with whether you wanted to listen to it or not?

14        A    I never said I wasn't going to listen to it.  I said

15   I wasn't going to view it.  I already told you that if he would

16   have come in person I would have gladly listened to it.  He

17   refused to come in person to meet with me.  If he sent it to me

18   via email or via text, which he kept asking me for my cell

19   phone number and I kept telling him I would not provide that to

20   him, I was not going to do it.

21        Q    Did you say any of that to the police officer?

22             MS. KARRON:  Objection to form.

23        A    We just watched the whole video.

24   BY MR. MACDONALD:

25        Q    And in regards to that comment specifically, do you
```

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 136 of 143

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    believe that you have a responsibility to ensure the safety of

2    students even at home?

3         MS. KARRON:  Objection to form.  Calls for a legal

4      conclusion, and speculation.

5    BY MR. MACDONALD:

6         Q    You can answer.

7         A    I don't know what happens in children's homes.  If a

8    child reports anything to me that happens at a home, yes, I

9    have a responsibility to report it.  I cannot presume or assume

10   what happens in a child's home, in children's homes.

11        Q    And you'd agree that you have a duty with respect to

12   a student's safety even if you learned of that incident through

13   a recording that was taken at home?

14        MS. KARRON:  Objection to form.

15        A    I have a responsibility to ensure children are safe.

16   It has to be reported to me, though, otherwise.  I have to

17   suspect.  The biggest thing here is you have to suspect.  I

18   don't suspect that she was abused.  If not, I would have called

19   DCF.

20   BY MR. MACDONALD:

21        Q    Now, in the video you reference cases of neglect, I

22   believe, as well; is that right?

23        A    No, I did not reference that.  What I told the

24   officer is exactly what I'm telling you, that if I would have

25   suspected neglect I would have called DCF.

1      Q     And in those cases if you had to report to DCF do you

2   also have a responsibility to investigate and take action in

3   regards to your role at AcadeMir?

4          MS. KARRON   Objection to form.

5      A     Once a report -- once you suspect anything like that,

6   you report it to DCF, you also have to report it to the police

7   and you allow them to investigate.  I'm not a detective nor am

8   I a DCF investigator.  Once DCF and the police get involved, I

9   lose jurisdiction.  Then it's on them for the findings.

10  BY MR. MACDONALD:

11     Q     Once DCF gets involved you lose jurisdiction?

12     A     Of the investigation.  I don't go to their houses and

13  visit them to talk to them and interview them.  That's DCF that

14  does that.

15     Q     Have you ever had to call DCF in the past while you

16  worked at AcadeMir?

17     A     Yes, of course.

18     Q     How many times?

19     A     I don't know.

20     Q     More than once?

21     A     Yes.

22     Q     Did you or anyone at AcadeMir ever contact DCF in

23  regards to Jane's allegations?

24     A     In regards to who?

25     Q     Jane's allegations.

1      A     No.  I mean, I didn't.  They don't have to tell me if

2  they call DCF, so I don't know, but I didn't.

3      Q     And why did you not call DCF?

4      A     Because I never suspected abuse, neglect, or

5  abandonment.

6      Q     At any point was Jane provided with a notice relating

7  to her Title IX rights that you're aware of?

8      A     No, I don't hand that out to students, but like I

9  told you, that's public domain.

10     Q     Jane or Jane's parents can get that form online?

11     A     Yes, they could if they wanted to.  They never

12 claimed harassment.  The words never came out of their mouth.

13 They never claimed anything like that.  Their whole thing was

14 that they wanted the kid kicked out, they wanted to see the

15 footage, and since I wasn't giving it, they were going to get

16 the police to do it.  And when the police didn't give it, then

17 that's it, they withdrew the girl from the school.

18     Q     What do you mean "when the police wouldn't give it"?

19     A     She said it in the video that she was not -- she

20 couldn't remove him from the school.  She couldn't show them

21 the video footage.  Because their whole thing was that police

22 were going to do it and we were going to see how the police

23 were going to, you know, come in and force us to do everything.

24 I told him that we can't do that for the privacy of our

25 students and such.

1    Q    Was Jane ever offered any support services as a

2    result of her complaint that she made against L.R.?

3    A    Yeah, she was offered, obviously, the counselor, and

