EXHIBIT "E"

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 2 of 118

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1                IN THE DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2

 3              CASE NO.  1:23-cv-23004-WPD

 4   JANE DOE, a minor, by and through her

 5   mother and next friend, MOTHER DOE,

 6       Plaintiff,

 7   vs.

 8   ACADEMIR CHARTER SCHOOLS, INC., and

 9   SUPERIOR CHARTER SCHOOL SERVICES,

10   INC.,

11       Defendants.

12   _____/

13

14

15          DEPOSITION OF MELISSA VALLADARES

16

17             WEDNESDAY, MAY 15, 2024
                12:02 p.m. - 3:27 p.m.
18

19       601 BRICKELL KEY DRIVE, SUITE 700
                  MIAMI, FLORIDA
20
                      -   -   -
21

22

     Reported By:
23
     Katiana Louis
24   Notary Public, State of Florida
     Miami Office #27402
25
```

```
 1      APPEARANCES:

 2      On behalf of the Plaintiff:

 3      DEREK SMITH LAW GROUP
        520 Brickell Key Drive, Suite O-301
 4      Miami, Florida 33131
        (786) 568-8120
 5
        By:  KYLE THOMAS MACDONALD, ESQUIRE
 6           Kyle@dereksmithlaw.com

 7


 8      On behalf of the Defendant AcadeMir Charter
        Schools, Inc.:
 9
        FREEMAN MATHIS & GARY, LLP
10      301 East Las Olas Boulevard, Suite 250
        Fort Lauderdale, Florida 33301
11      (954) 406-5674

12      By:  JULIE BETH KARRON, ESQUIRE
             Julie.karron@fmglaw.com
13


14      On behalf of the Defendant Superior Charter
        School Services, Inc.:
15
        GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
16      601 Bayshore Boulevard, Suite 800
        Tampa, Florida 33606
17      (813) 515-0322

18      By:  JULIE CATHERINE MCHAFFIE, ESQUIRE
             Jmchaffie@garrisonyount.com
19

20

21

22

23

24

25
```

```
 1                    I N D E X
        Examinations                          Page
 2
        MELISSA VALLADARES
 3
        DIRECT EXAMINATION BY MR. MACDONALD        4
 4

 5

 6                  E X H I B I T S
        No.    Description                     Page
 7
        1      Title IX Policies and Procedures:  28
 8             Sex-Based Discrimination and Sexual
               Harassment Manual
 9      2      Elementary Code of Student Conduct 34
        3      DCF Intake Report                 108
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      Thereupon:
 2                      MELISSA VALLADARES
 3      was called as a witness, and having been first
 4      duly sworn and responding "Yes," was examined and
 5      testified as follows:
 6                      DIRECT EXAMINATION
 7      BY MR. MACDONALD:
 8          Q.   Good afternoon.  My name is Kyle
 9      MacDonald and I represent Jane Doe in her lawsuit
10      against AcadeMir Charter Schools, Inc., and
11      Superior Charter School Services, Inc.  Thank you
12      for being here today.
13          A.   Thank you.
14          Q.   Can you please start by stating your
15      full name for the record.
16          A.   Melissa Valladares.
17          Q.   And can you spell your last name for the
18      record please?
19          A.   V-a-l-l-a-d-a-r-e-s.
20          Q.   Have you ever had your deposition taken
21      before?
22          A.   No.
23          Q.   Since this is your first deposition,
24      I'll just go over a few things so we're both on
25      the same page.
```

1          Do you understand that you have been
2    placed under oath and that you have an obligation
3    to testify truthfully here today?
4          A.   Yes.
5          Q.   The court reporter cannot transcribe any
6    inaudible responses like a gesture or a shrug, so
7    just please be sure to answer verbally as you
8    have been.  Okay?
9          A.   Okay.
10         Q.   And also the court reporter cannot
11   accurately reflect your responses if we speak at
12   the same time.  So, I will wait for you to finish
13   your answers.  And I just ask that you wait until
14   I finish my questions.  Okay?
15         A.   Okay.
16         Q.   Now, we want to ensure that we get your
17   best testimony in this lawsuit, so if there is
18   any questions that you don't understand or you
19   find confusing, just let me know and I'll be
20   happy to try and rephrase them for you.  Okay?
21         A.   Okay.
22         Q.   Now, on that same note, if you don't say
23   anything, I'll assume you understood the question
24   as asked.  Okay?
25         A.   Okay.

1    Q.   If you need to take a break at any

2    point, to go to the bathroom, get a drink of

3    water, anything like that, just let me know and

4    I'll be happy to do so. Okay?

5    A.   Okay.

6    Q.   Is there anything that would prevent you

7    from thinking clearly and testifying truthfully

8    here today?

9    A.   No.

10   Q.   Now, for the purposes of today's

11   deposition, I'll refer to AcadeMir Charter

12   Schools, Inc., just as AcadeMir if that's okay

13   with you.

14   A.   That's okay.

15   Q.   I'll also refer to my client, who is a

16   minor as "Jane" to help protect her identity if

17   that is okay with you.

18   A.   Okay.

19   Q.   What did you do to prepare for today's

20   deposition?

21   A.   I met with the attorney Julie.

22   Q.   Aside from speaking with the attorney

23   Julie, did you speak with anyone else about your

24   deposition here today?

25   A.   No.

1      Q.   Did you speak to Susie Bello about your
2    deposition here?
3      A.   That I was going to be here and not at
4    work today.
5      Q.   And when was that conversation?
6      A.   When I received the notice with the date
7    and time.
8      Q.   Have you spoken with Susie Bello in the
9    last two days?
10     A.   Yes.
11     Q.   And did you discuss your deposition
12   today?
13     A.   No, just the time and date that I was
14   going to be out of work.
15     Q.   Did you speak to anyone else from
16   AcadeMir about your deposition today?
17     A.   No.
18     Q.   Did you review any documents prior to
19   your deposition today?
20     A.   There was a complaint document that I
21   was provided.
22     Q.   And did you review any other documents
23   aside from the complaint in this case?
24     A.   Not that I remember.  I believe that was
25   the attachment.

1    Q.   What's your current address?

2    A.   14880 Southwest 26th Street, Miami,

3    Florida 33196.

4    Q.   And how long have you lived at that

5    address for?

6    A.   For four or five years.

7    Q.   Have you ever been arrested before?

8    A.   No, never.

9    Q.   Have you ever been a party to a civil

10   lawsuit before?

11   A.   No, never.

12   Q.   Have you ever been a witness to any

13   other lawsuit before?

14   A.   No, never.

15   Q.   Did you attend college?

16   A.   I did.

17   Q.   Where did you attend college?

18   A.   Miami-Dade and Barry University.

19   Q.   And what did you go to Miami-Dade for?

20   What degree specifically?

21   A.   What degree did I earn?  I earned an

22   associate's in early childhood education and an

23   associate's in elementary education.

24   Q.   And when was that that you earned that

25   degree?

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 10 of 118

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1          A.    I believe it to be 2004.  I believe it

2     was 2004.

3          Q.    And then you said you went to Barry

4     University?

5          A.    Maybe I was wrong.  Maybe it was 2002.

6     I did go to Barry as well.  I don't remember when

7     I graduated.  It was a really long time ago.

8          Q.    And what degree did you earn at Barry?

9          A.    Elementary K through 6 with ESOL

10    endorsement and I also attended Barry University

11    for my master's degree.

12         Q.    What did you get your master's degree

13    in?

14         A.    Educational leadership.

15         Q.    Do you have any professional

16    certifications?

17         A.    My professional and my teaching

18    certificate.  When I was in Miami-Dade College, I

19    also earned the DCF requirement hours when I was

20    earning my associate's in early childhood.  I

21    believe that's it.

22         Q.    And what are the DCF requirement hours?

23         A.    It's like a 20-hour course so that you

24    can take care of early childhood students.

25         Q.    And that was a course taught by

1   Miami-Dade College?

2        A.   Correct.

3        Q.   What kind of topics did that training

4   cover, if you recall?

5        A.   I don't necessarily recall.  That was

6   over 20 years ago.

7        Q.   Are you a member of any professional

8   organizations?

9        A.   NSTA, which is the National Science

10  Teachers Association.  I've been a part of the

11  Dade Reading Council and that's about it.

12       Q.   Where do you currently work?

13       A.   AcadeMir Charter School West.

14       Q.   And what do you do at AcadeMir?

15       A.   I'm the assistant principal.

16       Q.   And what are your roles and

17  responsibilities as assistant principal at

18  AcadeMir?

19       A.   Day-to-day operations when it comes to

20  teachers, students, families, and stakeholders.

21       Q.   Who do you report to in your role as

22  assistant principal?

23       A.   Susie Bello.

24       Q.   And is Susie Bello the principal of

25  AcadeMir Charter School West?

1        A.    That is correct.

2        Q.    How long have you been assistant

3    principal for?

4        A.    Two years.

5        Q.    So, that would be since 2022 roughly?

6        A.    Correct.

7        Q.    And what job did you perform prior to

8    2022?

9        A.    Curriculum.

10        Q.    What was your title in curriculum?

11        A.    Curriculum coach is how they title it,

12    not PE coach but for curriculum.

13        Q.    How long did you hold that role for?

14        A.    Since 2016.

15        Q.    And what responsibilities do you have as

16    a curriculum coach?

17        A.    You support the teachers in the area of

18    curriculum.  Curriculum is probably the large

19    umbrella under that.

20        Q.    So, what kind of duties would you

21    perform on a day-to-day basis?

22        A.    You would meet with teachers to discuss

23    what their lesson plans were, provide them

24    feedback.  You were there to support the teachers

25    during the instructional period in areas where

1    they felt they wanted to grow in the profession.

2         Q.   And who did you report to in that role?

3         A.   During what years because I was there

4    since 2016.

5         Q.   So, you reported to more than one person

6    during that time you were curriculum coach?

7         A.   Correct.

8         Q.   And which individuals did you report to

9    during that time frame?

10        A.   Susie Bello.  Prior to that Olivia

11   Bernal.

12        Q.   Anyone else?

13        A.   Report directly?  Like top of the

14   schools, those are the principals.

15        Q.   And when you reported to Olivia Bernal,

16   what was her title at the time?

17        A.   School principal.

18        Q.   And do you know if Olivia still works

19   for AcadeMir?

20        A.   Yes.

21        Q.   And what does Ms. Bernal do?

22        A.   I know she's a COO.  However, I don't

23   know what -- I don't know what she does.

24        Q.   When was the last time you spoke with

25   Ms. Bernal?

1    A.   I don't remember.  It's not someone that

2  I report to when she's at the school.

3    Q.   More than a week ago?

4    A.   Possibly.  I don't even remember when

5  was the last time I spoke to her.

6    Q.   You don't know if you've spoken to her

7  in the past week?

8    A.   In the past week, no, I haven't spoken

9  to her.

10    Q.   Does Ms. Bernal also work for Superior

11  Charter Schools, Inc.?

12    A.   Yes.

13    Q.   And what does Ms. Bernal do for

14  Superior?

15    A.   I don't know.

16    Q.   And what is your understanding of the

17  relationship between AcadeMir and Superior

18  Charter Schools Services, Inc.?

19    A.   I would understand it as the operations

20  of the schools they oversee.

21    Q.   What does that mean, the operations?

22    A.   Grants or allocations of funding for the

23  school, things that need to get purchased.

24  That's what I would understand it as.  I'm sure

25  it far exceeds that.  It's just not my realm of

1   what I deal with.

2       Q.   Do you know who's responsible for

3   handling compliance with state and federal law

4   for AcadeMir?

5       A.   Our principal, Susie Bello.

6       Q.   And how do you know that she's

7   responsible for that?

8       A.   Because she's the top of the school.

9       Q.   And does anyone else at AcadeMir handle

10  compliance with state and federal law besides

11  Ms. Bello that you're aware of?

12      A.   I guess everyone really.  You're a

13  teacher, a certified teacher; so, I think

14  everyone plays a role within compliance as a

15  whole, but not the lead.  I would take the lead

16  as the school principal.

17      Q.   And do you know who is responsible for

18  handling compliance with state and federal law

19  for Superior Charter School Services, Inc.?

20      A.   No, I don't know.

21      Q.   Do you know what Title IX is?

22      A.   Yes.

23      Q.   And what is your understanding of

24  Title IX?

25      A.   It's what protects someone from

1    discrimination.

2         Q.   And where did you learn that?

3         A.   It's something that is spoken about at

4    the school, at the opening of our schools.

5         Q.   Title IX is spoken about at the opening

6    of schools?

7         A.   When it talks about Title IX

8    specifically, I don't know exactly what was said

9    verbatim.  In the sense of discrimination and

10   how -- and what that looks like, yes.  There's a

11   training that we take.

12        Q.   And when you say the opening of a

13   school, does that mean like the start of the

14   school year annually?

15        A.   Correct.

16        Q.   And is that part of a meeting that takes

17   place with staff and faculty?

18        A.   Yes.

19        Q.   And what is that meeting called?

20        A.   Opening of school.

21        Q.   And is that held at a particular

22   location each year?

23        A.   Yes.

24        Q.   And where was it held most recently?

25        A.   Miami-Dade College.

1    Q.   And when did that take place that

2    meeting?

3    A.   Are you asking me for a date, like a

4    date?

5    Q.   Yes, if you could estimate roughly even

6    the month that it took place.

7    A.   August.

8    Q.   August of 2023?

9    A.   Correct.

10   Q.   And at that opening of schools, Title IX

11   specifically was not discussed but you said

12   discrimination generally was?

13   A.   I'm not sure exactly if the language

14   "Title IX" was used.  I don't remember.  But yes,

15   what the -- as far as discrimination and how to

16   report something of safety it was discussed

17   during the opening of schools.

18   Q.   And who discussed it specifically at

19   that training?

20   A.   Susie Bello.

21   Q.   And do you recall what Ms. Bello said

22   specifically about the responsibilities relating

23   to discrimination?

24   A.   That we're all mandatory reporters.

25   Q.   And what is that, mandatory reporters?

1      A.    The obligation of someone at the school.

2      Q.    Obligation to do what?

3      A.    To report anything that we suspect of

4   abuse, neglect, or abandonment of a child.

5      Q.    Did Ms. Bello discuss anything

6   specifically other than being mandatory reporters

7   at the training?

8      A.    I don't remember.

9           I know we take an additional training

10  through ADP for harassment.

11     Q.    And that training that you mentioned is

12  that done on an annual basis or is that a

13  one-time training?

14     A.    Annually.

15     Q.    And is that a training that is done in

16  person or online?

17     A.    Online.

18     Q.    And that's a training given by ADP, the

19  payroll company, I'm guessing?

20     A.    They go beyond payroll, but yes, you're

21  correct.

22     Q.    When did you last take that training?

23     A.    May I give you a month?

24     Q.    Yes, if you can only recall the month.

25     A.    August.

1      Q.    And that would be August of 2023?

2      A.    It would be either August or July, but I

3    believe it to be in August.  That is correct.

4      Q.    And did you conduct that training at

5    home by yourself because it was done online?

6      A.    No, sir, that's done at school.

7      Q.    When you say it's done at school, is it

8    a group activity where everyone does the training

9    at the same time?

10     A.    No, everyone goes into their classroom

11   or their office space and they conduct it on the

12   computer.

13     Q.    And at the end of this training, did you

14   receive a certificate or something similar?

15     A.    Yes.

16     Q.    And did you have to do anything with

17   that certificate?

18     A.    Provide it to Ms. Bello.

19     Q.    What topics were covered as part of that

20   training?

21     A.    It's a lot of different scenarios of

22   what might appear to happen and how would be --

23   or what -- what would be the best approach to

24   solve something that might be happening.

25     Q.    Did that training cover Title IX

1    specifically?

2        A.   Yes.

3        Q.   And what did that training address about

4    Title IX?

5        A.   Again, it was just different scenarios

6    that might be present, that might appear, that

7    might happen.  That might happen.

8        Q.   And did the training say anything in

9    regards to AcadeMir's obligations relating to

10   Title IX in those scenarios?

11       A.   I don't understand the question.

12       Q.   Well, you said that the training covers

13   specific scenarios; correct?

14       A.   Correct.

15       Q.   And it also covered Title IX; is that

16   right?

17       A.   Correct.

18       Q.   So, what kinds of scenarios involving

19   Title IX were covered?

20       A.   Specific scenarios, I wouldn't even be

21   able to recall specifics because it was a lot of

22   different scenarios.  However, through those

23   scenarios it would help the person be able to

24   identify the problem at stake and be able to

25   resolve the issue.

1    Q.   And how long was that training roughly?

2    A.   That's a good question.  I think an

3 hour.  I believe it to be an hour.  I'm not sure

4 though.

5    Q.   Have you received any other training

6 related to Title IX that we haven't discussed

7 already while you've been at AcadeMir?

8    A.   Not that I recall.

9    Q.   Does AcadeMir have Title IX policies?

10    A.   Yes.

11    Q.   What are those policies?

12    A.   If you suspect or have any kind of

13 reason to believe that a complaint warrants

14 something greater of, you know, I guess

15 discussion, of sorts, I would just discuss that

16 with my school principal.

17    Q.   And where did you learn that information

18 from?

19    A.   Ms. Bello.

20    Q.   Did Ms. Bello explain that in one of

21 these start -- I don't remember the term you

22 used -- opening of schools trainings or was this

23 something separate?

24    A.   No, in our opening of schools we're told

25 we can go to HR or Ms. Bello with anything that

1    we would feel warrants a conversation.

2         Q.    So, you learned what you just described

3    in something separate with Ms. Bello?

4         A.    Just with Ms. Bello.

5         Q.    What do you mean?

6         A.    In our opening of schools, you mean?

7         Q.    Well, a moment ago you were just

8    describing AcadeMir's Title IX policy.  So, I was

9    asking if you learned that information

10   specifically at the opening of schools training

11   or if that was a separate conversation or

12   training with Ms. Bello.

13        A.    Sorry, I misunderstood.  It was said by

14   Ms. Bello in our opening of schools.

15        Q.    Thank you for clarifying.

16             Does AcadeMir have any written Title IX

17   policies?

18        A.    I know there's a whole binder of

19   policies.  I'm sure there is a policy for all

20   kinds of things.  And I'm sure that includes

21   Title IX.  However, my level of work would only

22   stop at -- when I report it to Ms. Bello.

23        Q.    So, you don't know for a fact if there

24   is any written Title IX policies for AcadeMir?

25             MS. KARRON:  Objection to the form.

