Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 1 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1           UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF FLORIDA

3            CASE NO.  1:23-cv-23004-WPD

4

5   JANE DOE, a minor, by and through her

6   mother and next friend, MOTHER DOE,

7       Plaintiff,

8   vs.

9   ACADEMIR CHARTER SCHOOLS, INC., and

10  SUPERIOR CHARTER SCHOOL SERVICES, INC.,

11      Defendants.

12  _____/

13

14

15              DEPOSITION OF ROLANDO MIR

16

17              WEDNESDAY, MAY 8, 2024
                10:02 a.m. - 1:15 p.m.
18

19          ALL PARTIES APPEARED REMOTELY

20

21                  -   -   -

22

    Reported By:
23
    Katiana Louis
24  Notary Public, State of Florida
    Miami Office #27399
25

1       APPEARANCES:

2       On behalf of the Plaintiff:

3       DEREK SMITH LAW GROUP
        520 Brickell Key Drive, Suite O-301
4       Miami, Florida 33131
        (786) 568-8120
5
        By:  KYLE THOMAS MACDONALD, ESQUIRE
6            Kyle@dereksmithlaw.com

7
        On behalf of the Defendant Academir Charter
8       Schools, Inc.:

9       FREEMAN MATHIS & GARY, LLP
        301 East Las Olas Boulevard, Suite 250
10      Fort Lauderdale, Florida 33301
        (954) 406-5674
11
        By:  JULIE BETH KARRON, ESQUIRE
12           Julie.karron@fmglaw.com

13
        On behalf of the Defendant Superior Charter
14      School Services, Inc.:

15      GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
        601 Bayshore Boulevard, Suite 800
16      Tampa, Florida 33606
        (813) 515-0322
17
        By:  JULIE CATHERINE MCHAFFIE, ESQUIRE
18           Jmchaffie@garrisonyount.com

19

20

21

22

23

24

25

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 3 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

I N D E X

Examinations                                                    Page

ROLANDO MIR

DIRECT EXAMINATION BY MR. MACDONALD                                4
CERTIFICATE OF OATH                                              111
REPORTER'S DEPOSITION CERTIFICATE                                112

E X H I B I T S

No.              Description                                    Page

Exhibit 1        Notice of Taking Deposition                       7
Exhibit 2        Department of Children and                       96
                 Families Intake Report for
                 Jane Doe

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 4 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    Thereupon:

2                        ROLANDO MIR

3    was called as a witness and, having been first

4    duly sworn and responding, "Yes," was examined

5    and testified as follows:

6                      DIRECT EXAMINATION

7    BY MR. MACDONALD:

8         Q.   Good morning.  My name is Kyle

9    MacDonald.  And I represent Jane Doe in her

10   lawsuit against Academir Charter Schools, Inc.

11   and Superior Charter School Services, Inc.

12             Thank you for being here today.

13        A.   Thank you.

14        Q.   Can you please start by stating your

15   full name for the record please?

16        A.   Rolando Mir.

17        Q.   Have you ever been deposed before,

18   Mr. Mir?

19        A.    In different cases, yes, due to --

20   related to my job, my work in the past.

21        Q.   How many times have you been deposed

22   before?

23        A.   Six, seven times, more or less.

24        Q.   And you said when you were deposed those

25   six or seven times it was related to your work?

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 5 of 111

Deposition of Rolando Mir                    Jane Doe v. Academir Charter Schools, Inc., et al.

1        A.    Right.   I was a deputy sheriff in

2    Miami-Dade County.

3        Q.    Were all six or seven of those times

4    related to your work as a deputy sheriff?

5        A.    Related to the work, yes.

6        Q.    So, even though this isn't your first

7    deposition, I'll just go over a few things so

8    we're both on the same page.

9        A.    Absolutely.

10        Q.    Do you understand that you've been

11    placed under oath and you have the obligation to

12    testify truthfully here today?

13        A.    Yes.

14        Q.    And do you understand that even though

15    we're conducting this deposition via Zoom, your

16    testimony has the same force and effect as if you

17    were testifying in a court of law before a judge

18    and jury?

19        A.    I do.   Yes, sir.

20        Q.    Now, the court reporter cannot

21    transcribe any inaudible responses, like a

22    gesture or a shrug, so just please make sure to

23    respond clearly just as you have been.   Okay?

24        A.    Yes, sir.

25        Q.    And the court reporter also cannot

1    accurately reflect your responses if we speak at

2    the same time, so I'll wait until you finish your

3    answer, and I just ask that you wait until I

4    finish my question.

5         A.    Absolutely.

6         Q.    Now, we want to ensure that we get your

7    best testimony.  So if there is any question you

8    don't understand or you think is confusing, just

9    let me know and then I can rephrase it for you.

10   Okay?

11        A.    Okay.

12        Q.    And if you don't say anything, then I'll

13   assume you understood the question as asked.

14   Okay?

15        A.    Agreed.

16        Q.    If you need to a take a break at any

17   point, to go use the bathroom, get a drink of

18   water, anything like that, just let me know and

19   I'm happy to do so.

20        A.    Thank you.

21        Q.    Is there anything that would prevent you

22   from thinking clearly and testifying truthfully

23   here today?

24        A.    No, sir.

25        Q.    Now, for the purposes of today's

1    deposition, I'm going to refer to Superior

2    Charter School Services, Inc., as just Superior

3    if that's okay with you?

4         A.   That's okay.

5         Q.   And on that same note, I'll refer to my

6    client,                , as simply Jane, to protect

7    her identity if that's okay with you.

8         A.   That's fine.

9         Q.   Do you understand that you're here today

10   to testify on behalf of Superior?

11        A.   Yes, sir.

12        Q.   And do you understand that your answers

13   are based not only on your personal knowledge but

14   also all knowledge known or reasonably available

15   to Superior?

16        A.   Yes, sir.

17        Q.   And do you understand that your answers

18   will be binding on Superior?

19        A.   Yes, sir.

20             (Plaintiff's Exhibit No. 1 was

21        marked for identification.)

22   BY MR. MACDONALD:

23        Q.   And I'm going to show you a document.

24             Can you see the document I'm showing

25   you?

```
 1        A.    Yes, sir.
 2        Q.    Now I want to draw your attention to the
 3   list of topics here and I'll give you a moment to
 4   review.
 5        A.    Yes, sir.
 6        Q.    Are you prepared to give testimony on
 7   the topics listed on 1 through 10 on the page
 8   there?
 9        A.    Yes, sir.
10        Q.    I'll give you a moment to review this
11   next page.
12        A.    Okay.
13        Q.    Are you prepared to give testimony
14   regarding topics 11 through 21?
15        A.    Yes, sir.
16        Q.    And I'll give you a moment to review
17   this last page.
18        A.    Okay.
19        Q.    Are you ready and prepared to give
20   testimony regarding topics 22 to 29 as well?
21        A.    Yes, sir.
22        Q.    What did you do to prepare for today's
23   deposition?
24        A.    Read several documents that I have in
25   regards to this federal lawsuit and go through
```

1    several documents that the school provided.

2        Q.   What documents did you review prior to

3    today?

4        A.   The complaint, the federal complaint

5    against the school, the management agreement with

6    the school.

7        Q.   Any other documents?

8        A.   No.

9        Q.   Do you have those documents in front of

10   you?

11       A.   Yes, sir.

12       Q.   So, in front of you, you have the

13   complaint that was filed in this lawsuit and then

14   the management agreement between Superior and the

15   Academir; is that correct?

16       A.   That's correct.

17       Q.   Anything else in front of you?

18       A.   No, sir.

19       Q.   Okay.  Besides the attorney for

20   Superior, did you speak to anyone about your

21   deposition today?

22       A.   No, sir.

23       Q.   And where are you conducting today's

24   deposition from?

25       A.   From my office.

1    Q.   And where is your office located?

2    A.   5420 Southwest 157th Avenue, Unit 5,

3    Miami, Florida 33185.

4    Q.   Is anyone in the room with you?

5    A.   No, sir.

6    Q.   What is your current address?

7    A.   Home address or business address?

8    Q.   Your current home address.

9    A.   15571 Southwest 27th Street Miami,

10   Florida 33185.

11   Q.   And how long have you lived at that

12   address for?

13   A.   20 years.

14   Q.   Have you ever been arrested before?

15   A.   No, sir.

16   Q.   Have you ever been a party to a civil

17   lawsuit before?

18   A.   No, sir.

19   Q.   Did you attend college?

20   A.   Some college, mostly law enforcement.

21   Q.   And what college did you attend?

22   A.   Miami-Dade.

23   Q.   When did you take courses at Miami-Dade?

24   A.   Back in '79, 1979.

25   Q.   And did you earn a degree at Miami-Dade?

1        A.    No, sir.

2        Q.    Do you have any professional

3    certifications?

4        A.    Certifications being Miami-Dade County

5    Sheriff's Office.

6        Q.    And what kind of certifications did you

7    receive from Miami-Dade County Sheriff's Office?

8        A.    Certificate of corrections from the

9    department of Tallahassee.

10       Q.    Any other professional certifications

11   besides that one?

12       A.    No, sir.

13       Q.    Have you ever received any training

14   related to human resources before?

15       A.    Not training.

16       Q.    Are you a member of any professional

17   organizations?

18       A.    No, sir.

19       Q.    Now, you previously mentioned that you

20   worked for some time at the Miami-Dade County

21   Sheriff's Office; is that correct?

22       A.    Yes, sir.

23       Q.    How long did you work at the Sheriff's

24   Office for?

25       A.    25 years.

1    Q.   And what position did you hold with the

2    Sheriff's Office during that time?

3    A.   Extraditions.

4    Q.   And what does that entail?

5    A.   It entails picking up fugitives

6    throughout the state of Florida.

7    Q.   And did you do that for your entire time

8    at the Miami-Dade County Sheriff's Office?

9    A.   I did it for about 20 years out of the

10   25.

11   Q.   And what did you do for the other five

12   years?

13   A.   Various positions in the department.

14   Mostly courts.

15   Q.   And was that when you first started with

16   the Sheriff's Office or towards the end of your

17   career?

18   A.   Towards the beginning of my career.

19   Q.   Where do you work currently?

20   A.   At Superior Charter Schools Services.

21   Q.   And what do you do for Superior?

22   A.   I'm the CEO.

23   Q.   And how long have you been CEO of

24   Superior for?

25   A.   Since its existence, about 20 years.

1     Q.    Did you start the company, Superior?

2     A.    Yes, sir.

3     Q.    What made you want to start the company?

4     A.    Education.

5     Q.    What about education?

6     A.    My wife was a teacher and we wanted to

7   put schools to service the kids in the community.

8     Q.    Is your wife currently a teacher still?

9     A.    No, she's not.

10     Q.    She retired?

11     A.    No, she's not.

12     Q.    Where was she a teacher last?

13     A.    Last time she taught was 20 years ago

14   for a public school -- private school.

15     Q.    Is your wife currently employed?

16     A.    Yes, she is.

17     Q.    And where is she employed?

18     A.    With Superior.

19     Q.    And what does she do for Superior?

20     A.    She's the president of Superior.

21     Q.    What does that position entail?

22     A.    All financials for all Superior and for

23   all the charter schools.

24     Q.    You said she handles the financials for

25   Superior and all of the charter schools?

1    A.    Yes.

2    Q.    What charter schools are those?

3    A.    Academir Charter Schools.

4    Q.    Does she handle all of the finances for

5    all of the Academir Charter Schools?

6    A.    Yes, she oversees all the financials

7    besides the CPAs and the accountants.

8    Q.    And how long has your wife handled the

9    finances as president for all of the charter

10   schools?

11   A.    The same time, about 20 years since the

12   opening.

13   Q.    Do the Academir Charter Schools have

14   separate individuals that handle the finances or

15   are those duties strictly handled by your wife?

16   A.    Mostly finances by my wife.  There is

17   other personnel that handles other areas of

18   Superior.

19   Q.    And in your role as CEO, what are your

20   responsibilities?

21   A.    To oversee all the personnel in

22   Superior, to support all the schools and any need

23   that they might have.

24   Q.    And what personnel do you oversee?

25   A.    I oversee 18 people in Superior,

1    employees of Superior.

2         Q.   And what do those employees do?

3         A.   Some of them do payroll.  Some of them

4    do HR.  Some of them do curriculum.  I also

5    oversee the chief operating officer for Academir,

6    facility operators, grants.

7         Q.   You mentioned the chief operating

8    officer?

9         A.   Olivia Bernal.

10        Q.   And you oversee Ms. Bernal?

11        A.   Yes, sir.

12        Q.   What is the relationship between

13   Superior and Academir Charter Schools?

14        A.   Superior is the management company hired

15   by the board to run the schools.

16        Q.   And as the management company what kind

17   of responsibilities does Superior handle for the

18   schools?

