1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF FLORIDA
2

3        CASE NO.  1:23-cv-23004-WPD

4

5  JANE DOE, a minor, by and through her

6  mother and next friend, MOTHER DOE,

7     Plaintiff,

8  vs.

9  ACADEMIR CHARTER SCHOOLS, INC., and

10 SUPERIOR CHARTER SCHOOL SERVICES, INC.,

11    Defendants.

12 _____/

13

14

15        DEPOSITION OF OLIVIA ANGELICA BERNAL

16

17             THURSDAY, MAY 9, 2024
               10:02 a.m. - 4:44 p.m.
18

19        ALL PARTIES APPEARED REMOTELY

20

21                   -   -   -

22

23 Reported By:

24 Katiana Louis
   Notary Public, State of Florida
   Miami Office #27400
25

 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3        DEREK SMITH LAW GROUP
          520 Brickell Key Drive, Suite O-301
 4        Miami, Florida 33131
          (786) 568-8120
 5
          By:  KYLE THOMAS MACDONALD, ESQUIRE
 6             Kyle@dereksmithlaw.com

 7

 8    On behalf of the Defendant Academir Charter
      Schools, Inc.:
 9
          FREEMAN MATHIS & GARY, LLP
10        301 East Las Olas Boulevard, Suite 250
          Fort Lauderdale, Florida 33301
11        (954) 406-5674

12        By: JULIE BETH KARRON, ESQUIRE
              Julie.karron@fmglaw.com
13

14    On behalf of the Defendant Superior Charter
      School Services, Inc.:
15
          GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
16        601 Bayshore Boulevard, Suite 800
          Tampa, Florida 33606
17        (813) 515-0322

18        By: JULIE CATHERINE MCHAFFIE, ESQUIRE
              Jmchaffie@garrisonyount.com
19

20

21

22

23

24

25

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 3 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1                      I N D E X
        Examinations                           Page
 2
        OLIVIA ANGELICA BERNAL
 3
        DIRECT EXAMINATION BY MR. MACDONALD        4
 4      CERTIFICATE OF OATH                       243
        REPORTER'S DEPOSITION CERTIFICATE         244
 5
 6                    E X H I B I T S
 7      No.          Description                  Page
 8      Exhibit 1    Notice of Taking Deposition    7
        Exhibit 2    Miami-Dade Code of Student     77
 9                   Conduct
        Exhibit 3    District's Title IX Sexual    145
10                   Harassment Manual
        Exhibit 4    Case Management Referral Form 202
11      Exhibit 5    L.R. Case Management Referral 205
        Exhibit 6    Referal Action Codes         208
12      Exhibit 7    Department of Children and    224
                     Families Intake Report for Jane
13                   Doe
        Exhibit 8    Defendant's Notice of Service 228
14                   of Amended Answers to
                     Plaintiff's Interrogatories
15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon:

2                    OLIVIA ANGELICA BERNAL

3    was called as a witness and, having been first

4    duly sworn and responding, "Yes," was examined

5    and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. MACDONALD:

8        Q.   Good morning.  My name is Kyle MacDonald

9    and I represent Jane Doe in her lawsuit against

10   Academir Charter Schools, Inc., and Superior

11   Charter Schools Services, Inc.  Thank you for

12   being here today.

13       A.   Thank you.

14       Q.   Can you please start by stating your

15   full name for the record?

16       A.   Olivia Angelica Bernal.

17       Q.   Have you ever been deposed before?

18       A.   No.

19       Q.   Okay.  I'm going to go over a few things

20   so we're both on the same page for the

21   deposition.  Do you understand that you've been

22   placed under oath and you have the obligation to

23   testify truthfully here today?

24       A.   Yes.

25       Q.   And do you understand that even though

1    we're conducting this deposition via Zoom, your

2    testimony has the same force and effect as if you

3    were testifying in a court of law before a judge

4    and jury?

5         A.   Yes.

6         Q.   Now, the court reporter cannot

7    transcribe any inaudible responses like a gesture

8    or a shrug, so please make sure to respond

9    clearly and verbally just as you have been.

10   Okay?

11        A.   Okay.

12        Q.   Now, the court reporter also cannot

13   accurately reflect our responses if we speak at

14   the same time.  So, I will wait until you finish

15   your answers and I just ask that you wait until I

16   finish my questions.  Okay?

17        A.   Okay.

18        Q.   Now, we want to ensure that we get your

19   best testimony.  So, if there is any question you

20   don't understand, or anything you find confusing,

21   just let me know and I'll be happy to rephrase it

22   for you.  Okay?

23        A.   Okay.

24        Q.   If you need to take a break at any point

25   to use the bathroom, to get a drink of water,

1   anything like that just let me know, and I'm

2   happy to do so.

3        A.   Okay.

4        Q.   Is there anything that would prevent you

5   from thinking clearly and testifying truthfully

6   here today?

7        A.   No, sir.

8        Q.   Now, for the purposes of today's

9   deposition, I'm going to refer to Academir

10  Charter Schools, Inc. as simply Academir if

11  that's okay with you.

12       A.   That's fine.

13       Q.   And on that same note, I will refer to

14  my client, who is a minor,              , as Jane

15  Doe, to help protect her identity.  Is that okay

16  with you?

17       A.   That's fine with me.

18       Q.   Do you understand that you're here to

19  testify on behalf of Academir?

20       A.   Yes, sir.

21       Q.   And do you understand that your answers

22  are based not only on your own personal knowledge

23  but all knowledge known or reasonably available

24  to Academir?

25       A.   Yes, sir.

1    Q.   And do you understand that your answers

2    will be binding on Academir?

3    A.   Yes.

4         MR. MACDONALD:   I'm going to share

5    my screen and show you a document.

6    We'll mark this as Exhibit 1.

7         (Plaintiff's Exhibit No. 1 was

8    marked for identification.)

9    BY MR. MACDONALD:

10   Q.   And I want to draw your attention to

11   this list of topics here.  I'll give you a moment

12   to review.

13   A.   I'm done.

14   Q.   Are you prepared to give testimony

15   regarding those topics listed here, one through

16   ten?

17   A.   Yes.  Yes, I am.

18   Q.   Now I'll give you a moment to review

19   this next page.

20   A.   Ok.

21   Q.   Are you prepared to give testimony

22   regarding the topics listed here, topics 11

23   through 21?

24   A.   Yes, I am.

25   Q.   Now I'll give you a moment to review

1    this last page.

2         A.    Okay.

3         Q.    Are you prepared to give testimony

4    regarding topics 22 through 29 listed here?

5         A.    Yes, I am.

6         Q.    What did you do to prepare for today's

7    deposition?

8         A.    I read over some of the documents that

9    were provided.  I met with Ms. -- our attorney,

10   Ms. Karron, and we just reviewed some of the

11   types of, you know, questions, how to respond

12   and --

13             MS. KARRON:  Hold on.

14             MR. MACDONALD:  I have to cut you

15        off.

16             You don't have to tell me about

17        anything you discussed with your

18        attorney.

19             MS. KARRON:  I was about to object,

20        so thank you.

21   BY MR. MACDONALD:

22        Q.    What documents did you review to prepare

23   for today?

24        A.    I have them right here.  One of them was

25   the actual -- the filing that you guys made, our

1    management agreement, the student code of

2    conduct, things that I have in order to just

3    review and prepare, all of the Title IX stuff

4    that we handle.  And that was pretty much it.

5        Q.   Did you speak with anyone besides

6    Academir's attorney about today's deposition?

7        A.   No, sir.

8        Q.   What is your current address?

9        A.   I just moved.  So, it's 15709

10   Southwest 80th Lane, Miami, Florida 33193.

11       Q.   How long have you lived at that address

12   for?

13       A.   Since Saturday.

14       Q.   Where are you conducting today's

15   deposition from?

16       A.   From my work office.

17       Q.   Where is that located?

18       A.   15420 -- I don't even know our

19   address -- Southwest 157th Avenue.  And it's

20   suite -- not suite.  It's unit number 5 or bay

21   number 5.  I'm sorry.

22       Q.   And is that the office for Academir

23   Charter Schools or --

24       A.   It's the corporate office for Superior

25   Charter Schools that services all of the Academir

1  Charter Schools.

2       Q.   Is anyone in the room with you?

3       A.   No, sir.

4       Q.   Have you ever been arrested before?

5       A.   No, sir.

6       Q.   Have you ever been a party to a civil

7  lawsuit before?

8       A.   No.

9       Q.   Have you ever been a witness in any

10  lawsuit before?

11       A.   No.

12       Q.   Did you attend college?

13       A.   I did.

14       Q.   Where did you attend college?

15       A.   I did my undergrad at Nova Southeastern

16  University.  I did my master's at University of

17  Miami.  And I did my specialist degree in

18  leadership at Nova Southeastern University.

19       Q.   What degree did you first earn at Nova

20  Southeastern?

21       A.   Bachelor of Science in education, in

22  special education services.

23       Q.   And what degree did you earn at the

24  University of Miami?

25       A.   I earned a degree in reading K-12,

1    specialist, and special education.

2        Q.    And I believe you said you obtained a

3    certification at Nova after that?

4        A.    No, a specialist degree.

5        Q.    I apologize.  And what was that

6    specialist degree in?

7        A.    Educational leadership.

8        Q.    Do you have any professional

9    certifications?

10       A.    I do.  I have a Leadership, K-12.  I

11   have Reading K-12.  ESOL K-12.  Special Education

12   K-12.

13       Q.    And who are those certifications given

14   by?

15       A.    Florida Department of Education.

16       Q.    And did you have to undergo any training

17   or take any type of exam to earn those

18   certifications?

19       A.    Once you complete your program,

20   typically you go in and you take the exam.  If

21   you pass, then you're certified.

22           In Leadership, obviously you go through

23   an entire two years of training.  And after you

24   complete your program, you take the assessment to

25   get your certification in that area and that's

1    all.

2         Q.   Are you a member of any professional

3    associations or organizations?

4         A.   I'm part of the charter school alliance,

5    the Florida Charter School Alliance, that's

6    pretty much it right now.

7         Q.   What is the Florida Charter School

8    Alliance?

9         A.   It's an organization throughout the

10   state of Florida that provides resources and

11   support to charter schools.  I do some work for

12   them sometimes.  I did their evaluation system

13   for the state of Florida for the charter schools.

14        Q.   Was that paid work or you volunteered

15   with the organization?

16        A.   They initially paid me when I did the

17   evaluation system for them.  And then I just

18   consult with them.  If they need me to interview.

19   If they need me to do, you know, stuff like that,

20   I don't charge them.  It's part of our

21   partnership.

22             I did a fellowship with them to help

23   other principals and leaders throughout the state

24   of Florida as they're starting their career as

25   leaders.  So, I'm kind of like a mentor.

1      Q.   And how long have you been a member of

2    the charter school alliance for?

3      A.   A couple of years.  I've known them for

4    about ten years or so.

5      Q.   Where do you currently work?

6      A.   I work for two places.  I work for

7    Superior Charter School Services and I also work

8    for Academir Charter Schools, Inc.

9      Q.   What do you do for Superior Charter

10   School Services?

11     A.   A combination of things.  I have an

12   oversight of the charter schools, an organization

13   for compliance, for accountability.

14        I also help with the growth and

15   expansion.

16        I'm the writer and creator of all the

17   charter school applications.

18        I handle grants.

19        I handle issues that may arise at the

20   schools.

21        Title IX.

22        I do an array of different things.  I

23   help them with the acquisition of bonds and

24   transactions.  The day-to-day operations in terms

25   of compliance, in terms of manuals, in terms of

1    policies and procedures, handbooks.

2            The new opening to -- I start up

3    charters.  You know, from -- I write them.  I

4    start them.  I develop them, and I turn them over

5    to the new administration.

6        Q.   Now, you mentioned policies and

7    procedures.  What kind of policies and procedures

8    do you assist with for Superior?

9        A.   Well, we're contracted under Academir

10   Charter Schools to help support these charters

11   and so they have to have an array of different

12   policies in place.  So, I work with the attorneys

13   and I work with the organization and leaders

14   within to develop policies for safety, for

15   security, for reporting, for just the day-to-day

16   operations of things that have to be in place.

17           I support with the handbooks, the parent

18   teacher -- the parent of student handbooks, just

19   about all of the policies that they require on an

20   annual basis and to update them.  The fiscal

21   policies for grants, rents, for finances.

22       Q.   Now, I understand you assist with

23   policies and procedures for -- Academir's

24   policies and procedures.  Have you ever assisted

25   with any policies and procedures specific to

1    Superior?

2         A.    Typically I don't.  I mainly -- that

3    typically comes from like our HR department for

4    the employees, but typically, no.  That's not

5    something I do.  I mainly work with the charter

6    schools.

7         Q.    And then, you also mentioned compliance,

8    that you assist with for Superior.  What kind of

9    tasks do you perform with regards to compliance

10   that are specific to Superior?

11        A.    Just to ensure that we're providing the

12   resources that are needed to the schools.  For

13   example, the monthly financials, we subcontract

14   with our CPA.  So, I have to ensure that the CPA

15   hands in everything so that I can then turn it

16   over to the schools.  That our annual audits are

17   taking place.  That the engagement letters are

18   completed.  That our annual evaluation is

19   conducted.  That we conduct our meetings with the

20   governing board to ensure, you know, that we are

21   fiscally compliant with our quarterly meetings,

22   that the reporting of those meetings, that the

23   collection of the information, the notes that are

24   taken, that they are posted.  The aspect -- so

25   everything that pertains to Superior in terms of

1    compliance for the charter schools.

2         Q.   And then you mentioned grants as well

3    that you assist with for Superior; is that right?

4         A.   That is correct.

5         Q.   What kind of grants does Superior

6    receive?

7         A.   Superior does not receive grants.

8    Academir Charter Schools does receive grants.  We

9    are just the grant managers in terms of we work

10   with the principals to develop their budgets.

11   The budgets then are translated into a series of

12   documents that they need with their plans, with

13   their request for reimbursement.  The collection

14   of all of the invoicing payroll, anything that

15   needs to be submitted with each packet, we

16   prepare it and we turn it over to the principal

17   for upload into their compliance platform and

18   that's what I do.

19        Q.   And do those grants include both federal

20   and state grants?

21        A.   Yeah.  The -- well, all of the state

22   grants come from the federal government, so to

23   speak, right.  So, these last couple of grants,

24   they're ESSER grants which are obviously as a

25   result of COVID and learning loss and all those

1    kind of things, but they are disbursed and

2    allocated through the state, and are given to the

3    district for disbursement.  We have to develop

4    our plans, submit everything -- we submit

5    everything.  The grant funds to our county, our

6    district, Miami-Dade County as they are LEA for

7    grants.

8        Q.    And what is LEA?

9        A.    It's the holder of the grants.  They're

10   the ones that are responsible and like the agency

11   that we use per our county.  We're not our own

12   district.  So, we rely on our sponsor, which is

13   Miami-Dade County, to meet all those

14   requirements.

15       Q.    And then I believe you mentioned a

16   specific type of grant?  I believe it was an

17   acronym that you used.

18       A.    Yes, the ESSER, which are just the

19   educational success supplemental awards, right.

20   So, they're just grants that are -- that have

21   been out for the last couple of years.  Actually,

22   this September is the end of those.

23           We also have state-awarded grants for

24   new charter schools.  And it just depends, but

25   all of those monies belong to the schools for the

1   students for the -- not the day-to-day operations

2   but for specific things, like if there is

3   learning loss, are you doing tutoring after

4   school, homework assistance, purchasing new

5   curriculum, specific things to student learning.

6        Q.   Do you hold a specific title at

7   Superior?

8        A.   I'm the chief operating officer.

9        Q.   And are you a full-time employee with

10  Superior?

11       A.   Yes, I am.

12       Q.   And how long have you been chief

13  operating officer for?

14       A.   For the last two years.  I've been with

15  the organization for nine years.  I was

16  previously principal at Academir Charter School

17  West.

18       Q.   For the time that you've been chief

19  operating officer, who do you report to?

20       A.   Rolando and Esther Mir, and Alexander

21  Casas, which is the governing board chair for

22  Academir Charter Schools.

23       Q.   And you mentioned Rolando Mir.  Rolando

24  Mir is the CEO of Superior; is that right?

25       A.   Yes,

1      Q.    And you mentioned Esther Mir; is that

2   his wife I imagine?

3      A.    Yes, and she's the president of Superior

4   Charter Schools.

5      Q.    Were you principal at Academir

6   immediately prior to your role as chief operating

7   officer?

8      A.    I was.  Prior to that, yes.  So, I was

9   at Academir Charter School West and East, which

10  is another one of our charter schools that I

11  opened up, and then I transitioned.

12     Q.    How long were you principal for at

13  Academir?

14     A.    Six years, six and a half years.

15     Q.    And what prompted your transition from

16  principal to chief operating officer at Superior?

17     A.    It was a position that they had been

18  working on moving me because of the growth and

19  expansion.  As a principal I was also supporting

20  and helping with that growth and expansion of new

21  charter school applications, the new acquisition

22  of schools, and bonds and so it just became very

23  hectic for me and I had to make a decision and

24  they had been prompting me to come for a little

25  bit, but I loved the school setting.  And so, I

Deposition of Olivia Angelica Bernal                      Jane Doe v. Academir Charter Schools, Inc., et al.

1    was like, "I am not ready.  I'm not ready."  And

2    then it just became a lot and so I told them I

3    was ready and I moved over.

4        Q.   And you mentioned you also currently

5    work for Academir; correct?

6        A.   Correct.

7        Q.   And what do you do for Academir?

8        A.   I'm -- I support the schools.  I support

9    the principals.  All of the compliance stuff that

10   I do, I do it for the schools.  I do site visits.

11   I work with the principals.  I hold principal

12   meetings, trainings, just about everything.  I'm

13   the person that they typically call if they have

14   an issue or, "Hey, my police officer didn't show

15   up this morning," and I make sure that they're in

16   place, that I contact the people that need to be

17   contacted, if there is an issue at the school, if

18   they need help, if it's an admission of something

19   to the state, to the district, I am the person

20   that guides and supports them and helps them

21   through the process.

22       Q.   What is your title at Academir?

23       A.   I'm the chief operating officer.

24       Q.   So, you're the chief operating officer

25   for both Superior and Academir; is that correct?

1    A.   Yes.  And on record --

2         MS. KARRON:  Hold on.  Sorry.  I

3    just wanted to object -- to clarify.  I

4    think she said she was the CEO for

5    Superior and the COO for Academir.  Did

6    I get that wrong?

7         THE WITNESS:  Yes.  So, I'm the

8    chief operating officer for both

9    organizations, but on record for

10   Academir Charter Schools, I'm a

11   principal on special assignment because

12   that's the code that we use for the

13   district.

14   BY MR. MACDONALD:

15   Q.   So, just to go back to my last question:

16        You are chief operating officer for both

17   Academir and Superior; is that right?

18   A.   That's my title.  That's my title

19   overall, yes.  On record, and for Academir

20   Charter Schools I'm a principal on special

21   assignment.

22   Q.   Now, when you say "on record," what does

23   that mean?

24   A.   Through the district you have to have a

25   job code in order to have access to the district

1  portal and engage with the district.  And that's

2  what I'm on record, so I'm not going to assign

3  myself as a principal when I'm not.  Typically,

4  when someone is sent to like a region office or a

5  district office, they're first a principal and

6  then they're placed on a special assignment.

7      Q.   And when you just refer to "on record,"

8  do you mean for the purposes of reporting or

9  records for Miami-Dade County Schools?

10      A.   That's correct.

11      Q.   Why not list your title as chief

12  operating officer for Miami-Dade County Schools?

13      A.   Because this is not -- even though it's

14  our sponsor and our district, there are certain

15  codes that they allow us to use and not every

16  code, like a superintendant, is available for us

17  to use to put on record.  So, they only limit us

18  to a certain amount of different job codes that

19  we can have and so that's it.  That's the one

20  that we use.

21      Q.   Is there a job code for chief operating

22  officer?

23      A.   Yes, but that's only for the county's

24  use and we're not county employees, so we're not

25  allowed to use those.  Dade County even though

1   they are our sponsor, they're not my employer.

2   And so we have to abide by their rules and

3   regulations and those services are not included

4   for us.

5       Q.   And is there a policy or something

6   written that says that you can't list that title

7   in the manner that you just described?

8       A.   Not that I'm aware of.

9       Q.   Is Miami-Dade County Schools aware that

10  you're the chief operating officer?

11      A.   Yes.

12      Q.   Are you a full-time employee of

13  Academir?

14      A.   I'm not considered a full-time employee

15  for them, no.

16      Q.   Are you paid an annual salary by

17  Academir?

18      A.   I am.

19      Q.   And you're also paid an annual salary

20  from Superior, I imagine?

21      A.   I am.

22      Q.   And how long have you been chief

23  operating officer at Academir for?

24      A.   Since I moved over two years ago.  Yeah,

25  two years ago.

1      Q.    Meaning since you also moved over to

2    chief operating officer for Superior?

3      A.    At the same time, yes.

4      Q.    Who do you report to at Academir

5    specifically in your role as chief operating

6    officer there?

7      A.    Alexander Casas.

8      Q.    How do you distinguish your duties

9    between chief operating officer for Superior and

10   then chief operating officer for Academir?

11     A.    All of my line of work is for Academir

12   Charter Schools.  So, there are specific duties

13   that comingle because they have to because my

14   work here at Superior is for all of the charter

15   schools.  So, when I do budgets, or when I do

16   grants, or when I do applications, they're for a

17   particular school, but all of my work is for

18   Academir Charter Schools, and that is why I can

19   do both simultaneously because I'm doing my job

20   for both because that's what the line of work

21   requires.

22          None of my work is just specifically for

23   Superior because Superior is hired to do the

24   day-to-day operations of Academir Charter

25   Schools.  Now, there are physical days, like

1  yesterday, I was all day at a location.  Those

2  are the days that I'm physically there at a

3  campus.  A lot of my work is done through here

4  because that is what it entails.  I have to

5  complete, develop, you know, organize all of

6  those things here and then deploy.  So, every

7  aspect of my job is not for Superior; it's for

8  the schools.

9      Q.   So then, what specific duties do you

10 perform for Academir that you're paid a salary

11 for if all of your work for Superior is on behalf

12 of the schools?

13     A.   My site visits, individual cases where I

14 go to the school where I have to take care of

15 issues.  I do walkthroughs.  I do supports to the

16 schools.  I provide professional development.

17 And I do the work from there.  I help with

18 individual things that they may need, whether

19 it's, you know, issues with a parent, with

20 students, with teachers.  Just training, staff,

21 helping with recruiting, helping with enrollment.

22 That's what I do.  I do the start-ups.  I go.  I

23 check.  Next week I'm at another campus all week

24 long and I'm at that site physically.  I work on

25 student enrollments.  I have to go to

|

```
1    graduations.  There are a lot of other aspects of
2    the job that are just specific to each individual
3    school.
4        Q.   Are there any other employees that are
5    employed simultaneously by Academir and Superior
6    that you're aware of?
7        A.   No, not that I'm aware of.
8        Q.   And Academir is a not-for-profit
9    organization; is that right?
10       A.   That is correct.
11       Q.   Is Superior a not-for-profit
12   organization?
13       A.   No, it is not.
14       Q.   Isn't it a conflict of interest to work
15   as chief operating officer for Academir as a
16   not-for-profit while also working for Superior, a
17   for-profit organization that it contracts with?
18           MS. KARRON:  Objection to form.
19       That calls for a legal conclusion.
20           MR. MACDONALD:  You can answer.
21           THE WITNESS:  It is not a conflict
22       of interest because I'm getting paid a
23       salary on behalf of all of the things
24       that I do.
25           And this is a very common practice
```

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1       across many charter school

2       organizations, to have teams in place to

3       support and work with the schools.  And

4       it's -- it's not because -- I'm not

5       getting anything but my salary.  I'm not

6       doing it to profit off a school that is

7       not-for-profit.  I worked for the school

8       for many years.  Multiple of those

9       schools for many years.  I'm 25 -- 28

10      years into education.  So now my work is

11      at a different level.  And I have to, in

12      order to continue to grow and expand the

13      organization, I have to be able to do

14      that and represent the educational

15      portion of Superior for the schools.

16           You have to have an instructional

17      leader to be able to do that and guide

18      the work of all of those schools that

19      we're working with and try to make them

20      high-quality institutions by replicating

21      my particular campus and that's how we

22      have made our growth.  So, when you have

23      a leader like that, you have to have

24      them in both organizations.  We have --

25      Superior Charter School Services is in

1      charge of hiring and providing services

2      to the schools.  We have a curriculum

3      team, for example.  Their supporters or

4      directors that -- may work out of our

5      offices for the schools, but they work

6      for the schools only.

7           We have a CPA that works -- that we

8      contract with, but works only for the

9      schools, to provide the finances for the

10     schools.

11          So, is it not common?  It's common

12     across most and I would say -- I can't

13     say all, but I'd say it's a very common

14     practice in charter schools.

15     BY MR. MACDONALD:

16          Q.   It's a common practice for employees

17     to -- strike that.

18          It's a common practice for individuals

19     to be paid employees of both charter schools and

20     the management companies of those charter

21     schools?

22          MS. KARRON:  Objection to form.

23          THE WITNESS:  Yes.

24     BY MR. MACDONALD:

25          Q.   And when you say it's common, I imagine

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 29 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    you're referring to schools that you're familiar

2    with or worked with in the past?

3         A.   Yes, I worked at another charter school

4    organization.  And I was one of their executive

5    directors and it was the same.

6         Q.   Now, I know you touched on it briefly

7    before, but what is the relationship in terms of

8    operating the schools between Superior and

9    Academir?

10        A.   What is the relationship?  Can you

11   explain a little bit what you're trying to say?

12        Q.   Sure.  So, what aspects of operating

13   Academir Charter Schools does Superior handle?

14        A.   They handle typically the day-to-day.

15   Anything having to do with payroll, with HR, with

16   grants management, with financial and fiscal

17   responsibilities, with facilities, with safety,

18   with acquisition of new properties, land,

19   schools, representation at the district

20   compliance, CRCs, ARCs, when we're presenting new

21   applications, and just the day-to-day operations

22   of a school from accounts payable to accounts

23   receivable, curriculum, and instruction.

24        Q.   Are the teachers at Academir Charter

25   Schools employed by Academir or through Superior,

1    typically?

2         A.   They are employed by ADP.

3         Q.   They're employed by ADP, like the

4    payroll company?

5         A.   That is correct, for Academir Charter

6    Schools, Inc.

7         Q.   So then, who would you say is employed

8    by Academir Charter Schools and not ADP?

9         A.   These are employees at will.  So, their

10   contracts are through Academir Charter Schools,

11   Inc., and then everything is managed by ADP.  So

12   the hiring process, everything is -- their HR is

13   ADP, so to speak.

14        Q.   Okay.  But they're contracted through

15   Academir Charter Schools, Inc.; right?

16        A.   Uh-huh.

17        Q.   And those contracts I imagine set out

18   their salaries and responsibilities for the

19   teachers?

20        A.   Correct.

21        Q.   Is that the same case for administrators

22   of Academir Charter Schools?

23        A.   That is correct.

24        Q.   Now, you stated that you handle

25   compliance for Superior; is that right?

```
 1        A.   For Academir Charter Schools.

 2        Q.   Okay.

 3        A.   Well, both, right.  So, I do the

 4   compliance, because they're two separate -- the

 5   Academir for Academir Charter Schools, they're

 6   state and district requirements that need to be

 7   in place, that they need to upload on a monthly

 8   basis.  So, I ensure that all of those compliance

 9   pieces are in place, that they are submitted and

10   they're turning everything in.

11             From the Superior side, I make sure that

12   all of the needs that the school have are being

13   met whether it's their monthly financials, I make

14   sure our CPA has them in place and then I turn

15   them over to the schools.  So, I make sure that

16   both are compliant to ensure the success of each

17   school.

18        Q.   Okay.  So, you're responsible for

19   compliance with both entities; is that correct?

20        A.   Yes.  Not Superior as a whole, but the

21   piece that belongs to the school for the

22   operations of the school.  Because there are so

23   many other aspects of Superior.  I don't man

24   anything in Superior.  What I do is everything

25   for the schools.
```

1      Q.   Is there anyone else at Superior that

2   handles compliance?

3      A.   I mean, it just depends on what your

4   definition of compliance is.  So, if it's

5   employee compliance and things like that, we do

6   have somebody else in charge of employees.  I

7   don't do anything with the employees here

8   physically, but I only -- I work with the

9   compliance of the schools as it relates to

10  Superior and the schools.

11     Q.   Do you know if Superior itself receives

12  any federal funding?

13     A.   They do not.

14     Q.   And that includes indirect federal

15  funding as well?

16          MS. KARRON:  Objection to form.

17          MR. MACDONALD:  You can answer.

18          THE WITNESS:  We don't receive any

19     federal funding.  We receive funds for

20     the services we provide the schools.  We

21     don't receive grants.  We don't receive

22     anything else besides -- according to

23     our management agreement percentage from

24     every campus for the day-to-day

25     operations and services they are

1      receiving from this office.

2   BY MR. MACDONALD:

3      Q.   And that funding that you just mentioned

4   that comes from Academir; correct?

5      A.   Correct.

6      Q.   And what is that funding based on, the

7   amount, let's say?

8      A.   Every campus is different.  It's based

9   on enrollment, but it's typically 12 percent.

10  Some of them, we don't charge anything because

11  depending on where their financial standings are.

12  Some we reduce the cost based on where they are

13  financially, but typically it's -- on average

14  it's 12 percent across all charter school

15  organizations because that is, sort of, the set

16  amount, average amount, just like a portion, you

17  know, goes to the district.  Those are set

18  amounts that have to happen.

19     Q.   And Academir receives federal funding;

20  is that right?

21     A.   For every student that we have, it's

22  called FTE.

23     Q.   So yes, they do receive federal funding?

24     A.   The students, yes.  You get FTE for

25  every child that is in your building.

1      Q.   Sorry if I was not clear.  I just want

2  to clarify that Academir receives federal funding

3  for --

4      A.   Academir Charter Schools' individuals,

5  yes.

6      Q.   So then, how does Superior distinguish

7  whether it's receiving indirect federal funding

8  from Academir?

9          MS. KARRON:  Object to form.

10          THE WITNESS:  Can you clarify what

11  you mean by "indirect"?

12  BY MR. MACDONALD:

13      Q.   Well, you just mentioned that Academir

14  receives federal funding based on FTE; is that

15  right?

16      A.   They receive an annual FTE amount per

17  student and every month they get their FTE funds

18  that are placed in their accounts.  Those things

19  are done for the day-to-day operations and to

20  ensure that students receive an education.  And

21  in order to have that, you have to have -- just

22  like there's a district from Miami-Dade County

23  Public Schools that does everything for them, we

24  are, quote/unquote, "their district."  So, we

25  handle everything having to do with their

1    payroll, their insurance, with their HR needs,

2    with their accounts payable, accounts receivable,

3    with their grants, all of the managing stuff that

4    we have to do, they're providing us the payment

5    for all of those services at a minimal cost.  So,

6    we're just helping them run the day-to-day

7    operations.  So, whatever FTE that they get, that

8    they obtain, it's also to help them run the

9    schools because without that, they wouldn't be

10    able to run the schools the way they should be

11    able to.  So, that is what we do.  So, they have

12    to pay us for that, for those services, not me,

13    but the organization and that's how we help them

14    carry out their day to day.

15        Q.   So, I think we are --

16        A.   And it's paid through their FTE.  It's

17    paid through their funding.  That's how they get

18    funded.  So, that is the money they have to be

19    able to use and spend on the day-to-day

20    operations of their campuses.

21        Q.   And when you say "they," you're

22    referring to Academir Charter Schools?

23        A.   Academir, the schools, yes.

24        Q.   And you're saying Academir Charter

25    Schools receives FTE funding for all those things

1    you just mentioned; right?

2         A.    They receive for the day-to-day

3    operations of their school.  It's funding for

4    safe-school officers.  We obtain that.  We have

5    to pay the safe-school officers.  So, the monies

6    that we receive, obviously through our

7    departments, they have to be disbursed

8    accordingly.

9         Q.    For the FTE funding specifically, does

10   that include money from the federal government?

11        A.    That comes directly from Tallahassee,

12   which I'm assuming is also coming from the

13   federal government, but it's money that is

14   allocated.  Every state has their budget

15   allocation on an annual basis and every county

16   has a different allocation based on the cost of

17   living, where it's located, taxes, all of that

18   stuff gets put into this umbrella, and every

19   county in the state of Florida is paid

20   individually and every percentage, you know, that

21   is allocated to each county, that is how the

22   schools get paid and they break it down.  They

23   have this lump sum and they break it down into

24   the 12 months, and that's how they get paid, how

25   the schools get paid.

```
 1        Q.    And Superior is paid a percentage of
 2   that FTE; is that right?
 3        A.    Based on their student enrollment.
 4        Q.    Yes, they do, based on their student
 5   enrollment?
 6        A.    Yeah.  Every school has a percentage
 7   that we charge to help them do the day-to-day
 8   operations.  Correct.
 9        Q.    Do you know what Title IX is?
10        A.    I do.
11        Q.    What is your understanding of Title IX?
12        A.    So, Title IX is -- it covers a couple of
13   different things, right, to ensure the compliance
14   of students with regards to making sure they have
15   access to their education, and not discriminated
16   against, based on sex, sexual harassment,
17   anything like that, and that, you know, they're
18   not denied their education or any educational
19   programs.
20        Q.    Is Academir subject to Title IX
21   requirements?
22        A.    Yes, we are.
23             MS. KARRON:  Objection.  Calls for
24   a legal conclusion.
25   BY MR. MACDONALD:
```

1    Q.    Is Superior subject to Title IX

2    requirements that you are aware of?

3         MS. KARRON:  Same objection.

4         MR. MACDONALD:  I didn't hear your

5    response.

6         THE WITNESS:  Superior is.

7    BY MR. MACDONALD:

8    Q.    Have you received training on Title IX

9    before?

10   A.    I have.

11   Q.    And what kind of training have you

12   received on Title IX?

13   A.    On different occasions through the

14   district, I've also received it through our ADP.

15   Q.    You said you received it through

16   Miami-Dade County Schools?

17   A.    That's correct.

18   Q.    And also through ADP, you said?

19   A.    Uh-huh, yes.

20   Q.    What kind of Title IX training does ADP

21   have?

22   A.    It's modules online.  You have an online

23   course that you have to take and at the end you

24   get a certification.  And it explains the

25   different facets of the Civil Rights Compliance.

1    They talk about what to do, how to handle

2    situations, who to report to, things like that.

3         Q.    And those are online modules, you said?

4         A.    It's an online course.

5         Q.    Is that online course specific to

6    educational institutions or is it a general

7    training on those topics?

8         A.    General.  Typically, the ones specific

9    to education, as it relates to that, it comes

10   from the district, from Miami-Dade County Public

11   Schools, principals and administrators typically

12   have to go to the principal meetings, and

13   usually -- that's typically something that is

14   reviewed, that is covered, that is explained.

15        Q.    And that ADP online module specifically

16   covers Title IX?

17        A.    Sexual harassment, typically.  It covers

18   compliance for -- not compliance, discrimination,

19   you know, things that employees are entitled to.

20        Q.    But does it cover Title IX as it applies

21   to educational institutions that you are aware

22   of?

23        A.    Not that I'm aware.

24        Q.    What is your understanding of Academir's

25   responsibilities under Title IX?

1    A.   Well, that if there is an allegation or

2    some --

3         MS. KARRON:  I think the video

4    froze or --

5         MR. MACDONALD:  It froze for me.

6    Let's go off the record because it looks

7    like she was disconnected.

8         (A brief break was had.)

9    BY MR. MACDONALD:

10   Q.   So, I don't think I got your full

11   answer.  I believe my last question was:

12        What is your understanding of Academir's

13   responsibilities under Title IX?

14   A.   So, the responsibility is really to

15   ensure the safety of the child, right, that they

16   feel -- or in this case, dealing with students

17   because it could be students or it could be

18   employees, right.  So really the safety of each

19   individual before making a determination but just

20   to ensure that the student, if it relates to a

21   student, in this case, is that they obtain and

22   they have the right to their education and that

23   not an incident or any other issue hinders that.

24   Q.   And what is your understanding of

25   Superior's responsibilities under Title IX?

1    A.   As it relates to -- there are different

2  ways that we handle it, right.  So, you have the

3  Title IX as it relates to employees and staff

4  members or teachers and staff members.  You have

5  students and parents.  And then you have that of

6  any vendor or company or an applicant that comes.

7  And that, you know, to ensure that we handle any

8  matter that is reported to us, you know,

9  accordingly and that in the process we support

10 schools as needed whether it be to assist with an

11 investigation when something is not taken care of

12 at the school level and they want to proceed and

13 go to the next level, we as the managing company

14 step in to continue the process for a grievance

15 or something like that.

16    Q.   Does Academir have any Title IX

17 policies?

18    A.   We do.

19    Q.   And what policies are those?

20    A.   Obviously, it's explained.  And teachers

21 are trained or staff is trained on, you know,

22 what the rights are and what their responsibility

23 is as teachers and staff members are.  What they

24 can do in reporting and it's very different at

25 the school level where if there is something that

1    is reported, and then it goes directly to the

2    school administrator, right, or an employee goes

3    directly to their supervisor, then it goes to the

4    principal and then the process begins, right.  As

5    soon as -- it just depends on each individual

6    case, case by case, the way the action take

7    place.

8         Q.   Does Academir have any written Title IX

9    policies?

10        A.   We do.

11        Q.   And what are those policies?

12        A.   So, like I was explaining, we give a

13   description, and then who is responsible for

14   what.

15             What are the steps?  Number one, they

16   report it to the principal.  Well, they make sure

17   that the child or the employee is safe, right.

18   If there is an issue, right away you call 911,

19   but then you start the process.

20             The principal, you start the

21   investigation.  You handle it accordingly,

22   whether it's calling the police or the Department

23   of Children and Families, however the steps may

24   be depending on each case.  Then it's definitely

25   reported to us.

1           We have policies in place also that we

2   have to communicate with our LEA.  So, the Office

3   of Civil Rights and all that does not apply to us

4   because we are not Dade County Public Schools

5   employees.  So, we have to follow our own

6   procedures, but we do communicate with the

7   charter school office in case there is something

8   major or big happening.  And depending on the

9   level of severity, we do have to take next steps

10  of reporting to the state, of reporting to the

11  county, uploading specific information, obtain

12  different -- completing different steps in the

13  process, but it just depends.  There is a slew of

14  different steps that are required to be taken

15  depending on each case.

16       Q.   Now, you mention a charter school

17  organization, what are you referring to there?

18       A.   What do you mean a charter school

19  organization?

20       Q.   I believe you said something to the

21  effect of since there is no LEA with the county,

22  that you --

23       A.   Yeah.  So we are -- we are the county

24  for the schools, right.  However, we do report to

25  the charter school office if there is a case that

1    requires reporting to the state, like SESIR or

2    something to make them aware of depending on the

3    severity, and they provide services.

4              But we don't stop and say, "Let me call

5    the Office of Civil Rights and Compliance because

6    that does not pertain to us.  That's Miami-Dade

7    County Public Schools.  While they are our

8    sponsor and our LEA in accordance to our charter,

9    and there are certain things within our charter

10   that we opt into -- like the student code of

11   conduct, we opted in to use their student code of

12   conduct.  We opted in to use their corrective

13   reading plans.  So, there are things that we opt

14   into, but they're not -- all of the services that

15   are offered through Dade County don't pertain to

16   us, the charter schools.

17        Q.   Who is the charter school office?

18        A.   Miami-Dade County Schools has a charter

19   school office that is there to provide some --

20   the support or needed assistance to charter

21   schools.

22        Q.   And these policies that you described

23   that are written, where are they located?

24        A.   We have them here in HR, and the

25   principals have access to it.  They have it in

1    their Dropbox.  Everybody has that.  And it's

2    talked about and explained at the opening of

3    schools on an annual basis.

4         Q.   And when you say the policies are in HR,

5    what do you mean?  Where are they physically

6    stored?

7         A.   So, we have obviously our copy and we

8    follow the procedures.  We have -- our HR

9    department handles anything dealing with

10   employees.  I handle things dealing with parents

11   and students.  And Ms. Mir handles anything

12   dealing with vendors, contractors, and other.

13        Q.   Okay.  Where is the policy for Title IX

14   compliance relating to students located?

15        A.   Every single principal has a compliance

16   binder.  Within that they have all of the

17   policies and procedures.  We have our policies

18   and procedures, obviously here, a copy and they

19   have it in the schools.  And in addition, they go

20   over all the policies and procedures with their

21   staff.

22        Q.   Okay.  So, each principal in the

23   respective Academir Charter Schools has a

24   compliance binder?

25        A.   Yes.

1      Q.   And within that binder is Academir's

2    policies pertaining to Title IX procedures --

3      A.   Pertaining to all policies.  They have

4    all policies in their possession.  Every -- on an

5    annual basis those are updated, if they need to

6    reprint them and put them in a binder, just to

7    ensure that they have easy access to them that

8    they do.

9      Q.   Okay.  But setting aside all the other

10   policies and procedures, I'm just asking about

11   Title IX specifically.

12     A.   That's included in that policy.

13     Q.   Okay.

14     A.   It's included.

15     Q.   And what is that document titled?

16     A.   I'll tell you right now.  It's titled

17   just "Policies and Procedures."  And then in that

18   policies and procedures handbook that we have,

19   that's one of the items in there.

20     Q.   It says Title IX --

21     A.   It says, "Fiscal Policies and

22   Procedures" and then in there, one of the items

23   is Title IX.

24     Q.   It's within the fiscal policies and

25   procedures section then?

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.   Yes.

2      Q.   How long is the section on Title IX

3  that's within the fiscal policies and procedures,

4  roughly?

5      A.   I don't know.  I would have to pull it

6  up.  There's a couple of pages.  There is also a

7  form that they can fill out for grievances or if

8  they need to take it a step further as it

9  pertains to HR.

10     Q.   And these procedures are separate from

11 the Academir employee handbook?

12     A.   There's a section in the Academir

13 handbook that should say Title IX, but these

14 policies and procedures are separate.  Yes, they

15 are.

16     Q.   And those policies and procedures are

17 also separate from the Miami-Dade County Schools'

18 policies?

19     A.   That is correct.

20     Q.   So, I'll represent to you that based on

21 what you're describing to me, those policies and

22 procedures haven't been produced in this

23 litigation, based on what you're describing.  So,

24 I'm just trying to understand what that document

25 looks like.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1            MS. KARRON:  Give me a second,
 2       Kyle.
 3            Do you -- Olivia, is it possible
 4       for that section for somebody to make a
 5       copy of it and scan it for me?
 6            THE WITNESS:  Yes.
 7            MS. KARRON:  Would that be helpful,
 8       Kyle?
 9            MR. MACDONALD:  Yes, that would be
10       helpful.
11            MS. KARRON:  We can figure out how
12       to get you the whole binder, but for now
13       we can go ahead and just give you that
14       part.
15  BY MR. MACDONALD:
16       Q.   Do you have that policy and procedure
17  with you, Ms. Bernal?
18       A.   I have sections on it based on what I
19  just printed.  I'm sorry -- no, it works -- I
20  have it on my desktop -- not my computer, on my
21  drive, so -- but I can get it.  I can get it to
22  you guys.
23       Q.   Did you review those policies and
24  procedures before your deposition today?
25       A.   I did.
```

1    Q.    How many pages roughly would you say

2    that specific section on Title IX is?

3    A.    Roughly about ten.

4    Q.    Ten pages?

5    A.    Well, just because we add the

6    application.  We add a lot of different things in

7    there.  And we break it up into employee section,

8    student section.  So, it's not just of students.

9    So, remember we're handling employees.  We're

10   handling students, parents.  And we're also

11   handling vendors and contractors and at the end I

12   also add a form that they can complete and fill

13   out.  So, it makes it extensive, but it

14   delineates what is the process, how to start it,

15   and what are some of the things that we can do to

16   support the whole process.  It refers to:  Are

17   you following the student code of conduct?  What

18   level of issue is this type of incident?  Next

19   steps, who to report to, what to do.  And then

20   depending on if it's employees, what's their next

21   steps, if it's students, and vendors or other.

22   Q.    Who created that policy?

23   A.    So the team, my organization that we

24   have, HR, myself, Ms. Mir, Ms. Xenia, who is in

25   charge -- she's the director of HR.  We had to

1    sit down and go over the policies based on the

2    requirements through Miami-Dade County.  There

3    was a training that we participated in and then

4    right after that it tells you that you have to

5    develop a plan of action, who was the point

6    person for each, what are the steps that you need

7    to take.  And then we sat down, we developed it

8    and once it's reviewed and it's okayed by the

9    board, then we send it out to all the schools on

10   an annual basis just because it's -- it has to be

11   updated and just reviewed.

12       Q.   That was you and who else worked on that

13   policy with you?

14       A.   Ms. Xenia and Ms. Mir.  Ms. Xenia Mir

15   and Ms. Esther Mir.

16       Q.   Sorry.  What was the name?

17       A.   Xenia.

18       Q.   As well as Rolando Mir, as well?

19       A.   Ms. Esther Mir.

20       Q.   Anyone else besides her?

21       A.   Just us three.  We reviewed it.  We

22   looked at it and then the board has to review all

23   of the policies on an annual basis and that's one

24   of the policies.  So, it gets approved by the

25   board.

1      Q.    Who is the third person?

2      A.    Ms. Xenia Mir is the HR -- she's the HR

3   director of human resources.   And then Ms. Esther

4   Mir, who is the president of Superior Charter

5   Schools.

6      Q.    Okay.   And when were those policies

7   first created specific to the Title IX student

8   policies and procedures?

9      A.    There was policies already in place when

10  I came aboard because that is part of the HR,

11  especially when, you know, it pertains to

12  employees.   So I can't tell you when they were

13  established.   I know when I came aboard we made

14  some adjustments because of the requirements from

15  Dade County, so probably about two or three years

16  ago.

17     Q.    Now, you mentioned HR as it pertains to

18  employee policies.   I'm asking specifically about

19  Title IX student procedures.   When were those

20  created?

21     A.    We've always had procedures in place

22  even before I came along.   We have to follow

23  those procedures.   So I don't know when and who

24  created them because I came and they were already

25  established, what we do on an annual basis.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1          And when they were, kind of,

2     reconfigured was when I came aboard to work for

3     Superior, that's what I know because of my

4     experience, but other than that I can't tell you,

5     who created them back when they started.  I don't

6     know.

7          Q.   When was the last time that you worked

8     on that policy for Title IX pertaining to

9     students with the two other individuals that you

10    mentioned?

11         A.   We usually work on them over the summer

12    to present them for opening -- before, like, the

13    opening of schools and then but they have to

14    be -- so, it's once a year.  And it's usually

15    over the summer.

16         Q.   When was the last time you did that?

17         A.   Last summer.

18         Q.   What month would that be?

19         A.   Our summer months for planning, anywhere

20    from June to August, so during that time?

21         Q.   And was this a physical meeting between

22    you and these two other individuals where you

23    edited this policy?

24         A.   Correct.

25         Q.   And what changes did you make this year?

1      A.   Just making the form digital and I know

2  that one of the items that we added were the

3  vendor ones, because typically we just worry

4  about the employees and the students, parents

5  making complaints.  We also added the vendors

6  this past fiscal year.

7           And then trying to convert everything to

8  digital so they can have easy access to it so

9  they can do their reporting.

10          What we're thinking of doing this year

11 is making it a link so it can go directly to us.

12 So we've already discussed some of the changes of

13 our policies.

14          But every year we try to improve

15 something.  Sometimes we don't even do anything.

16 We'll say, "Okay.  It looks good."  I mean, it

17 just depends.

18      Q.   And the form was made electronic this

19 year, you said?

20      A.   We're going to make it electronic.

21      Q.   What have you done in regards to

22 preparing to make the form electronic?

23      A.   I haven't started.  We have the hard

24 copy of it.  We have a form, but to make it, we

25 just convert it and make it accessible as a link

1     to all of our staff and we put it on the

2     websites.

3          Q.   You have already put it on the websites

4     or that's a future plan?

5          A.   No, that is for this fiscal year.  We've

6     discussed it.

7          Q.   And what is that hard copy form?  What

8     is that document titled?

9          A.   I don't have it.  I didn't print it, but

10    it is a report.  I can't remember the title,

11    something to the effect of incident reporting.

12    And I know that it states employee -- like, you

13    have three little things that say employee, or

14    student, or other, or vendor.  So, you get to

15    select the dropdown.

16         Q.   And is that form specific to Title IX or

17    is that just a general accident or incident form?

18         A.   No, specific to Title IX.

19         Q.   What else is included on the form?

20         A.   Just name, date of incident, what type

21    of incident occurred.  You know, there's a

22    section where they get to report what took place,

23    if they know the name of who did it, where the

24    incident took place, the time.

25               That's not the incident reports that the

1    schools fill out though for incidents that take

2    place.  Let's say a child falls, or something

3    happens, an incident happens, there is another

4    form that is used at the school location where

5    they report what happened, who's reporting, if

6    there were any witnesses, did they contact the

7    parent.  Then they have to share the information

8    after they call the parents.  They update the

9    form, and then everybody who reported it has to

10   sign, who called has to sign, the parent has to

11   sign that they acknowledged that they were

12   provided the information.  That's a different

13   incident form.

14        Q.   So, going back to the procedures that

15   you mentioned that are in this compliance binder,

16   those have existed for at least more than a year;

17   correct?

18        A.   Yes.

19        Q.   And at any point did you all gather

20   documents for this case?

21        A.   I did not.

22        Q.   Do you know of anyone who did gather

23   documents for this case?

24        A.   The principal, the assistant principal,

25   the school site.

1      Q.   And the principal would be Susie Bello

2   in this case?

3      A.   That's correct.

4      Q.   And how do you know that?

5      A.   How do I know it?  Because this is one

6   of my principals.  And in order for her to be

7   able to go through this whole process and receive

8   any support or guidance, we have to communicate.

9   So, we knew that this was happening from the very

10  beginning.

11         And one of the first things is to make

12  sure you've kept all of your documentation.  You

13  know, typically these are not things -- you don't

14  keep every single thing that happens in one

15  fiscal year.  Typically, you know, there are

16  certain documents that you have to keep for seven

17  years at the school level.  And obviously, the

18  important information that pertains to student

19  enrollment and things like that, in a cumulative

20  folder, but there are some documents that are not

21  kept on an annual basis and they are discarded at

22  the end of the year.

23         So, we have to make sure and ensure

24  that, hey, you know, that is in case based on the

25  conversations you had with Mr. -- the attorneys

1    had with Mr. Mir, just make sure that you are

2    keeping your documentation and keeping it there

3    for as long as we need to.

4        Q.   Now, you mentioned that in that binder,

5    in the Title IX section there is one that

6    specifically pertains to the handling of student

7    complaints; is that right?

8        A.   That is correct.  Really, the

9    principals, when it deals with students, these

10   policies and procedures are -- yeah, these are

11   the way to operate, but they always have to go

12   back to the student code of conduct because you

13   are dealing with, you know -- with students that

14   are in essence are Dade County Public School

15   students being serviced under the charter.

16        So you have to abide by and follow those

17   policies and procedures delineated in the student

18   code of conduct.  It's not like they are going to

19   go and they are going to overstep the policies.

20   No.  These are policies in place if there is a

21   grievance.  Did you do these steps?  But the

22   student code of conduct is really what guides the

23   principal on the next steps and what actions to

24   take when incidents arise at the school level.

25   So, how to -- you know, what is going to happen

1   if a student makes this -- this claim, what

2   behaviors are targeted, what actions to take.

3   Make sure you contact the parent.  Make sure you

4   file a report, if it needs to be an incident

5   report.  You have step by step as to what you

6   need to do in these cases.

7       Q.   So, let's set aside the code of student

8   conduct that you mentioned before.  In the

9   compliance handbook or binder that the principals

10  have, there is a section on Title IX student

11  complaints; is that correct?

12      A.   Yes.

13      Q.   And what specifically does that section

14  say about the handling of student complaints?

15      A.   Well, first is to ensure the safety of

16  the child.  You have to, depending on -- in this

17  case, for example, you have a teacher that then

18  notified another teacher, right.  She's turning

19  the child over.  The teacher handles it

20  accordingly based on what she is provided.  At

21  that point, if there is something -- many times,

22  you know, children fall, whatever happens, you

23  know, you have to report it, you have to do an

24  incident report, depending on the severity, then

25  you communicate with your school principal and

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1    the situation starts from there.  There is a slew
 2    of different things that need to happen depending
 3    on each individual incident.  So, for me to tell
 4    you exactly everything that has to take place is
 5    very difficult because it depends on what was the
 6    situation at hand.
 7         Q.   In cases of student-on-student sexual
 8    harassment what is the first step that that
 9    policy states in terms of handling a complaint
10    from a student?
11              MS. KARRON:  Objection to form.
12              THE WITNESS:  Well, first of all,
13         again, you have to -- you're dealing
14         with five-year-olds, right.  You have to
15         make sure first that everybody is safe.
16         That everybody is listened to and heard
17         and immediately when it's something like
18         that, you have to take action, you
19         question the child.  You go, you
20         question the child.  And depending on
21         what the child says, if you feel she's
22         in danger, obviously you are going to
23         take a different route.  If you feel
24         that the child is okay and she's just
25         verbalizing something that was said to
```

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    her, you say, "Okay.  We're going to

2    handle it this way.  I'm going to

3    contact parents and we're going to

4    handle it internally with the parents.

5    And with the students you have to talk

6    to the students, you have to contact the

7    parents, so there is a certain, you

8    know, level of things you need to do

9    depending on the severity and the

10    situation at hand.

11    BY MR. MACDONALD:

12       Q.   So, the first step in that policy is

13    questioning the child?

14       A.   The first is to ensure the safety of the

15    child.  That is the first step that you have to

16    do, which is what I said.

17       Q.   And then the second step after ensuring

18    the safety of the child is to question the child?

19       A.   Yeah.  You have to first -- first of

20    all, you have to find out what took place in

21    order to make a determination of which way you

22    have to go.

23       Q.   And it's in the policy that says this?

24       A.   That is correct.

25       Q.   Does it describe the manner in which the

1   child is supposed to be questioned?

2       A.   No, sir.

3       Q.   And then what's the next step after

4   questioning the child?

5       A.   Depending on what the child, you know,

6   indicates or informs you of, then you have to

7   either -- you have to decide is this something

8   that is maybe it's, "He took my pencil," or

9   whatever.  You then have to call in both

10  children, do mediation.  If it's something more

11  extensive that you need to call the parent, then

12  you call each and every one of those parents.

13  You ask them to come in.  It just depends on each

14  individual case.  So, if you need to contact or

15  the next step or if you need to then take it to

16  the main office and take it to administration,

17  and let them know, hey, this incident occurred,

18  you know, parents need to be called and then you

19  proceed.

20       At that point, it just depends on who is

21  reporting.  If it's the teacher who is reporting,

22  she's going to, you know -- if it's something

23  internally -- remember these are little children.

24  They are always like:  "He pulled my hair."  "She

25  got my pencil."  "He threw my stuff on the

1    floor."  "He pushed me."  "He called me a curse

2    word."  So, it just depends on each incident how

3    it's handled.

4          And the policy doesn't tell you step, by

5    step, by step, by step, by step of what you have

6    to say, how do you say it.  If it's something

7    that needs to be investigated, we turn it over to

8    the authorities who have to do a thorough

9    investigation.  That's not for us to do.  We have

10   to get the initial information and we have to

11   ensure the safety of the child.

12         We have to ensure this to ensure that

13   they continue to obtain their education.  The

14   whole thing is to effectively transition them to

15   get access to their education.  That's our job.

16   If it's beyond that, then we have to --

17         Obviously every campus has a school

18   officer on there -- that is there throughout the

19   day.  And if the case warrants -- I mean, it just

20   be depends.  If we have to call because we fear

21   the child is in danger of their well-being and

22   it's something that is going to affect them or

23   that they were assaulted in any type of way, then

24   you go through the Department of Children and

25   Families.  So, it just depends on the severity of

1    the situation at hand and what is communicated to

2    us and what we have on hand at the school.

3         Q.   What does the policy say specifically as

4    to making a decision as to next steps after

5    interviewing a child?

6         A.   You have to make a determination if it's

7    something, you know, minimal, if it's

8    something -- what level of severity is it.  And

9    again, you refer back to the student code of

10   conduct.  There is five different levels.

11        If it's something, you know, did it

12   disrupt your learning environment?  And in this

13   case it did.  It disrupted the teacher having to

14   go and prompt and ask the child, and, you know,

15   go and get a translation from another employee so

16   we can get the right communication.  You know, it

17   depends.  If it stopped the learning environment,

18   then it warrants, you know, "Hey let's call all

19   parents at hand.  Let's, you know, sit down and

20   conference with the students, separate the

21   students."

22        I mean, it depends on what are the next

23   steps.  You know, there are a lot of different

24   next steps, and it does not delineate, step, by

25   step, by step, by step because every single case

Deposition of Olivia Angelica Bernal                          Jane Doe v. Academir Charter Schools, Inc., et al.

1    is individualized.  I can't look at it as a

2    whole.  It's impossible.

3        Q.   So, to clarify you're stating that there

4    is no steps of procedures in the policy in the

5    binder that the principals use?

6        A.   There are steps to follow, but they're

7    all very general.  This is -- if this warrants

8    that the communication -- if it's something -- I

9    can't tell you if there is a pencil that was

10   taken away from another child versus a child

11   being stabbed with a pencil, those are two

12   different actions that you have to take.

13            I can't tell you all the different types

14   of actions that are going to take place, but

15   first you have to ensure the safety of the child,

16   then you have to question the child or, you know,

17   get an understanding as to what is happening.  If

18   it warrants -- then you have to communicate with

19   both parents.  And then after that, if it's

20   something that needs to be taken to the next

21   level, then you go to the administration to

22   handle this, right.

23            And then the administration takes over

24   and starts her process:  Calling the parents,

25   bringing the parents out, you know, making sure

1    that the students are okay, that they're safe.

2              If there is a counselor on hand, the

3    counselor is deployed to speak to the child.  I

4    mean, there are steps.  And you'll see the steps,

5    you know, step by step, but it just depends.  Not

6    every situation is going to warrant that.  Not

7    every situation is going to go beyond, "Okay.

8    Are you safe?  Are you okay?"  "Can you return

9    the pencil?"  "Can you say I'm sorry?"  Yes,

10   those are the kinds of things that you have to

11   rule out.  You can't start a whole investigation

12   for a stolen -- because, you know, you are there

13   to ensure that the students obtain their

14   learning.  And that's really our job and to

15   ensure their safety, right.  And once you obtain

16   and you determine that they're safe, then

17   proceed.

18        Q.   So, I apologize if I'm not being clear.

19   I'm not asking you about general experience or

20   guidance on handling these topics.  I'm asking

21   you specifically about the Title IX policy on

22   handling student complaints that is contained in

23   the principal's binders.

24             Is there steps and procedures listed in

25   that specific section?

1    A.    There are, but they are very generic.

2  They are not popular to every single piece.

3    Q.    Okay.

4    A.    It's impossible.   There is no policy

5  like that in place.

6    Q.    Okay.   So, there are steps, but they

7  are --

8    A.    There is a policy in place.   There is a

9  policy in place.

10    Q.    So, I want to talk about those steps

11  that are in place for that policy.   You said, I

12  believe, the first step is ensuring the safety of

13  the child within that policy; is that right?

14    A.    That is correct.

15    Q.    And then the second step, I believe you

16  said, had to do with interviewing or asking the

17  child questions; is that right?

18    A.    Well, the only way that you're going to

19  be able to understand what is the situation is to

20  ask the child what happened.   You have to.   There

21  is no other way.   If a child comes to you, you

22  have to know, "Okay.   Are you okay?   Are you

23  hurt?   Are you injured?"

24              "No."

25              "Okay.   So what happened?"

1          After that you have to determine what

2     next steps to take.

3          Q.   And the policy says that you should

4     interview the child; correct?

5          A.   You have to.  You have to obtain the

6     information.  You need the information to get

7     started.

8          Q.   Okay.

9          A.   So, you should.  It doesn't say to

10    interview.  You don't have to interview a child.

11    We don't interview a child.  We ask the children

12    questions.  So, as an administrator, I'm not

13    sitting there and interviewing and writing down

14    questions and -- specific to this -- I say,

15    "Papito, what happened?  How do you feel?  What

16    happened?  Did you fall?  Did you get injured?

17    Are you hurt?"

18          Those are the kind of questions we do,

19    but we don't sit there and interview a child

20    asking them specific questions or probing them

21    to, you know, try to obtain the information.  No.

22    "What happened?  Tell me what happened."

23          MS. KARRON:  One second.  I think,

24     let me try -- perhaps is it possible,

25     Olivia, to get that policy now because I

 1         think he's just asking you to tell him

 2         what it actually says in the policy.

 3         So, maybe if we could give that over as

 4         well, then maybe that would be helpful.

 5               And stop me if you want, Kyle.  I'm

 6         just trying to streamline this.

 7               MR. MACDONALD:  If you have it in

 8         front of you, that would be great.

 9               MS. KARRON:  Yeah, if you have it

10         in front of you, maybe you just want to

11         read the steps exactly as it says.

12               THE WITNESS:  No, I just took the

13         specific items, but I didn't take

14         everything.  No.  It's just really to

15         ensure the safety and well-being of the

16         child.  If there is an emergency, you

17         have to call 911, obviously.  If the

18         child is hurt -- and that's what I'm

19         saying.  So, if there is an emergency,

20         then you call 911.

21    BY MR. MACDONALD:

22         Q.   Are you looking at a document right now?

23         A.   I am.

24         Q.   What is that document?

25         A.   Based on my --

1    Q.    What is that document titled?

2    A.    It's just based on my notes, but I mean,

3 I would have to leave the meeting and go and try

4 to tell them to send it to you, but really it's

5 just -- go ahead.

6    Q.    Do you have the policy or procedure that

7 you were just referencing in front of you?  Yes

8 or no?

9    A.    I do.  I do.

10    Q.    What is that document titled?

11    A.    It's the "Fiscal Policies and

12 Procedures."  So, under that fiscal policies and

13 procedures, it's one section.  And this one is

14 just the steps for -- the steps you can follow

15 when a sexual harassment is made or a sexual, you

16 know, in this case is made.

17    Q.    So, the document is titled "Fiscal

18 Policies and Procedures"?

19    A.    Yes.

20    Q.    And is there a list of steps in the

21 document you're looking at?

22    A.    It says, "One, ensure the safety and

23 well-being of the child."

24    Q.    Okay.

25    A.    "If there is an emergency, call 911.

1           "If you suspect abuse, neglect,

2     immediately call Department of Children and

3     Families.

4           "Four, notify the principal."

5           Again, this is when you suspect sexual

6     harassment.  In order to get to this step, you

7     have to first talk to the child.  If you don't

8     talk to the child, you can't get to these steps.

9       Q.   Hold on.  I believe I got the second

10    step.  You said the first step is ensuring the

11    safety of the child.  And I believe the second

12    one you said is if you suspect neglect or abuse;

13    is that right?

14      A.   Uh-huh.

15      Q.   And what is the third step listed?

16      A.   If you suspect child abuse or neglect,

17    call the Department of Children and Families.

18      Q.   Is that the second or the third step?

19      A.   That is the third step.

20      Q.   What was the second step?  I missed that

21    one.

22      A.   If there is an emergency, call 911.

23      Q.   And then you said the third one is about

24    if you suspect neglect or abuse.  What is the

25    next one after that?

```
 1          A.    Notify the principal or your site

 2    supervisor.

 3          Q.    Okay.  And then, the next step after

 4    that?

 5          A.    Then number five is what you do if the

 6    report involves an allegation of sexual

 7    harassment, by an adult or a student, it takes it

 8    to a level three.  So at this point, if you've

 9    identified that the child said, "I was just yada

10    yada," then you have to take it to a level three,

11    and then you go to the student code of conduct,

12    then you follow those procedures.  Which okay,

13    well, first of all, call the parents immediately.

14    And the code of conduct tells you exactly what to

15    do.

16          Q.    And that was the fifth step; is that

17    right?

18          A.    That is the fifth step.

19          Q.    Are there any steps after that?

20          A.    Contact our compliance office.

21                (Disconnection.)

22    BY MR. MACDONALD:

23          Q.    So now, going back because the court

24    reporter missed this part of the deposition.  You

25    previously were reading from a document that you
```

 1    had in front of you; is that right?

 2         A.    That is correct.

 3         Q.    And the document that you showed to the

 4    camera and that you had in front of you was, I

 5    believe, the compliance manual, Title IX

 6    Compliance Manual for Miami-Dade County Public

 7    Schools; is that right?

 8         A.    Uh-huh.

 9         Q.    And that was not a document of Academir

10    Charter Schools' policies; is that right?

11         A.    That policy is the same policy we have

12    in our manual, in our manual for students.  That

13    is the same policy because we have to follow that

14    same policy for students with the exception of

15    reporting it to the Miami-Dade cops and reporting

16    it to the Civil Rights Office because we have our

17    own contact person here at Superior for the Title

18    IX, and the police officers that we contact are

19    our safe-school officers.

20         Q.    And earlier when you were testifying

21    about the principal's compliance manual that they

22    have in their offices, and you referred to Title

23    IX policies, were you referring to the Miami-Dade

24    County Schools' policies?

25         A.    No, I was referring to -- there's a

1    combination.  We have to -- there are certain

2    slides -- there's certain information that we

3    have to have in our policy that encumbers

4    everything that Miami-Dade has with the support

5    services that we have, but we have to follow

6    those things.  We have to follow making sure that

7    they are safe, if there is something that we need

8    to notify the policy.  We have to follow those

9    things according to Miami-Dade public schools.

10          Now, when our guidelines are done, like

11   I told you, there is a training, there is a

12   meeting, they tell us, you have to insert all of

13   these things and then plug in all of the

14   additional information that you have for your

15   organization, who to contact, who to call, who is

16   responsible for this type of grievance, this type

17   of grievance, and this type of grievance.  And

18   that is what we have to do.  So, it's basically

19   what they have and what we need to add to our

20   policy.  And that is what we -- that is what we

21   have to upload into our policy plan.  So we

22   have -- all of our policies pretty much are like

23   that because they have to align with the

24   district, especially if we opt in to use their

25   student code of conduct, their student

```
 1   progression plan, their reading plan.  All of the

 2   policy that's in there has to be Miami-Dade

 3   policy because that is the one that we opt in to

 4   use.

 5        Q.   But earlier you referenced a compliance

 6   binder that each principal has; correct?

 7        A.   Correct.

 8        Q.   And in that compliance binder, you

 9   stated there was a section on handling Title IX

10   student complaints; is that right?

11        A.   Correct.

12        Q.   And that policy specifically, is that a

13   policy that pertains specifically to Academir

14   Charter Schools or is it the Miami-Dade County

15   Schools' policies on Title IX?

16        A.   It is a combination.  You have the

17   policy.  You have to follow the policy of

18   Miami-Dade County.  You have to include that,

19   especially when it deals with children because

20   you have to follow their student code of conduct.

21   I can't reinvent the student code of conduct and

22   the steps that they require for students.

23             And what changes in our policy is who to

24   contact, how to go about to complete the form,

25   what steps to take for employees, and what steps
```

1    to take for vendors, but the student section has

2    to be reflective of what they do with the

3    exception of the cops because we don't report to

4    their cops.  What we do is we report it to Dade

5    County Public Schools Charter office and who to

6    contact at our office that is in charge of the

7    Title IX grievances.  Those are the two things

8    that changed or three things that changed within

9    our policy, but it has to reflect and mirror that

10   of Miami-Dade County Public Schools.

11        Q.   So, that section in the principal's

12   compliance binder that refers to Title IX student

13   complaints, is that identical to the article that

14   you just read from Miami-Dade County Public

15   Schools?

16        A.   That particular section, yes, with the

17   exception -- it's not identical, because I told

18   you it's with the exception of the cops who --

19   you know, obviously you have your safe-school

20   officer and then your Title IX contact person.

21   And then instead of contacting the cops for Dade

22   County, you have, "contact the charter school's

23   office."

24        Q.   So, besides those changes that you just

25   mentioned, it is otherwise identical to the

1    Miami-Dade County Schools' policies that you were

2    reading off of earlier?

3        A.    Yeah, that is correct.

4        Q.    Are there any other policies in that

5    binder pertaining to Title IX student complaints

6    besides those ones that you just described now?

7        A.    No.

8        Q.    Outside of that binder that principals

9    have, does Academir Charter Schools have any

10   other Title IX policies regarding the handling of

11   student complaints?

12       A.    No.  Outside of Title IX?  Like, that

13   has nothing to do with Title IX or that it does

14   have to do with Title IX?

15       Q.    Are there any other Title IX policies in

16   place --

17       A.    No.

18       Q.    And you said those specific policies

19   have been in place for several years that are

20   contained in that compliance binder?

21       A.    Yeah.  We have to follow that.  That is

22   something that everybody has to follow because

23   those are just the steps that will get you to the

24   next level of what you need to do and your

25   actions.

```
1        Q.    And those are the same policies that you
2    worked on with Esther Mir and Xenia Mir?
3        A.    Yeah.   Remember, these are -- it's not
4    just the students.   It's the employees, the
5    contracts and the vendors, all of that stuff.   We
6    have to combine them and put them together.
7        Q.    Does Academir adhere to the Miami-Dade
8    County code of student conduct?
9        A.    We do.
10       Q.    And is that strictly enforced?
11       A.    Yes.   When we sign our contract and we
12   get the charter school application, we have to
13   opt in or opt out, depending on what we decide
14   works best for us, and then those contracts are
15   binded, they're executed by the board of
16   Miami-Dade County and our governing board.
17            (Plaintiff's Exhibit No. 2 was
18       marked for identification.)
19   BY MR. MACDONALD:
20       Q.    I'll show you a document and share my
21   screen.   So, this document is Defendant's Bates
22   labeled 153 to 227.   I'm going to show you a
23   specific section in a moment, but do you
24   recognize this document that I'm showing you?
25       A.    Yes.
```

1      Q.    What is it?

2      A.    The student code of conduct for

3   elementary students.

4      Q.    And Academir Charter Schools follows

5   these policies you said; right?

6      A.    Yes, sir.

7      Q.    And I know you said elementary.  Does

8   that include kindergarten as well?

9      A.    Yes.  Elementary can be considered pre-K

10   through fifth grade.

11      Q.    And you're familiar with these policies?

12      A.    Yes.

13      Q.    I'd like to draw your attention to this

14   page.  It's Defendant's Bates labeled 196, the

15   section titled "Sexual Harassment."  I'll give

16   you a moment to review it.

17      A.    Uh-huh.

18      Q.    You've reviewed that section there?

19      A.    Yes, sir.

20      Q.    Does Academir adhere to this policy

21   written in this sexual harassment section?

22      A.    We do.  However, Miami-Dade County

23   school police do not service Academir Charter

24   Schools or any charter schools.  We have our own

25   office -- our own officers.  So, we do not -- we

1  do not have to call the Civil Rights Compliance

2  either, but they don't service us.  That's not

3  part of the charter school services.  If a parent

4  calls them, they would say, "Okay.  You have to

5  call the school and report it there."

6        We have our own governing board.  We

7  have our own stuff.  This in particular, the

8  sexual harassment, and I'm sure that towards the

9  end of it, it defines what harassment is.  And

10  again, the procedures, we do have to do a SPAR.

11  If it's determined, an investigation is made and

12  is determined to have -- to be classified as

13  sexual harassment, then you have to proceed with

14  the SPAR and then complete an assessor report.

15  Then there is a slew of things that you have to

16  do if it gets to this level.

17     Q.   And what is a SPAR?

18     A.   It's a reporting system that

19  administrators have access to where they're

20  required to enter information once they get --

21  the Miami-Dade Police Department does, I guess,

22  an investigation and they'll give you a SPAR

23  number.  It's kind of like a -- that the incident

24  was created and then you have to report it into a

25  platform that the principals use that is called

1    DSIS.  And then they enter the information that

2    the incident took place and then you enter the

3    information, but that triggers a lot of other

4    stuff that you have to do.

5         Q.   And the SPAR is that a paper form or is

6    that an electronic form?

7         A.   Usually, the police officers do an

8    investigation.  They give you a card with a SPAR

9    number, and it's kind of like a report.  And then

10   you have to do it electronically.

11        Q.   Okay.  So, a police officer gives you a

12   SPAR form?

13        A.   So, no, they do a report form.  So, it

14   says the report -- to report these incidents,

15   right, of this nature, the police will determine

16   if a SPAR is required.  A SPAR is an

17   investigation.  They do an investigation and then

18   they -- well, not investigation.  They kind of

19   take the case and say, "Okay.  I'm going to do a

20   report."  And then they generate a number that

21   they give you and that triggers the next action.

22   But the police have to determine if this is a

23   case that merits to be looked at or not.  If it's

24   just something you need to bring in the parents,

25   speak to the children and do away with it, or if

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 81 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      it's something that determines an investigation.

2      And at that point, the next steps that you take

3      are going to be very different.

4           Q.   Now, since Academir doesn't use

5      Miami-Dade Schools' police, who is the police

6      department that makes that determination

7      regarding the SPAR?

8           A.   Miami-Dade.  In this case they'll give

9      you a -- just a -- a number.  Right, just a

10     number that you have to still enter into, like, a

11     police report.  Once it's -- it's not a police

12     report, but it's a report that administrators

13     have to complete after they are given a police

14     report, which triggers everything else.  A

15     reporting to the state, the identification,

16     what's going to happen, the next steps, is the

17     child going to be expelled.  It's just a number

18     of different things that happen after that, but

19     we -- go ahead.

20          Q.   The Miami-Dade County Police Department

21     makes the determination as to whether a SPAR is

22     required for Academir Charter Schools?

23          A.   No.  The Miami-Dade police.  I'm sorry.

24     And again a SPAR is --

25          Q.   Which --

Deposition of Olivia Angelica Bernal                              Jane Doe v. Academir Charter Schools, Inc., et al.

1    A.   A SPAR is a term used for Miami-Dade

2  County Public Schools.  It's not typically

3  something that the officer from Miami-Dade County

4  is going to tell me, "Give me a SPAR number," but

5  they are going to give you like a record number,

6  and that is considered.  So, when you fill out a

7  form, it's either a SPAR or the number that you

8  have to enter.  That's it.  But the SPAR is

9  really for them.  It's a term that they use when

10  the officer determines if this warrants further

11  investigation or the action to be taken.

12    Q.   So, I'm asking about Academir Charter

13  Schools and you mentioned a SPAR.

14         Does Academir Charter Schools use that

15  SPAR form?  Yes or no?

16    A.   We don't use the SPAR because it's a

17  term used for Miami-Dade County Public Schools.

18  We do complete that in our dashboard.  So,

19  through the DSIS, once they go into the principal

20  portal, there is a report that you fill out if

21  there is -- if you are given a report, if an

22  investigation is initiated.  It's not something

23  that we just go and enter and we get a SPAR

24  number.  It does not work like that.

25    Q.   So, Academir Charter Schools does not

1  use a SPAR form; correct?

2       A.   No.  Right now, no.

3       Q.   Okay.  Is there any form that's specific

4  to Academir that is used instead of a SPAR form?

5       A.   No, what it is, what we have is -- if

6  there is an incident, it's a dual form.  You have

7  an incident/injury report.  You identify if this

8  was an incident or an injury.  It's a report to

9  track, you know, something that took place so we

10 can keep documentation that parents were

11 notified, what was reported to us, and what took

12 place.  If somebody falls, hurts their knee,

13 whatever, did we call fire rescue.  So, it just

14 depends.  So, it kind of denotes or outlines all

15 of the steps that were taken for students.

16            Now, if the police is involved, then we

17 know police was called.  And then from there, the

18 police take over.  And then they usually generate

19 a number, whether it's the police or the fire

20 rescue, they come and they'll give you a number

21 so that you can enter and make sure that you keep

22 record of it.

23      Q.   You mentioned a form pertaining to

24 accidents; what is that called?

25      A.    It's called the "Accident Injury

1   Report."  I don't have it with me, but it's the

2   Academir Charter School "Accident Injury Report,"

3   which is, I believe, what the school did for this

4   case.

5       Q.   Okay.  Now, looking at this policy,

6   under the second sentence it says, "Upon

7   receiving a report of an incident sexual in

8   nature involving a student, employee, or

9   applicant, school or worksite administrators must

10  contact the MDCPS Office of Civil Rights

11  Compliance."

12      A.   Uh-huh.

13      Q.   Are Academir employees required to

14  contact the MDCPS Office of Civil Rights

15  Compliance upon receiving a report of an incident

16  that is sexual in nature?

17          MS. KARRON:  Objection to form.

18          THE WITNESS:  Academir are not

19      employees of Miami-Dade County Public

20      Schools, so they would not contact that

21      office.  They would contact our HR

22      department.

23  BY MR. MACDONALD:

24      Q.   Okay.  So, upon receiving a report of an

25  incident sexual in nature involving a student,

1   employee, or applicant, Academir employees have

2   to contact HR?

3       A.    Employees.  Dealing with employees

4   particularly for our schools that are -- are

5   adults.  Now, the students, they have to go

6   through the -- through a different process.  They

7   don't go through this.  They have to first follow

8   those other steps that I read to you earlier.

9           And this is for sexual harassment.  This

10  is when you've identified the situation at hand

11  to be a harassment case, depending who is taking

12  it.  If it was something that was said, minor,

13  something that was, "Oh, I like you," you know,

14  kids.  Every case can't be treated as a sexual

15  harassment case.

16      Q.    Well, I'm asking you specifically about

17  sexual harassment policies, that's why we're

18  looking at that section.

19          So, in the event of a report of a sexual

20  incident involving a student, who are Academir

21  employees required to contact?

22      A.    So, the personnel that I read to you

23  earlier.  And the steps that they take where they

24  first contact and communicate with their -- with

25  their school principal.  Once that is done and

1    the school principal determines that this is a

2    sexual harassment issue, then she contacts us or

3    the employee contacts us and we move forward the

4    support for them.  And we could launch an

5    investigation, but it just depends on --

6         Q.   So, the principal is the first person

7    that Academir employees are required to contact

8    upon receiving a report of a sexual incident

9    involving a student?

10        A.   That is correct.

11        Q.   Okay.  After --

12        A.   Or the supervisor at hand.  In this case

13   they have -- remember, there's two campuses; they

14   have a PLC and they have a main campus.  The PLC

15   has an assistant principal, a lead teacher there

16   that handles it.  It's either the principal or

17   the supervisor at that moment, that person is the

18   first person that would reach that information.

19   Obviously, if she's not able to handle it and she

20   sees this is an actual sexual harassment, she

21   will then contact her principal.

22             And in this case, you'll see it.

23   Obviously, it's Ms. V, who is the person in

24   charge there at that time that the incident took

25   place.

1    Q.   And who is Ms. V?

2    A.   Ms. Valladares.

3    Q.   And who is that?

4    A.   She is an assistant principal for

5    Academir Charter School West.

6    Q.   So, it's either a principal or an

7    assistant --

8    A.   Or supervisor.  Well, a supervisor,

9    whoever is that person in charge there at that

10   time.  And in this case, my teachers or the

11   teachers would go to their supervisor, which is

12   the assistant principal in charge of the PLC at

13   that time.

14   Q.   Who else would be a supervisor besides a

15   principal or an assistant principal?

16   A.   The principal runs the school; that is

17   her job.  She is the ultimate decision-maker at

18   that school.  Once that happens and they feel

19   that they need the intervention of our compliance

20   aspect of it, she contacts us and says, "Hey, I

21   have a case.  A parent is alleging this," or, "An

22   employee says that this happened."

23        Obviously, if it's an employee with a

24   student or anything like that, then we call the

25   cops immediately and we turn it over to them and

1    they start and they take over the investigation,

2    but the principal will always contact our office.

3        Q.   You mention they have to contact the

4    supervisor.  So, I'm asking you:

5            Who else besides an assistant principal

6    or principal could be a supervisor?

7        A.   That's it.  They would contact us

8    because the steps say contact the principal,

9    right, or their immediate supervisor.  So it's

10   somebody at the school level --

11       Q.   What steps?

12       A.   The steps of identifying if the child is

13   safe; do they need to call the police or -- I

14   think it's step four in the process where they

15   contact either -- if it's a teacher, they have to

16   contact their principal or their immediate

17   supervisor at the time.

18           And in this case it was Ms. Valladares.

19   And then, Ms. Valladares contacted her

20   supervisor, which is the principal.

21       Q.   And when you say steps, you're referring

22   to the Miami-Dade County Schools Title IX

23   compliance manual that you were reading from

24   early?

25       A.   Correct.  Correct, for students only.

1          Q.   Okay.  Now, looking back at this

2     document, after an Academir employee learns of a

3     sexual incident involving a student, do they

4     conduct an intake?

5               MS. KARRON:  Objection to form.

6               THE WITNESS:  So, when the

7          employee -- and that's why I said, you

8          have to ask questions.  "What happened?

9          Where did this take place?  Can you

10         explain?"  And then you determine what

11         next steps the employee has to do in

12         order to help the child and ensure that,

13         you know, they take the correct action,

14         if it's notifying the police, if it's

15         going to their supervisor, or if it's

16         just something the teacher can handle by

17         talking to the students, by calling

18         their parents, you know, calling the

19         counselors.  There are different steps

20         that they know they have to take.

21              The first thing that you have to do

22         after you ensure that they are safe and,

23         you know, before calling the police,

24         "Hey.  Are you okay?  What happened?"

25         You have to get that, especially from

1     little children.  You're not treating

2     them like adults or like as if this is a

3     crime.  You're talking about two

4     five-year-olds and you have to treat

5     them accordingly.  Just like they asked

6     the little girl -- I'm assuming they

7     asked the little girl questions.  They

8     had to have asked the little boy

9     questions.  You have to --

10   BY MR. MACDONALD:

11        Q.   I'm asking you generally about Academir

12   Charter School's policies.  I'm not asking you

13   about any particular --

14        A.   Yes, they have to ask the question.

15   They have to ask questions.  Is there an intake

16   form that they fill out?  They don't fill out an

17   intake form.  You know, while they're completing

18   their form that they have of the incident,

19   they're writing down what the child said, or if

20   there is a witness, they write down the witness

21   told me X, Y, and Z.  So, the teacher or whoever

22   is reporting it has to write it down on the form,

23   but we just need to know what happened.  There is

24   not an official intake form for it.

25        Q.   But I'm trying to understand, earlier

1    you testified that Academir Charter Schools

2    follows this specific policy.  So, I'm trying to

3    go through these steps to understand which of the

4    these policies, or steps in this policy rather,

5    that Academir adheres to.  So, I'm just trying to

6    understand that.

7              So, we discussed who has to be called

8    when they learn of a sexual incident.  The next

9    part listed here is about an intake.

10             So, is an intake conducted by Academir

11   employees upon learning of an incident that is

12   sexual in nature involving a student?

13        A.   I cannot call it an intake.  I can call

14   it a -- the incident form they have.

15        Q.   So no intake is conducted.  They do an

16   incident form?

17        A.   They do an incident form.  That is

18   correct.

19        Q.   And then listed here it says that the

20   next step is, "Determining whether the report if

21   proven to be true, would meet the definition of

22   sexual harassment"?

23        A.   Correct.

24        Q.   And is that a step that Academir

25   employees also follow in handling complaints?

1      A.    That is correct.

2      Q.    And then it also references "the

3    grievance procedures outlined in the Office of

4    Civil Rights Compliance Title IX Sexual

5    Harassment Manual procedures related to reports

6    of sexual harassment."

7          Do you see that?

8      A.    Yes, and that is where we go back and we

9    follow their procedures with the exception of

10   calling the Civil Rights Compliance because that

11   doesn't pertain to us and we have to have our own

12   procedure in place in-house, but all the other

13   processes of okay, did you follow these steps,

14   that is what we have to follow from Miami-Dade

15   County Public Schools.

16     Q.    So, Academir employees also reference

17   that same manual and utilize it in handling

18   complaints; correct?

19     A.    Correct.

20          MS. KARRON:  Kyle, do we know how

21       much longer you have, just to

22       determine -- I know we've been going for

23       like two and a half hours -- for a lunch

24       break?

25          MR. MACDONALD:  Yeah, once I finish

1          with this policy in this handbook, then

2          we can go ahead and take a break.  I

3          should be done pretty soon here.

4    BY MR. MACDONALD:

5          Q.   So, in this next paragraph here, it

6    discusses that reports of incidents that are

7    sexual in nature have to be reported to

8    Miami-Dade schools' police, to determine if a

9    SPAR is required.

10              Now, I understand Academir doesn't use a

11   SPAR report.  We talked about that earlier.

12              Are Academir employees required to

13   report that, report incidents that are sexual in

14   nature to the police?

15         A.   If it's determined to be -- if it's

16   determined to be something of abuse or neglect,

17   absolutely.

18         Q.   Only if it's determined to be abuse or

19   neglect, would it --

20         A.   If you feel that the child was abused or

21   neglected, absolutely you have to report it.  It

22   is our duty to report.

23         Q.   I'm asking if all incidents that are

24   sexual in nature are reported by Academir to

25   police or only those involving abuse or neglect?

1          MS. KARRON:  Object to form.

2     Perhaps you can define "sexual in

3     nature."

4          MR. MACDONALD:  That is what the

5     policy says that she stated the school

6     adheres to.

7          THE WITNESS:  So, here, the "sexual

8     in nature" -- again, if -- "Hey, you're

9     pretty.  I want to kiss you."  Those are

10     the things that you don't report, and

11     those could be considered sexual in

12     nature.  So, it just depends on the

13     severity.

14          If you ask the child and say, "Hey,

15     did he touch you?  Did he do something

16     to you?  Are you hurt?  Are you

17     injured?"  And the child says yes, then

18     absolutely without a doubt we call the

19     police because the child was abused in

20     any, you know, kind of, shape, way, or

21     form.

22          But if the child says, "No, he just

23     said something to me," and it's an

24     isolated incident and it's not a pattern

25     and the child is fine and is playing,

1    you know, moves on five minutes later

2    and is playing and is fine and is there

3    the rest of the day and has no

4    complaints and is not crying --

5    typically when a child comes and is

6    crying and is grieved by something that

7    has been done to them and -- children

8    are very expressive.  Children will tell

9    you everything.  And they'll tell you,

10   you know, "He touched me.  He hit me.

11   I'm upset."

12        And you know, if the child is

13   saying, okay, you know, "He said he

14   wanted to kiss me," or "He wanted to do

15   this," you understand that it may be

16   sexual in nature, but it's not something

17   that warrants us to call the police.

18   You know, it warrants us to reach out to

19   the parents, to speak to the children.

20   And if, you know, we determine or we see

21   that this is something that really could

22   have happened or that the child is so,

23   you know, upset that something must have

24   happened, without a doubt.

25        But in this case, again, it's

 1          just -- the "sexual in nature" has a

 2          very broad spectrum in education in

 3          children and young children.  You know,

 4          but it's -- but you have to -- typically

 5          those cases where abuse, if we find, you

 6          know, things that the kids are doing,

 7          saying continuously, a teacher knows.

 8          You have -- there's a certain level of

 9          behavior that these children display on

10          a day-to-day basis.

11              And, you know, sometimes, you know,

12          again, like I told you before, if it's,

13          "They took my pencil."  "He pinched me."

14          Those are things that happen amongst

15          children, but if you determine as a

16          teacher, as an educator, as a principal

17          that the child just said this and you,

18          you know, verified, "Are you sure?  Were

19          you touched?"

20              "No. No.  I wasn't touched.  He

21          just told me that."

22              Then you're not going to call the

23          police because they don't -- they're not

24          going to do the SPAR, you know.

25              Now, if they see, and, you know --

1         if you can actually see that there was

2         abuse and something took place, without

3         a doubt, the first thing in the minds of

4         administrators or the process or the

5         procedure is to call the police.

6    BY MR. MACDONALD:

7         Q.   Okay.  So, not all reports of incidents

8    that are sexual in nature are required to be

9    reported to the police by Academir employees?

10        A.   That is correct.

11        Q.   Only when an Academir employee suspects

12   abuse or neglect are they required to contact the

13   police department; correct?

14        A.   Well, not an employee.  If it goes

15   through and you have four different employees,

16   you know, that go through this and, you know, if

17   the child tells you, "No, he just told me

18   something," and makes her feel uncomfortable --

19             Obviously, these are five-year-olds.

20   You have to take every situation differently.  If

21   it's a fifth grader telling a student that, then

22   you're like -- the severity is very different.

23   But when you have children who may not even

24   express and tell you specifically the name of an

25   area in your body, just say, "He wants to kiss me

1    and he wants to touch me."

2            Kids are going to be kids.  And

3    kindergartners, you know, they're babies.  So,

4    you have to treat them accordingly.  You're not

5    just going to say, "Okay.  I'm going to" -- and

6    you have to look into the situation before making

7    that determination of calling the police.  It's

8    on a case by case.

9        Q.   I'm not asking you about any specific

10   scenario.  I'm not referencing five-year-olds or

11   kindergartners.  I'm just asking about Academir

12   policies which you're here to testify about.

13           In what cases are Academir employees

14   required to report incidents that are sexual in

15   nature to the police?

16       A.   When they suspect there is abuse.  If

17   there was physical abuse or, you know, an action

18   taken or a series of harassment where the child

19   themselves is visibly and physically impacted by

20   the situation, we, without a doubt, without a

21   doubt you have to say, "Okay.  Something must

22   have happened for this child to be so upset at

23   the situation.  So something, you know, must have

24   happened."  There are behaviors that the child

25   displays.  But if the child just says, "They did

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    this to me," and then continues on her way like

2    nothing ever happened -- it's like that.  One

3    minute they're fighting; the next minute they're

4    best friends.  So, you have to determine as an

5    administrator, as a leader, "Okay.  Does this

6    warrant the next step for me to get everybody

7    involved?"

8        Q.   Okay.  Are there any cases outside of

9    suspected child abuse or neglect in which an

10   Academir employee is required to contact the

11   police after learning of an incident sexual in

12   nature?

13            MS. KARRON:  Object to form.

14            THE WITNESS:  Yes.  Specifically

15       when a child says an adult touched them,

16       says that their panties were removed, or

17       it's something that a child would not

18       know to say or do or is displaying

19       specific behavior.  Typically it's that.

20       You say, if that child is saying, you

21       know, her dad was with her in the shower

22       or that her stepfather undressed her or

23       vice versa, the boy, that his babysitter

24       touched him.  When a child tells you

25       that an adult has done this to them or

1        that their teacher touched them

2        inappropriately, you call -- you launch

3        full-blown, you know, mode of the

4        police, the Department of Children and

5        Families.  Those are the kind of, you

6        know, allegations right then and there

7        that we don't even think about because

8        you can't -- you're -- at that point you

9        know that -- and you don't know, but you

10       have to make sure that you are looking

11       out for the safety of the child.  And if

12       something is happening, you're held

13       liable because that child shared

14       something with you that took place or

15       might have taken place or that she was

16       exposed to or he was exposed to.

17   BY MR. MACDONALD:

18       Q.   And you said something that a child

19   would not -- strike that.

20            You said something that a child would

21   not know --

22       A.   Typically.

23       Q.   What does that mean?

24       A.   Like they say specific names of their

25   genitals or that they were touched in an area

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 101 of
285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      that -- something hurts down there because her

2      stepdad got into her bed, whatever.

3              There are so many different cases and

4      situations and stuff you'll see.

5              Or "My back hurts because my mom whipped

6      me yesterday," or "I'm hungry because they didn't

7      give me food last night."  So those are, you

8      know, key things that you're just like -- or you

9      see bruises or you see something specific that,

10     you know, the child comes and he looks or she

11     looks not her usual self and may say things or

12     may be depressed.  There are things that kind of

13     alert you as an educator to say there may be

14     something.  Typically, if there is something like

15     that, they'll communicate with their

16     administrator and, you know, they'll proceed, you

17     know.

18         Q.   Would that include knowledge of sexual

19     acts that a child of that age should not know

20     about?

21              MS. KARRON:  Objection to form.

22              THE WITNESS:  It depends.

23     BY MR. MACDONALD:

24         Q.   What does it depend on?

25         A.   On a case by case.  It depends on a case

1    by case.  There are some kids -- and I know that

2    because as a principal for many years -- some

3    kids will say, "pipi" "toto" and they say all

4    kinds of things because their parents say that or

5    private parts.  "No me mira mis partes privadas."

6    "Don't look at my private parts."

7            Like, they know specific things, but,

8    you know, when it's sexual in nature, typically,

9    you know -- and again, kids, if they see -- if

10   they, you know, see something on TV or they see

11   their dad touching their mom, they are like, "Oh,

12   that's okay for me to do.  I like this girl; I'll

13   grab her butt."  Especially five-year-olds, where

14   they are inquisitive, and they'll tell you

15   specific things, like, "I like you.  I want to

16   kiss you," but when they start acting upon them

17   and, you know, you see other signs then you'll be

18   like, "Oh, Okay.  There is something happening,"

19   but when it's -- sometimes the kids will say "Oh,

20   I want to kiss you," you don't get alerted

21   because sometimes that is just -- they're

22   children and they're exploring.  However, you do

23   see a difference and that is why you have to ask.

24   "Did this person do this to you?  Did they not do

25   this to you?"

 1           And then if they did, then obviously

 2      everything changes for the school, and the way

 3      they're going to react.

 4           But sometimes kids say, you know, things

 5      and it depends on their parents.  Again, I bring

 6      it back to the parents because some parents are

 7      very open; whereas, you know, I'll have a little

 8      boy going to the bathroom, take down his pants

 9      and just start peeing there in front of everybody

10      and doesn't care.  And others say, "No, I'm not

11      going to show you my private parts.  I'll go into

12      the stall."  They will not go to the bathroom in

13      a urinal; they will go into the stall.  It all

14      depends.

15           And again, it's their upbringing and how

16      they are.  If their parents are, "Don't worry

17      about it.  Show everyone your pipi."  Or they

18      take them to the beach and they're naked and

19      they're okay with it -- not other parents.  Other

20      parents are like, "No.  You have to wear a

21      bathing suit because you have to cover your

22      private parts."

23           So, every child is different, but there

24      are children that stand out for specific things,

25      for specific behaviors and actions that prompt

1    you to say, "There is something happening"

2    sometimes.  Sometimes you're wrong.  Sometimes

3    their parents are just like that and he sees it.

4    And others times there may be something happening

5    in the home where the child is, you know, being

6    molested or touched or, you know, exposed to

7    things that they typically aren't at that age.

8         Q.   Now, looking back at this policy, in the

9    last paragraph it says, "A finding of sexual

10   harassment under the code of student conduct

11   cannot be made and corrective strategies for

12   sexual harassment may not be implemented without

13   the express authorization of the District's Title

14   IX Coordinator or designee."

15        Do you see that?

16        A.   Yes.

17        Q.   Does Academir Charter Schools adhere to

18   that specific aspect of the policy?

19        A.   Well, we don't -- we do have a Title IX

20   and we work with them here, myself and my team.

21   We work with them to ensure that, you know, that

22   the investigation is fully done before having to

23   take some of these actions.  You can't expel a

24   child.  Remember, these are public school

25   children, and until you have a complete

1    investigation and you have all of the pieces

2    together, and it is determined, "Okay, this child

3    did commit this," then you go ahead and you

4    suspend and you follow the student code of

5    conduct.

6          Or if it warrants something, you know,

7    terrible where it's a level, you know, three or

8    above that you need to expel and you need to go

9    through a different process, we just ensure that

10   everybody that is going through this process,

11   especially, you know, young children that, you

12   know, that you don't interrupt their educational

13   program or activity that they're -- that they

14   should have access to under the Title IX.  You

15   just don't go by --

16     Q.   I don't mean to cut you off.  I'm just

17   asking if Academir Charter Schools follows this

18   last section of the policy that I just read to

19   you.

20     A.   We follow the student code of conduct

21   and then with the support from the Title IX as it

22   relates to, you know, the strategies that need to

23   be taken.

24     Q.   You're not answering my question.

25          Is a finding of sexual harassment under

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 106 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    the code of student conduct prohibited from being

2    made until a Title XI coordinator or their

3    designee is contacted, like it says in this

4    policy, for Academir employees?

5         A.    Well, they contact us, but remember that

6    you're reading something where Dade County public

7    schools has their Civil Rights Compliance person

8    that tells them exactly what to do.  We don't.

9         We provide the support.  We engage once

10   there is complaint from, you know, beyond -- that

11   cannot be taken care of at the school, we take

12   care of the support for that, but we don't have

13   that Title IX person that says, "No, you cannot

14   move on until you communicate with them."

15        Yes, they contact us through the process

16   so we can provide the support and guidance and

17   take care of it after the fact that, you know,

18   they were not able to take care of it, but really

19   it's the authorities at that point.

20        The authorities are the ones that take

21   precedence and come in and say, "Okay.  This

22   child needs to be removed" or "this child did

23   commit this crime," or "did not commit this

24   crime," or "This is not a crime and just proceed

25   with your student code of conduct."  So --

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 107 of
285
Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.   Is that a no?

2      A.   So, I can't say in its entirety that we

3   do because there is a section in here that we

4   cannot follow because we do not have that.

5      Q.   Does Academir have a Title IX

6   coordinator?

7      A.   We do.

8      Q.   Who is it?

9      A.   We have three coordinators.  We have the

10  three people that they go to for specific things.

11  Xenia is for employees, myself is for students

12  and parents, and then Ms. Mir, which is for all

13  others -- vendor and all others.  So, let's say

14  that they --

15     Q.   So I want to go through those.

16          You said Xenia?

17     A.   -- for employees.

18     Q.   Okay.

19     A.   And staff.  And myself for parents and

20  students.

21     Q.   I don't believe that is what you said

22  previously.

23     A.   I did.  I've always said that.

24     Q.   You're the Title IX coordinator for

25  employees and students?

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 108 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.    Yes.

2      Q.    Are there any other Title IX

3  coordinators for students of Academir Charter

4  Schools besides you?

5      A.    No.

6      Q.    When did you become the Title IX

7  coordinator?

8      A.    When we developed the plan a couple of

9  years ago.  We had to delineate these roles.  We

10  had to set this up because Dade County --

11  remember, I told you we had the training and we

12  had to set up who is going to be responsible for

13  what and our HR --

14      Q.    When was that?

15      A.    I don't know.  Two years ago when I came

16  aboard.

17      Q.    Two years ago you became Title IX

18  coordinator?

19      A.    Yeah, or a year later when we started

20  revising the policies.

21      Q.    Okay.

22      A.    When we knew that we had to break it up

23  before and there was only one person, but now we

24  broke up because last year we had the training

25  and they're like, "You have to have these

1    specific things in place."

2        Q.    Is your status as a Title IX coordinator

3    documented anywhere?

4        A.    Just in the plan.  It will say who to

5    contact for different things.

6        Q.    What plan?

7        A.    Within our policy, it tells you who to

8    contact for all of the different areas.  So,

9    you'll see Xenia is for any employee -- any

10   faculty and staff; myself with parents; and

11   Ms. Mir for the vendors and the contractors.

12       Q.    Which policy states that you are the

13   Title IX coordinator for Academir students?

14       A.    It doesn't say I'm the coordinator.  It

15   just says I'm the contact person.

16       Q.    For Title IX purposes?

17       A.    Yes.

18       Q.    Where does it say that?

19       A.    In one of the pages of the policy where

20   it says who to contact for faculty and staff

21   issues, for parent and student issues, and then

22   for --

23       Q.    Okay.  What policy is that that you're

24   referring to?

25       A.    Title IX.

1    Q.   What Title IX policy?

2    A.   The one that we have on file for the

3    schools.

4    Q.   Okay.  What policy for Title IX do you

5    have on file?  Where is it located?

6    A.   I'm not following.  I told you in the

7    policies and procedures.  In the policies and

8    procedures manual or that section of the manual,

9    you have who to contact for what type of

10   complaint under Title IX.  You have the people

11   that are identified there.

12   Q.   Okay.  You're referencing a document.

13   Policies and procedures that list you as the

14   Title IX coordinator for students and --

15   A.   It does not list me as the Title IX

16   coordinator.  It's the contact person for Title

17   IX under students and parents, complainants.

18   Q.   Okay.

19   A.   Or when they have a complaint, correct.

20   Q.   Okay.

21   A.   And then for Xenia.  So, you'll see her

22   name, you'll see her name and you'll see

23   Ms. Mir's name.

24   Q.   Okay.  What is that document that you

25   just referenced?  What is that titled?

```
1        A.    It's under the fiscal management and

2    procedures.  Those are the same procedures that

3    we have for all Academir schools.

4        Q.    You said "fiscal management and

5    procedures"; correct?

6        A.    Correct.

7        Q.    Is that the same document that you read

8    from earlier in your deposition?

9        A.    No.

10        Q.    Okay.  What document is titled "Fiscal

11   Management and Procedures?"  Where is that

12   located?

13        A.    It's the policies that the schools have

14   to follow all of the things, from management of

15   funds, to enrollment, to everything.  And one of

16   those policies is the Title IX and the procedures

17   to follow for each.

18        Q.    You're not answering my question.

19              Where is that policy located?

20        A.    It's located at each school.  I told you

21   earlier that it was located at each school.  We

22   have the policy here.

23        Q.    Okay.  But earlier when you referenced a

24   policy related to fiscal management, you later

25   ended up reading from the Title IX compliance
```

1    manual of --

2         A.   Correct, because I had that one with me,

3    and I knew that that particular policy was for

4    students, similar to the one that we have with

5    the exception of the cops and the Civil Rights

6    Compliance office.

7         Q.   Okay.

8         A.   That policy is the one that we have to

9    follow for students.

10        Q.   Okay.  So I just --

11        A.   Sorry.  They wouldn't contact the

12   District Title IX.  They don't contact that

13   because that is not part of the charter.

14        Q.   So, I just want to make sure I

15   understand your testimony clearly.  There is a

16   policy that exists at each Academir Charter

17   School that discusses fiscal management and

18   within that it discusses your status relating to

19   Title IX matters that is separate from the

20   document that you read from earlier?

21        A.   Yes.  The document that I read from

22   earlier belongs to Miami-Dade County Public

23   Schools.  We, when dealing with students, we have

24   to follow the Dade County public schools

25   policies.  So, that policy has to be followed

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    with students for the Title IX.  That has nothing

2    to do with our contact.  When we add our contact

3    to the actual Title IX, what it means -- what if,

4    you know, sexual harassment, all of that, who to

5    contact for complaints about, you know, faculty

6    and staff, for students and for, you know, others

7    you have who to contact and what steps to follow.

8    That is part of the policy.

9         Q.    And for the school that my client

10   attended, where would that policy be located that

11   you just described?  Is it in Ms. Bello's office?

12        A.    In her binder.

13        Q.    In whose binder?

14        A.    Ms. Bello's binder.  Every principal,

15   every school has a binder with all of their

16   policies.

17        Q.    So, Ms. Bello -- and this is your

18   testimony today that Ms. Bello has a binder and

19   within it there are policies and procedures that

20   list you as the Title IX coordinator for Academir

21   Charter Schools; is that correct?

22        A.    That's correct.

23        Q.    Okay.

24        A.    But I'm not the Title IX coordinator.

25   But I'm the contact person for them.

1      Q.   I'm sorry.  That list you as the contact

2   person for Title IX; is that correct?

3      A.   For students -- for parents and

4   students.

5      Q.   I'm asking you about for Title IX

6   purposes and that is what you testified to.

7      A.   Correct, for parents and students.

8   Because you're saying general Title IX and I'm

9   not in charge of general Title IX.  You have

10  Xenia, you have myself, and you have Ms. Mir for

11  Title IX.  So, for students that is the person

12  she has the contact for.  For her staff, she has

13  Ms. Xenia, who is also on that same form.

14     Q.   So, is it your testimony now that you

15  are not the individual responsible for Title IX

16  matters relating to students?

17          MS. KARRON:  Object to form.

18          THE WITNESS:  I am.

19          MS. KARRON:  I think that -- and I

20       don't want to interrupt you at all and

21       you can strike this if you want.  I just

22       want to help clear it up because she's

23       saying that she's the coordinator

24       dealing with students and parents.

25       There's --

1           MR. MACDONALD:  Okay.  I'd like for

2      her to just finish her answer.  We'll

3      break in a moment.

4   BY MR. MACDONALD:

5      Q.   So, in that binder that Ms. Bello has in

6   her office, are the words "Title IX" listed

7   anywhere in that document?

8      A.   Yes.  Yes, they are.

9      Q.   And it lists you as the contact person

10  for Title IX matters relating to students;

11  correct?

12     A.   Correct.

13     Q.   And how long has that document existed

14  for that lists you as the point contact for Title

15  IX matters for students?

16     A.   I want to say last summer or the summer

17  before.  I can't recollect when that was

18  published or put out.

19     Q.   And that could be found under a section

20  relating to fiscal matters you said?

21     A.   Yes.

22     Q.   What does that binder look like?

23     A.   I don't know.  It's a long compliance

24  binder that they all have to carry that has all

25  of their policies, all of their manuals, their

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 116 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    handbooks, everything that they need on the

2    day-to-day operations, they're going to have it

3    there.

4              When we do our compliance visit with the

5    district, the district also asks them to please

6    show them their manuals, their handbooks, their

7    policies.  When we do county accreditation, they

8    have to show them all of the policies and they

9    typically tend to hold them in a binder.

10             I don't know what each one looks like.

11             I know that we say, "Hey, make sure you

12    add this to your binder.  Make sure you add this

13    to your policies."

14             Anything that is updated, you know, we

15    send out on an annual basis.  Their faculty

16    handbook and manuals, they should also be kept

17    there under one of the tabs.  They get evaluated

18    on a yearly basis -- or not evaluated, but they

19    do a site visit for compliance at the district

20    level and they have to show all of these

21    documents.  So, they keep them, you know, in a

22    binder, typically and it may be multiple binders

23    because there is a lot of, you know, documents,

24    policies, and procedures and they're all kept in

25    binders.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1          I can't tell you exactly what her binder

2     looks like.  I don't know.  Well, I haven't --

3          Q.   Have you ever seen one of these binders

4     before?

5          A.   Yes, because I used to be a principal so

6     I had my binders for compliance.

7          Q.   Have you ever seen any principal at

8     Academir with one of these binders?

9          A.   Yes.

10         Q.   And what did it look like?

11         A.   Three-ring binder, typically black with

12     labels, tabs.

13         Q.   Okay.  And who had this binder when you

14     saw it?

15         A.   Principals in the office, typically in

16     their office.

17         Q.   Which principal?

18         A.   Ms. Bello, Ms. Ortega, Ms. Triana

19     (phonetic).  You know, when I do my site visits,

20     their binders are there.

21         Q.   And you've seen Ms. Bello's binder

22     before with these policies and procedures;

23     correct?

24         A.   Uh-huh.

25         Q.   Was it black as well?

1       A.   I don't remember if it's black and

2   white, but I'm not sure, but -- I can't recall.

3       Q.   Where does she store it in her office?

4       A.   She has a shelf.  Well, they all have

5   shelves and they're all there.  All her binders

6   are there.

7       Q.   It's on a shelf in her office; correct?

8       A.   Correct.

9       Q.   Okay.  And is it one binder or more than

10  one binder that contain these policies related to

11  Title IX?

12      A.   One binder would be the one that has

13  Title IX.  I can't tell you which one she has it

14  in, but she has many binders in her office and

15  one of them has the section on Title IX.

16          MR. MACDONALD:  Well, I'm going to

17      go ahead and ask on the record that you

18      provide that to the attorneys for

19      Academir so they can give one of these

20      binders to us because they haven't been

21      produced in this litigation, just so you

22      know.

23          All right.  We can go ahead and go

24      and take a lunch break, so let's go off

25      the record.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
1                   (Lunch recess.)
2        BY MR. MACDONALD:
3             Q.    Now previously, before we took a break,
4        you stated you were a point of contact regarding
5        Title IX for Academir?
6             A.    I am only for students and parents.
7             Q.    But you are not a Title IX coordinator?
8             A.    We have an HR Title IX coordinator.
9        She's the one that you'll see as a designated
10       person.
11            Q.    Is there a Title IX coordinator for
12       students?
13            A.    Myself, Olivia Bernal.
14            Q.    So you are the Title IX coordinator for
15       students at Academir?
16            A.    Yes.
17            Q.    As a Title IX coordinator for Academir,
18       what duties do you handle?
19            A.    Any grievances that are brought forth by
20       parents with regards to -- that are sexual in
21       nature that come.  Anything having to do with --
22       I do all the grievances for the schools, but in
23       this particular case this is just related to sex
24       or touching or something of that nature --
25       sexual.
```

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 120 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    Q.   Are you the designated person that the

2    students are supposed to report Title IX

3    complaints to?

4    A.   They report it directly to their

5    schools.  If that process -- once that process

6    takes place, the schools notify me and the

7    parents can file a complaint if the issues are

8    not resolved at the school level.

9    Q.   And what about if the student themselves

10   wants to bring forward a complaint?

11   A.   They report it to their school

12   administration or they can file a complaint.

13   They can ask for it.

14        These are also kindergartners so it's

15   probably hard for them to, unless they tell their

16   teachers usually.

17   Q.   I'm not asking about kindergartners or

18   any particular instances.  I'm asking you about

19   generally the Title IX policies for Academir.

20   A.   Okay.

21   Q.   As Title IX coordinator, do you oversee

22   investigations?

23   A.   Me and my team, yeah.  We look at --

24   typically we don't have a whole lot, but we look

25   at any case that comes through.  We involve the

1    upper management, the executive management team

2    and we take a look.  We listen to parents.  We

3    work with the school administration.

4         Q.   Who is on your team bringing the Title

5    IX complaints?

6         A.   Xenia, Esther Mir, Rolando Mir.

7         Q.   Rolando Mir is a member of the Title IX

8    team?

9         A.   No, but if he has complaints from

10   parents, typically he'll join us.

11             In this case the parent reached out to

12   him directly.

13        Q.   I'm asking generally about Title IX

14   policies again.  Who are the --

15        A.   Those are my three members, me, Ms. Mir,

16   and Xenia.

17        Q.   And have both of those two other members

18   of your team undergone Title IX training?

19        A.   Yes.

20        Q.   And who conducted that training?

21        A.   Through ADP, we go through a training.

22        Q.   Is that the ADP TotalSource training

23   that you mentioned earlier?

24        A.   Yes.

25        Q.   But I thought that training didn't cover

1    Title IX topics?

2         A.    They did cover Title IX topics:  Sexual

3    harassment.  They do cover that topic.  You asked

4    me specifically about school-based.

5         Q.    Right and --

6         A.    For students you asked me and I said

7    that it does not cover student-based.  It's very

8    general and on how to handle cases and how to

9    address concerns.

10        Q.    So, let me rephrase the question.

11             For the other two members of the team,

12   have they received training that is specific to

13   the federal law Title IX and not general sexual

14   harassment training?

15        A.    Title IX, yes, they have.

16        Q.    When did they undergo that training?

17        A.    I don't know that.  I don't have that

18   answer.

19        Q.    What training was that that covered

20   Title IX specifically?

21        A.    I don't know.  You'd have to ask them.

22   I don't have that information with me.

23        Q.    Okay.  But previously you had testified

24   that they had received training on Title IX;

25   correct?

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 123 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1       A.    They have received training, that is

2   correct.

3       Q.    Okay.

4       A.    But do I know what day and time and what

5   was the title of it, I do not know.

6       Q.    What do you know about the Title IX

7   training they received?

8       A.    I don't know what Title IX they've

9   received.  I know they received it through ADP.

10           One of them is our HR director.  So, I

11  know that for sure she has received the Title IX.

12  Ms. Mir has also received the Title IX, but can I

13  tell you specific information about their

14  training, no, because I don't have that

15  information with me.

16      Q.    And those are the online modules that

17  you described earlier with ADP TotalSource; is

18  that right?

19      A.    Online training.

20      Q.    Right?

21      A.    The one that I attended.

22      Q.    Were the words "Title IX" included in

23  that training?

24      A.    Sexual harassment?  I can't recall.

25      Q.    What can't you recall?

1    A.   If it had the "Title IX" on the title.

2    Q.   Does ADP TotalSource specialize in

3  educational institutions?

4    A.   Yes.  The people that are handling our

5  accounts, yes.

6    Q.   And you know for a fact that the

7  training that you took covered Title IX topics?

8    A.   Yes.

9    Q.   Do you remember what the name of the

10  training was called?

11   A.   No, I do not.  I can't recall.

12   Q.   So, you mentioned that you and the two

13  of the members of that team handle Title IX

14  investigations; right?

15   A.   Say that again.

16   Q.   You mentioned that you and the two other

17  members of that team handle Title IX

18  investigations; is that right?

19   A.   Yes.

20   Q.   How many Title IX investigations have

21  you and your team handled in your tenure?

22   A.   I cannot recall.  I don't have a

23  specific number in my head.  I don't have that

24  information.  I wasn't told I had to bring that.

25   Q.   Well, you didn't have to bring anything.

1    I'm asking if you recall ever conducting a

2    Title IX --

3         A.   I don't recall -- I do recall, but I

4    don't recall the number of times that I have done

5    them.

6         Q.   Was it more than once?

7         A.   Yes.

8         Q.   Was it more than five times?

9         A.   Yes.

10        Q.   When is the most recent time you

11   conducted a Title IX investigation?

12        A.   Probably a couple of weeks ago, but I

13   can't recall.  And it really didn't boil down to

14   anything because there really wasn't a case to

15   follow.

16             It was just something that was brought

17   forth and then it was like a story that a child

18   said or a middle school student said.  And then

19   the story changed.  And so, they're like, "No, it

20   really didn't happen.  It was just I said that

21   because of this."  So, the case was not really

22   carried through.

23        Q.   So, this was a Title IX investigation

24   that you handled within the past couple of weeks?

25        A.   Yes, it was a complaint.  We didn't

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 126 of
285
Deposition of Olivia Angelica Bernal                          Jane Doe v. Academir Charter Schools, Inc., et al.

1    launch an investigation, no.

2        Q.    When was the last time you handled an

3    investigation of Title IX complaints?

4        A.    I can't recall.  I don't know the exact

5    date.  I can't recall.

6        Q.    Can you recall a single instance where

7    you handled a Title IX investigation?

8        A.    Yes.

9        Q.    What do you recall about that instance?

10       A.    The information came to me.  We looked

11   at it.  We collaborated with the school.  We got

12   the information from the police.  We reviewed

13   everything.  We called all the parties.  We

14   questioned students.  We questioned employees.

15   We spoke to parents.  We delivered an outcome.

16   We met with the parents to deliver all our

17   findings and that was pretty much it.

18       Q.    And when did that investigation take

19   place?

20       A.    When?

21       Q.    When?

22       A.    I can't recall.  I can't recall the

23   exact date.

24       Q.    Was it more than a year ago?

25       A.    No, couple months ago.  Probably about

1    six months ago.

2         Q.    And what did that investigation involve

3    that you conducted six months ago?

4         A.    What did it involve?  A student coming

5    into the restroom, parent says that the aftercare

6    person also came in, went to the bathroom, and he

7    saw him with his pants down.  And the other child

8    was in the bathroom.  Didn't conclude with

9    anything because there was no time frame.  This

10   was brought to our attention months later.  We

11   looked at cameras.  We did an investigation.  We

12   involved the police and there was no

13   determination.

14        Q.    What was the age of this student that

15   was involved in this Title IX complaint?

16        A.    First grade.

17        Q.    And how did you first learn of that

18   complaint?

19        A.    The school -- once it happened, the

20   school reported it.  The parent then contacted us

21   and we launched an investigation from our end.

22        Q.    A school reported it to you?

23        A.    Yes, sir.

24        Q.    Who reported it to you?

25        A.    The school principal.

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 128 of
285
Deposition of Olivia Angelica Bernal                                                                 Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.    Which principal was that?

2      A.    Rosali Ortega.

3      Q.    And then once you learned of that

4    complaint from Rosali Ortega, you took over the

5    investigation?

6      A.    Well, they had already started the

7    investigation with the police officer and all of

8    that.

9             We, myself and my team, went out to the

10   school.  We spoke to the principal.  We gathered

11   the information and then we called and contacted

12   the parent.  I went out -- back out to the school

13   where the information was being held, which is

14   the report from the student, the report from the

15   parent, the statement from the aftercare

16   gentleman or teenager who works in the aftercare.

17   There was no footage.  There was nothing.  The

18   police said they didn't have a timeline or a time

19   frame, so they really couldn't go back into the

20   cameras, and they didn't know when it happened,

21   if it was before or after school or during the

22   day.  So, there really wasn't -- and we made

23   findings.  We met with the parents.  We talked to

24   them.  The police spoke to them and that was it.

25     Q.    And were any interviews conducted as

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 129 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    part of that investigation?

2         A.   Yes, with the employee and with the

3    student.

4         Q.   Were those interviews documented or

5    reported?

6         A.   The written statement from the employee,

7    yes.

8         Q.   And what about the statement from the

9    student?

10        A.   Yes, and an incident report.

11        Q.   The written statement from the employee,

12   was that in an incident report as well or was

13   that in a different document?

14        A.   No, it was in a different statement

15   form.

16        Q.   Is that a standardized form that

17   Academir has?

18        A.   Yes, it's the typical one that it just

19   says statement.  It has lines.  And they write

20   their name, the date.

21        Q.   And that is a standardized form that

22   Academir uses during investigations?

23        A.   Yes, they should, just for statements.

24   That's the one that Miami-Dade County Public

25   Schools uses, we use the same one.  It's just a

1    paper with lines.

2         Q.    Are those statement documents that were

3    collected during that investigation stored

4    somewhere?

5         A.    In the employee file.

6         Q.    In the file for the employee that was

7    part of the investigation?

8         A.    The statement, the witness statement --

9    well, the statement that we have on file is the

10   witness -- the actual employee, so that one is in

11   the file.  And the student one should be -- it

12   should be because it happened this year so it

13   should be in that file, yes.

14        Q.    And would that be included in that

15   employee file as well?

16        A.    No, because it had nothing to do with --

17   because it's a student.  The incident report is

18   the school's.  The school has the documentation

19   as well as for the employee.  His statement

20   remains in his file.

21        Q.    And where would the school store that

22   statement from the student?

23        A.    There are two -- usually there's a

24   binder that has incident reports and then one

25   copy is sent here and we keep it on file.

1    Q.   You said there is an incident report and

2  there is a copy that is kept in the Superior

3  office?

4    A.   Yes.

5    Q.   And that includes the statement from the

6  student as well?

7    A.   That would be in his -- the HR file,

8  yes.

9    Q.   The statement from the student would be

10  in the HR file?

11    A.   No.  No, the statement from the

12  employee.

13    Q.   Where would the statement from the

14  student --

15    A.   There's an incident report that we do

16  for the student.  The student usually, when they

17  have their -- when they're that little, we write

18  it for them in their incident report; we're

19  reporting what they're saying.

20    Q.   Where would the statement form that you

21  described for the student, where is that stored?

22    A.   I said that is a statement form for the

23  employee.  He has his own statement and it's in

24  his file, in his employee file, and we also have

25  a copy here in his HR employee file.

1    Q.   So, there was no statement form used for

2    the student you're saying now?

3    A.   No, I don't believe so.  I can't recall.

4    Q.   Okay.  What was the outcome of that

5    investigation?

6    A.   Since this was reported months later and

7    the parents -- since nobody knew the time frame,

8    if it happened in September, if it happened over

9    the summer, if it happened in November, they

10   could not describe it.  He read something in the

11   book and he said, "It's like when I saw the pants

12   down of my aftercare teacher."  And there was

13   nothing -- you know, he said that he read it in a

14   book and he thought it was funny.  And there was

15   a gentleman in a stall and he saw his pants

16   through the bottom of the stall, not that he had

17   seen the actual employee physically naked.

18   Q.   And was there a final determination or

19   conclusion issued?

20        MS. KARRON:  I'll just object that

21   this is outside the scope of the inquiry

22   scheduled.

23        THE WITNESS:  Yeah.

24        MR. MACDONALD:  You can answer the

25   question unless your attorney --

```
 1              THE WITNESS:  It's unfounded.

 2        Unfounded.

 3     BY MR. MACDONALD:

 4        Q.    That was the final determination?

 5        A.    Yeah, unfounded, no crime committed.

 6              MR. MACDONALD:  And just for the

 7        record -- and I can pull up the

 8        notice -- the notice says, "Knowledge of

 9        any previous complaints or allegations

10        of sexual harassment/assault made by any

11        student of Defendant Academir from 2017

12        to the present, including the nature of

13        the complaints, investigations conducted

14        and resolutions reached."

15     BY MR. MACDONALD:

16        Q.    So, you said unfounded was the outcome;

17     right?

18        A.    Uh-huh.

19        Q.    Was that recorded anywhere, the outcome

20     of the investigation?

21        A.    Because it had to deal with an employee,

22     I'm sure that it was documented in his file.

23        Q.    What about for the student, would that

24     investigation conclusion be stored anywhere

25     outside of the employee file?
```

1      A.    No.   Once we have the meeting with the

2   parents and we explain everything and they're

3   okay, that is it.

4      Q.    There is no record kept of the outcome

5   of the Title IX investigation?

6      A.    It didn't get to be anything because

7   there was no -- there was no investigation to go

8   through.

9           Prior to getting to us, the officer

10   could not get any information on this because

11   there was no concrete information.   The student

12   didn't know.   The parents didn't know.   There was

13   no other witnesses but the employee and the

14   student saying he saw his pants in the stall at

15   the bottom.   And so, even though it was launched,

16   there was really nothing we could go by.   We went

17   based off all of the information that was

18   provided to us by the school.

19           We met with the parents.   We showed them

20   everything.   And the police officers spoke to

21   them and there was really no true outcome.

22      Q.    I would like to --

23      A.    Besides them saying that there was no --

24   there was no -- there was no -- they couldn't

25   make a conclusion based on the information they

1    provided.

2        Q.   Didn't you previously testify that the

3    conclusion was unfounded?

4        A.   It is unfounded because there was no

5    determination that was made.  There wasn't.

6            There was no determination made based on

7    the information we had.  We couldn't -- not

8    even -- the officer was present and we did the

9    full investigation and there was no information

10   that we could go on based off of the information

11   of seeing somebody in the stall with their pants

12   down.  You can't.  It's unfounded.  There is no

13   information to go on.  And that's it.  So we

14   closed it.

15           We let the parent know that it was

16   unfounded.  There is no evidence.  There is

17   nothing that we could go on.  And that's it.  If

18   the parents agrees and says, "Okay.  I want to do

19   further action."  At that point the parent

20   couldn't say anything because they had no

21   information to provide us or to continue.  There

22   was nothing to do if they're reporting it months

23   later or they don't know the time frame, or they

24   don't know exactly what happened.

25           So, it was unfounded.

1    Q.    But the determination that the

2    allegations were unfounded, was that recorded

3    anywhere?

4    A.    In the file of the employee who was

5    being accused of having his pants down in the

6    bathroom.

7    Q.    Outside of the employee file, is there

8    any record of the finding of your Title IX

9    investigation pertaining to this particular

10   allegation?

11   A.    I'm sure that there is something in the

12   file.  I can't recall.

13         Remember, we don't have the student

14   files here.  We don't keep any student files

15   here.  They're kept at the school.  So, I'm sure

16   that there is something -- whether it was in

17   writing because they met with the parents, the

18   actual parents at the school.

19   Q.    You're sure that there is something in

20   writing as to that unfounded --

21   A.    I'm not sure.  I'm not sure.  I know

22   that we have the incident report and it's there

23   at the school site.

24   Q.    Are employees of Academir required to

25   document findings of Title IX investigations?

1     A.    Can you explain that?  Like what -- I'm

2   not sure what you're referencing.

3     Q.    Well, you oversee Title IX

4   investigations for Academir; is that right?

5     A.    Correct.

6     Q.    And at the end of an investigation there

7   is a finding or conclusion; is that right?

8     A.    Correct.

9     Q.    Are the findings or conclusions at the

10  end of Academir's Title IX investigations

11  documented anywhere?

12    A.    If an investigation is fully launched

13  and there is an outcome, absolutely.  When it is

14  not, you'll not have any information besides what

15  is at the school.

16    Q.    And in the scenario you just told me

17  about that happened six months ago, there was a

18  full investigation; right?

19    A.    I have an incident report, I have a copy

20  of the incident report and that is about it.

21        When it's unfounded, there is really

22  nothing for us to go off.  We keep the incident

23  report on record, on file.  We leave it there.

24  We have the incident report on record for the

25  employee, his statement, that's on file.  We keep

1    that on file, on record for seven years and

2    that's it.

3         Q.    Okay.  So, Academir does not keep a

4    record of the finding or determination at the

5    conclusion of a Title IX investigation?

6         A.    We do.  We do and it's either put in the

7    employee file or in the student file.  That is

8    where it should be.

9         Q.    And in this case that you described six

10   months ago, it was put in the employee file, that

11   determination?

12        A.    For the employee, yes, because it was

13   against the employee.

14        Q.    And that's not kept in the student

15   records at all?

16        A.    No.

17        Q.    In situations where an employee is not

18   involved, where are findings or determinations

19   for Title IX investigations stored?

20        A.    It's not kept in the student records

21   unless there is a full-blown investigation where

22   there is something that is -- there is a police

23   report and everything, you keep it together, but

24   if there is no investigation or anything like

25   that, it's not kept on file besides the student

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 139 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    incident report.  That is kept -- the student

2    incident report is kept on file and it usually

3    indicates the action taken.

4         Q.   Who is responsible for writing the

5    Title IX findings or conclusions?

6         A.   It varies.  It could be depending on who

7    is responsible for the different case.  I'll be

8    responsible for writing students.  And usually

9    the principals give an outcome to the parents.

10        Q.   So, for all student Title IX complaints,

11   you're responsible for writing the conclusions or

12   determinations?

13        A.   Correct.

14        Q.   And when you conduct those

15   investigations and reach your conclusions or

16   determinations, those documents are stored in the

17   student file?

18        A.   If it gets to that, yes.  Again, I

19   started with this last year.  I haven't had big

20   cases.  These are elementary students.

21   Typically, you have very, very few.  Mainly what

22   we do is we get complaints for the adults, and

23   that is here and that is housed here.  And if

24   it's a school matter, it typically stays at the

25   school.

1    Q.    What do you mean it stays at the school?

2    A.    The student cumulative folder, anything

3    having to do with the case or if there is a

4    police report or something like that done and

5    determined, it's all in the student cumulative

6    folder.

7    Q.    Do you keep any records as Title IX

8    coordinator for Academir?

9    A.    If need be, but usually no.  It's

10   usually we keep them at the school site.

11   Q.    Have you ever needed to keep records of

12   Title IX investigations that you've conducted?

13   A.    No.

14   Q.    So, you do not have any records related

15   to Title IX investigations that you conducted in

16   the past?

17   A.    No, all I have is the incident reports.

18   Q.    Do you know what a notice of rights is?

19   A.    I do.  When you provide -- uh-huh.

20   Q.    What is it?

21   A.    It's a notice that you provide the

22   parents the rights that they have under a

23   complaint investigation.

24   Q.    And have you issued a notice of rights

25   in your time as a Title IX coordinator?

1    A.    I have not.

2    Q.    And why did you not issue a notice of

3    rights with the incident that happened six months

4    ago?

5    A.    Because it was handled and it wasn't --

6    before it got to me, the parent knew.  We had

7    already launched the investigation.  Nothing was

8    being stopped.  You know, the child continued

9    his -- to gain access to his education and his

10   afterschool activities.  There was a concern, a

11   complaint that came from a parent that the school

12   launched the investigation.  Once this happened,

13   they contacted me.  I went out there and we

14   discussed this.  And there was really nothing to

15   move forward to because we did everything that we

16   needed to do before it even got to -- you know,

17   we launched the investigation with the police,

18   the Department of Children and Families.

19        And everybody said there is nothing to

20   go by on this case.  The parent was given, you

21   know -- said, "You have the right to request an

22   investigation."  And they said, "Okay.  We'll do

23   it.  Let's do it."  They did it.

24        And I was there for moral support and

25   guidance for the principal.

1      Q.   So, for that particular instance you

2   conducted a Title IX investigation but you did

3   not provide a notice of rights to the parents?

4      A.   I have not.

5      Q.   Do you know what is typically included

6   in a notice of student rights for Academir

7   students?

8      A.   It's just the notice of rights that

9   provides them with the information -- and it

10   comes directly from the district -- of the rights

11   they have as parents to request an investigation.

12   If they don't like the outcome, they request

13   further actions -- and I have to look at the

14   paperwork.  I don't know it off the top of my

15   head.

16      Q.   You said it comes from the district?

17      A.   For students that they have the right to

18   apply -- I mean, to request an investigation, for

19   students.  For employees, that I cannot speak on

20   because I don't have that information.

21      Q.   For notice of rights that are given to

22   students of Academir is that a form created by

23   the district or is that a form created by

24   Academir?

25      A.   We follow the district guidelines which

1    is just the form.  Just like when we -- any form

2    that requires the due process of students for any

3    specialized programs, we have to use the district

4    forms.

5         Q.   Okay.  So, Academir utilizes the

6    Miami-Dade School District's notice of rights

7    form?

8         A.   Yes, I've given the notice of rights but

9    for other categories, not necessarily Title IX,

10   but anything having to do with special education

11   programs, that's the first thing they receive.

12        Q.   And does Academir also adhere to the

13   guidelines of when a -- strike that.

14             Does Academir also adhere to the

15   Miami-Dade County guidelines as to when a notice

16   of rights must be issued?

17        A.   Yes.

18        Q.   Now, I want to go back to the document I

19   was showing you earlier.  This was marked as

20   Exhibit 2.  Do you see the section labeled

21   "Sexual Harassment" and this is on the page

22   Defendant's Bates labeled 236?

23        A.   Yes.

24        Q.   Are you familiar with this definition of

25   sexual harassment that Miami-Dade County uses?

1      A.   Yes.

2      Q.   Is this the same definition of sexual

3  harassment that Academir uses in its Title IX

4  investigations?

5      A.   Yes.

6      Q.   And does Academir also use this same

7  sexual harassment definition in investigating any

8  kind of student sexual harassment issues?

9      A.   That is correct.

10      Q.   And do you see in the description for

11  sexual harassment where it says, "Examples may

12  include but are not limited to unwelcome

13  touching, graphic verbal comments, sexual jokes,

14  slurs, gestures, or pictures, whether in-person

15  or through any other method, including sexual

16  cyber-harassment."

17           Do you see that?

18      A.   Yes.

19      Q.   And towards the bottom, in the next

20  paragraph it says, "Corrective strategies for

21  sexual harassment may only be used in accordance

22  with the District's Title IX Sexual Harassment

23  Manual."

24           Do you see that?

25      A.   I do.

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 145 of
285
Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.    Does Academir utilize the district's

2  Title IX Sexual Harassment Manual?

3      A.    When it pertains to students, yes.

4      Q.    And do you see where it says example,

5  "The student was suspended for sexual harassment

6  because he repeatedly talked about a female

7  student's private parts, making her feel

8  uncomfortable"?

9      A.    Yes.

10      Q.    And you said you're familiar with

11  Miami-Dade County Title IX Sexual Harassment

12  Manual?

13      A.    Yes.

14          MR. MACDONALD:  I'm going to show

15      you another document.  We'll mark this

16      as Exhibit 3.

17          (Plaintiff's Exhibit No. 3 was

18      marked for identification.)

19  BY MR. MACDONALD:

20      Q.    Do you recognize this as the District's

21  Title IX Sexual Harassment Manual?

22      A.    Yes.

23      Q.    Do you see this page that is labeled 18?

24  I'll give you a moment to review it.

25      A.    Yes.

1 · · · · · Q. · · And is this the document you had

2 · · reviewed earlier --

3 · · · · · A. · · That's correct.

4 · · · · · Q. · · -- that you read the steps off of?

5 · · · · · A. · · Right.

6 · · · · · Q. · · And earlier you told me that Academir

7 · · follows this policy with the exception of the

8 · · references to the District's Office of Civil

9 · · Rights Compliance and the Title IX coordinator;

10 · · is that right?

11 · · · · · A. · · As well as the cops.

12 · · · · · Q. · · As well as the police?

13 · · · · · A. · · Correct.

14 · · · · · Q. · · And do you see under this section

15 · · labeled A, on page 19 that says, "Initial steps

16 · · in response to allegations of sexual harassment"?

17 · · · · · A. · · Yes.

18 · · · · · Q. · · And Academir adheres to these steps and

19 · · procedures in handling Title IX complaints?

20 · · · · · A. · · Yes.

21 · · · · · Q. · · And in step four listed there, do you

22 · · see a reference to a Title IX complaint form?

23 · · · · · A. · · Yes.

24 · · · · · Q. · · Does Academir give those forms to

25 · · students upon receiving a Title IX complaint?

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.   The school themselves handle all of the

2  initial complaints.  It doesn't get to a Title IX

3  office until it's an actual complaint from a

4  parent, which she called and we could not

5  schedule her, that was it, but everything that

6  happens prior to this --

7           Remember, we're not the district and we

8  don't go directly to them for anything.  They

9  come to us after the investigation and everything

10 is launched and their determination.  They reach

11 out to myself or -- next steps -- if the parents

12 are not happy with the outcome, or they need

13 support or guidance, they come to us.

14     Q.   Who makes the outcome or determination?

15     A.    If the investigation is conducted,

16 and -- at the school level -- I can't -- they

17 can't wait for me or anybody else, to say, "Hey,

18 call the police" or "Call the Department of

19 Children and Families."

20           Remember, these principals are the loco

21 parentis.  They have to make those decisions

22 based on each individual case at their school.

23 They do not wait for an agency or me to make a

24 determination for them because I don't have all

25 of the information, nor can I stop everything and

1    launch an investigation.

2            So all -- everything -- the principals

3    at their school sites have to do all of their due

4    diligence.  If at the end, if they still have not

5    reached a conclusion, obviously they have to

6    notify us and let us know this is taking place.

7    And if the parent is not or the student is not

8    happy, they come directly to us and they let us

9    know, "Hey, this has not been resolved."  But it

10   has to go directly to the school.  This is where

11   the action and the incident occurred.  I have

12   no -- I'm not at the location right then and

13   there and I can't make a determination for those

14   parents or decide for the school to call somebody

15   at that moment.  So, this comes to me after.

16       Q.   Okay.  So upon receiving a Title IX

17   complaint, the school principal is responsible

18   for conducting an investigation?

19       A.   She is.  The initial investigation has

20   to be on the principal.  That is correct.

21       Q.   And are you, as Title IX coordinator,

22   involved personally in that investigation

23   conducted by the principal?

24       A.   Once she starts an investigation, she

25   does everything, they contact me after.  And they

1    let me know, "Hey, Bernal.  Here is what is

2    happening.  What do I do?  I've communicated with

3    the parents or the officer found nothing."  I

4    say, "Okay."  If they need my help, I come out to

5    the school.  If they need further resolution, we

6    take over on this end and we invite the parents

7    here, or we communicate or we schedule an

8    appointment with the parents and then we follow

9    up, but typically all of the investigation and

10   everything has to be done immediately at the

11   school.

12        Q.   Okay.  So, you do not get involved in an

13   investigation in response to a Title IX complaint

14   until after the principal has made a conclusion?

15        A.   After everything has been initiated.

16   She probably is not going to make a conclusion.

17   If the child leaves a school before the

18   conclusion, there is really nothing she could do.

19   If she starts and she says, "Okay, I need to meet

20   with the parents.  I need to get all of the

21   information," we can't, you know, just call the

22   Department of Children and Families unless we

23   suspect that there is abuse or neglect, and that

24   this child is in distress and in harm's way, we

25   contact the Department of Children and Families

1   or we contact the police.  And they, you know,

2   obviously take over and we have to ensure the

3   safety of the children if they're still in our

4   care or if they've gone over, obviously we have

5   to communicate immediately with the families,

6   with the parents, of both children.  We meet with

7   the children.  We have to determine -- not we,

8   but the schools have to determine if this is

9   actually an incident that requires next steps or

10  further action if it's reported that, then they

11  know what to do, they know who to contact.  Once

12  that starts and it's still not -- you know, they

13  come to me and they come to us for support.

14       Q.   Who comes to you for support?

15       A.   The school administrators or parents on

16  behalf of their children.

17       Q.   So, after a principal receives a

18  complaint, a Title IX complaint, at what point or

19  when do you become involved as a Title IX

20  coordinator?

21       A.   It depends if there isn't -- if the

22  police have to get involved and they're referred

23  to the Department of Children and Families, they

24  call us right up or we or her to let us know that

25  this is taking place.  We review the information

1   and we wait for the authorities to come up with,

2   you know, or -- to determine if this is something

3   that needs to be processed or something that

4   needs to be continued.  And then, you know, we

5   work with the school.  We work with the families

6   depending on each individual, you know,

7   case-by-case need.

8       Q.   You mentioned if the police or the

9   Department of Children and Families become

10  involved, are those the only circumstances when

11  you become involved in an investigation as Title

12  IX coordinator?

13      A.    Not necessarily.  If it's something

14  severe, but typically that's our first line of

15  defense is making sure the safety of the student,

16  making sure that, you know, that all parties

17  involved are listened to, that, you know, if we

18  need to call the police, right then and there we

19  call the police.  You know, it depends.  If it's

20  a child or a student, those cases are taken very

21  seriously; the police are always involved if

22  that's the case.

23          And again, if it's an incident that

24  occurred between two young students, we have to

25  be very cautious and careful because these are

1    very small children and so we have to handle it

2    and understand what took place before we launch a

3    full investigation and call and alert, you know,

4    everybody when it might have just been,

5    something --

6         Q.   I want you to fully answer the question.

7    I think you're losing sight of the question I

8    asked.

9              In what circumstances do you become

10   involved in an investigation as Title IX

11   coordinator besides --

12        A.   It depends.

13        Q.   Okay.  What specific --

14        A.   If it merits our involvement because

15   there is no resolution or they need assistance at

16   the school because this is a case that warrants a

17   full investigation, we get involved.  If not, we

18   do not get involved.  Most cases are handled at

19   the school site.

20        Q.   Okay.  I want to know the specific

21   instances when you --

22        A.   I can't give you a specific.  I can't

23   answer that.  I don't know.  It's on a

24   case-by-case basis.

25        Q.   Okay.  So, there is no set guidelines as

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 153 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   to when you become involved as a Title IX

2   coordinator?

3        A.   I told you that it depends.  And I have

4   explained this several times.  You're not

5   understanding.  This is not a black and white.

6   This is when you're dealing with students.  It's

7   very different.  You're dealing with high school

8   students and kindergartners.  It's very

9   different.  I'm not going to get involved, you

10  know, when a little -- when somebody says let me

11  see your pipi.  I mean, kids show their pipi all

12  the time in kindergarten.  I mean, it's real.

13       Q.   Yes, but you're here to testify about

14  Academir's policies and procedures.  So I'm

15  trying to understand if there is a set criteria

16  for when you as the Title IX coordinator becomes

17  involved.  If the answer is no, that's okay.  I'm

18  just trying to understand.

19       A.   No.

20       Q.   So, there is no set criteria for when

21  you become involved as the --

22       A.   No, it's on a case-by-case basis.

23       Q.   And that case-by-case basis

24  determination is made by who?

25       A.   By the principal, by us.  It depends.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   If they need to contact us because there is truly

2   an investigation that needs to take place or if

3   there is a parent that comes directly to us to

4   make an allegation, obviously we get involved in

5   the very beginning.

6           If it's something that happens at the

7   school site and the school site is taking care of

8   it, the school principal takes care of it until

9   there is an outcome.  If there isn't obviously

10  they involve us if there is a grievance.  If the

11  parent is discontent with the outcome, they come

12  directly to us and that's how I get involved.

13      Q.   And so it also depends on who makes that

14  determination whether you should get involved as

15  a Title IX coordinator?

16      A.   There is no -- like I told you, it's not

17  black and white and it just depends on a

18  case-by-case basis.

19      Q.   Is there a form in which you as Title IX

20  coordinator log the facts and date and time of

21  the report?

22      A.   Yes.

23      Q.   And what form is that?

24      A.   We have two.  One is a Google doc when

25  they initially launch the complaint, they

1    complete it there so that I can have it

2    electronically.  And then there is a form that I

3    use for my notes.

4         Q.   What form do you use for your notes?

5         A.   Just a documentation form.  I can

6    provide it when I submit the other stuff so you

7    can take a look at it.

8         Q.   Is that a standardized form or did you

9    create it?

10        A.   I created it.

11        Q.   And there is also a Google doc that

12   lists complaints related to Title IX?

13        A.   Well, if they complete a complaint, they

14   can do it on the Google form.

15        Q.   What do you mean complete a complaint?

16        A.   So, if they're going to submit a

17   complaint, they can do it through a Google form.

18   It's a link so they can complete a form.

19        Q.   And who is they?

20        A.   Parents, students, teachers, whoever has

21   a complaint they can use that form, which

22   obviously, after COVID everything went digital,

23   so that's the form.  Before it was a paper-pencil

24   one, a handwritten one.  Now it's on Google.  So,

25   if there is a complaint, they can complete the

1    complaint electronically.

2         Q.   And do you see the section labeled "B.

3    Supportive Measures Offered to the Complainant

4    and Respondent"?

5         A.   Yes.

6         Q.   Does Academir utilize these procedures

7    as well in handling Title IX complaints?

8         A.   That is correct.

9         Q.   And do you see the section labeled

10   "Notice of Rights"?

11        A.   Yes.

12        Q.   And you said that Academir follows these

13   policies in giving notices of rights to Title IX

14   complainants as well?

15        A.   Yes.

16        Q.   And do you see the section labeled

17   "Interviews and Investigation"?

18        A.   I do.

19        Q.   And does Academir adhere to these

20   policies in conducting interviews and

21   investigations of Title IX complaints?

22        A.   Yes.

23        Q.   Are students who are interviewed in

24   Title IX investigations given a copy of their

25   statements?

1      A.    The incident reports, yes.   The parents

2   once they come in, we take -- whoever reports it,

3   usually is the person whether it's the student,

4   the teacher, we write it.   We write the witness

5   statement.   And all of the documentation is kept

6   there.   When the parent signs, we always make a

7   copy and we provide the parent with a copy.

8      Q.    So, if a statement is taken from a

9   student, a student is provided a copy of that

10  statement?

11     A.    The student is not provided; the parent

12  is provided a copy because the parents have to

13  sign that the information is accurate.   Once we

14  reach out to the parents, we talk to the parents,

15  whoever reported it has to sign.   The teacher has

16  to sign.   The school administrator has to sign

17  and the parent has to sign and they're provided

18  with a copy.

19     Q.    And during Academir's Title IX

20  investigations, are parties and witnesses allowed

21  to provide any evidence that they may have?

22     A.    Yes.

23     Q.    Does that include video or audio

24  recordings?

25     A.    Typically, no.   And I know what you're

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 158 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   referencing, but not -- if there is something

2   that is a text message or something that was

3   sent, usually the police gather the information,

4   but when there is a naked child in a bathtub

5   saying something like that, we do not, because

6   those are privacy laws, and we cannot -- we can't

7   see naked children or anything like that.

8           I understand that the dad didn't show

9   the video because the principal didn't want to

10  see the video of the naked child.  She, the

11  assistant principal, when he met with her had her

12  listen to a recording of it and that was that.

13          But we don't collect or take anything

14  until the investigation starts.  So, usually if

15  it's something that's brought to our attention --

16  but we have to be very cautious especially with

17  the content of it.  If it's something sexual in

18  nature, that there is an image of a naked child

19  or something like that, the police officer or the

20  detective in this case -- because the regular

21  officers don't do the investigation and they turn

22  it over to a detective who then gathers and

23  collects all of the information.

24      Q.   Okay.  I'm not asking about any specific

25  instances.  I'm just asking for the policies of

1   Academir during Title IX investigations.

2        A.   Yes, if it's a full-blown investigation,

3   yes, everything is admissible and it's collected.

4        Q.   Okay.  We can come back to this policy.

5   Are there any other policies pertaining to Title

6   IX for Academir that we have not reviewed?

7        A.   No.

8        Q.   Perfect.

9             No, and what about the document that you

10  had described earlier?  I believe you said it was

11  approximately ten pages with the fiscal measures.

12  We haven't reviewed that document; correct?

13       A.   No. I spoke to Ms. Karron and I told her

14  that I would forward you guys a copy.  I don't

15  know how I'm going to get the binder.  I'm going

16  to have to go to the school and make copies of

17  the binder?

18            MS. KARRON:  Don't tell him

19       anything that I told you.

20            But, yes, I can ask them to get the

21       documents over to us right away.  So,

22       Kyle, I will produce that as soon as I

23       have it.

24            MR. MACDONALD:  Thank you.

25  BY MR. MACDONALD:

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.   And that document that you referenced

2  earlier, does that -- I know it mentions you as a

3  contact person for Title IX; right?

4      A.   Yes.  For the parents and the students,

5  yes.

6      Q.   Does that document also list policies

7  and procedures for Title IX as it pertains to

8  Academir?

9      A.   Yes.

10     Q.   And what do those procedures pertain to?

11 Is it handling investigations?

12     A.   Yeah, just the grievance process and how

13 to go by -- if you are discontent with the

14 outcome, you know, this is the process to follow.

15 Most of those policies pertain to the employees.

16 Obviously they have a section on students.  And

17 then the portion of students is following the

18 Miami-Dade County Public Schools' policies and

19 procedures outlined in the Title IX sexual

20 harassment policies for the district for

21 students.  So, that one encompasses employees,

22 students, and then others vendors and so forth.

23 It includes the form.

24     Q.   And that was the policy that you drafted

25 with Xenia and Esther Mir?

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 161 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.   Yes.

2      Q.   Are you familiar with my client Jane?

3  We'll refer to her as Jane.

4      A.   I am not.

5      Q.   Are you aware of allegations she has

6  made pertaining to sexual harassment, sexual

7  assault?

8      A.   I am privy to the allegations that were

9  verbal in nature, yes, that later became physical

10 in nature, yes.

11     Q.   When did you first learn of the

12 allegations you mentioned?

13     A.   It wasn't until the following week.  The

14 school handled the situation, I believe on the

15 20th.  That Friday she contacted Mr. Mir.  On

16 Fridays we're not here.  The parent contacted

17 them directly.  And the following week there was

18 no school.  And then on Tuesday, you know,

19 obviously we discussed the situation.  They tried

20 to have the parents come out so we could meet

21 with them and we were not able to connect.  After

22 that the parents withdrew the child from the

23 school.

24     Q.   Who first notified you of the

25 allegations made by Jane?

1     A.    The school principal called us that

2   Wednesday or Tuesday regarding the situation.

3   And then we received a call from -- well, the

4   office received a call from the parent directly,

5   asking to speak to Mr. Mir.

6     Q.    And when you say the principal called

7   us, who?

8     A.    Not us.  A management company.  She

9   called and spoke to the executive management team

10   which is Mr. Mir and Ms. Mir.  Many times we're

11   handling different things and he was able to pick

12   up and speak to her.

13          And she just informed him that, you

14   know, this case was reported on Friday.  The

15   child communicated to four different adults that,

16   you know, the child just said something to her

17   verbally.  The child was fine.  The child was

18   left in aftercare, picked up in the afternoon.

19          We called the parents of both of --

20   well, we didn't.  The school called the parents

21   of both individuals.  And the parents then

22   contacted the teachers so that they could set up

23   an appointment or vice versa that Tuesday.  The

24   parents came out to meet with the assistant

25   principal and the teacher on that Tuesday.  And

1    then that afternoon after the parent got really

2    irate, the principal contacted the parents so

3    that they could meet and it didn't -- you know,

4    he never showed up.  So, the next day the child

5    came to school like normal on Tuesday and

6    Wednesday, didn't come back to school on Thursday

7    and Friday.  And that's all.

8         Q.   So, I just want to go through the events

9    in order.  So, just bear with me.  In terms of

10   the entire story, let's save that.

11             Who first told you about the allegations

12   made by Jane?

13        A.   That Wednesday when Ms. Bello called to

14   speak to us, here at the management office, she

15   was just, you know, "There's a parent that is

16   really upset," kind of gave us the background.  I

17   said, "Okay.  We're going to reach out."

18             The parent called here and left a

19   message.  I didn't get the message.  Mr. Mir got

20   the message because they asked specifically for

21   Mr. Mir.  On the school campuses we also have a

22   broad "If you have a question or concerns, please

23   call the management office.  Request to speak to

24   Mr. Mir."  He was the previous owner of the

25   Academir Preschool so a lot of the parents do

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    know him and will go directly to him and that's

2    how he got the call.

3        Q.   How did you first learn about that

4    incident?

5        A.   When Ms. Bello called us that Wednesday

6    to let us know that the parent, you know, never

7    showed up and that he was very upset and that he

8    was going to call us.

9        Q.   So, the first time you learned about

10   Jane's allegation was on a Wednesday when

11   Susie Bello called you?

12       A.   No.  She called the office and Mr. Mir

13   got the call.

14       Q.   And did Mr. Mir tell you about what the

15   allegations were?

16       A.   Yes, we spoke about it.

17       Q.   On that same Wednesday?

18       A.   I believe it was on the same Wednesday.

19       Q.   And what did Mr. Mir tell you the

20   allegations were about specifically?

21       A.   He just said that there was a parent

22   that was making allegations that his daughter

23   was -- and he got this from the teacher -- I

24   mean, not teacher, the principal, that the child

25   was inappropriately touched by another

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 165 of
285
Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    kindergartner student in the class, but that was

2    not what was reported to the principal.

3            So, the parent -- initially when the

4    parents were called and the student came to

5    report this to the teacher, she told the teacher

6    and she told -- well, the PE teacher, then the

7    regular teacher, then our administrative

8    assistant in the front, that the child told her

9    something inappropriate which was communicated to

10   both parents and it was told by the parent -- I

11   mean, by the student that someone told her

12   something inappropriate and she -- there -- they

13   know when something is said to them that they

14   have to report it to an adult, and she did.  She

15   reported it to her PE teacher.

16           Her PE teacher, when she turned over the

17   class, she says, "Hey, look this is what

18   happened."

19           The teacher asks the child, "What

20   happened."

21           She said, you know, "So-and-so said this

22   to me."

23           And then she's like, "Okay.  Maybe I'm

24   not understanding" because she's not Hispanic,

25   but they asked Ms. Sol (phonetic), who is in the

1  front, to translate what those two words meant so

2  they could be confirmed.  And she says, "Well,

3  you know, she's saying that, you know, he wanted

4  to kiss her and touch her tetitas and her cuca."

5  And we called the parents immediately.

6  And not we -- the school called the parents

7  immediately.  The teacher did.

8  Q.  Okay.  So, stepping back a little bit,

9  when you spoke to Rolando Mir, did he tell you

10  that the allegations involved touching or did he

11  tell you that the allegations were strictly

12  verbal on that Wednesday?

13  A.  Verbal.

14  Q.  And did he say --

15  A.  That all of the allegations that the

16  child reported to us were verbal.

17  Q.  Did he mention that the parents had

18  stated the allegations included touching as well?

19  A.  The principal communicated to him that

20  everything was verbal including that Tuesday when

21  they got back, the child confirmed to the

22  counselor that the child only told her verbal

23  comments; he did not touch her.

24  So, the four adults that the child

25  communicated with at the school level told

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 167 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    them -- that it was verbal comments that were

2    made to her; that he had not touched her.

3           When the parent comes in and is irate,

4    he's like, "No, my daughter was touched.  My

5    daughter was touched."  And then, obviously he

6    contacted or they contacted the office.

7        Q.   So, starting with the verbal

8    allegations, what were the words that were

9    reported when you learned of that incident

10   specifically?

11       A.   You have to ask those questions

12   specifically to the school, but what was said

13   was, "I want to kiss you in your mouth, touch

14   your tetitas and your cuca."  That is what was

15   conveyed to us.

16       Q.   And "tetitas" that refers to breast, I

17   imagine?

18       A.   Yes.

19       Q.   And what does "cuca" refer to?

20       A.   Private part of a girl.

21       Q.   So when you learned of this incident, it

22   was that Jane had reported to four individuals

23   that another student had made comments about

24   kissing her mouth, kissing her breast, and then

25   kissing her vagina?

1    A.   Not kissing.  He said, "I want to

2    touch."  He didn't say, "I want to kiss" or

3    anything like that.

4         And again, I wasn't present at the

5    school.  And this happened a very long time ago,

6    but I remember it was him saying, "I want to

7    touch your tetitas and your cuca," that's what he

8    said and "kiss you" so I can't -- I can't be

9    100 percent because but that was what was told to

10   me.

11   Q.   So, the comments that were reported by

12   Jane were about kissing her mouth, touching her

13   breast, and touching her vagina; is that right?

14   A.   Yes.

15   Q.   Okay.  When you learned first of just

16   the verbal allegations, did you then initiate a

17   Title IX investigation?

18   A.   No.

19   Q.   And --

20   A.   When this was communicated, the -- we

21   asked the parents to come in and schedule a

22   meeting with us.  By the time the investigation

23   started, the parents had already left the school.

24   Q.   All right.

25   A.   The school had to do their due diligence

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 169 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    and we didn't find out until after the fact, that

2    same week.  That was it.  She didn't come to

3    school those two days.  The parents were supposed

4    to come in and meet with us, and it never

5    happened.  So, at that point there is nothing for

6    me to start.  And once they withdraw the child,

7    there is not much I can do on this end because I

8    don't have access to that child nor do I have

9    access to the records of that child.  Everything

10   has to be turned over.  There is nothing I can do

11   at that point.

12        Q.   Did you conduct a Title IX

13   investigation?

14        A.   I did not.

15        Q.   Did anyone at Academir conduct a Title

16   IX investigation into Jane's allegations relating

17   to the verbal comments we just discussed?

18        A.   The school staff, they initially, you

19   know, ensured that the child is okay.  The child

20   was not crying.  There was no physical anything

21   that happened.  I know that they did do their

22   investigation.  They pulled the cameras.  They

23   spoke to the parents.  They completed the

24   documentation that they needed to complete.  They

25   had the counselor, which is one of the things

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 170 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    that normally happens when something like this

2    because they have to, you know, ask the right

3    questions to determine -- they have to ask the

4    right questions to ensure that the child is safe

5    and that everything is, you know, is followed.

6    And it was determined that the child only said it

7    was verbal.

8              At that point everything was done.  The

9    children were separated.

10             Can you hear me because I'm getting

11   feedback?

12             MR. MACDONALD:  Ms. Walton, I think

13       you may need to go on mute.

14   BY MR. MACDONALD:

15       Q.   I'm just asking if Academir conducted a

16   Title IX investigation into Jane's allegations?

17       A.   They conducted their initial

18   investigation to see if there had to be an

19   investigation.  They don't start an investigation

20   unless they are certain.

21             And, you know, you're dealing with two

22   five-year-olds that say things to one another.

23   We contacted -- we spoke to the child.  The child

24   said that she was not touched.  That the child

25   felt fine.  She was happy.  She stayed in

1    aftercare until the very end of the day.

2              When we communicated this to the parent,

3    the parent left her in aftercare.  There was

4    no -- you know, the child was not in distress.

5    Were there any signs of assault?  No, none of

6    that.

7              So, again, until Tuesday, even the

8    counselor spoke to the child, the child indicated

9    that the child only said something verbally to

10   her.  When somebody says something and it happens

11   once, if there is a repeated pattern and the

12   child is being constantly harassed.  "You're

13   pretty.  You're pretty.  I like you.  I like

14   you," you know -- you don't.  If it happens in

15   isolation -- you know, sometimes kids say things.

16             You can't launch a full investigation

17   unless you are certain that something actually

18   did happen to this child.  And again, if the

19   child herself is telling you that she's fine,

20   that he didn't touch her, that he didn't do

21   anything to her, and you communicate with both

22   parents, you communicate with both students, but

23   there -- sometimes there's, you know, that's it.

24   There is no need for an investigation.

25        Q.   Ms. Bernal, I'm just asking you a simple

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 172 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    question.  Yes or no, was a Title IX

2    investigation conducted by Academir into Jane's

3    allegations of the verbal comment?

4        A.   No, there was no investigation.

5        Q.   Was there any kind of investigation

6    pertaining to sexual harassment generally that

7    was conducted?

8        A.   Yes.  At the school level, yes.

9        Q.   And who was in charge of that

10   investigation, which employee?

11       A.   Initially, the teacher reports it to the

12   assistant principal.  Obviously, everybody is --

13   they asked her.  The teacher asked her.  Ms. Sol

14   asked her.  They -- there really isn't much to,

15   you know, to address at that point.  We knew that

16   a comment was made at the end of the day.  The

17   student got picked up, went home.

18           We spoke to the other student's parents.

19   The child was embarrassed.  He was like, "I'm

20   sorry.  I'm sorry."

21           The little girl, there was nothing wrong

22   with her.  She was fine.  She went on with her

23   day.  And that was at the end of the day.  And

24   really there is no -- nothing was determined at

25   that time.

1        On Tuesday, first thing you have the

2   counselor come in and talk to the child

3   obviously, to see --

4        Q.   So, I don't want to cut you off.

5   Because I don't want you to keep repeating

6   yourself.  I just want to go through it step by

7   step.

8        You said, yes, there was a sexual

9   harassment investigation conducted?

10       A.   Well, it wasn't -- it wasn't a sexual

11  harassment because it wasn't a sexual harassment

12  case.  It was an incident where a child verbally

13  said something to another child.  And so, at that

14  point it's only verbal.  And it wasn't something

15  where the child was, you know, physically and

16  mentally distraught.  So, kids say things to one

17  another.  And at that point it was determined

18  that, you know, it was just something verbal,

19  something that was said.

20       And the school has to make a

21  determination, you know.  Is it something that

22  was, you know, done because they're just kids?

23  And in this case it was.  Everybody that was

24  involved -- and Ms. Valladares, who was taking

25  care of the situation.  Were both parents called?

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    Yes, everybody was called.

2            Parents came in the following week.  And

3    then at that point, they needed to get more

4    information.  And things change from one weekend

5    to the next week and that's when everything kind

6    of spiraled.  But those specific questions, I

7    would like for you to ask the school-based

8    employees that were present there, doing the, you

9    know, following the process.

10   Q.   Well, you're here to testify on behalf

11   of Academir Charter Schools with regards to the

12   investigation.

13   A.   Okay.

14   Q.   You said that the verbal conduct

15   specifically, that did not constitute sexual

16   harassment per Academir's policies?

17           MS. KARRON:  Object to form.

18           THE WITNESS:  Again, children at

19       that age say things that many times can

20       be inappropriate.  If you see a pattern,

21       if you see that the child is like, "He's

22       bothering me.  He's bothering me and he

23       keeps touching me" -- or, you know,

24       kindergartners will do silly things.

25       And, you know, the fact that he said

Deposition of Olivia Angelica Bernal                     Jane Doe v. Academir Charter Schools, Inc., et al.

1      that -- obviously, we took matters

2      immediately --

3           The teacher pulled the children

4      aside, spoke to and called each parents.

5      Action was taken to ensure, "Hey, look

6      this is what happened today in school.

7      This is what I spoke to your son about.

8      He said, 'Yes, I said it,'" but it was

9      not something that this kid that you saw

10     that it was a constant harassment and

11     that the child felt she was, you know,

12     felt -- or you saw that she was

13     assaulted or something to that extent.

14     It wasn't.  It was a comment.  And the

15     teacher at that time said, you know,

16     "Okay.  I'm going to handle it.  I'm

17     going to contact your parent and I'll

18     talk to your parent."

19          And I don't want to speak on behalf

20     of the child, but I know that they did a

21     SCAM where they documented that the

22     child said something inappropriately.

23     That SCAM stays with him for the rest of

24     his academic record.  You know, it is

25     documented that this took place.  You

1          know, the teachers immediately separated

2          them.  They called the parents.  The

3          following week they were meetings with

4          the parents to discuss and that's when

5          the --

6     BY MR. MACDONALD:

7          Q.   Before you keep going -- I don't want to

8     keep cutting you off.  I want to keep track of

9     what you're saying.

10              You said a SCAM?

11         A.   Uh-huh.

12         Q.   What is that?

13         A.   It's a district form that we use.  It's

14    a district form that is used to document

15    incidents or situations that arise at the school

16    for everything.  And then it's documented and

17    it's kept in -- well, it's entered into DSIS and

18    it stays there as permanent record.

19         Q.   But the verbal conduct that was reported

20    to Academir, did the school consider that to

21    constitute sexual harassment?  Yes or no?

22         A.   No.  At the moment, no, especially after

23    questioning the child.

24         Q.   And who made that determination?

25         A.   The school administration, the

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 177 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      principal.

2           Q.    Okay.  So the principal --

3           A.    The assistant principal and the

4      principal is the one who ultimately makes those

5      decisions.

6                 MR. MACDONALD:  We can go ahead and

7            take a ten-minute break.

8                 (A brief break was had.)

9      BY MR. MACDONALD:

10          Q.    Previously, I believe you stated that at

11     some point the father of Jane alleged that the

12     conduct between Jane and this other student was

13     physical and was not just verbal; is that right?

14          A.    That is correct.

15          Q.    When the school, meaning Academir,

16     learned of that allegation of physical contact

17     between the two students, was that considered to

18     be a report of sexual harassment by Academir?

19          A.    So, I want you to understand that this

20     was never a harassment because harassment is

21     constant.  It's repeated.  This was an isolated

22     incident that the school was reporting because

23     the child said that it was verbal the entire

24     time.  The story then changed on Tuesday.  It

25     changed on Wednesday.  By the time it got to us,

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1    the parent reached out directly.

 2            So, we have to go based on the

 3    information that we have.  And prior to this, we

 4    had no indication, no notification.  The school

 5    didn't exhibit any of this, nor were they privy

 6    to any constant harassment.  That's why this

 7    didn't get to us because it didn't constitute a

 8    sexual harassment.

 9        Q.   Okay.  And --

10        A.   The father then brought it to the, I

11    guess, the administration.  That first it was

12    this and then it was that.  And the story changed

13    every time.

14            So at that point, obviously, it comes to

15    us and we try to set up the meeting with the

16    father or Mr. Mir tried to set up the meeting

17    with the father.

18        Q.   Regardless of whether it was proven to

19    be true or not, was the reported conduct of the

20    physical contact between the two students

21    considered to be sexual harassment by Academir?

22        A.   It was not because again, it was

23    something that was not considered harassment.  It

24    hadn't happened before.  It was something that --

25    it was an incident that took place at the school
```

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
1    that was verbal in nature.
2         Q.   I'm asking you specifically about the
3    father's allegations that you referenced,
4    specifically --
5         A.   The father didn't bring the allegations
6    to us.  He called us.  We got the information
7    from the school.
8         Q.   But the father's allegations to the
9    school of physical touching, did Academir believe
10   that to be a report of sexual harassment?
11        A.   No, because it was always verbal.  For
12   them it was always verbal until the story changed
13   on each day.  So, by the time that it got here,
14   we didn't consider it harassment.  Obviously, we
15   have to listen to the parent and if they say that
16   this is happening, you have to launch an
17   investigation, but that's why we set up the
18   meeting with the parents for the next week, which
19   never took place.  At that point we would have
20   launched the investigation because they're
21   requesting one and they have the right to, but
22   the school did not consider it a harassment case
23   because it wasn't a sexual harassment case for
24   them.  It was something -- it wasn't something
25   that was happening repeatedly and was keeping the
```

1    child from accessing her education.  It wasn't.

2    She was continuing to come to school.  She came

3    to school on Tuesday, had a great day.  She came

4    to school on Wednesday, had a great day.  She

5    didn't show up the next two days.

6         Q.   Okay.  But the father's reported conduct

7    to the school of one student putting his mouth on

8    another student's genitals, did that constitute

9    sexual harassment by Academir's standards?

10        A.   Well, we asked to meet -- the principal

11   asked to meet with the family so that she could

12   discuss the next steps.  We weren't given that

13   opportunity.

14        Q.   But the school received the report?

15        A.   The report from who?  Sorry.

16        Q.   I understand what you're saying in

17   regards to the investigation and the ultimate

18   findings by the school, but just the reported

19   conduct of what the father of Jane reported to

20   the school, did they consider that to be a report

21   of sexual harassment?

22        A.   If they were able to communicate with

23   the father, they would have launched the

24   investigation.  When the father came to speak to

25   the -- one of the administrators, he wouldn't --

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 181 of
285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    he cursed her out.  He would not let her speak.

2    He was irate.  You cannot communicate with a

3    father who has --

4              And again, I'm a parent so I know that.

5    When you're upset about a situation, and you want

6    it to go in a certain way -- the father did

7    not -- the only thing that the father wanted was

8    for us to remove the child from the school from

9    day one.  He said, "I want this child kicked out

10   of the school.  That's it."  That's the

11   only thing --

12        Q.   Okay.  Now --

13        A.   Can I finish because I think it's

14   important?

15             If we would have launched an

16   investigation, if the father actually said, "Hey,

17   look," he didn't care.  He said, "All I want is

18   the child to get kicked out of the school."

19   That's what he so was upset about, that the child

20   was still in school.

21             So, the principal spoke to him on the

22   phone and said, "I cannot kick a child out of

23   school.  It doesn't happen like that.  This is a

24   public school."

25        Q.   So, I understand what you're saying, but

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1   it's going to take a lot longer -- I know you're

 2   telling me other information.  I'm just trying to

 3   get to the questions that I'm asking you.  So, I

 4   understand what you're saying as to the

 5   difficulty of communicating with the father from

 6   the school's perspective.  I'm asking you:

 7           When the father of Jane reported the

 8   physical contact between Jane and this other

 9   student, did the school consider that reported

10   conduct alone to be sexual harassment?

11      A.   The school would have -- obviously, they

12   have to take a different stance at that point.

13   But the school had already spoken to the child

14   four times and she said no.

15           When this happened, the father himself,

16   that same day called the police.  He had already

17   started the process.  He didn't let us start

18   anything.  He didn't let us question -- he didn't

19   let us talk to him.  He didn't give the school

20   that opportunity to be able to communicate and

21   start the process.  He went and he did it on his

22   own.

23           So, when the police contacted, they

24   contacted the school principal.  They said, "Hey,

25   look.  I'm coming over.  Can you meet me there?"
```

1          And I can't speak for what happened with

2      the officer at that point.  Again, you know, you

3      can ask Ms. Bello when you meet with her, but the

4      father jumped all of that.  He didn't want to

5      hear it.  And he said, "I'm going to go to the

6      police because the police is going to take the

7      kid out of the school."  That was his -- what he

8      wanted to do.

9          And so you can't -- the police can't do

10     that.  The police has no jurisdiction over that.

11     They don't have the -- these are public school

12     students.  There's a process for everything.

13     Q.   So, if I understand you correctly, the

14     school Academir did not consider that reported

15     conduct to be sexual harassment because they had

16     already spoken with Jane about this?

17     A.   No, that's not -- they had already

18     spoken to her.  And everything that they knew of

19     this incident was it was a verbal incident.  It

20     wasn't a harassment because it was something that

21     did not happen prior to.  The kid never even said

22     anything to anybody else.  This was a one-time

23     thing that needed to be taken care of at the

24     school immediately.  Speaking to the parents,

25     speaking to the students, giving the students

1    counseling, separating them.  I mean, we took the

2    matters that we had in our hand to take those

3    measures to ensure the safety if anything ever

4    happened.

5           You know, again, when we meet with the

6    parents then we start -- again, you have to

7    listen.  You need to sit down and you need to

8    listen to the parents.  If at that point, it's

9    determined, then okay, we'll launch an

10   investigation.  But the father didn't give us

11   that opportunity.  I know he went ballistic.  And

12   then, by the time all of this started, he called

13   the cops.  He called the cops.  He did

14   everything.  So, the cops was already coming.

15   The student couldn't take action because the

16   father was already threatening and taking action

17   and already doing everything that he was doing.

18       Q.   And what day did that occur when the

19   father called the police and the things you just

20   mentioned?

21       A.   I can't recall, but I want to say it was

22   on Wednesday.

23       Q.   And when did the school first learn of

24   that allegation from Jane?

25       A.   On Friday.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.    Between Friday and Wednesday, did

2   Academir contact any law enforcement agency about

3   what had been reported?  Yes or no?

4      A.    No, they did not.

5      Q.    Between Friday and Wednesday, when the

6   father became involved and called law

7   enforcement, did Academir contact the Florida

8   Department of Children and Families?  Yes or no?

9      A.    No.  It was not a sexual harassment

10  case.  The school went based on what they knew,

11  which was a verbal comment that was made to the

12  child.  It was never brought to their attention

13  until the following Tuesday because there was no

14  school, it was a weekend -- it was a long

15  weekend.  And they didn't come back until Tuesday

16  once they met with the family.

17     Q.    I'll show you a document I showed you

18  earlier.  Do you recall looking at the Miami-Dade

19  code of student conduct?

20     A.    I do.

21     Q.    And do you remember telling me that

22  Academir adheres to this definition of sexual

23  harassment?

24     A.    Yes.

25     Q.    Ok.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.   And if you look at the example, it also

2  says, "repeatedly talked about a female."  So

3  you're talking about repeatedly, which is the

4  definition of harassment.  When something happens

5  repeatedly, often, constantly, that constitutes

6  sexual harassment.

7      Q.   That's an example.  Right.  So, let's

8  look at the definition.  It includes verbal

9  conduct; right?

10     A.   Uh-huh.

11     Q.   And non-verbal conduct, as well; is that

12 right?

13     A.   Yes.

14     Q.   And it goes on to say, "that is severe

15 or pervasive enough to create an intimidating,

16 hostile or offensive educational environment,

17 cause discomfort or humiliation or unreasonably

18 interfere with the individual's school

19 performance or participation as defined" -- and

20 then it cites --

21     A.   Correct.  Severe and pervasive.

22 Meaning, happening repeatedly.

23     Q.   Severe or pervasive; right?

24     A.   Uh-huh.

25     Q.   And what does "severe" mean?

1    A.   On a case by case, but it's something

2  that -- is it severe where -- did this actually,

3  if you ask for this particular instance, the

4  child said, "No, he hasn't done anything.  He

5  just told me."

6         These are five-year-olds.  These are not

7  criminals.  These are not adults.  These are

8  babies.  These are kids that you have to teach

9  right from wrong.  And if they're just saying,

10 "He didn't do anything.  He just told me he

11 wanted to."

12   Q.   Wanted to what?

13   A.   You can't -- "that he wanted to touch

14 me."  But, it doesn't -- again, these are young

15 children.  These are young children.  And it's

16 not something where, you know, you say, wow, you

17 know, he's a sexual offender.  He's a baby.  Both

18 of them are.  And you have to take matters

19 seriously.  But you have to communicate.  You

20 have to talk to them first.  You have to find out

21 what happened, you have to see if she was hurt if

22 he touched her.

23   Q.   And so, the other student, he is

24 referred to as L.R., he's five years old -- is

25 that right -- at the time of this incident?

1      A.   I'm not sure.  I want to say, yes.

2      Q.   Okay.

3      A.   They were both in kindergarten at the

4  time.

5      Q.   And in your opinion as chief operating

6  officer of Academir schools, is it normal or

7  appropriate behavior for a five-year-old student

8  to discuss touching another student's vagina and

9  breast?

10      A.   It depends.  It's on a

11  student-by-student basis.  There's some students

12  that --

13      Q.   It depends?

14      A.   Yeah, because you're talking about cuca

15  and tetitas and things that he may hear at home.

16  Is he acting upon it or is he doing something

17  beyond that?  Or is he talking about it

18  constantly.  And this was the first time he had

19  ever even said something like that.

20      Q.   When is it appropriate for a

21  five-year-old to discuss touching another

22  student's vagina?

23      A.   It depends on who the parents are and

24  who the child is.  I can't answer that question

25  because typically in a school setting it may not

Case 1:23-cv-23004-JB Document 67-2 Entered on FLSD Docket 09/26/2024 Page 189 of 285

Deposition of Olivia Angelica Bernal                Jane Doe v. Academir Charter Schools, Inc., et al.

1    be.

2        Q.   Well, you're the Title IX coordinator

3    and chief operating officer.  So I'm asking you:

4            In your professional opinion, in what

5    circumstances would it be appropriate that a

6    five-year-old --

7        A.   You're talking about kindergartner --

8        Q.   Hold on a moment.  Let me finish my

9    question.

10           In what circumstances would it be

11   appropriate for a five-year-old student to

12   discuss touching another student's vagina?

13           MS. KARRON:  Object to form.

14           THE WITNESS:  It never is something

15       where it is appropriate.  It's not, but

16       that's why there were consequences to

17       the actions that were done.

18           So, the child received a written

19       reprimand.  He received the counselling.

20       He received the referral, which is the

21       SCAM form.  There were consequences to

22       the actions.  I'm not saying that his

23       behavior was appropriate, which in no

24       way, shape, or form was appropriate, but

25       these are learning experiences for them.

1    It does not mean that the child

2    committed a crime because he said

3    something.  You have to learn.  These

4    are babies that you have to teach and

5    you have to let them know, "Hey, this is

6    wrong.  You don't say this in school."

7         This is why you communicate with

8    parents, "Hey parents, if you say those

9    words, 'cuca' and 'tetitas' around your

10   children, don't do it because they are

11   going to repeat them."

12        So these are the conversations you

13   have.  So I'm not saying that his

14   behavior in any way was appropriate or

15   any child talking about private parts in

16   their class is appropriate.  It is not.

17   It is never appropriate, but in the

18   context of the situation, you have to

19   look at it and you have to say, what --

20   if he said this or did he actually do

21   this.  And we don't know that that

22   actually took place.  And according to

23   all of our information and the child's

24   report to us, was that it was just a

25   verbal comment made to her.  And the

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 191 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    child was in no -- she was not in

2    distress mode.  She was not crying.  She

3    just said, "He wanted to do this."  She

4    told the teacher that.  And so, if we

5    see that the child is physically,

6    emotionally distressed about a

7    situation, we're like, "Okay.  This can

8    constitute harassment," but if five

9    minutes later you see them playing and

10   talking, then it may not because these

11   are five-year-olds.

12       And it all depends on an individual

13   basis.  Now, if you talk about a high

14   school student, you may be talking about

15   something different.

16   BY MR. MACDONALD:

17       Q.   Now, this other student, L.R., said that

18   he wanted to do these things -- is that right --

19   as it was reported?

20       A.   I only -- I cannot attest to that

21   because I was not there and I did not receive the

22   information firsthand.

23       Q.   Okay.  But what was reported to Academir

24   was that this other student, L.R., wanted to

25   engage in a sexual act; is that right?

1   A.   He said that he wanted to touch her

2   tetitas, yes.

3   Q.   Would you agree that that is a sexual

4   act?

5   A.   It's not a sexual act.  That is not a

6   sexual act.  That is comment.  That is a

7   statement that a child may make, but it's not an

8   act.  An act is when you actually do something

9   about it.  So, if I say, "I'm going to touch

10  you," and I touch you, that's an act.

11  Q.   But if a student says, "I want to touch

12  your breast," they're saying they want to engage

13  in a sexual act; right?

14        MS. KARRON:  Object to form.

15        THE WITNESS:  I can probably say

16     that, but not act on it.  I can't say

17     that.  I don't know.  I can't say that

18     for sure.

19  BY MR. MACDONALD:

20  Q.   And did Academir ever determine whether

21  the allegations of the physical contact between

22  the two students were true or not in its

23  estimation?

24  A.   There was not enough time to do any

25  investigation.  The child was pulled from the

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 193 of
285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    school.  And the officer that the father

2    contacted made a report.  And the dad said --

3          The officer told the principal, "The

4    minute that the dad said, 'Oh, there was

5    sexual -- she was touched,' the officer was --

6    told the father, "Wait.  Wait.  Wait.  I can't

7    handle this.  You need a detective."

8          He said, "No, yo quiero que ese nino se

9    vaya de la escuela."  That was the only thing

10   that the father was interested in, not to do an

11   investigation.

12         If my child is assaulted and touched, I

13   want a detective to do an investigation.  He

14   declined it.  He did not want that.

15         MS. KARRON:  If you're speaking in

16      Spanish, you need to do an English

17      translation so the court reporter can

18      get it down.

19         THE WITNESS:  I'm so sorry.  The

20      father -- the police officer, when he

21      contacted the principal, indicated that

22      the father, that the minute that he told

23      the officer that the -- that the

24      daughter was touched by another student,

25      assaulted by another student, the

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 194 of
285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1          officer said, "No.  I'm here only to

2          take a report.  In this case you're

3          going to need a detective."

4                And the father says, "No.  No.  No.

5          No detective.  We don't need a

6          detective.  I just need the child to be

7          taken out of the school."

8                So, if my daughter is assaulted,

9          and something actually physically

10         happened, you'd better believe I want

11         that detective to be there in there with

12         me doing a full-blown investigation.

13               And he told the officer no.

14               So, when the officer came to the

15         school, and spoke to the principal, he

16         said the dad didn't want to launch the

17         investigation.  He didn't want a

18         detective.

19               Regular cops just take reports.

20         They don't do an investigation.  They

21         have to turn this case over to a

22         detective.  And the father said he

23         didn't want that.

24    BY MR. MACDONALD:

25         Q.   How do you know that?

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.    Because the officer communicated that

2    with the principal.

3      Q.    And that was communicated to you from

4    the principal?

5      A.    Correct.

6      Q.    But you were not there, were you?

7      A.    I was not.

8      Q.    And you said if you had a daughter that

9    was assaulted you would want an investigation to

10   be conducted by law enforcement; is that right?

11     A.    Absolutely.  I would want a detective

12   present.

13     Q.    Okay.  And would you want that school

14   that your daughter went to to conduct an

15   investigation?

16     A.    If my daughter tells the school that

17   nothing happened, I can't.  If my daughter said,

18   "No, nothing happened.  He just said that to me,"

19   what investigation?

20          Now, if she told me, "Yes, I was

21   assaulted and I did all of this," but this is a

22   baby who is not -- who is communicating and not

23   communicating.  She communicated with the school

24   something completely different that did not take

25   place.  And it went from touch to lick to kiss to

Deposition of Olivia Angelica Bernal                           Jane Doe v. Academir Charter Schools, Inc., et al.

1    all the different things that changed the story

2    throughout the course.

3              But if the parent initially said, "Yes,

4    I want the investigation.  I want the

5    investigation to happen full blown with the

6    detective," I would have called him the minute I

7    left the school.  And he didn't -- he did it

8    three days later.

9              And again, when they offered to do the

10   investigation by a detective, according to the

11   principal, the father declined.

12       Q.    Now, prior to the father contacting law

13   enforcement, did the school know that he had made

14   allegations regarding physical touching involving

15   Jane?

16       A.    You'd have to ask the school that.

17       Q.    Well, you're here to testify on behalf

18   of the school in regards to these allegations.

19       A.    He communicated with the assistant

20   principal the day of the meeting with the

21   parents, the teacher, and the assistant

22   principal.

23       Q.    Was that before he met with law

24   enforcement officers?

25       A.    I don't believe so.

1    Q.   So, when the law enforcement officers

2    came to Academir that was the first time Academir

3    learned about the allegations of physical

4    touching?

5    A.   No, the father contacted -- well, the

6    father spoke to the principal over the phone

7    about a video that he had that he wanted to show

8    her -- that he wanted to send to her.

9         And the principal said, "No.  Come on in

10   to my office and we can talk.  And we can go to

11   the next steps and we can follow this procedure."

12        And the father never came and that's

13   when he called the police which was on Wednesday.

14   Q.   And from the employees of Academir's

15   perspective, what he reported that Jane had said

16   involving physical touching was not what she had

17   reported to school employees; is that correct?

18   A.   That is correct.  Until Tuesday -- that

19   was the story all until Tuesday.

20   Q.   And Jane had reported the physical

21   sexual acts at home with her parents; is that

22   right?

23        MS. KARRON:  Object to form.

24        THE WITNESS:  I wasn't there, but

25   yes, I'm assuming.

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 198 of
285
Deposition of Olivia Angelica Bernal                     Jane Doe v. Academir Charter Schools, Inc., et al.

1   BY MR. MACDONALD:

2       Q.    Well, isn't that what was reported to

3   Academir by Jane's father?

4       A.    Well, I wasn't present there, but that

5   is what the father reported.

6       Q.    And the father reported that Jane had

7   been sexually assaulted by another student, true

8   or not; correct?

9       A.    Correct.

10      Q.    In your opinion as chief operating

11  officer and the Title IX coordinator for

12  Academir, does the school have an obligation to

13  investigate allegations of sexual assault even if

14  they're told to a parent at home?

15      A.    Yes.

16      Q.    Did Academir investigate the allegations

17  that Jane made at home?

18      A.    The process was going to start.  The

19  father jumped the gun and he called the police --

20  not jumped the gun because that's his daughter.

21  At the end of the day that's his, you know, child

22  and he's do entitled to do anything.  And I would

23  do everything that I could in my power.  So I

24  can't say that.

25            But the day that he went to the school,

1    his concern was only -- when he went in the

2    morning, his concern was, "I want that kid out of

3    this school.  I want him out.  I want him out.  I

4    want him out."  That was the only thing that the

5    concern was.

6           Later on in the day it changed.  Later

7    on the next day it changed.

8           So, again, at that moment, if my

9    daughter really and truly is assaulted, I'm going

10   to pull her.  He didn't.  The child came to

11   school the next two days, but he didn't care

12   about -- he didn't care about any of the

13   assaults.  He wanted the child to be -- that was

14   the only demand that the father had to the

15   principal.

16          He said, "I want him out."

17          That was his worry.  He didn't -- it was

18   later that he brought that up, "Oh, no.  She was

19   licked.  She was licked."

20          And then it became, "She was touched in

21   her pants."  And then -- so every single moment

22   it changed what he was telling the

23   administration.

24      Q.   Okay.  But you said it was going to

25   start.  When was that investigation going to

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 200 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    start?

2         A.   Well, you have to first meet with the

3    parents and you have to get all of the details

4    and the information.  And he didn't.

5              When he got there, after the fact, he

6    started screaming and yelling and cursing and

7    going crazy.  And at that point how can you

8    communicate with an irate parent and start

9    anything if you don't have any information?  All

10   you have is what the dad is saying --

11        Q.   And just to --

12        A.   -- which is not what you had gone

13   through when you did all of your stuff until

14   Tuesday.

15             On Tuesday the child was still saying

16   that the child only told her something verbally.

17   And the counselor, when she interviewed her or

18   when she spoke to the child, did not see any

19   physical marks, did not see saying, did not see

20   the child in distress, nothing.  The child said,

21   "No, he just told me."

22        Q.   And are there notes of that interaction

23   between the counselor and Jane?

24        A.   Yes.  Usually what happens is that they

25   do, it's not a SCAM, but it's a -- a SCAM that

1    gets documented in the DSIS, which the district

2    portal, by the counselor.  And it's her

3    counseling notes.  And it says, "Spoke to the

4    child.  Child said yada yada.  And spoke to the

5    parents."

6              And so, you document what took place

7    there.  And that is -- I know that that did take

8    place and it's uploaded into the system.

9        Q.   But you said -- you discussed

10   communication with the parents and how the father

11   was irate.  Was the father's anger or difficulty

12   communicating the reason why there was no

13   investigation launched?

14       A.   No, that is not -- no.  The parent --

15   you have to be able to communicate with the

16   person who is making the allegations so that you

17   know exactly what needs to take place, and you

18   call and you do -- you launch the investigation.

19             But when the parent comes in and is

20   confrontational and belittling, and is cursing

21   and is going crazy in your office, that is very

22   hard to do.

23             So, again, I think that, you know,

24   having -- and that's why, you know, the principal

25   came in and, you know, said, called him or spoke

1     to him and said, "Hey.  I want you to come so

2     that we can start this process."

3            The father never showed up.  Then what

4     happened is that then the police showed up.

5            MR. MACDONALD:  Okay.  I'm going to

6        show you a document.

7            I believe this is Exhibit 4.  It's

8        Defendant's Bates labeled 288.

9            (Plaintiff's Exhibit No. 4 was

10       marked for identification.)

11    BY MR. MACDONALD:

12       Q.   I'll give you a moment to review.

13       A.   Yes.

14       Q.   Do you recognize this document?

15       A.   Yes.

16       Q.   What is it?

17       A.   It's a case management form to document

18    a meeting with the student.

19       Q.   And do you know who created this

20    document based on looking at it?

21       A.   Ms. Ruiz, the school counselor.

22       Q.   And does Ms. Ruiz still work for

23    Academir?

24       A.   She does not.

25       Q.   When did she leave Academir?

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 203 of
285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1     A.    The end of last year.

2     Q.    Do you know where she works now?

3     A.    I do not.  She went on to do her

4  master's program and something.  And I don't

5  know.  We don't follow employees once they leave.

6     Q.    And this form, this was in regard to

7  what Jane had reported; is that right?

8     A.    Correct.

9     Q.    Now, on the right-hand side, there is a

10  section that says "Service Code"; do you see

11  that?

12     A.    Yes.

13     Q.    What is that?

14     A.    Usually those are codes -- well, it is

15  always codes of what took place, meeting with the

16  students, conference with the parents, counseling

17  session.  It just depends.  I don't have the

18  codes with me, but they all stand for something.

19  Sometimes it's written reprimand, conference for

20  the record, yada yada?

21     Q.    And are those codes referral action

22  codes?

23     A.    These are service codes.  Referral

24  action codes are when you do a student case

25  management form for inappropriate behavior, for

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 204 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    actions that you need to take that need to be

2    documented for verbal warnings, written

3    reprimands, detention.  It's usually a negative

4    connotation.  These are always notes that you

5    keep when a counselor meets with a child.

6              The referral ones are very different.

7    The referrals are actions that the school takes

8    based on incidents that occur at the school.

9         Q.   And in the comments it says, "Student

10   felt uncomfortable due to a verbalized comment in

11   class at dismissal.  Student admitted it was only

12   a verbal comment."

13             Do you see that?

14        A.   Yes.

15        Q.   Why does this report not say what the

16   comment was?

17        A.   Because this is put on a public system.

18   And you have to protect the identity of the child

19   and what actually took place.  You don't -- you

20   make general statements.  You don't say specific

21   things of what the child is told.  It's

22   inappropriate language that the child used.

23   Inappropriate, you know, behavior, that was

24   displayed.  You don't document that in these.

25   These forms are not for that.  These are

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 205 of
285
Deposition of Olivia Angelica Bernal                                     Jane Doe v. Academir Charter Schools, Inc., et al.

1    counselling records and you don't keep that.

2    This is a school setting, an academic setting.

3    It's not like you're going to a counselor outside

4    that has to document all of those things.

5           All of these forms generally are very --

6    they read like that.  And that is the way that

7    the district wants to see it and reported.

8        Q.   I'm going to show you another document.

9    We're going to mark this as Exhibit 5.  This is

10   Defendant's Bates labeled 293.

11          (Plaintiff's Exhibit No. 5 was

12       marked for identification.)

13   BY MR. MACDONALD:

14       Q.   I'll give you a moment to review.

15       A.   Can you make it a little bigger so I can

16   see the bottom?

17       Q.   Sure.

18       A.   Okay.

19       Q.   Do you recognize this document that I'm

20   showing you?

21       A.   Yes, the student case management form.

22       Q.   And do you know what this specific form

23   was for?

24       A.   Documenting the incident with the

25   student that allegedly said these things to the

1    student, to the young lady, Jane Doe.

2        Q.   And who created this form if you can

3    tell from looking at it?

4        A.   The school principal.  Well, the teacher

5    initially writes it, the teacher.  She refers it

6    to administration.  Administration then processes

7    it.

8             So, the teacher usually says, "The

9    student made an inappropriate or used

10   inappropriate language with another student,"

11   let's say.  And then that form gets referred to

12   the school principal and the actions are then

13   taken.  But you have to note -- were parents

14   communicated with, was this child spoken to, did

15   they contact the parents, and so forth before it

16   gets to administration.

17       Q.   And here in the description for the

18   narrative it describes it as, "The student made

19   an inappropriate comment to another student

20   during class."

21            Is that right?

22       A.   Yes.

23       Q.   And then there are referral actions code

24   listed here; right?

25       A.   Uh-huh.

1    Q.   And it looks like R-9?

2    A.   Usually it's like a written reprimand,

3    conference for the record, meeting with the

4    family or the parents, usually those codes stand

5    for the action that was taken.

6    Q.   And that's R-9, C-6, and R-7, it looks

7    like?

8    A.   Yes, I believe so.

9    Q.   Are there referral action codes for

10   conduct that is of a sexual nature?

11   A.   There is when it is a level three or

12   above, where there's -- it is identified as that.

13   Q.   What is a level three or above?

14   A.   I'd have to go back into the student

15   code of conduct and identify it.

16   Q.   Is level three conduct the same sexual

17   harassment definition that we looked at earlier

18   for Miami-Dade County?

19   A.   In the actual handbook it tells you that

20   it has to be a level three or higher.  So, in

21   order for it to constitute that, it has to be an

22   offense that is a level three or higher.  We

23   would have to go back to the manual.  I don't

24   have it in front of me, but the student code of

25   conduct would indicate what a level three was and

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 208 of
285
Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      explain what each one means.

2              MR. MACDONALD:  Let me show you

3          another document.  We'll mark this as

4          Exhibit 6.

5              (Plaintiff's Exhibit No. 6 was

6          marked for identification.)

7      BY MR. MACDONALD:

8          Q.   I'll give you a moment to review.

9          A.   Uh-huh.

10         Q.   Do you recognize these as the referral

11     action codes for Miami-Dade County Schools?

12         A.   Yes.

13         Q.   And do you see on this list that there

14     are two separate categories for sexual

15     harassment?

16         A.   Uh-huh.

17         Q.   And that includes "unfounded" and

18     "founded," it looks like; right?

19         A.   Yes, under level three.

20         Q.   Now, why wouldn't the referral action

21     codes include sexual harassment?

22         A.   Because it wasn't considered a

23     harassment.  It wasn't a sexual harassment from

24     the very beginning.  It was not.  This referral

25     was done immediately after the incident occurred

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 209 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    in the afternoon.  And at that point, it did not

2    constitute a sexual harassment case.  It was

3    something that happened, isolated that day.  It

4    was not something that was happening consistently

5    or that took that to that -- identified it to

6    that level because the child was saying it was

7    something he said to her.  He didn't act upon it.

8    He didn't, you know -- he didn't touch her.

9           So once you have that information -- and

10   that initial information that they had all the

11   way through Tuesday, the child only said that the

12   child said that to her.  And she didn't say, "He

13   said that to me multiple times."  She just said,

14   "Hey, look what he said to me."

15          Inappropriate.  That is something we do

16   at the school is "Inappropriate, very

17   inappropriate."  And we sing a song that goes

18   along with it.  So, you know, those are things

19   that sometimes kids do.  And the immediate action

20   is -- okay.  That was destructive behavior

21   because you stopped the learning environment.

22   You stopped me from teaching, right, and you

23   disrupted the learning environment.  I had to

24   stop what I was doing, refer to the child and

25   attend to that child.  That is why it constituted

Deposition of Olivia Angelica Bernal                                      Jane Doe v. Academir Charter Schools, Inc., et al.

1    a level one offense where something happened that

2    stopped instruction at that time.

3              And really, in this, at the end of the

4    day, it wasn't even instruction because it was at

5    the very end of the day when the children were

6    getting ready to go home for dismissal.  So, it

7    wasn't that it stopped instruction in any -- it

8    was just like, "Okay.  I have to stop what I'm

9    doing because I have to take of care of the

10   situation."  It happened at the very tail end of

11   the day when the children were coming back inside

12   to get their stuff from PE to line up to go home.

13        Q.   Now, earlier I believe you said the

14   other student, L.R., was disciplined or

15   reprimanded; is that right?

16        A.   Yes, he was.

17        Q.   In what way was he disciplined or

18   reprimanded by the school?

19        A.   Well, he was reprimanded by the school

20   administration.

21              This is, you know, "This is something

22   you don't say.  You don't say in school."

23              There were consequences.  I know just to

24   have that referral on file, it will remain with

25   you all through your schooling.  And he was

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 211 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    referred to a school counselor, where he also met

2    with the school counselor.  The school counselor

3    does, I guess, sessions with him to ensure that

4    he understands correct behavior, redirects that

5    behavior, teaches him right from wrong and why

6    these kind of comments have negative

7    consequences, and what can happen as a result of

8    this.  Not to mention that we called the parents.

9    There was a parent conference and all of that

10   took place for this one comment that this child

11   made, you know, those were his consequences.  I

12   don't know further beyond that, but I know that

13   that is what I was communicated.

14        Q.   And were any accommodations offered to

15   Jane in response to these allegations?

16        A.    The children were separated immediately.

17   They were on the same table.  They have kidney

18   tables, so they sat together on the same table.

19   They were moved.  I know that the principal

20   offered to switch classes that they could move.

21   The parent was like, "Well, why do I have to

22   move?"

23             And they're like, "I'll move somebody at

24   this point.  I just want to, you know, keep them

25   away.  And if you're not satisfied with just

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 212 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   moving them, we can move one of the children out.

2   We don't have a problem with that."

3           He said, "No, I want him kicked out of

4   the school."  And that was the sentiment

5   throughout.

6       Q.   And that was the principal that offered

7   that to Jane's father?

8       A.   Yes.  In addition to that we offered

9   counseling.  And obviously, we need to make sure

10  that the child is okay.  That socially,

11  emotionally that she is okay to continue her, you

12  know, academic day and that was done, as well as

13  when she returned on Tuesday.  We offered the

14  class modification, the schedule, but the dad did

15  not want that.

16      Q.   And the principal's offer to have the

17  children separated is that documented anywhere?

18      A.   That was in a conversation with the

19  parent.  So, I don't know if she wrote that down

20  somewhere.

21      Q.   Are you aware of any documents that

22  would reflect that?

23      A.   No.

24      Q.   Okay.  Now, going back to when Jane's

25  father informed the school of Jane's allegations

1    about the physical contact between Jane and L.R.,

2    when the school learned of that, did they contact

3    the Florida Department of Children and Families?

4         A.   No, they did not.

5         Q.   And why did they not?

6         A.   Because they -- at that moment, they did

7    not think that it was anything beyond verbal.

8    When the father -- obviously this whole

9    transition happened.  And he came in and

10   typically, you say, "Okay.  If a child is saying

11   this and has changed the story so much or the

12   story went from this to this," you usually call

13   the Department of Children and Families.  By that

14   time, the father had already called everybody.

15   He had called the Department of Children and

16   Families.  He had called the police.  So, there

17   really was not much -- like, the school was like,

18   "Okay.  We want to meet with you.  We want to do

19   this."

20        And you also have to be careful because

21   if the parent says, "Oh if I launch an

22   investigation" and sometimes -- and I think that

23   sometimes the school if they felt anything was --

24   "Okay.  If I launch it, is he going to get upset?

25   What's going on."

```
 1           But again, the father, the only thing he
 2   communicated with my staff is he didn't want the
 3   child there anymore.  And when the principal
 4   wanted to meet with the parent to go to the next
 5   steps, he didn't come.  He didn't show up.  And
 6   he just showed up with the police or the police
 7   showed up and then we knew that the Department of
 8   Children and Families was called.
 9      Q.   Are Academir employees required to
10   report sexual acts committed between students,
11   minor students to the Florida Department of
12   Children and Families?
13      A.   Sexual acts, yes, when we -- absolutely.
14   Any sexual acts, especially with such small
15   children, but there was no acts.  That was not
16   verified.  And the child herself told four
17   employees, "He did not touch me.  He just told
18   me."
19      Q.   So, the school did not believe it
20   occurred, but you don't know that for a fact, do
21   you?
22      A.   No, I couldn't tell you that for a fact.
23      Q.   So, the school made the determination
24   that it did not happen and therefore they did not
25   have to contact --
```

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 215 of
285

Deposition of Olivia Angelica Bernal                                      Jane Doe v. Academir Charter Schools, Inc., et al.

1      A.    I can't tell you that that was the

2   determination, that they said it did not happen.

3   They just -- the process wasn't allowed to

4   continue because of the reaction of the parents.

5   It wasn't that they weren't going to --

6           If a parent comes in and says, "My child

7   was touched.  My child was touched," we're going

8   to do something, absolutely, but you have to

9   allow us to go through that process with you to

10  help you and do the investigation.  He did not

11  allow us to do that.  He became very irate and

12  then at that point he already had the police and

13  the investigation started.  So once it's

14  reported, you can't report and say, "Okay.

15  Look."

16          Usually the Department of Children and

17  Families comes out to the school, questions

18  students, questions administration.  That never

19  even took place either.

20      Q.    That never took place?

21      A.    They questioned the student, but they

22  didn't come out to the school to do it, which

23  usually takes place at the schools.

24          When we've called the Department of

25  Children and Families, they usually come out.

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 216 of
285
Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1        Q.    Did Jane's father prevent anyone in the

2    school from calling the Department of Children

3    and Families hotline?

4        A.    Not that I'm aware.

5        Q.    What did he do that prevented Academir

6    employees from contacting the Florida Department

7    of Children and Families hotline?

8        A.    Nothing I'm aware of -- anything -- I

9    mean, the only thing that the father really did

10   do truly was just become irate and, you know,

11   call the assistant principal a cunt and every

12   name in the book that you can imagine.  And

13   insulted her.  And at that point, what are you

14   going to do?  "Okay.  Thank you.  Good-bye,"

15   because, you know, there is no reasoning with

16   that father at that point.  You try to work with

17   the parents to the extent, you know, in good

18   faith and goodwill to try to resolve the

19   situation for them.  And again, when the

20   statement -- it went from this, to this, to this,

21   it kept changing.  The story changed along the

22   way.  And at that point, the father took matters

23   into his hands and did his reporting.

24       Q.    Well, I'm trying to understand why no

25   Academir employees contacted the Florida

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 217 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    Department of Children and Families.

2        A.   Because until Tuesday -- until

3    Tuesday -- until Tuesday, it was a verbal comment

4    that was made to the student.  Wednesday, the

5    police was already there.  So there was nothing

6    beyond that.  The school knew until Tuesday that

7    it was all verbal, that the child was not

8    touched, that nothing -- the child said, "He just

9    said to me.  He just told me.  He didn't touch

10   me.  He just told me."

11        So, until Tuesday that was the

12   understanding of the school.  By Wednesday things

13   had already changed.

14        Q.   By Wednesday when the police came, he

15   went into the school, you said, and got irate;

16   correct?

17        A.   Correct.

18        Q.   Okay.  And when he got irate, he was

19   telling this school about this alleged incident

20   involving the physical touching with his

21   daughter; is that right?

22        A.   And he was asked to go to the

23   principal's office so that they could start on

24   all of this.

25        Q.   But I'm asking --

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 218 of
285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    A.   He did not go.  He did not go.

2    Q.   That's not what I'm asking.

3    A.   I cannot tell you because I was not

4  physically there.  I can't tell you that the

5  father then left there.  I don't know if he went

6  home, if then he sat there and then he said I'm

7  going to call the cops.  I don't know.  I'm only

8  going based off of what was relayed to me.

9    Q.   I'm asking --

10    A.   I'm just telling you what was reported

11  to me, which was that the parent didn't show up,

12  the police officer showed up on Wednesday to the

13  campus.

14    Q.   Okay.  But I'm asking about when the

15  father became upset at the school, he informed

16  school staff about his daughter's allegation at

17  home; correct?

18    A.   He did to the assistant principal.

19    Q.   Okay.

20    A.   Which, again, the only reason why he was

21  there was he was asking the child to be kicked

22  out of school.

23    Q.   Okay.  And --

24    A.   He got upset because of that.  He got

25  upset.

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1      Q.   Okay.

2      A.   And he got upset because we said we

3  could not kick a child out of school because it

4  was a public school and things did not work that

5  way.

6      Q.   And the father told the assistant

7  principal prior to law enforcement coming to the

8  school; correct?

9      A.   Yes.

10     Q.   Why did the school not contact the

11 Florida Department of Children and Families when

12 they learned through the assistant principal of

13 the allegation of the physical contact between

14 the two students?

15     A.   Because everything that -- again, we

16 didn't know if the father was saying that because

17 he was upset and his story changed three times

18 because -- his story changed three times, every

19 time he met with them.  And until Tuesday, with

20 the child, including the counselor who

21 interviewed the child and said, you know, the

22 child doesn't seem in any distress.  These are

23 threat assessment teams that are issued to ensure

24 the safety of every single child.  You have to

25 first question to see if the child is in

```
1    distress.  And, in fact, if this is something
2    that really needs immediate attention from the
3    Department of Children and Families or law
4    enforcement.  And the child was happy-go-lucky
5    that day in school.  She was fine.  She was
6    saying still that the other child only told her
7    that.  And at that point, the school wanted to
8    communicate with the families to say, "Hey, let's
9    sit down.  What is that you're saying because you
10   told the assistant principal this.  You're
11   telling me this and now it's this.  So let's come
12   to an agreement."
13        Again, he never showed.  He didn't allow
14   us to do that process for him.
15        Q.   Okay.  But why --
16        A.   Then he took the child out of the
17   school.
18        Q.   I'm asking:
19        Why, when the assistant principal
20   learned of that allegation did not report it to
21   the Florida Department of Children and Families?
22        A.   I don't know.
23        Q.   Are you familiar with the term
24   "mandatory reporter"?
25        A.   Absolutely.  Yes, we are mandatory
```

Case 1:23-cv-23004-JB Document 67-2 Entered on FLSD Docket 09/26/2024 Page 221 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1   reporters, yes.

2           Q.    What do you understand the word

3   "mandatory" to mean in the term "mandatory

4   reporter"?

5           A.    When you are in doubt of a child -- in

6   our case, in a child being in danger or in

7   distress or you think that she is being abused,

8   neglected, exploited, abandoned, whatever it may

9   be you have to call them and you are responsible.

10          At that point it was not determined that

11  she was being abused, that she was being

12  neglected, that she was abandoned or exploited.

13  Those are the terms under the reporting that we

14  have to do.  If you feel that -- if you feel that

15  the child is being sexually molested or abused

16  without a doubt you have to call them.

17          Q.    Without a doubt?

18          A.    Whether it's -- without a doubt.

19          If it's a teacher or a parent.

20          But at that moment, it was not.  At that

21  moment there was no doubt.  The child was

22  constantly telling us, no, that this was -- that

23  he just made a comment to her.  I cannot report,

24  you know, another -- or she won't report another

25  child or I don't -- and I can't speak on their

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 222 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    behalf.  But if the child from what you know and

2    you know that the child, based on the information

3    that she is providing you was not abused, that

4    there seems to be no neglect, that the child is

5    not abandoned or being exploited, it doesn't

6    constitute that.

7           If the child herself tells me,

8    "Ms. Bernal, he touched me.  He hurt me.  He did

9    this to me," 100 percent this that is our due

10   diligence.  That is our responsibility as loco

11   parentis.  That is our number one priority, but

12   at that instant, at that moment the child not

13   did.  The child not in any way, shape, or form

14   say any of that.

15       Q.   So, because the school doubted the

16   accuracy of that report, they did not have to

17   contact the Florida Department of Children and

18   Families?

19       A.   We did not doubt -- I cannot say that

20   they doubted they accuracy.  They didn't.  They

21   tried to meet with the father.  The father became

22   very belligerent with them.  So it wasn't -- and

23   then did not show up to the meeting with the

24   principal.  He didn't show up to meet with the

25   principal.  The principal would have started that

1    process, because that was it at that point.  He

2    refused to.  She said, "I'll go see you where you

3    are.  I'll go meet you at the school.  Can you

4    meet me there?"

5              He said, "No.  Absolutely no."  So, at

6    that point, there's a -- you try to work with

7    them, but if there is something actually

8    happening, I don't think that --

9              These are all educators.  These are

10   people that we don't want -- it is in our best

11   interest to ensure their safety.  That's our

12   number one priority.  At that moment, it was not

13   a harassment case, at that moment, the child was

14   not in distress nor was she -- nor were there any

15   signs or indication that she was physically

16   abused.  She was not.

17       Q.   Are you aware that Jane's father did end

18   up calling the Department of Children and

19   Families?

20       A.   I did.  I found out through the reports

21   that you guys put together.

22       Q.   Did you review that report?

23       A.   Yes.

24       Q.   And so, based on reviewing that report

25   you're aware that Jane told an investor from the

```
 1    Florida Department of Children of Families that

 2    she was in fact physically --

 3        A.   I didn't read that report.  I just read

 4    the report that you guys put together not the

 5    report from the Department of Children and

 6    Families.  I'm not privy to that.  I didn't read

 7    that so I don't have that information.

 8             MR. MACDONALD:  So, I'll show you

 9         another exhibit.  We'll mark this it as

10         Plaintiff's Exhibit 7.  And this is

11         Plaintiff's Bates labeled DCF 1

12         through 14.

13             (Plaintiff's Exhibit No. 7 was

14         marked for identification.)

15    BY MR. MACDONALD:

16        Q.   And I'll give you a moment to review as

17    I share my screen.

18        A.   Okay.  That is the demographic

19    information.

20        Q.   What was that?

21        A.   That's just the demographic information.

22    Okay.  That was the allegations that the father

23    made or the parent made.

24             So, what the father communicated to the

25    school is that it happened in a class on a table
```

1   where they were sitting.  So, in PE it says that

2   right there -- right there it says right after

3   the incident occurred in PE, the child ran to the

4   teacher who told the school staff.

5           So, it was said that it took place in

6   her classroom.

7       Q.   Okay.  But based on -- but this report

8   from the Florida Department of Children and

9   Families, it doesn't just say the conduct was

10  just verbal; correct?

11      A.   No, that was the report that was made.

12  That was not what the findings were.  That was

13  the allegation narrative that she took down from

14  the parents.  That's not something that --

15      Q.   I'll show you another page.  Do you see

16  this section under "Narrative"?

17      A.   I do.

18      Q.   Do you see where it says, "They

19  disclosed that her friend from her old school

20      licked her private parts.  She said that

21  the parts that      licked were her poop and pee

22  pee.  She stated that this happened in the

23  classroom.  She said that this happened more than

24  once."

25          Do you see that?

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 226 of
285
Deposition of Olivia Angelica Bernal                                  Jane Doe v. Academir Charter Schools, Inc., et al.

1        A.    I see that.

2        Q.    Is that the parent's allegations?

3            MS. KARRON:  Object to form.

4    BY MR. MACDONALD:

5        Q.    Based on this report, it appears to be

6    Jane's allegations; would you agree?

7            MS. KARRON:  Object to form.

8            THE WITNESS:  I wasn't there, but

9        whatever is in the narrative is in the

10       narrative.

11           And it also says in the previous --

12       she was in a previous school with him.

13   BY MR. MACDONALD:

14       Q.    Okay.

15       A.    I don't know.  It could have happened in

16   the previous school.  Again -- "her poop and her

17   pee pee."  Okay.

18       Q.    And do you see this section labeled as

19   "Maltreatment" under "Narrative"?

20       A.    Yes, I do.

21       Q.    And do you see in that section it says,

22   "Child shows serious emotional symptoms requiring

23   intervention and/or lacks behavioral control,

24   and/or exhibits self-destructive behavior that

25   parent/caregiver is unwilling or unable to

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 227 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

```
 1      manage."

 2              Do you see that?

 3         A.   I do see that.

 4         Q.   At any point did Jane show any of those

 5      emotional symptoms resulting from what had

 6      occurred to Academir employees?

 7         A.   She -- not to my knowledge.  And I don't

 8      know the child so I haven't seen her personally.

 9      The school would be able to and the teacher would

10      be able to tell you more about her typical

11      behavior.

12         Q.   Did anyone from Academir report any

13      symptoms like that to you as Title IX coordinator

14      or chief operating officer?

15         A.   No, they did not.  They just -- you

16      know, mentioned, she was very sensitive and

17      things like that, but nothing out of the

18      ordinary.  These are kindergarten kids, you know,

19      but the teacher may have more to say on that.  I

20      can't speak for her.

21              I'm just going to get water.  Give me a

22      second.

23              MR. MACDONALD:  Let's take a quick

24         five-minute break.  I just want to check

25         my notes.  And we should be able to wrap
```

```
 1            up in a moment here.  So, we'll come

 2            back in five minutes.  Thank you.

 3                 (A brief break was had.)

 4                 MR. MACDONALD:  I just want to show

 5            you one more document.  We'll mark this

 6            as Plaintiff's Exhibit 8.

 7                 (Plaintiff's Exhibit No. 8 was

 8            marked for identification.)

 9       BY MR. MACDONALD:

10            Q.   Do you recognize this document I'm

11       showing you?

12            A.   Yes.

13            Q.   And do you recognize this document as

14       Academir Charter Schools, Inc., Amended Answers

15       to Interrogatories?

16            A.   Yes.

17            Q.   And before I go to specific questions, I

18       wanted to show you this page here at the end.  Do

19       you recognize that name here that signed this

20       document?

21            A.   Alexander Casas.

22            Q.   And do you see that he signed this under

23       penalty of perjury?

24            A.   I don't know.  Do I answer that?  Yes.

25            Q.   Do you see that he signed to the
```

1    accuracy of these answers?  Can you give a verbal

2    "yes" for the court reporter.

3         A.   I did.  I said, yes.

4         Q.   Thank you.  I want to draw your

5    attention to number ten.  I'll give you a moment

6    to read that.

7         A.   Okay.

8         Q.   Is that response accurate for number

9    ten?

10        A.   If they have Academir Charter Schools --

11   I'm not understanding.  Academir Charter Schools

12   has ever been accused of --

13        Q.   In the last seven years has Academir

14   Charter Schools ever had a report of sexual

15   harassment by a student?

16        A.   Okay.

17        Q.   Have they?

18        A.   If there is a sexual harassment that

19   we've processed that we have on record saying

20   that it happened, no.

21             Now, obviously this is different because

22   parents are alleging that this is -- that this

23   sexual harassment took place.  That would be

24   different.  Prior to that, I -- they don't have

25   that -- there is no documentation of that.

1    Q.   There is no documentation of past sexual

2    harassment complaints in the past seven years or

3    there were no past sexual harassment complaints

4    in the past seven years?

5    A.   On behalf of the governing board -- by

6    the time that it gets to the governing board, no.

7    If there was -- not of students to students.

8    There is always going to be issues that may arise

9    at the school, but I don't think that the

10   statement that, you know, we have ever been in a

11   case that we're in front of, you know -- in front

12   of attorneys with this, no.  This is the first

13   time we've ever gone through something like this.

14   And this is the first.  At least in my opinion

15   and I've been here for nine years and this is the

16   first.

17        And I don't know how long Mr. Casas has

18   been here.  Well, he's been here for 10 or 11

19   years and I don't think that he has ever had his

20   staff go to trial because of an allegation.

21   Q.   Okay.  I'm not asking about lawsuits or

22   anything involving attorneys.  I'm asking if any

23   student in the past seven years has ever made an

24   allegation of sexual harassment at Academir

25   Charter Schools?

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    A.    No.   If they make a comment or

2    complaint, I mean, you know, it's very different.

3    The case that I shared with you, the child said

4    that there was an adult standing with his pants

5    down in the stall.   That does not constitute

6    something with, you know, sexual harassment.   We

7    haven't had a staff or anything like that

8    involved in a sexual harassment case with

9    students that I'm aware of in this role this last

10   year, no, that there has been with the exception

11   of this student now, Jane Doe, that we've had,

12   that is the first time that I've seen it in this

13   role this time around.   As a Title IX and my

14   newly added thing to my role -- one of my roles,

15   you know, while there may be something that a

16   child says, you know, but it has never been

17   brought.   And that's why you're asking me these

18   questions and sometimes I'm like I don't even

19   know because we have never had a serious case.

20   If there is something like that maybe with

21   teachers, but never with students that we've had

22   this type of case beyond this one here that we're

23   facing.

24   Q.    So, just to clarify.   I'm not asking you

25   about a case.

1           In the past seven years in any role that

2     you've served at Academir, are you aware of any

3     student making a report of sexual harassment of

4     any kind?

5           A.    In the past seven years as a principal

6     and prior to this role, no, because I was a

7     principal and I didn't have that issue.  Here in

8     this role, these minor things that I've seen, but

9     never a sexual allegation to the point where

10    we're at now.

11          Q.    Okay.  But you're not answering my

12    question.  I'm not asking if --

13          A.    I can't respond for another person who

14    said that.  I can't say that he has never seen

15    it.  I haven't seen it except for this case that

16    I have here with the exception of some minor

17    things, but those are kid things that are taken

18    care of and nobody said I want to file an

19    allegation harassment, that, you know, I've been

20    sexually harassed.  Never have I seen that.

21    Never.

22          Q.    Okay.  But I'm not asking if Mr. Casas

23    has ever seen --

24          A.    You asked me if I had seen it in my

25    seven years here a sexual harassment, never, with

1    the exception of this case here.

2        Q.   And that includes any complaint by a

3    student regardless of whether it became a

4    formal --

5        A.   I can't answer that because in seven

6    years I wasn't in this role.  So, I don't know if

7    it happened at another campus or something like

8    that.  I can't answer that question.  I wasn't

9    there and that was not my role so I can't answer

10   that question.

11       Q.   Okay.  But from your personal knowledge,

12   let's say in the times --

13       A.   And I said no.  The only case that I'm

14   aware of --

15       Q.   Hold on.  Just so the court reporter can

16   record what we're saying.

17            In the time that you've worked at

18   Academir in any role, have you ever received

19   personal knowledge of any complaint by a student,

20   informal or formal, any kind of allegation of

21   sexual harassment?  Yes or no?

22       A.   No.

23       Q.   Thank you.

24       A.   With the exception of this case.  With

25   the exception of this case.

1    Q.   Of course.  Now, previously you

2    mentioned conducting Title IX investigations in

3    your role as Title IX coordinator; is that

4    correct?

5    A.   Correct.

6    Q.   Did any of those Title IX investigations

7    involve allegations of sexual harassment?

8    A.   No.  Like I shared with you the last one

9    that was -- we were involved in involved one of

10   the aftercares with their pants down.  There was

11   no touching.  There was nothing.  He just thought

12   it was funny and he read Diary of a Wimpy Kid and

13   that was the last one.  And again, unfounded.  So

14   it was nothing that the child was complaining

15   that he was sexually harassed.

16   Q.   Okay.  Outside of that incident, were

17   there any other Title IX investigations that you

18   conducted?

19   A.   No.  Not to that extent, no.  When I'm

20   involved if it's -- like, you know, a teacher

21   took a picture and it was out of context, and a

22   child said something, you know, but nothing

23   physically as a sexual assault itself that they

24   felt they were abused or anything of that nature,

25   that they were touched, that they were fondled,

1    nothing like that.

2         Q.   Have there been report of sexual

3    comments in your time as a Title IX coordinator?

4         A.   I'm sure, but a comment is very

5    different from a sexual harassment, from kids --

6    kids are kids.  And I couldn't tell you, no, that

7    a kid is not going to make a sexual comment to

8    another kid.  You know, they are kids.  I can't

9    tell you no.

10        Q.   As you can --

11        A.   I can't tell you no.  I can't tell you

12   no.  In this particular role I haven't seen it.

13             As a principal perhaps somebody says, "I

14   like you.  You're cute.  You've got a big butt,"

15   something like that but nothing where there was a

16   sexual harassment complaint regarding an

17   incident, an assault.

18        Q.   And now, I want to draw your attention

19   to question 11.  I'll give you a moment to

20   review.

21        A.   Okay.  Yes.

22        Q.   Now earlier; -- well, let me start with

23   this:

24             Is that response accurate?

25        A.   For employees, yes.

1      Q.   Well, this question asked about Title IX

2    compliance.  It doesn't limit it to employees; is

3    that right?

4      A.   This is how we conduct our day to day as

5    to what is required of our employees with regards

6    to Title IX, with regards to their training, with

7    regards to their reporting.

8      Q.   And their reporting and investigation of

9    Title IX complaints; correct?

10     A.   Correct.

11     Q.   And that would include student

12   complaints under Title IX; right?

13     A.   Right.

14     Q.   Okay.  Now, in this list of documents

15   and policies, do you see the policy that you

16   described earlier relating to, I believe it

17   was --

18     A.   No, because this is just the teacher

19   handbook.  The fiscal policies and procedures are

20   not part of the handbook.

21     Q.   Sorry.  I just wanted to finish my

22   question there.

23          I believe earlier you testified

24   regarding a place in the principal's compliance

25   binder that states that you are responsible for

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 237 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

 1    handling student Title IX matters and it contains

 2    other additional information about Title IX.  Is

 3    that document or policy listed in this response?

 4         A.    No.

 5         Q.    Do you know why?

 6         A.    Because this particular one only

 7    pertains to our faculty and staff, the teachers,

 8    right.  And following the student code of

 9    conduct, this is for reporting sexual harassment.

10    Having to go through the training, this

11    particular manual would not have that.  It's

12    under the fiscal policies and procedures for the

13    day-to-day operations.  And so, it is the

14    responsibility of the principal to share that

15    with her staff.

16              But this is just the required policies

17    that are in place for teachers, right.  Now, the

18    policies for following specific procedures for

19    the day-to-day operations will not necessarily

20    include all of that, would not include every

21    single policy that we have in place for different

22    things; for financing, for budgeting, for

23    enrollment.  I would not give that to the

24    teachers.  That is not part of this handbook.

25    This only the teacher handbook -- the teacher

Case 1:23-cv-23004-JB Document 67-2 Entered on FLSD Docket 09/26/2024 Page 238 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    faculty handbook.

2         Q.   To be clear you'd agree that this

3    question requests policies and procedures related

4    to Title IX; right?

5         A.   Yeah, but this is for faculty and --

6    these are employees.  This is not Title IX for

7    students.

8         Q.   Where are you reading that?

9         A.   Because all of the stuff that you

10   mentioned here, that you scrolled down through,

11   that pertains to the faculty and staff handbook.

12        Q.   Okay.

13        A.   It's not a parent-student handbook.

14   It's a handbook for the faculty.  So when

15   reporting the harassment, you know, for

16   themselves, for, you know, compliance with

17   D.A. -- well, the training through ADP.  The

18   person that is in charge of that, which is Xenia.

19   So, that is what that is talking about.

20        Q.   And you're referring to this section

21   here; right?

22        A.   Well, the section of the manual -- you

23   have a combination of the management agreement

24   and the section of the faculty handbook.

25        Q.   And you're referring to this part listed

Case 1:23-cv-23004-JB  Document 67-2  Entered on FLSD Docket 09/26/2024  Page 239 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1    here as "Answer"; correct?

2        A.    That is correct.

3        Q.    I'm asking you about the question.

4    "Describe in detail any policies or procedures

5    related to Title IX compliance."

6              Do you see that?

7        A.    I don't know who responded.

8        Q.    I'm not asking you --

9        A.    I can't answer to something I didn't do

10   myself.  So, if I would have been able to tell

11   you all of these things because I wrote it or I

12   did it and I can explain, I can't.  This is

13   something that was put together for answers.

14             And again, you know --

15       Q.    Ms. Bernal --

16       A.    I'm sure that in that little excerpt

17   they're not going to put everything that has to

18   do with Title IX?  I'm sure that -- you know, you

19   have a combination of things that were put

20   together, to, you know -- that the training was

21   there, that we follow the policies, that there

22   were procedures in place, that management carries

23   it out.  You're not going to get all of the

24   information that you need here.

25       Q.    You're here to testify regarding Title

1    IX policies --

2         A.    And I have.

3         Q.    -- regarding Defendant Academir,

4    Academir Charter School Services.

5         A.    Correct.

6         Q.    Okay.  And you were also expected to

7    testify regarding these responses.  So, I'm not

8    asking you about faculty or staff.  I'm asking

9    you if you see in this response the policy

10   relating to Title IX that you described to me

11   earlier that is related to fiscal policies and

12   procedures.

13        A.    It's not there.

14        Q.    And that is a policy regarding Title IX

15   that --

16        A.    The only thing that I see referred to

17   there is the employee handbook and the student

18   code of conduct.  That is the only things that

19   was added to that answer.

20        Q.    And that fiscal policy also references

21   Title IX; correct?

22        A.    Yes, it does.

23        Q.    Okay.  Do you see number 12 there?  I'll

24   give you a moment to review.

25        A.    Yes.

1    Q.   Is that response accurate?

2    A.   Not necessarily because I know that

3  things were updated.  Minor things were updated

4  of who to contact for what.  And this is a new

5  role.  So, I know that they were updated over the

6  summer in terms of who to contact because Xenia

7  really only does the HR.

8    Q.   So, the Title IX policies for Academir

9  were updated within the past five years?

10   A.   Yes, they were.

11   Q.   Do you know how many times?

12   A.   I can only attest to one.

13   Q.   And that one time was in the summer that

14  you had mentioned earlier?

15   A.   Yes, when we decided to break it down so

16  everybody has a point of contact for -- according

17  to staff, students, and vendors.  And then the

18  form was changed to the digital form.

19   Q.   Was that change made after Jane brought

20  these allegations against Academir?

21   A.   Yes, because this happened last fiscal

22  year, if I'm not mistaken, so yeah.

23   Q.   Are you aware of any other changes that

24  were made to Academir's Title IX policy besides

25  that one that was made in the summer most

1    recently?

2         A.   No, I'm not aware of -- I'm not privy to

3    that.  No.

4         Q.   And prior to those changes that you made

5    in the summer to that policy were the words

6    "Title IX" included in that policy?

7         A.   Yes.

8              MR. MACDONALD:  And those are all

9         the questions I have for you today,

10        Ms. Bernal.

11             I appreciate it.

12             MS. KARRON:  I have no questions.

13             We'll waive.

14             (Reading and signing were waived.)

15             (Thereupon, the taking of the

16        deposition was concluded at 4:44 p.m.)

17

18

19

20

21

22

23

24

25

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 243 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

1                    CERTIFICATE OF OATH

2

3     STATE OF FLORIDA
      COUNTY OF MIAMI-DADE
4

5              I, the undersigned Notary Public, in and

6     for the State of Florida, hereby certify that

7     OLIVIA ANGELICA BERNAL personally appeared before

8     me on May 9, 2024, and was duly sworn by me.

9

10

11

12             WITNESS my hand and official seal this

13    9th day of June, 2024.

14

15

16

17

18    _____
                                    *Katiana Louis*
19    KATIANA LOUIS
      Notary Public-State of Florida
      COMMISSION #HH 443618
20    EXPIRES September 13, 2027

21

22

23

24

25

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 244 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

1              REPORTER'S DEPOSITION CERTIFICATE

2     STATE OF FLORIDA
      COUNTY OF MIAMI-DADE
3

4

5          I, KATIANA LOUIS, do hereby certify that

6     I was authorized to and did stenographically

7     report the foregoing deposition; and that the

8     transcript is a true and correct transcription of

9     the testimony given by the witness.

10

11         I further certify that I am not a

12    relative, employee, attorney or counsel of any of

13    the parties, nor am I a relative or employee of

14    any of the parties' attorney or counsel connected

15    with the action, nor am I financially interested

16    in the action.

17

18

19         Dated this 9th day of June, 2024.

20

21

22                              *Katiana Louis*

23         KATIANA LOUIS

24

25

## WORD INDEX

**< 1 >**
**1**  3:8  7:6, 7  224:11
**1:23-cv-23004-WPD**
 1:3
**10**  230:18
**10:02**  1:17
**100**  168:9  222:9
**11**  7:22  230:18
 235:19
**12**  33:9, 14  36:24
 240:23
**13**  243:20
**14**  224:12
**145**  3:9
**153**  77:22
**15420**  9:18
**15709**  9:9
**157th**  9:19
**18**  145:23
**19**  146:15
**196**  78:14

**< 2 >**
**2**  3:8  77:17  143:20
**2017**  133:11
**202**  3:10
**2024**  1:17  243:8, 13
 244:19
**2027**  243:20
**205**  3:11
**208**  3:11
**20th**  161:15
**21**  7:23
**22**  8:4
**224**  3:12
**227**  77:22
**228**  3:13
**236**  143:22
**243**  3:4
**244**  3:4
**25**  27:9
**250**  2:10
**27400**  1:24
**28**  27:9
**288**  202:8
**29**  8:4
**293**  205:10

**< 3 >**
**3**  3:9  145:16, 17
**301**  2:10
**33131**  2:4
**33193**  9:10
**33301**  2:10
**33606**  2:16

**< 4 >**
**4**  3:1, 10  202:7, 9
**4:44**  1:17  242:16
**406-5674**  2:11
**443618**  243:19

**< 5 >**
**5**  3:11  9:20, 21
 205:9, 11
**515-0322**  2:17
**520**  2:3
**568-8120**  2:4

**< 6 >**
**6**  3:11  208:4, 5
**601**  2:16

**< 7 >**
**7**  3:8, 12  224:10, 13
**77**  3:8
**786**  2:4

**< 8 >**
**8**  3:13  228:6, 7
**800**  2:16
**80th**  9:10
**813**  2:17

**< 9 >**
**9**  1:17  243:8
**911**  42:18  68:17, 20
 69:25  70:22
**954**  2:11
**9th**  243:13  244:19

**< A >**
**a.m**  1:17
**abandoned**  221:8, 12
 222:5
**abide**  23:2  57:16

**able**  27:13, 17  35:10,
 11, 19  56:7  66:19
 86:19  106:18  161:21
 162:11  180:22
 182:20  201:15  227:9,
 10, 25  239:10
**aboard**  51:10, 13
 52:2  108:16
**absolutely**  93:17, 21
 94:18  137:13  195:11
 214:13  215:8  220:25
 223:5
**abuse**  70:1, 12, 16, 24
 93:16, 18, 25  96:5
 97:2, 12  98:16, 17
 99:9  149:23
**abused**  93:20  94:19
 221:7, 11, 15  222:3
 223:16  234:24
**academic**  175:24
 205:2  212:12
**ACADEMIR**  1:9  2:8
 4:10  6:9, 10, 19, 24
 7:2  9:22, 25  13:8
 14:9  16:8  18:16, 22
 19:5, 9, 13  20:5, 7, 22,
 25  21:5, 10, 17, 19
 23:13, 17, 23  24:4, 10,
 11, 18, 24  25:10  26:5,
 8, 15  29:9, 13, 24, 25
 30:5, 8, 10, 15, 22
 31:1, 5  33:4, 19  34:2,
 4, 8, 13  35:22, 23, 24
 37:20  41:16  42:8
 45:23  47:11, 12  72:9
 74:13  76:9  77:7
 78:4, 20, 23  81:4, 22
 82:12, 14, 25  83:4
 84:2, 13, 18  85:1, 20
 86:7  87:5  89:2
 90:11  91:1, 5, 10, 24
 92:16  93:10, 12, 24
 97:9, 11  98:11, 13
 99:10  104:17  105:17
 106:4  107:5  108:3
 109:13  111:3  112:16
 113:20  117:8  118:19
 119:5, 15, 17  120:19
 129:17, 22  133:11
 136:24  137:4  138:3

**140**:8  142:6, 22, 24
 143:5, 12, 14  144:3, 6
 145:1  146:6, 18, 24
 156:6, 12, 19  159:1, 6
 160:8  163:25  169:15
 170:15  172:2  174:11
 176:20  177:15, 18
 178:21  179:9  183:14
 185:2, 7, 22  188:6
 191:23  192:20  197:2
 198:3, 12, 16  202:23,
 25  214:9  216:5, 25
 227:6, 12  228:14
 229:10, 11, 13  230:24
 232:2  233:18  240:3,
 4  241:8, 20
**Academir's**  9:6
 14:23  39:24  40:12
 46:1  137:10  153:14
 157:19  174:16  180:9
 197:14  241:24
**access**  21:25  37:15
 44:25  46:7  53:8
 62:15  79:19  105:14
 141:9  169:8, 9
**accessible**  53:25
**accessing**  180:1
**accident**  54:17  83:25
 84:2
**accidents**  83:24
**accommodations**
 211:14
**accountability**  13:13
**accounts**  29:22
 34:18  35:2  124:5
**accreditation**  116:7
**accuracy**  222:16, 20
 229:1
**accurate**  157:13
 229:8  235:24  241:1
**accurately**  5:13
**accused**  136:5  229:12
**acknowledged**  55:11
**acquisition**  13:23
 19:21  29:18
**acronym**  17:17
**act**  191:25  192:4, 5,
 6, 8, 10, 13, 16  209:7
**acting**  102:16  188:16

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 246 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

**Action** 3:*11* 42:6 50:5 59:*18* 80:*21* 82:*11* 89:*13* 98:*17* 135:*19* 139:*3* 148:*11* 150:*10* 175:5 184:*15*, *16* 203:*21*, *24* 207:5, *9* 208:*11*, *20* 209:*19* 244:*15*, *16*

**actions** 57:*23* 58:2 64:*12*, *14* 76:*25* 103:*25* 104:*23* 142:*13* 189:*17*, *22* 204:*1*, *7* 206:*12*, *23*

**activities** 141:*10*

**activity** 105:*13*

**acts** 101:*19* 197:*21* 214:*10*, *13*, *14*, *15*

**actual** 8:*25* 86:*20* 113:*3* 130:*10* 132:*17* 136:*18* 147:*3* 207:*19*

**add** 49:5, 6, *12* 73:*19* 113:2 116:*12*

**added** 53:2, 5 231:*14* 240:*19*

**addition** 45:*19* 212:8

**additional** 73:*14* 237:2

**address** 9:*8*, *11*, *19* 122:9 172:*15*

**adhere** 77:7 78:*20* 104:*17* 143:*12*, *14* 156:*19*

**adheres** 91:5 94:6 146:*18* 185:22

**adjustments** 51:*14*

**administration** 14:5 61:*16* 64:*21*, *23* 120:*12* 121:*3* 176:*25* 178:*11* 199:*23* 206:*6*, *16* 210:*20* 215:*18*

**administrative** 165:7

**administrator** 42:2 67:*12* 99:5 101:*16* 157:*16*

**administrators** 30:*21* 39:*11* 79:*19* 81:*12* 84:9 97:*4* 150:*15* 180:*25*

**admissible** 159:*3*

**admission** 20:*18*

**admitted** 204:*11*

**ADP** 30:2, *3*, *8*, *11*, *13* 38:*14*, *18*, *20* 39:*15* 121:*21*, *22* 123:9, *17* 124:*2* 238:*17*

**adult** 71:7 99:*15*, *25* 165:*14* 231:*4*

**adults** 85:5 90:*2* 139:*22* 162:*15* 166:*24* 187:*7*

**affect** 62:*22*

**aftercare** 127:5 128:*15*, *16* 132:*12* 162:*18* 171:*1*, *3*

**aftercares** 234:*10*

**afternoon** 162:*18* 163:*1* 209:*1*

**afterschool** 141:*10*

**age** 101:*19* 104:7 127:*14* 174:*19*

**agency** 17:*10* 147:*23* 185:*2*

**ago** 23:*24*, *25* 51:*16* 108:9, *15*, *17* 125:*12* 126:*24*, *25* 127:*1*, *3* 137:*17* 138:*10* 141:*4* 168:*5*

**agree** 192:*3* 226:*6* 238:*2*

**agreement** 9:*1* 32:*23* 220:*12* 238:*23*

**agrees** 135:*18*

**ahead** 48:*13* 69:*5* 81:*19* 93:*2* 105:*3* 118:*17*, *23* 177:*6*

**alert** 101:*13* 152:*3*

**alerted** 102:*20*

**Alexander** 18:*20* 24:7 228:*21*

**align** 73:*23*

**allegation** 40:*1* 71:6 136:*10* 154:*4* 164:*10* 177:*16* 184:*24* 218:*16* 219:*13* 220:*20* 225:*13* 230:*20*, *24* 232:*9*, *19* 233:*20*

**allegations** 100:*6* 133:*9* 136:*2* 146:*16*

**admission** 161:5, *8*, *12*, *25* 163:*11* 164:*15*, *20*, *22* 166:*10*, *11*, *15*, *18* 167:8 168:*16* 169:*16* 170:*16* 172:*3* 179:*3*, *5*, *8* 192:*21* 196:*14*, *18* 197:*3* 198:*13*, *16* 201:*16* 211:*15* 212:*25* 224:*22* 226:*2*, *6* 234:7 241:*20*

**alleged** 177:*11* 217:*19*

**allegedly** 205:*25*

**alleging** 87:*21* 229:*22*

**alliance** 12:*4*, *5*, *8* 13:*2*

**allocated** 17:2 36:*14*, *21*

**allocation** 36:*15*, *16*

**allow** 22:*15* 215:9, *11* 220:*13*

**allowed** 22:*25* 157:*20* 215:*3*

**Amended** 3:*14* 228:*14*

**amount** 22:*18* 33:7, *16* 34:*16*

**amounts** 33:*18*

**and/or** 226:*23*, *24*

**ANGELICA** 1:*15* 3:*1* 4:2, *16* 243:7

**anger** 201:*11*

**annual** 14:*20* 15:*16*, *18* 23:*16*, *19* 34:*16* 36:*15* 45:*3* 46:5 50:*10*, *23* 51:*25* 56:*21* 116:*15*

**answer** 26:*20* 32:*17* 40:*11* 115:2 122:*18* 132:*24* 152:6, *23* 153:*17* 188:*24* 228:*24* 233:5, *8*, *9* 239:*1*, *9* 240:*19*

**answering** 105:*24* 111:*18* 232:*11*

**Answers** 3:*14* 5:*15* 6:*21* 7:*1* 228:*14* 229:*1* 239:*13*

**anybody** 147:*17*

**anymore** 214:*3*

**apologize** 11:5 65:*18*

**APPEARANCES** 2:*1*

**APPEARED** 1:*19* 243:7

**appears** 226:5

**applicant** 41:6 84:9 85:*1*

**application** 49:6 77:*12*

**applications** 13:*17* 19:*21* 24:*16* 29:*21*

**applies** 39:*20*

**apply** 43:*3* 142:*18*

**appointment** 149:8 162:*23*

**appreciate** 242:*11*

**appropriate** 188:7, *20* 189:*5*, *11*, *15*, *23*, *24* 190:*14*, *16*, *17*

**approved** 50:*24*

**approximately** 159:*11*

**ARCs** 29:*20*

**area** 11:*25* 97:*25* 100:*25*

**areas** 109:*8*

**array** 13:22 14:*11*

**arrested** 10:*4*

**article** 75:*13*

**aside** 46:9 58:7 175:*4*

**asked** 90:5, 7, *8* 122:*3*, *6* 152:8 163:*20* 165:*25* 168:*21* 172:*13*, *14* 180:*10*, *11* 217:22 232:24 236:*1*

**asking** 46:*10* 51:*18* 65:*19*, *20* 66:*16* 67:*20* 68:*1* 82:*12* 85:*16* 88:*4* 90:*11*, *12* 93:23 98:9, *11* 105:*17* 114:5 120:*17*, *18* 121:*13* 125:*1* 158:*24*, *25* 162:5 170:*15* 171:*25* 179:2 182:*3*, *6* 189:*3* 217:*25* 218:2, *9*, *14*, *21* 220:*18* 230:*21*, *22*

**admissible** 159:*3*

183:22

231:*17*, *24*  232:*12*, *22*
239:*3*, *8*  240:*8*

**asks**  116:*5*  165:*19*

**aspect**  15:*24*  25:*7*
87:*20*  104:*18*

**aspects**  26:*1*  29:*12*
31:*23*

**assault**  161:*7*  171:*5*
198:*13*  234:*23*
235:*17*

**assaulted**  62:*23*
175:*13*  193:*12*, *25*
194:*8*  195:*9*, *21*
198:*7*  199:*9*

**assaults**  199:*13*

**assessment**  11:*24*
219:*23*

**assessor**  79:*14*

**assign**  22:*2*

**assignment**  21:*11*, *21*
22:*6*

**assist**  14:*8*, *22*  15:*8*
16:*3*  41:*10*

**assistance**  18:*4*
44:*20*  152:*15*

**assistant**  55:*24*
86:*15*  87:*4*, *7*, *12*, *15*
88:*5*  158:*11*  162:*24*
165:*8*  172:*12*  177:*3*
196:*19*, *21*  216:*11*
218:*18*  219:*6*, *12*
220:*10*, *19*

**assisted**  14:*24*

**associations**  12:*3*

**assuming**  36:*12*  90:*6*
197:*25*

**attend**  10:*12*, *14*
209:*25*

**attended**  113:*10*
123:*21*

**attention**  7:*10*  78:*13*
127:*10*  158:*15*
185:*12*  220:*2*  229:*5*
235:*18*

**attest**  191:*20*  241:*12*

**attorney**  8:*9*, *18*  9:*6*
132:*25*  244:*12*, *14*

**attorneys**  14:*12*
56:*25*  118:*18*  230:*12*,

22

**audio**  157:*23*

**audits**  15:*16*

**August**  52:*20*

**authorities**  62:*8*
106:*19*, *20*  151:*1*

**authorization**  104:*13*

**authorized**  244:*6*

**available**  6:*23*  22:*16*

**Avenue**  9:*19*

**average**  33:*13*, *16*

**awards**  17:*19*

**aware**  23:*8*, *9*  26:*6*, *7*
38:*2*  39:*21*, *23*  44:*2*
161:*5*  212:*21*  216:*4*,
8  223:*17*, *25*  231:*9*
232:*2*  233:*14*  241:*23*
242:*2*

**< B >**

**babies**  98:*3*  187:*8*
190:*4*

**baby**  187:*17*  195:*22*

**babysitter**  99:*23*

**Bachelor**  10:*21*

**back**  21:*15*  52:*5*
55:*14*  57:*12*  63:*9*
71:*23*  89:*1*  92:*8*
101:*5*  103:*6*  104:*8*
128:*12*, *19*  143:*18*
159:*4*  163:*6*  166:*8*,
21  185:*15*  207:*14*, *23*
210:*11*  212:*24*  228:*2*

**background**  163:*16*

**ballistic**  184:*11*

**based**  6:*22*  33:*6*, *8*,
12  34:*14*  36:*16*  37:*3*,
4, *16*  47:*20*, *23*  48:*18*
50:*1*  56:*24*  58:*20*
68:*25*  69:*2*  134:*17*,
25  135:*6*, *10*  147:*22*
178:*2*  185:*10*  202:*20*
204:*8*  218:*8*  222:*2*
223:*24*  225:*7*  226:*5*

**basically**  73:*18*

**basis**  14:*20*  31:*8*
36:*15*  45:*3*  46:*5*
50:*10*, *23*  51:*25*
56:*21*  96:*10*  116:*15*,
18  152:*24*  153:*22*, *23*

**154:*18*  188:*11*
191:*13*

**Bates**  77:*21*  78:*14*
143:*22*  202:*8*  205:*10*
224:*11*

**bathing**  103:*21*

**bathroom**  5:*25*
103:*8*, *12*  127:*6*, *8*
136:*6*

**bathtub**  158:*4*

**bay**  9:*20*

**Bayshore**  2:*16*

**beach**  103:*18*

**bear**  163:*9*

**bed**  101:*2*

**beginning**  56:*10*
154:*5*  208:*24*

**begins**  42:*4*

**behalf**  2:*2*, *8*, *14*
6:*19*  25:*11*  26:*23*
150:*16*  174:*10*
175:*19*  196:*17*  222:*1*
230:*5*

**behavior**  96:*9*  99:*19*
188:*7*  189:*23*  190:*14*
203:*25*  204:*23*
209:*20*  211:*4*, *5*
226:*24*  227:*11*

**behavioral**  226:*23*

**behaviors**  58:*2*
98:*24*  103:*25*

**believe**  11:*2*  17:*15*,
16  40:*11*  43:*20*
66:*12*, *15*  70:*9*, *11*
72:*5*  84:*3*  107:*21*
132:*3*  159:*10*  161:*14*
164:*18*  177:*10*  179:*9*
194:*10*  196:*25*  202:*7*
207:*8*  210:*13*  214:*19*
236:*16*, *23*

**belittling**  201:*20*

**belligerent**  222:*22*

**Bello**  56:*1*  113:*17*,
18  115:*5*  117:*18*
163:*13*  164:*5*, *11*
183:*3*

**Bello's**  113:*11*, *14*
117:*21*

**belong**  17:*25*

**belongs**  31:*21*  112:*22*

**BERNAL**  1:*15*  3:*1*
4:*2*, *16*  48:*17*  119:*13*
149:*1*  171:*25*  222:*8*
239:*15*  242:*10*  243:*7*

**best**  5:*19*  77:*14*
99:*4*  223:*10*

**BETH**  2:*12*

**better**  194:*10*

**beyond**  62:*16*  65:*7*
106:*10*  188:*17*
211:*12*  213:*7*  217:*6*
231:*22*

**big**  43:*8*  139:*19*
235:*14*

**bigger**  205:*15*

**binded**  77:*15*

**binder**  45:*16*, *24*
46:*1*, *6*  48:*12*  55:*15*
57:*4*  58:*9*  64:*5*  74:*6*,
8  75:*12*  76:*5*, *8*, *20*
113:*12*, *13*, *14*, *15*, *18*
115:*5*, *22*, *24*  116:*9*,
12, *22*  117:*1*, *11*, *13*,
21  118:*9*, *10*, *12*
130:*24*  159:*15*, *17*
236:*25*

**binders**  65:*23*
116:*22*, *25*  117:*3*, *6*, *8*,
20  118:*5*, *14*, *20*

**binding**  7:*2*

**bit**  19:*25*  29:*11*
166:*8*

**black**  117:*11*, *25*
118:*1*  153:*5*  154:*17*

**blown**  196:*5*

**board**  15:*20*  18:*21*
50:*9*, *22*, *25*  77:*15*, *16*
79:*6*  230:*5*, *6*

**body**  97:*25*

**boil**  125:*13*

**bonds**  13:*23*  19:*22*

**book**  132:*11*, *14*
216:*12*

**bothering**  174:*22*

**bottom**  132:*16*
134:*15*  144:*19*
205:*16*

**Boulevard**  2:*10*, *16*

**boy**  90:*8*  99:*23*
103:*8*

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 248 of 285
Deposition of Olivia Angelica Bernal
Jane Doe v. Academir Charter Schools, Inc., et al.

**break** 5:24  36:22, 23
40:8  49:7  92:24
93:2  108:22  115:3
118:24  119:3  177:7,
8  227:24  228:3
241:15
**breast** 167:16, 24
168:13  188:9  192:12
**Brickell** 2:3
**brief** 40:8  177:8
228:3
**briefly** 29:6
**bring** 80:24  103:5
120:10  124:24, 25
179:5
**bringing** 64:25  121:4
**broad** 96:2  163:22
**broke** 108:24
**brought** 119:19
125:16  127:10
158:15  178:10
185:12  199:18
231:17  241:19
**bruises** 101:9
**budget** 36:14
**budgeting** 237:22
**budgets** 16:10, 11
24:15
**building** 33:25
**butt** 102:13  235:14

**< C >**
**C-6** 207:6
**call** 20:13  42:18
44:4  55:8  61:9, 11,
12  62:20  63:18
68:17, 20  69:25  70:2,
17, 22  71:13  73:15
79:1, 5  83:13  87:24
88:13  91:13  94:18
95:17  96:22  97:5
100:2  147:18  148:14
149:21  150:24
151:18, 19  152:3
162:3, 4  163:23
164:2, 8, 13  201:18
213:12  216:11  218:7
221:9, 16
**called** 4:3  33:22
55:10  61:18  62:1

79:25  83:17, 24, 25
91:7  124:10  126:13
128:11  147:4  162:1,
6, 9, 19, 20  163:13, 18
164:5, 11, 12  165:4
166:5, 6  173:25
174:1  175:4  176:2
179:6  182:16  184:12,
13, 19  185:6  196:6
197:13  198:19
201:25  211:8  213:14,
15, 16  214:8  215:24
**calling** 42:22  64:24
89:17, 18, 23  92:10
98:7  216:2  223:18
**calls** 26:19  37:23
79:4
**camera** 72:4
**cameras** 127:11
128:20  169:22
**campus** 25:3, 23
27:21  32:24  33:8
62:17  86:14  218:13
233:7
**campuses** 35:20
86:13  163:21
**card** 80:8
**care** 25:14  41:11
103:10  106:11, 12, 17,
18  150:4  154:7, 8
173:25  181:17
183:23  199:11, 12
210:9  232:18
**career** 12:24
**careful** 151:25
213:20
**carried** 125:22
**carries** 239:22
**carry** 35:14  115:24
**Casas** 18:21  24:7
228:21  230:17
232:22
**CASE** 1:3  3:10, 11
30:21  40:16, 21  42:6,
24  43:7, 15, 25  55:20,
23  56:2, 24  58:17
61:14  62:19  63:13,
25  69:16  80:19, 23
81:8  84:4  85:11, 14,
15  86:12, 22  87:10,

21  88:18  95:25  98:8
101:25  102:1  119:23
120:25  121:11
125:14, 21  138:9
139:7  140:3  141:20
147:22  151:22
152:16  158:20
162:14  173:12, 23
179:22, 23  185:10
187:1  194:2, 21
202:17  203:24
205:21  209:2  221:6
223:13  230:11  231:3,
8, 19, 22, 25  232:15
233:1, 13, 24, 25
**case-by-case** 151:7
152:24  153:22, 23
154:18
**cases** 25:13  58:6
59:7  96:5  98:13
99:8  101:3  122:8
139:20  151:20
152:18
**categories** 143:9
208:14
**CATHERINE** 2:18
**cause** 186:17
**cautious** 151:25
158:16
**CEO** 18:24  21:4
**certain** 12:14, 18
44:9  56:16  60:7
73:1, 2  96:8  170:20
171:17  181:6
**CERTIFICATE** 3:4
243:1  244:1
**certification** 11:3, 25
38:24
**certifications** 11:9, 13,
18
**certified** 11:21
**certify** 243:6  244:5,
11
**chair** 18:21
**change** 174:4  241:19
**changed** 75:8  125:19
177:24, 25  178:12
179:12  196:1  199:6,
7, 22  213:11  216:21

217:13  219:17, 18
241:18
**changes** 52:25  53:12
74:23  75:24  103:2
241:23  242:4
**changing** 216:21
**charge** 12:20  28:1
32:6  33:10  37:7
49:25  75:6  86:24
87:9, 12  114:9  172:9
238:18
**CHARTER** 1:9, 10
2:8, 14  4:10, 11  6:10
9:23, 25  10:1  12:4, 5,
7, 11, 13  13:2, 7, 8, 9,
12, 17  14:10  15:5
16:1, 8  17:24  18:16,
22  19:4, 9, 10, 21
21:10, 20  24:12, 14,
18, 24  27:1, 25  28:14,
19, 20  29:3, 13, 24
30:5, 8, 10, 15, 22
31:1, 5  33:14  34:4
35:22, 24  43:7, 16, 18,
25  44:8, 9, 16, 17, 18,
20  45:23  51:4  57:15
72:10  74:14  75:5, 22
76:9  77:12  78:4, 23,
24  79:3  81:22  82:12,
14, 25  84:2  87:5
90:12  91:1  104:17
105:17  108:3  112:13,
16  113:21  174:11
228:14  229:10, 11, 14
230:25  240:4
**charters** 14:3, 10
**check** 25:23  227:24
**chief** 18:8, 12, 18
19:6, 16  20:23, 24
21:8, 16  22:11, 21
23:10, 22  24:2, 5, 9,
10  26:15  188:5
189:3  198:10  227:14
**child** 33:25  40:15
42:17  55:2  58:16, 19
59:19, 20, 21, 24
60:13, 15, 18  61:1, 4,
5  62:11, 21  63:5, 14
64:10, 15, 16  65:3
66:13, 17, 20, 21  67:4,

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 249 of
285
Deposition of Olivia Angelica Bernal                                Jane Doe v. Academir Charter Schools, Inc., et al.

10, 11, 19  68:16, 18
69:23  70:7, 8, 11, 16
71:9  81:17  88:12
89:12  90:19  93:20
94:14, 17, 19, 22, 25
95:5, 12, 22  96:17
97:17  98:18, 22, 24,
25  99:9, 15, 17, 20, 24
100:11, 13, 18, 20
101:10, 19  103:23
104:5, 24  105:2
106:22  125:17  127:7
141:8  149:17, 24
151:20  158:4, 10, 18
161:22  162:15, 16, 17
163:4  164:24  165:8,
19  166:16, 21, 22, 24
169:6, 8, 9, 19  170:4,
6, 23, 24  171:4, 8, 9,
12, 18, 19  172:19
173:2, 12, 13, 15
174:21  175:11, 20, 22
176:23  177:23  180:1
181:8, 9, 18, 19, 22
182:13  185:12  187:4
188:24  189:18  190:1,
15  191:1, 5  192:7, 25
193:12  194:6  198:21
199:10, 13  200:15, 16,
18, 20  201:4  204:5,
18, 21, 22  206:14
209:6, 11, 12, 24, 25
211:10  212:10
213:10  214:3, 16
215:6, 7  217:7, 8
218:21  219:3, 20, 21,
22, 24, 25  220:4, 6, 16
221:5, 6, 15, 21, 25
222:1, 2, 4, 7, 12, 13
223:13  225:3  226:22
227:8  231:3, 16
234:14, 22
**Children**  3:12  42:23
58:22  61:10, 23
62:24  67:11  70:2, 17
74:19  80:25  90:1
95:7, 8, 19  96:3, 9, 15
97:23  100:4  102:22
103:24  104:25
105:11  141:18

147:19  149:22, 25
150:3, 6, 7, 16, 23
151:9  152:1  158:7
170:9  174:18  175:3
185:8  187:15  190:10
210:5, 11  211:16
212:1, 17  213:3, 13,
15  214:8, 12, 15
215:16, 25  216:2, 7
217:1  219:11  220:3,
21  222:17  223:18
224:1, 5  225:8
**child's**  190:23
**circumstances**  151:10
152:9  189:5, 10
**cites**  186:20
**civil**  10:6  38:25
43:3  44:5  72:16
79:1  84:10, 14  92:4,
10  106:7  112:5
146:8
**claim**  58:1
**clarify**  21:3  34:2, 10
64:3  231:24
**class**  165:1, 17
190:16  204:11
206:20  212:14
224:25
**classes**  211:20
**classified**  79:12
**classroom**  225:6, 23
**clear**  34:1  65:18
114:22  238:2
**clearly**  5:9  6:5
112:15
**client**  6:14  113:9
161:2
**closed**  135:14
**Code**  3:8  9:1  21:12,
25  22:16, 21  44:10,
11  49:17  57:12, 18,
22  58:7  63:9  71:11,
14  73:25  74:20, 21
77:8  78:2  104:10
105:4, 20  106:1, 25
185:19  203:10
206:23  207:15, 24
237:8  240:18
**Codes**  3:11  22:15,
18  203:14, 15, 18, 21,

22, 23, 24  207:4, 9
208:11, 21
**collaborated**  126:11
**collect**  158:13
**collected**  130:3  159:3
**collection**  15:23
16:13
**collects**  158:23
**college**  10:12, 14
**combination**  13:11
73:1  74:16  238:23
239:19
**combine**  77:6
**come**  16:22  19:24
61:13  83:20  106:21
119:21  147:9, 13
148:8  149:4  150:13
151:1  154:11  157:2
159:4  161:20  163:6
168:21  169:2, 4
173:2  180:2  185:15
197:9  202:1  214:5
215:22, 25  220:11
228:1
**comes**  15:3  33:4
36:11  39:9  41:6
66:21  95:5  101:10
120:25  142:10, 16
148:15  150:14  154:3
167:3  178:14  201:19
215:6, 17
**coming**  36:12  127:4
182:25  184:14
210:11  219:7
**comingle**  24:13
**comment**  172:3, 16
175:14  185:11
190:25  192:6  204:10,
12, 16  206:19  211:10
217:3  221:23  231:1
235:4, 7
**comments**  144:13
166:23  167:1, 23
168:11  169:17  204:9
211:6  235:3
**COMMISSION**
243:19
**commit**  105:3  106:23
**committed**  133:5
190:2  214:10

**common**  26:25
28:11, 13, 16, 18, 25
**communicate**  43:2, 6
56:8  58:25  64:18
85:24  101:15  106:14
149:7  150:5  171:21,
22  180:22  181:2
182:20  187:19  190:7
200:8  201:15  220:8
**communicated**  63:1
149:2  162:15  165:9
166:19, 25  168:20
171:2  195:1, 3, 23
196:19  206:14
211:13  214:2  224:24
**communicating**  182:5
195:22, 23  201:12
**communication**  63:16
64:8  201:10
**companies**  28:20
**company**  30:4  41:6,
13  162:8
**Complainant**  156:3
**complainants**  110:17
156:14
**complaining**  234:14
**complaint**  59:9
106:10  110:10, 19
120:7, 10, 12  125:25
127:15, 18  128:4
140:23  141:11
146:22, 25  147:3
148:17  149:13
150:18  154:25
155:13, 15, 17, 21, 25
156:1  231:2  233:2,
19  235:16
**complaints**  53:5
57:7  58:11, 14  65:22
74:10  75:13  76:5, 11
91:25  92:18  95:4
113:5  120:3  121:5, 9
126:3  133:9, 13
139:10, 22  146:19
147:1  155:12  156:7,
21  230:2, 3  236:9, 12
**complete**  11:19, 24
25:5  49:12  74:24
79:14  81:13  82:18

104:*25*  155:*1*, *13*, *15*, *18*, *25*  169:*24*

**completed**  15:*18*  169:*23*

**completely**  195:*24*

**completing**  43:*12*  90:*17*

**compliance**  13:*13*, *25*  15:*7*, *9*  16:*1*, *17*  20:*9*  29:*20*  30:*25*  31:*4*, *8*, *19*  32:*2*, *4*, *5*, *9*  37:*13*  38:*25*  39:*18*  44:*5*  45:*14*, *15*, *24*  55:*15*  58:*9*  71:*20*  72:*5*, *6*, *21*  74:*5*, *8*  75:*12*  76:*20*  79:*1*  84:*11*, *15*  87:*19*  88:*23*  92:*4*, *10*  106:*7*  111:*25*  112:*6*  115:*23*  116:*4*, *19*  117:*6*  146:*9*  236:*2*, *24*  238:*16*  239:*5*

**compliant**  15:*21*  31:*16*

**computer**  48:*20*

**concern**  141:*10*  199:*1*, *2*, *5*

**concerns**  122:*9*  163:*22*

**conclude**  127:*8*

**concluded**  242:*16*

**conclusion**  26:*19*  37:*24*  132:*19*  133:*24*  134:*25*  135:*3*  137:*7*  138:*5*  148:*5*  149:*14*, *16*, *18*

**conclusions**  137:*9*  139:*5*, *11*, *15*

**concrete**  134:*11*

**Conduct**  3:*9*  9:*2*  15:*19*  44:*11*, *12*  49:*17*  57:*12*, *18*, *22*  58:*8*  63:*10*  71:*11*, *14*  73:*25*  74:*20*, *21*  77:*8*  78:*2*  89:*4*  104:*10*  105:*5*, *20*  106:*1*, *25*  139:*14*  169:*12*, *15*  174:*14*  176:*19*  177:*12*  178:*19*  180:*6*, *19*  182:*10*  183:*15*  185:*19*  186:*9*, *11*

195:*14*  207:*10*, *15*, *16*, *25*  225:*9*  236:*4*  237:*9*  240:*18*

**conducted**  15:*19*  91:*10*, *15*  121:*20*  125:*11*  127:*3*  128:*25*  133:*13*  140:*12*, *15*  142:*2*  147:*15*  148:*23*  170:*15*, *17*  172:*2*, *7*  173:*9*  195:*10*  234:*18*

**conducting**  5:*1*  9:*14*  125:*1*  148:*18*  156:*20*  234:*2*

**conference**  63:*20*  203:*16*, *19*  207:*3*  211:*9*

**confirmed**  166:*2*, *21*

**conflict**  26:*14*, *21*

**confrontational**  201:*20*

**confusing**  5:*20*

**connect**  161:*21*

**connected**  244:*14*

**connotation**  204:*4*

**consequences**  189:*16*, *21*  210:*23*  211:*7*, *11*

**consider**  176:*20*  179:*14*, *22*  180:*20*  182:*9*  183:*14*

**considered**  23:*14*  78:*9*  82:*6*  94:*11*  177:*17*  178:*21*, *23*  208:*22*

**consistently**  209:*4*

**constant**  175:*10*  177:*21*  178:*6*

**constantly**  171:*12*  186:*5*  188:*18*  221:*22*

**constitute**  174:*15*  176:*21*  178:*7*  180:*8*  191:*8*  207:*21*  209:*2*  222:*6*  231:*5*

**constituted**  209:*25*

**constitutes**  186:*5*

**consult**  12:*18*

**contact**  20:*16*  55:*6*  58:*3*  60:*3*, *6*  61:*14*  71:*20*  72:*17*, *18*  73:*15*  74:*24*  75:*6*, *20*, *22*  84:*10*, *14*, *20*, *21*

85:*2*, *21*, *24*  86:*7*, *21*  88:*2*, *3*, *7*, *8*, *15*, *16*  97:*12*  99:*10*  106:*5*, *15*  109:*5*, *8*, *15*, *20*  110:*9*, *16*  112:*11*, *12*  113:*2*, *5*, *7*, *25*  114:*1*, *12*  115:*9*, *14*  119:*4*  148:*25*  149:*25*  150:*1*, *11*  154:*1*  160:*3*  175:*17*  177:*16*  178:*20*  182:*8*  185:*2*, *7*  192:*21*  206:*15*  213:*1*, *2*  214:*25*  219:*10*, *13*  222:*17*  241:*4*, *6*, *16*

**contacted**  20:*17*  88:*19*  106:*3*  127:*20*  128:*11*  141:*13*  161:*15*, *16*  162:*22*  163:*2*  167:*6*  170:*23*  182:*23*, *24*  193:*2*, *21*  197:*5*  216:*25*

**contacting**  75:*21*  196:*12*  216:*6*

**contacts**  86:*2*, *3*  87:*20*

**contain**  118:*10*

**contained**  65:*22*  76:*20*

**contains**  237:*1*

**content**  158:*17*

**context**  190:*18*  234:*21*

**continue**  27:*12*  41:*14*  62:*13*  135:*21*  212:*11*  215:*4*

**continued**  141:*8*  151:*4*

**continues**  99:*1*

**continuing**  180:*2*

**continuously**  96:*7*

**contract**  28:*8*  77:*11*

**contracted**  14:*9*  30:*14*

**contractors**  45:*12*  49:*11*  109:*11*

**contracts**  26:*17*  30:*10*, *17*  77:*5*, *14*

**control**  226:*23*

**conversation**  212:*18*

**conversations**  56:*25*  190:*12*

**convert**  53:*7*, *25*

**conveyed**  167:*15*

**COO**  21:*5*

**Coordinator**  104:*14*  106:*2*  107:*6*, *24*  108:*7*, *18*  109:*2*, *13*, *14*  110:*14*, *16*  113:*20*, *24*  114:*23*  119:*7*, *8*, *11*, *14*, *17*  120:*21*  140:*8*, *25*  146:*9*  148:*21*  150:*20*  151:*12*  152:*11*  153:*2*, *16*  154:*15*, *20*  189:*2*  198:*11*  227:*13*  234:*3*  235:*3*

**coordinators**  107:*9*  108:*3*

**copies**  159:*16*

**cops**  72:*15*  75:*3*, *4*, *18*, *21*  87:*25*  112:*5*  146:*11*  184:*13*, *14*  194:*19*  218:*7*

**copy**  45:*7*, *18*  48:*5*  53:*24*  54:*7*  130:*25*  131:*2*, *25*  137:*19*  156:*24*  157:*7*, *9*, *12*, *18*  159:*14*

**corporate**  9:*24*

**correct**  16:*4*  20:*5*, *6*, *25*  22:*10*  26:*10*  30:*5*, *20*, *23*  31:*19*  33:*4*, *5*  37:*8*  38:*17*  47:*19*  52:*24*  55:*17*  56:*3*  57:*8*  58:*11*  60:*24*  66:*14*  67:*4*  72:*2*  74:*6*, *7*, *11*  76:*3*  83:*1*  86:*10*  88:*25*  89:*13*  91:*18*, *23*  92:*1*, *18*, *19*  97:*10*, *13*  110:*19*  111:*5*, *6*  112:*2*  113:*21*, *22*  114:*2*, *7*  115:*11*, *12*  117:*23*  118:*7*, *8*  122:*25*  123:*2*  137:*5*, *8*  139:*13*  144:*9*  146:*3*, *13*  148:*20*  156:*8*  159:*12*  177:*14*  186:*21*  195:*5*  197:*17*,

*18* 198:8, *9* 203:8
211:*4* 217:*16, 17*
218:*17* 219:8 225:*10*
234:4, *5* 236:9, *10*
239:*1, 2* 240:5, *21*
244:8
**corrective** 44:*12*
104:*11* 144:*20*
**correctly** 183:*13*
**cost** 33:*12* 35:5
36:*16*
**counsel** 244:*12, 14*
**counseling** 184:*1*
201:*3* 203:*16* 212:9
**counselling** 189:*19*
205:*1*
**counselor** 65:2, *3*
166:*22* 169:*25* 171:8
173:*2* 200:*17, 23*
201:2 202:*21* 204:5
205:*3* 211:*1, 2*
219:*20*
**counselors** 89:*19*
**county** 17:5, *6, 11, 13*
22:9, *12, 24, 25* 23:9
34:22 36:*15, 19, 21*
38:*16* 39:*10* 43:*4, 11,
21, 23* 44:7, *15, 18*
47:*17* 50:2 51:*15*
57:*14* 72:6, *24* 74:*14,
18* 75:5, *10, 14, 22*
76:*1* 77:8, *16* 78:22
81:*20* 82:2, *3, 17*
84:*19* 88:22 92:*15*
106:6 108:*10* 112:22,
*24* 116:7 129:*24*
143:*15, 25* 145:*11*
160:*18* 207:*18*
208:*11* 243:*3* 244:2
**county's** 22:*23*
**couple** 13:*3* 16:*23*
17:*21* 37:*12* 47:6
108:8 125:*12, 24*
126:*25*
**course** 38:*23* 39:*4, 5*
196:2 234:*1*
**COURT** 1:*1* 5:*3, 6,
12* 71:23 193:*17*
229:2 233:*15*

**cover** 39:*20* 103:*21*
121:*25* 122:2, *3, 7*
**covered** 39:*14*
122:*19* 124:7
**covers** 37:*12* 39:*16,
17*
**COVID** 16:*25* 155:22
**CPA** 15:*14* 28:7
31:*14*
**crazy** 200:7 201:*21*
**CRCs** 29:*20*
**create** 155:9 186:*15*
**created** 49:22 51:7,
*20, 24* 52:5 79:*24*
142:22, *23* 155:*10*
202:*19* 206:2
**creator** 13:*16*
**crime** 90:*3* 106:*23,
24* 133:5 190:2
**criminals** 187:7
**criteria** 153:*15, 20*
**crying** 95:*4, 6*
169:*20* 191:2
**cuca** 166:*4* 167:*14,
19* 168:7 188:*14*
190:9
**cumulative** 56:*19*
140:2, *5*
**cunt** 216:*11*
**current** 9:8
**currently** 13:*5* 20:*4*
**curriculum** 18:*5*
28:2 29:*23*
**curse** 62:*1*
**cursed** 181:*1*
**cursing** 200:*6* 201:*20*
**cut** 8:*14* 105:*16*
173:*4*
**cute** 235:*14*
**cutting** 176:8
**cyber-harassment**
144:*16*

**< D >**
**D.A** 238:*17*
**dad** 99:*21* 102:*11*
158:8 193:2, *4*
194:*16* 200:*10*
212:*14*

**Dade** 22:25 43:*4*
44:*15* 51:*15* 57:*14*
75:*4, 21* 106:6
108:*10* 112:24
**danger** 59:22 62:*21*
221:6
**dashboard** 82:*18*
**date** 54:*20* 126:5, *23*
129:*20* 154:*20*
**Dated** 244:*19*
**daughter** 164:*22*
167:*4, 5* 193:*24*
194:8 195:8, *14, 16,
17* 198:*20* 199:9
217:*21*
**daughter's** 218:*16*
**day** 25:*1* 35:*14*
62:*19* 95:*3* 123:*4*
128:*22* 163:*4* 171:*1*
172:*16, 23* 179:*13*
180:*3, 4* 181:9
182:*16* 184:*18*
196:*20* 198:*21, 25*
199:6, *7* 209:*3* 210:*4,
5, 11* 212:*12* 220:5
236:*4* 243:*13* 244:*19*
**days** 24:25 25:2
169:*3* 180:5 196:8
199:*11*
**day-to-day** 13:*24*
14:*15* 18:*1* 24:*24*
29:*14, 21* 32:24
34:*19* 35:6, *19* 36:2
37:7 96:*10* 116:2
237:*13, 19*
**DCF** 224:*11*
**de** 193:*9*
**deal** 133:*21*
**dealing** 40:*16* 45:9,
*10, 12* 57:*13* 59:*13*
85:*3* 112:23 114:*24*
153:6, *7* 170:*21*
**deals** 57:9 74:*19*
**decide** 61:7 77:*13*
148:*14*
**decided** 241:*15*
**decision** 19:*23* 63:*4*
**decision-maker** 87:*17*
**decisions** 147:*21*
177:5

**declined** 193:*14*
196:*11*
**Defendant** 2:*8, 14*
3:*13* 133:*11* 240:*3*
**Defendants** 1:*11*
**Defendant's** 77:*21*
78:*14* 143:22 202:8
205:*10*
**defense** 151:*15*
**define** 94:2
**defined** 186:*19*
**defines** 79:9
**definitely** 42:*24*
**definition** 32:*4*
91:*21* 143:*24* 144:2,
*7* 185:22 186:*4, 8*
207:*17*
**degree** 10:*17, 19, 23,
25* 11:*4, 6*
**delineate** 63:*24* 108:9
**delineated** 57:*17*
**delineates** 49:*14*
**deliver** 126:*16*
**delivered** 126:*15*
**demand** 199:*14*
**demographic** 224:*18,
21*
**denied** 37:*18*
**denotes** 83:*14*
**Department** 3:*12*
11:*15* 15:*3* 42:22
45:9 62:*24* 70:2, *17*
79:*21* 81:6, *20* 84:22
97:*13* 100:*4* 141:*18*
147:*18* 149:22, *25*
150:23 151:9 185:8
213:3, *13, 15* 214:7,
*11* 215:*16, 24* 216:2,
6* 217:*1* 219:*11*
220:3, *21* 222:*17*
223:*18* 224:*1, 5*
225:8
**departments** 36:7
**depend** 101:*24*
**depending** 33:*11*
42:*24* 43:*8, 15* 44:2
49:*20* 58:*16, 24* 59:2,
*20* 60:9 61:5 77:*13*
85:*11* 139:6 151:6

depends   17:24   32:3
42:5   43:13   53:17
59:5   61:13, 20   62:2,
20, 25   63:17, 22   65:5
83:14   86:5   94:12
101:22, 25   103:5, 14
150:21   151:19
152:12   153:3, 25
154:13, 17   188:10, 13,
23   191:12   203:17
deploy   25:6
deployed   65:3
deposed   4:17
DEPOSITION   1:15
3:4, 8   4:21   5:1   6:9
8:7   9:6, 15   48:24
71:24   111:8   242:16
244:1, 7
depressed   101:12
DEREK   2:3
describe   60:25
132:10   239:4
described   23:7
44:22   76:6   113:11
123:17   131:21   138:9
159:10   236:16
240:10
describes   206:18
describing   47:21, 23
Description   3:7
42:13   144:10   206:17
designated   119:9
120:1
designee   104:14
106:3
desktop   48:20
destructive   209:20
detail   239:4
details   200:3
detective   158:20, 22
193:7, 13   194:3, 5, 6,
11, 18, 22   195:11
196:6, 10
detention   204:3
determination   40:19
60:21   63:6   81:6, 21
98:7   127:13   132:18
133:4   135:5, 6   136:1
138:4, 11   147:10, 14,
24   148:13   153:24

154:14   173:21
176:24   214:23   215:2
determinations
138:18   139:12, 16
determine   65:16
67:1   80:15, 22   89:10
92:22   93:8   95:20
96:15   99:4   150:7, 8
151:2   170:3   192:20
determined   79:11, 12
93:15, 16, 18   105:2
140:5   170:6   172:24
173:17   184:9   221:10
determines   81:1
82:10   86:1
Determining   91:20
develop   14:4, 14
16:10   17:3   25:5
50:5
developed   50:7   108:8
development   25:16
Diary   234:12
difference   102:23
different   13:22
14:11   22:18   27:11
33:8   36:16   37:13
38:13, 25   41:1, 24
43:12, 14   49:6   55:12
59:2, 23   63:10, 23
64:12, 13   81:3, 18
85:6   89:19   97:15, 22
101:3   103:23   105:9
109:5, 8   129:13, 14
139:7   153:7, 9
162:11, 15   182:12
191:15   195:24   196:1
204:6   229:21, 24
231:2   235:5   237:21
differently   97:20
difficult   59:5
difficulty   182:5
201:11
digital   53:1, 8
155:22   241:18
diligence   148:4
168:25   222:10
DIRECT   3:1   4:6
directly   36:11   42:1,
3   53:11   120:4
121:12   142:10   147:8

148:8, 10   154:3, 12
161:17   162:4   164:1
178:1
director   49:25   51:3
123:10
directors   28:4   29:5
disbursed   17:1   36:7
disbursement   17:3
discarded   56:21
disciplined   210:14, 17
disclosed   225:19
discomfort   186:17
disconnected   40:7
Disconnection   71:21
discontent   154:11
160:13
discriminated   37:15
discrimination   39:18
discuss   176:4   180:12
188:8, 21   189:12
discussed   8:17   53:12
54:6   91:7   141:14
161:19   169:17   201:9
discusses   93:6
112:17, 18
dismissal   204:11
210:6
display   96:9
displayed   204:24
displaying   99:18
displays   98:25
disrupt   63:12
disrupted   63:13
209:23
distinguish   24:8   34:6
distraught   173:16
distress   149:24
171:4   191:2   200:20
219:22   220:1   221:7
223:14
distressed   191:6
DISTRICT   1:1   17:3,
6, 12   20:19   21:13, 24,
25   22:1, 5, 14   29:19
31:6   33:17   34:22, 24
38:14   39:10   73:24
112:12   116:5, 19
142:10, 16, 23, 25
143:3   147:7   160:20

176:13, 14   201:1
205:7
District's   3:9   104:13
143:6   144:22   145:1,
20   146:8
doc   154:24   155:11
document   7:5   46:15
47:24   54:8   68:22, 24
69:1, 10, 17, 21   71:25
72:3, 9   77:20, 21, 24
89:2   110:12, 24
111:7, 10   112:20, 21
115:7, 13   129:13
136:25   143:18
145:15   146:1   159:9,
12   160:1, 6   176:14
185:17   201:6   202:6,
14, 17, 20   204:24
205:4, 8, 19   208:3
228:5, 10, 13, 20
237:3
documentation   56:12
57:2   83:10   130:18
155:5   157:5   169:24
229:25   230:1
documented   109:3
129:4   133:22   137:11
175:21, 25   176:16
201:1   204:2   212:17
Documenting   205:24
documents   8:8, 22
16:12   55:20, 23
56:16, 20   116:21, 23
130:2   139:16   159:21
212:21   236:14
DOE   1:5, 6   3:13
4:9   6:15   206:1
231:11
doing   18:3   24:19
27:6   53:10   96:6
174:8   184:17   188:16
194:12   209:24   210:9
doubt   94:18   95:24
97:3   98:20, 21   221:5,
16, 17, 18, 21   222:19
doubted   222:15, 20
drafted   160:24
draw   7:10   78:13
229:4   235:18

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 253 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

drink  5:25
Drive  2:3  48:21
Dropbox  45:1
dropdown  54:15
DSIS  80:1  82:19
  176:17  201:1
dual  83:6
due  143:2  148:3
  168:25  204:10  222:9
duly  4:4  243:8
duties  24:8, 12  25:9
  119:18
duty  93:22

< E >
earlier  72:20  74:5
  76:2  85:8, 23  90:25
  93:11  111:8, 21, 23
  112:20, 22  121:23
  123:17  143:19  146:2,
  6  159:10  160:2
  185:18  207:17
  210:13  235:22
  236:16, 23  240:11
  241:14
early  88:24
earn  10:19, 23  11:17
earned  10:25
East  2:10  19:9
easy  46:7  53:8
edited  52:23
education  10:21, 22
  11:1, 11, 15  27:10
  34:20  37:15, 18  39:9
  40:22  62:13, 15  96:2
  141:9  143:10  180:1
Educational  11:7
  17:19  27:14  37:18
  39:6, 21  105:12
  124:3  186:16
educator  96:16
  101:13
educators  223:9
effect  5:2  43:21
  54:11
effectively  62:14
either  61:7  79:2
  82:7  86:16  87:6
  88:15  138:6  215:19

electronic  53:18, 20,
  22  80:6
electronically  80:10
  155:2  156:1
elementary  78:3, 7, 9
  139:20
embarrassed  172:19
emergency  68:16, 19
  69:25  70:22
emotional  226:22
  227:5
emotionally  191:6
  212:11
employed  26:5
  29:25  30:2, 3, 7
employee  18:9  23:12,
  14  32:5  42:2, 17
  47:11  49:7  51:18
  54:12, 13  63:15  84:8
  85:1  86:3  87:22, 23
  89:2, 7, 11  97:11, 14
  99:10  109:9  129:2, 6,
  11  130:5, 6, 10, 15, 19
  131:12, 23, 24, 25
  132:17  133:21, 25
  134:13  136:4, 7
  137:25  138:7, 10, 12,
  13, 17  172:10  240:17
  244:12, 13
employees  15:4
  22:24  26:4  28:16, 19
  30:9  32:6, 7  39:19
  40:18  41:3  43:5
  45:10  49:9, 20  51:12
  53:4  74:25  77:4
  84:13, 19  85:1, 3, 21
  86:7  91:11, 25  92:16
  93:12  97:9, 15  98:13
  106:4  107:11, 17, 25
  126:14  136:24
  142:19  160:15, 21
  174:8  197:14, 17
  203:5  214:9, 17
  216:6, 25  227:6
  235:25  236:2, 5
  238:6
employer  23:1
encompasses  160:21
encumbers  73:3

ended  111:25
enforced  77:10
enforcement  185:2, 7
  195:10  196:13, 24
  197:1  219:7  220:4
engage  22:1  106:9
  191:25  192:12
engagement  15:17
English  193:16
enrollment  25:21
  33:9  37:3, 5  56:19
  111:15  237:23
enrollments  25:25
ensure  5:18  15:11,
  14, 20  31:8, 16  34:20
  37:13  40:15, 20  41:7
  46:7  56:23  58:15
  60:14  62:11, 12
  64:15  65:13, 15
  68:15  69:22  89:12,
  22  104:21  105:9
  150:2  170:4  175:5
  184:3  211:3  219:23
  223:11
ensured  169:19
ensuring  60:17
  66:12  70:10
entails  25:4
enter  79:20  80:1, 2
  81:10  82:8, 23  83:21
entered  176:17
entire  11:23  163:10
  177:23
entirety  107:2
entities  31:19
entitled  39:19  198:22
environment  63:12,
  17  186:16  209:21, 23
escuela  193:9
ese  193:8
ESOL  11:11
especially  51:11
  73:24  74:19  89:25
  102:13  105:11
  158:16  176:22
  214:14
ESQUIRE  2:4, 12, 18
essence  57:14
ESSER  16:24  17:18
established  51:13, 25

Esther  18:20  19:1
  50:15, 19  51:3  77:2
  121:6  160:25
estimation  192:23
evaluated  116:17, 18
evaluation  12:12, 17
  15:18
event  85:19
events  163:8
Everybody  45:1
  55:9  59:15, 16  76:22
  99:6  103:9  105:10
  141:19  152:4  172:12
  173:23  174:1  213:14
  241:16
evidence  135:16
  157:21
exact  126:4, 23
exactly  59:4  68:11
  71:14  106:8  117:1
  135:24  201:17
exam  11:17, 20
EXAMINATION  3:1
  4:6
Examinations  3:1
examined  4:4
example  15:13  28:3
  58:17  145:4  186:1, 7
Examples  144:11
exception  72:14  75:3,
  17, 18  92:9  112:5
  146:7  231:10  232:16
  233:1, 24, 25
excerpt  239:16
executed  77:15
executive  29:4  121:1
  162:9
Exhibit  3:8, 9, 10, 11,
  12, 13  7:6, 7  77:17
  143:20  145:16, 17
  178:5  202:7, 9  205:9,
  11  208:4, 5  224:9, 10,
  13  228:6, 7
exhibits  226:24
existed  55:16  115:13
exists  112:16
expand  27:12
expansion  13:15
  19:19, 20

expected   240:6
expel   104:23   105:8
expelled   81:17
experience   52:4
65:19
experiences   189:25
EXPIRES   243:20
explain   29:11   89:10
134:2   137:1   208:1
239:12
explained   39:14
41:20   45:2   153:4
explaining   42:12
explains   38:24
exploited   221:8, 12
222:5
exploring   102:22
exposed   100:16
104:6
express   97:24   104:13
expressive   95:8
extensive   49:13
61:11
extent   175:13   216:17
234:19

< F >
facets   38:25
facilities   29:17
facing   231:23
fact   106:17   124:6
169:1   174:25   200:5
214:20, 22   220:1
224:2
facts   154:20
faculty   109:10, 20
113:5   116:15   237:7
238:1, 5, 11, 14, 24
240:8
faith   216:18
fall   58:22   67:16
falls   55:2   83:12
familiar   29:1   78:11
143:24   145:10   161:2
220:23
Families   3:12   42:23
62:25   70:3, 17   100:5
141:18   147:19
149:22, 25   150:5, 23
151:5, 9   185:8   213:3,

13, 16   214:8, 12
215:17, 25   216:3, 7
217:1   219:11   220:3,
8, 21   222:18   223:19
224:1, 6   225:9
family   180:11
185:16   207:4
father   177:11   178:10,
16, 17   179:5   180:19,
23, 24   181:3, 6, 7, 16
182:5, 7, 15   183:4
184:10, 16, 19   185:6
193:1, 6, 10, 20, 22
194:4, 22   196:11, 12
197:5, 6, 12   198:3, 5,
6, 19   199:14   201:10
202:3   212:7, 25
213:8, 14   214:1
216:1, 9, 16, 22   218:5,
15   219:6, 16   222:21
223:17   224:22, 24
father's   179:3, 8
180:6   201:11
fear   62:20
federal   16:19, 22
32:12, 14, 19   33:19,
23   34:2, 7, 14   36:10,
13   122:13
feedback   170:11
feel   40:16   59:21, 23
67:15   87:18   93:20
97:18   145:7   221:14
fellowship   12:22
felt   170:25   175:11,
12   204:10   213:23
234:24
female   145:6   186:2
fifth   71:16, 18   78:10
97:21
fighting   99:3
figure   48:11
file   58:4   110:2, 5
120:7, 12   130:5, 6, 9,
11, 13, 15, 20, 25
131:7, 10, 24, 25
133:22, 25   136:4, 7,
12   137:23, 25   138:1,
7, 10, 25   139:2, 17
210:24   232:18

files   136:14
filing   8:25
fill   47:7   49:12   55:1
82:6, 20   90:16
final   132:18   133:4
finances   14:21   28:9
financial   29:16   33:11
financially   33:13
244:15
financials   15:13
31:13
financing   237:22
find   5:20   60:20
96:5   169:1   187:20
finding   104:9   105:25
136:8   137:7   138:4
findings   126:17
128:23   136:25   137:9
138:18   139:5   180:18
225:12
fine   6:12, 17   94:25
95:2   162:17   170:25
171:19   172:22   220:5
finish   5:14, 16   92:25
115:2   181:13   189:8
236:21
fire   83:13, 19
first   4:3   10:19   22:5
51:7   56:11   58:15
59:8, 12, 15   60:12, 14,
15, 19   64:15   66:12
70:7, 10   71:13   85:7,
24   86:6, 18   89:21
97:3   127:16, 17
143:11   151:14
161:11, 24   163:11
164:3, 9   168:15
173:1   178:11   184:23
187:20   188:18   197:2
200:2   219:25   230:12,
14, 16   231:12
firsthand   191:22
fiscal   14:20   29:16
46:21, 24   47:3   53:6
54:5   56:15   69:11, 12,
17   111:1, 4, 10, 24
112:17   115:20
159:11   236:19
237:12   240:11, 20

241:21
fiscally   15:21
five   63:10   71:5   95:1
125:8   187:24   191:8
228:2   241:9
five-minute   227:24
five-year-old   188:7,
21   189:6, 11
five-year-olds   59:14
90:4   97:19   98:10
102:13   170:22   187:6
191:11
floor   62:1
FLORIDA   1:1, 24
2:4, 10, 16   9:10
11:15   12:5, 7, 10, 13,
24   36:19   185:7
213:3   214:11   216:6,
25   219:11   220:21
222:17   224:1   225:8
243:3, 6, 19   244:2
folder   56:20   140:2, 6
follow   43:5   45:8
51:22   57:16   64:6
69:14   71:12   72:13
73:5, 6, 8   74:17, 20
76:21, 22   85:7   91:25
92:9, 13, 14   105:4, 20
107:4   111:14, 17
112:9, 24   113:7
125:15   142:25   149:8
160:14   197:11   203:5
239:21
followed   112:25
170:5
following   49:17
110:6   160:17   161:13,
17   174:2, 9   176:3
185:13   237:8, 18
follows   4:5   78:4
91:2   105:17   146:7
156:12
fondled   234:25
food   101:7
footage   128:17
force   5:2
foregoing   244:7
Form   3:10   26:18
28:22   32:16   34:9
47:7   49:12   53:1, 18,

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 255 of 285
Deposition of Olivia Angelica Bernal
Jane Doe v. Academir Charter Schools, Inc., et al.

22, 24  54:7, 16, 17, 19
55:4, 9, 13  59:11
74:24  80:5, 6, 12, 13
82:7, 15  83:1, 3, 4, 6,
23  84:17  89:5  90:16,
17, 18, 22, 24  91:14,
16, 17  94:1, 21  99:13
101:21  114:13, 17
129:15, 16, 21  131:20,
22  132:1  142:22, 23
143:1, 7  146:22
154:19, 23  155:2, 4, 5,
8, 14, 17, 18, 21, 23
160:23  174:17
176:13, 14  189:13, 21,
24  192:14  197:23
202:17  203:6, 25
205:21, 22  206:2, 11
222:13  226:3, 7
241:18
**formal**  233:4, 20
**forms**  143:4  146:24
204:25  205:5
**for-profit**  26:17
**Fort**  2:10
**FORTE**  2:14
**forth**  119:19  125:17
160:22  206:15
**forward**  86:3  120:10
141:15  159:14
**found**  115:19  149:3
223:20
**founded**  208:18
**Four**  70:4  88:14
97:15  146:21  162:15
166:24  167:22
182:14  214:16
**frame**  127:9  128:19
132:7  135:23
**FREEMAN**  2:8
**Friday**  161:15
162:14  163:7  184:25
185:1, 5
**Fridays**  161:16
**friend**  1:6  225:19
**friends**  99:4
**front**  68:8, 10  69:7
72:1, 4  103:9  165:8
166:1  207:24  230:11
**froze**  40:4, 5

**FTE**  33:22, 24  34:14,
16, 17  35:7, 16, 25
36:9  37:2
**full**  4:15  40:10
135:9  137:18  152:3,
17  171:16  196:5
**full-blown**  100:3
138:21  159:2  194:12
**full-time**  18:9  23:12,
14
**fully**  104:22  137:12
152:6
**funded**  35:18
**funding**  32:12, 15, 19
33:3, 6, 19, 23  34:2, 7,
14  35:17, 25  36:3, 9
**funds**  17:5  32:19
34:17  111:15
**funny**  132:14  234:12
**further**  47:8  82:10
135:19  142:13  149:5
150:10  211:12
244:11
**future**  54:4

**< G >**
**gain**  141:9
**GARRISON**  2:14
**GARY**  2:8
**gather**  55:19, 22
158:3
**gathered**  128:10
**gathers**  158:22
**general**  39:6, 8
54:17  64:7  65:19
114:8, 9  122:8, 13
204:20
**generally**  90:11
120:19  121:13  172:6
205:5
**generate**  80:20  83:18
**generic**  66:1
**genitals**  100:25  180:8
**gentleman**  128:16
132:15
**gesture**  5:7
**gestures**  144:14
**getting**  26:22  27:5
134:9  170:10  210:6

**girl**  90:6, 7  102:12
167:20  172:21
**give**  7:11, 14, 18, 21,
25  8:3  42:12  48:1,
13  68:3  78:15  79:22
80:8, 21  81:8  82:4, 5
83:20  101:7  118:19
139:9  145:24  146:24
152:22  182:19
184:10  202:12
205:14  208:8  224:16
227:21  229:1, 5
235:19  237:23
240:24
**given**  11:13  17:2
81:13  82:21  141:20
142:21  143:8  156:24
180:12  244:9
**gives**  80:11
**giving**  156:13  183:25
**go**  4:19  11:20, 22
21:15  25:14, 22, 25
39:12  40:6  41:13
45:19  48:13  50:1
53:11  56:7  57:11, 19
59:19  60:22  62:24
63:14, 15  64:21  65:7
69:3, 5  71:11  74:24
81:19  82:19, 23  85:5,
7  87:11  91:3  92:8
93:2  97:16  103:11,
12, 13  105:3, 8, 15
107:10, 15  118:17, 23,
24  121:21  128:19
134:7, 16  135:10, 13,
17  137:22  141:20
143:18  147:8  148:10
159:16  160:13  163:8
164:1  170:13  173:6
177:6  178:2  181:6
183:5  197:10  207:14,
23  210:6, 12  214:4
215:9  217:22  218:1
223:2, 3  228:17
230:20  237:10
**goes**  33:17  42:1, 2, 3
97:14  186:14  209:17
**going**  4:19  6:9  7:4
22:2  53:20  55:14
57:18, 19, 25  59:22

60:1, 2, 3  61:22
62:22  64:14  65:6, 7
66:18  71:23  77:22
80:19  81:3, 16, 17
82:4, 5  89:15  92:22
96:22, 24  98:2, 5
103:3, 8, 11  105:12
108:12  116:2  118:16
145:14  149:16  153:9
155:16  159:15
163:17  164:8  175:16,
17  176:7  182:1
183:5, 6  190:11
192:9  194:3  198:18
199:9, 24, 25  200:7
201:21  202:5  205:3,
8, 9  212:24  213:24,
25  215:5, 7  216:14
218:7, 8  227:21
230:8  235:7  239:17,
23
**Good**  4:8  53:16
216:17
**Good-bye**  216:14
**goodwill**  216:18
**Google**  154:24
155:11, 14, 17, 24
**governing**  15:20
18:21  77:16  79:6
230:5, 6
**government**  16:22
36:10, 13
**grab**  102:13
**grade**  78:10  127:16
**grader**  97:21
**graduations**  26:1
**grant**  16:9  17:5, 16
**grants**  13:18  14:21
16:2, 5, 7, 8, 19, 20, 22,
23, 24  17:7, 9, 20, 23
24:16  29:16  32:21
35:3
**graphic**  144:13
**great**  68:8  180:3, 4
**grievance**  41:14
57:21  73:16, 17  92:3
154:10  160:12
**grievances**  47:7  75:7
119:19, 22

grieved 95:6
**GROUP** 2:3
grow 27:12
**growth** 13:14 19:18, 20 27:22
guess 79:21 178:11 211:3
guidance 56:8 65:20 106:16 141:25 147:13
guide 27:17
guidelines 73:10 142:25 143:13, 15 152:25
guides 20:20 57:22
gun 198:19, 20
guys 8:25 48:22 159:14 223:21 224:4

**< H >**
hair 61:24
half 19:14 92:23
hand 59:6 60:10 63:1, 2, 19 65:2 85:10 86:12 184:2 243:12
handbook 46:18 47:11, 13 58:9 93:1 116:16 207:19 236:19, 20 237:24, 25 238:1, 11, 13, 14, 24 240:17
handbooks 14:1, 17, 18 116:1, 6
handle 9:4 13:18, 19 29:13, 14 30:24 34:25 39:1 41:2, 7 42:21 45:10 60:2, 4 64:22 86:19 89:16 119:18 122:8 124:13, 17 147:1 152:1 175:16 193:7
handled 62:3 124:21 125:24 126:2, 7 141:5 152:18 161:14
handles 32:2 45:9, 11 58:19 86:16
handling 49:9, 10, 11 57:6 58:14 59:9 65:20, 22 74:9 76:10

91:25 92:17 124:4 146:19 156:7 160:11 162:11 237:1
hands 15:15 216:23
handwritten 155:24
happen 33:18 57:25 59:2 81:16, 18 96:14 125:20 171:18 181:23 183:21 196:5 211:7 214:24 215:2
happened 55:5 66:20, 25 67:15, 16, 22 87:22 89:8, 24 90:23 95:22, 24 98:22, 24 99:2 127:19 128:20 130:12 132:8, 9 135:24 137:17 141:3, 12 165:18, 20 168:5 169:5, 21 175:6 178:24 182:15 183:1 184:4 187:21 194:10 195:17, 18 202:4 209:3 210:1, 10 213:9 224:25 225:22, 23 226:15 229:20 233:7 241:21
happening 43:8 56:9 64:17 100:12 102:18 104:1, 4 149:2 179:16, 25 186:22 209:4 223:8
happens 55:3 56:14 58:22 87:18 147:6 154:6 170:1 171:10, 14 186:4 200:24
happy 5:21 6:2 147:12 148:8 170:25
happy-go-lucky 220:4
harassed 171:12 232:20 234:15
Harassment 3:10 37:16 39:17 59:8 69:15 70:6 71:7 78:15, 21 79:8, 9, 13 85:9, 11, 15, 17 86:2, 20 91:22 92:5, 6 98:18 104:10, 12 105:25 113:4 122:3, 14 123:24 143:21, 25

144:3, 7, 8, 11, 21, 22 145:2, 5, 11, 21 146:16 160:20 161:6 172:6 173:9, 11 174:16 175:10 176:21 177:18, 20 178:6, 8, 21, 23 179:10, 14, 22, 23 180:9, 21 182:10 183:15, 20 185:9, 23 186:4, 6 191:8 207:17 208:15, 21, 23 209:2 223:13 229:15, 18, 23 230:2, 3, 24 231:6, 8 232:3, 19, 25 233:21 234:7 235:5, 16 237:9 238:15
harassment/assault 133:10
hard 53:23 54:7 120:15 201:22
harm's 149:24
head 124:23 142:15
hear 38:4 170:10 183:5 188:15
heard 59:16
hectic 19:23
held 100:12 128:13
he'll 121:10
help 6:15 12:22 13:14, 23 14:10 20:18 25:17 35:8, 13 37:7 89:12 114:22 149:4 215:10
helpful 48:7, 10 68:4
helping 19:20 25:21 35:6
helps 20:20
Hey 20:14 56:24 61:17 63:18 87:20 89:24 94:8, 14 116:11 147:17 148:9 149:1 165:17 175:5 181:16 182:24 190:5, 8 202:1 209:14 220:8
HH 243:19
high 153:7 191:13
higher 207:20, 22

high-quality 27:20
hinders 40:23
hired 24:23
hiring 28:1 30:12
Hispanic 165:24
hit 95:10
Hold 8:13 18:6 20:11 21:2 70:9 116:9 189:8 233:15
holder 17:9
home 104:5 172:17 188:15 197:21 198:14, 17 210:6, 12 218:6, 17
homework 18:4
hostile 186:16
hotline 216:3, 7
hours 92:23
housed 139:23
HR 15:3 29:15 30:12 35:1 44:24 45:4, 8 47:9 49:24, 25 51:2, 10, 17 84:21 85:2 108:13 119:8 123:10 131:7, 10, 25 241:7
human 51:3
humiliation 186:17
hungry 101:6
hurt 66:23 67:17 68:18 94:16 187:21 222:8
hurts 83:12 101:1, 5

**< I >**
identical 75:13, 17, 25
identification 7:8 77:18 81:15 145:18 202:10 205:12 208:6 224:14 228:8
identified 71:9 85:10 110:11 207:12 209:5
identify 83:7 207:15
identifying 88:12
identity 6:15 204:18
image 158:18
imagine 19:2 23:20 28:25 30:17 167:17 216:12

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 257 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

**immediate** 88:*9, 16*
209:*19* 220:2
**immediately** 19:*6*
59:*17* 70:2 71:*13*
87:25 149:*10* 150:5
166:5, *7* 175:2 176:*1*
183:*24* 208:25
211:*16*
**impacted** 98:*19*
**implemented** 104:*12*
**important** 56:*18*
181:*14*
**impossible** 64:2 66:*4*
**improve** 53:*14*
**inappropriate** 165:*9,
12* 174:*20* 203:25
204:22, *23* 206:*9, 10,
19* 209:*15, 16, 17*
**inappropriately**
100:2 164:*25* 175:22
**inaudible** 5:*7*
**incident** 40:*23* 49:*18*
54:*11, 17, 20, 21, 24,
25* 55:*3, 13* 58:*4, 24*
59:*3* 61:*17* 62:2
79:*23* 80:2 83:*6, 8*
84:*7, 15, 25* 85:*20*
86:*8, 24* 89:*3* 90:*18*
91:*8, 11, 14, 16, 17*
94:*24* 99:*11* 129:*10,
12* 130:*17, 24* 131:*1,
15, 18* 136:22 137:*19,
20, 22, 24* 139:*1, 2*
140:*17* 141:*3* 148:*11*
150:*9* 151:*23* 157:*1*
164:*4* 167:*9, 21*
173:*12* 177:22
178:*25* 183:*19*
187:*25* 205:*24*
208:*25* 217:*19* 225:*3*
234:*16* 235:*17*
**incident/injury** 83:*7*
**incidents** 55:*1* 57:*24*
80:*14* 93:*6, 13, 23*
97:*7* 98:*14* 176:*15*
204:*8*
**include** 16:*19* 36:*10*
74:*18* 78:*8* 101:*18*
144:*12* 157:*23*

208:*21* 236:*11*
237:*20*
**included** 23:*3* 46:*12,
14* 54:*19* 123:22
130:*14* 142:5 166:*18*
242:*6*
**includes** 32:*14* 131:5
160:*23* 186:*8* 208:*17*
233:*2*
**including** 133:*12*
144:*15* 166:*20*
219:*20*
**indicate** 207:*25*
**indicated** 171:*8*
193:*21*
**indicates** 61:*6* 139:*3*
**indication** 178:*4*
223:*15*
**indirect** 32:*14* 34:*7,
11*
**individual** 25:*13, 18*
26:*2* 40:*19* 42:5
59:*3* 61:*14* 114:*15*
147:*22* 151:6 191:*12*
**individualized** 64:*1*
**individually** 36:*20*
**individuals** 28:*18*
34:*4* 52:*9, 22* 162:*21*
167:*22*
**individual's** 186:*18*
**informal** 233:*20*
**information** 15:*23*
43:*11* 55:*7, 12* 56:*18*
62:*10* 67:*6, 21* 73:*2,
14* 79:*20* 80:*1, 3*
86:*18* 122:22 123:*13,
15* 124:*24* 126:*10, 12*
128:*11, 13* 134:*10, 11,
17, 25* 135:*7, 9, 10, 13,
21* 137:*14* 142:*9, 20*
147:*25* 149:*21*
150:*25* 157:*13* 158:*3,
23* 174:*4* 178:*3*
179:*6* 182:*2* 190:*23*
191:*22* 200:*4, 9*
209:*9, 10* 222:*2*
224:*7, 19, 21* 237:*2*
239:*24*
**informed** 162:*13*

212:*25* 218:*15*
**informs** 61:*6*
**in-house** 92:*12*
**initial** 62:*10* 146:*15*
147:*2* 148:*19* 170:*17*
209:*10*
**initially** 12:*16*
154:*25* 165:*3* 169:*18*
172:*11* 196:*3* 206:*5*
**initiate** 168:*16*
**initiated** 82:22
149:*15*
**injured** 66:*23* 67:*16*
94:*17*
**injury** 83:*8, 25* 84:2
**in-person** 144:*14*
**inquiry** 132:*21*
**inquisitive** 102:*14*
**insert** 73:*12*
**inside** 210:*11*
**instance** 126:*6, 9*
142:*1* 187:*3*
**instances** 120:*18*
152:*21* 158:*25*
**instant** 222:*12*
**institutions** 27:*20*
39:*6, 21* 124:*3*
**instruction** 29:*23*
210:*2, 4, 7*
**instructional** 27:*16*
**insulted** 216:*13*
**insurance** 35:*1*
**Intake** 3:*12* 89:*4*
90:*15, 17, 24* 91:*9, 10,
13, 15*
**interaction** 200:*22*
**interest** 26:*14, 22*
223:*11*
**interested** 193:*10*
244:*15*
**interfere** 186:*18*
**internally** 60:*4* 61:*23*
**Interrogatories** 3:*14*
228:*15*
**interrupt** 105:*12*
114:*20*
**intervention** 87:*19*
226:*23*
**interview** 12:*18* 67:*4,
10, 11, 19*

**interviewed** 156:*23*
200:*17* 219:*21*
**interviewing** 63:*5*
66:*16* 67:*13*
**interviews** 128:*25*
129:*4* 156:*17, 20*
**intimidating** 186:*15*
**investigate** 198:*13, 16*
**investigated** 62:*7*
**investigating** 144:*7*
**investigation** 41:*11*
42:*21* 62:*9* 65:*11*
79:*11, 22* 80:*8, 17, 18*
81:*1* 82:*11, 22* 86:5
88:*1* 104:22 105:*1*
125:*11, 23* 126:*1, 3, 7,
18* 127:*2, 11, 21*
128:*5, 7* 129:*1* 130:*3,
7* 132:5 133:*20, 24*
134:*5, 7* 135:*9* 136:*9*
137:*6, 12, 18* 138:*5,
21, 24* 140:*23* 141:*7,
12, 17, 22* 142:*2, 11,
18* 147:*9, 15* 148:*1,
18, 19, 22, 24* 149:*9,
13* 151:*11* 152:*3, 10,
17* 154:2 156:*17*
158:*14, 21* 159:2
168:*17, 22* 169:*13, 16,
22* 170:*16, 18, 19*
171:*16, 24* 172:*2, 4, 5,
10* 173:*9* 174:*12*
179:*17, 20* 180:*17, 24*
181:*16* 184:*10*
192:*25* 193:*11, 13*
194:*12, 17, 20* 195:*9,
15, 19* 196:*4, 5, 10*
199:*25* 201:*13, 18*
213:22 215:*10, 13*
236:*8*
**investigations** 120:22
124:*14, 18, 20* 129:22
133:*13* 136:*25* 137:*4,
10* 138:*19* 139:*15*
140:*12, 15* 144:*4*
156:*21, 24* 157:*20*
159:*1* 160:*11* 234:*2,
6, 17*
**investor** 223:*25*

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 258 of 285

Deposition of Olivia Angelica Bernal                                Jane Doe v. Academir Charter Schools, Inc., et al.

**invite** 149:*6*

**invoicing** 16:*14*

**involve** 120:*25* 127:*2, 4* 154:*10* 234:*7*

**involved** 83:*16* 99:*7* 127:*12, 15* 138:*18* 148:*22* 149:*12* 150:*19, 22* 151:*10, 11, 17, 21* 152:*10, 17, 18* 153:*1, 9, 17, 21* 154:*4, 12, 14* 166:*10* 173:*24* 185:*6* 231:*8* 234:*9, 20*

**involvement** 152:*14*

**involves** 71:*6*

**involving** 84:*8, 25* 85:*20* 86:*9* 89:*3* 91:*12* 93:*25* 196:*14* 197:*16* 217:*20* 230:*22*

**irate** 163:*2* 167:*3* 181:*2* 200:*8* 201:*11* 215:*11* 216:*10* 217:*15, 18*

**isolated** 94:*24* 177:*21* 209:*3*

**isolation** 171:*15*

**issue** 20:*14, 17* 40:*23* 42:*18* 49:*18* 86:*2* 141:*2* 232:*7*

**issued** 132:*19* 140:*24* 143:*16* 219:*23*

**issues** 13:*19* 25:*15, 19* 109:*21* 120:*7* 144:*8* 230:*8*

**items** 46:*19, 22* 53:*2* 68:*13*

**its** 107:*2* 144:*3* 192:*22*

**IX** 3:*9* 9:*3* 13:*21* 37:*9, 11, 12, 20* 38:*1, 8, 12, 20* 39:*16, 20, 25* 40:*13, 25* 41:*3, 16* 42:*8* 45:*13* 46:*2, 11, 20, 23* 47:*2, 13* 49:*2* 51:*7, 19* 52:*8* 54:*16, 18* 57:*5* 58:*10* 65:*21* 72:*5, 18, 23* 74:*9, 15* 75:*7, 12, 20* 76:*5, 10,*

12, 13, 14, 15 88:*22* 92:*4* 104:*14, 19* 105:*14, 21* 106:*13* 107:*5, 24* 108:*2, 6, 17* 109:*2, 13, 16, 25* 110:*1, 4, 10, 14, 15, 17* 111:*16, 25* 112:*12, 19* 113:*1, 3, 20, 24* 114:*2, 5, 8, 9, 11, 15* 115:*6, 10, 15* 118:*11, 13, 15* 119:*5, 7, 8, 11, 14, 17* 120:*2, 19, 21* 121:*5, 7, 13, 18* 122:*1, 2, 13, 15, 20, 24* 123:*6, 8, 11, 12, 22* 124:*1, 7, 13, 17, 20* 125:*2, 11, 23* 126:*3, 7* 127:*15* 134:*5* 136:*8, 25* 137:*3, 10* 138:*5, 19* 139:*5, 10* 140:*7, 12, 15, 25* 142:*2* 143:*9* 144:*3, 22* 145:*2, 11, 21* 146:*9, 19, 22, 25* 147:*2* 148:*16, 21* 149:*13* 150:*18, 19* 151:*12* 152:*10* 153:*1, 16* 154:*15, 19* 155:*12* 156:*7, 13, 21, 24* 157:*19* 159:*1, 6* 160:*3, 7, 19* 168:*17* 169:*12, 16* 170:*16* 172:*1* 189:*2* 198:*11* 227:*13* 231:*13* 234:*2, 3, 6, 17* 235:*3* 236:*1, 6, 9, 12* 237:*1, 2* 238:*4, 6* 239:*5, 18* 240:*1, 10, 14, 21* 241:*8, 24* 242:*6*

**< J >**

**JANE** 1:*5* 3:*12* 4:*9* 6:*14* 161:*2, 3, 25* 163:*12* 167:*22* 168:*12* 177:*11, 12* 180:*19* 182:*7, 8* 183:*16* 184:*24* 196:*15* 197:*15, 20* 198:*6, 17* 200:*23* 203:*7* 206:*1* 211:*15*

213:*1* 223:*25* 227:*4* 231:*11* 241:*19*

**Jane's** 164:*10* 169:*16* 170:*16* 172:*2* 198:*3* 212:*7, 24, 25* 216:*1* 223:*17* 226:*6*

**Jmchaffie@garrisonyo unt.com** 2:*18*

**job** 21:*25* 22:*18, 21* 24:*19* 25:*7* 26:*2* 62:*15* 65:*14* 87:*17*

**join** 121:*10*

**jokes** 144:*13*

**judge** 5:*3*

**JULIE** 2:*12, 18*

**Julie.karron@fmglaw. com** 2:*12*

**jumped** 183:*4* 198:*19, 20*

**June** 52:*20* 243:*13* 244:*19*

**jurisdiction** 183:*10*

**jury** 5:*4*

**< K >**

**K-12** 10:*25* 11:*10, 11, 12*

**KARRON** 2:*12* 8:*10, 13, 19* 21:*2* 26:*18* 28:*22* 32:*16* 34:*9* 37:*23* 38:*3* 40:*3* 48:*1, 7, 11* 59:*11* 67:*23* 68:*9* 84:*17* 89:*5* 92:*20* 94:*1* 99:*13* 101:*21* 114:*17, 19* 132:*20* 159:*13, 18* 174:*17* 189:*13* 192:*14* 193:*15* 197:*23* 226:*3, 7* 242:*12*

**Katiana** 1:*19* 243:*18* 244:*5, 23*

**keep** 56:*14, 16* 83:*10, 21* 116:*21* 130:*25* 136:*14* 137:*22, 25* 138:*3, 23* 140:*7, 10, 11* 173:*5* 176:*7, 8* 204:*5* 205:*1* 211:*24*

**keeping** 57:*2* 179:*25*

**keeps** 174:*23*

**kept** 56:*12, 21* 116:*16, 24* 131:*2* 134:*4* 136:*15* 138:*14, 20, 25* 139:*1, 2* 157:*5* 176:*17* 216:*21*

**Key** 2:*3* 101:*8*

**kick** 181:*22* 219:*3*

**kicked** 181:*9, 18* 212:*3* 218:*21*

**kid** 175:*9* 183:*7, 21* 199:*2* 232:*17* 234:*12* 235:*7, 8*

**kidney** 211:*17*

**kids** 85:*14* 96:*6* 98:*2* 102:*1, 3, 9, 19* 103:*4* 153:*11* 171:*15* 173:*16, 22* 187:*8* 209:*19* 227:*18* 235:*5, 6, 8*

**kind** 12:*25* 14:*7* 15:*8* 16:*5* 17:*1* 38:*11, 20* 52:*1* 67:*18* 79:*23* 80:*9, 18* 83:*14* 94:*20* 100:*5* 101:*12* 144:*8* 163:*16* 172:*5* 174:*5* 211:*6* 232:*4* 233:*20*

**kindergarten** 78:*8* 153:*12* 188:*3* 227:*18*

**kindergartner** 165:*1* 189:*7*

**kindergartners** 98:*3, 11* 120:*14, 17* 153:*8* 174:*24*

**kinds** 65:*10* 102:*4*

**kiss** 94:*9* 95:*14* 97:*25* 102:*16, 20* 166:*4* 167:*13* 168:*2, 8* 195:*25*

**kissing** 167:*24, 25* 168:*1, 12*

**knee** 83:*12*

**knew** 56:*9* 108:*22* 112:*3* 132:*7* 141:*6* 172:*15* 183:*18* 185:*10* 214:*7* 217:*6*

**know** 5:*21* 6:*1* 8:*11* 9:*18* 12:*19* 14:*3* 15:*20* 25:*5, 19* 29:*6* 32:*11* 33:*17* 36:*20*

37:9, 17   39:19   41:7, 8, 21   47:5   51:11, 13, 23   52:3, 6   53:1   54:12, 21, 23   55:22   56:4, 5, 13, 15, 24   57:13, 25   58:22, 23   60:8   61:5, 17, 18, 22   63:7, 11, 14, 16, 18, 19, 23   64:16, 25   65:5, 12   66:22   67:21   69:16   75:19   78:7   83:9, 17   85:13   89:13, 18, 20, 23   90:17, 23   92:20, 22   94:20   95:1, 10, 12, 13, 18, 20, 23   96:3, 6, 11, 18, 24, 25   97:16   98:3, 17, 23   99:18, 21   100:3, 6, 9, 21   101:8, 10, 16, 17, 19   102:1, 7, 8, 9, 10, 17   103:4, 7   104:5, 6, 21   105:6, 7, 11, 12, 22   106:10, 17   108:15   113:4, 5, 6   115:23   116:10, 11, 14, 21, 23   117:2, 19   118:22   122:17, 21   123:4, 5, 6, 8, 9, 11   124:6   126:4   128:20   132:13   134:12   135:15, 23, 24   136:21   140:18   141:8, 16, 21   142:5, 14   148:6, 9   149:1, 21   150:1, 11, 12, 24   151:2, 4, 6, 16, 17, 19   152:3, 20, 23   153:10   157:25   159:15   160:2, 14   161:18   162:14, 16   163:3, 15   164:1, 6   165:13, 21   166:3   169:19, 21   170:2, 5, 21   171:4, 14, 15, 23   172:15   173:15, 18, 21, 22   174:9, 23, 25   175:11, 15, 20, 24   176:1   181:4   182:1   183:2   184:5, 11   187:16, 17   190:5, 21   192:17   194:25   196:13   198:21   201:7,

17, 23, 24, 25   202:19   203:2, 5   204:23   205:22   209:8, 18   210:21, 23   211:11, 12, 19, 24   212:12, 19   214:20   216:10, 15, 17   218:5, 7   219:16, 21   220:22   221:24   222:1, 2   226:15   227:8, 16, 18   228:24   230:10, 11, 17   231:2, 6, 15, 16, 19   232:19   233:6   234:20, 22   235:8   237:5   238:15, 16   239:7, 14, 18, 20   241:2, 5, 11
**knowledge**   6:22, 23   101:18   133:8   227:7   233:11, 19
**known**   6:23   13:3
**knows**   96:7
**KYLE**   2:4   4:8   48:2, 8   68:5   92:20   159:22
**Kyle@dereksmithlaw. com**   2:6

**< L >**
**L.L.C**   2:14
**L.R**   3:11   187:24   191:17, 24   210:14   213:1
**la**   193:9
**labeled**   77:22   78:14   143:20, 22   145:23   146:15   156:2, 9, 16   202:8   205:10   224:11   226:18
**labels**   117:12
**lacks**   226:23
**lady**   206:1
**land**   29:18
**Lane**   9:10
**language**   204:22   206:10
**Las**   2:10
**Lauderdale**   2:10
**launch**   86:4   100:2   126:1   148:1   152:2   154:25   171:16   179:16   184:9   194:16   201:18   213:21, 24

**launched**   127:21   134:15   137:12   141:7, 12, 17   147:10   179:20   180:23   181:15   201:13
**LAW**   2:3   5:3   122:13   185:2, 6   195:10   196:12, 23   197:1   219:7   220:3
**laws**   158:6
**lawsuit**   4:9   10:7, 10
**lawsuits**   230:21
**LEA**   17:6, 8   43:2, 21   44:8
**lead**   86:15
**leader**   27:17, 23   99:5
**leaders**   12:23, 25   14:13
**leadership**   10:18   11:7, 10, 22
**learn**   91:8   127:17   161:11   164:3   184:23   190:3
**learned**   128:3   164:9   167:9, 21   168:15   177:16   197:3   213:2   219:12   220:20
**learning**   16:25   18:3, 5   63:12, 17   65:14   91:11   99:11   189:25   209:21, 23
**learns**   89:2
**leave**   69:3   137:23   202:25   203:5
**leaves**   149:17
**left**   162:18   163:18   168:23   171:3   196:7   218:5
**legal**   26:19   37:24
**letters**   15:17
**level**   27:11   41:12, 13, 25   43:9   49:18   56:17   57:24   60:8   63:8   64:21   71:8, 10   76:24   79:16   88:10   96:8   105:7   116:20   120:8   147:16   166:25   172:8   207:11, 13, 16, 20, 22, 25   208:19   209:6

210:1
**levels**   63:10
**liable**   100:13
**lick**   195:25
**licked**   199:19   225:20, 21
**limit**   22:17   236:2
**limited**   144:12
**line**   24:11, 20   151:14   210:12
**lines**   129:19   130:1
**link**   53:11, 25   155:18
**list**   7:11   22:11   23:6   69:20   110:13, 15   113:20   114:1   160:6   208:13   236:14
**listed**   7:15, 22   8:4   65:24   70:15   91:9, 19   115:6   146:21   206:24   237:3   238:25
**listen**   121:2   158:12   179:15   184:7, 8
**listened**   59:16   151:17
**lists**   115:9, 14   155:12
**litigation**   47:23   118:21
**little**   19:24   29:11   54:13   61:23   90:1, 6, 7, 8   103:7   131:17   153:10   166:8   172:21   205:15   239:16
**lived**   9:11
**living**   36:17
**LLP**   2:8
**located**   9:17   36:17   44:23   45:14   110:5   111:12, 19, 20, 21   113:10
**location**   25:1   55:4   148:12
**loco**   147:20   222:10
**log**   154:20
**long**   9:11   13:1   18:12   19:12   23:22   25:24   47:2   57:3   115:13, 23   168:5   185:14   230:17
**longer**   92:21   182:1
**look**   64:1   98:6   102:6   115:22   117:10

120:*23*, *24*   121:2
142:*13*   155:7   165:*17*
175:5   181:*17*   182:*25*
186:*1*, *8*   190:*19*
209:*14*   215:*15*
**looked**   50:22   80:*23*
126:*10*   127:*11*
207:*17*
**looking**   68:22   69:*21*
84:5   85:*18*   89:*1*
100:*10*   104:8   185:*18*
202:20   206:3
**looks**   40:6   47:25
53:*16*   101:*10*, *11*
116:*10*   117:2   207:*1*,
*6*   208:*18*
**losing**   152:7
**loss**   16:25   18:*3*
**lot**   20:2   25:*3*   26:*1*
49:6   63:*23*   80:*3*
116:*23*   120:*24*
163:*25*   182:*1*
**Louis**   1:*19*   243:*18*
244:5, *23*
**loved**   19:*25*
**lump**   36:*23*
**lunch**   92:*23*   118:*24*
119:*1*

**< M >**
**MACDONALD**   2:*4*
3:*1*   4:7, *8*   7:4, *9*
8:*14*, *21*   21:*14*   26:20
28:*15*, *24*   32:*17*   33:2
34:*12*   37:25   38:*4*, *7*
40:5, *9*   48:*9*, *15*
60:*11*   68:7, *21*   71:22
77:*19*   84:*23*   90:*10*
92:25   93:*4*   94:*4*
97:6   100:*17*   101:*23*
115:*1*, *4*   118:*16*
119:2   132:*24*   133:*3*,
*6*, *15*   145:*14*, *19*
159:*24*, *25*   170:*12*, *14*
176:6   177:6, *9*
191:*16*   192:*19*
194:*24*   198:*1*   202:5,
*11*   205:*13*   208:2, *7*
224:8, *15*   226:4, *13*

227:*23*   228:*4*, *9*
242:*8*
**main**   61:*16*   86:*14*
**major**   43:*8*
**making**   37:*14*   40:*19*
53:*1*, *5*, *11*   63:*4*
64:25   73:6   98:6
145:7   151:*15*, *16*
164:22   201:*16*   232:*3*
**Maltreatment**   226:*19*
**man**   31:*23*
**manage**   227:*1*
**managed**   30:*11*
**Management**   3:*10*, *11*
9:*1*   28:20   29:*16*
32:*23*   111:*1*, *4*, *11*, *14*,
*24*   112:*17*   121:*1*
162:*8*, *9*   163:*14*, *23*
202:*17*   203:25
205:*21*   238:*23*
239:22
**managers**   16:*9*
**managing**   35:*3*   41:*13*
**mandatory**   220:*24*,
*25*   221:*3*
**manner**   23:7   60:*25*
**Manual**   3:*10*   72:5, *6*,
*12*, *21*   88:*23*   92:5, *17*
110:8   112:*1*   144:*23*
145:2, *12*, *21*   207:*23*
237:*11*   238:22
**manuals**   13:*25*
115:*25*   116:6, *16*
**mark**   7:6   145:*15*
205:9   208:*3*   224:9
228:5
**marked**   7:8   77:*18*
143:*19*   145:*18*
202:*10*   205:*12*   208:6
224:*14*   228:*8*
**marks**   200:*19*
**master's**   10:*16*   203:*4*
**MATHIS**   2:*8*
**matter**   41:*8*   139:*24*
**matters**   112:*19*
114:*16*   115:*10*, *15*, *20*
175:*1*   184:2   187:*18*
216:22   237:*1*
**MCHAFFIE**   2:*18*
**MDCPS**   84:*10*, *14*

**mean**   21:*23*   22:*8*
32:*3*   34:*11*   43:*18*
45:5   53:*16*   62:*19*
63:22   65:4   69:2
100:*23*   105:*16*   140:*1*
142:*18*   153:*11*, *12*
155:*15*   164:*24*
165:*11*   184:*1*   186:*25*
190:*1*   216:9   221:*3*
231:2
**Meaning**   24:*1*
177:*15*   186:22
**means**   113:*3*   208:*1*
**meant**   166:*1*
**Measures**   156:*3*
159:*11*   184:*3*
**mediation**   61:*10*
**meet**   17:*13*   91:*21*
149:*19*   150:6   161:20
162:*24*   163:*3*   169:4
180:*10*, *11*   182:*25*
183:*3*   184:5   200:2
213:*18*   214:*4*   222:*21*,
*24*   223:*3*, *4*
**meeting**   52:*21*   69:*3*
73:*12*   134:*1*   168:22
178:*15*, *16*   179:*18*
196:20   202:*18*
203:*15*   207:*3*   222:*23*
**meetings**   15:*19*, *21*,
*22*   20:*12*   39:*12*
176:*3*
**meets**   204:5
**member**   12:2   13:*1*
121:7
**members**   41:*4*, *23*
121:*15*, *17*   122:*11*
124:*13*, *17*
**mentally**   173:*16*
**mention**   43:*16*   88:*3*
166:*17*   211:*8*
**mentioned**   14:6   15:7
16:2   17:*15*   18:*23*
19:*1*   20:*4*   33:*3*
34:*13*   36:*1*   51:*17*
52:*10*   55:*15*   57:*4*
58:8   75:25   82:*13*
83:*23*   121:*23*   124:*12*,
*16*   151:8   161:*12*

184:*20*   227:*16*   234:*2*
238:*10*   241:*14*
**mentions**   160:2
**mentor**   12:*25*
**merits**   80:*23*   152:*14*
**message**   158:2
163:*19*, *20*
**met**   8:9   31:*13*
126:*16*   128:*23*
134:*19*   136:*17*
158:*11*   185:*16*
196:*23*   211:*1*   219:*19*
**method**   144:*15*
**Miami**   1:*24*   2:*4*
9:*10*   10:*17*, *24*
**Miami-Dade**   3:*8*
17:6, *13*   22:9, *12*
23:9   34:22   38:*16*
39:*10*   44:6, *18*   47:*17*
50:2   72:6, *15*, *23*
73:4, *9*   74:2, *14*, *18*
75:*10*, *14*   76:*17*   77:7,
*16*   78:22   79:*21*   81:5,
*8*, *20*, *23*   82:*1*, *3*, *17*
84:*19*   88:22   92:*14*
93:*8*   112:22   129:*24*
143:6, *15*, *25*   145:*11*
160:*18*   185:*18*
207:*18*   208:*11*   243:*18*
244:2
**middle**   125:*18*
**minds**   97:*3*
**minimal**   35:5   63:7
**minor**   1:5   6:*14*
85:*12*   214:*11*   232:*8*,
*16*   241:*3*
**minute**   99:*3*   193:*4*,
*22*   196:6
**minutes**   95:*1*   191:9
228:2
**Mir**   18:*20*, *23*, *24*
19:*1*   45:*11*   49:*24*
50:*14*, *15*, *18*, *19*   51:2,
*4*   57:*1*   77:2   107:*12*
109:*11*   114:*10*   121:6,
*7*, *15*   123:*12*   160:*25*
161:*15*   162:5, *10*
163:*19*, *21*, *24*   164:*12*,
*14*, *19*   166:9   178:*16*

**mira** 102:5
**mirror** 75:9
**Mir's** 110:23
**mis** 102:5
**missed** 70:20 71:24
**mistaken** 241:22
**mode** 100:3 191:2
**modification** 212:14
**module** 39:15
**modules** 38:22 39:3
123:16
**molested** 104:6
221:15
**mom** 101:5 102:11
**moment** 7:11, 18, 25
77:23 78:16 86:17
115:3 145:24 148:15
176:22 189:8 199:8,
21 202:12 205:14
208:8 213:6 221:20,
21 222:12 223:12, 13
224:16 228:1 229:5
235:19 240:24
**money** 35:18 36:10,
13
**monies** 17:25 36:5
**month** 34:17 52:18
**monthly** 15:13 31:7,
13
**months** 36:24 52:19
126:25 127:1, 3, 10
132:6 135:22 137:17
138:10 141:3
**moral** 141:24
**morning** 4:8 20:15
199:2
**mother** 1:6
**mouth** 167:13, 24
168:12 180:7
**move** 86:3 106:14
141:15 211:20, 22, 23
212:1
**moved** 9:9 20:3
23:24 24:1 211:19
**moves** 95:1
**moving** 19:18 212:1
**MULCAHY** 2:14
**Multiple** 27:8
116:22 209:13

**mute** 170:13

**< N >**
**naked** 103:18
132:17 158:4, 7, 10,
18
**name** 4:8, 15 50:16
54:20, 23 97:24
110:22, 23 124:9
129:20 216:12
228:19
**names** 100:24
**narrative** 206:18
225:13, 16 226:9, 10,
19
**nature** 80:15 84:8,
16, 25 91:12 93:7, 14,
24 94:3, 8, 12 95:16
96:1 97:8 98:15
99:12 102:8 119:21,
24 133:12 158:18
161:9, 10 179:1
207:10 234:24
**necessarily** 143:9
151:13 237:19 241:2
**need** 5:24 12:18, 19
16:12 20:16, 18
25:18 31:6, 7 46:5
47:8 50:6 57:3 58:6
59:2 60:8 61:11, 14,
15, 18 67:6 73:7, 19
76:24 80:24 87:19
88:13 90:23 105:8,
22 116:1 140:9
147:12 149:4, 5, 19,
20 151:7, 18 152:15
154:1 170:13 171:24
184:7 193:7, 16
194:3, 5, 6 204:1
212:9 239:24
**needed** 15:12 41:10
44:20 140:11 141:16
169:24 174:3 183:23
**needs** 16:15 31:12
35:1 58:4 62:7
64:20 106:22 151:3,
4 154:2 201:17
220:2
**negative** 204:3 211:6

**neglect** 70:1, 12, 16,
24 93:16, 19, 25
97:12 99:9 149:23
222:4
**neglected** 93:21
221:8, 12
**never** 163:4 164:6
169:4 177:20 179:19
183:21 185:12
189:14 190:17
197:12 202:3 215:18,
20 220:13 231:16, 19,
21 232:9, 14, 20, 21,
25
**new** 14:2, 5 17:24
18:4 19:20, 21 29:18,
20 241:4
**newly** 231:14
**night** 101:7
**nine** 18:15 230:15
**nino** 193:8
**non-verbal** 186:11
**normal** 163:5 188:6
**normally** 170:1
**Notary** 1:24 243:5,
19
**note** 6:13 206:13
**notes** 15:23 69:2
155:3, 4 200:22
201:3 204:4 227:25
**not-for-profit** 26:8,
11, 16 27:7
**Notice** 3:8, 13 133:8
140:18, 21, 24 141:2
142:3, 6, 8, 21 143:6,
8, 15 156:10
**notices** 156:13
**notification** 178:4
**notified** 58:18 83:11
161:24
**notify** 70:4 71:1
73:8 120:6 148:6
**notifying** 89:14
**Nova** 10:15, 18, 19
11:3
**November** 132:9
**number** 9:20, 21
42:15 71:5 79:23
80:9, 20 81:9, 10, 17
82:4, 5, 7, 24 83:19,

20 124:23 125:4
222:11 223:12 229:5,
8 240:23

**< O >**
**O-301** 2:3
**OATH** 3:4 4:22
243:1
**object** 8:19 21:3
34:9 94:1 99:13
114:17 132:20
174:17 189:13
192:14 197:23 226:3,
7
**Objection** 26:18
28:22 32:16 37:23
38:3 59:11 84:17
89:5 101:21
**obligation** 4:22
198:12
**obtain** 35:8 36:4
40:21 43:11 62:13
65:13, 15 67:5, 21
**obtained** 11:2
**obviously** 11:22
16:24 36:6 41:20
45:7, 18 56:17 59:22
62:17 68:17 75:19
86:19, 23 87:23
97:19 103:1 148:5
150:2, 4 154:4, 9
155:22 160:16
161:19 167:5 172:12
173:3 175:1 178:14
179:14 182:11 212:9
213:8 229:21
**occasions** 38:13
**occur** 184:18 204:8
**occurred** 54:21
61:17 148:11 151:24
208:25 214:20 225:3
227:6
**offender** 187:17
**offense** 207:22 210:1
**offensive** 186:16
**offer** 212:16
**offered** 44:15 156:3
196:9 211:14, 20
212:6, 8, 13

**Office** 1:*24* 9:*16, 22, 24* 22:*4, 5* 33:*1* 43:*2, 7, 25* 44:*5, 17, 19* 61:*16* 71:*20* 72:*16* 75:*5, 6, 23* 78:*25* 84:*10, 14, 21* 88:*2* 92:*3* 112:*6* 113:*11* 115:*6* 117:*15, 16* 118:*3, 7, 14* 131:*3* 146:*8* 147:*3* 162:*4* 163:*14, 23* 164:*12* 167:*6* 197:*10* 201:*21* 217:*23*

**officer** 18:*8, 13, 19* 19:*7, 16* 20:*14, 23, 24* 21:*8, 16* 22:*12, 22* 23:*10, 23* 24:*2, 6, 9, 10* 26:*15* 62:*18* 75:*20* 80:*11* 82:*3, 10* 128:*7* 134:*9* 135:*8* 149:*3* 158:*19* 183:*2* 188:*6* 189:*3* 193:*1, 3, 5, 20, 23* 194:*1, 13, 14* 195:*1* 198:*11* 218:*12* 227:*14*

**officers** 36:*4, 5* 72:*18, 19* 78:*25* 80:*7* 134:*20* 158:*21* 196:*24* 197:*1*

**offices** 28:*5* 72:*22*

**official** 90:*24* 243:*12*

**Oh** 85:*13* 102:*11, 18, 19* 193:*4* 199:*18* 213:*21*

**Ok** 7:*20* 185:*25*

**Okay** 4:*19* 5:*10, 11, 16, 17, 22, 23* 6:*3, 11, 15* 8:*2* 30:*14* 31:*2, 18* 45:*13, 22* 46:*9, 13* 51:*6* 53:*16* 59:*24* 60:*1* 65:*1, 7, 8* 66:*3, 6, 22, 25* 67:*8* 69:*24* 71:*3, 12* 79:*4* 80:*11, 19* 83:*3* 84:*5, 24* 86:*11* 89:*1, 24* 92:*13* 95:*13* 97:*7* 98:*5, 21* 99:*5, 8* 102:*12, 18* 103:*19* 105:*2* 106:*21* 107:*18* 108:*21* 109:*23* 110:*4, 12, 18,*

20, 24 111:*10, 23* 112:*7, 10* 113:*23* 115:*1* 117:*13* 118:*9* 120:*20* 122:*23* 123:*3* 132:*4* 134:*3* 135:*18* 138:*3* 141:*22* 143:*5* 148:*16* 149:*4, 12, 19* 152:*13, 20, 25* 153:*17* 158:*24* 159:*4* 163:*17* 165:*23* 166:*8* 168:*15* 169:*19* 174:*13* 175:*16* 177:*2* 178:*9* 180:*6* 181:*12* 184:*9* 188:*2* 191:*7, 23* 195:*13* 199:*24* 202:*5* 205:*18* 209:*20* 210:*8* 212:*10, 11, 24* 213:*10, 18, 24* 215:*14* 216:*14* 217:*18* 218:*14, 19, 23* 219:*1* 220:*15* 224:*18, 22* 225:*7* 226:*14, 17* 229:*7, 16* 230:*21* 232:*11, 22* 233:*11* 234:*16* 235:*21* 236:*14* 238:*12* 240:*6, 23*

**okayed** 50:*8*

**Olas** 2:*10*

**old** 187:*24* 225:*19*

**OLIVIA** 1:*15* 3:*1* 4:*2, 16* 48:*3* 67:*25* 119:*13* 243:*7*

**Once** 11:*19* 50:*8* 52:*14* 65:*15* 79:*20* 81:*11* 82:*19* 85:*25* 87:*18* 92:*25* 106:*9* 120:*5* 125:*6* 127:*19* 128:*3* 134:*1* 141:*12* 148:*24* 150:*11* 157:*2, 13* 169:*6* 171:*11* 185:*16* 203:*5* 209:*9* 215:*13* 225:*24*

**ones** 17:*10* 39:*8* 53:*3* 76:*6* 106:*20* 204:*6*

**one-time** 183:*22*

**online** 38:*22* 39:*3, 4, 5, 15* 123:*16, 19*

**open** 103:*7*

**opened** 19:*11*

**opening** 14:*2* 45:*2* 52:*12, 13*

**operate** 57:*11*

**operating** 18:*8, 13, 19* 19:*6, 16* 20:*23, 24* 21:*8, 16* 22:*12, 21* 23:*10, 23* 24:*2, 5, 9, 10* 26:*15* 29:*8, 12* 188:*5* 189:*3* 198:*10* 227:*14*

**operations** 13:*24* 14:*16* 18:*1* 24:*24* 29:*21* 31:*22* 32:*25* 34:*19* 35:*7, 20* 36:*3* 37:*8* 116:*2* 237:*13, 19*

**opinion** 188:*5* 189:*4* 198:*10* 230:*14*

**opportunity** 180:*13* 182:*20* 184:*11*

**opt** 44:*10, 13* 73:*24* 74:*3* 77:*13*

**opted** 44:*11, 12*

**order** 9:*2* 21:*25* 27:*12* 34:*21* 56:*6* 60:*21* 70:*6* 89:*12* 163:*9* 207:*21*

**ordinary** 227:*18*

**organization** 12:*9, 15* 13:*12* 14:*13* 18:*15* 26:*9, 12, 17* 27:*13* 29:*4* 35:*13* 43:*17, 19* 49:*23* 73:*15*

**organizations** 12:*3* 21:*9* 27:*2, 24* 33:*15*

**organize** 25:*5*

**Ortega** 117:*18* 128:*2, 4*

**outcome** 126:*15* 132:*4* 133:*16, 19* 134:*4, 21* 137:*13* 139:*9* 142:*12* 147:*12, 14* 154:*9, 11* 160:*14*

**outlined** 92:*3* 160:*19*

**outlines** 83:*14*

**Outside** 76:*8, 12* 99:*8* 132:*21* 133:*25* 136:*7* 205:*3* 234:*16*

**overall** 21:*19*

**oversee** 120:*21* 137:*3*

**oversight** 13:*12*

**overstep** 57:*19*

**owner** 163:*24*

**< P >**

**p.m** 1:*17* 242:*16*

**packet** 16:*15*

**Page** 3:*1, 7* 4:*20* 7:*19* 8:*1* 78:*14* 143:*21* 145:*23* 146:*15* 225:*15* 228:*18*

**pages** 47:*6* 49:*1, 4* 109:*19* 159:*11*

**paid** 12:*14, 16* 23:*16, 19* 25:*10* 26:*22* 28:*19* 35:*16, 17* 36:*19, 22, 24, 25* 37:*1*

**panties** 99:*16*

**pants** 103:*8* 127:*7* 132:*11, 15* 134:*14* 135:*11* 136:*5* 199:*21* 231:*4* 234:*10*

**paper** 80:*5* 130:*1*

**paper-pencil** 155:*23*

**paperwork** 142:*14*

**Papito** 67:*15*

**paragraph** 93:*5* 104:*9* 144:*20*

**parent** 14:*17, 18* 25:*19* 55:*7, 10* 58:*3* 61:*11* 79:*3* 87:*21* 109:*21* 121:*11* 127:*5, 20* 128:*12, 15* 135:*15, 19* 141:*6, 11, 20* 147:*4* 148:*7* 154:*3, 11* 157:*6, 7, 11, 17* 161:*16* 162:*4* 163:*1, 15, 18* 164:*6, 21* 165:*3, 10* 167:*3* 171:*2, 3* 175:*17, 18* 178:*1* 179:*15* 181:*4* 196:*3* 198:*14* 200:*8* 201:*14, 19* 211:*9, 21* 212:*19* 213:*21* 214:*4* 215:*6* 218:*11* 221:*19* 224:*23*

**parent/caregiver** 226:*25*

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 263 of 285

Deposition of Olivia Angelica Bernal
Jane Doe v. Academir Charter Schools, Inc., et al.

**parentis** 147:*21* 222:*11*

**parents** 41:*5* 45:*10* 49:*10* 53:*4* 55:*8* 60:*3, 4, 7* 61:*12, 18* 63:*19* 64:*19, 24, 25* 71:*13* 80:*24* 83:*10* 89:*18* 95:*19* 102:4 103:5, *6, 16, 19, 20* 104:*3* 107:*12, 19* 109:*10* 110:*17* 114:*3, 7, 24* 119:6, *20* 120:7 121:2, *10* 126:*15, 16* 128:*23* 132:7 134:2, *12, 19* 135:18 136:*17, 18* 139:9 140:22 142:*3, 11* 147:*11* 148:*14* 149:*3, 6, 8, 20* 150:6, *15* 155:*20* 157:*1, 12, 14* 160:*4* 161:*20, 22* 162:*19, 20, 21, 24* 163:2, *25* 165:*4, 10* 166:*5, 6, 17* 168:*21, 23* 169:*3, 23* 171:22 172:*18* 173:*25* 174:2 175:*4* 176:*2, 4* 179:*18* 183:*24* 184:6, *8* 188:*23* 190:*8* 196:*21* 197:*21* 200:*3* 201:*5, 10* 203:*16* 206:*13, 15* 207:*4* 211:*8* 215:*4* 216:*17* 225:*14* 229:22

**parent's** 226:*2*
**parent-student** 238:*13*
**part** 12:*4, 20* 48:*14* 51:*10* 71:*24* 79:*3* 91:*9* 112:*13* 113:8 129:*1* 130:7 167:*20* 236:*20* 237:*24* 238:25
**partes** 102:*5*
**participated** 50:*3*
**participation** 186:*19*
**particular** 24:*17* 27:*21* 75:*16* 79:*7* 90:*13* 112:*3* 119:*23* 120:*18* 136:9 142:*1*

187:*3* 235:*12* 237:6, *11*

**particularly** 85:*4*
**PARTIES** 1:*19* 126:*13* 151:*16* 157:*20* 244:*13, 14*
**partnership** 12:*21*
**parts** 102:5, *6* 103:*11, 22* 145:7 190:*15* 225:*20, 21*
**party** 10:*6*
**pass** 11:*21*
**pattern** 94:*24* 171:*11* 174:*20*
**pay** 35:*12* 36:*5*
**payable** 29:22 35:2
**payment** 35:*4*
**payroll** 16:*14* 29:*15* 30:*4* 35:*1*
**PE** 165:6, *15, 16* 210:*12* 225:*1, 3*
**pee** 225:*21, 22* 226:*17*
**peeing** 103:*9*
**penalty** 228:*23*
**pencil** 61:*8, 25* 64:*9, 11* 65:*9* 96:*13*
**people** 20:*16* 107:*10* 110:*10* 124:*4* 223:*10*
**percent** 33:9, *14* 168:*9* 222:*9*
**percentage** 32:*23* 36:*20* 37:*1, 6*
**Perfect** 159:*8*
**perform** 15:*9* 25:*10*
**performance** 186:*19*
**perjury** 228:*23*
**permanent** 176:*18*
**person** 20:*13, 19* 50:*6* 51:*1* 72:*17* 75:*20* 86:*6, 17, 18, 23* 87:*9* 102:*24* 106:7, *13* 108:*23* 109:*15* 110:*16* 113:*25* 114:*2, 11* 115:*9* 119:*10* 120:*1* 127:*6* 157:*3* 160:*3* 201:*16* 232:*13* 238:*18*
**personal** 6:*22* 233:*11, 19*

**personally** 148:*22* 227:*8* 243:*7*
**personnel** 85:*22*
**perspective** 182:*6* 197:*15*
**pertain** 44:*6, 15* 92:*11* 160:*10, 15*
**pertaining** 46:*2, 3* 52:*8* 76:*5* 83:*23* 136:*9* 159:*5* 161:*6* 172:*6*
**pertains** 15:*25* 47:*9* 51:*11, 17* 56:*18* 57:*6* 74:*13* 145:*3* 160:*7* 237:*7* 238:*11*
**pervasive** 186:*15, 21, 23*
**phone** 181:*22* 197:*6*
**phonetic** 117:*19* 165:*25*
**physical** 24:*25* 52:*21* 98:*17* 161:*9* 169:*20* 177:*13, 16* 178:*20* 179:*9* 182:*8* 192:*21* 196:*14* 197:*3, 16, 20* 200:*19* 213:*1* 217:*20* 219:*13*
**physically** 25:*2, 24* 32:*8* 45:*5* 98:*19* 132:*17* 173:*15* 191:*5* 194:*9* 218:*4* 223:*15* 224:*2* 234:*23*
**pick** 162:*11*
**picked** 162:*18* 172:*17*
**picture** 234:*21*
**pictures** 144:*14*
**piece** 31:*21* 66:*2*
**pieces** 31:*9* 105:*1*
**pinched** 96:*13*
**pipi** 102:*3* 103:*17* 153:*11*
**place** 14:*12, 16* 15:*17* 20:*16* 27:*2* 31:*7, 9, 14* 42:*7* 43:*1* 51:*9, 21* 54:22, *24* 55:*2* 57:*20* 59:*4* 60:*20* 64:*14* 66:*5, 8, 9, 11* 76:*16, 19* 80:2 83:*9, 12* 86:*25* 89:*9* 92:*12* 97:*2* 100:*14*,

*15* 109:*1* 120:*6* 126:*19* 148:*6* 150:*25* 152:2 154:*2* 175:*25* 178:*25* 179:*19* 190:*22* 195:*25* 201:*6, 8, 17* 203:*15* 204:*19* 211:*10* 215:*19, 20, 23* 225:*5* 229:*23* 236:*24* 237:*17, 21* 239:22

**placed** 4:*22* 22:*6* 34:*18*
**places** 13:*6*
**Plaintiff** 1:*7* 2:*2* 3:*14*
**Plaintiff's** 7:*7* 77:*17* 145:*17* 202:*9* 205:*11* 208:*5* 224:*10, 11, 13* 228:*6, 7*
**plan** 50:*5* 54:*4* 73:*21* 74:*1* 108:*8* 109:*4, 6*
**planning** 52:*19*
**plans** 16:*12* 17:*4* 44:*13*
**platform** 16:*17* 79:*25*
**playing** 94:*25* 95:*2* 191:*9*
**PLC** 86:*14* 87:*12*
**please** 4:*14* 5:*8* 116:*5* 163:*22*
**plug** 73:*13*
**point** 5:*24* 50:*5* 55:*19* 58:*21* 61:*20* 71:*8* 81:*2* 100:*8* 106:*19* 115:*14* 119:*4* 135:*19* 150:*18* 169:*5, 11* 170:*8* 172:*15* 173:*14, 17* 174:*3* 177:*11* 178:*14* 179:*19* 182:*12* 183:*2* 184:*8* 200:*7* 209:*1* 211:*24* 215:*12* 216:*13, 16, 22* 220:*7* 221:*10* 223:*1, 6* 227:*4* 232:*9* 241:*16*
**police** 20:*14* 42:*22* 72:*18* 78:*23* 79:*21* 80:*7, 11, 15, 22* 81:*5, 11, 13, 20, 23* 83:*16, 17, 18, 19* 88:*13*

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 264 of 285

Deposition of Olivia Angelica Bernal                                    Jane Doe v. Academir Charter Schools, Inc., et al.

89:*14, 23*  93:*8, 14, 25*
94:*19*  95:*17*  96:*23*
97:*5, 9, 13*  98:*7, 15*
99:*11*  100:*4*  126:*12*
127:*12*  128:*7, 18, 24*
134:*20*  138:*22*  140:*4*
141:*17*  146:*12*
147:*18*  150:*1, 22*
151:*8, 18, 19, 21*
158:*3, 19*  182:*16, 23*
183:*6, 9, 10*  184:*19*
193:*20*  197:*13*
198:*19*  202:*4*  213:*16*
214:*6*  215:*12*  217:*5,*
*14*  218:*12*
**policies**  14:*1, 6, 7, 12,*
*14, 19, 21, 23, 24, 25*
41:*17, 19*  42:*9, 11*
43:*1*  44:*22*  45:*4, 17,*
*20*  46:*2, 3, 4, 10, 17,*
*18, 21, 24*  47:*3, 14, 16,*
*18, 21*  48:*23*  50:*1, 23,*
*24*  51:*6, 8, 9, 18*
53:*13*  57:*10, 17, 19,*
*20*  69:*11, 12, 18*
72:*10, 23, 24*  73:*22*
74:*15*  76:*1, 4, 10, 15,*
*18*  77:*1*  78:*5, 11*
85:*17*  90:*12*  91:*4*
98:*12*  108:*20*  110:*7,*
*13*  111:*13, 16*  112:*25*
113:*16, 19*  115:*25*
116:*7, 8, 13, 24*
117:*22*  118:*10*
120:*19*  121:*14*
153:*14*  156:*13, 20*
158:*25*  159:*5*  160:*6,*
*15, 18, 20*  174:*16*
236:*15, 19*  237:*12, 16,*
*18*  238:*3*  239:*4, 21*
240:*1, 11*  241:*8*
**policy**  23:*5*  45:*13*
46:*12*  48:*16*  49:*22*
50:*13*  52:*8, 23*  59:*9*
60:*12, 23*  62:*4*  63:*3*
64:*4*  65:*21*  66:*4, 8, 9,*
*11, 13*  67:*3, 25*  68:*2*
69:*6*  72:*11, 13, 14*
73:*3, 8, 20, 21*  74:*2, 3,*
*12, 13, 17, 23*  75:*9*

78:*20*  84:*5*  91:*2, 4*
93:*1*  94:*5*  104:*8, 18*
105:*18*  106:*4*  109:*7,*
*12, 19, 23*  110:*1, 4*
111:*19, 22, 24*  112:*3,*
*8, 16, 25*  113:*8, 10*
146:*7*  159:*4*  160:*24*
236:*15*  237:*3, 21*
240:*9, 14, 20*  241:*24*
242:*5, 6*
**poop**  225:*21*  226:*16*
**popular**  66:*2*
**portal**  22:*1*  82:*20*
201:*2*
**portion**  27:*15*  33:*16*
160:*17*
**position**  19:*17*
**possession**  46:*4*
**possible**  48:*3*  67:*24*
**posted**  15:*24*
**power**  198:*23*
**practice**  26:*25*  28:*14,*
*16, 18*
**precedence**  106:*21*
**pre-K**  78:*9*
**prepare**  8:*6, 22*  9:*3*
16:*16*
**prepared**  7:*14, 21*
8:*3*
**preparing**  53:*22*
**Preschool**  163:*25*
**present**  52:*12*
133:*12*  135:*8*  168:*4*
174:*8*  195:*12*  198:*4*
**presenting**  29:*20*
**president**  19:*3*  51:*4*
**pretty**  9:*4*  12:*6*
73:*22*  93:*3*  94:*9*
126:*17*  171:*13*
**prevent**  6:*4*  216:*1*
**prevented**  216:*5*
**previous**  133:*9*
163:*24*  226:*11, 12, 16*
**previously**  18:*16*
71:*25*  107:*22*  119:*3*
122:*23*  135:*2*  177:*10*
234:*1*
**principal**  16:*16*
18:*16*  19:*5, 12, 16, 19*
20:*11*  21:*11, 20*  22:*3,*

*5*  39:*12*  42:*4, 16, 20*
45:*15, 22*  55:*24*  56:*1*
57:*23*  58:*25*  70:*4*
71:*1*  74:*6*  82:*19*
85:*25*  86:*1, 6, 15, 16,*
*21*  87:*4, 6, 12, 15, 16*
88:*2, 5, 6, 8, 16, 20*
96:*16*  102:*2*  113:*14*
117:*5, 7, 17*  127:*25*
128:*1, 10*  141:*25*
148:*17, 20, 23*  149:*14*
150:*17*  153:*25*  154:*8*
158:*9, 11*  162:*1, 6, 25*
163:*2*  164:*24*  165:*2*
166:*19*  172:*12*  177:*1,*
*2, 3, 4*  180:*10*  181:*21*
182:*24*  193:*3, 21*
194:*15*  195:*2, 4*
196:*11, 20, 22*  197:*6,*
*9*  199:*15*  201:*24*
206:*4, 12*  211:*19*
212:*6*  214:*3*  216:*11*
218:*18*  219:*7, 12*
220:*10, 19*  222:*24, 25*
232:*5, 7*  235:*13*
237:*14*
**principals**  12:*23*
16:*10*  20:*9, 11*  39:*11*
44:*25*  56:*6*  57:*9*
58:*9*  64:*5*  76:*8*
79:*25*  117:*15*  139:*9*
147:*20*  148:*2*
**principal's**  65:*23*
72:*21*  75:*11*  212:*16*
217:*23*  236:*24*
**print**  54:*9*
**printed**  48:*19*
**prior**  19:*6, 8*  134:*9*
147:*6*  178:*3*  183:*21*
196:*12*  219:*7*  229:*24*
232:*6*  242:*4*
**priority**  222:*11*
223:*12*
**privacy**  158:*6*
**privadas**  102:*5*
**private**  102:*5, 6*
103:*11, 22*  145:*7*
167:*20*  190:*15*
225:*20*

**privy**  161:*8*  178:*5*
224:*6*  242:*2*
**probably**  51:*15*
120:*15*  125:*12*
126:*25*  149:*16*
192:*15*
**probing**  67:*20*
**problem**  212:*2*
**procedure**  48:*16*
69:*6*  92:*12*  97:*5*
197:*11*
**procedures**  14:*1, 7,*
*23, 24, 25*  43:*6*  45:*8,*
*17, 18, 20*  46:*2, 10, 17,*
*18, 22, 25*  47:*3, 10, 14,*
*16, 22*  48:*24*  51:*8, 19,*
*21, 23*  55:*14*  57:*10,*
*17*  64:*4*  65:*24*  69:*12,*
*13, 18*  71:*12*  79:*10*
92:*3, 5, 9*  110:*7, 8, 13*
111:*2, 5, 11, 16*
113:*19*  116:*24*
117:*22*  146:*19*
153:*14*  156:*6*  160:*7,*
*10, 19*  236:*19*  237:*12,*
*18*  238:*3*  239:*4, 22*
240:*12*
**proceed**  41:*12*  61:*19*
65:*17*  79:*13*  101:*16*
106:*24*
**process**  20:*21*  30:*12*
41:*9, 14*  42:*4, 19*
43:*13*  49:*14, 16*  56:*7*
64:*24*  85:*6*  88:*14*
97:*4*  105:*9, 10*
106:*15*  120:*5*  143:*2*
160:*12, 14*  174:*9*
182:*17, 21*  183:*12*
198:*18*  202:*2*  215:*3,*
*9*  220:*14*  223:*1*
**processed**  151:*3*
229:*19*
**processes**  92:*13*
206:*6*
**produce**  159:*22*
**produced**  47:*22*
118:*21*
**professional**  11:*8*
12:*2*  25:*16*  189:*4*
**profit**  27:*6*

**program** 11:*19, 24*
105:*13* 203:*4*
**programs** 37:*19*
143:*3, 11*
**progression** 74:*1*
**prohibited** 106:*1*
**prompt** 63:*14* 103:*25*
**prompted** 19:*15*
**prompting** 19:*24*
**properties** 29:*18*
**protect** 6:*15* 204:*18*
**proven** 91:*21* 178:*18*
**provide** 25:*16* 28:*9*
32:*20* 44:*3, 19* 106:*9,
16* 118:*18* 135:*21*
140:*19, 21* 142:*3*
155:*6* 157:*7, 21*
**provided** 8:*9* 55:*12*
58:*20* 134:*18* 135:*1*
157:*9, 11, 12, 17*
**provides** 12:*10* 142:*9*
**providing** 15:*11*
28:*1* 35:*4* 222:*3*
**Public** 1:*24* 34:*23*
39:*10* 43:*4* 44:*7*
57:*14* 72:*6* 73:*9*
75:*5, 10, 14* 82:*2, 17*
84:*19* 92:*15* 104:*24*
106:*6* 112:*22, 24*
129:*24* 160:*18*
181:*24* 183:*11*
204:*17* 219:*4* 243:*5*
**Public-State** 243:*19*
**published** 115:*18*
**pull** 47:*5* 133:*7*
199:*10*
**pulled** 61:*24* 169:*22*
175:*3* 192:*25*
**purchasing** 18:*4*
**purposes** 6:*8* 22:*8*
109:*16* 114:*6*
**pushed** 62:*1*
**put** 22:*17* 36:*18*
46:*6* 54:*1, 3* 77:*6*
115:*18* 138:*6, 10*
204:*17* 223:*21* 224:*4*
239:*13, 17, 19*
**putting** 180:*7*

**< Q >**
**quarterly** 15:*21*
**que** 193:*8*
**question** 5:*19* 21:*15*
40:*11* 59:*19, 20*
60:*18* 64:*16* 90:*14*
105:*24* 111:*18*
122:*10* 132:*25* 152:*6,
7* 163:*22* 172:*1*
182:*18* 188:*24* 189:*9*
219:*25* 232:*12* 233:*8,
10* 235:*19* 236:*1, 22*
238:*3* 239:*3*
**questioned** 61:*1*
126:*14* 215:*21*
**questioning** 60:*13*
61:*4* 176:*23*
**questions** 5:*16* 8:*11*
66:*17* 67:*12, 14, 18,
20* 89:*8* 90:*7, 9, 15*
167:*11* 170:*3, 4*
174:*6* 182:*3* 215:*17,
18* 228:*17* 231:*18*
242:*9, 12*
**quick** 227:*23*
**quiero** 193:*8*
**quote/unquote** 34:*24*

**< R >**
**R-7** 207:*6*
**R-9** 207:*1, 6*
**ran** 225:*3*
**reach** 86:*18* 95:*18*
139:*15* 147:*10*
157:*14* 163:*17*
**reached** 121:*11*
133:*14* 148:*5* 178:*1*
**react** 103:*3*
**reaction** 215:*4*
**read** 8:*8* 68:*11*
75:*14* 85:*8, 22*
105:*18* 111:*7* 112:*20,
21* 132:*10, 13* 146:*4*
205:*6* 224:*3, 6* 229:*6*
234:*12*
**reading** 10:*25* 11:*11*
44:*13* 71:*25* 74:*1*
76:*2* 88:*23* 106:*6*
111:*25* 238:*8* 242:*14*

**ready** 20:*1, 3* 210:*6*
**real** 153:*12*
**really** 40:*14, 18* 57:*8,
22* 65:*14* 68:*14* 69:*4*
82:*9* 95:*21* 106:*18*
125:*13, 14, 20, 21*
128:*19, 22* 134:*16, 21*
137:*21* 141:*14*
149:*18* 163:*1, 16*
172:*14, 24* 199:*9*
210:*3* 213:*17* 216:*9*
220:*2* 241:*7*
**reason** 201:*12* 218:*20*
**reasonably** 6:*23*
**reasoning** 216:*15*
**recall** 118:*2* 123:*24,
25* 124:*11, 22* 125:*1,
3, 4, 13* 126:*4, 5, 6, 9,
22* 132:*3* 136:*12*
184:*21* 185:*18*
**receivable** 29:*23* 35:*2*
**receive** 16:*6, 7, 8*
32:*18, 19, 21* 33:*23*
34:*16, 20* 36:*2, 6*
56:*7* 143:*11* 191:*21*
**received** 38:*8, 12, 14,
15* 122:*12, 24* 123:*1,
7, 9, 11, 12* 162:*3, 4*
180:*14* 189:*18, 19, 20*
233:*18*
**receives** 32:*11* 33:*19*
34:*2, 14* 35:*25*
150:*17*
**receiving** 33:*1* 34:*7*
84:*7, 15, 24* 86:*8*
146:*25* 148:*16*
**recess** 119:*1*
**recognize** 77:*24*
145:*20* 202:*14*
205:*19* 208:*10*
228:*10, 13, 19*
**recollect** 115:*17*
**reconfigured** 52:*2*
**record** 4:*15* 21:*1, 9,
19, 22* 22:*2, 7, 17*
40:*6* 82:*5* 83:*22*
118:*17, 25* 133:*7*
134:*4* 136:*8* 137:*23,
24* 138:*1, 4* 175:*24*

176:*18* 203:*20* 207:*3*
229:*19* 233:*16*
**recorded** 133:*19*
136:*2*
**recording** 158:*12*
**recordings** 157:*24*
**records** 22:*9* 138:*15,
20* 140:*7, 11, 14*
169:*9* 205:*1*
**recruiting** 25:*21*
**redirects** 211:*4*
**reduce** 33:*12*
**refer** 6:*9, 13* 22:*7*
63:*9* 161:*3* 167:*19*
209:*24*
**Referal** 3:*11*
**reference** 92:*16*
146:*22*
**referenced** 74:*5*
110:*25* 111:*23* 160:*1*
179:*3*
**references** 92:*2*
146:*8* 240:*20*
**referencing** 69:*7*
98:*10* 110:*12* 137:*2*
158:*1*
**Referral** 3:*10, 11*
189:*20* 203:*21, 23*
204:*6* 206:*23* 207:*9*
208:*10, 20, 24* 210:*24*
**referrals** 204:*7*
**referred** 72:*22*
150:*22* 187:*24*
206:*11* 211:*1* 240:*16*
**referring** 29:*1* 35:*22*
43:*17* 72:*23, 25*
88:*21* 109:*24* 238:*20,
25*
**refers** 49:*16* 75:*12*
167:*16* 206:*5*
**reflect** 5:*13* 75:*9*
212:*22*
**reflective** 75:*2*
**refused** 223:*2*
**regard** 203:*6*
**regarding** 7:*15, 22*
8:*4* 76:*10* 81:*7*
119:*4* 162:*2* 196:*14*
235:*16* 236:*24*
239:*25* 240:*3, 7, 14*

**Regardless** 178:*18*
233:*3*
**regards** 15:*9* 37:*14*
53:*21* 119:*20* 174:*11*
180:*17* 196:*18* 236:*5,*
*6*, *7*
**region** 22:*4*
**regular** 158:*20*
165:*7* 194:*19*
**regulations** 23:*3*
**reimbursement** 16:*13*
**reinvent** 74:*21*
**related** 92:*5* 111:*24*
118:*10* 119:*23*
140:*14* 155:*12* 238:*3*
239:*5* 240:*11*
**relates** 32:*9* 39:*9*
40:*20* 41:*1*, *3* 105:*22*
**relating** 45:*14*
112:*18* 114:*16*
115:*10*, *20* 169:*16*
236:*16* 240:*10*
**relationship** 29:*7*, *10*
**relative** 244:*12*, *13*
**relayed** 218:*8*
**rely** 17:*12*
**remain** 210:*24*
**remains** 130:*20*
**remember** 49:*9*
54:*10* 61:*23* 77:*3*
86:*13* 104:*24* 106:*5*
108:*11* 118:*1* 124:*9*
136:*13* 147:*7*, *20*
168:*6* 185:*21*
**REMOTELY** 1:*19*
**remove** 181:*8*
**removed** 99:*16*
106:*22*
**rents** 14:*21*
**repeat** 190:*11*
**repeated** 171:*11*
177:*21*
**repeatedly** 145:*6*
179:*25* 186:*2*, *3*, *5*, *22*
**repeating** 173:*5*
**rephrase** 5:*21* 122:*10*
**replicating** 27:*20*
**Report** 3:*12* 18:*19*
24:*4* 39:*2* 42:*16*
43:*24* 49:*19* 54:*10,*

22 55:*5* 58:*4*, *5*, *23*,
*24* 71:*6* 75:*3*, *4* 79:*5*,
*14*, *24* 80:*9*, *13*, *14*, *20*
81:*11*, *12*, *14* 82:*20*,
*21* 83:*7*, *8* 84:*1*, *2*, *7*,
*15*, *24* 85:*19* 86:*8*
91:*20* 93:*11*, *13*, *21*,
*22* 94:*10* 98:*14*
120:*2*, *4*, *11* 128:*14*
129:*10*, *12* 130:*17*
131:*1*, *15*, *18* 136:*22*
137:*19*, *20*, *23*, *24*
138:*23* 139:*1*, *2*
140:*4* 154:*21* 165:*5*,
*14* 177:*18* 179:*10*
180:*14*, *15*, *20* 190:*24*
193:*2* 194:*2* 204:*15*
214:*10* 215:*14*
220:*20* 221:*23*, *24*
222:*16* 223:*22*, *24*
224:*3*, *4*, *5* 225:*7*, *11*
226:*5* 227:*12* 229:*14*
232:*3* 235:*2* 244:*7*
**Reported** 1:*19* 41:*8*
42:*1*, *25* 55:*9* 83:*11*
93:*7*, *24* 97:*9* 127:*20*,
*22*, *24* 129:*5* 132:*6*
150:*10* 157:*15*
162:*14* 165:*2*, *15*
166:*16* 167:*9*, *22*
168:*11* 176:*19*
178:*19* 180:*6*, *18*, *19*
182:*7*, *9* 183:*14*
185:*3* 191:*19*, *23*
197:*15*, *17*, *20* 198:*2*,
*5*, *6* 203:*7* 205:*7*
215:*14* 218:*10*
**reporter** 5:*6*, *12*
71:*24* 193:*17* 220:*24*
221:*4* 229:*2* 233:*15*
**reporters** 221:*1*
**REPORTER'S** 3:*4*
244:*1*
**reporting** 14:*15*
15:*22* 22:*8* 41:*24*
43:*10* 44:*1* 53:*9*
54:*11* 55:*5* 61:*21*
72:*15* 79:*18* 81:*15*
90:*22* 131:*19* 135:*22*
177:*22* 216:*23*

221:*13* 236:*7*, *8*
237:*9* 238:*15*
**reports** 54:*25* 92:*5*
93:*6* 97:*7* 130:*24*
140:*17* 157:*1*, *2*
172:*11* 194:*19*
223:*20*
**represent** 4:*9* 27:*14*
47:*20*
**representation** 29:*19*
**reprimand** 189:*19*
203:*19* 207:*2*
**reprimanded** 210:*15*,
*18*, *19*
**reprimands** 204:*3*
**reprint** 46:*6*
**request** 16:*13*
141:*21* 142:*11*, *12*, *18*
163:*23*
**requesting** 179:*21*
**requests** 238:*3*
**require** 14:*19* 74:*22*
**required** 43:*14*
79:*20* 80:*16* 81:*22*
84:*13* 85:*21* 86:*7*
93:*9*, *12* 97:*8*, *12*
98:*14* 99:*10* 136:*24*
214:*9* 236:*5* 237:*16*
**requirements** 17:*14*
31:*6* 37:*21* 38:*2*
50:*2* 51:*14*
**requires** 24:*21* 44:*1*
143:*2* 150:*9*
**requiring** 226:*22*
**rescue** 83:*13*, *20*
**resolution** 149:*5*
152:*15*
**resolutions** 133:*14*
**resolve** 216:*18*
**resolved** 120:*8* 148:*9*
**resources** 12:*10*
15:*12* 51:*3*
**respective** 45:*23*
**respond** 5:*8* 8:*11*
232:*13*
**responded** 239:*7*
**Respondent** 156:*4*
**responding** 4:*4*
**response** 38:*5*
146:*16* 149:*13*

211:*15* 229:*8* 235:*24*
237:*3* 240:*9* 241:*1*
**responses** 5:*7*, *13*
240:*7*
**responsibilities** 29:*17*
30:*18* 39:*25* 40:*13*,
*25*
**responsibility** 40:*14*
41:*22* 222:*10* 237:*14*
**responsible** 17:*10*
31:*18* 42:*13* 73:*16*
108:*12* 114:*15* 139:*4*,
*7*, *8*, *11* 148:*17* 221:*9*
236:*25*
**rest** 95:*3* 175:*23*
**restroom** 127:*5*
**result** 16:*25* 211:*7*
**resulting** 227:*5*
**return** 65:*8*
**returned** 212:*13*
**review** 7:*12*, *18*, *25*
8:*22* 9:*3* 48:*23*
50:*22* 78:*16* 145:*24*
150:*25* 202:*12*
205:*14* 208:*8* 223:*22*
224:*16* 235:*20*
240:*24*
**reviewed** 8:*10* 39:*14*
50:*8*, *11*, *21* 78:*18*
126:*12* 146:*2* 159:*6*,
*12*
**reviewing** 223:*24*
**revising** 108:*20*
**right** 8:*24* 12:*6*
16:*3*, *23* 17:*19* 18:*24*
21:*17* 26:*9* 30:*15*, *25*
31:*3* 33:*20* 34:*15*
36:*1* 37:*2*, *13* 40:*15*,
*18*, *22* 41:*2* 42:*2*, *4*,
*17*, *18* 43:*24* 46:*16*
50:*4* 57:*7* 58:*18*
59:*14* 63:*16* 64:*22*
65:*15* 66:*13*, *17*
68:*22* 70:*13* 71:*17*
72:*1*, *7*, *10* 74:*10*
78:*5* 80:*15* 81:*9*
83:*2* 88:*9* 100:*6*
118:*23* 122:*5* 123:*18*,
*20* 124:*14*, *18* 133:*17*
137:*4*, *7*, *18* 141:*21*

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 267 of 285

Deposition of Olivia Angelica Bernal                          Jane Doe v. Academir Charter Schools, Inc., et al.

142:*17*  146:5, *10*
148:*12*  150:*24*
151:*18*  159:*21*  160:*3*
168:*13*, *24*  170:2, *4*
177:*13*  179:*21*  186:7,
*9*, *12*, *23*  187:9, *25*
191:*18*, *25*  192:*13*
195:*10*  197:22  203:7
206:*21*, *24*  208:*18*
209:22  210:*15*  211:5
217:*21*  225:2  236:*3*,
*12*, *13*  237:8, *17*
238:*4*, *21*

**right-hand**  203:9

**Rights**  38:25  41:22
43:*3*  44:5  72:16
79:*1*  84:*10*, *14*  92:4,
*10*  106:7  112:5
140:*18*, *22*, *24*  141:*3*
142:3, *6*, *8*, *10*, *21*
143:6, *8*, *16*  146:9
156:*10*, *13*

**Rolando**  18:*20*, *23*
50:*18*  121:6, *7*  166:9

**role**  19:6  24:5
231:9, *13*, *14*  232:*1*, *6*,
*8*  233:6, *9*, *18*  234:*3*
235:*12*  241:5

**roles**  108:9  231:*14*

**room**  10:2

**Rosali**  128:2, *4*

**roughly**  47:4  49:*1*, *3*

**route**  59:*23*

**Ruiz**  202:2*1*, *22*

**rule**  65:*11*

**rules**  23:2

**run**  35:6, *8*, *10*

**runs**  87:16


**< S >**

**safe**  42:*17*  59:*15*
65:*1*, *8*, *16*  73:7
88:*13*  89:22  170:4

**safe-school**  36:*4*, *5*
72:*19*  75:*19*

**safety**  14:*14*  29:*17*
40:*15*, *18*  58:*15*
60:*14*, *18*  62:*11*
64:*15*  65:*15*  66:*12*
68:*15*  69:22  70:*11*

100:*11*  150:*3*  151:*15*
184:*3*  219:*24*  223:*11*

**salaries**  30:*18*

**salary**  23:*16*, *19*
25:*10*  26:23  27:5

**sat**  50:7  211:*18*
218:6

**satisfied**  211:*25*

**Saturday**  9:*13*

**save**  163:*10*

**saw**  117:*14*  127:7
132:*11*, *15*  134:*14*
175:9, *12*

**saying**  35:*24*  68:*19*
95:*13*  96:7  99:*20*
114:8, *23*  131:*19*
132:2  134:*14*, *23*
158:5  166:*3*  168:6
176:9  180:*16*  181:*25*
182:*4*  187:9  189:22
190:*13*  192:*12*
200:*10*, *15*, *19*  209:6
213:*10*  219:*16*  220:6,
*9*  229:*19*  233:*16*

**says**  23:6  46:*20*, *21*
59:*21*  60:*23*  67:*3*
68:*2*, *11*  69:22  80:*14*
84:6  87:*20*, *22*  91:*19*
94:*5*, *17*, *22*  98:*25*
99:*15*, *16*  104:9
106:*3*, *13*  109:*15*, *20*
127:5  129:*19*  133:8
135:*18*  144:*11*, *20*
145:4  146:*15*  149:*19*
153:*10*  165:*17*  166:2
171:*10*  186:2  192:*11*
194:4  201:*3*  203:*10*
204:9  206:8  213:*21*
215:6  225:*1*, *2*, *18*
226:*11*, *21*  231:*16*
235:*13*

**SCAM**  175:*21*, *23*
176:*10*  189:*21*
200:*25*

**scan**  48:*5*

**scenario**  98:*10*
137:*16*

**schedule**  147:*5*
149:7  168:*21*  212:*14*

**scheduled**  132:22

**SCHOOL**  1:*10*  2:*14*
12:*4*, *5*, *7*  13:2, *7*, *10*,
*17*  18:*4*, *16*  19:9, *21*,
*25*  20:*17*  24:*17*
25:*14*  26:*3*  27:*1*, *6*, *7*,
*25*  29:*3*, *22*  31:*12*, *17*,
*21*, *22*  33:*14*  36:*3*
37:6  41:*12*, *25*  42:2
43:*7*, *16*, *18*, *25*  44:*17*,
*19*  55:*4*, *25*  56:*17*
57:*14*, *24*  58:*25*
62:*17*  63:2  77:*12*
78:*23*  79:*3*, *5*  84:2, *3*,
*9*  85:*25*  86:*1*  87:5,
*16*, *18*  88:*10*  94:5
103:2  104:*24*  106:*11*
111:*20*, *21*  112:*17*
113:*9*, *15*  120:8, *11*
121:*3*  125:*18*  126:*11*
127:*19*, *20*, *22*, *25*
128:*10*, *12*, *21*  130:*18*,
*21*  134:*18*  136:*15*, *18*,
*23*  137:*15*  139:*24*, *25*
140:*1*, *10*  141:*11*
143:6  147:*1*, *16*, *22*
148:*3*, *10*, *14*, *17*
149:*5*, *11*, *17*  150:*15*
151:5  152:*16*, *19*
153:7  154:7, *8*
157:*16*  159:*16*
161:*14*, *18*, *23*  162:*1*,
*20*  163:5, *6*, *21*  166:6,
*25*  167:*12*  168:5, *23*,
*25*  169:*3*, *18*  172:8
173:*20*  175:6  176:*15*,
*20*, *25*  177:*15*, *22*
178:*4*, *25*  179:*7*, *9*, *22*
180:2, *3*, *4*, *7*, *14*, *18*,
*20*  181:8, *10*, *18*, *20*,
*23*, *24*  182:9, *11*, *13*,
*19*, *24*  183:*7*, *11*, *14*,
*24*  184:*23*  185:*10*, *14*
186:*18*  188:25  190:6
191:*14*  193:*1*  194:7,
*15*  195:*13*, *16*, *23*
196:7, *13*, *16*, *18*
197:*17*  198:*12*, *25*
199:*3*, *11*  202:2*1*
204:7, *8*  205:2  206:*4*,
*12*  209:*16*  210:*18*, *19*,

22  211:*1*, *2*  212:*4*, *25*
213:2, *17*, *23*  214:*19*,
*23*  215:*17*, *22*  216:2
217:6, *12*, *15*, *19*
218:*15*, *16*, *22*  219:*3*,
*4*, *8*, *10*  220:5, *7*, *17*
222:*15*  223:*3*  224:*25*
225:4, *19*  226:*12*, *16*
227:9  230:9  240:*4*

**school-based**  122:*4*
174:7

**schooling**  210:*25*

**SCHOOLS**  1:9  2:8
4:*10*, *11*  6:*10*  9:*23*,
*25*  10:*1*  12:*11*, *13*
13:*8*, *12*, *20*  14:*10*
15:6, *12*, *16*  16:*1*, *8*
17:*24*, *25*  18:22  19:*4*,
*10*, *22*  20:8, *10*  21:*10*,
*20*  22:9, *12*  23:9
24:*12*, *15*, *18*, *25*  25:8,
*12*, *16*  27:*3*, *9*, *15*, *18*
28:*2*, *5*, *6*, *9*, *10*, *14*, *19*,
*21*  29:*1*, *8*, *13*, *19*, *25*
30:*6*, *8*, *10*, *15*, *22*
31:*1*, *5*, *15*, *25*  32:*9*,
*10*, *20*  34:*4*, *23*  35:*9*,
*10*, *22*, *23*, *25*  36:22,
*25*  38:*16*  39:*11*
41:*10*  43:*4*, *24*  44:7,
*16*, *18*, *21*  45:*3*, *19*, *23*
47:*17*  50:9  51:5
52:*13*  55:*1*  72:7, *10*,
*24*  73:9  74:*14*, *15*
75:5, *10*, *15*  76:*1*, *9*
78:*4*, *24*  81:5, *22*
82:2, *13*, *14*, *17*, *25*
84:*20*  85:4  88:22
91:*1*  92:*15*  93:8
104:*17*  105:*17*  106:7
108:*4*  110:*3*  111:*3*,
*13*  112:*23*, *24*  113:2*1*
119:22  120:5, *6*
129:*25*  150:8  160:*18*
174:*11*  188:6  208:*11*
215:23  228:*14*
229:*10*, *11*, *14*  230:*25*

**school's**  75:22  90:*12*
130:*18*  182:6

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 268 of 285

Deposition of Olivia Angelica Bernal                          Jane Doe v. Academir Charter Schools, Inc., et al.

**Science** 10:*21*
**scope** 132:*21*
**screaming** 200:*6*
**screen** 7:*5* 77:*21*
224:*17*
**scrolled** 238:*10*
**se** 193:*8*
**seal** 243:*12*
**second** 48:*1* 60:*17*
66:*15* 67:*23* 70:*9,11,*
*18,20* 84:*6* 227:22
**section** 46:*25* 47:*2,*
*12* 48:*4* 49:*2,7,8*
54:*22* 57:*5* 58:*10,13*
65:*25* 69:*13* 74:*9*
75:*1,11,16* 77:*23*
78:*15,18,21* 85:*18*
105:*18* 107:*3* 110:*8*
115:*19* 118:*15*
143:*20* 146:*14* 156:*2,*
*9,16* 160:*16* 203:*10*
225:*16* 226:*18,21*
238:*20,22,24*
**sections** 48:*18*
**security** 14:*15*
**see** 65:*4* 86:*22* 92:*7*
95:*20* 96:*25* 97:*1*
101:*4,9* 102:*9,10,17,*
*23* 104:*15* 109:*9*
110:*21,22* 119:*9*
143:*20* 144:*10,17,24*
145:*4,23* 146:*14,22*
153:*11* 156:*2,9,16*
158:*7,10* 170:*18*
173:*3* 174:*20,21*
187:*21* 191:*5,9*
200:*18,19* 203:*10*
204:*13* 205:*7,16*
208:*13* 219:*25* 223:*2*
225:*15,18,25* 226:*1,*
*18,21* 227:*2,3*
228:*22,25* 236:*15*
239:*6* 240:*9,16,23*
**seeing** 135:*11*
**seen** 117:*3,7,21*
132:*17* 227:*8* 231:*12*
232:*8,14,15,20,23,*
*24* 235:*12*
**sees** 86:*20* 104:*3*

**select** 54:*15*
**self** 101:*11*
**self-destructive**
226:*24*
**send** 50:*9* 69:*4*
116:*15* 197:*8*
**sensitive** 227:*16*
**sent** 22:*4* 130:*25*
158:*3*
**sentence** 84:*6*
**sentiment** 212:*4*
**separate** 31:*4* 47:*10,*
*14,17* 63:*20* 112:*19*
208:*14*
**separated** 170:*9*
176:*1* 211:*16* 212:*17*
**separating** 184:*1*
**September** 17:22
132:*8* 243:*20*
**series** 16:*11* 98:*18*
**serious** 226:22
231:*19*
**seriously** 151:*21*
187:*19*
**served** 232:2
**Service** 3:*13* 78:*23*
79:2 203:*10,23*
**serviced** 57:*15*
**SERVICES** 1:*10*
2:*14* 4:*11* 9:25
10:22 13:*7,10* 23:*3*
27:25 28:*1* 32:*20,25*
35:*5,12* 44:*3,14*
73:*5* 79:*3* 240:*4*
**SESIR** 44:*1*
**session** 203:*17*
**sessions** 211:*3*
**set** 30:*17* 33:*15,17*
58:*7* 108:*10,12*
152:*25* 153:*15,20*
162:22 178:*15,16*
179:*17*
**setting** 19:*25* 46:*9*
188:*25* 205:*2*
**seven** 56:*16* 138:*1*
229:*13* 230:*2,4,23*
232:*1,5,25* 233:*5*
**severe** 151:*14*
186:*14,21,23,25*
187:*2*

**severity** 43:*9* 44:*3*
58:*24* 60:*9* 62:*25*
63:*8* 94:*13* 97:*22*
**sex** 37:*16* 119:*23*
**Sexual** 3:*9* 37:*16*
39:*17* 59:*7* 69:*15*
70:*5* 71:*6* 78:*15,21*
79:*8,13* 84:*7,16,25*
85:*9,14,17,19* 86:*2,*
*8,20* 89:*3* 91:*8,12,*
22 92:*4,6* 93:*7,13,*
*24* 94:*2,7,11* 95:*16*
96:*1* 97:*8* 98:*14*
99:*11* 101:*18* 102:*8*
104:*9,12* 105:*25*
113:*4* 119:*20,25*
122:*2,13* 123:*24*
133:*10* 143:*21,25*
144:*2,7,8,11,13,15,*
*21,22* 145:*2,5,11,21*
146:*16* 158:*17*
160:*19* 161:*6* 172:*6*
173:*8,10,11* 174:*15*
176:*21* 177:*18* 178:*8,*
*21* 179:*10,23* 180:*9,*
*21* 182:*10* 183:*15*
185:*9,22* 186:*6*
187:*17* 191:*25* 192:*3,*
*5,6,13* 193:*5* 197:*21*
198:*13* 207:*10,16*
208:*14,21,23* 209:*2*
214:*10,13,14* 229:*14,*
*18,23* 230:*1,3,24*
231:*6,8* 232:*3,9,25*
233:*21* 234:*7,23*
235:*2,5,7,16* 237:*9*
**sexually** 198:*7*
221:*15* 232:*20*
234:*15*
**shape** 94:*20* 189:*24*
222:*13*
**share** 7:*4* 55:*7*
77:*20* 224:*17* 237:*14*
**shared** 100:*13* 231:*3*
234:*8*
**shelf** 118:*4,7*
**shelves** 118:*5*
**show** 7:*5* 20:*14*
77:*20,22* 103:*11,17*
116:*6,8,20* 145:*14*

**153**:*11* 158:*8* 180:*5*
185:*17* 197:*7* 202:*6*
205:*8* 208:*2* 214:*5*
218:*11* 222:*23,24*
224:*8* 225:*15* 227:*4*
228:*4,18*
**showed** 72:*3* 134:*19*
163:*4* 164:*7* 185:*17*
202:*3,4* 214:*6,7*
218:*12* 220:*13*
**shower** 99:*21*
**showing** 77:*24*
143:*19* 205:*20*
228:*11*
**shows** 226:22
**shrug** 5:*8*
**side** 31:*11* 203:*9*
**sight** 152:*7*
**sign** 55:*10,11* 77:*11*
157:*13,15,16,17*
**signed** 228:*19,22,25*
**signing** 242:*14*
**signs** 102:*17* 157:*6*
171:*5* 223:*15*
**silly** 174:*24*
**similar** 112:*4*
**simple** 171:*25*
**simply** 6:*10*
**simultaneously** 24:*19*
26:*5*
**sing** 209:*17*
**single** 45:*15* 56:*14*
63:*25* 66:*2* 126:*6*
199:*21* 219:*24*
237:*21*
**sir** 6:*7,20,25* 9:*7*
10:*3,5* 61:*2* 78:*6,19*
127:*23*
**sit** 50:*1* 63:*19* 67:*19*
184:*7* 220:*9*
**site** 20:*10* 25:*13,24*
55:*25* 71:*1* 116:*19*
117:*19* 136:*23*
140:*10* 152:*19* 154:*7*
**sites** 148:*3*
**sitting** 67:*13* 225:*1*
**situation** 59:*1,6*
60:*10* 63:*1* 65:*6,7*
66:*19* 85:*10* 97:*20*
98:*6,20,23* 161:*14,*

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

19 162:2 173:25
181:5 190:18 191:7
210:10 216:19
**situations** 39:2
101:4 138:17 176:15
**Six** 19:14 127:1, 3
137:17 138:9 141:3
**slew** 43:13 59:1
79:15
**slides** 73:2
**slurs** 144:14
**small** 152:1 214:14
**SMITH** 2:3
**So-and-so** 165:21
**socially** 212:10
**Sol** 165:25 172:13
**somebody** 32:6 48:4
83:12 88:10 135:11
148:14 153:10
171:10 211:23
235:13
**son** 175:7
**song** 209:17
**soon** 42:5 93:3
159:22
**sorry** 9:21 21:2
34:1 48:19 50:16
65:9 81:23 112:11
114:1 172:20 180:15
193:19 236:21
**sort** 33:15
**Southeastern** 10:15,
18, 20
**SOUTHERN** 1:1
**Southwest** 9:10, 19
**Spanish** 193:16
**SPAR** 79:10, 14, 17,
22 80:5, 8, 12, 16
81:7, 21, 24 82:1, 4, 7,
8, 13, 15, 16, 23 83:1,
4 93:9, 11 96:24
**speak** 5:13 9:5
16:23 30:13 65:3
80:25 95:19 142:19
162:5, 12 163:14, 23
175:19 180:24 181:1
183:1 221:25 227:20
**Speaking** 183:24, 25
193:15

**special** 10:22 11:1,
11 21:11, 20 22:6
143:10
**specialist** 10:17 11:1,
4, 6
**specialize** 124:2
**specialized** 143:3
**specific** 14:25 15:10
17:16 18:2, 5, 6
24:12 25:9 26:2
39:5, 8 43:11 49:2
51:7 54:16, 18 65:25
67:14, 20 68:13
76:18 77:23 83:3
91:2 98:9 99:19
100:24 101:9 102:7,
15 103:24, 25 104:18
107:10 109:1 122:12
123:13 124:23
152:13, 20, 22 158:24
174:6 204:20 205:22
228:17 237:18
**specifically** 24:5, 22
36:9 39:15 46:11
51:18 57:6 58:13
63:3 65:21 74:12, 13
85:16 97:24 99:14
122:4, 20 163:20
164:20 167:10, 12
174:15 179:2, 4
**spectrum** 96:2
**spend** 35:19
**spiraled** 174:6
**spoke** 126:15 128:10,
24 134:20 159:13
162:9 164:16 166:9
169:23 170:23 171:8
172:18 175:4, 7
181:21 194:15 197:6
200:18 201:3, 4, 25
**spoken** 182:13
183:16, 18 206:14
**sponsor** 17:12 22:14
23:1 44:8
**stabbed** 64:11
**staff** 25:20 41:3, 4,
21, 23 45:21 54:1
107:19 109:10, 20
113:6 114:12 169:18
214:2 218:16 225:4

230:20 231:7 237:7,
15 238:11 240:8
241:17
**stall** 103:12, 13
132:15, 16 134:14
135:11 231:5
**stance** 182:12
**stand** 103:24 203:18
207:4
**standardized** 129:16,
21 155:8
**standards** 180:9
**standing** 231:4
**standings** 33:11
**start** 4:14 14:2, 4
42:19, 20 49:14
65:11 88:1 102:16
103:9 169:6 170:19
182:17, 21 184:6
198:18 199:25 200:1,
8 202:2 217:23
235:22
**started** 52:5 53:23
67:7 108:19 128:6
139:19 168:23
182:17 184:12 200:6
215:13 222:25
**starting** 12:24 167:7
**starts** 59:1 64:24
148:24 149:19
150:12 158:14
**start-ups** 25:22
**State** 1:24 12:10, 13,
23 16:20, 21 17:2
20:19 31:6 36:14, 19
43:10 44:1 81:15
243:3, 6 244:2
**state-awarded** 17:23
**stated** 30:24 74:9
94:5 119:4 166:18
177:10 225:22
**statement** 128:15
129:6, 8, 11, 14, 19
130:2, 8, 9, 19, 22
131:5, 9, 11, 13, 20, 22,
23 132:1 137:25
157:5, 8, 10 192:7
216:20 230:10
**statements** 129:23
156:25 204:20

**STATES** 1:1 54:12
59:9 109:12 236:25
**stating** 4:14 64:3
**status** 109:2 112:18
**stayed** 170:25
**stays** 139:24 140:1
175:23 176:18
**stenographically**
244:6
**step** 41:14 47:8
58:5 59:8 60:12, 15,
17 61:3, 15 62:4, 5
63:24, 25 65:5 66:12,
15 70:6, 10, 15, 18, 19,
20 71:3, 16, 18 88:14
91:20, 24 99:6
146:21 173:6, 7
**stepdad** 101:2
**stepfather** 99:22
**stepping** 166:8
**steps** 42:15, 23 43:9,
12, 14 49:19, 21 50:6
57:21, 23 63:4, 23, 24
64:4, 6 65:4, 24 66:6,
10 67:2 68:11 69:14,
20 70:8 71:19 74:22,
25 76:23 81:2, 16
83:15 85:8, 23 88:8,
11, 12, 21 89:11, 19
91:3, 4 92:13 113:7
146:4, 15, 18 147:11
150:9 180:12 197:11
214:5
**stolen** 65:12
**stop** 44:4 68:5
147:25 209:24 210:8
**stopped** 63:17 141:8
209:21, 22 210:2, 7
**store** 118:3 130:21
**stored** 45:6 130:3
131:21 133:24
138:19 139:16
**story** 125:17, 19
163:10 177:24
178:12 179:12 196:1
197:19 213:11, 12
216:21 219:17, 18
**strategies** 104:11
105:22 144:20

Case 1:23-cv-23004-JB Document 67-2 Entered on FLSD Docket 09/26/2024 Page 270 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

streamline 68:6
strictly 77:10 166:11
strike 28:17 100:19
114:21 143:13
Student 3:8 9:1
14:18 18:5 25:25
33:21 34:17 37:3,4
40:20,21 44:10,11
49:8,17 51:7,19
54:14 56:18 57:6,12,
17,22 58:1,7,10,14
59:10 63:9 65:22
71:7,11 73:25 74:10,
20,21 75:1,12 76:5,
11 77:8 78:2 84:8,
25 85:20 86:9 87:24
89:3 91:12 97:21
104:10 105:4,20
106:1,25 109:21
120:9 125:18 127:4,
14 128:14 129:3,9
130:11,17,22 131:6,
9,14,16,21 132:2
133:11,23 134:11,14
136:13,14 138:7,14,
20,25 139:1,10,17
140:2,5 142:6 144:8
145:5 148:7 151:15,
20 157:3,9,11 165:1,
4,11 167:23 172:17
177:12 180:7 182:9
184:15 185:19
187:23 188:7 189:11
191:14,17,24 192:11
193:24,25 198:7
202:18 203:24 204:9,
11 205:21,25 206:1,
9,10,18,19 207:14,
24 210:14 215:21
217:4 229:15 230:23
231:11 232:3 233:3,
19 236:11 237:1,8
240:17
student-based 122:7
student-by-student
188:11
student-on-student
59:7
students 18:1 25:20
33:24 34:20 37:14

40:16,17 41:5 45:11,
14 49:8,10,21 52:9
53:4 57:9,13,15
60:5,6 63:20,21
65:1,13 72:12,14
74:22 77:4 78:3
83:15 85:5 88:25
89:17 107:11,20,25
108:3 109:13 110:14,
17 112:4,9,23 113:1,
6 114:3,4,7,11,16,
24 115:10,15 119:6,
12,15 120:2 122:6
126:14 139:8,20
142:7,17,19,22
143:2 145:3 146:25
151:24 153:6,8
155:20 156:23 160:4,
16,17,21,22 171:22
177:17 178:20
183:12,25 188:11
192:22 203:16
214:10,11 215:18
219:14 230:7 231:9,
21 238:7 241:17
student's 145:7
172:18 180:8 188:8,
22 189:12
stuff 9:3 12:19 20:9
35:3 36:18 61:25
77:5 79:7 80:4
101:4 155:6 200:13
210:12 238:9
subcontract 15:13
subject 37:20 38:1
submit 17:4 155:6,
16
submitted 16:15 31:9
success 17:19 31:16
suit 103:21
Suite 2:3,10,16 9:20
sum 36:23
summer 52:11,15,17,
19 115:16 132:9
241:6,13,25 242:5
superintendant 22:16
SUPERIOR 1:10
2:14 4:10 9:24 13:7,
9 14:8 15:1,8,10,25
16:3,5,7 18:7,10,24

19:3,16 20:25 21:5,
17 23:20 24:2,9,14,
23 25:7,11 26:5,11,
16 27:15,25 29:8,13,
25 30:25 31:11,20,
23,24 32:1,10,11
34:6 37:1 38:1,6
51:4 52:3 72:17
131:2
Superior's 40:25
supervisor 42:3 71:2
86:12,17 87:8,11,14
88:4,6,9,17,20
89:15
supplemental 17:19
support 12:11 14:10,
17 20:8 27:3 41:9
44:20 49:16 56:8
73:4 86:4 105:21
106:9,12,16 141:24
147:13 150:13,14
supporters 28:3
supporting 19:19
Supportive 156:3
supports 20:20 25:15
supposed 61:1 120:2
169:3
sure 5:8 20:15
29:12 31:11,14,15
37:14 42:16 56:12,
23 57:1 58:3 59:15
64:25 73:6 79:8
83:21 96:18 100:10
112:14 116:11,12
118:2 123:11 133:22
136:11,15,19,21
137:2 151:15,16
188:1 192:18 205:17
212:9 235:4 239:16,
18
Susie 56:1 164:11
suspect 70:1,5,12,16,
24 98:16 149:23
suspected 99:9
suspects 97:11
suspend 105:4
suspended 145:5
switch 211:20
sworn 4:4 243:8

symptoms 226:22
227:5,13
system 12:12,17
79:18 201:8 204:17

< T >
table 211:17,18
224:25
tables 211:18
tabs 116:17 117:12
tail 210:10
take 5:24 11:17,20,
24 25:14 38:23 42:6
43:9 47:8 50:7 55:1
57:24 58:2 59:4,18,
23 61:15,16 64:12,
14 67:2 68:13 71:10
74:25 75:1 80:19
81:2 83:18 85:23
88:1 89:9,13,20
93:2 97:20 103:8,18
104:23 106:11,17,18,
20 118:24 121:2
126:18 149:6 150:2
154:2 155:7 157:2
158:13 177:7 182:1,
12 183:6 184:2,15
187:18 194:2,19
195:24 201:7,17
204:1 210:9 227:23
taken 15:24 41:11
43:14 64:10,20
82:11 83:15 98:18
100:15 105:23
106:11 139:3 151:20
157:8 175:5 183:23
194:7 206:13 207:5
232:17
takes 64:23 71:7
120:6 154:8 204:7
215:23
talk 39:1 60:5
66:10 70:7,8 157:14
173:2 175:18 182:19
187:20 191:13
197:10
talked 45:2 93:11
128:23 145:6 186:2
talking 89:17 90:3
186:3 188:14,17

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 271 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

189:7  190:15  191:10,
14  238:19
**Tallahassee**  36:11
**Tampa**  2:16
**targeted**  58:2
**tasks**  15:9
**taxes**  36:17
**teach**  187:8  190:4
**teacher**  14:18  58:17,
18, 19  61:21  63:13
86:15  88:15  89:16
90:21  96:7, 16  100:1
132:12  157:4, 15
162:25  164:23, 24
165:5, 6, 7, 15, 16, 19
166:7  172:11, 13
175:3, 15  191:4
196:21  206:4, 5, 8
221:19  225:4  227:9,
19  234:20  236:18
237:25
**teachers**  25:20  29:24
30:19  41:4, 20, 23
87:10, 11  120:16
155:20  162:22  176:1
231:21  237:7, 17, 24
**teaches**  211:5
**teaching**  209:22
**team**  28:3  49:23
104:20  120:23  121:1,
4, 8, 18  122:11
124:13, 17, 21  128:9
162:9
**teams**  27:2  219:23
**teenager**  128:16
**tell**  8:16  46:16
51:12  52:4  59:3
62:4  64:9, 13  67:22
68:1  69:4  73:12
82:4  95:8, 9  97:24
102:14  117:1  118:13
120:15  123:13
159:18  164:14, 19
166:9, 11  206:3
214:22  215:1  218:3,
4  227:10  235:6, 9, 11
239:10
**telling**  97:21  171:19
182:2  185:21  199:22

217:19  218:10
220:11  221:22
**tells**  50:4  71:14
97:17  99:24  106:8
109:7  195:16  207:19
222:7
**ten**  7:16  13:4  49:3,
4  159:11  229:5, 9
**tend**  116:9
**ten-minute**  177:7
**tenure**  124:21
**term**  82:1, 9, 17
220:23  221:3
**terms**  13:24, 25
15:25  16:9  29:7
59:9  163:9  221:13
241:6
**terrible**  105:7
**testified**  4:5  91:1
114:6  122:23  236:23
**testify**  4:23  6:19
98:12  135:2  153:13
174:10  196:17
239:25  240:7
**testifying**  5:3  6:5
72:20
**testimony**  5:2, 19
7:14, 21  8:3  112:15
113:18  114:14  244:9
**tetitas**  166:4  167:14,
16  168:7  188:15
190:9  192:2
**text**  158:2
**Thank**  4:11, 13  8:20
159:24  216:14  228:2
229:4  233:23
**thing**  56:14  62:14
89:21  97:3  143:11
173:1  181:7, 11
183:23  193:9  199:4
214:1  216:9  231:14
240:16
**things**  4:19  9:2
13:11, 22  14:16  17:1
18:2, 5  25:6, 18
26:23  32:5  34:18
35:25  37:13  39:2, 19
44:9, 13  45:10  49:6,
15  54:13  56:11, 13,
19  59:2  60:8  65:10

73:6, 9, 13  75:7, 8
79:15  81:18  94:10
96:6, 14  101:8, 11, 12
102:4, 7, 15  103:4, 24
104:7  107:10  109:1,
5  111:14  162:11
169:25  170:22
171:15  173:16  174:4,
19, 24  184:19  188:15
191:18  196:1  204:21
205:4, 25  209:18
217:12  219:4  227:17
232:8, 17  237:22
239:11, 19  240:18
241:3
**think**  21:4  35:15
40:3, 10  67:23  68:1
88:14  100:7  114:19
152:7  170:12  181:13
201:23  213:7, 22
221:7  223:8  230:9,
19
**thinking**  6:5  53:10
**third**  51:1  70:15, 18,
19, 23
**THOMAS**  2:4
**thorough**  62:8
**thought**  121:25
132:14  234:11
**threat**  219:23
**threatening**  184:16
**three**  50:21  51:15
54:13  71:8, 10  75:8
105:7  107:9, 10
121:15  196:8  207:11,
13, 16, 20, 22, 25
208:19  219:17, 18
**Three-ring**  117:11
**threw**  61:25
**THURSDAY**  1:17
163:6
**time**  5:14  18:18
24:3  52:7, 16, 20
54:24  86:24  87:10,
13  88:17  123:4
125:10  126:2  127:9
128:18  132:7  135:23
140:25  153:12
154:20  164:9  168:5,
22  172:25  175:15

177:24, 25  178:13
179:13  184:12
187:25  188:4, 18
192:24  197:2  210:2
213:14  219:19  230:6,
13  231:12, 13  233:17
235:3  241:13
**timeline**  128:18
**times**  58:21  104:4
125:4, 8  153:4
162:10  174:19
182:14  209:13
219:17, 18  233:12
241:11
**Title**  3:9  9:3  13:21
18:6  20:22  21:18
22:11  23:6  37:9, 11,
12, 20  38:1, 8, 12, 20
39:16, 20, 25  40:13,
25  41:3, 16  42:8
45:13  46:2, 11, 20, 23
47:2, 13  49:2  51:7,
19  52:8  54:10, 16, 18
57:5  58:10  65:21
72:5, 17, 22  74:9, 15
75:7, 12, 20  76:5, 10,
12, 13, 14, 15  88:22
92:4  104:13, 19
105:14, 21  106:2, 13
107:5, 24  108:2, 6, 17
109:2, 13, 16, 25
110:1, 4, 10, 14, 15, 16
111:16, 25  112:12, 19
113:1, 3, 20, 24  114:2,
5, 8, 9, 11, 15  115:6,
10, 14  118:11, 13, 15
119:5, 7, 8, 11, 14, 17
120:2, 19, 21  121:4, 7,
13, 18  122:1, 2, 13, 15,
20, 24  123:5, 6, 8, 11,
12, 22  124:1, 7, 13, 17,
20  125:2, 11, 23
126:3, 7  127:15
134:5  136:8, 25
137:3, 10  138:5, 19
139:5, 10  140:7, 12,
15, 25  142:2  143:9
144:3, 22  145:2, 11,
21  146:9, 19, 22, 25
147:2  148:16, 21

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 272 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

149:*13*  150:*18, 19*
151:*11*  152:*10*  153:*1,*
*16*  154:*15, 19*  155:*12*
156:*7, 13, 21, 24*
157:*19*  159:*1, 5*
160:*3, 7, 19*  168:*17*
169:*12, 15*  170:*16*
172:*1*  189:2  198:*11*
227:*13*  231:*13*  234:2,
*3, 6, 17*  235:3  236:*1,*
*6, 9, 12*  237:*1, 2*
238:*4, 6*  239:*5, 18, 25*
240:*10, 14, 21*  241:*8,*
*24*  242:6
**titled**  46:*15, 16*  54:8
69:*1, 10, 17*  78:*15*
110:*25*  111:*10*
**today**  4:*12, 23*  6:6
8:*23*  48:*24*  113:*18*
175:6  242:9
**today's**  6:8  8:6  9:6,
*14*
**told**  20:2  73:*11*
75:*17*  90:*21*  96:*12,*
*21*  97:*17*  108:*11*
110:6  111:*20*  124:*24*
137:*16*  146:6  153:*3*
154:*16*  159:*13, 19*
163:*11*  165:5, *6, 8, 10,*
*11*  166:*22, 25*  168:9
187:5, *10*  191:*4*
193:*3, 6, 22*  194:*13*
195:*20*  198:*14*
200:*16, 21*  204:*21*
214:*16, 17*  217:*9, 10*
219:6  220:6, *10*
223:*25*  225:*4*
**top**  142:*14*
**topic**  122:*3*
**topics**  7:*11, 15, 22*
8:*4*  39:7  65:*20*
122:*1, 2*  124:7
**TotalSource**  121:*22*
123:*17*  124:2
**toto**  102:*3*
**touch**  94:*15*  98:*1*
166:*4, 23*  167:*13*
168:2, *7*  171:*20*
187:*13*  192:*1, 9, 10,*

*11*  195:*25*  209:*8*
214:*17*  217:*9*
**touched**  29:6  95:*10*
96:*19, 20*  99:*15, 24*
100:*1, 25*  104:6
164:*25*  167:2, *4, 5*
170:*24*  187:*22*  193:*5,*
*12, 24*  199:*20*  215:*7*
217:*8*  222:*8*  234:*25*
**touching**  102:*11*
119:*24*  144:*13*
166:*10, 18*  168:*12, 13*
174:*23*  179:9  188:*8,*
*21*  189:*12*  196:*14*
197:*4, 16*  217:*20*
234:*11*
**track**  83:9  176:8
**trained**  41:*21*
**training**  11:*16, 23*
25:*20*  38:*8, 11, 20*
39:7  50:*3*  73:*11*
108:*11, 24*  121:*18, 20,*
*21, 22, 25*  122:*12, 14,*
*16, 19, 24*  123:*1, 7, 14,*
*19, 23*  124:7, *10*
236:6  237:*10*  238:*17*
239:*20*
**trainings**  20:*12*
**transactions**  13:*24*
**transcribe**  5:7
**transcript**  244:*8*
**transcription**  244:*8*
**transition**  19:*15*
62:*14*  213:9
**transitioned**  19:*11*
**translate**  166:*1*
**translated**  16:*11*
**translation**  63:*15*
193:*17*
**treat**  90:*4*  98:*4*
**treated**  85:*14*
**treating**  90:*1*
**trial**  230:*20*
**Triana**  117:*18*
**tried**  161:*19*  178:*16*
222:*21*
**triggers**  80:*3, 21*
81:*14*

**true**  91:*21*  134:*21*
178:*19*  192:*22*  198:*7*
244:*8*
**truly**  154:*1*  199:*9*
216:*10*
**truthfully**  4:*23*  6:5
**try**  27:*19*  53:*14*
67:*21, 24*  69:*3*
178:*15*  216:*16, 18*
223:6
**trying**  29:*11*  47:*24*
53:7  68:6  90:*25*
91:2, *5*  153:*15, 18*
182:2  216:*24*
**Tuesday**  161:*18*
162:2, *23, 25*  163:5
166:*20*  171:7  173:*1*
177:*24*  180:*3*  185:*13,*
*15*  197:*18, 19*  200:*14,*
*15*  209:*11*  212:*13*
217:2, *3, 6, 11*  219:*19*
**turn**  14:*4*  15:*15*
16:*16*  31:*14*  62:7
87:*25*  158:*21*  194:*21*
**turned**  165:*16*
169:*10*
**turning**  31:*10*  58:*18*
**tutoring**  18:*3*
**TV**  102:*10*
**two**  11:*23*  13:6
18:*14*  23:*24, 25*  31:*4*
51:*15*  52:9, *22*  64:*11*
75:7  86:*13*  90:*3*
92:*23*  108:*15, 17*
121:*17*  122:*11*
124:*12, 16*  130:*23*
151:*24*  154:*24*  166:*1*
169:*3*  170:*21*  177:*17*
178:*20*  180:*5*  192:*22*
199:*11*  208:*14*
219:*14*
**type**  11:*17*  17:*16*
49:*18*  54:*20*  62:*23*
73:*16, 17*  110:*9*
231:*22*
**types**  8:*11*  64:*13*
**typical**  129:*18*
227:*10*
**typically**  11:*20*  15:*2,*
*3, 4*  20:*13*  22:*3*

29:*14*  30:*1*  33:*9, 13*
39:*8, 11, 13, 17*  53:*3*
56:*13, 15*  82:2  95:5
96:*4*  99:*19*  100:*22*
101:*14*  102:*8*  104:*7*
116:*9, 22*  117:*11, 15*
120:*24*  121:*10*
139:*21, 24*  142:*5*
149:9  151:*14*  157:*25*
188:*25*  213:*10*

**< U >**
**Uh-huh**  30:*16*  38:*19*
70:*14*  72:8  78:*17*
84:*12*  117:*24*  133:*18*
140:*19*  176:*11*
186:*10, 24*  206:*25*
208:9, *16*
**ultimate**  87:*17*
180:*17*
**ultimately**  177:*4*
**umbrella**  36:*18*
**unable**  226:*25*
**uncomfortable**  97:*18*
145:8  204:*10*
**undergo**  11:*16*
122:*16*
**undergone**  121:*18*
**undergrad**  10:*15*
**undersigned**  243:*5*
**understand**  4:*21, 25*
5:*20*  6:*18, 21*  7:*1*
14:*22*  47:*24*  66:*19*
90:*25*  91:*3, 6*  93:*10*
95:*15*  112:*15*  152:*2*
153:*15, 18*  158:*8*
177:*19*  180:*16*
181:*25*  182:*4*  183:*13*
216:*24*  221:2
**understanding**  37:*11*
39:*24*  40:*12, 24*
64:*17*  153:5  165:*24*
217:*12*  229:*11*
**understands**  211:*4*
**undressed**  99:*22*
**unfounded**  133:*1, 2, 5,*
*16*  135:*3, 4, 12, 16, 25*
136:2, *20*  137:*21*
208:*17*  234:*13*

Case 1:23-cv-23004-JB Document 67-2 Entered on FLSD Docket 09/26/2024 Page 273 of 285
Deposition of Olivia Angelica Bernal
Jane Doe v. Academir Charter Schools, Inc., et al.

**unit** 9:*20*

**UNITED** 1:*1*

**University** 10:*16*, *18*, *24*

**unreasonably** 186:*17*

**unwelcome** 144:*12*

**unwilling** 226:*25*

**upbringing** 103:*15*

**update** 14:*20* 55:*8*

**updated** 46:*5* 50:*11* 116:*14* 241:*3*, *5*, *9*

**upload** 16:*17* 31:*7* 73:*21*

**uploaded** 201:*8*

**uploading** 43:*11*

**upper** 121:*1*

**upset** 95:*11*, *23* 98:*22* 163:*16* 164:*7* 181:*5*, *19* 213:*24* 218:*15*, *24*, *25* 219:*2*, *17*

**urinal** 103:*13*

**use** 5:*25* 17:*11* 21:*12* 22:*15*, *17*, *20*, *24*, *25* 35:*19* 44:*11*, *12* 64:*5* 73:*24* 74:*4* 79:*25* 81:*4* 82:*9*, *14*, *16* 83:*1* 93:*10* 129:*25* 143:*3* 144:*6* 155:*3*, *4*, *21* 176:*13*

**uses** 129:*22*, *25* 143:*25* 144:*3*

**usual** 101:*11*

**usually** 39:*13* 52:*11*, *14* 80:*7* 83:*18* 120:*16* 130:*23* 131:*16* 139:*2*, *8* 140:*9*, *10* 157:*3* 158:*3*, *14* 200:*24* 203:*14* 204:*3* 206:*8* 207:*2*, *4* 213:*12* 215:*16*, *23*, *25*

**utilize** 92:*17* 145:*1* 156:*6*

**utilizes** 143:*5*

**< V >**

**vagina** 167:*25* 168:*13* 188:*8*, *22* 189:*12*

**Valladares** 87:*2* 88:*18*, *19* 173:*24*

**varies** 139:*6*

**vaya** 193:*9*

**vendor** 41:*6* 53:*3* 54:*14* 107:*13*

**vendors** 45:*12* 49:*11*, *21* 53:*5* 75:*1* 77:*5* 109:*11* 160:*22* 241:*17*

**verbal** 144:*13* 161:*9* 166:*12*, *13*, *16*, *20*, *22* 167:*1*, *7* 168:*16* 169:*17* 170:*7* 172:*3* 173:*14*, *18* 174:*14* 176:*19* 177:*13*, *23* 179:*1*, *11*, *12* 183:*19* 185:*11* 186:*8* 190:*25* 204:*2*, *12* 213:*7* 217:*3*, *7* 225:*10* 229:*1*

**verbalized** 204:*10*

**verbalizing** 59:*25*

**verbally** 5:*9* 162:*17* 171:*9* 173:*12* 200:*16*

**verified** 96:*18* 214:*16*

**versa** 99:*23* 162:*23*

**versus** 64:*10*

**vice** 99:*23* 162:*23*

**video** 40:*3* 157:*23* 158:*9*, *10* 197:*7*

**visibly** 98:*19*

**visit** 116:*4*, *19*

**visits** 20:*10* 25:*13* 117:*19*

**volunteered** 12:*14*

**vs** 1:*8*

**< W >**

**wait** 5:*14*, *15* 147:*17*, *23* 151:*1* 193:*6*

**waive** 242:*13*

**waived** 242:*14*

**walkthroughs** 25:*15*

**Walton** 170:*12*

**want** 5:*18* 7:*10* 34:*1* 41:*12* 66:*10* 68:*5*, *10* 94:*9* 102:*15*, *20* 107:*15* 112:*14* 114:*20*, *21*, *22* 115:*16*

135:*18* 143:*18* 152:*6*, *20* 158:*9* 163:*8* 167:*13* 168:*1*, *2*, *6* 173:*4*, *5*, *6* 175:*19* 176:*7*, *8* 177:*19* 181:*5*, *9*, *17* 183:*4* 184:*21* 188:*1* 192:*11*, *12* 193:*13*, *14* 194:*10*, *16*, *17*, *23* 195:*9*, *11*, *13* 196:*4* 199:*2*, *3*, *4*, *16* 202:*1* 211:*24* 212:*3*, *15* 213:*18* 214:*2* 223:*10* 227:*24* 228:*4* 229:*4* 232:*18* 235:*18*

**wanted** 21:*3* 95:*14* 166:*3* 181:*7* 183:*8* 187:*11*, *12*, *13* 191:*3*, *18*, *24* 192:*1* 197:*7*, *8* 199:*13* 214:*4* 220:*7* 228:*18* 236:*21*

**wants** 97:*25* 98:*1* 120:*10* 205:*7*

**warnings** 204:*2*

**warrant** 65:*6* 99:*6*

**warrants** 62:*19* 63:*18* 64:*7*, *18* 82:*10* 95:*17*, *18* 105:*6* 152:*16*

**water** 5:*25* 227:*21*

**way** 35:*10* 42:*6* 57:*11* 60:*2*, *21* 62:*23* 66:*18*, *21* 94:*20* 99:*1* 103:*2* 149:*24* 181:*6* 189:*24* 190:*14* 205:*6* 209:*11* 210:*17* 216:*22* 219:*5* 222:*13*

**ways** 41:*2*

**wear** 103:*20*

**websites** 54:*2*, *3*

**Wednesday** 162:*2* 163:*6*, *13* 164:*5*, *10*, *17*, *18* 166:*12* 177:*25* 180:*4* 184:*22* 185:*1*, *5* 197:*13* 217:*4*, *12*, *14* 218:*12*

**week** 25:*23* 161:*13*, *17* 169:*2* 174:*2*, *5* 176:*3* 179:*18*

**weekend** 174:*4* 185:*14*, *15*

**weeks** 125:*12*, *24*

**Well** 14:*9* 16:*2*, *21* 31:*3* 32:*15* 34:*13* 40:*1* 42:*16* 49:*5* 50:*18* 58:*15* 59:*12* 66:*18* 68:*4* 71:*13* 78:*8* 80:*18* 85:*16* 87:*8* 97:*14* 104:*19* 106:*5* 117:*2*, *25* 118:*4*, *16* 124:*25* 128:*6* 129:*12* 130:*9*, *15*, *19* 131:*6* 137:*3* 146:*11*, *12* 155:*13* 156:*7*, *14* 162:*3*, *20* 165:*6* 166:*2*, *18* 173:*10* 174:*10* 176:*17* 180:*10* 186:*11* 189:*2* 196:*17* 197:*5* 198:*2*, *4* 200:*2* 203:*14* 206:*4* 210:*19* 211:*21* 212:*12* 216:*24* 230:*18* 235:*22* 236:*1* 238:*17*, *22*

**well-being** 62:*21* 68:*15* 69:*23*

**went** 127:*6* 128:*9*, *12* 134:*16* 141:*13* 155:*22* 172:*17*, *22* 182:*21* 184:*11* 185:*10* 195:*14*, *25* 198:*25* 199:*1* 203:*3* 213:*12* 216:*20* 217:*15* 218:*5*

**we're** 4:*20* 5:*1* 14:*9* 15:*11* 17:*11* 22:*24* 27:*19* 29:*20* 35:*6* 49:*9*, *10* 53:*10*, *20* 60:*1*, *3* 85:*17* 131:*18* 147:*7* 161:*16* 162:*10* 163:*17* 191:*7* 205:*9* 215:*7* 230:*11* 231:*22* 232:*10* 233:*16*

**West** 18:*17* 19:*9* 87:*5*

**We've** 51:*21* 53:*12* 54:*5* 92:*22* 215:*24*

229:*19*  230:*13*
231:*11*, *21*
**whipped**  101:*5*
**white**  118:2  153:5
154:*17*
**wife**  19:2
**Wimpy**  234:*12*
**withdraw**  169:6
**withdrew**  161:22
**witness**  4:*3*  10:9
21:7  26:*21*  28:*23*
32:*18*  34:*10*  38:6
48:6  59:*12*  68:*12*
84:*18*  89:6  90:*20*
94:7  99:*14*  101:22
114:*18*  130:8, *10*
132:23  133:*1*  157:4
174:*18*  189:*14*
192:*15*  193:*19*
197:*24*  226:8  243:*12*
244:9
**witnesses**  55:6
134:*13*  157:20
**word**  62:2  221:2
**words**  115:6  123:22
166:*1*  167:8  190:9
242:5
**work**  9:*16*  12:*11*, *14*
13:*5*, *6*, *7*  14:*12*, *13*
15:5  16:9  20:*5*, *11*
24:*11*, *14*, *17*, *20*, *22*
25:*3*, *11*, *17*, *24*  26:*14*
27:*3*, *10*, *18*  28:4, *5*
32:8  52:2, *11*  82:24
104:*20*, *21*  121:*3*
151:5  202:22  216:*16*
219:*4*  223:6
**worked**  27:7  29:2, *3*
50:*12*  52:7  77:2
233:*17*
**working**  19:*18*  26:*16*
27:*19*
**works**  28:7, *8*  48:*19*
77:*14*  128:*16*  203:2
**worksite**  84:9
**worry**  53:*3*  103:*16*
199:*17*
**wow**  187:*16*
**wrap**  227:25

**write**  14:*3*  90:*20*, *22*
129:*19*  131:*17*  157:4
**writer**  13:*16*
**writes**  206:5
**writing**  67:*13*  90:*19*
136:*17*, *20*  139:*4*, *8*,
*11*
**written**  23:6  42:8
44:*23*  78:*21*  129:*6*,
*11*  189:*18*  203:*19*
204:2  207:2
**wrong**  21:6  104:2
172:*21*  187:*9*  190:6
211:5
**wrote**  212:*19*  239:*11*

**< X >**
**Xenia**  49:*24*  50:*14*,
*17*  51:2  77:2  107:*11*,
*16*  109:9  110:*21*
114:*10*, *13*  121:6, *16*
160:25  238:*18*  241:6
**XI**  106:2

**< Y >**
**yada**  71:9, *10*  201:*4*
203:*20*
**Yeah**  16:*21*  23:24
37:6  43:*23*  57:*10*
60:19  68:9  76:3, *21*
77:3  92:25  108:*19*
120:23  132:23  133:*5*
160:*12*  188:*14*  238:5
241:22
**year**  52:*14*, *25*  53:*6*,
*10*, *14*, *19*  54:5  55:*16*
56:*15*, *22*  108:*19*, *24*
126:24  130:*12*
139:*19*  203:*1*  231:*10*
241:22
**yearly**  116:*18*
**years**  11:*23*  13:*3*, *4*
17:*21*  18:*14*, *15*
19:*14*  23:*24*, *25*  27:*8*,
*9*, *10*  51:*15*  56:*17*
76:*19*  102:2  108:*9*,
*15*, *17*  138:*1*  187:*24*
229:*13*  230:2, *4*, *15*,
*19*, *23*  232:*1*, *5*, *25*

233:6  241:*9*
**yelling**  200:6
**yesterday**  25:*1*  101:6
**yo**  193:*8*
**young**  96:*3*  105:*11*
151:*24*  187:*14*, *15*
206:*1*
**YOUNT**  2:*14*

**< Z >**
**Zoom**  5:*1*

## WORD LIST

< 1 >
1  (4)
1:23-cv-23004-WPD  (1)
10  (1)
10:02  (1)
100  (2)
11  (3)
12  (4)
13  (1)
14  (1)
145  (1)
153  (1)
15420  (1)
15709  (1)
157th  (1)
18  (1)
19  (1)
196  (1)

< 2 >
2  (3)
2017  (1)
202  (1)
2024  (4)
2027  (1)
205  (1)
208  (1)
20th  (1)
21  (1)
22  (1)
224  (1)
227  (1)
228  (1)
236  (1)
243  (1)
244  (1)
25  (1)
250  (1)
27400  (1)
28  (1)
288  (1)
29  (1)
293  (1)

< 3 >
3  (3)

301  (1)
33131  (1)
33193  (1)
33301  (1)
33606  (1)

< 4 >
4  (4)
4:44  (2)
406-5674  (1)
443618  (1)

< 5 >
5  (5)
515-0322  (1)
520  (1)
568-8120  (1)

< 6 >
6  (3)
601  (1)

< 7 >
7  (4)
77  (1)
786  (1)

< 8 >
8  (3)
800  (1)
80th  (1)
813  (1)

< 9 >
9  (2)
911  (5)
954  (1)
9th  (2)

< A >
a.m  (1)
abandoned  (3)
abide  (2)
able  (18)
aboard  (4)
absolutely  (9)
abuse  (14)
abused  (8)
academic  (3)

ACADEMIR  (180)
Academir's  (12)
access  (11)
accessible  (1)
accessing  (1)
accident  (3)
accidents  (1)
accommodations  (1)
accountability  (1)
accounts  (6)
accreditation  (1)
accuracy  (3)
accurate  (4)
accurately  (1)
accused  (2)
acknowledged  (1)
acquisition  (3)
acronym  (1)
act  (10)
acting  (2)
Action  (24)
actions  (14)
activities  (1)
activity  (1)
acts  (6)
actual  (8)
add  (7)
added  (4)
addition  (2)
additional  (2)
address  (5)
adhere  (6)
adheres  (4)
adjustments  (1)
administration  (14)
administrative  (1)
administrator  (5)
administrators  (8)
admissible  (1)
admission  (1)
admitted  (1)
ADP  (15)
adult  (5)
adults  (6)
affect  (1)
aftercare  (7)
aftercares  (1)
afternoon  (3)
afterschool  (1)

age  (4)
agency  (3)
ago  (15)
agree  (3)
agreement  (4)
agrees  (1)
ahead  (8)
alert  (2)
alerted  (1)
Alexander  (3)
align  (1)
allegation  (16)
allegations  (38)
alleged  (2)
allegedly  (1)
alleging  (2)
alliance  (4)
allocated  (3)
allocation  (2)
allow  (4)
allowed  (3)
Amended  (2)
amount  (5)
amounts  (1)
and/or  (2)
ANGELICA  (5)
anger  (1)
annual  (14)
answer  (17)
answering  (3)
Answers  (7)
anybody  (2)
anymore  (1)
apologize  (2)
APPEARANCES  (1)
APPEARED  (2)
appears  (1)
applicant  (3)
application  (2)
applications  (4)
applies  (1)
apply  (2)
appointment  (2)
appreciate  (1)
appropriate  (10)
approved  (1)
approximately  (1)
ARCs  (1)
area  (3)

areas  (1)
array  (2)
arrested  (1)
article  (1)
aside  (3)
asked  (17)
asking  (46)
asks  (2)
aspect  (4)
aspects  (3)
assault  (5)
assaulted  (9)
assaults  (1)
assessment  (2)
assessor  (1)
assign  (1)
assignment  (3)
assist  (5)
assistance  (3)
assistant  (20)
assisted  (1)
associations  (1)
assuming  (3)
attend  (3)
attended  (2)
attention  (8)
attest  (2)
attorney  (6)
attorneys  (5)
audio  (1)
audits  (1)
August  (1)
authorities  (4)
authorization  (1)
authorized  (1)
available  (2)
Avenue  (1)
average  (2)
awards  (1)
aware  (19)

< B >
babies  (3)
baby  (2)
babysitter  (1)
Bachelor  (1)
back  (24)
background  (1)
ballistic  (1)

based  (31)
basically  (1)
basis  (18)
Bates  (6)
bathing  (1)
bathroom  (6)
bathtub  (1)
bay  (1)
Bayshore  (1)
beach  (1)
bear  (1)
bed  (1)
beginning  (3)
begins  (1)
behalf  (12)
behavior  (12)
behavioral  (1)
behaviors  (3)
believe  (26)
belittling  (1)
belligerent  (1)
Bello  (9)
Bello's  (3)
belong  (1)
belongs  (2)
BERNAL  (12)
best  (4)
BETH  (1)
better  (1)
beyond  (8)
big  (3)
bigger  (1)
binded  (1)
binder  (37)
binders  (10)
binding  (1)
bit  (3)
black  (5)
blown  (1)
board  (10)
body  (1)
boil  (1)
bonds  (2)
book  (3)
bothering  (2)
bottom  (4)
Boulevard  (2)
boy  (3)
break  (16)

breast  (5)
Brickell  (1)
brief  (3)
briefly  (1)
bring  (6)
bringing  (2)
broad  (2)
broke  (1)
brought  (9)
bruises  (1)
budget  (1)
budgeting  (1)
budgets  (3)
building  (1)
butt  (2)

< C >
C-6  (1)
call  (49)
called  (47)
calling  (9)
calls  (3)
camera  (1)
cameras  (3)
campus  (9)
campuses  (3)
card  (1)
care  (17)
career  (1)
careful  (2)
carried  (1)
carries  (1)
carry  (2)
Casas  (5)
CASE  (82)
case-by-case  (5)
cases  (11)
categories  (2)
CATHERINE  (1)
cause  (1)
cautious  (2)
CEO  (2)
certain  (11)
CERTIFICATE  (4)
certification  (3)
certifications  (3)
certified  (1)
certify  (3)
chair  (1)

change  (2)
changed  (17)
changes  (7)
changing  (1)
charge  (13)
CHARTER  (101)
charters  (2)
check  (2)
chief  (22)
child  (205)
Children  (68)
child's  (1)
circumstances  (4)
cites  (1)
civil  (13)
claim  (1)
clarify  (5)
class  (7)
classes  (1)
classified  (1)
classroom  (2)
clear  (4)
clearly  (3)
client  (3)
closed  (1)
Code  (33)
Codes  (14)
collaborated  (1)
collect  (1)
collected  (2)
collection  (2)
collects  (1)
college  (2)
combination  (5)
combine  (1)
come  (31)
comes  (19)
coming  (6)
comingle  (1)
comment  (16)
comments  (9)
COMMISSION  (1)
commit  (3)
committed  (3)
common  (7)
communicate  (20)
communicated  (16)
communicating  (4)
communication  (3)

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 277 of 285

Deposition of Olivia Angelica Bernal                          Jane Doe v. Academir Charter Schools, Inc., et al.

companies *(1)*
company *(4)*
Complainant *(1)*
complainants *(2)*
complaining *(1)*
complaint *(31)*
complaints *(30)*
complete *(15)*
completed *(2)*
completely *(1)*
completing *(2)*
compliance *(53)*
compliant *(2)*
computer *(1)*
concern *(4)*
concerns *(2)*
conclude *(1)*
concluded *(1)*
conclusion *(12)*
conclusions *(4)*
concrete *(1)*
Conduct *(47)*
conducted *(20)*
conducting *(6)*
conference *(5)*
confirmed *(2)*
conflict *(2)*
confrontational *(1)*
confusing *(1)*
connect *(1)*
connected *(1)*
connotation *(1)*
consequences *(5)*
consider *(6)*
considered *(8)*
consistently *(1)*
constant *(3)*
constantly *(4)*
constitute *(9)*
constituted *(1)*
constitutes *(1)*
consult *(1)*
contact *(74)*
contacted *(19)*
contacting *(3)*
contacts *(3)*
contain *(1)*
contained *(2)*
contains *(1)*

content *(1)*
context *(2)*
continue *(6)*
continued *(2)*
continues *(1)*
continuing *(1)*
continuously *(1)*
contract *(2)*
contracted *(2)*
contractors *(3)*
contracts *(5)*
control *(1)*
conversation *(1)*
conversations *(2)*
convert *(2)*
conveyed *(1)*
COO *(1)*
Coordinator *(36)*
coordinators *(2)*
copies *(1)*
cops *(13)*
copy *(16)*
corporate *(1)*
correct *(87)*
corrective *(3)*
correctly *(1)*
cost *(3)*
counsel *(2)*
counseling *(4)*
counselling *(2)*
counselor *(16)*
counselors *(1)*
county *(59)*
county's *(1)*
couple *(9)*
course *(5)*
COURT *(8)*
cover *(6)*
covered *(3)*
covers *(3)*
COVID *(2)*
CPA *(4)*
crazy *(2)*
CRCs *(1)*
create *(2)*
created *(11)*
creator *(1)*
crime *(6)*
criminals *(1)*

criteria *(2)*
crying *(4)*
cuca *(6)*
cumulative *(3)*
cunt *(1)*
current *(1)*
currently *(2)*
curriculum *(3)*
curse *(1)*
cursed *(1)*
cursing *(2)*
cut *(3)*
cute *(1)*
cutting *(1)*
cyber-harassment *(1)*

**< D >**
D.A *(1)*
dad *(8)*
Dade *(10)*
danger *(3)*
dashboard *(1)*
date *(5)*
Dated *(1)*
daughter *(12)*
daughter's *(1)*
day *(33)*
days *(6)*
day-to-day *(16)*
DCF *(1)*
de *(1)*
deal *(1)*
dealing *(12)*
deals *(2)*
decide *(3)*
decided *(1)*
decision *(2)*
decision-maker *(1)*
decisions *(2)*
declined *(1)*
Defendant *(5)*
Defendants *(1)*
Defendant's *(5)*
defense *(1)*
define *(1)*
defined *(1)*
defines *(1)*
definitely *(1)*
definition *(9)*

degree *(6)*
delineate *(2)*
delineated *(1)*
delineates *(1)*
deliver *(1)*
delivered *(1)*
demand *(1)*
demographic *(2)*
denied *(1)*
denotes *(1)*
Department *(39)*
departments *(1)*
depend *(1)*
depending *(16)*
depends *(33)*
deploy *(1)*
deployed *(1)*
deposed *(1)*
DEPOSITION *(15)*
depressed *(1)*
DEREK *(1)*
describe *(3)*
described *(10)*
describes *(1)*
describing *(2)*
Description *(4)*
designated *(2)*
designee *(2)*
desktop *(1)*
destructive *(1)*
detail *(1)*
details *(1)*
detective *(13)*
detention *(1)*
determination *(24)*
determinations *(3)*
determine *(15)*
determined *(12)*
determines *(3)*
Determining *(1)*
develop *(6)*
developed *(2)*
development *(1)*
Diary *(1)*
difference *(1)*
different *(50)*
differently *(1)*
difficult *(1)*
difficulty *(2)*

digital  (4)
diligence  (3)
DIRECT  (2)
directly  (16)
director  (3)
directors  (2)
disbursed  (2)
disbursement  (1)
discarded  (1)
disciplined  (2)
disclosed  (1)
discomfort  (1)
disconnected  (1)
Disconnection  (1)
discontent  (2)
discriminated  (1)
discrimination  (1)
discuss  (5)
discussed  (8)
discusses  (3)
dismissal  (2)
display  (1)
displayed  (1)
displaying  (1)
displays  (1)
disrupt  (1)
disrupted  (2)
distinguish  (2)
distraught  (1)
distress  (8)
distressed  (1)
DISTRICT  (35)
District's  (7)
doc  (2)
document  (51)
documentation  (9)
documented  (10)
Documenting  (1)
documents  (14)
DOE  (7)
doing  (12)
doubt  (11)
doubted  (2)
drafted  (1)
draw  (4)
drink  (1)
Drive  (2)
Dropbox  (1)
dropdown  (1)

DSIS  (4)
dual  (1)
due  (5)
duly  (2)
duties  (4)
duty  (1)

< E >
earlier  (27)
early  (1)
earn  (3)
earned  (1)
East  (2)
easy  (2)
edited  (1)
education  (17)
Educational  (9)
educator  (2)
educators  (1)
effect  (3)
effectively  (1)
either  (8)
electronic  (4)
electronically  (3)
elementary  (4)
embarrassed  (1)
emergency  (4)
emotional  (2)
emotionally  (2)
employed  (5)
employee  (52)
employees  (55)
employer  (1)
encompasses  (1)
encumbers  (1)
ended  (1)
enforced  (1)
enforcement  (8)
engage  (4)
engagement  (1)
English  (1)
enrollment  (7)
enrollments  (1)
ensure  (34)
ensured  (1)
ensuring  (3)
entails  (1)
enter  (7)
entered  (1)

entire  (3)
entirety  (1)
entities  (1)
entitled  (2)
environment  (5)
escuela  (1)
ese  (1)
ESOL  (1)
especially  (9)
ESQUIRE  (3)
essence  (1)
ESSER  (2)
established  (2)
Esther  (8)
estimation  (1)
evaluated  (2)
evaluation  (3)
event  (1)
events  (1)
Everybody  (15)
evidence  (2)
exact  (1)
exactly  (7)
exam  (2)
EXAMINATION  (2)
Examinations  (1)
examined  (1)
example  (6)
Examples  (1)
exception  (12)
excerpt  (1)
executed  (1)
executive  (3)
Exhibit  (26)
exhibits  (1)
existed  (2)
exists  (1)
expand  (1)
expansion  (3)
expected  (1)
expel  (2)
expelled  (1)
experience  (2)
experiences  (1)
EXPIRES  (1)
explain  (6)
explained  (4)
explaining  (1)
explains  (1)

exploited  (3)
exploring  (1)
exposed  (3)
express  (2)
expressive  (1)
extensive  (2)
extent  (3)

< F >
facets  (1)
facilities  (1)
facing  (1)
fact  (9)
facts  (1)
faculty  (11)
faith  (1)
fall  (2)
falls  (2)
familiar  (6)
Families  (34)
family  (3)
father  (57)
father's  (4)
fear  (1)
federal  (13)
feedback  (1)
feel  (10)
fellowship  (1)
felt  (6)
female  (2)
fifth  (4)
fighting  (1)
figure  (1)
file  (34)
files  (2)
filing  (1)
fill  (7)
final  (2)
finances  (2)
financial  (2)
financially  (2)
financials  (2)
financing  (1)
find  (5)
finding  (5)
findings  (8)
fine  (9)
finish  (7)
fire  (2)

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 279 of 285
Deposition of Olivia Angelica Bernal
Jane Doe v. Academir Charter Schools, Inc., et al.

first  (47)
firsthand  (1)
fiscal  (23)
fiscally  (1)
five  (8)
five-minute  (1)
five-year-old  (4)
five-year-olds  (8)
floor  (1)
FLORIDA  (27)
folder  (3)
follow  (35)
followed  (2)
following  (11)
follows  (6)
fondled  (1)
food  (1)
footage  (1)
force  (1)
foregoing  (1)
Form  (91)
formal  (2)
forms  (4)
for-profit  (1)
Fort  (1)
FORTE  (1)
forth  (4)
forward  (4)
found  (3)
founded  (1)
Four  (9)
frame  (4)
FREEMAN  (1)
Friday  (6)
Fridays  (1)
friend  (2)
friends  (1)
front  (11)
froze  (2)
FTE  (10)
full  (8)
full-blown  (4)
full-time  (3)
fully  (3)
funded  (1)
funding  (14)
funds  (4)
funny  (2)
further  (8)

future  (1)

< G >
gain  (1)
GARRISON  (1)
GARY  (1)
gather  (3)
gathered  (1)
gathers  (1)
general  (10)
generally  (5)
generate  (2)
generic  (1)
genitals  (2)
gentleman  (2)
gesture  (1)
gestures  (1)
getting  (5)
girl  (5)
give  (36)
given  (10)
gives  (1)
giving  (2)
go  (87)
goes  (7)
going  (81)
Good  (3)
Good-bye  (1)
goodwill  (1)
Google  (5)
governing  (6)
government  (3)
grab  (1)
grade  (2)
grader  (1)
graduations  (1)
grant  (3)
grants  (19)
graphic  (1)
great  (3)
grievance  (8)
grievances  (4)
grieved  (1)
GROUP  (1)
grow  (1)
growth  (4)
guess  (3)
guidance  (5)
guide  (1)

guidelines  (5)
guides  (2)
gun  (2)
guys  (5)

< H >
hair  (1)
half  (2)
hand  (10)
handbook  (17)
handbooks  (5)
handle  (25)
handled  (8)
handles  (5)
handling  (18)
hands  (2)
handwritten  (1)
happen  (14)
happened  (52)
happening  (13)
happens  (12)
happy  (5)
happy-go-lucky  (1)
harassed  (3)
Harassment  (96)
harassment/assault  (1)
hard  (4)
harm's  (1)
head  (2)
hear  (4)
heard  (1)
hectic  (1)
held  (2)
he'll  (1)
help  (14)
helpful  (3)
helping  (4)
helps  (1)
Hey  (21)
HH  (1)
high  (2)
higher  (1)
high-quality  (1)
hinders  (1)
hired  (1)
hiring  (2)
Hispanic  (1)
hit  (1)

Hold  (8)
holder  (1)
home  (10)
homework  (1)
hostile  (1)
hotline  (2)
hours  (1)
housed  (1)
HR  (23)
human  (1)
humiliation  (1)
hungry  (1)
hurt  (6)
hurts  (3)

< I >
identical  (3)
identification  (9)
identified  (5)
identify  (2)
identifying  (1)
identity  (2)
image  (1)
imagine  (6)
immediate  (4)
immediately  (14)
impacted  (1)
implemented  (1)
important  (2)
impossible  (2)
improve  (1)
inappropriate  (12)
inappropriately  (3)
inaudible  (1)
incident  (69)
incident/injury  (1)
incidents  (10)
include  (11)
included  (9)
includes  (4)
including  (6)
indicate  (1)
indicated  (2)
indicates  (2)
indication  (2)
indirect  (3)
individual  (11)
individualized  (1)
individually  (1)

individuals *(6)*
individual's *(1)*
informal *(1)*
information *(57)*
informed *(3)*
informs *(1)*
in-house *(1)*
initial *(6)*
initially *(7)*
initiate *(1)*
initiated *(2)*
injured *(3)*
injury *(3)*
in-person *(1)*
inquiry *(1)*
inquisitive *(1)*
insert *(1)*
inside *(1)*
instance *(4)*
instances *(3)*
instant *(1)*
institutions *(4)*
instruction *(4)*
instructional *(1)*
insulted *(1)*
insurance *(1)*
Intake *(9)*
interaction *(1)*
interest *(3)*
interested *(2)*
interfere *(1)*
internally *(2)*
Interrogatories *(2)*
interrupt *(2)*
intervention *(2)*
interview *(6)*
interviewed *(3)*
interviewing *(3)*
interviews *(4)*
intimidating *(1)*
investigate *(2)*
investigated *(1)*
investigating *(1)*
investigation *(112)*
investigations *(22)*
investor *(1)*
invite *(1)*
invoicing *(1)*
involve *(5)*

involved *(30)*
involvement *(1)*
involves *(1)*
involving *(11)*
irate *(9)*
isolated *(3)*
isolation *(1)*
issue *(8)*
issued *(4)*
issues *(8)*
items *(4)*
its *(3)*
IX *(204)*

< J >
JANE *(31)*
Jane's *(11)*
Jmchaffie@garrisonyo
unt.com *(1)*
job *(9)*
join *(1)*
jokes *(1)*
judge *(1)*
JULIE *(2)*
Julie.karron@fmglaw.
com *(1)*
jumped *(3)*
June *(3)*
jurisdiction *(1)*
jury *(1)*

< K >
K-12 *(5)*
KARRON *(37)*
Katiana *(4)*
keep *(21)*
keeping *(3)*
keeps *(1)*
kept *(15)*
Key *(2)*
kick *(2)*
kicked *(4)*
kid *(8)*
kidney *(1)*
kids *(20)*
kind *(23)*
kindergarten *(4)*
kindergartner *(2)*
kindergartners *(6)*

kinds *(2)*
kiss *(10)*
kissing *(5)*
knee *(1)*
knew *(10)*
know *(289)*
knowledge *(7)*
known *(2)*
knows *(1)*
KYLE *(7)*
Kyle@dereksmithlaw.
com *(1)*

< L >
L.L.C *(1)*
L.R *(6)*
la *(1)*
labeled *(13)*
labels *(1)*
lacks *(1)*
lady *(1)*
land *(1)*
Lane *(1)*
language *(2)*
Las *(1)*
Lauderdale *(1)*
launch *(13)*
launched *(11)*
LAW *(11)*
laws *(1)*
lawsuit *(3)*
lawsuits *(1)*
LEA *(5)*
lead *(1)*
leader *(3)*
leaders *(3)*
leadership *(4)*
learn *(6)*
learned *(10)*
learning *(11)*
learns *(1)*
leave *(4)*
leaves *(1)*
left *(6)*
legal *(2)*
letters *(1)*
level *(32)*
levels *(1)*
liable *(1)*

lick *(1)*
licked *(4)*
limit *(2)*
limited *(1)*
line *(4)*
lines *(2)*
link *(3)*
list *(11)*
listed *(12)*
listen *(5)*
listened *(2)*
lists *(3)*
litigation *(2)*
little *(15)*
lived *(1)*
living *(1)*
LLP *(1)*
located *(10)*
location *(3)*
loco *(2)*
log *(1)*
long *(13)*
longer *(2)*
look *(19)*
looked *(5)*
looking *(10)*
looks *(10)*
losing *(1)*
loss *(2)*
lot *(10)*
Louis *(4)*
loved *(1)*
lump *(1)*
lunch *(3)*

< M >
MACDONALD *(69)*
main *(2)*
major *(1)*
making *(15)*
Maltreatment *(1)*
man *(1)*
manage *(1)*
managed *(1)*
Management *(23)*
managers *(1)*
managing *(2)*
mandatory *(4)*
manner *(2)*

Deposition of Olivia Angelica Bernal                      Jane Doe v. Academir Charter Schools, Inc., et al.

Manual  (19)
manuals  (4)
mark  (6)
marked  (9)
marks  (1)
master's  (2)
MATHIS  (1)
matter  (2)
matters  (10)
MCHAFFIE  (1)
MDCPS  (2)
mean  (26)
Meaning  (3)
means  (2)
meant  (1)
Measures  (3)
mediation  (1)
meet  (20)
meeting  (13)
meetings  (6)
meets  (1)
member  (3)
members  (8)
mentally  (1)
mention  (4)
mentioned  (28)
mentions  (1)
mentor  (1)
merits  (2)
message  (4)
met  (11)
method  (1)
Miami  (5)
Miami-Dade  (51)
middle  (1)
minds  (1)
minimal  (2)
minor  (7)
minute  (5)
minutes  (3)
Mir  (37)
mira  (1)
mirror  (1)
Mir's  (1)
mis  (1)
missed  (2)
mistaken  (1)
mode  (2)
modification  (1)

module  (1)
modules  (3)
molested  (2)
mom  (2)
moment  (27)
money  (3)
monies  (2)
month  (2)
monthly  (3)
months  (11)
moral  (1)
morning  (3)
mother  (2)
mouth  (4)
move  (7)
moved  (5)
moves  (1)
moving  (2)
MULCAHY  (1)
Multiple  (3)
mute  (1)

< N >
naked  (6)
name  (13)
names  (1)
narrative  (6)
nature  (26)
necessarily  (4)
need  (55)
needed  (8)
needs  (12)
negative  (2)
neglect  (11)
neglected  (3)
never  (22)
new  (9)
newly  (1)
night  (1)
nine  (2)
nino  (1)
non-verbal  (1)
normal  (2)
normally  (1)
Notary  (3)
note  (2)
notes  (8)
not-for-profit  (4)
Notice  (16)

notices  (1)
notification  (1)
notified  (3)
notify  (5)
notifying  (1)
Nova  (4)
November  (1)
number  (23)

< O >
O-301  (1)
OATH  (3)
object  (13)
Objection  (9)
obligation  (2)
obtain  (9)
obtained  (1)
obviously  (34)
occasions  (1)
occur  (2)
occurred  (8)
offender  (1)
offense  (2)
offensive  (1)
offer  (1)
offered  (8)
Office  (44)
officer  (44)
officers  (10)
offices  (2)
official  (2)
Oh  (7)
Ok  (2)
Okay  (142)
okayed  (1)
Olas  (1)
old  (2)
OLIVIA  (8)
Once  (28)
ones  (6)
one-time  (1)
online  (8)
open  (1)
opened  (1)
opening  (4)
operate  (1)
operating  (24)
operations  (15)
opinion  (4)

opportunity  (3)
opt  (6)
opted  (2)
order  (10)
ordinary  (1)
organization  (15)
organizations  (5)
organize  (1)
Ortega  (3)
outcome  (14)
outlined  (2)
outlines  (1)
Outside  (8)
overall  (1)
oversee  (2)
oversight  (1)
overstep  (1)
owner  (1)

< P >
p.m  (2)
packet  (1)
Page  (11)
pages  (5)
paid  (14)
panties  (1)
pants  (10)
paper  (2)
paper-pencil  (1)
paperwork  (1)
Papito  (1)
paragraph  (3)
parent  (59)
parent/caregiver  (1)
parentis  (2)
parents  (112)
parent's  (1)
parent-student  (1)
part  (15)
partes  (1)
participated  (1)
participation  (1)
particular  (14)
particularly  (1)
PARTIES  (6)
partnership  (1)
parts  (8)
party  (1)
pass  (1)

Deposition of Olivia Angelica Bernal

Jane Doe v. Academir Charter Schools, Inc., et al.

pattern *(3)*
pay *(2)*
payable *(2)*
payment *(1)*
payroll *(4)*
PE *(6)*
pee *(4)*
peeing *(1)*
penalty *(1)*
pencil *(6)*
people *(5)*
percent *(4)*
percentage *(4)*
Perfect *(1)*
perform *(2)*
performance *(1)*
perjury *(1)*
permanent *(1)*
person *(29)*
personal *(3)*
personally *(3)*
personnel *(1)*
perspective *(2)*
pertain *(5)*
pertaining *(9)*
pertains *(11)*
pervasive *(3)*
phone *(2)*
phonetic *(2)*
physical *(19)*
physically *(13)*
pick *(1)*
picked *(2)*
picture *(1)*
pictures *(1)*
piece *(2)*
pieces *(2)*
pinched *(1)*
pipi *(4)*
place *(61)*
placed *(3)*
places *(1)*
Plaintiff *(3)*
Plaintiff's *(11)*
plan *(8)*
planning *(1)*
plans *(3)*
platform *(2)*
playing *(3)*

PLC *(3)*
please *(4)*
plug *(1)*
point *(40)*
police *(73)*
policies *(105)*
policy *(77)*
poop *(2)*
popular *(1)*
portal *(3)*
portion *(3)*
position *(1)*
possession *(1)*
possible *(2)*
posted *(1)*
power *(1)*
practice *(4)*
precedence *(1)*
pre-K *(1)*
prepare *(4)*
prepared *(3)*
preparing *(1)*
Preschool *(1)*
present *(7)*
presenting *(1)*
president *(2)*
pretty *(8)*
prevent *(2)*
prevented *(1)*
previous *(5)*
previously *(8)*
principal *(108)*
principals *(16)*
principal's *(6)*
print *(1)*
printed *(1)*
prior *(11)*
priority *(2)*
privacy *(1)*
privadas *(1)*
private *(8)*
privy *(4)*
probably *(6)*
probing *(1)*
problem *(1)*
procedure *(5)*
procedures *(64)*
proceed *(6)*
process *(32)*

processed *(2)*
processes *(2)*
produce *(1)*
produced *(2)*
professional *(4)*
profit *(1)*
program *(4)*
programs *(3)*
progression *(1)*
prohibited *(1)*
prompt *(2)*
prompted *(1)*
prompting *(1)*
properties *(1)*
protect *(2)*
proven *(2)*
provide *(15)*
provided *(9)*
provides *(2)*
providing *(4)*
Public *(26)*
Public-State *(1)*
published *(1)*
pull *(3)*
pulled *(4)*
purchasing *(1)*
purposes *(4)*
pushed *(1)*
put *(15)*
putting *(1)*

< Q >
quarterly *(1)*
que *(1)*
question *(28)*
questioned *(4)*
questioning *(3)*
questions *(22)*
quick *(1)*
quiero *(1)*
quote/unquote *(1)*

< R >
R-7 *(1)*
R-9 *(2)*
ran *(1)*
reach *(6)*
reached *(4)*
react *(1)*

reaction *(1)*
read *(18)*
reading *(11)*
ready *(4)*
real *(1)*
really *(31)*
reason *(2)*
reasonably *(1)*
reasoning *(1)*
recall *(20)*
receivable *(2)*
receive *(15)*
received *(19)*
receives *(6)*
receiving *(8)*
recess *(1)*
recognize *(8)*
recollect *(1)*
reconfigured *(1)*
record *(26)*
recorded *(2)*
recording *(1)*
recordings *(1)*
records *(8)*
recruiting *(1)*
redirects *(1)*
reduce *(1)*
refer *(7)*
Referal *(1)*
reference *(2)*
referenced *(5)*
references *(3)*
referencing *(5)*
Referral *(12)*
referrals *(1)*
referred *(6)*
referring *(9)*
refers *(4)*
reflect *(3)*
reflective *(1)*
refused *(1)*
regard *(1)*
regarding *(14)*
Regardless *(2)*
regards *(10)*
region *(1)*
regular *(3)*
regulations *(1)*
reimbursement *(1)*

reinvent (1)
related (9)
relates (6)
relating (8)
relationship (2)
relative (2)
relayed (1)
rely (1)
remain (1)
remains (1)
remember (15)
REMOTELY (1)
remove (1)
removed (2)
rents (1)
repeat (1)
repeated (2)
repeatedly (6)
repeating (1)
rephrase (2)
replicating (1)
Report (99)
Reported (44)
reporter (8)
reporters (1)
REPORTER'S (2)
reporting (26)
reports (11)
represent (3)
representation (1)
reprimand (3)
reprimanded (3)
reprimands (1)
reprint (1)
request (6)
requesting (1)
requests (1)
require (2)
required (17)
requirements (6)
requires (4)
requiring (1)
rescue (2)
resolution (2)
resolutions (1)
resolve (1)
resolved (2)
resources (3)
respective (1)

respond (3)
responded (1)
Respondent (1)
responding (1)
response (9)
responses (3)
responsibilities (5)
responsibility (4)
responsible (13)
rest (2)
restroom (1)
result (2)
resulting (1)
return (1)
returned (1)
review (17)
reviewed (10)
reviewing (1)
revising (1)
right (102)
right-hand (1)
Rights (27)
Rolando (7)
role (14)
roles (2)
room (1)
Rosali (2)
roughly (3)
route (1)
Ruiz (2)
rule (1)
rules (1)
run (3)
runs (1)

< S >
safe (9)
safe-school (4)
safety (20)
salaries (1)
salary (5)
sat (3)
satisfied (1)
Saturday (1)
save (1)
saw (7)
saying (32)
says (54)
SCAM (6)

scan (1)
scenario (2)
schedule (4)
scheduled (1)
SCHOOL (235)
school-based (2)
schooling (1)
SCHOOLS (146)
school's (4)
Science (1)
scope (1)
screaming (1)
screen (3)
scrolled (1)
se (1)
seal (1)
second (10)
section (40)
sections (1)
security (1)
see (66)
seeing (1)
seen (13)
sees (2)
select (1)
self (1)
self-destructive (1)
send (4)
sensitive (1)
sent (3)
sentence (1)
sentiment (1)
separate (7)
separated (4)
separating (1)
September (3)
series (2)
serious (2)
seriously (2)
served (1)
Service (5)
serviced (1)
SERVICES (19)
SESIR (1)
session (1)
sessions (1)
set (13)
setting (5)
seven (10)

severe (6)
severity (8)
sex (2)
Sexual (125)
sexually (4)
shape (3)
share (5)
shared (3)
shelf (2)
shelves (1)
show (27)
showed (11)
shower (1)
showing (4)
shows (1)
shrug (1)
side (2)
sight (1)
sign (9)
signed (3)
signing (1)
signs (4)
silly (1)
similar (1)
simple (1)
simply (1)
simultaneously (2)
sing (1)
single (8)
sir (10)
sit (5)
site (12)
sites (1)
sitting (2)
situation (21)
situations (4)
Six (7)
slew (3)
slides (1)
slurs (1)
small (2)
SMITH (1)
So-and-so (1)
socially (1)
Sol (2)
somebody (10)
son (1)
song (1)
soon (3)

Deposition of Olivia Angelica Bernal | Jane Doe v. Academir Charter Schools, Inc., et al.

**sorry** *(14)*
**sort** *(1)*
**Southeastern** *(3)*
**SOUTHERN** *(1)*
**Southwest** *(2)*
**Spanish** *(1)*
**SPAR** *(25)*
**speak** *(18)*
**Speaking** *(3)*
**special** *(7)*
**specialist** *(4)*
**specialize** *(1)*
**specialized** *(1)*
**specific** *(47)*
**specifically** *(24)*
**spectrum** *(1)*
**spend** *(1)*
**spiraled** *(1)*
**spoke** *(21)*
**spoken** *(4)*
**sponsor** *(4)*
**stabbed** *(1)*
**staff** *(23)*
**stall** *(7)*
**stance** *(1)*
**stand** *(3)*
**standardized** *(3)*
**standards** *(1)*
**standing** *(1)*
**standings** *(1)*
**start** *(22)*
**started** *(12)*
**starting** *(2)*
**starts** *(6)*
**start-ups** *(1)*
**State** *(17)*
**state-awarded** *(1)*
**stated** *(7)*
**statement** *(27)*
**statements** *(3)*
**STATES** *(5)*
**stating** *(2)*
**status** *(2)*
**stayed** *(1)*
**stays** *(4)*
**stenographically** *(1)*
**step** *(40)*
**stepdad** *(1)*
**stepfather** *(1)*

**stepping** *(1)*
**steps** *(54)*
**stolen** *(1)*
**stop** *(5)*
**stopped** *(6)*
**store** *(2)*
**stored** *(6)*
**story** *(13)*
**strategies** *(3)*
**streamline** *(1)*
**strictly** *(2)*
**strike** *(4)*
**Student** *(145)*
**student-based** *(1)*
**student-by-student** *(1)*
**student-on-student** *(1)*
**students** *(97)*
**student's** *(6)*
**stuff** *(14)*
**subcontract** *(1)*
**subject** *(2)*
**submit** *(4)*
**submitted** *(2)*
**success** *(2)*
**suit** *(1)*
**Suite** *(5)*
**sum** *(1)*
**summer** *(11)*
**superintendant** *(1)*
**SUPERIOR** *(54)*
**Superior's** *(1)*
**supervisor** *(14)*
**supplemental** *(1)*
**support** *(20)*
**supporters** *(1)*
**supporting** *(1)*
**Supportive** *(1)*
**supports** *(2)*
**supposed** *(3)*
**sure** *(41)*
**Susie** *(2)*
**suspect** *(7)*
**suspected** *(1)*
**suspects** *(1)*
**suspend** *(1)*
**suspended** *(1)*
**switch** *(1)*

**sworn** *(2)*
**symptoms** *(3)*
**system** *(5)*

**< T >**
**table** *(3)*
**tables** *(1)*
**tabs** *(2)*
**tail** *(1)*
**take** *(66)*
**taken** *(20)*
**takes** *(6)*
**talk** *(12)*
**talked** *(5)*
**talking** *(10)*
**Tallahassee** *(1)*
**Tampa** *(1)*
**targeted** *(1)*
**tasks** *(1)*
**taxes** *(1)*
**teach** *(2)*
**teacher** *(44)*
**teachers** *(16)*
**teaches** *(1)*
**teaching** *(1)*
**team** *(14)*
**teams** *(2)*
**teenager** *(1)*
**tell** *(37)*
**telling** *(9)*
**tells** *(9)*
**ten** *(7)*
**tend** *(1)*
**ten-minute** *(1)*
**tenure** *(1)*
**term** *(5)*
**terms** *(10)*
**terrible** *(1)*
**testified** *(5)*
**testify** *(9)*
**testifying** *(3)*
**testimony** *(9)*
**tetitas** *(7)*
**text** *(1)*
**Thank** *(8)*
**thing** *(15)*
**things** *(80)*
**think** *(19)*
**thinking** *(2)*

**third** *(5)*
**THOMAS** *(1)*
**thorough** *(1)*
**thought** *(3)*
**threat** *(1)*
**threatening** *(1)*
**three** *(20)*
**Three-ring** *(1)*
**threw** *(1)*
**THURSDAY** *(2)*
**time** *(46)*
**timeline** *(1)*
**times** *(13)*
**Title** *(214)*
**titled** *(9)*
**today** *(8)*
**today's** *(4)*
**told** *(47)*
**top** *(1)*
**topic** *(1)*
**topics** *(10)*
**TotalSource** *(3)*
**toto** *(1)*
**touch** *(17)*
**touched** *(24)*
**touching** *(17)*
**track** *(2)*
**trained** *(2)*
**training** *(32)*
**trainings** *(1)*
**transactions** *(1)*
**transcribe** *(1)*
**transcript** *(1)*
**transcription** *(1)*
**transition** *(3)*
**transitioned** *(1)*
**translate** *(1)*
**translated** *(1)*
**translation** *(2)*
**treat** *(2)*
**treated** *(1)*
**treating** *(1)*
**trial** *(1)*
**Triana** *(1)*
**tried** *(3)*
**triggers** *(3)*
**true** *(6)*
**truly** *(3)*
**truthfully** *(2)*

Case 1:23-cv-23004-JB   Document 67-2   Entered on FLSD Docket 09/26/2024   Page 285 of 285

Deposition of Olivia Angelica Bernal                    Jane Doe v. Academir Charter Schools, Inc., et al.

try  *(9)*
trying  *(11)*
Tuesday  *(24)*
turn  *(8)*
turned  *(2)*
turning  *(2)*
tutoring  *(1)*
TV  *(1)*
two  *(33)*
type  *(10)*
types  *(2)*
typical  *(2)*
typically  *(39)*

**< U >**
Uh-huh  *(15)*
ultimate  *(2)*
ultimately  *(1)*
umbrella  *(1)*
unable  *(1)*
uncomfortable  *(3)*
undergo  *(2)*
undergone  *(1)*
undergrad  *(1)*
undersigned  *(1)*
understand  *(26)*
understanding  *(9)*
understands  *(1)*
undressed  *(1)*
unfounded  *(14)*
unit  *(1)*
UNITED  *(1)*
University  *(4)*
unreasonably  *(1)*
unwelcome  *(1)*
unwilling  *(1)*
upbringing  *(1)*
update  *(2)*
updated  *(7)*
upload  *(3)*
uploaded  *(1)*
uploading  *(1)*
upper  *(1)*
upset  *(13)*
urinal  *(1)*
use  *(28)*
uses  *(4)*
usual  *(1)*
usually  *(25)*

utilize  *(3)*
utilizes  *(1)*

**< V >**
vagina  *(5)*
Valladares  *(4)*
varies  *(1)*
vaya  *(1)*
vendor  *(4)*
vendors  *(9)*
verbal  *(33)*
verbalized  *(1)*
verbalizing  *(1)*
verbally  *(5)*
verified  *(2)*
versa  *(2)*
versus  *(1)*
vice  *(2)*
video  *(5)*
visibly  *(1)*
visit  *(2)*
visits  *(3)*
volunteered  *(1)*
vs  *(1)*

**< W >**
wait  *(8)*
waive  *(1)*
waived  *(1)*
walkthroughs  *(1)*
Walton  *(1)*
want  *(70)*
wanted  *(20)*
wants  *(4)*
warnings  *(1)*
warrant  *(2)*
warrants  *(9)*
water  *(2)*
way  *(21)*
ways  *(1)*
wear  *(1)*
websites  *(2)*
Wednesday  *(18)*
week  *(9)*
weekend  *(3)*
weeks  *(2)*
Well  *(67)*
well-being  *(3)*
went  *(20)*

we're  *(30)*
West  *(3)*
We've  *(9)*
whipped  *(1)*
white  *(3)*
wife  *(1)*
Wimpy  *(1)*
withdraw  *(1)*
withdrew  *(1)*
witness  *(32)*
witnesses  *(3)*
word  *(2)*
words  *(6)*
work  *(41)*
worked  *(7)*
working  *(3)*
works  *(6)*
worksite  *(1)*
worry  *(3)*
wow  *(1)*
wrap  *(1)*
write  *(7)*
writer  *(1)*
writes  *(1)*
writing  *(7)*
written  *(10)*
wrong  *(6)*
wrote  *(2)*

**< X >**
Xenia  *(17)*
XI  *(1)*

**< Y >**
yada  *(6)*
Yeah  *(19)*
year  *(18)*
yearly  *(1)*
years  *(33)*
yelling  *(1)*
yesterday  *(2)*
yo  *(1)*
young  *(6)*
YOUNT  *(1)*

**< Z >**
Zoom  *(1)*