EXHIBIT "A"

**In the Matter Of:**

DOE V. ACADEMIR CHARTER SCHOOLS

1:23-cv-23004

---

# GREGORY L. IANNUZZI, M.D.

*September 25, 2024*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3    JANE DOE, a minor, by and through
     Her mother and next friend, MOTHER DOE,
4
             Plaintiff,

5    vs.                      CASE NO.:  1:23-cv-23004

6    ACADEMIR CHARTER SCHOOLS, INC.,
     and SUPERIOR CHARTER SCHOOL
7    SERVICES, INC.,

8            Defendants.
                                                           /
9    _____

10

11                  VIDEOCONFERENCE DEPOSITION OF
                      GREGORY L. IANNUZZI, M.D.
                     Taken by Counsel for Defendant
12                Superior Charter School Services, Inc.
                          (Pages 1 - 79)

13

14                  Wednesday, September 25, 2024
                      11:01 a.m. - 12:47 p.m.
15

16

17                        HELD REMOTELY
                        VIA VIDEOCONFERENCE
18

19

20

21
     Reported by:
22   Julie Palitto, RPR
     Notary Public, State of Florida
23   Esquire Deposition Services - Tampa Office
     Phone - 813.221.2535, 800.838.2814
24   Esquire Job No. J11647675

25



GREGORY L. IANNUZZI, M.D.                    September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                            2

```
 1   REMOTE APPEARANCES:

 2          KYLE T. MACDONALD, ESQUIRE
            Derek Smith Law Group, PLLC
 3          520 Brickell Key Drive
            Suite O-301
 4          Miami, Florida 33131-2433
            786.568.8120
 5          kyle@dereksmithlaw.com
            On Behalf of Plaintiff
 6
            SCOTT P. YOUNT, EQSUIRE
 7          Garrison, Yount, Forte & Mulcahy, LLC
            601 Bayshore Boulevard
 8          Suite 800
            Tampa, Florida 33606-2760
 9          813.275.0404
            syount@garrisonyount.com
10          On Behalf of Defendant
             Superior Charter School Services, Inc.
11
            JULIE B. KARRON, ESQUIRE
12          jkarron@kelleykronenberg.com
            TAYLOR A. WHITE, ESQUIRE
13          twhite@kklaw.com
            Kelley Kronenberg
14          10360 West State Road 84
            Fort Lauderdale, Florida 33324-4236
15          954.370.9970
            jkarron@kelleykronenberg.com
16          On Behalf of Defendant
             AcadeMir Charter Schools, Inc.
17

18

19

20

21

22

23

24

25
```



1          I N D E X

2    GREGORY L. IANNUZZI, M.D.                    PAGE NO.

3    Direct Examination by Mr. Yount                    4

4    Direct Examination by Ms. Karron                  44

5    Redirect Examination by Mr. Yount                 69

6    Cross-Examination by Mr. MacDonald                71

7    Certificate of Reporter                           74

8    Certificate of Oath                               75

9    Errata Sheets                                76 - 79

10              E X H I B I T S

11   DESCRIPTION                                 PAGE NO.

12   Exhibit 1   Notice of Taking Deposition           7
                 Duces Tecum of Gregory Iannuzzi, M.D.
13
     Exhibit 2   Curriculum CV of                      7
14               Gregory Iannuzzi, M.D.

15   Exhibit 3   Expert Witness Case List              8

16   Exhibit 4   Updated Billing Statement            16

17   (NOTE:  Exhibits 2-4 were not received by
     Court reporter.)

18

19

20

21

22

23

24

25



GREGORY L. IANNUZZI, M.D.                                September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                                        4

```
 1   Videoconference Deposition taken of GREG IANNUZZI, M.D.,

 2   before Julie Palitto, Registered Professional Reporter

 3   and Notary Public in and for the State of Florida at

 4   Large, in the above cause.

 5                        *   *   *   *   *

 6        THE COURT REPORTER:  Dr. Iannuzzi, please raise

 7     your right hand to be sworn in.

 8        Do you solemnly swear the testimony you're about

 9     to give will be the truth, the whole truth, and

10     nothing but the truth, so help you God?

11        THE DEPONENT:  Yes, I do.

12        THE COURT REPORTER:  Thank you.

13   THEREUPON,

14                  GREG IANNUZZI, M.D.,

15   having been first duly sworn, was examined and testified

16   as follows:

17                  DIRECT EXAMINATION

18   BY MR. YOUNT:

19     Q    Doctor, my name is Scott Yount, and I represent

20   one of the defendants in the lawsuit filed by -- we'll

21   call her "Jane Doe" for today's deposition purposes; is

22   that okay with you?

23     A    Yes, sir.

24     Q    And when I'm referring to "Jane Doe," I'm

25   referring to the child, not to the parents, okay?
```



GREGORY L. IANNUZZI, M.D.                         September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                                 5

```
 1        A    I understand.
 2        Q    Have you given a deposition before?
 3        A    Yes.
 4        Q    So you understand the process?  If you don't
 5   understand my questions, please let me know; I'll
 6   rephrase, okay?
 7        A    Yes, I will.
 8        Q    Are you represented by counsel here today?
 9        A    No.
10        Q    Have you authorized Kyle MacDonald or anybody
11   associated with his law firm to file legal pleadings on
12   your behalf in this case?
13        A    No.
14        Q    You were served a subpoena duces tecum in
15   connection with this deposition, correct?
16        A    No.
17        Q    All right.  Did you receive a copy of the notice
18   of deposition duces tecum, which was filed under the
19   court record in this case?
20        A    Yes.
21        Q    And you were aware that that document requested
22   that you bring certain documents to your deposition?
23        A    Well, I see that in the copy.  I never received
24   it.  If I receive it, I'm happy to use my representation,
25   which is the office of general counsel at the University
```



GREGORY L. IANNUZZI, M.D.                                September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                                          6

```
 1   of South Florida.

 2        Q    Yeah.  I'm not sure that your answer was

 3   responsive to my question.

 4        A    Sure.

 5        Q    Did you bring any documents responsive to the

 6   Schedule A?

 7        A    I was never served the deposition, the subpoena,

 8   so no.

 9        Q    Okay.  So do you have any documents is my

10   question?

11        A    I have a copy of my report.

12        Q    Okay.  Do you have anything else with you today?

13        A    No, sir.

14        Q    All right.  You previously produced a copy of

15   your CV to Mr. MacDonald, and that is an eight-page

16   document.  Do you have access to your CV?

17        A    Yes.

18        Q    Is your CV eight pages long?

19        A    Maybe.  But my more recent version is probably 9

20   or 10 now.

21        Q    Okay.  So will you please provide the court

22   reporter -- she put her email address in the chat.  Will

23   you please email to her at the conclusion of the

24   deposition your updated CV, which we're going to attach

25   as Exhibit No. 2 to the deposition.  Okay?
```

```
 1              (Defendant Superior Charter Exhibit 2 was marked
 2         for identification.)
 3         A    Yes.  I'll make a note.
 4         Q    And then we're going to attach Exhibit No. 1 is
 5    the copy of the notice of taking deposition duces tecum.
 6    That's going to be Exhibit No. 1.
 7              (Defendant Superior Charter Exhibit 1 was marked
 8         for identification.)
 9    BY MR. YOUNT:
10         Q    Doctor, have you ever -- have you testified in
11    court before?
12         A    Yes.
13         Q    In what types of cases?
14         A    Predominantly criminal.
15         Q    All right.
16         A    Competency, sanity, mitigation.
17         Q    Okay.  How many times have you testified in
18    court?
19         A    I think approximately seven.
20         Q    Do you have a list of the cases in which you
21    testified?
22         A    Yes.
23         Q    And will you produce that?
24         A    Sure.
25         Q    We're going to attach that as Exhibit No. 3, and
```

```
 1   I'll ask you to produce that and send it to the
 2   court reporter as well.
 3            (Defendant Superior Charter Exhibit 3 was marked
 4      for identification.)
 5   BY MR. YOUNT:
 6      Q    Are there any civil cases on that testifying
 7   list?
 8      A    Yes.
 9      Q    What types of civil cases have you testified in?
10      A    I would have to review it to be sure.  Usually
11   personal -- a few personal injury.  I believe -- I can't
12   recall off the top of my head which ones actually went
13   all the way, you know, through deposition and testimony
14   versus which ended prematurely, but I'm happy to provide
15   it.
16      Q    All right.  Can you access that document now?
17      A    Sure.  Give me one minute.
18            All right.  I have it pulled up.
19      Q    How many cases are listed on your testifying
20   list?
21      A    Six -- no.  I'm sorry -- five.  This one may not
22   be accurate, actually.  Hang on one second.  Let me see
23   if this is the most recent one.  It was, in fact, an old
24   one.  So this is -- I have the recent one pulled up.
25   There are seven listed.
```



 1      Q    Seven?  And those were cases where you testified
 2  at trial, or does that include depositions?
 3      A    It includes depositions as well.
 4      Q    All right.  Of the seven cases listed, how many
 5  are trials and how many are depositions?
 6      A    I have two depositions and five hearings, not
 7  necessarily a trial with a jury, but in the courtroom
 8  with the judge, both attorneys present, all clients.
 9      Q    And of the -- so of the five hearings, are any
10  of those the same case where you also gave a deposition?
11      A    No.  They're all unique cases.
12      Q    Okay.  So there are seven individual cases where
13  you've given testimony; is that accurate?
14      A    Correct.
15      Q    Of those seven, how many are criminal and how
16  many are civil?
17      A    Four are criminal and three are civil.
18      Q    And would you -- are any of them commitment
19  cases?
20      A    No.  These are where I served as an expert
21  witness.  These are not as a treating provider
22  petitioning to have a patient committed.
23      Q    Okay.  And of the four criminal cases, which
24  ones -- how many did you testify for the prosecution and
25  how many for defense?