4    she could have gotten further services, but on Wednesday the

5    father told me that he did not want her speaking to anybody

6    else so he refused that.

7    Q    Anything else besides being offered the counseling in

8    regards to support services?

9    A    I mean, it starts with the counselor and then the

10   counselor refers to the mental health coordinator, but we never

11   got a chance to do that because the counselor met the girl on

12   Tuesday, interviewed the girl.  On Wednesday the father told me

13   he didn't want his daughter talking to anybody.  The mental

14   health coordinator always has to call the parents to get

15   consent.  He already didn't consent.  And she was absent on

16   Thursday, Friday, and Monday.  And then on Tuesday she was

17   withdrawn.  We were never given that opportunity.

18   Q    Were any other services offered to Jane besides those

19   that you just described?

20   A    The counseling and the mental health?

21   Q    Yeah, besides that.

22   A    No, her father refused the help.

23   Q    And then you mentioned a mental health coordinator.

24   Who is that?

25   A    Kathy Gonzalez.

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 140 of 143

Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1      Q      And she's an employee of AcadeMir, I'm guessing?

2      A      No, she's an employee of Miami-Dade County Public

3   Schools.

4      Q      And what goal does she have as a counselor?

5      A      She's my mental health coordinator for the district.

6   She comes to my school once or twice a week to provide services

7   and support for families, uh-huh.

8      Q      But she never got involved with the situation

9   involving Jane, correct?

10     A      I don't believe so because on Wednesday the dad told

11  us that he didn't want her talking to anybody else.

12     Q      And was any action taken towards L.R. as a result of

13  what was reported?

14     A      A disciplinary referral that goes on his permanent

15  record, yes.

16     Q      And that was the form that we reviewed earlier; is

17  that right?

18     A      Correct.

19     Q      Anything else besides that form?

20     A      He was spoken to by multiple individuals.  He was

21  also spoken to by the counselor.  He received the disciplinary

22  referral.  It's a level one offense.  So, yes, that's it, you

23  write a referral, you speak with the child.  Part of

24  kindergarten is also constantly explaining acceptable behaviors

25  in the school.  It's part of our teaching.  Just like we teach

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 141 of 143

Deposition of Susie Bello                                          Jane Doe v. AcadeMir Charter Schools, Inc., et al.

 1   to stand in line and walk in line, we also teach them things

 2   you do and don't do in school.  We have to teach them.  And he

 3   never did it again.

 4          MR. MACDONALD:  We are going off the record.  We'll

 5      just take like a quick ten-minute break, but I should be

 6      pretty much done.  We should be able to wrap this up soon.

 7          (A recess was taken.)

 8          MR. MACDONALD:  Back on the record.  Those are all

 9      the questions I have for you today, Ms. Bello.  Counsel

10      for AcadeMir or Superior may have some questions for you,

11      but that's all I have.  Thank you very much for your

12      time.

13          MS. KARRON:  Thank you.  We will waive reading.

14          (At 3:29 p.m., no further questions were propounded

15      to this witness.)

16

17

18

19

20

21

22

23

24

25

Case 1:23-cv-23004-JB   Document 58-3   Entered on FLSD Docket 09/24/2024   Page 142 of
143
Deposition of Susie Bello                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA

 3   COUNTY OF HILLSBOROUGH

 4        I, the undersigned authority, certify that SUSIE BELLO

 5   remotely appeared before me and was duly sworn.

 6        WITNESS my hand and official seal this 13th day of

 7   May, 2024.

 8

 9

10        _____

11        MELISSA FERNANDEZ
          Notary Public - State of Florida
          Commission No.:  HH 278990
12        My Commission Expires:  6/21/2026

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2   STATE OF FLORIDA

 3   COUNTY OF HILLSBOROUGH

 4       I, MELISSA FERNANDEZ, Court Reporter, certify

 5   that I was authorized to and did stenographically report

 6   the foregoing deposition, and that the transcript is

 7   a true record of the stenographic notes.

 8       I further certify that I am not a relative,

 9   employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of any of the parties'

11   attorney or counsel connected with the action, nor am

12   I financially interested in the action.

13       Dated this 25th day of August, 2024.

14

15

16   _____

17   MELISSA FERNANDEZ
     Court Stenographer

18

19

20

21

22

23

24

25
```