```
 1          Misstates prior testimony.
 2              THE WITNESS:  I'm sorry.
 3              MS. KARRON:  I'll be objecting
 4       during the deposition, but you can feel
 5       free to ignore me unless I tell you not
 6       to answer.
 7              THE WITNESS:  Okay.
 8              MR. MACDONALD:  Can you read back
 9       the question?
10              (Whereupon, the requested portion
11       of the record was read by the reporter.)
12              MR. MACDONALD:  Unless she
13       instructs you not to answer, you have to
14       answer the question.
15              THE WITNESS:  I don't understand
16       what to do.  Do I answer it?
17    BY MR. MACDONALD:
18       Q.   Yes.
19       A.   Do I know if there are policies, yes,
20    there are policies in place.
21       Q.   And have you ever seen these written
22    Title IX policies?
23       A.   There's policies that go home in the
24    section of discrimination to parents in a
25    handbook.
```

1    Q.   And what is that handbook called?

2    A.   I believe it's the parent student

3  handbook.  It might just be parent handbook.  I'm

4  not sure if it says both titles or just one.

5    Q.   Have you ever seen any other written

6  Title IX policies besides the ones in that

7  handbook you just mentioned?

8    A.   I know that it's in the policy binder in

9  Ms. Bello's office.

10    Q.   And how do you know that?

11    A.   It says policies.

12    Q.   Have you reviewed this policy binder

13  before?

14    A.   No, I only refer to the policy binder if

15  needed.

16    Q.   Then how do you know that there is a

17  policy binder that contains Title IX policies?

18    A.   Because all of our policies are inside

19  this policy binder.

20    Q.   Has anyone ever told you that there is a

21  Title IX policy contained in a binder that

22  Ms. Bello has?

23    A.   All of our policies are in the binder.

24    Q.   Has anyone ever told you that there is a

25  binder containing these Title IX policies?

Deposition of Melissa Valladares                          Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1      A.    Ms. Bello.

2      Q.    When did Ms. Bello tell you that?

3      A.    When we start our trainings.

4      Q.    What trainings?

5      A.    Trainings for our school at the

6  beginning of the school year.

7      Q.    And is that the opening of schools

8  meeting you were referring to or something

9  different?

10     A.    We go through different meetings with

11 just administration.

12     Q.    And in which meeting did Ms. Bello tell

13 you there was a binder containing Title IX

14 policies?

15     A.    I don't remember.

16     Q.    Do you remember any meeting in which

17 Ms. Bello told you about a binder containing

18 Title IX policies?

19     A.    Specifically, I don't remember.

20     Q.    When did Ms. Bello tell you there was a

21 binder containing Title IX policies?

22     A.    Our instructions for policies are always

23 referred in reference to a binder that is in the

24 office.

25     Q.    But when did Ms. Bello specifically tell

1    you about this binder containing Title IX

2    policies?

3         A.   I don't know.

4         Q.   Was anyone else present when Ms. Bello

5    told you there was a binder containing Title IX

6    policies?

7         A.   I don't recall.

8         Q.   What do you recall about the

9    conversation with Ms. Bello where she told you

10   this?

11        A.   That we have a binder with all the

12   policies of our school.

13        Q.   And in that conversation she mentioned

14   Title IX specifically?

15        A.   I don't recall.

16        Q.   Did Ms. Bello ever explain what those

17   policies were specifically?

18        A.   I don't understand.

19        Q.   Well, you testified that Ms. Bello

20   informed you that there are binders containing

21   these policies including Title IX policies;

22   correct?

23        A.   Correct.

24        Q.   And during that conversation did

25   Ms. Bello explain what specifically those Title

1    IX policies addressed?

2         A.   No, I don't recall.  I know that if I

3    need to report anything whether it's from

4    student, teacher, a staff member, I would tell

5    her or my HR.

6         Q.   And when you say HR who are you

7    referring to?

8         A.   Human resources.

9         Q.   Is there a particular person that

10   handles human resources?

11        A.   Her name is Xenia.

12        Q.   Is Xenia an employee of AcadeMir Charter

13   Schools?

14        A.   I believe so.

15        Q.   And do you know what Xenia's title is?

16        A.   HR.

17        Q.   What is the procedure for handling Title

18   IX complaints for employees at AcadeMir?

19        A.   I don't know.  I know what it is for me.

20        Q.   And what is that process?

21        A.   I speak to Ms. Bello or I speak to HR.

22        Q.   And what happens after that?

23        A.   I don't know.

24        Q.   Have you ever received a Title IX

25   complaint?

```
 1            A.    No.
 2            Q.    Does AcadeMir have any policies in place
 3      regarding sexual harassment?
 4            A.    I'm sure.
 5            Q.    Do you know for a fact that AcadeMir has
 6      policies in place for sexual harassment?
 7            A.    It's part of our training.
 8            Q.    Which training?
 9            A.    The one that we take on ADP.
10            Q.    Now, that ADP training, is that created
11      specifically for AcadeMir?
12            A.    I don't know.
13            Q.    Did that training address anything
14      specific to AcadeMir like let's say the name of
15      employees?
16            A.    No.
17            Q.    Have you ever received a complaint of
18      sexual harassment?
19            A.    No.
20            Q.    Do you know of anyone at AcadeMir who
21      has ever received a complaint of sexual
22      harassment?
23            A.    Not that I am aware of.
24            Q.    Have you ever received a complaint
25      regarding discrimination?
```