19        A.   Anything having to do with financials,

20   anything having to do with repairs, anything

21   having to do with hiring employees, recruiting

22   students, grants, preparing grants, opening new

23   facilitates, opening up schools.

24        Q.   And in terms of handling financials,

25   Superior handles all aspects for the financials

1    for each of the Academir Charter Schools;

2    correct?

3        A.   Correct, in connection with the CPAs.

4        Q.   And who are the CPAs that you are

5    referring to?

6        A.   I forget the company name now, but it's

7    a company.

8        Q.   And this company is regularly involved

9    with handling the finances of Academir Charter

10   Schools?

11       A.   Absolutely.  They do reporting every

12   month.

13       Q.   What kind of reporting do they do?

14       A.   They have to report to the district all

15   the finances on a monthly basis and to us.

16       Q.   And when you say the district, do you

17   mean the Miami-Dade County School District?

18       A.   Correct.

19       Q.   And you also mentioned handling the

20   hiring -- I'm sorry -- that Superior handles the

21   hiring for Academir Charter Schools; is that

22   correct?

23       A.   Correct.

24       Q.   Does Superior do the hiring for all

25   employees of the charter schools?

1      A.   Superior assists in the hiring.  The

2   board hires the principals.  Superior recommends,

3   searches -- recruits and recommend the

4   principals.  The principals ultimately are the

5   ones that decide if they are hired or not.

6      Q.   So, Superior handles the recruitment and

7   the interview process then for any employees of

8   the Academir Charter Schools?

9      A.   We do, and also the principal does the

10   interviewing, the final interview.

11      Q.   And then the principal of the respective

12   Academir Charter Schools makes the final decision

13   as to whether to hire an employee?

14      A.   Absolutely.

15      Q.   Does Superior handle any of the training

16   for new employees of Academir Charter Schools?

17      A.   No, sir.

18      Q.   And do you know who is responsible for

19   the training of new employees for Academir

20   Charter Schools?

21      A.   Certain trainings are done by the

22   payroll company, TotalSource ADP, some training

23   is done by them, by the school, by the principal.

24      Q.   Does Superior handle any aspect of

25   training for Academir Charter School employees?

1        A.   No, sir.

2        Q.   Now, you previously mentioned that the

3   Academir Charter Schools board is the one that

4   hired Superior as a management company; is that

5   right?

6        A.   That's correct.

7        Q.   When you say the board, what are you

8   referring to?

9        A.   The board of directors.

10        Q.   Is there a board of directors for all of

11   the Academir Charter Schools or are there

12   separate boards for each school?

13        A.   No, there is one board for all the

14   schools.

15        Q.   And how many individuals sit on that

16   board?

17        A.   Five.

18        Q.   How are those individuals selected?

19        A.   They are recruited by the chair and then

20   they are selected by the whole board.

21        Q.   Who is the chair of the board?

22        A.   Alexander Casas.

23        Q.   How long has Superior served as the

24   management company for Academir Charter Schools?

25        A.   Since 2008.

1    Q.   And do you know when Academir Charter

2    Schools was founded?

3    A.   In 2008.

4    Q.   So, Superior has served as the

5    management company since the beginning of the

6    schools; is that right?

7    A.   Since the inception, yes.

8    Q.   Who founded Academir Charter Schools?

9    A.   I did.

10   Q.   And did you start the charter schools

11   with anyone else?

12   A.   Only my wife and I.

13   Q.   Have you ever worked for Academir

14   Charter Schools, for example, when you first

15   started the company?

16   A.   No, sir.

17   Q.   Did you start Superior at the same time

18   as Academir Charter Schools?

19   A.   More or less the same time.

20   Q.   What made you want to start Superior as

21   a management company in addition to Academir

22   Charter Schools?

23   A.   I wanted to be the management company

24   for the schools.  We wanted to manage them.

25   Q.   Is it common for charter schools to have

1    management companies like Superior?

2        A.   Yes, sir.

3        Q.   Does Superior contract with Academir

4    Charter Schools on an annual basis?

5        A.   Usually on a five-year basis.

6        Q.   And has the board of Academir ever

7    utilized a different management company?

8        A.   No.

9        Q.   How is Superior compensated for its

10   services to Academir Charter Schools?

11       A.   Get a percentage of the revenue that the

12   school -- the FTE comes every month.

13       Q.   What's the percentage?

14       A.   It varies, 10 percent, 12 percent.  It

15   depends on the school, mostly 12 percent.

16       Q.   You mentioned FTE, what is that?

17       A.   That is money paid by pupils from the

18   county to the charter school.

19       Q.   So Superior is paid roughly 12 percent

20   of the amount of money paid from Miami-Dade

21   County to Academir Charter Schools then?

22       A.   Correct.

23       Q.   Is that the main source of funding for

24   Superior?

25       A.   Correct.

1    Q.    Does Superior receive funding from any
2    other outlets besides the county?

3    A.    No, sir.

4    Q.    Are there requirements that are attached
5    to that money from Miami-Dade County?

6    A.    No, sir.

7    Q.    Miami-Dade County doesn't have any
8    compliance requirements for Superior or Academir
9    in compliance for that money?

10   A.    No, sir.

11   Q.    Now, you previously mentioned grants.
12   Where do those grants come from?

13   A.    Those are grants that are applied -- we
14   apply for those grants from the federal
15   government and from the state for all the schools
16   depending on what the state puts out and we apply
17   for them and most of the time we're granted for
18   those grants.

19   Q.    And you said those are state and federal
20   grants?

21   A.    Yes, sir.

22   Q.    Do you know who administers those
23   federal grants if a particular department?

24   A.    The chief operating officer is the one
25   in charge of that.

Deposition of Rolando Mir                                 Jane Doe v. Academir Charter Schools, Inc., et al.

1    Q.   Are those grants given by the federal

2  department of education?

3    A.   Yes, and from the state department of

4  education.

5    Q.   Do they come from both the Florida

6  department of education and then the federal

7  department of education?

8    A.   Correct.  Correct.

9    Q.   Do those federal grants have any

10  requirements in terms of the funding that's given

11  to Superior?

12    A.   They are not given to Superior.  They're

13  given to the Academir Charter Schools.

14    Q.   Do you know if there are any

15  requirements imposed on Academir Charter Schools

16  in relation to those federal grants?

17    A.   There are.  There are regulations.

18    Q.   Do you know what those are?

19    A.   Not offhand.  She's the most involved in

20  that, but those grants are given for whatever

21  specific reason that we applied for.  So, if we

22  applied for furniture, it's got to be for

23  furniture.  It cannot be used for other things.

24    Q.   You mentioned "she"; who are you

25  referring to?

1    A.    The chief operating officer, Olivia

2  Bernal.

3    Q.    And if I understand you correctly, those

4  grants are given directly to Academir Charter

5  Schools by the federal and state government?

6    A.    Yes, sir.

7    Q.    Does Superior receive any of that money

8  that comes from those federal or state grants?

9    A.    Absolutely not.

10    Q.    Now, you previously mentioned that

11  Superior receives a percentage of the FTE from

12  Miami-Dade County schools; right?

13    A.    Correct.

14    Q.    Are you aware if any of those funds that

15  Miami-Dade County schools grants to Superior are

16  from the federal government?

17    A.    I'm not aware of that, no.  They come

18  from the state.

19        And let me correct something.

20  Miami-Dade County does not pay Superior.

21  Miami-Dade County pays Academir Charter Schools.

22  Academir Charter Schools is the one that pays a

23  percentage to Superior for their services.

24    Q.    If I understand you correctly,

25  Miami-Dade County schools paid Academir based on

```
 1      its enrollment?

 2           A.    Exactly.

 3           Q.    And then Academir Charter Schools pays a

 4      percentage of those funds to Superior for its

 5      management services; is that right?

 6           A.    A percentage of those funds get paid to

 7      Superior based on the contract which, like I

 8      stated before, is a percent.

 9           Q.    Now, you previously mentioned

10      Ms. Bernal, who is the chief operating officer.

11      She's the chief operating officer for Superior;

12      is that right?

13           A.    She's the chief operating officer for

14      the charter schools.

15           Q.    Okay.

16           A.    She handles all of the charter schools.

17           Q.    And Ms. Bernal is also responsible for

18      compliance with those grants that come from the

19      state and federal government on behalf of

20      Academir; is that right?

21           A.    Yes, sir.

22           Q.    Is Ms. Bernal responsible for all

23      aspects of legal compliance for Academir that you

24      are aware of?

25           A.    A lot of the compliances are done by the
```

1   principals too, but when it comes to Superior,

2   Ms. Bernal is the one that handles it.

3       Q.   What do you mean when it comes to

4   Superior?

5       A.   If there is a compliance that has to be

6   met, she will do it.  She does all the

7   compliance.  If it's something the principal has

8   to do, then the principal will handle that

9   compliance on their side.

10      Q.   So, Ms. Bernal handles compliance for

11  Superior, but she's the chief operating officer

12  for Academir?

13      A.   Yes, sir.

14      Q.   How does that work?

15      A.   She worked for the schools in the past.

16  She was a principal in the school and then she

17  became chief operating officer for all of those

18  schools.  Now she works out of Superior.

19      Q.   What do you mean she works out of

20  Superior?

21      A.   She works out of Superior's offices and

22  she manages all of those schools.

23      Q.   Just so I understand you correctly,

24  Ms. Bernal is an employee of Academir Charter

25  Schools?

Deposition of Rolando Mir                                      Jane Doe v. Academir Charter Schools, Inc., et al.

1        A.    Is an employee of Academir Charter

2    Schools and is an employee of Superior.

3        Q.    So, she's employed by both?

4        A.    Yes.

5        Q.    Do both Superior and Academir Charter

6    Schools pay Ms. Bernal a salary?

7        A.    Yes, sir.

8        Q.    How much does Superior pay Ms. Bernal on

9    an annual basis?

10       A.    $150,000.

11       Q.    And do you know how much Academir

12   Charter Schools pay Ms. Bernal?

13       A.    It's the in the 50s, I believe.  I'm not

14   sure at this point.

15       Q.    And you said Ms. Bernal works out of

16   Superior; is that right?

17       A.    That's correct.

18       Q.    Do you mean the physical office that she

19   works at?

20       A.    That's what I mean, the physical office.

21       Q.    Who does Ms. Bernal report to directly?

22       A.    To me.

23       Q.    And is that for her work for both

24   Academir Charter Schools and Superior?

25       A.    Yes, sir.

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 27 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.    And you also said Ms. Bernal handles all
2  aspects of compliance for Superior?
3      A.    Not all aspects of compliance for
4  Superior.
5      Q.    What aspects of compliance does she
6  handle for Superior?
7      A.    She handles anything having to do with
8  the grants, like I mentioned.  She handles
9  anything having to do with the county compliance
10  for the schools, anything having to do with the
11  schools.  But not all the -- the Superior is --
12  there's different people in Superior that handle
13  different aspects of Superior.
14      Q.    Does anyone else that works for Superior
15  handle compliance?
16      A.    My wife sometimes.
17      Q.    What aspects of compliance does your
18  wife handle?
19      A.    Some from the district, some of the --
20  certain requirements have to be met, like renewal
21  of charters and things like that, of that nature.
22      Q.    Does Ms. Bernal handle compliance with
23  federal law for Superior?
24      A.    No.
25      Q.    Who handles compliance with federal law

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 28 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

 1         for Superior?

 2              A.    My wife and I.

 3              Q.    What aspects of federal legal compliance

 4         do your wife and yourself handle?

 5              A.    Of federal legal?

 6              Q.    Yes.

 7              A.    I don't understand the question.

 8              Q.    Well, I asked who handles compliance

 9         with federal law for Superior and I believe you

10         told me your wife and yourself handle those

11         aspects?

12              A.    Correct.

13              Q.    So, what do your wife and yourself do in

14         that regard?

15              A.    It all depends what the compliance --

16         whatever compliance needs to be met, that's what

17         we do.

18              Q.    What have you done in the past in

19         relation to compliance with federal law on behalf

20         of Superior?

21              A.    When it comes to employees and

22         compliances on hiring and payroll and training we

23         handle those things like I said with the

24         TotalSource ADP.

25              Q.    You and your wife handle compliance with

1    federal law for employee training?

2         A.    In conjunction with ADP, yes.

3         Q.    How does Superior ensure employees are

4    complying with federal law in conjunction with

5    ADP?

6         A.    Through ADP attorneys.  We deal with the

7    ADP and their attorneys constantly on all

8    compliances and anything that has to be met.

9         Q.    You deal with attorneys from ADP?

10        A.    Yes, we deal with -- not myself, HR

11   does, but we deal with attorneys.  That's why we

12   have TotalSource with them.