1    A    One for the defense and two where I was court

2    appointed.  So they were both -- I believe it was the

3    prosecution that called for the testimony in those cases,

4    yeah.

5    Q    You said there were four criminal; you said one

6    defense, two court appointed.  What about the other one?

7    A    My apologies.  Three -- so, yeah, there was one

8    for the defense, and then three where I was court

9    appointed and asked to testify by the prosecution.

10   Q    All right.  Did any of those four criminal cases

11   involve a child?

12   A    No.  Those are all adult cases.

13   Q    All right.  Let's talk about the three civil

14   cases.  Were you plaintiff or defense?

15   A    Let's -- one moment.  I was court appointed and

16   asked to testify for the defense in one instance.

17   Q    Was that a competency matter?

18   A    No.  That was a disability.  I was --

19   Q    Social security -- social security matter?

20   A    No.  This was a -- I'm sorry.  It was workplace

21   damage.

22   Q    Okay.

23   A    I was asked to testify by the state in a

24   dependency matter which involved a child.  And I was

25   court appointed in a guardianship matter and subject to a



 1  hearing.  And this was from the representation of the

 2  ward, so the defendant.

 3      Q    In connection with the dependency matter, did

 4  you examine the child and do a forensic -- did you do an

 5  examination of the child and question the child?

 6      A    Yes.

 7      Q    Are you fluent in Spanish?

 8      A    No.

 9      Q    So in connection with your work on this case, is

10  it fair to say that you relied entirely on the

11  transcriptions and didn't verify those by other means?

12      A    No.  That's not correct.

13          MR. MACDONALD:  Object to form.

14  BY MR. YOUNT:

15      Q    All right.  Explain.

16      A    Sure.  I interviewed the -- I did not ask to

17  have the transcriptions verified; however, I did

18  interview the parents as well as the child in English.

19      Q    Got you.  Okay.

20      A    And I interviewed the parents with an

21  interpreter present.

22      Q    And who was the interpreter present?

23      A    I don't recall the name.  They're listed in my

24  report.  If I can consult that, I can give you the name.

25      Q    Let me ask you this:  Was it -- you can consult



1   your report at any time during the deposition.

2           Was the interpreter provided by your office, or

3   was that provided by Mr. MacDonald's office?

4       A   Provided by Mr. MacDonald's office.

5       Q   And was the -- when you did the interview, that

6   was a Zoom interview with the parents?

7       A   Yes.  That is correct.

8       Q   And where was the translator?

9       A   I believe the translator and the parents were

10  located in Miami.  They were both at a remote location.

11  They were not in the same room together.

12      Q   Okay.  In connection with your work on this

13  case, are you working through USF or is this something

14  you're doing on your own?

15      A   I do all my work through USF.

16      Q   Okay.  And do you advertise your services for

17  expert services anywhere?

18      A   No, not to my knowledge.  I may be retained by

19  an agency or two at this point and in an expert witness

20  directory.  I don't know if they do any advertising, but

21  I certainly don't.

22      Q   All right.  Explain that to me.  How would you

23  get in an expert witness directory if you didn't ask for

24  that to happen?

25      A   They solicit me.



1    Q    Okay.  What expert directories are you in?

2    A    As far as I know, I think there's a company

3    called Juris Medicus that may have me listed as an

4    expert.  There is another one, which is pending, but I'm

5    not -- where I'm not currently listed.  There's a few

6    others.  I can't recall the names off the top of my head,

7    but --

8    Q    The one that's pending, what is that called?

9    A    Round Table Group.

10   Q    And have you ever worked with Mr. MacDonald or

11   his law firm before?

12   A    Before this case, yes.

13   Q    Yes.  All right.  And how many other times?

14   A    Prior to this case?

15   Q    Yes.

16   A    Once.

17   Q    And then have you -- were you working with the

18   law firm, or have you worked with the law firm on any

19   cases other than this one subsequent?

20   A    Yes.  I believe -- the total number, I don't

21   recall.  It's certainly five or fewer over the course of

22   two, two and a half years.

23   Q    So you have one in the past, you have this

24   Jane Doe case, and you have three or four other matters

25   where you're working for Mr. McDonald's law firm?



 1      A     Probably three or fewer.

 2      Q     And is Mr. MacDonald the lead attorney on those

 3  other three or fewer cases that you're working?

 4      A     No.  There may -- I believe he's only been the

 5  lead attorney on maybe three or four total cases of the

 6  five or so.

 7      Q     How much have you billed in connection with this

 8  case?

 9      A     Around 15- -- under $1500.

10      Q     How do you charge for your expert services?

11      A     Hourly.

12      Q     And that's whether you're interviewing a

13  patient, consulting with Mr. MacDonald, reviewing

14  materials, it's the same, same rate?

15      A     Correct; travel, deposition testimony, writing

16  reports.

17      Q     The same rate?

18      A     All the same rate.

19      Q     Which is what?

20      A     $400 per hour.

21      Q     And then checks -- if I wanted to hire you as an

22  expert and I was going to send you a payment, that check

23  would be made payable to USF?

24      A     It's through an entity of USF called University

25  Medical Services Association, UMSA, Inc.



 1      Q    And how do you personally get compensated for
 2   the work you perform as an expert?
 3      A    University takes a fixed amount up until I've
 4   sort of earned back what I cost the University, and then
 5   beyond that, the funds are split via percentage to the
 6   University, a percentage to me.
 7      Q    How much overall of your time do you spend doing
 8   consulting work on litigation?
 9      A    10 percent.
10      Q    Do you have -- do you have a billing ledger that
11   would show the work that --
12          THE COURT REPORTER:  I'm sorry.  Your question
13      broke up.
14          MR. YOUNT:  My apologies.
15   BY MR. YOUNT:
16      Q    I'm going to re-ask the question, Doctor.  Do
17   you have a billing ledger which would set forth the work
18   performed and hours billed on this case?
19      A    Yes.
20      Q    And we'll attach that --
21          MR. YOUNT:  Are we on 4 now, Ms. Court Reporter?
22          THE COURT REPORTER:  I believe it is.  I
23      apologize.
24          MR. YOUNT:  That's all right.
25          MR. MACDONALD:  Let me object to the marking of



 1        exhibits that he hasn't produced and he doesn't have

 2        in front of him, you know, and weren't able to review

 3        the documents, but --

 4             MR. YOUNT:  So an objection's great.  But what

 5        are you -- as a practical matter, what are you

 6        saying, that he's not going to produce it?

 7             MR. MACDONALD:  The documents that were included

 8        in the initial disclosures, to the extent they've

 9        been updated, we will provide those.

10   BY MR. YOUNT:

11        Q    All right.  So, Doctor, what I'm going to ask

12   you to do is to take your updated billing statement and

13   email it to the court reporter.  Whether you do that or

14   not is up to you and Mr. MacDonald, but that's what I'm

15   going to ask you to do.  And I'm going to identify it as

16   No. 4, and then if it's produced, it's produced.  If it's

17   not, it's not, okay?

18             (Defendant Superior Charter Exhibit 4 was marked

19        for identification.)

20        A    Yes.  I understand.

21        Q    In connection -- let's set aside your litigation

22   work.  When you're working as a -- what do you call

23   yourself, a clinical psychiatrist or a forensic -- what

24   do you call yourself?

25        A    A psychiatrist.



1     Q     What do you do?

2     A     I am a psychiatrist with board certification in

3   adult psychiatry, child and adolescent psychiatry, and

4   forensic psychiatry.

5     Q     And on a regular day in your life, or take me

6   through a regular day in your life.  Are you seeing

7   patients?  Are you at the hospital rounding?

8     A     I -- my -- the predominant -- most of my

9   clinical time is spent seeing patients and teaching.  So

10  on Monday, it's an outpatient setting with residents.  On

11  a Tuesday, Wednesday, Friday, it's a hospital, Tampa

12  General Hospital.  On a Thursday, it's teaching in the

13  forensic psychiatry fellowship and potentially also doing

14  cases.

15    Q     And when you're seeing people in the hospital,

16  you're seeing them in the psychiatric unit in the

17  hospital?

18    A     It's a general medical hospital, and I'm

19  providing psychiatric consultation to the main services.

20    Q     Okay.  Do you have an office practice?  Do you

21  see patients in an office setting?

22    A     I do on Mondays with the residents of the

23  University of South Florida.

24    Q     And where is your office?

25    A     At the University of South Florida,



1  3515 East Fletcher.

2     Q    Of your patients who you provide medical

3  treatment and care to, what percentage is children

4  versus adults?

5     A    I have a -- of the outpatient practice, it's 50

6  percent children.  It's probably moving to 30 because

7  I've recently been tasked with another adult clinic.  And

8  then in the general medical hospital, it's whatever comes

9  in that day, so both adults and children.

10    Q    And of the children you see on an outpatient

11 basis who you consider to be your patients, how many of

12 those primarily speak Spanish?

13    A    Primarily?

14    Q    Yes.

15    A    Probably 10 to 20 percent.  That may be

16 optimistic.  Maybe 10 percent.

17    Q    How do you communicate with them?

18    A    Most of the time, they speak English as fluently

19 or better than Spanish.  If translator services are

20 needed, they're offered through the university, and I

21 implement them based on patient preference.

22    Q    All right.  When were you first contacted to

23 work on this case?