```
 1        A.   No.
 2        Q.   Do you know of any employees at AcadeMir
 3   who have received complaints of discrimination?
 4        A.   Not that I am aware of.
 5        Q.   Besides what is contained in that ADP
 6   training, are you aware of any other written
 7   policies for AcadeMir regarding sexual
 8   harassment?
 9        A.   I don't know.
10        MR. MACDONALD:  I'd like to show
11   you a document.  Give me a moment.  I'll
12   show you this document here we'll go
13   ahead and mark it as Exhibit 1.
14        (Plaintiff's Exhibit No. 1 was
15   marked for identification.)
16   BY MR. MACDONALD:
17        Q.   I'll give you a moment to review.
18        MS. KARRON:  Could you please
19   explain what you're showing the witness.
20        MR. MACDONALD:  It's a document,
21   Title IX.  Policies and Procedures:
22   Sex-Based Discrimination and Sexual
23   Harassment Manual.
24        MS. KARRON:  Thanks.
25        THE WITNESS:  Are you wanting me to
```

1      read this verbatim word for word, the

2      whole handbook?

3   BY MR. MACDONALD:

4      Q.   No, I just want to give you a moment to

5   review the document and I'll ask you questions

6   about it.

7      A.   Like a graded quiz?  Do I need to

8   memorize the information?

9      Q.   No, I just want to give you the

10  opportunity to review it briefly.

11     A.   Can I reference the document while

12  you're talking to me?

13     Q.   Yes.

14     A.   Okay.

15     Q.   Do you recognize that document?

16     A.   It's not a document that I would see on

17  a day to day, but I'm sure it's at the school.

18     Q.   Have you ever seen that document before?

19     A.   Not that I recall, no.

20     Q.   Do you know who the Title IX coordinator

21  is for AcadeMir?

22     A.   Ms. Mir, Xenia Mir, who is our HR

23  person, the same one I referenced earlier.

24     Q.   Were you aware of that prior to

25  reviewing that document?

1    A.   The extra title of coordinator, no.  I

2  know that she's the person I would go to, so I

3  guess you would say, coordinator.  I just know

4  her as HR.  I also said earlier I didn't know her

5  title.  I just know her as HR.

6    Q.   Now, I want to draw your attention to

7  the fourth page, I believe.  They're not

8  numbered.  But on that page you'll see "Sexual

9  Harassment" under "Title IX" in blue text.

10    A.   I'm sorry.  Where?  There is no blue

11  text.

12    Q.   There should be a subheading under -- it

13  should be the title page and then one, two, three

14  pages?

15    A.   You said fourth.  That's why I didn't

16  get there.

17    Q.   Now, do you see the top of that page

18  there is a reference to an online complaint form?

19    A.   That's correct.

20    Q.   Do you know what that complaint form is?

21    A.   I'm sure it's online.

22    Q.   Have you ever seen that complaint form

23  before?

24    A.   Never had to fill it out, so no.

25    Q.   Have you ever received training related

1  to filling out that form?

2      A.   On how to fill out a form?  Forms are

3  usually self-explanatory.  We never get trained

4  on filling out forms.

5      Q.   And then I want to draw your attention

6  to the next page.  And there is a section --

7      A.   I'll come back to that later.  Where am

8  I going?

9      Q.   On the next page, there is a section

10  titled "How does AcadeMir Charter Schools respond

11  to reports of sexual harassment?"

12      A.   Okay.

13      Q.   Do you see that?

14      A.   Yes.

15      Q.   I'll give you a moment to review that

16  section.

17      A.   May I go to the next page to finish?

18      Q.   Yes.

19      A.   Okay.

20      Q.   Is that section an accurate statement

21  regarding how AcadeMir Charter Schools responds

22  to reports of sexual harassment?

23      A.   Yes.

24      Q.   And in that section do you see there's a

25  reference to the term "supported measures"?

1    A.   With the asterisk that the respondent

2    has an equal right to supportive measures?  That?

3    Q.   Do you know what the term "supportive

4    measures" means in that context?

5    A.   Within what context?  The policy?

6    Q.   Do you know what the term "supportive

7    measures" means within the context of AcadeMir's

8    policies?

9    A.   Well, you would have to look at the case

10   for what it is because it depends on -- it has

11   many variables.

12   Q.   And what particularly could those

13   supportive measures be?

14        MS. KARRON:   Objection.  Calls for

15        speculation.

16   BY MR. MACDONALD:

17   Q.   Based on your experience, what kind of

18   supportive measures are available under

19   AcadeMir's policies?

20   A.   Again, I would think that it would

21   depend on the case at hand.  There's some

22   limitations to a school, equally that there are a

23   lot of things that the school can do depending on

24   what the case is.

25   Q.   What kinds of things can a school do

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    depending on a case?

2         A.    Depends on the case.

3         Q.    What does it depend on?

4         A.    The case.  Are you talking about sexual

5    harassment or are you talking about harassment?

6         Q.    Well, what would it depend on in cases

7    of sexual harassment?

8         A.    The students, their schedule, their age.

9         Q.    Have you ever received any training

10   related to supportive measures for Title IX

11   purposes or sexual harassment purposes?

12        A.    I don't recall.

13        Q.    Have you ever had to offer supportive

14   measures to any AcadeMir students in response to

15   a claim of sexual harassment?

16        A.    No.

17        Q.    Have you ever had to offer supportive

18   measures to an AcadeMir student in response to a

19   complaint of discrimination?

20        A.    No.

21        Q.    Now, I want to draw your attention to

22   the next page in the section titled "Student

23   Parent Complaints."

24        A.    Am I supposed to be reading it?

25        Q.    Yes.  I'll give you a moment to review

1    the section titled "Student Parent Complaints."

2                Have you had a chance to review?

3         A.    Yes.

4         Q.    Do you see in that section there's a

5    reference to the Miami-Dade County Public Schools

6    Code of Student Conduct?

7         A.    Correct.

8         Q.    Are you familiar with that document?

9         A.    Yes.

10        Q.    And in your experience, does AcadeMir

11   adhere to those policies in the Miami-Dade County

12   Public Schools Code of Student Conduct?

13        A.    Yes.

14             MR. MACDONALD:  Now, I'll show you

15        another document.  You can set that one

16        aside for a moment.  We'll mark this as

17        Plaintiff's Exhibit 2.

18             (Plaintiff's Exhibit No. 2 was

19        marked for identification.)

20             MR. MACDONALD:  And for the record

21        this document is titled "Elementary Code

22        of Student Conduct."

23             MS. KARRON:  Thank you.

24   BY MR. MACDONALD:

25        Q.    And I'll give you a moment to just

1    review that.

2              Do you recognize that document?

3         A.   Yes.

4         Q.   And what is it?

5         A.   It's the code of student conduct.

6         Q.   Have you ever received training related

7    to this code of student conduct?

8         A.   I don't understand the question.  Like

9    where we all went through it, page by page?

10        Q.   Well, what do you understand the term

11   "training" to mean?

12        A.   A review put forth in a gathering to go

13   page by page of this handbook.

14        Q.   Okay.  And have you ever received

15   training related to this code of student conduct?

16        A.   No.

17        Q.   Now, I want to draw your attention to

18   the page labeled 43.

19        A.   Page Number 43?

20        Q.   That's correct.

21        A.   Okay.

22        Q.   Are you familiar with this section

23   titled "Sexual Harassment"?

24        A.   Okay.

25        Q.   Are you familiar with this section

1    titled "Sexual Harassment"?

2        A.    I'm sure if it was in the handbook.

3        Q.    In your experience does AcadeMir adhere

4    to this policy regarding sexual harassment?

5        A.    I've never had to experience needing to

6    address sexual harassment as outlined in this

7    statement.

8        Q.    Upon an AcadeMir employee receiving a

9    report of an incident that is sexual in nature

10   involving a student, what are employees required

11   to do?

12       A.    Tell the principal.

13       Q.    They're required to tell the principal

14   you said?

15       A.    Yes.

16       Q.    Are they required to tell anyone else?

17       A.    You would first address your concern

18   with the principal.  And then the principal

19   carries guidance and policies throughout.

20       Q.    Is there anyone else that an employee

21   can report to regarding one of those incidents

22   besides the principal?

23       A.    Can they?  I'm sure they can report it

24   to any authority.

25       Q.    Is there anyone else that an AcadeMir

1    employee could report to under this policy?

2         A.    Xenia.

3         Q.    Anyone else besides Xenia and the

4    principal?

5         A.    Like an employee, like a teacher, or

6    myself that one would report to at the school?

7    Is that the question?  Or are you talking about,

8    like, the authorities such stated here as the

9    Office of Civil Rights Compliance?

10        Q.    Can AcadeMir employees report to that

11   Office of Civil Rights Compliance if they receive

12   a report of an incident sexual in nature

13   involving a student based on your experience?

14        A.    Can they?  Yes.

15        Q.    Are they required to?

16        A.    Are they required to?  I think, sure.

17   We're all mandatory reporters.

18        Q.    And what does the term "mandatory

19   reporters" mean in this context specifically?

20        A.    In what context?

21        Q.    In the context of handling of reports

22   that are sexual in nature?

23        A.    What is my requirement?

24        Q.    As a mandatory reporter, what are the

25   requirements under the sexual harassment policies

1   as you understand them?

2        A.   You would report it.  And once you

3   report it, it goes into a different level of

4   jurisdiction that you don't have control over.

5   It goes somewhere else.

6        Q.   And when you say mandatory reporter,

7   that means an employee is required to make that

8   report; is that right?

9        A.   Correct.

10        Q.   What kinds of reports are you required

11   to do for that mandatory reporting?

12        A.   In the event where there was sexual

13   harassment, in the event that you suspect abuse,

14   neglect, or abandonment.

15        Q.   Now, in this policy there is also

16   reference to the term SPAR, do you see that?

17        A.   Uh-huh.

18        Q.   Do you know what the term SPAR means?

19        A.   Like its acronym broken down?  No.

20        Q.   Do you know what it is generally?

21        A.   Sure.

22        Q.   What is it?

23        A.   It's the level in which we document.

24        Q.   What do you mean the level in which you

25   document?

1      A.    I believe it to be the -- like an

2   investigation, and within that investigation

3   there is documentation, like forms that you need

4   to complete.

5      Q.    Have you ever filled out one of those

6   forms before?

7      A.    No.

8      Q.    Now, I want to draw your attention to

9   page 83.  Do you see the section titled "Sexual

10  Harassment" and then there is a box containing

11  some text?

12     A.    Yes.

13     Q.    I'll give you a moment to review that

14  section.

15     A.    Okay.

16     Q.    In your experience, does AcadeMir

17  utilize this definition of "sexual harassment"?

18     A.    Yes.

19     Q.    And in this section do you see where it

20  says, "Examples may include but are not limited

21  to unwelcome touching, graphic verbal comments,

22  sexual jokes, slurs, gestures, or pictures

23  whether in-person or through any other method,

24  including sexual or cyber-harassment"?

25     A.    Yes, I see it there.

1      Q.   And do you see towards the bottom where

2   it says, "Example, a student was suspended for

3   sexual harassment because he repeatedly talked

4   about a female student's private parts making her

5   feel uncomfortable"?

6      A.   Yes, I see it.

7      Q.   Now, I want to draw your attention to

8   the next page, 84, to a section titled "Sexual

9   Offenses (Other)."

10          Did you get a chance to review?

11      A.   Yes.

12      Q.   In your experience does AcadeMir utilize

13   this definition of "Sexual Offenses (Other)"?

14      A.   Yes.

15          MS. KARRON:   Objection to form.

16   BY MR. MACDONALD:

17      Q.   And in that section, do you see there

18   are several examples listed?

19      A.   I see it.

20      Q.   And do you see among those examples one

21   of them is "Any type of sexual contact with a

22   student who is under age 16 years old"?

23      A.   I see it.

24      Q.   Now I want to draw your attention to

25   page 76.  I'd like to draw your attention to the

1    section titled "Harassment Level II - Behavior."

2    Just let me know when you have had a chance to

3    review.

4            Have you had a chance to review that

5    section?

6        A.   Yes.

7        Q.   In your experience does AcadeMir utilize

8    this definition for "Harassment Level II -

9    Behavior"?

10        A.   Yes.

11        Q.   Are you familiar with the terms

12    "Level II," "Level III"?

13        A.   Yes.

14        Q.   What do those terms mean?

15        A.   The severity of the incident.

16        Q.   And where did you learn about the use of

17    severity in relation to those levels?

18        A.   In meetings with Ms. Bello.

19        Q.   You've received training on those

20    levels?

21        A.   I think our definition of "training"

22    might be a little different.  So, to be clear, we

23    don't take full documents page by page and break

24    them down.  We have discussions.  There are

25    several meetings.  There's a level of

Deposition of Melissa Valladares          Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    understanding of certain documents; however, we

2    don't go page by page and read it together in a

3    group setting.

4         Q.   But you discussed the application of

5    those levels in relation to student conduct with

6    Ms. Bello and other staff members?

7         A.   Yes.

8         Q.   Now, previously you testified that upon

9    receiving a complaint relating to discrimination

10   or harassment, you would report it to the

11   principal; is that right?

12        A.   Correct.

13        Q.   You said correct?

14        A.   Yes, that is correct.

15        Q.   Where are students or -- sorry.  Strike

16   that.

17             To whom are students instructed to

18   report complaints related to discrimination or

19   harassment?

20        A.   To any adult that's in the building.

21        Q.   Any adult?

22        A.   Any adult.  The only adults that are in

23   the building are those that work at the school.

24        Q.   And how are students instructed of that

25   reporting process?

1      A.   It's in the code of student conduct.

2      Q.   Are students ever specifically informed

3   of that procedure for reporting those complaints?

4      A.   I don't know.

5      Q.   You don't know if students are informed

6   of that?

7      A.   I know I did not go and explain this to

8   students.  So, if some other adult did, I don't

9   know.

10     Q.   Are you aware of any other AcadeMir

11  employees that have instructed students in that

12  manner?

13     A.   I don't know.

14          MR. MACDONALD:  We can go ahead and

15      go off the record.  And we'll go ahead

16      and take a five-minute break if that's

17      okay with everyone.

18          (A brief break was had.)

19  BY MR. MACDONALD:

20     Q.   Are you familiar with my client Jane?

21     A.   Yes.

22     Q.   Have you ever met her before?

23     A.   Yes.

24     Q.   And she was a student at AcadeMir; is

25  that right?

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1        A.    That is correct.

2        Q.    When did she start her enrollment with

3    AcadeMir?

4        A.    In her years of VPK.

5        Q.    And when was that?  When she was in VPK?

6        A.    At the age of four.

7        Q.    And when was that in terms of a calendar

8    year, if you recall?

9        A.    So, not her kindergarten year of last

10   year, but the year before that.

11       Q.    How often did you interact with Jane

12   when she was a student at AcadeMir?

13       A.    Every day that I was working.

14       Q.    So pretty frequently then; right?

15       A.    That is correct.

16       Q.    During Jane's enrollment, did she ever

17   have any issues related to her academic

18   performance?

19       A.    No.

20       Q.    During Jane's enrollment, did she ever

21   have any issues related to discipline?

22       A.    Discipline that she was given severity

23   minus just a parent phone call or parent

24   conference, not that I am aware of.

25       Q.    What do you mean severity minus?

1    A.   Nothing that she was given a referral

2    for.

3         Q.   But there were things that caused

4    AcadeMir to reach out to her parents?

5         A.   Not AcadeMir, but the teacher.

6         Q.   And which teacher was that?

7         A.   Ms. Chaudry.

8         Q.   What issues did Jane have that required

9    contacting her parents?

10        A.   She had, I guess one would consider

11   tantrums.  I guess I would categorize them as

12   tantrums.

13        Q.   Tantrums about what?

14        A.   Not doing something, not wanting to do

15   something, which is transitioning from one

16   subject to the next, maybe not wanting to do her

17   math or -- in that kind of transition or subject

18   matter.

19        Q.   You mentioned transitioning?

20        A.   We go from subject to subject.  So,

21   we'll start in a subject.  Students will start

22   doing reading and then they will move into a

23   different subject.  So, that's the transition I'm

24   referring to.  Maybe she wanted to stay on

25   reading; she didn't want to move to math.  So,

1  that's what I'm referring to.

2      Q.   And Jane would have a temper tantrum

3  when that transition would occur?

4      A.   Yes.

5      Q.   When were you first made aware of that

6  issue?

7      A.   I wouldn't be able to recall an exact

8  month or date.  I just know that it came up in

9  conversation with the teacher when discussing

10 students.  It wasn't anything that I took part

11 in, that kind of discussion.  It's very normal

12 for a kindergartner.  They are just coming into

13 school and kindergarten is very different from

14 VPK.

15     Q.   And this is something that Ms. Chaudry

16 shared with you specifically?

17     A.   Yes.

18     Q.   Was anyone else present for that

19 conversation?

20     A.   No.  It was mentioned in like a data

21 chat when we were discussing data, which is also

22 a normal group setting type of conversation.

23     Q.   What is a data chat?

24     A.   Students take assessments on a biweekly

25 basis and/or district test that we discuss

1    student success and how to achieve certain levels

2    of learning gaps or extensions of their learning.

3        Q.   And it was in one of those data chats

4    that Ms. Chaudry mentioned these issues?

5        A.   And she had mentioned it equally prior.

6        Q.   So, yes, but she had also mentioned it

7    in a previous conversation with you?

8        A.   Correct.

9        Q.   Who else was present for the data chat

10   when Ms. Chaudry made those statements?

11       A.   Ms. Bello and other kindergarten

12   teachers were present.

13       Q.   What kindergarten teachers were present?

14       A.   During data chats?

15       Q.   During that specific data chat.

16       A.   I wouldn't be able to recall that

17   specific data chat.  No.  I don't know.

18       Q.   Where did that conversation take place

19   during that data chat?

20       A.   Data chats take place in Ms. Bello's

21   office.

22       Q.   And where did the conversation that

23   happened prior with Ms. Chaudry take place?

24       A.   On our campus.

25       Q.   Where on the campus?

1        A.   Like a specific location you're asking?

2    I wouldn't be able to break it down to a specific

3    location.  I don't know.  I just know that we had

4    a conversation about different kinds of students

5    and that was one of the conversations that had

6    come up.  Plus, equally, I've witnessed one of

7    her tantrums, one would say.

8        Q.   When did you witness one of her

9    tantrums?

10        A.   She had put a tear into her legging.  I

11    don't remember how she had torn up her legging

12    that day.  And I think the whole school had heard

13    how loudly she was vocalizing that day how upset

14    she was.

15        Q.   When did that happen?

16        A.   At some point during the school year.  I

17    wouldn't be able to recall an exact day or month

18    even.  She was just a student that -- you heard

19    her.

20        Q.   And where did that take place?

21        A.   On our campus.

22        Q.   Where on the campus?

23        A.   Like a specific place that she was

24    upset?

25        Q.   That you heard her getting upset.

1    A.   Where I would be?  I'm sure I was

2    probably walking in a hallway as I usually do.

3    When I'm on that campus, I'll walk the hallways

4    or I'll be in my office.  The school isn't that

5    large of a campus if Jane was upset.

6    Q.   Was anyone else there when you heard

7    that incident about the tearing of her legging?

8    A.   Ms. Chaudry.

9    Q.   Anyone else?

10    A.   Not -- I don't know.  I'm sure there

11    were other adults present in the building.

12    Q.   Did you consider these temper tantrums

13    to be a serious issue?

14    A.   No.

15    Q.   You said it's fairly normal for students

16    of that age to have those issues pertaining to

17    temper tantrums?

18    A.   Yeah, kindergarten is a special group

19    because they're usually coming to a setting that

20    is very structured, where they otherwise were not

21    having that same kind of level of structure in

22    their day-to-day.

23    Q.   Were those issues related to the temper

24    tantrum ever documented?

25    A.   That would be a question for

1    Ms. Chaudry.  I don't know.

2        Q.   Are you aware of any documents

3    personally that would reflect those issues

4    pertaining to temper tantrums?

5        A.   Am I aware of any documents?  No.

6        Q.   Now, you mentioned that it did not rise

7    to the level of referrals; is that right?

8        A.   Right.

9        Q.   What type of conduct typically rises to

10   the level of referrals?

11       A.   Probably like -- you want me to give

12   something I would write a referral for?  It could

13   be something as -- it could severe, that would

14   warrant a referral, or something such as

15   inappropriate language, they would get a

16   referral.

17       Q.   And who does that referral go to

18   typically?

19       A.   Ms. Bello.

20       Q.   During Jane's enrollment, did she ever

21   report sexual harassment to any employees of

22   AcadeMir?

23       A.   No.

24       Q.   Did Jane's parents ever report sexual

25   harassment during her enrollment at AcadeMir?

1      A.   I know that Dad came in on Tuesday --

2   Mom and Dad had come in on Tuesday, so that would

3   be the 24th, after something that had taken place

4   on Friday.  And they had made allegations that

5   were far different than what was said on the

6   20th, which was the Friday that an incident took

7   place.

8      Q.   And when you say the 20th, what date are

9   you referring to?

10      A.   Friday.

11      Q.   January 20th?

12      A.   That's correct.

13      Q.   January 20, 2023?

14      A.   Correct.

15      Q.   What was reported on that Friday,

16   January 20th?

17      A.   That a student had used inappropriate

18   language towards another student.

19      Q.   Which student made inappropriate

20   language or stated inappropriate language?

21      A.   Do I use his name?

22      Q.   Yes, you can use his name,

23      A.   I'm sorry.  I asked because we were

24   using the other student's name different so I

25   wasn't sure.  His name is      .