13        Q.    Now, I know you mentioned hiring and

14   training and several other aspects of federal

15   compliance, who handles federal education

16   requirements for Superior?

17        A.    Ms. Bernal.

18        Q.    And are you familiar with what she does

19   in that regard with federal education law?

20        A.    Not really.

21        Q.    Does anyone else handle compliance with

22   federal education law on behalf of Superior

23   besides Ms. Bernal?

24        A.    No.

25        Q.    And does Ms. Bernal also handle that

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 30 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    same federal education law compliance for

2    Academir or is there a someone else that handles

3    that?

4         A.    For the charters she would be the one

5    handling it.

6         Q.    And no one else besides Ms. Bernal is

7    handling that on behalf of Academir; correct?

8         A.    Not that I am aware of.

9         Q.    Now, in terms of the operations of

10   Academir Charter Schools, who are, let's say, the

11   teachers employed by?

12        A.    The teachers are employed by ADP.

13        Q.    The teachers are employed by ADP?

14        A.    Yes.

15        Q.    They don't work for Academir Charter

16   Schools?

17        A.    They work for Academir Charter Schools,

18   employed by ADP.

19        Q.    Are you referring to handling payroll?

20        A.    Handling payroll and hiring, that's part

21   of TotalSource.

22        Q.    But Academir Charter Schools teachers

23   and faculty are not employed by Superior;

24   correct?

25        A.    They're not.

1      Q.    And is that also true for the

2   administrators of Academir Charter Schools?

3      A.    Correct.

4      Q.    And I believe previously you said there

5   are about 18 employees for Superior?

6      A.    Yes.

7      Q.    And that includes yourself, your wife,

8   and Ms. Bernal?

9      A.    Correct.

10      Q.    Who else is employed by Superior?

11      A.    Xenia is in charge of -- do you want

12   names or do you just want positions?

13      Q.    We can do positions.

14      A.    We have an HR -- we have two HR people.

15   We have two payroll people.  We have three

16   curriculum coaches.  We have Ms. Bernal.  We have

17   the vice president Magdiel.  We have a facility

18   supervisor, to supervise the facility to make

19   sure they are in compliance with signage and all

20   that, that the school requires.  And let's see,

21   receptionist, afterschool program attendant.

22   About 18 people.

23      Q.    Now, you mentioned a vice principal, I

24   believe, a vice president?

25      A.    Yes, sir.

1    Q.    Who is that?

2    A.    Magdiel Rodriguez.

3    Q.    And what kind of responsibilities do

4    they handle for Superior as vice president?

5    A.    He handles Superior when the president,

6    my wife and I are not present, he's in charge of

7    everything we do.

8    Q.    Do you know what Title IX is?

9    A.    Yes, sir.

10   Q.    What is Title IX?

11        MS. KARRON:  Object to the form.

12        MR. MACDONALD:  You can go ahead

13   and answer.

14        THE WITNESS:  Anything having to do

15   with sexual harassment, harassment of a

16   person, I believe.

17   BY MR. MACDONALD:

18   Q.    You said you believe Title IX relates to

19   sexual harassment; is that right?

20   A.    Yes, sir.

21   Q.    And are you aware that Title IX refers

22   to a federal law?

23   A.    I know it's a federal law, yes.

24   Q.    Have you ever received any type of

25   training related to Title IX before?

      

1      A.   No, sir.

2      Q.   You've never done any training related

3   to Title IX you've said?

4      A.   No, sir.

5      Q.   How did learn of what Title IX is if

6   you've never done any training related to it?

7      A.   Heard of it.

8      Q.   Do you know if Superior is subject to

9   any Title IX requirements?

10      MS. KARRON:  Object to form.  Calls

11     for a legal conclusion.

12      MR. MACDONALD:  You can answer.

13      THE WITNESS:  I'm not aware of it.

14    No.

15   BY MR. MACDONALD:

16      Q.   Do you know if Superior receives any

17   federal funding that relates to Title IX?

18      A.   No, sir.

19      Q.   No as in you do not know?

20      A.   No, we don't receive any funding.

21      Q.   Superior doesn't receive any federal

22   funding directly is what you're saying?

23      A.   Correct, sir.  They don't receive any.

24      Q.   Are you aware that Miami-Dade County

25   receives federal funding?

1          A.   I'm sure they do.

2          Q.   You're sure that Miami-Dade County

3     receives federal funding?

4          A.   Yes.

5          Q.   Do you know if Academir Charter Schools

6     receives federal funding?

7          A.   I'm sure through Miami-Dade County

8     Public Schools they receive federal funding.

9          Q.   And it's from that money that

10    Academir receives that Superior is paid; is that

11    right?

12         A.   Yes, sir.

13         Q.   So then wouldn't it be true that

14    Superior also receives federal funding?

15              MS. KARRON:   Object to form.

16              THE WITNESS:   Superior doesn't

17         receive funding directly from the

18         federal government.

19    BY MR. MACDONALD:

20         Q.   But it does receive federal funding

21    indirectly?

22         A.   I'm not aware of it.

23         Q.   Does Superior conduct any Title IX

24    training for its 18 employees?

25         A.   I'm sure through TotalSource ADP they

1    do.

2          Q.    Do you know that for a fact?

3          A.    No, I don't, but I'm sure they do the

4    training.

5          Q.    You believe ADP TotalSource administers

6    Title IX training to Superior employees?

7          A.    Not to Superior's employees, to the

8    charter schools' employees.

9          Q.    Well, first I wanted to ask you about

10   Superior employees.  Does Superior give any Title

11   IX training to any of its 18 employees?

12         A.    No, sir.

13         Q.    Does Superior give any Title IX training

14   to Academir Charter School employees?

15         A.    Not Superior.  To ADP TotalSource.

16         Q.    What kind of Title IX training does ADP

17   TotalSource give to Academir Charter School

18   employees?

19         A.    I couldn't tell you.  I don't know.

20         Q.    Does ADP TotalSource give trainings

21   directly related to education or education

22   compliance, I should say?

23         A.    No, I don't believe so.

24         Q.    Do you know what topics ADP TotalSource

25   trains Academir Charter School employees on?

1        A.    On harassment, on various other things.

2        Q.    What various other things?

3        A.    Such as sexual harassment.  I'm not

4   really familiar with it because I don't work HR.

5   The HR people might know that, but I know they do

6   training for them and they have to do training

7   before they hire them.

8        Q.    Have you ever had to undergo that ADP

9   TotalSource training?

10        A.    Not, I'm not an employee of Academir

11   Charter Schools.  It's only for employees.

12        Q.    When did ADP TotalSource begin giving

13   those trainings to Academir Charter Schools'

14   employees?

15        A.    From the inception when they were hired

16   to do the payroll and the TotalSource portion of

17   it.

18        Q.    And do you know roughly when that was?

19        A.    I would say about 15 years.  I don't

20   know exactly, but 15 years.  They have been there

21   for a long time.

22        Q.    And the training that is given to

23   Academir Charter Schools' employees by ADP

24   TotalSource is that an online training or is that

25   in person?

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 37 of 111

Deposition of Rolando Mir                                          Jane Doe v. Academir Charter Schools, Inc., et al.

1        A.    It's online.

2        Q.    And is it that a training that has to be

3   done once an Academir employee starts or does it

4   have to be done on a regular basis?

5        A.    I think it has to be done once.  I'm not

6   sure if it has to be done over a certain amount

7   of time or renewed, but I'm sure it's only once.

8        Q.    Do you know if the training that's given

9   by ADP TotalSource to Academir employees is

10  general training on sexual harassment and not

11  specialized for educational institutions?

12            MS. KARRON:  Objection to form.

13            THE WITNESS:  I'm not sure.

14            MR. MACDONALD:  We'll go ahead and

15       take a break on the record.  We can take

16       a ten-minute break.

17            (A brief break was had.)

18  BY MR. MACDONALD:

19       Q.    Mr. Mir, does Superior have any policies

20  regarding Title IX?

21       A.    I'm sure we do.

22       Q.    Do you know for a fact that Superior has

23  Title IX policies?

24       A.    I don't know for a fact.

25       Q.    Is there someone at Superior that would

1    know for a fact?

2        A.    The president would know and Ms. Bernal

3    would know too.

4        Q.    The president being who?

5        A.    My wife.

6        Q.    Why do you say your wife would know if

7    Superior had Title IX policies?

8        A.    They're the ones that handle those kinds

9    of policies and procedures for Superior.

10       Q.    Do you have any idea where those Title

11   IX policies would be found if they exist?

12       A.    No.

13       Q.    Does Superior have written policies of

14   any kind?

15       A.    Again, they're the ones -- they would

16   know.  I don't get involved in those things.

17       Q.    You don't know if the company has any

18   kinds of policies?

19           MS. KARRON:  Object to form.

20           MR. MACDONALD:  You can answer.

21           THE WITNESS:  I'm sure they do, but

22   I can't tell you where.

23   BY MR. MACDONALD:

24       Q.    Does Superior have an employee handbook?

25       A.    I believe so, yes.

1      Q.    Where would that employee handbook for

2   Superior employees be located?

3      A.    Again, they would know.

4      Q.    Do you understand that you've been

5   designated to testify regarding Title IX policies

6   for Superior?

7      A.    Yes, I understand.

8      Q.    But you don't know if there is any Title

9   IX policies in existence for Superior?

10        MS. KARRON:   Object to form.

11        THE WITNESS:   I'm sure there are,

12      but I don't know where they are or who

13      would handle them.

14   BY MR. MACDONALD:

15      Q.    Is there a physical location where

16   policies for Superior are stored?

17      A.    Right here in the main office.

18      Q.    What kind of policies are stored in the

19   main office?

20      A.    All kinds of policies, school policies,

21   Superior policies.   All policies are stored here

22   in the main office.

23      Q.    What kind of policies specific to

24   Superior are stored in that office?

25      A.    Any policies that pertain to Superior

1    would be stored in this main office.

2         Q.   Can you give me an example?

3         A.   No.  I don't know which policies would

4    be stored here.  Like I said, they would know.

5              MS. KARRON:  Hey, Kyle, the

6         representative that's appearing tomorrow

7         is Olivia.  So for whatever he can't

8         answer, she probably can answer.  I'm

9         not sure if I gave you a name, but

10        Olivia Bernal is the one that is going

11        to be appearing.

12             MR. MACDONALD:  The only issue --

13        and we can talk about it off the record

14        if you would like, is that she's

15        designated for Academir and he's

16        supposed to be testifying as to Title IX

17        for Superior, but for now we can just

18        move on.

19   BY MR. MACDONALD:

20        Q.   Is there any kind of Title IX complaint

21   procedure that you are aware of for Superior?

22        A.   No, sir, there is no complaint.

23        Q.   What do you mean?

24        A.   You asked me if there was any complaints

25   that I was aware of and I'm not aware of any

```
 1      complaints.
 2           Q.    I'm sorry if I was unclear.
 3                 Is there any procedure for handling
 4      Title IX complaints that Superior has in place?
 5           A.    I'm sure there are.
 6           Q.    But you're not aware of any?
 7           A.    Not aware of.  All of that is handled by
 8      Ms. Bernal.
 9           Q.    Have you reviewed any policies with
10      Ms. Bernal for Superior?
11           A.    Not me.
12           Q.    How do you ensure that Ms. Bernal is
13      properly handling procedures in place for
14      Superior employees?
15           A.    I trust that she is.
16           Q.    Does Superior have any procedures
17      related to financial reporting?
18           A.    No.
19           Q.    Does Superior have any policies related
20      to handling any kind of educational records?
21           A.    No, that's all done through the schools.
22           Q.    Now, you mentioned that there are
23      policies for Superior stored at the office that
24      you're located at; is that right?
25           A.    If there are policies, they are stored
```

1    here.

2         Q.   But you do not know for a fact if there

3    are policies for Superior that exist in the

4    office?

5         A.   I don't know for a fact.

6         Q.   Does Superior have any policies related

7    to Title IX investigations?

8         A.   I'm sure they do, but I'm not aware of

9    any.

10        Q.   What makes you say that you are sure

11   that they do?

12        A.   Because that's their job to do and I'm

13   sure they do their job well.

14        Q.   And who is the "they" that you are

15   referring to?

16        A.   Chief operating officer, Ms. Bernal.

17        Q.   Does Superior have a person who is

18   designated for receiving Title IX complaints?

19        A.   That would be Ms. Bernal.

20        Q.   And how do you know that?

21        A.   Because there would be nobody else that

22   would handle that -- complaints of those types of

23   nature, only her.

24        Q.   Do you know if Ms. Bernal has ever

25   handled Title IX complaints in the past?

1     A.    Not aware of it.

2     Q.    Does Superior have any policies in place

3  regarding sexual harassment?

4     A.    I'm sure we do.

5     Q.    Do you know for a fact that Superior has

6  policies in place for sexual harassment?