24    A    This would have been in the spring of 2023.

25    Q    And how were you contacted?



```
1      A    Via email.

2      Q    Who sent you the email?

3      A    I believe Mr. MacDonald.

4      Q    Do you have a copy of that email?

5      A    I have to look.  I don't know if it's still on

6  there.

7      Q    Let me ask you this:  How do you organize your

8  file?  Do you have like all of the emails that you

9  exchange with Mr. MacDonald; do you have those in a

10  specific area?

11      A    All my emails go into one large inbox and where

12  I reference them if I -- if I need to.  Sometimes they go

13  missing.

14      Q    Okay.

15      A    But for the most part, I just archive them

16  there.

17      Q    And this is your USF email address?

18      A    Yes.

19      Q    Did you make any effort to segregate the emails

20  that exchanged in this case?

21      A    No.

22      Q    Did -- in connection with the emails exchanged

23  between you and Mr. MacDonald, did he ever include a

24  recitation of what purported to be the facts of the

25  case?
```



GREGORY L. IANNUZZI, M.D.                    September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                              20

1      A    I don't recall.  He may have given me an

2    overview.  Typically, I ask for an overview from the

3    attorneys at the beginning of the case so I know sort

4    of superficially what I'm walking into, but I don't

5    recall.

6      Q    What were you asked to do in this case?

7      A    Evaluate a child who was voicing concerns of

8    sexual abuse.

9      Q    Who was voicing the concerns of sexual abuse,

10   the child or the parents?

11     A    Both.

12     Q    Okay.  And then, so what did you do in

13   connection with your work on this case?

14     A    Prior to accepting the case, I discussed, you

15   know, where -- what my expertise is and how it might be

16   helpful.  I'm a child and adolescent psychiatrist with

17   board certification and also a forensic psychiatrist with

18   some additional training in structured interviews of

19   children for sexual -- sexual abuse concerns.  And I

20   discussed, theoretically, how we would proceed with the

21   evaluation, which typically consists of first, you know,

22   having -- reviewing records, having a discussion with the

23   parents about the concerns without the child present, and

24   then planning an interview with the child using a

25   structured protocol that would be audio and video



 1   recorded.
 2       Q    Now, when you say "review records," was that
 3   specifically related to this case, or is that just kind
 4   of a general thing as part of your practice?
 5       A    Part of my practice.
 6       Q    Okay.  In this case, were there any records,
 7   either medical records or psychiatric or psychological or
 8   mental health records for you to review?
 9       A    I don't believe there were at the time of the
10   interview.  I don't believe there are even now, so --
11       Q    Okay.  So I want to get a definitive answer on
12   this one.  Are there any mental health records related to
13   patient Jane Doe?
14       A    May I reference my report?
15       Q    Please.
16       A    No.
17       Q    All right.  So you'd agree with me that, to your
18   knowledge, Jane Doe never received any sort of mental
19   health counseling related to this incident; is that
20   correct?
21       A    To my knowledge, yes.
22       Q    Okay.  Do you find that unusual -- have you ever
23   come across that in a case where the parents are claiming
24   an alleged sexual assault, yet the child has received no
25   mental health counseling whatsoever?



 1      A     Yes.  That's probably the most common.

 2      Q     That's common?  So what was the purpose for

 3   bringing the child to you?  It wasn't to get treatment,

 4   was it?

 5      A     No.  I was to conduct an independent examination

 6   and to interview the child to see what disclosures occur

 7   related to the incident, what the child discusses, and as

 8   well as to arrive to any psychiatric diagnosis should one

 9   apply.

10      Q     Okay.  And to be clear, it was your

11   understanding that you were not to provide her with any

12   mental health treatment, correct?

13      A     Correct.  I separate forensic work from clinical

14   work fairly substantially.  I don't do the same in an

15   individual patient.

16      Q     And so if you were going to provide care and

17   treatment to this little girl, you would have taken a

18   different approach in your examination and in your

19   treatment -- in your examination and treatment of her; is

20   that correct?

21      A     Your question cut out.

22      Q     If you were going to provide mental health

23   treatment to Jane Doe, you would have taken a different

24   approach in connection with your interactions with her;

25   is that correct?

 1        A    Yes.
 2        Q    All right.  In fact, you put in your report that
 3   she's not your patient, you're not her doctor, and you're
 4   not treating her, correct?
 5        A    Yes.
 6        Q    All right.  Now, so is it fair to say that the
 7   reason that you examined her is for this litigation,
 8   correct?
 9        A    Correct.
10        Q    Because you want to help her recover money,
11   correct?
12        A    Not correct.
13             MR. MACDONALD:  Objection; form.
14             MR. YOUNT:  What's wrong with the form?
15             MR. MACDONALD:  It's misleading and it's
16        argumentative.
17             MR. YOUNT:  Okay.
18   BY MR. YOUNT:
19        Q    Okay.  What was the truth qualifier, Doctor?
20        A    I'm sorry?
21        Q    A truth qualifier, do you use truth qualifiers
22   when you interview children?
23        A    You'd have to -- I don't know -- I'm not
24   familiar with that term.
25        Q    What do you do, if anything, to verify that a



1  child understands the difference between the truth and a

2  lie in connection with a forensic examination?

3      A    I start with a -- by using a standardized

4  protocol, and they typically ask if the -- on one of the

5  earlier phases of the protocol to ask the child some

6  relatively simple questions related to truth and lying to

7  see whether they, one, can discern truth from lie and,

8  two, are -- can be corrected if they are not adequately

9  doing so --

10     Q    Okay.  And --

11     A    -- and to teach them.

12     Q    -- this protocol that you follow, is this a

13 protocol that's -- that is accepted in your industry of

14 forensic psychiatrists?

15     A    Yes.

16     Q    Is it written down anywhere?

17     A    Yes.

18     Q    Where would I find it?

19     A    You can look via Google.  It's readily

20 available.

21     Q    And what's it called?  What do I look up?

22     A    NICHD, the National Institute of Child Health

23 and Human Development, I believe, is what it stands for,

24 protocol for interviewing children.

25     Q    So it's titled just what one would think.  NICHD



 1  protocol for interviewing children?

 2     A    Probably just NICHD protocol, but when you're

 3  searching for it, if you type interviewing children, it

 4  will narrow the results.

 5     Q    And you followed that protocol in connection

 6  with your interview of Jane Doe?

 7     A    Yes.

 8     Q    Did you satisfy yourself -- when asking her

 9  questions where you tried to ascertain whether she

10  understood the difference between a truth and a lie, did

11  you satisfy yourself that she did?

12     A    Yes.

13     Q    All right.  How old was Jane Doe when you

14  interviewed her?

15     A    Six years old.

16     Q    Did she seem to be engaged in the interview

17  process with you?

18     A    Yes.

19     Q    Did she -- were her answers generally responsive

20  to the questions that you asked?

21     A    Yes.

22     Q    I'm sorry?

23     A    Yes, generally.

24     Q    Okay.  And -- Doctor, you with me?

25     A    We -- there was about a 10-second lapse.



```
 1        Q     All right.

 2              MR. YOUNT:   It says my Internet connection is

 3        bad.  I'm going to log off real quick and log back

 4        in.  So let's go off the record for a brief time,

 5        okay?

 6              MR. MACDONALD:   Okay.

 7              MR. YOUNT:   I'll be right back.

 8              (Off the record from 11:27 a.m. to 11:28 a.m.).

 9   BY MR. YOUNT:

10        Q     So, Doctor, I was asking you about what I was

11   referring to as a truth qualifier, and you said as part

12   of standard protocol where you would -- that you go

13   through in order to satisfy yourself that a child

14   understands the difference between a truth and a lie.

15   That's kind of where we are topically, okay?

16        A     Just to be clear, the truth qualifier, the

17   purpose is typically to teach the child that truth is

18   what should be uttered in the interview, more so than to

19   satisfy my own personal -- you know, satisfy any opinions

20   I have.

21        Q     All right.  Let me ask you this, Doctor:  When

22   looking back at the interview, in hindsight, do you feel

23   that Jane Doe was truthful throughout the entire

24   interview?

25        A     Yes.
```



 1      Q    Okay.  Did she give inconsistent responses to
 2  your questions?
 3      A    At times.  But I would have to refer to the
 4  transcript to identify specific instances.  And with
 5  respect to the overall allegations, they were consistent.
 6      Q    Okay.  So when you say the overall allegations,
 7  that they were consistent, give me some examples of
 8  specifics that you found to be consistent in what she
 9  told you?
10      A    She consistently told me that she experienced
11  some kind of sexual behavior from another child on two
12  occasions; once on -- at recess or the playground, I
13  believe, and once in the classroom.
14      Q    All right.  So when you say "sexual behavior,"
15  are you distinguishing -- are you including both verbal
16  and physical?
17      A    I'm referring to physical.
18      Q    Physical?  Okay.  So it's your -- it's your
19  belief based upon your interview that Jane Doe's
20  allegations were physical in nature; is that accurate?
21      A    Yes.  My understanding of her allegations were
22  that she was communicating to me that they were physical.
23      Q    Okay.  And those alle- -- you understand in this
24  case, there's a significant dispute of fact as to whether
25  what LR did was verbal versus physical?  You understand



 1 | that that's a critical issue in this case, correct?
 2 |    A    Correct.
 3 |    Q    In connection with your review of the interview
 4 | that the child gave that was provided to you -- are you
 5 | familiar with what I'm talking about?
 6 |    A    Could you be more specific, please?
 7 |    Q    So you have a document in your file which is a
 8 | transcript of an interview that was given in Spanish
 9 | where I believe it's the mom asked questions of the child
10 | related to the incident.
11 |    A    Yes.
12 |    Q    You would agree with me that the mother led the
13 | child during that question-and-answer session?
14 |         MR. MACDONALD:  Objection; form.  You can
15 |    answer.
16 |    A    No, I don't agree.
17 |    Q    Okay.  So it is your testimony that the mother
18 | did not lead the child when she asked those questions?
19 |    A    Yes.
20 |    Q    Okay.  Now, was -- when the child was talking to
21 | you in your interview, was she consistent with the areas
22 | where she described being touched?
23 |    A    Yes.
24 |    Q    And what were those areas?
25 |    A    We need to reference my report to see the words



 1   that she used, but she referenced her chest, her groin,

 2   and her butt.

 3       Q    Okay.  How often -- how many times in the

 4   interview did she reference her stomach?