```
 1        Q.   And what is       's last name?
 2        A.   ████████████
 3        Q.   Now, from this point forward we can
 4   refer to              as L.R., if that is okay
 5   with you?
 6        A.   Okay.
 7        Q.   Who was it reported that L.R. made this
 8   statement to?
 9        A.   Who told me?
10        Q.   We can start there.  Who told you about
11   this incident?
12        A.   Ms. Chaudry.
13        Q.   And what exactly did Ms. Chaudry report
14   to you?
15        A.   That L.R. made an inappropriate comment
16   to Jane.
17        Q.   Was this a conversation that took place
18   in person?
19        A.   Between Ms. Chaudry and myself, that is
20   correct.
21        Q.   Where did it take place physically?
22        A.   I don't remember.
23        Q.   Now, did Ms. Chaudry tell you what the
24   inappropriate comments were?
25        A.   Yes.
```

Deposition of Melissa Valladares                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    Q.   What were those comments?

2    A.   That L.R. said that he wanted to touch

3  her cuca and her -- I believe the word was

4  tetitas.

5    Q.   And the term "cuca," is that referring

6  to her vagina?

7    A.   I mean --

8         MS. KARRON:  Objection to form.

9  BY MR. MACDONALD:

10    Q.   What do you understand the term "cuca"

11  to mean?

12    A.   I would understand it as a private area.

13    Q.   Private area meaning the area of

14  genitals; correct?

15    A.   Correct.

16    Q.   And the other term, "tetitas," what do

17  you understand that term to mean?

18    A.   I would take that as, I guess, breast,

19  equally another private area.

20    Q.   Did Ms. Chaudry tell you anything else

21  about those comments aside that he stated he

22  wanted to touch her cuca and tetitas?

23    A.   Can you ask me the question again?  I

24  didn't understand.

25    Q.   Did Ms. Chaudry tell you anything else

1    about the comments during that conversation?

2         A.   No.

3         Q.   Did Ms. Chaudry tell you how she had

4    learned of that incident?

5         A.   Yes.

6         Q.   And how did you she learn of it?

7         A.   Through Ms. Mortazavi, the PE coach.

8         Q.   And what was your reaction when you

9    learned of this incident?

10        A.   I contacted Ms. Bello.

11        Q.   How soon after speaking with Ms. Chaudry

12   did you speak with Ms. Bello?

13        A.   That same day.

14        Q.   Was it more than a few hours after?

15        A.   I don't remember the time frame.

16        Q.   Was it a conversation in person with

17   Ms. Bello?

18        A.   No, it was over the phone.

19        Q.   Were you concerned when you learned

20   about this incident?

21        A.   Was I concerned?  In what regard?

22        Q.   Well, did you consider that to be a

23   serious issue?

24        A.   No.

25        Q.   And why is that?

1    A.   Because kids say a lot of things at that

2    age, especially things they hear in their homes.

3    So, a student saying something inappropriate at

4    that age, you would discuss those matters with

5    parents.

6    Q.   And how old was Jane at the time of this

7    incident?

8    A.    In kindergarten, so those kids would be

9    five or six.

10   Q.   And was L.R. a kindergartner?

11   A.    Yes.

12   Q.   Of approximately the same age?

13   A.    Yes.

14   Q.   In your experience is it common for

15   five- or six-year-olds to make comments similar

16   to those?

17   A.    They say a lot of stuff.  Kindergartners

18   are like little parrots, and they come back with

19   things that are said in their homes without

20   really understanding what it is that they are

21   saying out loud, more than they just say.

22   Q.   Have you ever dealt with a five- or

23   six-year-old making comments like that in the

24   past?

25   A.    Not that I recall.

1      Q.   Are you aware of any other employees of

2  AcadeMir that have dealt with students of that

3  similar age of 5, 4, 6, making comments of that

4  nature?

5      A.   Not that I recall.

6           MS. KARRON:  Objection to form.

7  BY MR. MACDONALD:

8      Q.   So, how do you know that is a common

9  occurrence then?

10     A.   That students repeat what they say?

11     Q.   Well, this was the first time you ever

12 had a report made to you about a five or

13 six-year-old making allegations of this nature;

14 is that right?

15     A.   That is correct.

16     Q.   And you said that you didn't believe it

17 was a serious issue; is that right?

18     A.   That is correct.

19     Q.   Why wouldn't this be a serious issue if

20 this was the first time that you had learned of

21 an incident of that nature happening at AcadeMir?

22          MS. KARRON:  Objection to form.

23          MR. MACDONALD:  You can answer the

24     question.

25          THE WITNESS:  Wait.  It threw me

```
 1          off.  Can you state it again?
 2     BY MR. MACDONALD:
 3          Q.   Why did you not consider this to be a
 4     serious issue if that was the first time that you
 5     had ever learned of a report of a five or
 6     six-year-old making allegations of that nature?
 7          A.    Of saying things that they heard in
 8     their homes?  Well, I've heard plenty of things
 9     that have been said from children's homes;
10     however, you're taking it as if the child
11     understood at a level of sexual, that
12     five-year-olds don't understand sex.  They're
13     five.  So, you and I are at our age can
14     understand sex, but five-year-olds, they don't
15     understand sex.  So, that's why the student L.R.
16     was reprimanded for his Level I offense of a
17     referral with inappropriate language that was
18     used.
19          Q.   How do you know that L.R. didn't
20     understand the nature of those comments?
21          A.   He's five.
22          Q.   Did you ever speak to L.R. about those
23     comments?
24          A.   I did not.
25          Q.   How long has L.R. been enrolled at
```

1    AcadeMir for?

2         A.   That I know of since kindergarten and

3    still enrolled in first grade this school year.

4         Q.   During L.R.'s enrollment, has he ever

5    had any issues related to his academic

6    performance?

7         A.   No.

8         Q.   During L.R.'s enrollment, has he ever

9    had issues related to his behavior, conduct?

10        A.   No.

11        Q.   So, going back to when you learned of

12   that incident, you said you spoke with Ms. Bello?

13        A.   That is correct.

14        Q.   What did you tell Ms. Bello?

15        A.   That the student made an inappropriate

16   comment to another student.

17        Q.   Did you tell her what specifically those

18   comments were?

19        A.   That is correct.

20        Q.   What was her reaction?

21        A.   I can't see through a telephone.

22        Q.   What did she say in response?

23        A.   That she's going to take care of it and

24   she did.

25        Q.   What do you mean she did?

1    A.    There was nothing further for me to

2    investigate.  From there she did, I guess, what

3    she did, or what she does.  I don't know.

4    Q.    Now, you learned of this incident on

5    Friday the 20th, you said?

6    A.    That's correct.

7    Q.    Now, when you learned of this incident,

8    did you contact Jane's parents?

9    A.    Did I personally, no.

10   Q.    Do you know if anyone else did?

11   A.    Yes.

12   Q.    Who contacted her parents?

13   A.    Ms. Zoley.

14   Q.    Who is Ms. Zoley?

15   A.    The school front desk receptionist.

16   Q.    And how do you know that?

17   A.    That she contacted the parent?

18   Q.    Yes.

19   A.    There was an incident report that was

20   completed.

21   Q.    Did anyone tell you personally that

22   Ms. Zoley had placed that phone call?

23   A.    I don't recall.

24   Q.    Were L.R.'s parents notified of that

25   issue?

1    A.   Yes.

2    Q.   When were they notified?

3    A.   On Friday, the 20th.

4    Q.   How were they notified?

5    A.   Who spoke to them first?

6    Q.   Who was the first person to notify

7  L.R.'s parents?

8    A.   Ms. Chaudry.

9    Q.   And was it a phone call that Ms. Chaudry

10  placed?

11   A.   I don't know.  That would be a question

12  for Ms. Chaudry.

13   Q.   Did Ms. Chaudry tell you that she

14  contacted L.R.'s parents?

15   A.   Yes.

16   Q.   When did she tell you that?

17   A.   The 20th.

18   Q.   And what did she say L.R.'s parents

19  stated in response?

20   A.   That that student heard that language at

21  home and he repeated it from his home.  That she

22  was embarrassed and apologetic for that student

23  using that language in school.

24   Q.   And this was L.R.'s mother?

25   A.   Correct.