7     A.    I know for a fact.

8     Q.    How do you know that?

9     A.    Because she handles all those things.

10     Q.    And who is she?

11     A.    Ms. Bernal, the chief operating officer.

12     Q.    Have you ever discussed sexual

13  harassment policies with Ms. Bernal?

14     A.    No.

15     Q.    Have you ever assigned Ms. Bernal

16  responsibility for handling sexual harassment

17  policies for Superior?

18     A.    That's part of her job, yes.

19     Q.    And has Ms. Bernal created any type of

20  written policies related to sexual harassment?

21     A.    I'm sure she has.

22     Q.    Do you know for a fact that Ms. Bernal

23  has created any written sexual harassment

24  policies for Superior?

25     A.    I believe so, yes.

1     Q.   And are those written sexual harassment

2  policies stored somewhere?

3     A.   I believe so, yes.

4     Q.   Where do you believe that they are

5  stored?

6     A.   At corporate offices here.

7     Q.   Do you know who created those policies?

8     A.   If they were created, they were created

9  by her.

10     Q.   Has Ms. Bernal ever written any other

11  policies for Superior?

12     A.   I believe so, yes.

13     Q.   Do you know for a fact that Ms. Bernal

14  has written any other policies for Superior?

15     A.   Yes.

16     Q.   What policies are those?

17     A.   I'm not sure.  She's the one that writes

18  policies for any type of a case.

19     Q.   Right, but the question I had asked was

20  whether you know for a fact that Ms. Bernal has

21  written policies for Superior.  And I believe you

22  answered in the affirmative.  So I was asking:

23          What policies do you know for a fact?

24     A.   I know for a fact she writes policies.

25  Am I aware of any that she does?  No, I'm not

1    aware of any.

2         Q.   Are there any documents that you're

3    aware of that would refresh your recollection as

4    to the policies that are in place for Superior in

5    regards to sexual harassment?

6         A.   No, sir.

7         Q.   Do you know what the Miami-Dade County

8    schools code of student conduct is?

9         A.   No, that is something that the

10   principals and Ms. Bernal would know.

11        Q.   So then, Superior does not adhere to

12   Miami-Dade County schools code of conduct?

13        A.   Not Superior.

14        Q.   So, you're not familiar with any of the

15   policies contained in the Miami-Dade County

16   schools code of conduct then?

17        A.   No.

18        Q.   Have you ever received any training

19   related to the Miami-Dade County schools code of

20   student conduct?

21        A.   No, sir.

22        Q.   Are you familiar with the Miami-Dade

23   County Public Schools Office of Civil Rights

24   Compliance?

25        A.   I'm familiar with it.

1      Q.    What do you know about it?

2      A.    Anything having to do with civil rights.

3      Q.    What about civil rights in regards to

4   the Office of Civil Rights Compliance are you

5   aware of?

6      A.    I've heard about it, but I don't know

7   much about it.  I've heard about it.

8      Q.    Have you ever contacted the Office of

9   Civil Rights Compliance --

10      A.    No, sir.

11      Q.    -- before?

12      A.    No, sir.

13      Q.    Have any employees of Superior ever

14   contacted the Office of Civil Rights Compliance

15   for Miami-Dade County?

16      A.    Not that I know of.

17      Q.    Do you know if Academir Charter Schools

18   adheres to the Miami-Dade County schools code of

19   student conduct?

20      A.    I believe they do.

21      Q.    How do you know that?

22      A.    Because it's mandatory for them and they

23   are the ones that get the training.

24      Q.    Employees of Academir Charter Schools

25   receive training on the code of student conduct?

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 47 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1        A.    No, the principals, the administration

2   of the schools.

3        Q.    What kind of training does the

4   administration receive?

5        A.    I have no idea.

6        Q.    How do you know that they receive

7   training then?

8        A.    Because it's mandatory for them to get

9   training on those issues.

10       Q.    Who is it mandated by?

11       A.    Miami-Dade County Public Schools.

12       Q.    Do you know if Miami-Dade County schools

13   mandate that any Superior employees be trained in

14   relation to the code of student conduct?

15       A.    No.

16       Q.    Are you aware of reporting requirements

17   for employees of Academir in relation to the

18   Department of Children and Families?

19       A.    I'm not familiar with it.  I know

20   they're required to do so, but I'm not familiar

21   with it.

22       Q.    Do you know that employees of Academir

23   Charter Schools are required to do what?

24       A.    They're required to report anything to

25   Children and Families pertaining to any student

1    that has any type of complaint or incident that

2    requires that type of reporting, depending on

3    each and every single case independently.

4         Q.   Do you know what kind of incidents

5    require reporting to the Florida Department of

6    Children and Families?

7         A.   Any incidents that would be of touching,

8    of battery, to any student to another student or

9    from anybody.

10        Q.   You said of touching or battery

11   involving students?

12        A.   Right.

13        Q.   Are incidents of abuse required to be

14   reported to the Department of Children and

15   Families that you're aware of?

16        A.   Yes.

17             MS. KARRON:  Objection to form.

18   BY MR. MACDONALD:

19        Q.   Are employees at Academir Charter

20   Schools required to report allegations of a

21   sexual nature to the Department of Children and

22   Families that you're aware of?

23             MS. KARRON:  Objection to forms.

24             MR. MACDONALD:  You can answer.

25             THE WITNESS:  Depending on the case

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 49 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1           and depending on what type of incident,

 2           they must report.

 3      BY MR. MACDONALD:

 4           Q.   What does it depend on for incidents

 5      involving sexual allegations?

 6           A.   It has to be an incident of touching a

 7      student, hitting a student, threatening a student

 8      for them to report to children and families.

 9      It's a police.

10           Q.   Does that include verbal sexual conduct?

11           A.   No.

12           Q.   And you mentioned threats fall within

13      that reporting requirement; is that right?

14           A.   Right.

15           Q.   Aren't threats verbal?

16           A.   Depending on the department to get

17      advice on whether that occurred, it would be

18      Metro Dade police.

19           Q.   It has to be reported you said to the

20      Miami-Dade police?

21           A.   Yes, threats must be reported.

22           Q.   And do employees of Superior ever

23      receive training related to that reporting

24      requirement for the Department of Children and

25      Families?
```

1        A.    No.

2        Q.    Do you know if employees of Academir

3   Charter Schools receive training on that

4   mandatory reporting requirement?

5        A.    Yes, they do, by the principal and by

6   the district.

7        Q.    Does the principal conduct the training?

8        A.    The principal conducts training and the

9   district conducts training too.

10        Q.    And when you say district, you're saying

11   the Miami-Dade County School District conducts

12   that training?

13        A.    Correct, and also TotalSource.

14        Q.    What does TotalSource conduct?

15        A.    Give them training on those types of

16   incidents and the reporting for the state to the

17   Department of Children and Families, to the

18   police.

19        Q.    Reporting to the Florida Department of

20   Children and Families is covered by ADP

21   TotalSource training?

22        A.    Some of it is covered by them, some is

23   covered by the district, and some is covered by

24   the principal.

25        Q.    How often does the principal of each

1    respective Academir school give training related

2    to that reporting requirement?

3        A.    On a yearly basis.

4        Q.    And does that occur at the same time

5    each year?  Does it vary?

6        A.    Usually at the beginning of the school

7    year.

8        Q.    And is this training where all of the

9    teachers are gathered?

10       A.    All employees, yes.

11       Q.    And the training that Miami-Dade County

12   gives is that also conducted within that same

13   meeting?

14       A.    No.

15       Q.    When are those done?

16       A.    Those are trainings that Miami-Dade

17   County schools does.  It's at one of their sites.

18   It varies from place to place.

19       Q.    And employees of Academir Charter

20   Schools are required to attend those?

21       A.    Yes.

22       Q.    How often?

23       A.    Yearly.

24       Q.    And who verifies that those employees

25   attend those trainings given by Miami-Dade

1    County?

2         A.    The principals.

3         Q.    So, each principal of each respective

4    Academir Charter School is responsible for

5    ensuring that those trainings are attended?

6         A.    Correct.

7         Q.    Now, earlier I mentioned my client who

8    we refer to as Jane, do you recall that?

9         A.    Yes, sir.

10        Q.    Was Jane a student with Academir Charter

11   Schools at any point?

12        A.    Yes, sir.

13        Q.    When was Jane enrolled with Academir?

14        A.    That will have to be answered by the

15   principal.  I have no idea when she started in

16   the school.  The principal should have that

17   information.

18        Q.    Have you ever met my client Jane or her

19   parents?

20        A.    No, sir.

21        Q.    Have you ever communicated with Jane's

22   parents?

23        A.    On January 27th in the morning.

24        Q.    January 27th of 2023?

25        A.    Yes, sir.

1    Q.    How did you communicate with Jane's

2    parents on January 27, 2023?

3    A.    I received a call from her mother that

4    she needed to talk to me desperately about an

5    incident that had occurred in the school with

6    another boy and she wanted to meet with me.  And

7    we set up a meeting with her that day.  I told

8    her I was out of town and I told her I would be

9    back on Monday.  And I said we could meet.  And

10   she said fine.

11   Q.    Was that the first time you communicated

12   with Jane's parents?

13   A.    Yes, sir.

14   Q.    And you said you received a phone call;

15   is that right?

16   A.    Correct.

17   Q.    And that was Jane's mother giving you a

18   phone call?

19   A.    Yes, sir.

20   Q.    And did you miss that phone call?

21   A.    No, I received a phone call.  I was out

22   of town.  I received a phone call.  She said she

23   needed to talk to me, referring to an incident

24   that occurred at the school with her daughter,

25   and that if I was able to attend to her.

1          And I said, "Absolutely, I will talk to
2    you, but I'm out of town today."
3          I was out of town when she called me.  I
4    was in Tampa, or on my way to Tampa.  And we
5    scheduled it for the next Monday.  That was
6    Friday the 27th.  We scheduled it for Monday at
7    11:00.
8          I would say about 15 minutes later, I
9    recalled that I had a meeting that day in the
10   morning, a conference.  And I called her back and
11   said, "Can we change that from 11:15" -- it was
12   supposed to be 11-something.  I don't recall.  I
13   said, "Can we change it to 4:00 in the
14   afternoon?"
15         She said, "Yes."
16         And I said, "Okay.  I'll meet you at the
17   office at 4:00 on Monday."  And that was the last
18   that I talked to her.
19     Q.   So, stepping back a little bit, you
20   first received that phone call from Jane's mother
21   on the 27th, which was a Friday; is that right?
22     A.   Yes, sir.
23     Q.   And you said you were in Tampa at that
24   time?
25     A.   I was on my way to Tampa.