 5       A    I don't recall.

 6       Q    Okay.  And in order for her statements about

 7   where she was touched to be consistent, every time she

 8   was asked the question where was she touched, she would

 9   have to give all three of those responses, correct?

10       A    No, not correct.  Consistency is a range.  If

11   you're looking for a hundred percent consistency where

12   she's always mentioning all three, I mean, that's not

13   consistent with childhood, you know, developmental

14   reporting standards.  So she wouldn't -- it's -- children

15   most commonly make errors of omission where they omit

16   details, so it's typical for them to select one or the

17   other and forget to mention the other two.

18       Q    Okay.  So if there were what I would refer to as

19   an inconsistency, you would say -- with respect to where

20   on her body was she touched, you would say that that's

21   just normal childhood omissions, correct?

22       A    No.  That's not correct.

23       Q    Explain.

24       A    What I was referring to is the child may not

25   always say that it was all three locations.  They may say



GREGORY L. IANNUZZI, M.D.                                September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                                        30

```
 1   one and omit the other two, or say another and similarly,

 2   whether they -- or indicating, you know, stomach or

 3   something else, you know, a different anatomical

 4   location.  That is a separate issue than what I was

 5   referring to.

 6       Q    Okay.  And, in fact, in your interview of the

 7   child, she was not entirely consistent by identifying the

 8   same body parts every time she described how she was

 9   touched; is that correct?

10       A    Correct.  Sometimes she identifies one;

11   sometimes she identifies another.  The overall gestalt

12   from the multiple spontaneous reportings that she did

13   were those three areas.

14       Q    And sometimes you provided her with -- you

15   identified the body part where she claims that she was

16   touched before she did; is that correct?

17       A    No.  That is not correct.

18       Q    That's not correct?  Okay.  So this transcript

19   has no references where you would identify a body part --

20   you would help her find the answer that you were looking

21   for?  That will not show up in the transcript; is that

22   correct?

23           MR. MACDONALD:  Objection; form.

24   BY MR. YOUNT:

25       Q    I'm sorry.  What was your answer?
```



```
 1            MR. MACDONALD:  You can answer.
 2       A     To the best of my knowledge, no.  I refer to the
 3   body parts only after they bring them to the discussion.
 4   I would defer to the transcript, however.
 5       Q     What role does the power of suggestion play in a
 6   child abuse investigation -- forensic psychiatrist
 7   investigation?
 8       A     It's a fundamental aspect of interviewing
 9   children in these cases, and is the reason that
10   standardized protocols exist to improved the reliability
11   and accuracy of the information disclosed by the
12   children.
13       Q     Okay.  And what did you do in connection with
14   your interview to ensure that things that weren't true
15   weren't being suggested to this child?
16       A     I followed the NICHD protocol, which in general
17   flows from open-ended prompts as vague as can be and do
18   not introduce new information until that -- unless the
19   information has been introduced by the child, and over
20   the course of the protocol, gradually hones in to
21   identify areas for clarification if they have been
22   omitted.
23       Q     With respect to the interview -- the transcribed
24   interview between the child and the mom that you
25   reviewed, did that interview purport to comply with any
```



 1   sort of protocol which would help against the power of
 2   suggestion?
 3       A    No.
 4       Q    In fact, in that interview, there were multiple
 5   instances where a professional like yourself would say,
 6   "Hey, that is a question that suggests the answer."
 7   Would you agree with that?
 8            MR. MACDONALD:  Objection; form.  You can
 9       answer.
10       A    I would not agree with that without first
11   reviewing the transcript again.  From my recollection of
12   it, she actually did a reasonable job of asking and
13   soliciting using an open-ended style for at least a
14   portion of the questions, but I can't comment on all of
15   them.
16       Q    Well, let's go ahead and take a look at it,
17   then.  Do you have that document?
18       A    I can pull it up.  All right.  I have it pulled
19   up.  Sorry.  Was there a standing question?
20       Q    There is not.  So let me ask you.  And I'm
21   looking at -- the title of the document says "Audio
22   Recording Translation into English"; is that what you're
23   looking at?
24       A    That is correct.  Yes.
25       Q    It says "Woman:" and then "Child:."  Is that the



 1   same document?

 2       A    Yes.

 3       Q    About a third of the way down the page, the

 4   question "Woman:  She asked you what LR had done, and

 5   what -- did you tell her the truth, right; you always

 6   have to tell the truth"; you agree that that's a leading

 7   question, correct?

 8       A    I do agree with you that that is leading;

 9   however, this instruction about always telling the truth,

10   and telling the truth is in agreement with standardized

11   protocols for child interview techniques.

12       Q    Okay.  Let me ask you -- do you have an opinion

13   as to whether this child was telling the truth about what

14   she said LR did to her at school?

15       A    I have a personal opinion, but an expert

16   opinion, no.  That's ultimately up to the trier of fact.

17       Q    What is your personal opinion?

18       A    My personal opinion are that the report that she

19   gave to me and to -- in other documents that I've seen

20   has been consistent, and the consistency supports that

21   her claims are genuine.

22       Q    Okay.  So are you aware of multiple reports that

23   when Jane Doe first reported the incident, she reported

24   the incident to be verbal only?

25       A    I have not seen any of those reports.



1       Q     Okay.  So --

2       A     I'm aware that that is the -- what I've seen

3    discussed in the records from the defense, that the --

4    that the report was verbal.

5       Q     Okay.  So you certainly acknowledge and

6    understand that it is the Defendant's position in this

7    case, as supported by the testimony of the school

8    employees, that Jane Doe's first complaints were it was

9    verbal only, correct?

10           MR. MACDONALD:  Objection; form.  Go ahead.

11      A     That is correct.  I have not been provided with

12   any of that testimony to review.

13      Q     Okay.  If you assume that that testimony exists,

14   that testimony would be inconsistent with what Mom and

15   Dad told you in their interview, correct?

16      A     Correct.

17           MR. MACDONALD:  Objection; form.

18   BY MR. YOUNT:

19      Q     I need a clean answer, please, Doctor.

20           MR. MACDONALD:  Same objection.  Go ahead.

21      A     Correct.

22      Q     And that would also be inconsistent with what

23   Jane Doe told you in your interview, correct?

24           MR. MACDONALD:  Objection; form.  Go ahead.

25      A     Could you please clarify the question?



1      Q    To the extent that school employees have

2   testified and documented that what Jane Doe told them was

3   that LR told her things rather than physically touched

4   her, those reports would be inconsistent with what

5   Jane Doe told you in your interview, correct?

6      A    Correct.  The consistencies I'm referring to are

7   Jane Doe's consistent report of the behavior per the

8   records that I have reviewed.

9      Q    And all of those reports about what Jane Doe

10  said were subsequent to her telling school personnel that

11  it was verbal only; is that correct?

12          MR. MACDONALD:  Objection; form.  Go ahead.

13     A    Correct.  As far as -- to my knowledge, yes.

14     Q    Now, when you spoke to Jane Doe, there were some

15  inconsistencies about where and how many times whatever

16  happened happened, correct?

17     A    Correct.

18     Q    At first she told you that it happened in the

19  classroom, correct?

20     A    I don't recall which she disclosed first.  I'd

21  defer to the transcript.

22     Q    Okay.  But at some point, she said it was in the

23  classroom, and then in another time she said that it was

24  on the playground or in the park; is that correct?

25     A    That is correct.



```
 1        Q    Are you aware that there are cameras in the

 2   classroom?

 3        A    I was informed of that.  Yes.

 4        Q    Can you explain as a professional, or in

 5   whatever capacity you can explain, how physical licking

 6   and touching could have occurred in a classroom when the

 7   videotape refutes that?

 8        A    I have not been shown the video, and all I have

 9   to rely on here is the information that was provided to

10   me, which was Jane Doe's report and the documents I

11   reviewed and the interview from the parents.

12        Q    Wouldn't that be a critical piece of information

13   in doing a forensic evaluation to evaluate the

14   credibility if there's a video with --

15            THE COURT REPORTER:  I'm sorry.  Your question

16       froze up.

17   BY MR. YOUNT:

18        Q    Doctor, would you agree that a video would be a

19   critical piece of information in doing a forensic ex- --

20   a forensic evaluation in this case to determine whether

21   the little girl was telling the truth or not?

22        A    It would be helpful, yes, and I have requested

23   it.

24        Q    Okay.  And did you ever get it?

25        A    No.
```



GREGORY L. IANNUZZI, M.D.                         September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                              37

```
 1      Q    Who did you request it from?

 2      A    Mr. MacDonald.

 3      Q    And when you work on a case, you want all the

 4   available information in order to give the best opinion

 5   possible; is that correct?

 6      A    Yes, all of the available relevant information.

 7      Q    Did you ask the parents why they got no medical

 8   or psychological treatment for the child?

 9      A    I don't recall.  I would defer to my report.  I

10   seem to recall them telling me that they tried to

11   minimize the number of occasions they discussed it with

12   the child or brought it up, and I want to say that that

13   was the reason why they didn't solicit any further

14   treatment or involvement.

15      Q    What sort of -- what sort of behaviors do you

16   typically see a child demonstrate when they are subjected

17   to sexual abuse?

18      A    Unfortunately, there is not a typical.  There's

19   a broad range of symptoms that can occur.  And general

20   categories or symptoms include regression of

21   developmental milestones, changes in behavior, changes in

22   emotion, different voicing of thoughts and concerns that

23   a child has.

24      Q    Of those four categories of symptoms, how many

25   of them did you see in Jane Doe?
```



1       A      Let me reference my report there in the end near

2   the assessment where I discuss the symptoms.  They should

3   be listed there.  One second.

4             Referencing my report, page 13, under the

5   heading of "Adjustment Disorder, paragraph 3, Mrs. and

6   Mr. -- I'm sorry -- "The parents identified that

7   Jane Doe's behavior changed following these stressors.

8   They identified Jane Doe was afraid of the dark, no

9   longer slept alone, occasionally had nightmares, more

10  often seemed sad, more often brought up topics involving

11  bullying, lying, and LR."  Those are the symptoms that

12  were notable on my exam.