```
1        Q.   And she said that he had heard comments
2    of that nature at least at home?
3        A.   Correct.
4        Q.   Did she say how he heard those comments
5    or what specifically was the context in which he
6    heard them?
7        A.   That would be a question for
8    Ms. Chaudry.  I'm not aware.
9        Q.   Did anyone else speak to L.R.'s parents?
10       A.   I don't know.
11       Q.   That you are aware of?
12       A.   I don't know.
13       Q.   Well, I'm asking if you know if anyone
14   else spoke to L.R.'s parents besides Ms. Chaudry.
15       A.   I know I didn't.
16       Q.   Are you aware of any other employees of
17   AcadeMir that spoke to L.R.'s parents besides
18   Ms. Chaudry?
19       A.   I don't know.
20       Q.   You're not sure?
21       A.   I don't know.  Once I reported it to
22   Ms. Bello, she, like I said, kind of took it from
23   there.  I don't know.
24       Q.   Were L.R.'s parents ever notified in
25   writing of this incident?
```

1     A.   I don't know.

2     Q.   Were you aware of any other issues

3  between L.R. and Jane in the past?

4     A.   No.

5     Q.   Did you ask Ms. Chaudry or any other

6  employees about that?

7     A.   I asked them about an issue between the

8  both of them.

9     Q.   Did you ask Ms. Chaudry or anyone else

10 if there had been issues in the past between

11 these two students?

12    A.   Issues between students is usually

13 brought to my attention.  And at no time was an

14 issue ever brought to my attention regarding

15 these two students.  No.  This in itself was an

16 isolated incident.

17    Q.   How do you know that?

18    A.   Again, the teachers are very open to

19 discuss student behaviors and support needed for

20 student behaviors.  So, there was no other point

21 in time where an incident between Jane and L.R.

22 was ever reported to me.

23    Q.   Now, after Jane's parents were notified

24 on that Friday, what happened next?

25    A.   The parents of Jane reached out to

1    Ms. Chaudry to schedule a parent teacher

2    conference.

3         Q.   When was that?

4         A.   I don't know.

5         Q.   Do you know when that conference took

6    place?

7         A.   Tuesday, the 24th.

8         Q.   And did Ms. Chaudry tell you about this

9    conference?

10         A.   Yes.

11         Q.   Did she tell you before or after the

12    conference?

13         A.   I was in the conference.

14         Q.   And what was your understanding of why

15    Jane's parents wanted a conference?

16         A.   I don't know why they wanted it, but I

17    do know that they requested it.

18         Q.   How did they request that meeting?

19         A.   To Ms. Chaudry.

20         Q.   And Ms. Chaudry at some point asked you

21    to join her in that meeting?

22         A.   Correct.

23         Q.   So, on Tuesday who was present at that

24    meeting besides yourself and Ms. Chaudry?

25         A.   Jane's parents.

1    Q.   Both her mother and her father?

2    A.   Correct.

3    Q.   And what did they say specifically in

4    that meeting?

5    A.   That is the day that the dad had brought

6    up that it was not that the student L.R. said

7    this inappropriate comment but rather the

8    student, L.R., touched Jane.

9    Q.   That L.R. had touched Jane's vagina and

10   breast?

11   A.   I don't recall him saying specific

12   areas.  He definitely used the word touched.

13   Q.   Did he use the words, cuca or tetitas?

14   A.   Him specifically?  The dad?  No.

15   Q.   Did he say how he learned of this

16   allegation?  Whether Jane had told him or --

17   A.   I don't remember.

18   Q.   And what did you say in response to what

19   Jane's dad had shared with you?

20   A.   That I will investigate the matter.

21   Q.   Anything else?

22   A.   And that I would get back to him.

23   Q.   Did you say anything else?

24   A.   I don't remember.

25   Q.   And Ms., Chaudry, did she say anything

1    in that meeting?

2         A.   I'm sure she did.  I just don't recall.

3         Q.   And did Jane's father seem satisfied

4    regarding that statement regarding the

5    investigation?

6         A.   Yes.

7         Q.   Did you tell Jane's father when you

8    would follow up regarding this investigation?

9         A.   Yes.

10        Q.   And when was that?

11        A.   Same day.

12        Q.   So, you told him you would conduct the

13   investigation and let him know by the end of the

14   day?

15        A.   And I would follow-up with him, yes.

16   Some cases can be concluded the same day, but

17   I'll still follow up within the same day.  I find

18   it appropriate.

19        Q.   And how did the meeting conclude?

20        A.   With the counselor and myself.

21        Q.   The counselor was present with the

22   meeting with Jane's parents?

23        A.   During the one with Ms. Chaudry.

24        Q.   Let me clarify.  How did the meeting

25   conclude between you, Ms. Chaudry and Jane's

1  parents?

2      A.   That I would follow up at the end of the

3  day.

4      Q.   Did you in fact conduct an

5  investigation?

6      A.   Yes.

7      Q.   And what exactly did you do during the

8  course of your investigation?

9      A.   I reached out immediately to my school

10  principal, Ms. Bello, where she kind of took it

11  from there.  The counselor had come out and

12  spoken with Jane.  And the video footage from our

13  classroom was reviewed.

14      Q.   When did the guidance counselor get

15  involved?

16      A.   That day when the story changed that the

17  father was alleging physical touch.

18      Q.   And who reached out to the guidance

19  counselor?

20      A.   I would believe it to be Ms. Bello.

21      Q.   Did you reach out to the guidance

22  counselor?

23      A.   No, I reached out to Ms. Bello.

24      Q.   And how did you learn of the guidance

25  counselor's involvement  in this situation?  Did

1    she speak with you?

2        A.   We both spoke to Jane's dad at the end

3    of the day, close to -- end of the school day,

4    not day like day to night.

5        Q.   And was that a phone call or in person?

6        A.   Phone call.

7        Q.   Did anything occur between your phone

8    call to Ms. Bello about this investigation and

9    then your conversation later with Jane's father

10   and the guidance counselor?

11           MS. KARRON:  Objection to form.

12           THE WITNESS:  I didn't understand

13       the question.

14   BY MR. MACDONALD:

15       Q.   What happened after you spoke with

16   Ms. Bello on the phone that day?

17       A.   Like for me?

18       Q.   In regards to your investigation.

19       A.   Well, Ms. Bello was the one who -- that

20   would be a question for Ms. Bello, not for me.

21       Q.   Didn't you conduct the investigation?

22       A.   Ms. Bello did.

23       Q.   So, you did not conduct an

24   investigation?

25       A.   I reviewed footage alongside Ms. Bello.

1      Q.   Did you believe that to be conducting an

2  investigation?

3      A.   Well, for me, of what my part in my

4  support, and what was -- me?  Yeah, I'm not the

5  whole -- I'm not the whole party.  There's other

6  members involved.

7      Q.   Did Ms. Bello conduct an investigation

8  that you're aware of?

9      A.   Yes.

10     Q.   And how do you know that?

11     A.   Because there was a conclusion.

12     Q.   So, you said you reviewed video footage

13  with Ms. Bello?

14     A.   Correct.

15     Q.   When did you review video footage with

16  her?

17     A.   I can't recall an exact time of day.

18  That day.

19     Q.   But it was prior to your phone call with

20  the guidance counselor and Jane's father?

21     A.   Correct.

22     Q.   And where did you review that footage

23  with Ms. Bello?

24     A.   I don't remember.  No, I don't remember.

25  It would be there at the school, I'm not sure

1    what exact spot.  I don't remember.

2        Q.   Is there a particular location on campus

3    where video footage could be viewed?

4        A.   No.

5        Q.   How is video footage accessed at the

6    school?

7        A.   A computer and you log in.

8        Q.   Any computer?

9        A.   The security camera computer.

10       Q.   And where is that located?

11       A.   In the office.

12       Q.   And that's one particular computer that

13   has access to that footage; correct?

14       A.   There's other computers.  It's username

15   and password to access.

16       Q.   And what other computers can access that

17   footage?

18       A.   I'm sure there are others.

19       Q.   Well, you testified you weren't sure

20   where that took place, where you reviewed the

21   footage.  So, I'm trying to understand where

22   footage can be reviewed.

23       A.   On a computer.

24       Q.   How is it accessed?

25       A.   By logging in.

1    Q.    Logging in to what?

2    A.    Into the website for our computers.

3    Q.    What website is that?

4    A.    There's a website.

5    Q.    Do you know what it's called?

6    A.    I want to say it's Hik.  I might be

7    wrong.  I don't access that information on a

8    regular, so I wouldn't be able to give you a URL

9    web address to access to it.

10    Q.    And can anyone, rather any employee of

11    AcadeMir access that footage?

12    A.    No.

13    Q.    Which employees can access that footage?

14    A.    The username and password is only

15    provided to the principal and our IT personnel.

16    Q.    And you're not sure if you reviewed that

17    footage in the room where that particular

18    computer is located in that office?

19    A.    I don't remember.

20    Q.    What happened when you went over that

21    footage with Ms. Bello?

22    A.    The kids were orderly.  They're in their

23    room taking their tests.  You had the dividers

24    up.  The teacher had control of her classroom.

25    She was giving directions for these multitude of

```
 1    tests they were taking throughout the day.  You

 2    see students engaged in assessments.  Yeah, in

 3    essence, that is what it was.

 4        Q.   What time period did you and Ms. Bello

 5    review that footage for?

 6        A.   How long did it take us to view the

 7    whole day's worth?

 8        Q.   Let me rephrase.  Did you only review

 9    the camera footage for that Friday, January 20th?

10        A.   Yes, that I did, yes, me.  I can testify

11    for myself.

12        Q.   And did you and Ms. Bello watch footage

13    for that entire day on Friday, January 20th?

14        A.   Yes.

15        Q.   And you didn't see anything abnormal in

16    that footage?

17        A.   No.

18        Q.   Did you and Ms. Bello review or --

19    sorry.  Strike that.

20             Why did you and Ms. Bello not review

21    footage from any other days?

22        A.   Like wait.  Hold on.  If I understand

23    your question correctly, you're asking why we

24    didn't review footage of days prior to this

25    allegation from the dad?
```

 1        Q.    Well, you reviewed that footage with
 2   Ms. Bello in response to what Jane's father had
 3   alleged?
 4        A.    Correct.
 5        Q.    And did Jane's father specify where he
 6   believed this took place?
 7        A.    Yes.
 8        Q.    And what did he say in that regard?
 9        A.    In the classroom.
10        Q.    And did he say a specific time period in
11   which he believed that it took place?
12        A.    No.
13        Q.    So then, did you consider reviewing the
14   security camera footage from other days besides
15   the 20th?
16        A.    No.
17        Q.    Why not?
18        A.    Because Jane spoke of the incident on
19   the 20th, about it occurring on the 20th.
20        Q.    How do you know that Jane spoke about
21   the 20th specifically?
22        A.    That was the day it was reported.
23        Q.    Right, Jane made that report on the
24   20th?
25        A.    Correct.

1    Q.   But are you aware if she said that it

2  took place on the 20th?

3    A.   She didn't report it to me.  So, that

4  would be a question for someone else, not for me.

5    Q.   Well, did anyone tell you that?

6    A.   Me, specifically, no.

7    Q.   So then, how do you know that Jane

8  reported that it took place on the 20th?

9    A.   Like I said, it was something that was

10 reported on the 20th as occurring on the 20th.

11 That would be a question for Ms. Bello.  I would

12 believe, if you would think that it would be

13 something that might have been said by others, it

14 wasn't told to me, which is why I only looked at

15 the day that the dad had alleged that the

16 incident took place and so did the child.

17    Q.   The child had alleged that it took place

18 on the 20th?

19    A.   That's when she reported it, that the

20 student made an inappropriate comment to her.

21    Q.   But did you or Ms. Bello consider

22 looking at other days of footage to see if this

23 had occurred on a different day?

24    A.   No, I did not.

25    Q.   Were there any policies or procedures

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1    that you used when you were reviewing this
 2    footage?
 3         A.    Observation.
 4         Q.    Just personal observations?
 5         A.    Yeah, you're looking for student
 6    behavior, teacher behaviors.
 7         Q.    What behavior are you looking for in a
 8    teacher?
 9         A.    That she's teaching.  It's a funny
10    question.  Sorry.
11         Q.    Who made the decision between you and
12    Ms. Bello as to which footage to review?
13         A.    Are we talking about that again, that we
14    looked at the day of the 20th?
15         Q.    I'm asking -- who decided between you
16    and Ms. Bello which days to look at this footage?
17         A.    I don't know who made the executive
18    decision of grabbing the footage of the date the
19    report was made of the student making
20    inappropriate comments.  But I do know I only
21    looked at the 20th, which was Friday.
22         Q.    What happened after you reviewed that
23    footage with Ms. Bello?
24         A.    I think when we got done looking at the
25    footage, I believe by then the counselor was done
```

1   speaking to students and we had reached out to

2   the parents of Jane.