```
1          Q.    What were you on your way to Tampa for?
2          A.    Search of a school -- searching of a
3     school.  I was on my way to Tampa searching for a
4     facility in Tampa and then I was on my way to
5     Orlando, another school that I was building in
6     Orlando.
7          Q.    You were looking for a facility to host
8     a perspective school in the Tampa area?
9          A.    Correct.
10         Q.    Where were you when you received that
11    phone call specifically from Jane's mother?
12         A.    On the turnpike.
13         Q.    And when you first picked up that phone
14    call, what did Jane's mother say to you
15    specifically?
16         A.    She said, "Mr. Mir?"
17               I said, "Yes."
18               She said, "This is so-and-so.  I had an
19    incident at the school and I need desperately to
20    talk to you."
21               I said, "Fine.  What happened?"
22               She said, "Something happened of a boy
23    telling my daughter something and I can't allow
24    that."
25               And I said, "Okay.  Fine.  We'll meet on
```

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 56 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    Monday.  I can't meet now; I'm out of town, but

2    we'll meet Monday and discuss it.  And we'll get

3    to the bottom of it."

4             And then she said, "Fine."

5             And then 15 minutes later, like I said,

6    I called her back and said, "I can't do it at

7    11:15.  I can do it at 4:00."

8             And she said, "Fine."

9        Q.   Jane's mother told you on that phone

10   call that another boy or a boy, rather, had told

11   her daughter something?

12       A.   Yes.

13       Q.   Did she say what that boy had told her

14   daughter?

15       A.   Yes.  She said to me that the boy had

16   told her daughter that he wanted to touch her

17   private parts and kiss her in the mouth and that

18   was not acceptable.  Those were her words.

19       Q.   Jane's mother stated that a boy had told

20   her daughter that he wants to touch her private

21   parts and kiss her in the mouth?

22       A.   Yes, sir, that is what she told me.

23       Q.   Did she say who that boy was?

24       A.   She didn't say.

25       Q.   Did she say if that boy was a classmate

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 57 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

 1    of her daughter's?

 2         A.   Yes.

 3         Q.   And when she told you that you responded

 4    by offering to meet on Monday to discuss the

 5    issue?

 6         A.   Yes.  She wanted to meet with me.  She

 7    said, "I want to meet with you and I want to talk

 8    to you personally."

 9              That's when I said, "We can meet on

10    Monday.  I can't meet now.  I'm on the road."

11         Q.   Did you say anything else to Jane's

12    mother on that phone call?

13         A.   No, that was it to her.

14         Q.   Did you know how old Jane's -- Jane was

15    at the time of this phone call?

16         A.   No.

17         Q.   Did Jane's mother say how old her

18    daughter was?

19         A.   No, she never said the age of the

20    daughter or anything.  Just by seeing the grade,

21    I assumed it's kindergartners.

22         Q.   She said that her daughter was in

23    kindergarten?

24         A.   Yes.

25         Q.   On that phone call did you say what time

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 58 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    you would meet with Jane's mother?

2         A.   Yes, I did.  From the beginning of the

3    first call, I made the appointment for 11:15, if

4    I'm not mistaken.  And then I realized I had a

5    conference that day, Monday morning around 11:00.

6    So, I called back and I said, "I have to change

7    that for 4:00 because I have a meeting in the

8    morning."

9              She said, "No problem, 4:00."

10             And I said, "I'll meet you in the office

11   at 4:00."

12             She said, "Fine."

13        Q.   Where were you originally scheduled to

14   meet with Jane's mother at 11:15?  What was the

15   location?

16        A.   At my office.

17        Q.   So that's the corporate office of

18   Superior; is that right?

19        A.   The corporate office of Superior, that's

20   right, yes.

21        Q.   After you got off the phone with Jane's

22   phone call, that initial phone call, did you

23   notify anyone else of what had been reported to

24   you?

25        A.   I called the principal right away.  I

1   asked her, "What is going on?  I received a call

2   from a mother saying that this happened."

3          She said, "I'm aware of it.  I'm working

4   on it."

5          And I told her, "Make sure that you do,

6   because I have a meeting with the mother on

7   Monday.  She's very upset."

8      Q.   And who is the principal that you spoke

9   to?

10     A.   Ms. Suzy Bello.

11     Q.   And on that phone call Ms. Bello told

12  you that she was already aware of that alleged

13  incident?

14     A.   Yes, and that she was working on it.

15  She was taking care of it.

16     Q.   Did Ms. Bello say how she was working on

17  it?

18     A.   No.

19     Q.   Did Ms. Bello say when she had learned

20  of that incident?

21     A.   No.

22     Q.   Did you discuss with Ms. Bello what

23  specifically had been alleged in relation to the

24  touching of the private parts and the kissing on

25  the mouth?

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 60 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    A.   I told her.  I told her that the

2   complaint that the mother had given me was that

3   another student in the classroom had told her

4   daughter that he wanted to touch her parts and

5   wanted to kiss her in the mouth.  And I asked

6   her, "Are you aware of this?"

7         And she said, "Yes I am, and I'm working

8   on it."

9    Q.   When you learned of that complaint by

10  Jane's mother, did you contact the Department of

11  Children and Families?

12   A.   That's the principal's job to do.

13  That's the principal's duty depending on the case

14  itself, on a case-by-case basis, depending on

15  what type of incident it is and if it requires

16  Department of Children and Families or the police

17  for that matter.

18   Q.   It was Ms. Bello's responsibility to do

19  any report if it was necessary.

20   A.   That's the principal's job to do.

21   Q.   Did you ask Ms. Bello if she reported

22  the incident to the Florida Department of

23  Children and Families?

24   A.   Not that day.

25   Q.   Did you ask Ms. Bello if she reported

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 61 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   the incident to law enforcement?

2       A.   I didn't ask her anything that day, just

3   what had happened, and the call that I got from

4   the mother regarding the alleged incident with

5   the child, and what the child told the little

6   girl.  And to -- "Make sure you handle it because

7   I have a meeting with the mother.  She is very

8   upset."  That is all that transpired on the call

9   with Ms. Bello that day.

10      Q.   At the time you learned of that

11  incident, did you believe that Ms. Bello was

12  required to report the incident to the Florida

13  Department of Children and Families?

14      A.   No, because I didn't know the severity

15  of the case or what the case called for or -- it

16  was a verbal, to me.  All I know is when they

17  called me on that it was a verbal incident, a

18  child telling another child, a five-year-old

19  telling another five-year-old.

20      Q.   And you didn't believe that kind of

21  verbal incident needed to be reported to the

22  Florida Department of Children and Families?

23      A.   It needs to be dealt with, but not with

24  the Florida Department of Children and Families

25  or for the police to investigate.

1      Q.    Why do you say that?

2      A.    Because that's the procedure.  The

3  procedure is if it's verbal, then they deal with

4  the students.  They punish who has to be punished

5  and speak to the parents about it.

6      Q.    Even if it's a verbal remark that's

7  sexual in nature like this one?

8      A.    Yes, the Department of Children and

9  Families wouldn't want to hear that if it's

10 verbal.

11     Q.    They wouldn't want to hear that?

12     A.    If it's verbal, they don't want to hear

13 it.  They won't even investigate it if it's a

14 verbal incident.

15     Q.    How do you know that?

16     A.    Because that's the rules and regulations

17 of Children and Families, and from prior cases in

18 the schools when there has been verbal abuse,

19 Children and Families don't want to hear about

20 it.  The school's principal has to deal with it.

21     Q.    What past cases are you referring to?

22     A.    Cases in the schools, kids telling kids

23 different things.  As much as the principal wants

24 to report it, there's only so much you can do,

25 only so much you can report depending on the

1   severity of the case.

2        Q.   And those past cases that you mentioned

3   are those ones that you were involved in or are

4   you speaking generally about past cases you may

5   have heard of?

6        A.   Speaking generally of the cases that

7   I've heard of.  I don't get involved in those

8   things.  Like I said, that's the principal's job

9   to do.  I don't govern what the principal does.

10  The principal is the principal of the school.

11       Q.   Now, you said after you went to Tampa

12  you traveled to Orlando that weekend?

13       A.   Yes.

14       Q.   And when did you return back to Miami?

15       A.   On Sunday night.  I say Orlando, but it

16  wasn't Orlando.  It was Osceola County, that's

17  where I put up a school.  It's another school in

18  Osceola and that's where I was.

19       Q.   And on Monday you realized there was a

20  conflict with your schedule?

21       A.   No, not on Monday.  The same day, on

22  Friday when she called me.

23       Q.   Okay.

24       A.   15 minutes later I realized that there

25  was a conflict.  And I called her back and I

1   said, "It can't be at 11:30.  Can I meet you at

2   4:00?"

3            And she said, "No problem."

4            I said, "Fine.  I'll meet you at the

5   office at 4:00."

6       Q.   What was the conflict at you had at

7   11:30?

8       A.   I had a Zoom meeting.

9       Q.   With who?

10           MS. KARRON:  Object.

11           THE WITNESS:  I don't recall.  It's

12      been a year-something.  I don't recall

13      exactly.  I have one every day.  I have

14      about 10, 15 every day.

15  BY MR. MACDONALD:

16      Q.   Do you keep a calendar of meetings that

17  you attend?

18      A.   No, sir.

19      Q.   You don't have any kind of calendar?

20      A.   No, sir.  These are meetings between the

21  schools and the principals and things that they

22  need, and things they want to do for the school,

23  and things like that, which in the past we used

24  to do it in person, but now that we have Zoom, we

25  do it on Zoom.

1      Q.   And you don't recall who that meeting
2  was with?
3      A.   I don't recall what school it was or who
4  it was with.
5      Q.   And was the location of that Monday
6  meeting at 4:00 p.m. going to be the same?
7      A.   Yes, sir.
8      Q.   And did you end up meeting with Jane's
9  mother at 4:00 p.m. that day?
10     A.   No.  I waited for her all day.  I called
11 the schools at about 5:00 in the afternoon.  And
12 I asked the schools, "Is the mother there?  Did
13 the mother go there?"
14          "No.  She didn't show up there."
15     Q.   Who did you call?
16     A.   I called Susie Bello.  I called the
17 primary learning center where the daughter's
18 school is.  No one had seen the mother.  At
19 around 7:00 p.m. there was a text sent to my
20 wife's phone, not mine, saying, "I called the
21 school and you were nowhere to be found."
22          I called back -- we text her back and
23 said, "We were there all day waiting for you in
24 the office since 4:00.  You never showed up."
25          She said, "Thank you for the late call,

1   but I just withdrew my daughter out of the

2   school."

3           And we told her, "We're sorry you had to

4   do that without talking to us, but you have to do

5   what is in the best interest of your daughter."

6       Q.   When you called to see about this

7   meeting you spoke to Susie Bello; is that right?

8       A.   Yes.

9       Q.   And you said you called the primary

10  learning center school?

11      A.   Yes, sir.

12      Q.   Who did you speak to at the school?

13      A.   At the school, I didn't talk to Susie

14  Bello at the school, I spoke to the -- I spoke to

15  the secretary on site.  And I called the primary

16  learning center where her daughter is.  And I

17  spoke to Ms. Sol (phonetic), she's the school

18  receptionist and I asked her, "Has the mother

19  been there?  Has the mother been asking?"

20          She said, "No.  I haven't seen the

21  mother."

22      Q.   You spoke to Ms. Sol and you said a

23  receptionist?

24      A.   Ms. Sol is the receptionist.

25      Q.   It's the same person?

1     A.   Yes.

2     Q.   So, if I understand you correctly you

3   did not speak to Susie Bello?

4     A.   No, not to Susie Bello.  I spoke to

5   Susie Bello's secretary.

6     Q.   And that's Ms. Sol?

7     A.   Yes.

8     Q.   And did you speak with anyone else to

9   see about this meeting with Jane's mother besides

10  Ms. Sol?

11    A.   No, I stayed in the office until

12  7:00 p.m. waiting.  Nobody showed up.

13    Q.   You waited at your office from 4:00 p.m.

14  to 7:00 waiting for her to show up?

15    A.   Yes, sir.

16    Q.   Did you have Jane's mother cell phone

17  number?

18    A.   No.

19    Q.   How did Jane's mother contact you on

20  that Friday?

21    A.   Via phone.

22    Q.   So wouldn't you still have her phone

23  number on Monday, three days later?

24    A.   I didn't have my phone with me that day.

25  Like I said, she was texting my wife's phone.

1     Q.    You didn't have your phone with you that

2   Monday?

3     A.    No, sir.

4     Q.    Where was your phone?

5     A.    I left it at home.  That's why I

6   contacted the school and asked the school, "Is

7   the mother there?"

8     Q.    Your phone was at home the entire day on

9   that Monday?

10    A.    Yes, sir.

11    Q.    How did you call Ms. Sol if you didn't

12  have your phone?

13    A.    I called from my office.

14    Q.    And that's an office landline I imagine?

15    A.    Yes, sir.

16    Q.    Did you consider asking anyone at the

17  school for Jane's mother's phone number?

18    A.    No, I was so involved waiting for her --

19  I just sat there waiting.  I did tell the schools

20  if she shows up, I'm waiting for her.  And she

21  never showed up according to the schools.

22    Q.    According to Ms. Sol?

23    A.    According to Ms. Sol, yes.

24    Q.    Did anyone else tell you that she never

25  showed up?

1      A.    No.

2      Q.    And you said that later that evening

3    Jane's mother contacted your wife?

4      A.    She had sent a text from -- prior to

5    7:00.  We returned the text to her.  She had sent

6    a text saying she was waiting for us and we never

7    showed up.  Apparently she thought we were going

8    to meet at the school.

9          We said, "We were waiting for you in the

10   office all afternoon."

11         She said, "Thank you for the late call.

12   I appreciate you calling me, but I withdrew my

13   daughter already from the school."

14         And my wife expressed to her, "I'm sorry

15   you had to do that before talking to us, but you

16   have to do what's in the best interest of your

17   daughter.  We understand."

18     Q.    And was that a text message or a phone

19   call?

20     A.    A text message.

21     Q.    And was that text message sent to your

22   phone or to your wife's phone?

23     A.    It was sent to my wife's phone.

24     Q.    And when did your wife notify you about

25   that text message?

1      A.   Instantly when she saw it.  We were both

2   sitting there waiting for her and she looked at

3   the text and saw it and that's what we responded.

4      Q.   You and your wife were together?

5      A.   Yes, sir.

6      Q.   Where were you?

7      A.   In Superior.

8      Q.   In the offices of Superior?

9      A.   Yes, we were sitting in the conference

10   room.

11      Q.   Was it after 7:00 p.m. that she received

12   that text message?

13      A.   No, the text messages were before.  I'm

14   not sure what time, but it was before.  We just

15   didn't see the text messages until about 7:00.

16      Q.   So, your wife had received the text

17   message prior to 7:00 p.m. but you and her did

18   not see it until after 7:00 p.m.?

19      A.   Correct.

20      Q.   And when your wife notified you about

21   that text message, she responded back with a text

22   message?

23      A.   Yes, sir.

24      Q.   And it was within that exchange that

25   Jane's mother said she was withdrawing her

1    daughter from that school?

2         A.    Yes, sir.  She thanked her for the late

3    response and that -- to advise her that she

4    had -- "Thank you for the late response, but I

5    have withdrawn my daughter from the school."

6    That is when I found out that the daughter was

7    withdrawn from the school by her telling me.

8         Q.    What was your reaction to the news?

9         A.    I was shocked because I usually listen

10   to the parents.  I like to talk to the parents.

11   And I like to see what's happening, what happened

12   to the girl.  I like to get to the bottom of

13   everything.  She didn't give me the opportunity

14   to do that.

15        Q.    Did you call Jane's mother when she told

16   you that?

17        A.    No, we simply responded -- we

18   acknowledged, "We're sorry that you did this, but

19   I guess you have to do what is in the best

20   interest of your child."

21        Q.    Did you ask to speak to Jane's mother to

22   gather additional information about what had

23   occurred?

24        A.    No, that was going to be done at the

25   meeting.

1   Q.   But once you learned that Jane's mother

2   was planning on withdrawing her daughter, did you

3   consider reaching out to her to get additional

4   information about what had been alleged?

5   A.   I didn't find out that she was trying to

6   remove the daughter; I found out that she did.

7   She called me and told me, "I have withdrawn my