13      Q      And then some of those symptoms, you found that

14  you couldn't necessarily relate to the potential alleged

15  sexual incident; is that correct?

16      A      That is correct.

17      Q      Now, in your interview of Jane Doe, she talked

18  about unicorns a lot during the interview, correct?

19      A      I don't recall.  I'd have to reference the

20  transcript.

21      Q      Let me ask you this:  Assuming that she did talk

22  about unicorns in her interview, do you believe that that

23  has any relation to the alleged incident with LR?

24      A      Not to my knowledge unless -- I seem to be

25  having a memory about something about unicorn underwear,



 1  so that could be a relationship, but I -- it could be

 2  totally incorrect, and I apologize if that is something I

 3  have created.

 4      Q   I believe that that's something you created, but

 5  the records will speak for themselves.  So she also

 6  talked a lot about a frog and her father, having a dream

 7  about her father being eaten by a frog; do you recall

 8  that?

 9      A   I recall the frog, not the dream about the

10  father being eaten by a frog, but I do recall the frog.

11      Q   Okay.

12      A   The frog was a toy that she had selected at the

13  beginning of the interview and played with throughout the

14  interview.

15      Q   Do you believe that those stories that she was

16  telling you, do you believe that those were related in

17  any way to the incident involving LR?

18      A   Not to my knowledge, no.  I don't believe that

19  they were related in terms of context -- content, rather;

20  however, you've heard the DSM-5, when it comes to

21  nightmares related to a traumatic or stressful situation,

22  it's usually the affect of content, meaning fear or

23  anxiety.  That is the thing that relates them, not

24  necessarily the specific content.  So the fact that it

25  was a nightmare where there was fear and anxiety and she



 1  was experiencing this relate -- suggests that there is a

 2  connection to some kind of traumatic stressor.

 3      Q    Did Jane Doe express to you that she experienced

 4  fear?

 5      A    It was observed by her parents, so no, I don't

 6  believe she told me that.  And she demonstrated it at one

 7  point during the interview as well, two points.

 8      Q    All right.  You gave me a pretty convoluted

 9  answer.  I asked you if she expressed that she

10  was experiencing fear.  What is the answer to that

11  question?

12      A    I don't recall.  I'd defer to the transcript.

13      Q    Okay.  And then you said the parents told you

14  that she expressed fear; is that correct?

15      A    Yes.  I do recall that.

16      Q    And that would be reflected in your interview

17  with the parents, correct?

18      A    Yes.

19      Q    And then you said a third thing.  What was that?

20      A    She demonstrated fear on two occasions during

21  the interview with me.

22      Q    She was afraid of your eyes at one point?

23      A    That was one instance, yes.

24      Q    And then she was also afraid because you were

25  taller than she was, and you had to lower your chair and



 1  sit on the floor?

 2      A    I was combining that with the eye incident where

 3  she said that I was scaring her for whatever reason, and,

 4  yes, that was my response, to sit on the floor.  The

 5  second incident I was referring to was when the lights

 6  flickered out, and she yelled loudly.

 7      Q    Are those normal reactions of a six-year-old

 8  child?

 9      A    They can be.  The parents informed me that they

10  were not typical for her or that they were things that

11  had changed as a result of, you know, following this

12  incident.

13      Q    So I'm talking about the fear that you saw.

14  Certainly it would have to be unusual and never had

15  been seen before because she's never had that experience

16  where she was interviewed by a forensic psychiatrist,

17  correct?

18          MR. MACDONALD:  Objection; form.  Go ahead.

19      A    I'm not sure I understand the question.

20      Q    You just suggested that the parents told you

21  that the fear that you saw all of a sudden occurred after

22  the LR incident?

23      A    Correct.  That's what -- what I observed was a

24  child who demonstrated some fear in their interaction

25  with me.  She told me that she was -- I was scaring her.



1  And then she demonstrated, you know, a loud yell when the
2  lights temporarily turned off during the interview and
3  that we were alone together in a dark room.  That can be
4  developmentally appropriate.  It can also indicate a
5  regression of milestones.  What the parents discussed
6  with me after, because they were observing the interview
7  through a one-way mirror, was that she did not previously
8  demonstrate fear of the dark and this yelling prior to
9  these incidents.  So in their view, this was a change in
10 her behavior.
11     Q    But you don't have an opinion as to whether
12 those fears were manifested by the LR incident, do you?
13     A    I cannot say with certainty.  No.
14     Q    Now, you said it was a one-way mirror, but
15 Jane Doe could actually see her mom during the interview,
16 correct?
17     A    Yes.  I suppose the one-way mirror is not very
18 good that we have at our institution.
19     Q    Would you expect Jane Doe's -- the words that
20 she would choose to describe the body parts involved,
21 would you expect those to be consistent over time as she
22 told the story?
23     A    Not necessarily.  Children have a variety of
24 idiosyncratic use of language, and as their vocabulary
25 develops or they use new words or they learn to more



 1   consistently use words, particularly in a critical period

 2   like age between five and six, the specific words could

 3   change.

 4       Q    Now, did Jane Doe ever tell you how LR touched

 5   her body?  In other words, was it -- did he pull down her

 6   pants, or did he lift up her shirt?  Did you ever come to

 7   an understanding as to how that happened?

 8       A    She was not clear in reporting that.  So, no, I

 9   didn't quite understand how that occurred.

10       Q    Did you ask -- did you ask a follow-up question

11   to try to figure out the answer to that?

12       A    I did approach that topic cautiously on several

13   occasions because I did not want to introduce a false

14   memory or a false narrative or ask a suggesting question,

15   and despite this, she was not able to give a consistent,

16   clear response.

17           She did lift her shirt up several times in

18   gesture to her stomach and, you know, or her underpants,

19   but it wasn't consistent enough to be clear.

20           MR. YOUNT:  I'm going to allow Ms. Karron to ask

21       you some questions.  I want to try to get my Internet

22       connection working better.  But I'll probably have

23       some in a few minutes.  So thanks very much for your

24       time for now.

25           MS. KARRON:  Thank you.  Let's just take a few



 1      minutes, if we could.  And then I will get started.
 2      Thanks.
 3              (Off the record from 11:45 a.m. to 11:57 a.m.)
 4                        DIRECT EXAMINATION
 5  BY MS. KARRON:
 6      Q    Do you have any opinions in this case that are
 7  not reflected in your written report?
 8      A    No.
 9      Q    Did you discuss your deposition testimony today
10  or prepare for it in any way by speaking with Kyle or any
11  member of his law firm?
12      A    I met with Kyle for a period of -- I believe it
13  was 30 minutes.
14      Q    And what did you discuss during that time?
15      A    Mostly just to, you know, prepare for the
16  questions about my professional background based on him
17  observing a previous deposition with another expert.
18      Q    Okay.  Were you shown any documents during that
19  preparation?
20      A    No.  But I requested two documents, which I had
21  not previously reviewed.
22      Q    What documents were those?
23      A    The DCF report and the police report related to
24  this incident.
25      Q    Okay.  And did you have the opportunity to



 1  review those documents before your deposition?

 2      A    Yes.

 3      Q    Okay.  And based on the DCF report, what was

 4  your understanding of the DCF's outcome?

 5      A    The DCF -- the outcome was that they were not

 6  proceeding forward with the case, and I believe it said

 7  that it was not a mandatory case.

 8      Q    In your experience dealing with children and

 9  reporting sexual occurrences, is it typical for the DCF

10  to decide not to proceed with the case?

11      A    That does occur fairly commonly.

12      Q    And the police report -- you reviewed the police

13  report.  Did the report indicate anything about a sexual

14  incident?

15      A    The report from the police officer discussed

16  concern that, I believe, the father had about the child

17  and -- Jane Doe and LR remaining in a classroom together,

18  but I don't believe it discussed the incident.

19      Q    Okay.  The meetings that you had with Jane's

20  parents, was an interpreter present for all of them?

21      A    No.

22      Q    And are you aware that Jane's parents' first

23  language is not English?

24      A    Yes.  I had a preliminary meeting via the phone

25  to determine the extent of their English language skills;



 1  at which point, I determined that a translator was

 2  necessary to proceed, and so we scheduled a subsequent

 3  evaluation via video with a translator.

 4      Q    And what about with regard to Jane, was she ever

 5  given an interpreter during your interview with her?

 6      A    She was not.

 7      Q    And are you also aware that Spanish is her first

 8  language?

 9      A    I am.  I discussed with the parents beforehand,

10  and they indicated that the child had sufficient English

11  skills to proceed and would prefer to proceed in English,

12  and so we proceeded as such.

13      Q    Isn't it true, Doctor, that at one point in your

14  interview, Jane expressed an issue with not having the

15  proper words to be able to use?

16      A    I seem to vaguely recall that being said.

17      Q    Okay.  And did that indicate to you that she

18  might not have the proper English words to use?

19      A    That was my interpretation, but I don't know

20  that that meant that she had the perfect Spanish words;

21  it was just she didn't have the right words in general.

22      Q    Did you ask her one way or another whether she

23  understood or needed to speak in Spanish?

24      A    I don't recall.

25      Q    Okay.  Typically, when a child reports sexual



 1  abuse to one of their parents, what typical steps would
 2  you expect a parent to take?
 3      A    I typically expect a parent to -- well, it
 4  depends vastly on the circumstances.
 5      Q    Okay.  Let's use Jane Doe's circumstances,
 6  an allegation of a five-year-old touching another
 7  five-year-old.  The child goes to her mother and tells
 8  her exactly what she said in that recorded transcript
 9  that you saw; how would you expect the parents to react?
10      A    I'm not sure.  Can you clarify your question,
11  please?
12      Q    Sure.  And I can only put it -- I have an
13  11-year-old daughter, and if she came to me and told me
14  that someone physically touched her -- and I don't know
15  the psychological appropriateness, and that's where you
16  come in, but my reaction would be to immediately get on
17  the phone with the police, get my daughter to a hospital,
18  get her checked out, and get her any kind of professional
19  help she might need.  And I understand in this case, a
20  lawyer was contacted before even the police.  And so my
21  question to you is what type of reaction would you expect
22  from a parent who is told these things by their young
23  child?
24      A    Sure.  Reactions can vary dramatically.  My
25  understanding of their reaction in this case was that



1    they reached out to the school for some clarification.