3       Q.   The guidance counselor interviewed

4   students?

5       A.   Yes.

6       Q.   Who was the guidance counselor at the

7   time?

8       A.   Stephanie Ruiz.

9       Q.   Does she still work at AcadeMir?

10      A.   She does not.  She's working on

11  clinicals or earning a certificate towards her

12  career.

13      Q.   When did she leave AcadeMir?

14      A.   At the end of the school year in June,

15  at the end of the school year.

16      Q.   Do you know if Ms. Ruiz works anywhere

17  currently?

18      A.   I have no idea.

19      Q.   Do you know what school she goes to?

20      A.   I have no idea.

21      Q.   Have you stayed in contact with Ms. Ruiz

22  since she left?

23      A.   No.

24      Q.   How did you learn of Ms. Ruiz

25  interviewing students?

1       A.    That she was doing it?  I could see her.

2       Q.    You witnessed her interviewing students?

3       A.    No, I wasn't present during the

4    interviews, but I know she went on campus to

5    interview students.

6       Q.    How did you learn of that?

7       A.    I could see her, when she came on to

8    campus I could see her.

9       Q.    But did you see her conducting these

10   interviews?

11      A.    No, I'm not present for those

12   interviews.

13      Q.    So, how do you know that she conducted

14   the interviews?

15      A.    The students came out of class and they

16   went into a room to speak to her.

17      Q.    And you saw this?

18      A.    That she spoke to students?  I didn't

19   see her going in and out of anywhere.  I just

20   know that the students -- she came on to campus

21   and she came for that purpose.

22      Q.    How do you know that she was there for

23   that purpose?

24      A.    Because -- this is very specific.

25   Because she came on to campus.  I don't know how

1    to explain this.

2         Q.   Did Ms. Ruiz tell you that she was going

3    to conduct interviews with students prior to

4    doing so?

5         A.   Yes.

6         Q.   When did she tell you that?

7         A.   When she came on to campus.

8         Q.   When was that roughly?

9         A.   Tuesday the 24th.

10        Q.   Was that a conversation in person?

11        A.   Yes.

12        Q.   Did Ms. Ruiz tell you who she was going

13   to interview?

14        A.   I'm not sure if she said out loud "I'm

15   here to pick up L.R. and Jane."

16        Q.   And did Ms. Ruiz speak to you after

17   conducting those interviews?

18        A.   No.

19        Q.   Do you know what the outcome of those

20   interviews were?

21        A.   No, that would be a question for

22   Ms. Bello.

23        Q.   And that same day you spoke to Jane's

24   father with Ms. Ruiz; is that right?

25        A.   That's correct.

1    Q.   What occurred on that phone call?

2    A.   I had advised that we had reviewed the

3  cameras and what I had stated to you of what I

4  had seen, which was that the students -- do you

5  want me to state it again?  About the students

6  were taking assessments, their dividers were up,

7  the teachers were giving instructions.  At no

8  point did I see L.R. make any type of contact

9  towards Jane at any point during their

10  instructional period at the school.

11    Q.   On that Friday, the 20th?

12    A.   Correct.

13    Q.   What did he say in response, Jane's

14  father?

15    A.   He wanted to see the cameras.  I told

16  him I couldn't show him the cameras.  For the

17  privacy of students, that was not something I

18  could allow him to view.  However, I know that I

19  had seen the footage.  And again I reiterated

20  what I had seen in the footage.

21    Q.   Did Ms. Ruiz say anything on the call?

22    A.   I don't remember what she said.

23    Q.   Okay.  Then following that phone call,

24  what happened next?

25    A.   On Wednesday, dad showed up to the

1    school.

2          Q.    Where did he show up?

3          A.    At the school.  You want the address?

4          Q.    Did Jane's father speak with anyone

5    specifically?

6          A.    With me.

7          Q.    And what did Jane's father say to you on

8    that Wednesday?

9          A.    Well, that Wednesday, he entered into

10   our school very upset using a whole lot of

11   inappropriate language in front of children, in

12   front of other staff members.  To defuse that

13   situation, I ushered him quite quickly into our

14   lobby area and asked him to please come into my

15   office.  He told me he had a recording of Jane in

16   the bathtub.  He told me that he wanted me to see

17   the video.

18          I said, "Sorry, Dad.  I can't see the

19   video, but I can hear the video if there is

20   something you want to share."

21          So, he did.  He played the audio.  I

22   listened to the audio.  And during that

23   conversation, obviously, Dad was very upset.

24          I told him that I don't know why her

25   story is different in this audio message that I'm

1    hearing from what she told our staff on Friday,

2    the 20th, what she had shared with our counselor,

3    Ms. Ruiz on Tuesday; however, again, he was

4    asking, "I want to see the video.  I want to say

5    the video."

6            And I said, "I'm sorry.  That is not

7    something I can share" because of the privacy of

8    our students, I can't allow him to see and view

9    the video footage of the students.

10           He was obviously very upset.  And I told

11   him to please reach out to Ms. Bello, maybe as

12   she can give him a different answer.  I cannot

13   give him a different answer.  But he definitely

14   was not satisfied with my response.

15      Q.   What did Jane say in that recording that

16   you listened to?

17      A.    I can't recall verbatim what the child

18   had said, but I know it had alleged some type of

19   physical touch between her and L.R., using that

20   same language of tetitas and cuca.

21      Q.   So, on that recording that you listened

22   to, Jane alleged that L.R. had touched her breast

23   and vagina?

24      A.   Her tetitas and cuca.

25           MS. KARRON:  Objection to form.

```
 1    BY MR. MACDONALD:
 2        Q.   On that recording Jane alleged that she
 3    had been touched by L.R. on her tetitas and cuca;
 4    is that right?
 5        A.   Yes.
 6        Q.   And you said you believe that was
 7    different than what Jane had reported to
 8    employees of the school?
 9        A.   I don't believe.  I know it was
10    different.
11        Q.   And what did you offer, if anything, to
12    Jane's father in terms of next steps after
13    learning of this recording?
14        A.   I had told him to reach out to
15    Ms. Bello.
16        Q.   When you listened to that recording, did
17    you understand that to be a complaint of sexual
18    harassment?
19        A.   No.
20        Q.   Why not?
21        A.   Because, again, this was an isolated
22    incident of a student making a verbal comment to
23    another student from what I had learned from what
24    was first stated on Friday from both students --
25    both students on Friday.  Again stated on
```

1    Tuesday, upon meeting with the counselors, same

2    statement.  The student never veered into a

3    different story.  So, no, I wouldn't -- I

4    wouldn't take this as sexual harassment.  This

5    was an isolated incident.

6         Q.   But the recording you listened to, on it

7    Jane did not say it was a verbal incident; is

8    that right?

9              MS. KARRON:  Objection to form.

10             MR. MACDONALD:  Go ahead.  You can

11        answer.

12             THE WITNESS:  Can you say it again?

13   BY MR. MACDONALD:

14        Q.   On that recording, Jane alleged that she

15   had actually been touched by L.R.; correct?

16        A.   She said that L.R. touched her tetitas

17   and her kuka.

18        Q.   And you would agree that is more than

19   verbal; right?

20             MS. KARRON:  Objection to form.

21             MR. MACDONALD:  You can answer.

22             THE WITNESS:  That was very

23        different from what she stated on

24        Friday, and very different to what she

25        stated on Tuesday.

1    BY MR. MACDONALD:

2        Q.   So, you believe that recording was not

3    consistent with what Jane had reported

4    previously?

5        A.   Correct.

6        Q.   But did you believe at that time if

7    proven true what Jane stated on that recording

8    constituted sexual harassment?

9            MS. KARRON:  Objection to form.

10           THE WITNESS:  I saw footage.  Can

11       you tell me again?

12   BY MR. MACDONALD:

13       Q.   When you listened to that recording, did

14   you believe that what Jane had alleged if proven

15   to be true constituted sexual harassment?

16           MS. KARRON:  Objection to form.

17       Calls for a legal conclusion.

18           THE WITNESS:  What she said.

19   BY MR. MACDONALD:

20       Q.   Are you familiar with the term "sexual

21   harassment"?

22       A.   Yes.

23       Q.   And what is your understanding of that

24   term?

25       A.   Can I read it as defined by our student

1    code of conduct?

2        Q.   I'm asking what your personal

3    understanding of that term is.

4            MS. KARRON:  Objection to form.

5            THE WITNESS:  Can I read it?  I can

6        read it.

7            MS. KARRON:  If that's your

8        response to the question.

9            THE WITNESS:  Going to the

10       glossary -- do you want me to read it?

11   BY MR. MACDONALD:

12       Q.   I'm asking what is your personal

13   understanding of the term "sexual harassment"?

14       A.   So, it says here "The United States

15   Department of Education defines sexual harassment

16   as unwelcome sexual conduct, including

17   conditioning any aid, benefit or service of the

18   school on an individual's participation in

19   unwelcome sexual conduct, sexual assault, dating

20   or domestic violence, stalking, and all forms of

21   sexual harassment that a reasonable person would

22   determine so severe, pervasive, and objectively

23   offensive that it denies a student access to an

24   education program or activity."

25           Should I continue?

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    Q.   Is that your personal understanding of
2  the term "sexual harassment"?
3    A.   Yes.
4    Q.   When you learned of what Jane had said
5  on the recording, did you understand that to be a
6  report of unwelcomed sexual conduct?
7    A.   So, what Jane had said in her recording
8  was very different than what Jane had stated to
9  the adult present on Friday, the 20th, and on
10  Tuesday, the 24th.
11    Q.   That's not what I'm asking you.  I'm
12  asking:  When you heard that recording, did you
13  understand what Jane had alleged to be unwelcomed
14  sexual conduct?
15         MS. KARRON:  Objection to form.
16         MR. MACDONALD:  You have to answer.
17         THE WITNESS:  You're asking me to
18      formulate an opinion on a recording that
19      was not even in my presence nor were the
20      questions coming from me.  I can't
21      formulate an opinion on that.
22  BY MR. MACDONALD:
23    Q.   You can't formulate an opinion as to
24  whether that recording was reporting unwelcomed
25  sexual conduct?

1    A.   That answer came as a result of the

2    questions from someone else.  That was not my

3    questions.  Those were not the questions that

4    were brought forth or questioning that was

5    brought forth by the schools or by any adults

6    that were present at the school.  These were

7    questions in the privacy of a home during a

8    private intimate moment in a bathtub.

9          So, I can't formulate an opinion of

10   whatever that was, which is why I did whatever I

11   knew to do which is "please contact Ms. Bello,"

12   which I know that the parent did.

13   Q.   Why does it matter that the recording

14   took place at home?

15   A.   Because a child at home is very

16   different than a child at school.  Those are two

17   different children.

18   Q.   What do you mean they're two different

19   children?

20   A.   So, children in a school have different

21   structures that are not found in the home.

22   "We're going to eat at 10:00 because that is our

23   lunchtime."  So, whether they want to eat at

24   10:00,  or maybe they didn't want to have their

25   lunch at that time, but either way, everyone is

Deposition of Melissa Valladares                                   Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    going to the cafeteria at 10:00, because it's

2    very different from inside the home.

3         Q.   And what does that have to do with

4    whether you believed what Jane had stated on that

5    recording constituted unwelcomed sexual conduct?

6              MS. KARRON:   Objection to form.

7              THE WITNESS:   It wasn't for me to

8         formulate any kind of opinions.   That

9         was for me to be able to tell him that

10        he needed to contact Ms. Bello.

11   BY MR. MACDONALD:

12        Q.   Now, earlier you testified that you're

13   familiar with the requirements of being a

14   mandatory reporter?

15        A.   That is correct.

16        Q.   And those requirements pertain to

17   reports regarding child abuse or child neglect;

18   is that correct?

19        A.   That is correct.

20        Q.   Would that include the sexual assault of

21   a child?

22             MS. KARRON:   Objection to form.

23             THE WITNESS:   You would report if

24        you suspect abuse, neglect, abandonment,

25        and of course if in the event of a

1           sexual assault, you would absolutely

2           report sexual assault.

3      BY MR. MACDONALD:

4           Q.   And would that include if a sexual

5      assault was reported to you regardless of the

6      location in which that report was made?

7                MS. KARRON:  Objection to form.

8      BY MR. MACDONALD:

9           Q.   Let me rephrase the question.  As a

10     mandatory reporter, are you required to report

11     allegations of sexual assault if those

12     allegations are made in a child's home?

13                MS. KARRON:  Objection to form.

14                THE WITNESS:  Can you tell me that

15          question again?

16     BY MR. MACDONALD:

17          Q.   Earlier you testified that you're

18     familiar with requirements of being a mandatory

19     reporter; is that right?