8   daughter.  Thank you for your late text.  I have

9   withdrawn my daughter from the school."

10   Q.   But you didn't consider meeting with her

11   to gather additional information about this other

12   student that was alleged to have made these

13   sexual comments?

14        MS. KARRON:  Objection.  Asked and

15     answered.

16        MR. MACDONALD:  You can answer.

17        THE WITNESS:  Based on the

18     comments, I would have loved to talk to

19     her about it, but I didn't see the

20     urgency based on the comments -- on the

21     comments made by the child, by the two

22     kids.

23   BY MR. MACDONALD:

24   Q.   You didn't see the urgency?

25   A.   On a verbal incident?  I don't like it,

1    but I don't see the urgency for that and she had

2    withdrawn the daughter.

3         Q.   You didn't see the urgency with a

4    five-year-old making the remarks about touching

5    another child's genitals?

6              MS. KARRON:  Object to form.

7              MR. MACDONALD:  You can answer.

8              THE WITNESS:  I didn't see the

9         urgency of asking the mother for any

10        more information based on the fact that

11        she had withdrawn her daughter.

12   BY MR. MACDONALD:

13        Q.   At this time did you know who the other

14   student was that was alleged to have made these

15   remarks?

16        A.   No.  I knew it was a student from her

17   class, but I didn't know who the student was.

18        Q.   Were you concerned that this other

19   student might be posing some kind of risk to

20   other students in the classroom?

21        A.   It's always a concern and I followed up

22   with the principal and everything.

23        Q.   When did you follow up with the

24   principal?

25        A.   The next day.

1    Q.   On that Tuesday?

2    A.    On Wednesday -- Monday was teacher

3  planning day, so there was no school, no office.

4  So on Tuesday is when I got this information from

5  the mother and on Wednesday I followed up with

6  the principal.

7    Q.   And was that a phone call?

8    A.   Yes, sir.

9    Q.   And what did you discuss with Ms. Bello

10 on the phone call?

11   A.   I told Ms. Bello, "The mother has

12 withdrawn the daughter from the school, what went

13 on there?"

14       And she told me the same thing, that it

15 was a verbal threat to the girl and the mother

16 wasn't happy, the husband wasn't happy either.

17 And right after that she told me she had to go to

18 the school because the police were there at the

19 school investigating the case, called by the

20 father, so she went to the school to deal with

21 the police and the father.

22   Q.   The police came to investigate on that

23 Wednesday?

24   A.   Yes.

25   Q.   Did Ms. Bello tell you what occurred

1    with the police?

2        A.    Yes.   Afterwards, she called me and told

3    me that the police was there.   The father had

4    called the police.   And the police met with the

5    father at their home, and then they came to the

6    school and explained to the principal that the

7    father's concern from the beginning was to have

8    the child removed from the school immediately.

9    That is something we cannot do.   There is

10   policies and procedures with the district.   You

11   can't just do that.   And that the father wanted

12   to see the video, which is something we can't do

13   either due to policies.   And that the father said

14   that he wanted the police officer to order the

15   principal to see the video.

16           The police officer said, "I can't

17   obligate the principal to do any of those things.

18   I can't obligate the principal to throw the other

19   boy out of the school.   If you are concerned

20   about this, then you can file a complaint, and we

21   can have an investigation.   I would have to call

22   a detective in to perform an investigation."

23           At that point, the father told the

24   police officer that he doesn't want to

25   investigate anything.   He doesn't want any

1    detectives, he just wants the boy to leave the

2    school.

3            And the police officer said, "Yeah, I'm

4    sorry.  We can't do that.  We can't order her to

5    do that."  And that was it.

6        Q.   And Ms. Bello told you this that same

7    day after she had spoken to these police

8    officers?

9        A.   Yes, sir.

10        Q.   And did she say what agencies those

11    police officers were from?

12        A.   Miami-Dade County.

13        Q.   Did you speak to any of these police

14    officers?

15        A.   No, sir.

16        Q.   Do you know if the other student who

17    we'll refer to as L.R. if his parents were ever

18    notified of this incident?

19        A.   I'm not aware of nothing with the other

20    student.

21        Q.   Did Ms. Bello discuss anything related

22    to that other student L.R. with you?

23        A.   She had a meeting with the mother and

24    the father of that other student just like she

25    had a meeting with Jane's parents, but that was

1     all, made him aware of the situation and was

2     verbally reprimanded.  I believe the boy

3     apologized for his words and that's all I know

4     about the other boy.

5          Q.   Did Ms. Bello say when she met with that

6     student?

7          A.   No.

8          Q.   I'm sorry, that student's parents,

9     rather?

10         A.   No.

11         Q.   When you spoke with Ms. Bello, was there

12    ever any concerns that L.R., that student might

13    be subjected to abuse based on those comments he

14    had made?

15              MS. KARRON:  Objection to form.

16              THE WITNESS:  So, one of the

17         questions that I asked her at the

18         beginning when we started the

19         conversation was, "What type of child is

20         he?  Does he have any problems?  Is he

21         that type of child?"

22              And the answer was, "No.  He's a

23         good student."

24    BY MR. MACDONALD:

25         Q.   And that student was in kindergarten as

1    well; right?

2        A.   Yes, sir.

3        Q.   So, that student L.R. would have been

4    roughly five years old?

5        A.   Yes, sir.

6        Q.   In your experience being involved with

7    Academir Charter Schools is it normal for a

8    five-year-old to make comments regarding touching

9    another student's genitals?

10        MS. KARRON:   Objection to form.

11    Calls for speculation.

12        MR. MACDONALD:   You can answer.

13        THE WITNESS:   Kids at that age make

14    all sorts of comments.

15   BY MR. MACDONALD:

16        Q.   Kids of that age make sexual comments in

17   your experience?

18        A.   They make comments, make sexual

19   comments, they do that type of -- sometimes they

20   learn by it.  They are discovering, so they do

21   those things.

22        Q.   They learn by discovering, what do you

23   mean by that?

24        A.   Not that they learn by discovering, but

25   children at that age say things and they want to

1    discover things and they say things like that.

2    It's not uncommon for a child at that age to say

3    things like that.

4        Q.   Was there any investigation conducted in

5    regards to what had been alleged by Jane's

6    parents?

7        A.   The school did their investigation and

8    it was concluded that it occurred.

9        Q.   What was that investigation comprised

10   of?

11       A.   The principal's investigation and the

12   police.

13       Q.   Do you know what Ms. Bello did in

14   regards to that investigation?

15       A.   I don't know what type of investigation

16   she did or who she spoke to.  She did an

17   investigation.

18       Q.   Do you know if Ms. Bello interviewed any

19   witnesses?

20       A.   I'm not aware of that.  She can probably

21   answer that for you.

22       Q.   Do you know if Ms. Bello had Jane

23   evaluated by any guidance counselors, anything

24   like that?

25       A.   The day she met with the parents and the

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 80 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    police, she was supposed to be seen with the

2    psychologist at the school, but she had no

3    opportunity to do so.  He had released her from

4    the school.

5        Q.   Who was the psychologist at the school?

6        A.   I don't recall who the psychologist at

7    that school is, but Ms. Bello offered it to the

8    parents.  Not only did she offer the psychologist

9    to see the daughter, but she offered to move the

10   daughter to another classroom, but he simply just

11   removed her from the school.

12       Q.   Ms. Bello offered to move the daughter

13   to another classroom?

14       A.   Yes, her daughter or the boy; someone

15   was going to be moved out of the classroom.

16   That's what she offered him, but she specifically

17   told him she can't get rid of the child for those

18   things, which was his interest.  His interest was

19   to remove the child from the school completely,

20   the other boy, not the girl.

21       Q.   So, Ms. Bello offered to have Jane move

22   to another classroom?

23       A.   The father refused because the father

24   said that he didn't want his daughter to get away

25   from her friends or from her studies in that

1    class that she loved.

2         Q.    I thought previously you had told me

3    that there are policies that wouldn't allow a

4    child to be separated from the classroom?

5         A.    I didn't say anything about a classroom.

6    I said a child could not be removed from the

7    school, throw them out in other words.

8         Q.    I see.

9         A.    That was his interest.

10        Q.    And Jane's father wanted this other

11   student, L.R., to be moved to another classroom

12   and not Jane; is that right?

13        A.    No.  He didn't want L.R. to be removed

14   from the classroom.  He wanted L.R. to be removed

15   completely from Academir Charter Schools.  In

16   other words, "Tell the parents of L.R. to take

17   him home and don't bring him back."

18        Q.    Did Ms. Bello offer to have that

19   student, L.R., moved to another classroom?

20        A.    She offered him to move L.R. or to move

21   his daughter from the classroom so they wouldn't

22   be together any longer.  He didn't want that.

23        Q.    Ms. Bello made both offers to Jane's

24   father?

25        A.    Yes.

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 82 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1        Q.    And he rejected?

2        A.    He rejected.

3        Q.    Where would Jane have been moved to had

4    they accepted that proposal?

5        A.    The most I could say is to another

6    school, I don't know where exactly because she's

7    the one that puts them in different classrooms.

8    I don't know how many kindergarten classes she

9    has there, or anything like that, but it would be

10   to another classroom in the building.  There are

11   several kindergarten classes.

12       Q.    Did Ms. Bello say when she offered to

13   have the children separated when she spoke with

14   Jane's father?

15       A.    That was during the first meeting when

16   the parents came in and filed the complaint.

17   There was another meeting after that and that's

18   when Ms. Bello offered him when he said he wanted

19   the child out of the school.  She said, "I cannot

20   do that.  By policy, I cannot do that but I can

21   do this for you."

22       Q.    Are you aware of any documents that

23   would show that Ms. Bello had given that option

24   to Jane's father?

25       A.    No, I'm not aware of any documents.

1    Q.    And you said the school conducted an

2    investigation about this incident; is that right?

3    A.    Correct.

4    Q.    Was that investigation documented

5    anywhere that you are aware of?

6    A.    I'm sure she has all documents, yes.

7    Q.    But are you aware of any documents

8    specifically?

9    A.    No.

10   Q.    And you also mentioned video camera

11   footage; is that right?

12   A.    Correct.

13   Q.    And Jane's parents wanted to see that

14   video camera footage?

15   A.    Correct.

16   Q.    Did they say why they wanted to review

17   that video camera footage?

18   A.    I don't know.  They told that to the

19   principal.  I don't know what the purpose was to

20   see the video, but that's what they told the

21   principal and that could not be done.

22   Q.    Why can that not be done?

23   A.    In relation to the other students and

24   their parents they have to approve for that video

25   to be shown to anybody else and we don't do that,

1    only to law enforcement and during an ongoing

2    investigation.

3         Q.   Is that policy written anywhere?

4         A.   Miami-Dade County -- I believe it is.

5    Miami-Dade County Public Schools.

6         Q.   That's a Miami-Dade County policy?

7         A.   I believe so, yes.

8         Q.   Did Academir Charter Schools adhere to

9    all Miami-Dade County Public Schools policies?

10        A.   They must.

11             MS. KARRON:  And I'm going to

12        object to form.

13   BY MR. MACDONALD:

14        Q.   Would that include the code of student

15   conduct that I had asked you about earlier?

16        A.   Yes, sir.

17        Q.   Because I believe previously you stated

18   that they did not adhere to that policy, unless

19   I'm incorrect?

20        A.   No.  No.  Miami-Dade County -- Academir

21   Charter Schools and all charter schools must

22   adhere by Miami-Dade County policies.

23        Q.   And is that also true for Superior as

24   the management company for Academir?

25        A.   Not Superior.  Superior has nothing to

1    do with Miami-Dade County.

2         Q.   Do you know if Academir Charter Schools

3    reported the incident reported by Jane's parents

4    to the county?

5         A.   I believe they did, yes.

6         Q.   Who in the county did they report that

7    incident to?

8         A.   It would be the charter schools section

9    of Miami-Dade County schools.

10        Q.   And is there a person that's responsible

11   for that, that charter school section?

12        A.   There are several people, but the

13   principal is the one that calls and talks to that

14   section of the Miami-Dade County Public Schools.

15   I can give one name, Gina Kash (phonetic) is one

16   of them, probably.  I don't know if she spoke to

17   that particular person.  She would best

18   answer that.  The principal would best answer who

19   she spoke to.

20        Q.   Do you know if anyone from Academir

21   Charter Schools reported it in writing to

22   Miami-Dade County?

23        A.   I don't know.  I couldn't tell you if it

24   was in writing or verbal, but they must report

25   it.

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 86 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1          MS. KARRON:  Are we going to break

2      for lunch?

3          MR. MACDONALD:  We can go ahead and

4      go off the record.

5          (A brief break was had.)

6  BY MR. MACDONALD:

7      Q.   At any point did Jane's parents allege

8  that this incident between L.R. and Jane involved

9  actual physical touching?

10     A.   The second time they spoke to the

11 principal, they came back to the principal saying

12 that -- actually, first they told the principal

13 that it wasn't verbal, that he had touched her

14 private parts and kissed her in the mouth.  That

15 was the second meeting -- the first -- all we

16 knew was that there was a verbal comment made to

17 the girl.  We went by that.

18          When the father came in for the second

19 time to speak to the principal, that wasn't the

20 case.  The case was he had touched her in the

21 private parts and kissed her in the mouth.

22     Q.   And when was that discussion?

23     A.   Must have been before the 27th.  I don't

24 know exactly when that was when they told the

25 principal that.

1        Q.   And when did you become aware that

2   Jane's father had alleged that it was actual

3   physical touching that occurred?

4        A.   The day that the principal advised me

5   that the police was on site wanting to talk to

6   them.

7        Q.   And once you learned of that allegation

8   by Jane's father, did you contact the Florida

9   Department of Children and Families?

10       A.   Once again, that is the principal's job

11  to do.  I believe that they had withdrawn the

12  child already.  I believe.  I'm not sure.

13       Q.   Do you know if Ms. Bello or anyone else

14  from Academir Charter Schools contacted the

15  Florida Department of Children and Families once

16  Jane's father had made that allegation of

17  physical touching?

18       A.   I believe -- I don't believe they did

19  based on the facts of the police not finding

20  anything and closing their case.

21       Q.   You believed that no one contacted the

22  Florida DCF because the police investigation did

23  not uncover anything?

24       A.   I believe that is what the principal had

25  in her report or that's what she reported to me.

1    Q.   At any point did Ms. Bello or anyone

2    from Academir Charter Schools discuss Jane making

3    an allegation directly to a staff or faculty

4    member at Academir?

5    A.   Yes.  According to the principal, there

6    was a statement made by the child to the PE

7    teacher.  The PE teacher then passed it on the

8    teacher.

9    Q.   How did you become aware of this?

10   A.   Because when I called Ms. Bello to find

11   out what was going on and to let me know what had

12   happened, who had said what, and who had done

13   what.  And that's when she said to me.

14   Q.   And what did Ms. Bello say that Jane had

15   reported to her PE teacher specifically?

16   A.   That the boy had told her that he wanted

17   to touch her parts, kiss her in the mouth, and

18   touch her titties.  She said that to the PE

19   teacher, to the teacher, to the vice principal,

20   and to the counselor.

21   Q.   And when you say counselor who is that?

22   A.   The school counselor, and Ms. Bello had

23   the school counselor talk to the child.

24   Q.   What is the counselor's name?

25   A.   I don't know.  I'm not familiar with the

1    employees' names.  There's a lot of them.

2         Q.   When did Jane speak with the guidance

3    counselor?

4         A.   I believe it's a female and the second

5    date, second date of the report.  The incident

6    occurred -- the incident report was written, it