2    It was also my understanding that the recording was

3    subsequent to a discussion with the school and was not

4    the same night of the initial disclosure, but if there's

5    a correction in that timeline, you know, please inform

6    me, and that there were some requests made of the school

7    to provide video recording, and there was a DCF filing.

8    As far as the relationship between all of that and

9    contacting the attorneys, I'm not aware of that timeline.

10   The parents had expressed to me that they were interested

11   in not traumatizing the child further by having extensive

12   discussions about this or bringing this up a lot, and

13   that is consistent with how some parents choose to handle

14   these sort of things.

15        Q    And it's interesting that you mention that

16   because you, in fact, had a two-hour discussion with Jane

17   about the alleged incident, didn't you?

18        A    I did.

19        Q    And that's not consistent with keeping the child

20   from talking about it, is it?

21        A    It is not, and it is downstream.  At this point,

22   I believe the child had been interviewed about this on a

23   couple of different occasions, and this was really the

24   only way to get any further information.  There really

25   wasn't an alternative, which was, I guess, why they



```
 1   agreed to proceed with the interview with me after we had

 2   met during the video and discussed, you know, what the

 3   procedure would be.

 4       Q    In your professional experience, how do leading

 5   questions impact a five-year-old child's memory and

 6   recitation of events?

 7       A    Leading questions can, in some children, impact

 8   the core memory and, you know, effectively corrupt the

 9   memory in some children.

10       Q    Effectively correct the what?

11       A    The core memory of the incident.

12       Q    And does that mean, Doctor, that the child can

13   be led to believe that something happened that actually

14   didn't happen?

15       A    Yes.  That's consistent with the literature on

16   children's memory.

17       Q    And you testified that Jane seemed to understand

18   and answer your questions, but your report indicates that

19   you had to repeat questions multiple times before even

20   getting a relevant response.  Could you clarify that for

21   me?

22       A    Yes.  The response style -- Jane Doe's response

23   style was somewhat inconsistent where sometimes she would

24   answer questions right away, and sometimes she was

25   distracted or playing or doing something else, and I
```



 1  would have the need to repeat the question or circle back

 2  to the question in order to get a response that was

 3  relevant to the question.

 4      Q    Is that typical of a child who's endured sexual

 5  abuse, to not be able to answer direct questions about

 6  it?

 7      A    Yes, and of children of really -- of that

 8  developmental level, that's typical.

 9      Q    Okay.  And I know that Mr. Yount asked you about

10  whether you were aware that Jane indicated to her PE

11  teacher, her kindergarten teacher, and her former VPK

12  teacher she wasn't touched, and I'm not sure whether you

13  knew whether -- what the details were.  But my

14  understanding is that she told three adults the day of

15  the alleged incident that it was only verbal, and when

16  asked where it occurred or when it occurred, she couldn't

17  remember and neither could the other child.  Is that

18  consistent with what you were told in Jane's interview or

19  by her parents?

20          MR. MACDONALD:  Objection; form.  Go ahead.

21      A    Sorry.  Can you clarify the question?

22      Q    Sure.  So I was basically providing background.

23  My understanding is that Jane told three teachers on the

24  day of the incident that nothing happened to her

25  physically and that it was only a verbal comment and



```
 1   couldn't even recall where it happened.  So I'm trying to
 2   reconcile how four months later, she's able to come to
 3   you and suddenly recall all these details and incidents,
 4   and it turns from one touching to two touching.  So my
 5   question is:  What is your understanding of what she told
 6   the teachers on the day of the incident, and how do you
 7   explain the transition of her story over time from a
 8   psychological perspective?
 9       A     Sure.  I don't have access to the disclosures
10   made to the other adults at the school.  So I have no
11   knowledge of what those disclosures were.  I've heard
12   secondhand that what you summarized, which is that they
13   were verbal disclosure -- or that she verbally disclosed
14   it was a verbal incident and not a physical one, but
15   that's all the information I have related to that.
16           The records that I have of her descriptions are
17   that it was physical, and as far as the -- I don't know
18   early-on statements versus the more detailed subsequent
19   statements.  Again, errors of omission are very common
20   particularly with young children of the age of five, so
21   neglecting details, skipping over details, responding
22   with "I don't know" is common if, you know, appropriate
23   interview techniques aren't being used to solicit, you
24   know, open-ended responses.
25       Q     Okay.
```



1    A    So that may explain the discrepancy between --

2    any apparent discrepancies in what was said.

3    Q    Were you also told that in addition to her

4    consistent statement that the incident was only verbal to

5    three adults, that the following school day, the trained

6    school counselor interviewed both children and were also

7    told the same thing, that nothing physical happened?

8         MR. MACDONALD:  Objection; form.  Go ahead.

9    A    I was aware that there was a counselor that

10   interviewed Jane Doe, but I haven't seen any recordings

11   of that or transcripts of that, and I know nothing about

12   the nature of the interview other than I believe the

13   conclusion you surmised, which was that Jane Doe repeated

14   that it was -- or that the psychologist said that

15   Jane Doe said it was physical -- or verbal and not

16   physical.

17   Q    And if it's true that Jane Doe unequivocally

18   reported to four school professionals that she was not

19   touched, do you think it's more likely -- strike that.

20        If she consistently reported to four school

21   individuals that she was not physically touched, is it

22   more likely that she was telling the truth to them

23   immediately after the incident or more likely that her

24   future story is more accurate?

25   A    That is difficult to discern because it has to



1   do with how the information was elicited in those early

2   disclosures and interviews.

3       Q    Explain that for me, Doctor.

4       A    If leading questions were used, yes-no

5   questions, questions which posed information that she

6   affirmed, then it may again corrupt the core memory.

7   It may result in testimony that's vastly different.

8   From all I've been provided and seen related to her

9   disclosures, she has corrected people when they've tried

10  to tell her or clarify whether it was verbal only or

11  physical and verbal, and she says no, this was physical,

12  so --

13      Q    So you agree that it's possible if she told the

14  same thing to four adult teachers and didn't correct

15  them, that it's really questionable whether or not she

16  was ever physically touched?

17          MR. MACDONALD:  Objection; form.  Go ahead.

18      A    I'm sorry.  Can you clarify the question?

19      Q    Yeah.  So my question is:  If the -- if Jane

20  told the same thing to four adults, that she wasn't

21  touched, assuming that their questions weren't leading

22  and that they specifically asked her if anyone touched

23  her and was she okay, and she denied ever being touched,

24  then isn't it possible that, in fact, a false memory was

25  created at some point leading to her physical



 1   allegations?

 2       A     Yes.

 3             MR. MACDONALD:   Objection; form.

 4   BY MS. KARRON:

 5       Q     Could you answer again?   We didn't get that.

 6       A     Yes, that is possible.

 7       Q     And would you expect the first few responses out

 8   of a child nearest to an event to be the most accurate

 9   representation of their recollection?

10       A     It depends on the interactions between the

11   person disclosing and -- the child and the person they're

12   disclosing it to.   In general, earlier disclosures and

13   more spontaneous disclosures are considered more

14   reliable.

15       Q     And in this case, you agree that as far as

16   resulting behavioral issues, that Jane didn't demonstrate

17   any new sexual behaviors?

18       A     To my knowledge, no.

19       Q     And she didn't demonstrate any behaviors

20   indicative of anxiety?

21       A     As per my report, she did demonstrate behaviors

22   concerning for anxiety, and I list them in the opinion

23   section under current DSM-5-TR diagnoses.

24       Q     And is that the adjustment disorder reference?

25       A     Yes.



 1      Q     Jane didn't make any complaints of any vague
 2   body symptoms, did she?

 3      A     Not to my recollection.

 4      Q     Your diagnosis of adjustment disorder, can your
 5   clinical diagnosis of adjustment disorder had been an
 6   outcome of a child being suddenly removed from her school
 7   environment and placed in a new, strange environment?

 8      A     Yes.

 9      Q     You have no way to differentiate whether Jane's
10   adjustment disorder that you diagnosed was related to the
11   sexual incident or related to something else such as her
12   switching schools at that time?

13      A     Other -- correct, other than what is delineated
14   in my report.  The statements that she makes, which are
15   thematically related to the sexual incident can more
16   clearly be tied to that as the precipitant.

17      Q     Okay.  And are you aware that Jane's grades
18   didn't decline at all as a result of this incident?

19            MR. MACDONALD:  Objection; form.  Go ahead.

20      A     I believe the parents did tell me that she
21   continued to do well in school after the incident.  Yes.

22      Q     Okay.  Did you perform any diagnostic testing on
23   Jane's parents?

24      A     No.

25      Q     Did you conduct any formal or detailed



 1  psychiatric evaluations of each parent, whether together
 2  or individually?
 3      A    I conducted a -- the psychiatric assessment to
 4  the extent that we would in a child evaluation, which is
 5  obtaining some history from the parents, but not going in
 6  depth into their individual psychiatric histories.  The
 7  target of the interactions are very much focused on the
 8  child, which is consistent with clinical practice.
 9      Q    Did you do testing on either parent?  Did you
10  conduct any psychological or projective testing on either
11  parent?
12      A    No.
13      Q    Okay.  How is it, Doctor, then, that you're able
14  to opine in your report that the parents weren't
15  malingering?
16      A    Can you draw me to that specific --
17      Q    Certainly.  I'm looking -- let's see.
18  "Similarly, I carefully considered whether Father Doe and
19  Mother Doe feigned or exaggerated changes they observed
20  in Jane's behavior."  And then it goes down to, "This is
21  not consistent with feigning or exaggerating symptoms.
22  Based on these factors, I determined Jane and her parents
23  were not malingering."  And my question to you, Doctor,
24  is:  How, if you didn't conduct the appropriate
25  psychological testing on the parents, are you able to



1    give a conclusion in a court of law that they were

2    malingering or not malingering?