20          A.   Yes.

21          Q.   And you just testified that you believe

22     a report of sexual assault of a child would be

23     included in those duties to report; is that

24     right?

25          A.   Correct.

1      Q.   Do those same duties apply if a child

2   reports a sexual assault from their home?

3           MS. KARRON:   Objection to form.

4           THE WITNESS:   Julie, can I take

5      five minutes?

6           MS. KARRON:   Yes, but you have to

7      answer the pending question first and

8      then you can take a break.

9           THE WITNESS:   Sounds good.

10          So, the question to answer would

11     be -- yes, I am a mandatory reporter.

12     When it comes to something that I

13     suspect, me, personally suspecting

14     abuse, neglect, abandonment, or

15     definitely sexual harassment, do I need

16     to report?   The answer is yes, yes, I

17     do.

18          MR. MACDONALD:   That was

19     nonresponsive, but we can go ahead and

20     take a break and we'll come back to it.

21     And we'll come back in five minutes.

22          (A brief break was had.)

23   BY MR. MACDONALD:

24     Q.   Now, before we went on break, I was

25   asking about the recording that you listened to

1    that Jane's father showed you.  Do you recall

2    that?

3        A.    Yes.

4        Q.    Now, when I asked you about that, you

5    mentioned something about the person conducting

6    the questioning or something similar.  Do you

7    recall that?

8        A.    No.

9        Q.    Do you recall saying something about the

10   person asking the questions on the recording?

11       A.    To the father?

12       Q.    Let me try to rephrase the question.

13   When I had previously asked you about your

14   reaction to listening to that recording, you

15   discussed the fact that the recording had been

16   made in the home as well as you were not the

17   person asking those questions or something to

18   that effect.

19       A.    I believe I had stated that Jane had a

20   different answer from what she was saying inside

21   of that recording.

22       Q.    And the fact that Jane on that recording

23   was alleging something different, did that raise

24   concerns to you about opening an investigation?

25       A.    Yeah.  Well, I called my principal to

1    discuss that there is this new allegation that

2    wasn't previously mentioned.

3         Q.   Did you believe what Jane alleged?

4         A.   I don't think it's up for me to assume

5    anything.

6         Q.   Well, did you make any assumption as to

7    whether she was telling the truth?

8              MS. KARRON:   Objection to form.

9         Calls for speculation.

10             MR. MACDONALD:   Go ahead.

11             THE WITNESS:   It's not for me to

12        assume.   I don't have to assume.

13   BY MR. MACDONALD:

14        Q.   You had no opinion as to whether Jane

15   was telling the truth when you heard that

16   recording?

17        A.   No.

18        Q.   Now, previously do you recall reviewing

19   the definitions of "sexual harassment" in the

20   Miami-Dade County code of student conduct?

21        A.   Yes.

22        Q.   And do you recall those definitions?   I

23   believe you even read a portion; is that right?

24        A.   Yes.

25        Q.   But you did not believe what Jane

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    reported on that recording to constitute sexual

2    harassment per that definition?

3              MS. KARRON:  Objection to form.

4        Asked and answered.

5              MR. MACDONALD:  Go ahead.

6              THE WITNESS:  It was answered.

7        Asked and answered.

8    BY MR. MACDONALD:

9        Q.    Julie is going to make objections and

10   you don't have to comment on them.  It's going to

11   slow things down if you comment on the

12   objections, but let me try to rephrase the

13   question for you.

14             Did you -- when you listened to that

15   recording in which Jane made those allegations,

16   did you consider that to be a report that fell

17   under Title IX?

18       A.    No.

19       Q.    Why not?

20       A.    Because this was an isolated incident

21   that under my findings of my previous

22   investigation did not show a student that was

23   sexually assaulted inside of a classroom.

24       Q.    You said your previous findings and

25   investigation?

1     A.    Yes.

2     Q.    What were your findings in your previous

3  investigation?

4     A.    Students were taking tests, students had

5  blockers on their desks, student was wearing

6  jeans.  It was a Friday in the school, the

7  teacher was giving instruction.  The teacher was

8  present throughout the class period.  Students

9  were never left alone.

10    Q.    And those were your investigative

11 findings?

12    A.    In my observation of that video, yes.

13    Q.    And because of your previous

14 investigation, you did not believe that Jane's

15 allegations on that recording to fall within

16 Title IX?

17         MS. KARRON:  Objection to form.

18    Mischaracterizes testimony.

19         THE WITNESS:  It wasn't for me to

20    formulate an opinion on.  I had called

21    Ms. Bello and I told her what the dad

22    had allowed me to listen to in that

23    recording.

24 BY MR. MACDONALD:

25    Q.    When you spoke to Ms. Bello, did you at

1   any point tell her that you believed the father's

2   questioning to be leading?

3        A.   I do believe that the father's

4   questionings were leading.

5        Q.   What do you mean the questions were

6   leading?

7        A.   When the child is asked a question, for

8   example, "Today is a great day?"  That's a

9   leading question because you go under an

10  assumption that today was great.  Today might not

11  have been so great.  So, the way that you

12  formulate a question, absolutely provides another

13  person's response.

14       Q.   And what specifically led you to believe

15  that his questions on that recording were

16  leading?

17       A.   The questions.

18       Q.   Have you ever received any type of

19  training as to questioning in this context?

20       A.   What do you mean?

21       Q.   Well, how did you determine that those

22  questions were leading?  Was that based on

23  training or experience that you have?

24       A.   I would believe that I have -- that I'm

25  a human.  People know when there is a question

1  that is leading as opposed to a question that

2  allows a person to give an answer without you

3  wanting the response or warranting the response.

4      Q.   Do you think Jane's father wanted a

5  particular response when he was conducting that

6  questioning?

7      A.   I don't think any parent would want a

8  response negative from their child.

9      Q.   What do you mean by that?

10     A.   I don't think that a person wants to

11 hear anything negative from their child.  I think

12 every parent wants to hear that their child is on

13 sunshine and rainbows and cloudy with a chance of

14 meatballs, is great.

15     Q.   So, why would you believe that Jane's

16 father was leading her to a particular

17 conclusion?

18          MS. KARRON:  Objection to form.

19          MR. MACDONALD:  Go ahead.

20          THE WITNESS:  What was the

21  question?

22 BY MR. MACDONALD:

23     Q.   I was asking you so then why based on

24 what you stated that parents would not want to

25 reach a negative conclusion, how did that

1    influence your belief that Jane's father's

2    questions were leading.

3              MS. KARRON:  Objection to form.

4              MR. MACDONALD:  Go ahead.

5              THE WITNESS:  So, I think it's the

6        way that the questions were framed.

7    BY MR. MACDONALD:

8        Q.   Have you ever undergone any training

9    related to the questioning of children?

10       A.   I have -- I have been in what one would

11   consider training for children since I was in

12   high school.  In my years of high school, I was

13   part of a magnet for education.  I earned an

14   associate's degree in early childhood education.

15   I earned an associate's degree in elementary

16   education.  I earned my bachelor's in early

17   education.  All of my teaching and training has

18   always been with education; and children, of

19   course, at the forefront of all of that training.

20       Q.   And during the course of that long

21   career in education, have you ever received

22   training on how to evaluate the questioning of a

23   child on whether it's leading or not?

24       A.   Like I said earlier, when a person asks

25   a question that draws a conclusion in which you

1    seek, that is considered a leading question.  For

2    example, "Today was a great day."  Maybe today

3    wasn't great.  Maybe today the person wanted to

4    say it was a cloudy day.  So a question framed

5    with a response in which you seek is a leading

6    question.

7        Q.   I'm asking you if you have ever received

8    any training regarding leading questions in the

9    manner in which you just described.

10       A.   I've gone through lots of training in my

11   world and in my career of education.  All of my

12   career has been in education since I began high

13   school.  So, one specific day, one specific

14   training if that's the response in which you're

15   seeking, I don't think that I can give you that

16   level of response more than I have had many years

17   as an educator and a person who has done nothing

18   besides seek knowledge in the world of education.

19       Q.   Now, you previously testified that

20   AcadeMir follows that Miami-Dade County Code of

21   Student Conduct; is that right?

22       A.   That's correct.

23       Q.   Is there any part of that code of

24   student conduct that has any information about

25   evaluating the questioning of a child that you

Deposition of Melissa Valladares                  Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    are aware of?

2         A.   Can I go through it?

3         Q.   If you'd like to, sure.

4         A.   So, here it talks about "All corrective

5    strategies used by school-site administrators

6    must be in compliance with school board rules and

7    policies.  Inherent in these rules and policies

8    is the philosophy of fairness and consideration

9    for actions that are in the best interest of

10   students.

11             "When confronted with an act that may

12   require the imposition of corrective strategies

13   by the school, the student and all other

14   appropriate persons should be given the

15   opportunity to explain the circumstances of the

16   incident."

17        Q.   What page are you reading from?

18        A.   Page 25.  Do you want it?

19        Q.   No.  I'm okay.  And what does that have

20   to do with the evaluation of leading questions?

21             MS. KARRON:  Objection to form.

22             THE WITNESS:  So, when someone is

23        having this kind of opportunity to

24        address the incident for what it is, you

25        make contact with that student and

Deposition of Melissa Valladares                                Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1          you're able to speak with them.
2     BY MR. MACDONALD:
3          Q.   Did you do that?
4          A.   Jane did not return to school nor did
5     the parent allow for the school to reach out to
6     Jane.
7          Q.   Did you try?
8          A.   No.  Dad said no.
9          Q.   Did you reach out to L.R. or his
10    parents?
11         A.   Me personally, I did not.
12         Q.   And do you have any records as to L.R.'s
13    explanation of the circumstances of the incident?
14         A.   Me, like personally in my possession?
15         Q.   Are you aware of any that AcadeMir has?
16         A.   He has a discipline referral.
17         Q.   And does that document the circumstances
18    of the incident specifically?
19         A.   I didn't write out the referral.  I'm
20    not sure what's written on there.
21         Q.   And Ms. Ruiz's interview with L.R.; is
22    that documented in detail anywhere?
23         A.   I don't know.
24         Q.   Now, when you listened to that
25    recording, did you contact the Department of

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 101 of 118

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    Children and Families?

2         A.   I did not.

3         Q.   Do you know if anyone else at AcadeMir

4    did?

5         A.   I don't know.

6         Q.   When you listened to that recording, did

7    you contact Miami-Dade County Schools?

8         A.   Like, I contacted Ms. Bello.

9         Q.   When you listened to that recording, did

10   you contact the Office of Civil Rights Compliance

11   for Miami-Dade County Schools?

12        A.   I did not.

13        Q.   And when you listened to that recording,

14   did you contact any law enforcement agency?

15        A.   That day we had spoken to law

16   enforcement.

17        Q.   Did you contact law enforcement?

18        A.   I did not.

19        Q.   Did anyone at AcadeMir reach out to law

20   enforcement?

21        A.   I don't know.  I know that law

22   enforcement was spoken to Wednesday around -- I

23   want to say it was around 5:00, maybe 6:00, I

24   don't know.  But I know it was the same day,

25   later in the day.

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1      Q.   And that was because Jane's parents
2  contacted the police; is that right?
3      A.   That is correct.
4      Q.   Did you speak to the police at any
5  point?
6      A.   On that initial contact on the school
7  premises, like the school -- they never came
8  inside the school.  They were outside the school.
9      Q.   Did you speak to them during that
10  initial contact?
11      A.   I want to say yes.  I don't recall what
12  was said, but I did speak to them that day.
13  Ms. Bello and I were both present to speak to the
14  officer.
15      Q.   Was this on one occasion or two
16  occasions when you spoke with police?
17      A.   What?
18      Q.   Did you speak with the police just one
19  time that day?
20      A.   Yes.
21      Q.   And that was with Ms. Bello outside of
22  the school?
23      A.   Correct.
24      Q.   What do you recall about that
25  conversation with the police?

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 103 of 118

Deposition of Melissa Valladares                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    A.   I know that Jane's dad was again

2  requesting the video footage.  I know that Jane's

3  dad was requesting for L.R. to be removed from

4  school.  I remember that the police officer

5  had -- after hearing the allegations that it had

6  to be investigated through a detective and the

7  dad didn't want a detective.  I don't remember

8  what he said specifically.

9    Q.   How soon after that incident with the

10  police did Jane withdraw from classes at

11  AcadeMir?

12    A.   She was in school on Tuesday.  It was

13  literacy week, so we had a bunch of different

14  activities to celebrate literacy.  So, she was

15  there on Tuesday.  Monday was a teacher planning

16  day.  Tuesday we had activities and she was

17  there.  I believe she even stayed in aftercare.

18  Wednesday she was there and I believe she was

19  absent on Thursday and Friday and thereafter

20  until her withdrawal.

21    Q.   At any point did Jane's parents request

22  that L.R. and Jane be taught in separate

23  classrooms?

24    A.   No, even at the conclusion of that

25  police report, at the bottom, the conclusion was

1   made to have the students in the same class but

2   separated.  It's on the -- it was on the police

3   report.  I think that's what it is called, the

4   police report.  Is that what it's called?  It's

5   the form that the police provides or the paper

6   that the police provides.  That was a conclusion

7   made that day.