7    was told to the parents when they arrived at the

8    school in the afternoon.  The parents signed it,

9    the mother signed the incident report.  The next

10   day is when all this takes place.

11        Q.   Did Ms. Bello ask the counselor to meet

12   with Jane?

13        A.   I believe so, yes.

14        Q.   Do you know if there were any notes from

15   that meeting between the counselor and Jane?

16        A.   I believe so.  I'm not sure, but I

17   believe so.

18        Q.   Why do you believe so?

19        A.   Because if the counselor meets with a

20   child, she has to do her reports, so I'm assuming

21   she reported everything.

22        Q.   The counselor is required to?

23        A.   Yes.

24        Q.   And where are those reports stored?

25        A.   At the school with the principal.

1    Q.   And is there a particular form or

2    anything that is used for those counselor

3    reports?

4    A.   I couldn't tell you.  I'm not aware of

5    it.

6    Q.   Would Ms. Bello be aware of those

7    reports and where they're stored?

8    A.   Yes, she would.

9    Q.   Now, earlier you said there was an

10   investigation conducted by Academir; right?

11   A.   Yes.

12   Q.   Was there a separate investigation

13   conducted by Superior?

14   A.   No.  Superior relies on the school to do

15   the investigations and the reportings.

16   Q.   And who was ultimately responsible for

17   handling and conducting that investigation for

18   Academir?

19   A.   The principal.

20   Q.   And what was the final outcome of that

21   investigation conducted by Ms. Bello?

22   A.   Based on the allegations -- at the

23   beginning allegations of when the child

24   verbally -- there was no findings.  They spoke to

25   the child.  The child said that he said it and

1   that he was apologizing.  And the child was

2   reprimanded.  The parents were brought in.  They

3   had -- the principal spoke with the parents.  The

4   first time they spoke to the parents.

5            Then the second time the story changed

6   to touching.

7            And then the third time the father came

8   in upset to the offices and had a meeting with

9   the vice principal.  It got heated with the vice

10  principal because the parent was changing the

11  story to not only did he touch her, he licked her

12  in her parts, and touched her titties and kissed

13  her in the mouth.  And then the father got upset

14  when the vice principal had a conversation with

15  him and called the vice principal a cunt and left

16  the school.  He was told to leave the school.

17           He called the principal several times to

18  talk to her and the principal said, "I can't talk

19  on the phone.  If you want to see me, you have

20  got to come to the school."

21           And he wanted to show the principal a

22  video that he took at home.  The vice principal

23  said, "I don't see videos you took at home.

24  Please don't send them to me."  And that was it.

25           After that, he took the child out of the

1    school.

2        Q.   Now you said Jane's father called

3    someone a cunt?

4        A.   He called the assistant principal a

5    cunt.  That she didn't know what she was doing

6    and she was a cunt.

7        Q.   How do you know that?

8        A.   It was told me to by the principal and

9    the vice principal and the staff.  It happened at

10   the primary learning center where the child

11   attended.

12       Q.   You weren't there for that meeting

13   though; correct?

14       A.   No, sir.  No, sir.

15       Q.   Now, you said at one point was it

16   Ms. Bello who met with L.R.'s parents and the

17   student as well?

18       A.   Yes, that's what I have been told.

19       Q.   And you were told in that meeting that

20   the student L.R. admitted to making those verbal

21   comments but not to physical touching?

22       A.   Yes, he did.  He said he made those

23   comments and he was apologizing to the girl for

24   it.

25       Q.   Was that student L.R. disciplined or

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 93 of 111

Deposition of Rolando Mir                          Jane Doe v. Academir Charter Schools, Inc., et al.

1    reprimanded for what had occurred?

2         A.   Yes, he was disciplined and the parents

3    were brought in and they were told and he was

4    disciplined.

5         Q.   And how was he disciplined?

6         A.   I have no idea what the code of conduct

7    for that type of behavior is, but the principal

8    does know.

9         Q.   Now, you also mentioned a video that

10   Ms. Bello did not want to see?

11        A.   Yes.  The father said he had made a

12   video of the girl in the bathtub saying

13   something.  And he was going to show Ms. Bello.

14   And Ms. Bello said, "I'm not interested in seeing

15   anything that happened at home.  Don't show me

16   the video.  I don't want to see that video.  That

17   does not pertain to this."

18        Q.   Did Jane's father say what was contained

19   in the video specifically?

20        A.   No, he just said to her -- this is what

21   I've been told by the principal.  "You need to

22   see this video of my daughter in the bathroom,

23   what she said in the bathroom."

24             And Ms. Bello said, "I don't want to see

25   the video.  Don't show me no video.  I don't need

1    to see the video."

2         Q.    Why?

3         A.    Because she was in the bathtub, that's

4    why she didn't want to see the video.

5         Q.    And Ms. Bello told you that?

6         A.    Yes, sir.

7         Q.    Now, earlier we had discussed the

8    reporting requirements involving the Florida

9    Department of Children and Families; do you

10   recall that?

11        A.    Yes, sir.

12        Q.    And in regards to the verbal allegations

13   of sexual misconduct, you did not believe that

14   was something that DCF would be interested in

15   handling or addressing?

16        A.    It's not that I don't believe in it.

17   It's -- I've been told by the principal that

18   Children and Families will not respond or do any

19   investigation based on a verbal threat or a

20   verbal incident.

21        Q.    And who told you that?

22        A.    The principal.

23        Q.    And what about cases where there is both

24   alleged verbal conduct and alleged physical

25   conduct like in the case of Jane?

Case 1:23-cv-23004-JB  Document 65-7  Entered on FLSD Docket 09/26/2024  Page 95 of 111

Deposition of Rolando Mir                          Jane Doe v. Academir Charter Schools, Inc., et al.

1          MS. KARRON:  Objection to form.

2          THE WITNESS:  Do I respond?

3          MR. MACDONALD:  Yes, you can

4      respond.

5          THE WITNESS:  I would assume that

6      in that case they should have filed a

7      report with the Department of Children

8      and Families and the police, but the

9      police had been filed.  And the police

10     didn't find any evidence and the child

11     was removed from the school.

12  BY MR. MACDONALD:

13     Q.   But did you believe that any Academir

14  school employees had an obligation to report the

15  alleged conduct to the Florida Department of

16  Children and Families?

17     A.   I believe that we're supposed to look

18  out for these kids.  We're supposed to be their

19  watchdog at all times in the school, but it all

20  depends on the incident, what type of incident,

21  and what type of evidence and, you know, what the

22  school has to go on to those things.  You can't

23  just call them and tell, because they're not

24  going to do anything about it.

25     Q.   What do you mean they're not going to do

1   anything about it?

2        A.   They won't investigate unless it's

3   something that merits an investigation from the

4   Department of Children and Families.  And they

5   say this type of behavior, verbal, it's not

6   investigated.  It's dealt with by the school.

7   It's a school issue.  And remember, all this was

8   based on a verbal incident, a verbal incident up

9   to the very end.

10            MR. MACDONALD:  I'd like to show

11       you a document.  We're going to mark it

12       as Plaintiff's Exhibit 2.  And it's

13       Plaintiff's Bates labeled DCF 1

14       through 14.

15            (Plaintiff's Exhibit No. 2 was

16       marked for identification.)

17  BY MR. MACDONALD:

18       Q.   I'll give you a moment to review this

19  first page here.

20       A.   Okay.

21       Q.   Okay.  I'll give you a chance to review

22  the second page.

23       A.   Okay.  This is the first time I see

24  this.

25       Q.   This is the first time you see this

1    document?

2         A.   Yes, sir.

3         Q.   Were you aware that Jane's parents

4    contacted the Florida Department of Children and

5    Families?

6         A.   No, sir.

7         Q.   Were you aware that the Florida

8    Department of Children and Families did in fact

9    investigate what had been alleged?

10        A.   No, sir.

11        Q.   Now, looking at the text under that

12   narrative section, do you see those two

13   paragraphs?

14        A.   Yes.

15        Q.   Are those allegations contained in the

16   narrative consistent with what was reported to

17   Superior and Academir based on what you're aware

18   of?

19        A.   No.

20        Q.   And what is different about that

21   statement from what you believe was reported?

22        A.   His narrative is saying there was a

23   sexual abuse by      , and he used his tongue to

24   lick Jane's breast, vagina, and anus and lifted

25   her skirt and licked her chest.  And it occurred

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 98 of 111

Deposition of Rolando Mir                           Jane Doe v. Academir Charter Schools, Inc., et al.

1   without Jane's consent.  And the only thing we

2   knew was that he verbally told her that he wanted

3   to do the touching of the parts, the kissing of

4   the mouth, and touching the titties.  And it says

5   here also that he pulled up Jane's skirt.  Jane

6   wasn't wearing a skirt that day.  She was wearing

7   pants.

8        Q.   You said -- Jane.  I'm going to refer to

9   her as Jane -- well, I guess the report says it,

10  so it doesn't make a difference either way, but

11  Jane was wearing a skirt, you said?

12       A.   That's what the report says here; Jane

13  was wearing pants.  It was a Friday, and on

14  Friday it's jeans day.  And she was wearing

15  jeans.  Actually, according to the principal,

16  she's always wearing jeans or some type of

17  leggings.

18       Q.   How do you know what Jane was wearing on

19  a particular day?

20       A.   Because on Friday it's jeans day for all

21  the kids and I was told by the principal she was

22  wearing jeans in the classroom.

23       Q.   And on what day was this?

24       A.   On Friday.  Friday is jeans day for all

25  the kids.

1    Q.   And was this particular Friday the same

2  day that Jane had made the report to the PE

3  teacher?

4    A.   Correct.

5    Q.   So, are you saying that that led

6  Ms. Bello or you to believe that what Jane was

7  alleging wasn't accurate?

8         MS. KARRON:   Object to form.

9    That's not what he said.

10        MR. MACDONALD:   You can go ahead.

11        THE WITNESS:   I don't know.   I

12    don't know about Ms. Bello, but the

13    incident report here written by the

14    Department of Children and Families says

15    he pulled up a skirt and that tells me

16    it's wrong because there was no skirt.

17  BY MR. MACDONALD:

18    Q.   There was no skirt as in referring to

19  the bottom half that someone wears?

20    A.   Correct.

21    Q.   When you look at the statement doesn't

22  it say Jane's "shirt"?

23    A.   You're correct, it says "shirt."   It

24  also says it's not known where a school staff was

25  at the time.   Well, the teacher was in the

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 100 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    classroom at all times.

2         Q.   At all times when?

3         A.   When they were in the classroom.

4         Q.   While Jane was in the classroom on that

5    Friday?

6         A.   Yes, sir.

7         Q.   Were you there on that day?

8         A.   No, I'm not there, but the teachers are

9    in the classroom at all times with the students.

10   They're not alone.  And according to the video we

11   have of the classroom, the teacher was there.

12        Q.   Do you see on this page under "Special

13   Condition Response Summary"?

14        A.   Yes.

15        Q.   Do you see where it says, "The parents

16   believe that the school did not act properly in

17   handling the incident"?

18        A.   I see it.

19        Q.   Do you believe that Academir handled the

20   incident involving Jane properly?

21        A.   I believe so.  Based on what the

22   evidence was and what they had to go on, they

23   acted proper.

24        Q.   And do you believe that Superior in its

25   role as the management company handled the

1    incident properly involving Jane?

2        A.   According to the responsibilities of

3    Superior, yes.

4        Q.   What are the responsibilities of

5    Superior that you're referring to?

6        A.   It's the principal's call.  It's the

7    principal's reporting, and the principal is the

8    one that has to do all the types of reporting and

9    all types of investigations on cases like this,

10   and then they send us their findings.

11       Q.   And based on that you believe Superior

12   handled the incident properly involving Jane?

13       A.   Yes, sir.

14       Q.   And do you see the paragraph that is

15   under "Narrative" on this page that I'm showing

16   you?

17       A.   Yes, sir.

18       Q.   And do you see where it says, "She is

19   concerned that the alleged perpetrator will do

20   this again to another classmate"?

21       A.   Yes, sir.

22       Q.   At any point were you concerned that

23   another incident concerning L.R. would occur?

24            MS. KARRON:  Objection to form.

25            MR. MACDONALD:  You can answer.

1      THE WITNESS:  No, I didn't have a

2   concern of it, due to the nature of the

3   incident, due to their age.  I didn't

4   have a concern.  I didn't like it.  I

5   didn't like that incident, but I didn't

6   find a concern for it.

7      And I see here that it says the

8   mother of      feels like nothing has

9   been done with this case.  She believes

10  there should have been an investigation.

11     The father was given the

12  opportunity by Metro Dade police to

13  launch an investigation with detectives

14  and the father declined.  He said he

15  didn't want an investigation.

16     So, as a father I would have gotten

17  an investigation by everybody.

18  BY MR. MACDONALD:

19     Q.   How do you know that?

20     A.   Because he has told that to the police

21  and the police told us.

22     Q.   The police told you?

23     A.   The police told us in the report.

24     Q.   The police in their report said that the

25  father declined to launch an investigation?

1    A.    The police officer didn't report it

2   to -- told the principal that she offered the

3   father if he wanted to launch an investigation,

4   she would have to call detectives so they can

5   perform the investigation properly.  He said he

6   didn't want any detectives.  Those were his

7   words.  He didn't want any detectives.  He just

8   wanted the child to be thrown out of the school.

9          As to the mother's comment, I would

10  say -- I would have launched an investigation

11  immediately being the father.

12    Q.    You don't think Jane's parents made an

13  effort to launch an investigation when they

14  contacted the Florida Department of Children and

15  Families?

16    A.    I don't think they made an attempt to

17  launch an investigation with the police

18  department.  The police department was there.

19  They asked them if they wanted to launch an

20  investigation, which they didn't -- which he

21  didn't.

22    Q.    Are you aware that the Florida

23  Department of Children and Families also has the

24  ability to refer incidents to law enforcement?

25    A.    I'm aware of it.  And it starts with the

 1    police first.  The police decides if there is a

 2    case to call Children and Families, they act

 3    first.  If the father would have claimed it, the

 4    police would have reported it to Children and

 5    Families themselves and an investigation would

 6    have been launched by Miami-Dade County police.

 7        Q.   Now going back to this first page

 8    briefly -- strike that.

 9             Do you see on this page here the

10    paragraph under "Narrative"?

11        A.   Uh-huh.

12        Q.   And do you see where it says, "CPI spoke

13    with sexual crimes unit regarding the case and

14    they stated that they were not going to

15    investigate this case.  Sexual crimes unit

16    advised CPI to contact the school board resource

17    officer so that they could generate a case"?

18        A.   I see it.

19        Q.   Based on that does it sound like the

20    Florida Department of Children and Families was

21    reporting the incident to law enforcement?

22             MS. KARRON:  Objection to form.

23        Calls for speculation.

24             THE WITNESS:  I'm not aware of what

25        Children and Families did.  Like I said,

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 105 of
111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1          this is the first time I see a report
 2          from Children and Families.
 3   BY MR. MACDONALD:
 4          Q.   You see on this page labeled DCF 10
 5   under "Narrative," that paragraph there?
 6          A.   Yes.
 7          Q.   And do you see where it says that, "She
 8   said that this happened more than once"?
 9          A.   Yes.
10          Q.   At any point did Jane's parents or Jane
11   allege that there had been incidents involving
12   L.R. more than once?
13          A.   Never that I am aware of.
14          Q.   Do you see the text under the narrative
15   section on this page, DCF 12?
16          A.   Yes.
17          Q.   And in this second paragraph do you see
18   where it says, "The school refused to switch
19          out of        classroom, so the parents
20   switched      to a new school"?
21          A.   That's not true.  The school offered to
22   remove the child or switch his daughter, either
23   one.
24          Q.   So, that's not true?
25          A.   That's not true.
```