3        A    The focus of the evaluation was the child, so

4    the -- any focus of questions I directed towards the

5    parents was their account of the child.  So within that,

6    that was within the realm of a normal child/adolescent

7    psychiatric interview of both child and parents.

8             The statements that the parents made related to

9    the child, which supported that they weren't feigning or

10   exaggerating, those statements specifically related to

11   the child were their report that the, you know, child

12   continued to do well, which is not consistent with

13   someone who would be feigning or exaggerating where they

14   would typically say -- you know, a more common response

15   would be "everything's gotten worse since this occurred

16   with the child."  That was not what the parents

17   disclosed.  The focus was very much the child, and the

18   only relationship with the interview of the parents was

19   focused on that of the child.

20       Q    So you have parents that have stated to you that

21   they don't want their daughter to keep remembering it,

22   and they don't want to bring it up to her, and that's why

23   they didn't seek professional help, but yet, to advanced

24   litigation, you spent two hours with her talking to her

25   about it, and presumably, a six-hour round-trip drive for



 1   her to get there to you.  So with that understanding, the

 2   fact that the parents admitted that her grades went up,

 3   how do you determine whether or not they're malingering,

 4   or based on that one behavior, given everything else you

 5   know?

 6        A    Well, again, what I'm drawing attention to here

 7   is that, you know, determining that the statements that

 8   they made to me were not being feigned or exaggerated

 9   based on the fact that the statements that they made to

10   me indicated that her performance was good and hadn't

11   changed and was -- you know, that she was doing well.

12   Those are the statements that I'm referring to.

13        Q    In your professional opinion, did the interviews

14   and questioning you had with the parents constitute a

15   sufficient basis with your training and experience to

16   diagnose someone as not malingering?

17        A    With respect to the child, yes.

18        Q    When you say, "With respect to the child," I

19   understand that the child repeated something to the

20   parents, and you feel the parents were honestly repeating

21   what they heard.  But how do you know one way or another

22   whether the parents had a psychological history of lying

23   or they were malingering in order to have the added

24   benefit of seeking money in this case, which we know that

25   they are doing?



 1            MR. MACDONALD:  Objection; form.  You can

 2        answer.

 3        A     Again, the extent of a normal interview of a

 4     child of this age involves some history from the parents

 5     with respect to the child's function.  So the assessments

 6     that I provided are related to the parents' comments

 7     about the child's functioning.  I have a very -- it does

 8     not expand to include a full psychiatric assessment of

 9     the parents.  That is not a typical part of a child and

10     adolescent or a child psychiatric evaluation.  So it's

11     limited to that.

12        Q     Okay.  So you're not going to go to court and

13     testify as to whether or not the parents are telling the

14     truth in this case, are you?

15        A     No.  That's ultimately for the triers of fact to

16     determine as seen with the child.

17        Q     All right.  What is the projective testing?

18        A     Can you be more specific?  I think it's a

19     general category of psychological testing that I don't

20     routinely administer.

21        Q     Okay.  What is your understanding of what

22     projective testing is?

23        A     It's a test -- it's a test that's

24     administered by psychologists, and it assesses some

25     aspects of psychological functioning, which involve a lot



GREGORY L. IANNUZZI, M.D.                            September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                                    60

1   of conjecture, but it's really outside of my scope.

2       Q    Did you determine -- did you consider projective

3   testing to determine the reliability and validity of

4   Jane's reports in this case?

5       A    No, I did not.  I'm not all that familiar with

6   projective testing, and to my knowledge, the reliability

7   and validity of it is somewhat in question.  So I would

8   not have utilized it in this instance.

9       Q    Are you able to identify the major contributing

10  cause for Jane's sudden fear of the dark?

11      A    Sudden fear of the dark, no.

12      Q    Are you able to determine the major contributing

13  cause for Jane sleeping in bed with her parents?

14      A    No.

15      Q    And are you able to identify the major

16  contributing cause for Jane having occasional nightmares?

17      A    No.

18      Q    And are you able to identify the major

19  contributing cause for Jane seeming sad more often?

20      A    No.

21      Q    Now I want to ask some questions about reasons

22  that a five-year-old or six-year-old child would lie or

23  fabricate a story.  Is fear of losing a parent's approval

24  a reason a child might lie?

25      A    Yes.



```
1      Q    And what about getting carried away when they're
2   telling a story?  Is that a reason a child might
3   embellish or lie?
4      A    Yes.
5      Q    And you testified already you agree that if a
6   question is leading, that could create false memories in
7   children?
8      A    Yes.
9      Q    And do you agree that any undue influence by her
10  parents could result in Jane changing her narrative?
11     A    Could, yes.
12     Q    And also, since we don't know what was said to
13  Jane prior to her mother recording the conversation, you
14  have no way to rule out whether what was said to her
15  before the recording started impacted her responses, do
16  you?
17     A    Correct.
18     Q    Okay.  And could the context manner and
19  structure of questioning influence Jane's version of the
20  story?
21     A    Yes.  Although, Jane has demonstrated some
22  resilience with this respect because she, in all of the
23  recordings I've seen of her testimony, she's pretty --
24  she fairly quickly corrects the person if they're
25  providing incorrect information from what I've seen.
```



1    Q    All right.  And from reading your interview with

2  her, the transcript of it, it seems like at one point,

3  "my belly, my belly, ew, the squirrel, the turtle," and

4  I'm -- I'm not -- I'm using language more figuratively

5  today, but it seemed like to me that she was completely

6  all over the place and more focused on an issue of

7  receiving

8  bubble gum and not identifying specific instances of the

9  story.  And so my question is:  From your professional

10  opinion, is that the behavior that you would expect to

11  see of a typical five-year-old, or does it just vary?

12    A    It varies.  It can be the behavior of a typical

13  five-year-old.  It can also indicate the presence of a

14  psychiatric disturbance, which I discuss in the section

15  titled "Consideration of Attention Deficit/Hyperactivity

16  Disorder."

17    Q    And the reason -- strike that.

18        So if a child hears something in a certain way

19  for a long period of time, that could lead them to

20  believe a certain event happened in a certain way,

21  correct?

22    A    Correct.

23        MR. MACDONALD:  Objection; form.

24  BY MS. KARRON:

25    Q    Are you familiar with research indicating that a



 1  parent often intentionally -- unintentionally asks
 2  children questions in a suggestive way, which results in
 3  false report?
 4      A    Is there a specific article you're referring to?
 5  I know that research exists on the topic, but I don't
 6  know if you're referring to something specific.
 7      Q    Not a specific article.  I'm just asking if
 8  you're familiar with it.
 9      A    Yes.  I'm familiar that that research exists.
10      Q    Okay.  If a child were to have -- we'll use Jane
11  for this example, five years old in kindergarten and have
12  her pants pulled down or removed in the classroom full of
13  other kindergartners, what would a typical reaction be of
14  like-aged kindergartners?
15      A    It varies widely.  I can't necessarily comment.
16      Q    Would you expect an entire classroom of
17  kindergartners to ignore the conduct or not have any type
18  of reaction whatsoever?
19      A    Again, it varies vastly.  So I'm sure there are
20  a number of children that do, and I'm sure there are a
21  number of children that divert their attention to it.
22      Q    Okay.  And that sounds like a generic answer,
23  and I'm trying -- from a logical standpoint, your
24  kindergartner is sitting in a classroom and being
25  sexually assaulted in front of a room of entire -- other



```
 1   kindergartners and a teacher, and I'm asking what the
 2   likelihood that five-year-old children wouldn't stop and
 3   react in some way, whether that be point, "Look, oh, my
 4   gosh, so-and-so's showing their butt," whatever it is.
 5   Wouldn't you agree, Doctor, that it is atypical for a
 6   classroom of kindergartners who witness a sexual assault
 7   to stay silent and not say a word?
 8          MR. MACDONALD:  Objection; form.  Go ahead.
 9      A    To stay silent, I think, is -- and not say a
10   word, I think, is atypical of that age group altogether.
11   Again, the reaction varies widely.  It depends on the
12   context, depends on the kids, depends on the classroom,
13   the teacher.  I can't -- I have no way to, you know, more
14   than a layperson to predict how a particular class
15   responded.
16      Q    Okay.  So you got to interview Jane for a while
17   and get to know her personality and her reaction.  How
18   would you have expected Jane to react in a scenario where
19   she's in a classroom in front of others and such an
20   assault happens to her that requires the removal of her
21   pants or pulling them down?  What would you expect her
22   reaction to be?
23      A    We're sort of fully in the realm of speculation
24   now, but Jane's a fairly animated child, so -- but again,
25   it depends on the context.  She may have been animated in
```



 1   that instance.  She may have not been if, you know, there
 2   was some other circumstances going on to why or how it
 3   was being done.  I don't know.
 4       Q    How common is it for a five-year-old child to
 5   exhibit sexual behaviors such as those alleged here by
 6   LR?
 7       A    It varies, especially if the child has
 8   experienced sexual abuse themselves.  It may be fairly
 9   common in those instances, but I -- I can't say for
10   certain.
11       Q    Is sexual behavior developmentally age
12   appropriate in five-year-old children?
13       A    Yes.
14       Q    Is it normal for five-year-old children to be
15   curious about their bodies or even touch themselves or
16   show their genitals?
17       A    Yes.
18       Q    And we had discussed a little bit before in your
19   discussions with Mr. Yount about behaviors that you would
20   expect to see.  And I want to focus you specifically on
21   behaviors you would expect to see from a five- to
22   six-year-old kindergarten child experiencing sexual
23   trauma by another child of the same age.  Is acting
24   younger a behavior that you would potentially see?
25       A    Potentially see, yes.