8        Q.   What was the conclusion?

9        A.   Both students will remain at the school

10  and be separated in the classrooms.

11       Q.   Are you referring to separate locations

12  within the same classroom?

13       A.   Correct, which is what we did even

14  initially upon the student making that comment

15  towards Jane.

16       Q.   But at any point did Jane's parents

17  request that Jane and L.R. be taught in separate

18  classrooms, not just in different locations?

19       A.    Jane's father didn't want her removed

20  from her classroom.  He said that she liked her

21  teacher and she -- that he -- that he did not

22  want her removed from her classroom.

23       Q.   And at any point did AcadeMir offer to

24  have L.R. placed in a separate classroom?

25       A.   That would be a question for Ms. Bello.

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 105 of 118

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    Q.   So, you are not aware of that?

2    A.   I don't have that kind of authority.

3    Q.   Are you aware of that kind of offer

4    being made or that offer specifically?

5    A.   Me personally, no.  That would be for

6    Ms. Bello to answer.

7    Q.   At any point did anyone from AcadeMir

8    meet with L.R.'s parents?

9    A.   I don't know.

10   Q.   Are parent-teacher conferences

11   documented?

12   A.   Yes.

13   Q.   Are they required to be documented?

14   A.   Sure.

15   Q.   And does AcadeMir get rid of those forms

16   at any point?

17   A.   At the end of the school year.

18   Q.   So, any parent-teacher conference form

19   relating to a meeting with L.R.'s parents would

20   no longer exist; is that your understanding?

21   A.   Correct.

22   Q.   Had you spoken with L.R.'s parents in

23   the past prior to this incident?

24   A.   No.

25   Q.   Have you ever spoken to L.R.'s parents?

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1        A.   Like over circumstance of any kind?  I
 2   mean, basic of activities or welcoming parents on
 3   the campus, "Hi.  Good morning.  How are you," as
 4   I do with all the families.  It's part of my
 5   every single day arrival.
 6        Q.   What are L.R.'s parents names?
 7        A.   ██████████████████████
 8        Q.   You don't know either of the first
 9   names?
10        A.   I don't refer to anyone by first name.
11        Q.   I'm not asking if you refer to them.
12   I'm asking if you know their first names.
13        A.   No, I don't.  I don't speak to people by
14   first name.
15        Q.   Do you know what L.R.'s parents do for
16   work?
17        A.   I have no idea.
18        Q.   Has L.R. had any issues since this
19   incident?
20        A.   No.
21        Q.   Does L.R. have any relatives that are
22   enrolled in the school?
23        A.   No.
24        Q.   None?
25        A.   None.
```

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 107 of
118
Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1      Q.   L.R. doesn't have a sister?

2      A.   He does.  Emma.  That's right.

3      Q.   What grade is Emma in?

4      A.   I don't know.  She's older.

5      Q.   And do L.R. or Emma have any relatives

6    that work for AcadeMir?

7      A.   No.

8           Jane has relatives in the school.

9      Q.   That attend the school?

10     A.   Uh-huh.

11     Q.   And at some point L.R. was issued a

12   referral form; is that right?

13     A.   That's right.

14     Q.   Outside of that form was any other

15   action taken against L.R. as a result of this

16   incident that you are aware of?

17     A.   Aside from the referral?  Not that I'm

18   aware of.

19     Q.   Does AcadeMir use an electronic system

20   for student records?

21     A.   Yes.

22     Q.   What is that called?

23     A.   DSIS.

24     Q.   How is that spelled?

25     A.   D-S-I-S.  I don't know.

1      Q.   And is that program operated by

2   Miami-Dade County?

3      A.   Yes.  You referenced the school, not the

4   actual county; right?  It's a Miami-Dade public

5   school operational system.

6      Q.   And do referral forms have to be entered

7   into that system?

8      A.   Yes.

9      Q.   Are you aware that at some point Jane's

10  parents contacted the Department of Children and

11  Families themselves?

12     A.   Am I aware that they contacted them?  I

13  believe it to be on a document that was presented

14  to us in that complaint, but that was the first

15  time I learned that they had contacted DCF.

16     Q.   You reviewed a document from the

17  Department of Children and Families prior to this

18  deposition?

19     A.   No.

20     Q.   No?

21     A.   No.

22     Q.   Then what were you referring to?

23     A.   The complaint form that it was stated in

24  there.

25          MR. MACDONALD:  I'd like to show

1      you a document.  We'll mark this as

2      Plaintiff's Exhibit 3.

3           (Plaintiff's Exhibit No. 3 was

4      marked for identification.)

5           MS. KARRON:  Can you describe the

6      document for me.

7           MR. MACDONALD:  Yes, it's titled

8      "Intake Report."  And it's plaintiffs

9      Bates labeled started at DCF1.

10           THE WITNESS:  Well, that's false.

11      It says law enforcement notified.  That

12      says "no" and it should have been

13      checked "yes."  That's wrong, just FYI.

14           What is CPI?  And what is CPT?

15   BY MR. MACDONALD:

16      Q.   Have you had a chance to review the

17   document?

18      A.   No.  As I'm reading, I'm coming across

19   acronyms.  Can you please advise what is CPI?

20      Q.   I can't answer questions for you.  I'll

21   give you a moment to review the rest of the

22   document.

23           MS. KARRON:  Just answer based on

24      what you know.

25           MR. MACDONALD:  I believe CPI

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 110 of
118
Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1          stands for "child protective

2          investigation."

3     BY MR. MACDONALD:

4          Q.   Have you had a chance to review the

5     document?

6          A.   Yes.

7          Q.   I'll represent to you that this document

8     was produced by the Florida Department of

9     Children and Families.  Now, I want draw your

10    attention to the page labeled DCF2.  Do you see

11    the section labeled "Narrative"?

12         A.   Yes.

13         Q.   And do you see the first sentence there

14    that starts, "On 1/20/23"?

15         A.   Okay.

16         Q.   Are those allegations consistent with

17    what you heard on the recording that Jane's

18    father showed you?

19              MS. KARRON:  Objection to form.

20              THE WITNESS:  When Jane made the

21         comment to her PE teacher that L.R. said

22         an inappropriate comment, and then

23         Ms. Mortazavi shared that information

24         with Ms. Chaudry who again asked the

25         student what happened.  Jane again

1    stated that L.R. made an inappropriate

2    comment to her, not using those words;

3    she used other language.

4         And again, Jane spoke to Ms. Zoley,

5    who is the front desk receptionist, who

6    also equally heard from Jane to say that

7    L.R. made an inappropriate comment to

8    her.  So, to the -- to what I have known

9    from the staff members of the school of

10   what Jane said is not at all what is

11   stated here.  This is very different

12   from what was said to staff members at

13   the school.

14   BY MR. MACDONALD:

15       Q.   That's not what I asked.

16            Is that first sentence consistent with

17   the recording that you listened to from Jane?

18       A.   I don't recall exactly what Jane said in

19   the recording about areas in which she was

20   touched.

21       Q.   And I want to draw your attention to

22   page 10, DCF10.  Do you see that?

23       A.   What am I looking for?

24       Q.   That section labeled "narrative" on

25   page 10?

1          A.    Yes.

2          Q.    I'll give you a moment to review it.

3          A.    Okay.

4          Q.    And do you see on the last three

5     sentences where it describes what Jane alleged to

6     the investigator?

7          A.    Okay.

8          Q.    And in these notes from the

9     investigator, do you see anything about leading

10    questions?

11         A.    There is no mention of that here.

12         Q.    And do you see any notes regarding

13    inconsistencies in what Jane had reported to this

14    investigator?

15              MS. KARRON:  Objection to form.

16              THE WITNESS:  Which one was the one

17         that she spoke to the investigators?

18         The first one that we read?  That was

19         her words being used to an investigator?

20         This is Jane and this is what you're

21         trying to get me to compare it to?

22    BY MR. MACDONALD:

23         Q.    Well, do you see in that narrative

24    section where it says, "She said that the parts

25    that       licked" and it says, "She stated"?

1     A.    Okay.

2     Q.    And you'd agree that is in reference to

3   Jane; is that right?

4         MS. KARRON:   Objection to form,

5     improper impeachment, and this is not a

6     document that she created herself for

7     this.

8         MR. MACDONALD:   You can answer.

9         THE WITNESS:   Things that are

10    usually said are in quotes.  I don't see

11    any quotation marks here.

12  BY MR. MACDONALD:

13    Q.    What do the quotation marks have to do

14  with anything?

15    A.    In narrative writing one would use

16  quotation marks to dictate verbatim of what

17  someone said.

18    Q.    Do you believe that the investigator's

19  report was not proper based on that?

20        MS. KARRON:   Objection.

21        THE WITNESS:   You're asking me to

22    know something that I don't know.

23  BY MR. MACDONALD:

24    Q.    Did AcadeMir ever reach a conclusion as

25  to whether Jane was sexually abused while she was

Deposition of Melissa Valladares                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1    enrolled at the school?

2         A.   That would be a question for Ms. Bello.

3         Q.   You don't know if the school ever

4    reached a conclusion as to whether Jane was

5    sexually abused?

6         A.   No.  That would be a question for

7    Ms. Bello.

8         Q.   And did the school ever reach a

9    conclusion as to whether what Jane had alleged on

10   the recording that you listened to was true?

11        A.   No.  That would be a question for

12   Ms. Bello.

13        Q.   No, the school didn't; or no, you're not

14   sure?

15        A.   No, I don't know.  That would be a

16   question for Ms. Bello.

17        Q.   Okay.  In your opinion and experience at

18   AcadeMir do you think that the school handled

19   this situation with Jane properly?

20             MS. KARRON:  Objection to form.

21             THE WITNESS:  Yes.

22   BY MR. MACDONALD:

23        Q.   And why is that?

24        A.   From my point of action, I would believe

25   that the actions in which I took were

1    appropriate.

2        Q.   And is that your opinion for the actions

3    of the school as a whole?

4        A.   I can't speak to the actions of others.

5    I can only attest and speak to my own actions.

6        Q.   Even as assistant principal of the

7    school?

8            MS. KARRON:   Objection to form.

9        Asked and answered.

10           THE WITNESS:   Totally agree.

11   BY MR. MACDONALD:

12       Q.   That wasn't asked and answered.   I

13   haven't asked as assistant principal.

14       A.   I told you already my opinion and

15   attested to my answers regardless of title of --

16   my actions -- per my actions.   So, what I said

17   was that my actions were absolutely appropriate.

18       Q.   And were your findings as part of the

19   investigation that you alleged you conducted,

20   were those findings documented anywhere?

21       A.   I don't understand.   Like on a form?

22       Q.   Are there any documents in existence

23   that you're aware of that show the investigative

24   findings that you reached?

25       A.   That would be a question for Ms. Bello.

1      Q.   Why do you believe Ms. Bello would know

2   about those documents?

3      A.   Because I know I did not fill out any

4   document.  So, if documents exist or if documents

5   were present or completed, I know that I did not.

6   So I can speak and attest to my own doings.  I

7   did not fill out any documents besides the

8   reports that I know that I have seen, which is

9   the incident report.

10           MR. MACDONALD:  Okay.  Well, those

11       are all the questions I have for you

12       today, and I want to thank you for your

13       time.  And counsel for AcadeMir may have

14       some questions for you, but that's all I

15       have.

16           MS. KARRON:  I have no questions.

17       And we'll waive reading.  Thank you for

18       your time, Ms. Valladares.

19           (Reading and signing were waived.)

20           (Thereupon, the taking of the

21       deposition was concluded at 3:27 p.m.)

22

23

24

25

Case 1:23-cv-23004-JB   Document 58-5   Entered on FLSD Docket 09/24/2024   Page 117 of 118

Deposition of Melissa Valladares                                    Jane Doe v. AcadeMir Charter Schools, Inc., et al.

```
 1                      CERTIFICATE OF OATH

 2

 3      STATE OF FLORIDA
        COUNTY OF MIAMI-DADE
 4

 5              I, the undersigned Notary Public, in and

 6      for the State of Florida, hereby certify that

 7      MELISSA VALLADARES personally appeared before me

 8      on May 15, 2024, and was duly sworn by me.

 9

10

11

12              WITNESS my hand and official seal this

13      15th day of May, 2024.

14

15

16

17

18      _____
        KATIANA LOUIS
19      Notary Public-State of Florida
        COMMISSION #HH 443618
20      EXPIRES September 13, 2027

21

22

23

24

25
```

Deposition of Melissa Valladares                                      Jane Doe v. AcadeMir Charter Schools, Inc., et al.

1              REPORTER'S DEPOSITION CERTIFICATE

2     STATE OF FLORIDA
      COUNTY OF MIAMI-DADE
3

4

5              I, KATIANA LOUIS, do hereby certify that

6     I was authorized to and did stenographically

7     report the foregoing deposition; and that the

8     transcript is a true and correct transcription of

9     the testimony given by the witness.

10

11             I further certify that I am not a

12    relative, employee, attorney or counsel of any of

13    the parties, nor am I a relative or employee of

14    any of the parties' attorney or counsel connected

15    with the action, nor am I financially interested

16    in the action.

17

18

19             Dated this 15th day of May, 2024.

20

21

22             *Katiana Louis*
                _____
23             KATIANA LOUIS

24

25