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 106 of
111

Deposition of Rolando Mir                              Jane Doe v. Academir Charter Schools, Inc., et al.

1          Q.    Now, in terms of the investigation

2     conducted by Academir, at any point during the

3     course of that investigation, did you ever text

4     anyone about what Jane had alleged?

5          A.    No, sir.

6          Q.    Did you ever exchange text messages with

7     Jane's parents?

8          A.    Only at the beginning for the meeting.

9          Q.    Did you ever exchange text messages with

10    Susie Bello about what Jane had alleged?

11         A.    No, anything with the principal is

12    verbal.

13         Q.    Did you ever exchange any e-mails with

14    anyone regarding this incident alleged by Jane?

15         A.    No, sir.  Only with the attorneys.

16         Q.    And you don't have to tell me about any

17    messages you exchanged with your attorneys of

18    course.

19              Does Academir have any electronic

20    reporting systems that are connected to

21    Miami-Dade County?

22         A.    I believe the principal does, yes.

23         Q.    And what is that?

24         A.    I believe it's DSIS.  That is the

25    program they use to communicate with the

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 107 of 111

Deposition of Rolando Mir                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   district.

2       Q.   How is that spelled?

3       A.   It used to be ISIS, but now they changed

4   it to DSIS.  I believe it is DSIS.  I believe.

5   I'm not sure.

6       Q.   And what exactly does that program

7   contain?

8       A.   That is the program that the principals

9   use for staff, for principals, for students, for

10  attendance, all sorts of things with the

11  district.  They have to be reported to the

12  district.

13      Q.   And would that include the incident

14  involving Jane?

15      A.   I'm not sure.  They might have other

16  types of communications with the district in

17  regards to those things, but I believe this is

18  DCIS.

19      Q.   Now earlier I know you stated that you

20  believe the school had offered to have Jane

21  either be removed from the classroom or have L.R.

22  removed from the classroom; is that right?

23      A.   That's correct.

24      Q.   Were any other accommodations or

25  measures offered to Jane besides that?

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 108 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    A.   That I know of, the principal offered to

2    move either child, if he wanted to move the

3    daughter out or remove the child from the

4    classroom that's the best she could do from the

5    classroom.  And she offered to have the

6    psychologist see the girl and work with the girl

7    and he didn't do either one.

8    Q.   And that would be the school

9    psychologist; right?

10   A.   Yes, sir.

11   Q.   Do you know if that school psychologist

12   was Ms. Stephanie Ruiz?

13   A.   I believe Ms. Ruiz is the psychologist

14   in that school.

15   Q.   Do you know who Stephanie Ruiz is?

16   A.   I believe she is the psychologist for

17   Academir Charter School West.

18   Q.   Do you know if she still works for

19   Academir?

20   A.   I believe so, yes.

21   Q.   Was there anything else offered to

22   Jane's parents that you're aware of besides the

23   classroom arrangement where students will be

24   separated or speaking to a counselor?

25   A.   Other than to launch an investigation, a

1    formal investigation with Miami-Dade County

2    police, I'm not aware of any other.

3        Q.   Did you ever speak to anyone in the

4    police department about this incident?

5        A.   No, sir.

6        Q.   Did you ever consider reaching out to

7    anyone from the police department given that they

8    had become involved?

9        A.   No, they dealt with the principal.  The

10   principal is the one that reports to me the

11   findings.

12       Q.   Are you still in regular communication

13   with anyone from the police department?

14       A.   In regards to this case?

15       Q.   Generally.

16       A.   No.

17       Q.   At any point did Superior give Jane or

18   Jane's parents any notices regarding her rights?

19       A.   No.

20       Q.   At any point did Superior give Jane or

21   Jane's parents any kind of written documentation

22   about this incident?

23       A.   No, sir.

24       Q.   Is this the first time that an

25   allegation was made of a sexual nature at

1    Academir Charter Schools that you are aware of?

2         A.    That I'm aware of, yes.

3         Q.    And is that also the case in regards to

4    Superior being involved in any allegations of a

5    sexual nature?

6         A.    Yes, sir.

7              MR. MACDONALD:  Let's go off the

8         record.

9              (A brief break was had.)

10   BY MR. MACDONALD:

11        Q.    Those are all the questions I have for

12   you today, Mr. Mir.  I want to thank you for your

13   time.  There may be other questions for you from

14   your attorneys, but those are all the ones I have

15   for you today.

16             MS. KARRON:  I have none.

17             (Reading and signing were waived.)

18             (Thereupon, the taking of the

19        deposition was concluded at 1:15 p.m.)

20

21

22

23

24

25

Case 1:23-cv-23004-JB   Document 65-7   Entered on FLSD Docket 09/26/2024   Page 111 of 111

Deposition of Rolando Mir                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1              REPORTER'S DEPOSITION CERTIFICATE

2    STATE OF FLORIDA
     COUNTY OF MIAMI-DADE
3

4

5              I, KATIANA LOUIS, do hereby certify that

6    I was authorized to and did stenographically

7    report the foregoing deposition; and that the

8    transcript is a true and correct transcription of

9    the testimony given by the witness.

10

11             I further certify that I am not a

12   relative, employee, attorney or counsel of any of

13   the parties, nor am I a relative or employee of

14   any of the parties' attorney or counsel connected

15   with the action, nor am I financially interested

16   in the action.

17

18

19             Dated this 9th day of June, 2024.

20

21

22

23   _____
     KATIANA LOUIS

24

25