1      Q    And that includes bed-wetting, thumb-sucking, or
2    wanting to be babied?
3      A    Yes.
4      Q    Did you see any of those behaviors or hear about
5    any of those with regard to Jane?
6      A    From -- not those specific behaviors, the
7    general category of behaving younger, right, to being
8    developmentally regressed, that was described by the
9    parents.
10     Q    And what did they say was happening?  Was that
11   sleeping in the bed with them?
12     A    Correct.  Being afraid of the dark, not sleeping
13   alone, having nightmares, those items.
14     Q    Right.  And we already said those could also be
15   from her moving schools as well, right?
16     A    Yes.  Correct.
17     Q    Okay.  And what about changes in behavior like
18   becoming aggressive, withdrawn, clingy, or having
19   difficulty concentrating, are those behaviors that could
20   typically be seen when a five-year-old is abused by
21   another five-year-old?
22     A    Yes.
23     Q    And did you have any indication that those
24   behaviors were present in this case?
25     A    No.



1    Q    Okay.  And what about with regard to change in
2  eating habits such as loss of appetite, trouble
3  swallowing, or sudden eating changes, is that something
4  that could be demonstrated by such a child in this
5  scenario?
6    A    It could be.  Yes.
7    Q    And were those apparent in this case at all?
8    A    No.
9    Q    Same question with regard to hygiene, changes in
10 hygiene, like not wanting to bathe or wearing baggy
11 clothing.  Are those types of behaviors that are
12 potential in a sexual abuse victim or child of the same
13 age?
14   A    Yes, they are possible.
15   Q    And was there any indication that those took
16 place?
17   A    No, not to my knowledge.
18   Q    And what about fears, intense fears or unusual
19 or new fears around touch or being with a particular
20 person in a particular place, is that something that you
21 saw in this case?
22   A    Other than the yell when she was in the room
23 with me and the lights went out and the discussion that
24 we already talked about from the parents about being in
25 the dark, no.



```
 1      Q    And what about the inappropriate behavior, like
 2   saying or doing sexual things that seem inappropriate for
 3   a five- or six-year-old child or showing inappropriate
 4   behavior, seductiveness or sexualized behavior, are those
 5   things that you would commonly see in an abuse victim?
 6      A    They can be seen.  I wouldn't say commonly.  The
 7   responses vary widely.
 8      Q    And was any inappropriate behavior of Jane
 9   disclosed to you in this case?
10      A    Not to my knowledge, no, other than the repeated
11   disclosures about LR and lying and touching.
12      Q    And would those disclosures be inappropriate
13   behavior on behalf of Jane?
14      A    It would be expected in an instance where this
15   kind of thing occurred, where a kid just kind of
16   repeatedly and spontaneously brings it up in situations
17   that is not appropriate.
18      Q    Okay.  And what about self-mutilation, engaging
19   in self-mutilation like cutting or sticking yourself, is
20   that something that is a behavior as a result of the
21   sexual abuse?
22      A    It can be, yes.
23      Q    Was there any self-mutilation in this case?
24      A    No, not to my knowledge.
25           MS. KARRON:  I think that's all I have.  I'll
```



 1      turn it back to Scott.  I think, Scott, you said you

 2      had more?

 3           MR. YOUNT:  I do have just a couple.

 4                     REDIRECT EXAMINATION

 5  BY MR. YOUNT:

 6      Q    Doctor, would you agree that it is inconsistent

 7  with good forensic psychiatric practices to disregard or

 8  ignore information because that information is

 9  inconsistent with the result sought by the person paying

10  your bills?

11           MR. MACDONALD:  Objection; form.

12      A    Yeah, I would agree with that.

13      Q    Why did you not consider the video of the

14  classroom in connection with your forensic analysis in

15  this case?

16      A    I requested it on several occasions, and I have

17  yet to be provided it.

18      Q    Why did you disregard the reports and testimony

19  of school personnel who consistently recorded and

20  reported that Jane Doe's complaints were that LR's

21  actions were verbal only?

22           MR. MACDONALD:  Objection; form.

23      A    This is the first I've heard that those -- that

24  evidence exists.  I'd be happy to review it.  I haven't

25  been provided it.



1      Q     And when you accept an assignment, you ask the

2   attorney retaining you to provide you with all relevant

3   information in the case, correct?

4      A     Correct.

5      Q     How much has Mr. MacDonald's law firm paid for

6   your expert services in the last three years?

7      A     I don't recall off the top of my head.  It's

8   been five -- again, five or fewer cases.  I think some of

9   them maybe have yet to move forward.  The average case is

10  probably somewhere in the realm of -- I don't know -- 15

11  to -- or $1500 to $2,000.  So that's probably a good

12  estimation, but I'd have to check.

13     Q     Okay.  But that's information that you have and

14  you have access to, correct?

15     A     It could be calculated based on information in

16  my possession.

17     Q     You could pull invoices, correct?

18     A     Right.

19     Q     And just to be clear, with respect to the

20  Schedule A of documents produced, you've brought none of

21  that information here to the deposition today to produce

22  it, correct?

23     A     Correct.  I haven't been -- if I've been served

24  that -- if I am served that, I'm happy to respond with

25  USF counsel, yeah.  That's fine.



1    Q    All right.

2         MR. YOUNT:  That's all the questions I have.

3    Thank you.

4         MS. KARRON:  Thank you.  Kyle, do you have

5    anything?

6         MR. MACDONALD:  I have just a few quick

7    questions very briefly.

8                    CROSS-EXAMINATION

9  BY MR. MACDONALD:

10   Q    Dr. Iannuzzi, can you tell me the date of your

11 expert report?  You're muted.

12   A    Sorry.  Thank you.  The date of my -- I

13 submitted the report was August 3rd, 2023.

14   Q    And are you aware that the complaint in this

15 case was filed on August 9th, 2023?

16   A    No, I was not aware of that.

17   Q    And that would be after you had already written

18 your expert report that we have in this case; is that

19 right?

20   A    Correct.

21   Q    All right.

22        MR. MACDONALD:  I have no further questions,

23   Dr. Iannuzzi.

24        MR. YOUNT:  Doctor, do you want yo read and sign

25   or waive?



GREGORY L. IANNUZZI, M.D.                      September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                              72

```
 1        THE DEPONENT:  Read and sign.
 2        MR. YOUNT:  Okay.  And recall that I made a
 3   request that you produce documents to the court
 4   reporter.  I'm going to leave it up to you and
 5   Mr. MacDonald how to respond to that, but it is my
 6   expectation that you're going to send the documents
 7   requested.  Okay?
 8        THE DEPONENT:  I have noted as to those
 9   documents, the updated CV and invoices related to
10   this case; is that what it was?
11        MR. YOUNT:  I --
12        MR. MACDONALD:  Yes.  I'll go over them.
13        THE DEPONENT:  Okay.  Yeah.  Once I get the
14   transcript, I'm happy to review that.
15        MR. YOUNT:  Thank you, sir.
16   Thank you, Ms. Court Reporter.
17        THE COURT REPORTER:  Thank you.  Do you need to
18   order the transcript?
19        MR. YOUNT:  Yes.
20        MS. KARRON:  I will not at this time.
21        THE COURT REPORTER:  Okay.  Mr. MacDonald, do
22   you need to order a copy?
23        MR. MACDONALD:  I'm okay.
24        THE COURT REPORTER:  Okay.
25        MR. MACDONALD:  Yeah.  We're okay for now.
```



GREGORY L. IANNUZZI, M.D.                    September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                              73

```
 1   Thank you, though.

 2        THE COURT REPORTER:  Okay.  And is that regular

 3   time for the transcript order?

 4        MR. YOUNT:  Yeah, regular time.

 5        (Videoconference Deposition of

 6   GREG IANNUZZI, M.D., concluded at 12:47 p.m., and

 7   reading and signing is not waived.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA     )

 3   COUNTY OF PINELLAS   )

 4        I, JULIE R. PALITTO, RPR, Registered Professional

 5   Reporter, certify that I was authorized to and did

 6   stenographically report the videoconference deposition of

 7   the foregoing witness remotely; that a review of the

 8   transcript was requested; and that the transcript is a

 9   true and complete record of my stenographic notes.

10        I FURTHER CERTIFY that I am not a relative,

11   employee, attorney or counsel of any of the parties to

12   this cause, nor am I a relative or employee of any of the

13   parties' attorney or counsel connected with this action,

14   nor am I financially interested in the outcome of this

15   action.

16        Dated this 15th day of October 2024, at

17   Clearwater, Pinellas County, Florida.

18

19                    JULIE R. PALITTO, RPR-CP

20

21

22

23

24

25
```



GREGORY L. IANNUZZI, M.D.                                    September 25, 2024
DOE V. ACADEMIR CHARTER SCHOOLS                                            75

```
 1                      CERTIFICATE OF OATH

 2    STATE OF FLORIDA     )

 3    PINELLAS COUNTY      )

 4          I, JULIE R. PALITTO, RPR-CP, the undersigned

 5    authority, certify that GREGORY L. IANNUZZI, M.D., the

 6    witness named herein, personally appeared before me

 7    remotely via videoconference for the taking of the

 8    foregoing deposition and was by me first duly sworn to

 9    tell the whole truth.

10          Witness my hand and official seal this 15th day

11    of October, 2024.

12

13                        _____

14                        JULIE R. PALITTO, RPR-CP
                          Notary Public, State of Florida
                          My Commission No. HH 060969
15                        Expires:  December 4, 2024

16

17

18

19

20

21

22

23

24

25
```

