EXHIBIT "C"

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3

  JANE DOE, a minor, by and through
4 Her mother and next friend, MOTHER DOE,

5        Plaintiff,

6 vs.                          Case No: 1:23-cv-23004

7 ACADEMIR CHARTER SCHOOLS, INC.
  And SUPERIOR CHARTER SCHOOL
8 SERVICES, INC.,

9        Defendants.

10 _____/

11 VIDEOCONFERENCE
   DEPOSITION OF:          ██████████████
12
   DATE:                   MONDAY, AUGUST 26, 2024
13
   TIME:                   12:02 P.M. - 4:25 P.M.
14
   PLACE:                  MIAMI, FLORIDA 33131
15

16 STENOGRAPHICALLY
   REPORTED BY:            AMBER PORTELLO
17

18

19

20

21

22

23

24

25



```
 1   A P P E A R A N C E S:

 2   KYLE MACDONALD, ESQUIRE
     OF: Derek Smith Law Group, PLLC
 3        520 Brickell Key Drive
          Suite O-301
 4        Miami, FL 33131-2433
          Office: 786-568-8120
 5        Kyle@dereksmithlaw.com
          APPEARING ON BEHALF OF THE PLAINTIFF
 6        (Via Videoconference)

 7   JULIE KARRON, ESQUIRE
     TAYLOR WHITE, ESQUIRE
 8   OF: Kelley Kronenberg
          10360 West State Road 84
 9        Fort Lauderdale, FL 33324-4236
          Office: 954-370-9970
10        Jkarron@kelleykronenberg.com
          Twhite@kklaw.com
11        APPEARING ON BEHALF OF THE DEFENDANT ACADEMIR
          (Via Videoconference)
12
     JULIE MARHEFKA, ESQUIRE
13   OF: Garrison, Yount, Forte & Mulcahy, L.L.C.
          601 Bayshore Boulevard
14        Suite 800
          Tampa, FL 33606-2760
15        Office: 813-515-0322
          Jmarhefka@garrisonyount.com
16        APPEARING ON BEHALF OF DEFENDANT SUPERIOR
          (Via Videoconference)
17

18   ALSO PRESENT:
          Carmen Quintana, Interpreter
19

20

21

22

23

24

25
```



```
1                        I N D E X

2   TESTIMONY OF ███████████████

3       DIRECT EXAMINATION BY MS. KARRON                4

4       FURTHER DIRECT EXAMINATION BY MS. MARHEFKA      84

5   CERTIFICATE OF OATH..................................92

6   CERTIFICATE OF DEPOSITION TRANSCRIPT.................93

7

8                   INDEX OF EXHIBITS

9   DEFENDANT'S EXHIBITS

10  EXHIBIT 1     41
    (Text Messages)
11  EXHIBIT 2     45
    (Police Report)
12

13  REPORTER'S NOTE:  Exhibits mentioned above were retained
    by Julie Karron, Esquire.

14

15                    ------

16                S T I P U L A T I O N S

17      It is hereby stipulated and agreed by and between

18  the counsel for the respective parties and the deponent

19  that the reading and signing of the deposition

20  transcript be reserved.

21                    ------

22

23

24

25
```



■■■■■■■■

```
 1                    P R O C E E D I N G S
 2                        *********
 3          COURT REPORTER:  Would you raise your right
 4     hand, please?
 5          Do you solemnly swear or affirm to translate
 6     Spanish to English and English to Spanish?
 7          THE INTERPRETER:  I do.
 8          COURT REPORTER:  Would you raise your right
 9     hand, please?
10          Do you solemnly swear or affirm that the
11     testimony you're about to give in this cause is the
12     truth, the whole truth and nothing but the truth?
13          THE WITNESS:  Yes.
14   THEREUPON
15                      ■■■■■■■■■■
16   was called as a witness and, having first been duly
17   sworn, testified as follows:
18                      DIRECT EXAMINATION
19   BY MS. KARRON:
20     Q.   Good morning.  I'm the attorney for Academir
21   Charter Schools, and I'm here to take your deposition.
22          Can you please state your full name for the
23   record?
24     A.   ■■■■■■■■■
25     Q.   And, ■■■■■■■ we are here with an
```



```
 1  interpreter.  Can you tell me, do you speak any English?
 2      A.   Yes.
 3      Q.   Okay.  Are you fluent in English?
 4      A.   No.
 5      Q.   Have you ever had your deposition taken before?
 6      A.   No.
 7      Q.   Okay.  I'm going to go over some rules.  There
 8  is a court reporter here typing everything that we say.
 9  Also, as you can see, there is an interpreter
10  interpreting from English to Spanish and Spanish to
11  English.  So for that reason we have to be careful not
12  to tong over each other.  Also, make sure that the
13  answers are all verbal.  If you say things like uh-uh
14  and uh-huh, it will be very difficult for the court
15  reporter to get your response down.  Also please do not
16  guess.  If you're not sure of something, you can tell
17  me.  If you don't understand my question, please ask for
18  a clarification.  Also, you are under oath, so the
19  penalty of not telling the truth will be perjury.
20          Do you understand these rules?
21      A.   Yes.
22      Q.   Okay.  Are you presently on any medication or
23  under the influence of any substance that would affect
24  your ability to understand questions or testify
25  truthfully?
```



```
 1      A.   No.

 2      Q.   Is anyone in the room with you?

 3      A.   Yes.

 4      Q.   Who's in the room with you?

 5      A.   The attorney.

 6      Q.   Anyone else?

 7      A.   No.

 8      Q.   Okay.  Do you have any documents in front of

 9 you?

10      A.   No.

11      Q.   Do you have a computer in front of you?

12      A.   Yes.

13      Q.   Okay.  Is your computer on?

14      A.   Yes.

15      Q.   Is anything open on the screen other than this

16 Zoom deposition meeting?

17      A.   No.

18      Q.   Okay.  And just to make sure I understand that

19 you do speak some English, but let the interpreter fully

20 interpret the question into Spanish before you answer

21 just to make it easier.

22           Okay?

23      A.   Okay.

24           MR. MACDONALD:  Julie, before we go further,

25      can you turn on your camera first just so we can see
```



███████████████

```
 1    who's asking questions?

 2         MS. KARRON:  I'm having camera difficulty.  I

 3    tried to do it and something happened.  I think

 4    there is some sort of computer error where it only

 5    pulls it from my laptop screen and the laptop is

 6    closed and underneath, but my picture should pop up

 7    and I'm the only one asking questions I believe.

 8         MR. MACDONALD:  Okay.

 9  BY MS. KARRON:

10    Q.   Did you meet with anyone to prepare for your

11  deposition today?

12    A.   Yes.

13    Q.   How many meetings did you have?

14    A.   One today.

15    Q.   And was that with anyone other than your

16  attorney?

17    A.   The attorney and the paralegal.

18    Q.   Okay.  Was anyone else in the room?

19    A.   No.

20    Q.   Was anyone else on the phone?

21    A.   No.

22    Q.   Have you ever been known by any other names

23  other than ████████████████?

24    A.   Well, my second last name which is Figueroa,

25  but my name has always been ██████████████
```



```
 1      Q.   And I'm getting some echo.  Are you guys
 2  hearing that?
 3      A.   Yes.
 4           MS. KARRON:  Do you hear it too, Kyle?  When he
 5      talks, I hear an echo.
 6           MR. MACDONALD:  Yeah.  It might just be the
 7      room actually:
 8           MS. KARRON:  Okay.
 9  BY MS. KARRON:
10      Q.   How old are you, sir?
11      A.   Forty.
12      Q.   And when were you born?
13      A.   1984.
14      Q.   What is your date of birth?
15      A.   June 30th.
16      Q.   And where were you born?
17      A.   In Cuba.
18      Q.   How long have you lived in the United States?
19      A.   Since 2013.
20      Q.   Do you have a Social Security number?
21      A.   Yes.
22      Q.   Can you share that with me?  You can take it
23  off the record for your protection.
24           MR. MACDONALD:  I'm going to object to the
25      form.  I can give you it off the record if you'd
```



```
 1       like, like outside of the deposition.
 2            MS. KARRON:  He's going to do it off the record
 3       if he knows it.  If he doesn't know it, then he
 4       doesn't know it.
 5            THE WITNESS:  Is it necessary for me to give
 6       it?
 7            MR. MACDONALD:  If you have it, you can tell
 8       her what it is.
 9            (An off-the-record discussion was had.)
10  BY MS. KARRON:
11       Q.   What is your current citizenship status?
12            MR. MACDONALD:  Objection, form.  You can
13       answer the question.
14            THE WITNESS:  Citizen.
15  BY MS. KARRON:
16       Q.   And when did you get your citizenship?
17       A.   I don't exactly remember.  I believe it was in
18  2019.
19       Q.   And during the deposition, I'm going to be
20  asking questions, and your attorney could be objecting
21  to the form of a question.  But unless somebody --
22  unless your attorney tells you not to answer the
23  question, you can just automatically answer instead of
24  asking your attorney if it's okay to answer.
25            You have a Florida driver's license that you
```



1    showed?

2        A.   Yes.

3        Q.   Has your license ever been suspended or

4    revoked?

5        A.   No.

6        Q.   What is the highest level of education that

7    you've completed?

8        A.   Bachelor's Degree.

9        Q.   And when did you get that from and where?

10       A.   2011, Cuba.

11       Q.   And what is the degree in?

12       A.   Information technology.

13       Q.   Do you have any other degrees or certificates?

14       A.   I have a certificate in IT.

15       Q.   Anything else?

16       A.   I don't remember.

17       Q.   Have you ever served in the military?

18       A.   Not in the United States.

19       Q.   What about in Cuba?

20       A.   Military service.

21       Q.   Have you ever been arrested or convicted of a

22   crime?

23       A.   No.

24       Q.   Aside from the case that we're here about

25   today, have you ever sued anyone or been sued?



```
 1     A.   No.
 2     Q.   Have you ever gotten a lawyer and filed a claim
 3  against anyone other than this case?
 4     A.   No.
 5     Q.   What is your current home address?
 6     A.   ███████████████████████████████████████████████
 7  ███████
 8     Q.   And how long have you lived at that address?
 9     A.   For about three years.
10     Q.   And who do you live with?
11     A.   My wife and my girl.
12     Q.   How many children do you have?
13     A.   One.
14     Q.   And is your wife -- tell me your wife's name?
15     A.   ██████████
16     Q.   And when were you and ██████ married?
17     A.   We've been with each other for nine years.
18     Q.   When did you marry ██████?
19     A.   We're not legally married.
20     Q.   And what is your child's name?
21     A.   ██████████
22     Q.   And how old is your daughter?
23     A.   Seven years old.
24     Q.   And what's her date of birth?
25     A.   █████████████
```



```
 1     Q.    What school does your daughter go to?
 2     A.    Kendale Lakes Elementary.
 3     Q.    Where do you currently work?
 4     A.    I work from home.
 5     Q.    Who is your employer?
 6     A.    A company called Church World Service.
 7     Q.    How long have you been working for Church World
 8  Service?
 9     A.    Management administrator.  Data management
10  administrator.
11     Q.    Okay.  Through your job, do you have health
12  insurance?
13     A.    Yes.
14     Q.    How long have you had health insurance through
15  your job for?
16     A.    Eight years.
17     Q.    And what company is your health insurance with?
18     A.    Aetna.
19     Q.    Is your daughter on your health insurance?  Is
20  she a member on your health insurance?
21     A.    Yes.
22     Q.    And has your daughter's health insurance paid
23  for any medical treatment or appointments for this case?
24           MR. MACDONALD:  Objection, form.
25  BY MS. KARRON:
```



```
 1      Q.   I can clarify that.  That was a bad question.
 2  Has the Aetna insurance paid for anything related to the
 3  sexual incident that we're here about?
 4      A.   No.
 5      Q.   I'm going to ask you some questions about your
 6  daughter's medical history.  And when I'm talking about
 7  history, I'm talking about everything prior to January
 8  20, 2023.
 9           Has your daughter ever been diagnosed with any
10  medical or psychological conditions?
11      A.   No.
12      Q.   Before this incident that we're here about, had
13  your daughter ever been to a psychiatrist or a
14  psychologist or any mental health professional?
15      A.   Speech therapist.
16      Q.   Other than a speech therapist, did she have a
17  counselor or a psychiatrist or a psychologist that she
18  would see before this incident?
19      A.   When she was going to the speech therapy, we
20  decided to take her -- I don't remember -- to a
21  psychiatrist because it was recommended that in addition
22  to the speech therapist to take her with a psychiatrist.
23      Q.   Okay.  And was that before the sexual incident
24  that we're here about?
25      A.   Yes.
```



1    Q.   And when was that that she saw a psychiatrist?

2    A.   I don't remember, but it was when the speech

3  therapy was going on.  About two to three years.

4    Q.   How many times did she see a psychiatrist?

5    A.   Multiple times, and the psychiatrist told us

6  that she didn't have any problem whatsoever.

7    Q.   And do you remember what year that was?

8    A.   No.

9    Q.   Do you remember the name of the psychiatrist?

10   A.   It was a woman, but I don't remember the name.

11   Q.   Who was your daughter's pediatrician?

12   A.   Well, it was Emilio before.  It's just that

13  that changed.  It's at a pediatrician center.

14   Q.   When did that change?

15   A.   I don't remember.  Two to three years.

16   Q.   And why did you change from your previous

17  pediatrician to the current one?

18   A.   We didn't change pediatrician.  The center

19  changed.  We have always been to the same place.

20   Q.   Has your daughter ever had any surgeries?

21   A.   No.

22   Q.   Does your daughter take any medications

23  regularly that are prescription?

24   A.   No.

25   Q.   Around the time of the sexual incident, was



1  your daughter on any prescription medications?

2     A.   No.

3     Q.   Was there a period of time where your daughter

4  was enrolled in Academir Charter School West?

5     A.   Yes.

6     Q.   And if you know the years or the dates, can you

7  share that with me?

8     A.   From two years until the accident, the

9  incident.

10     Q.   Did your daughter go to VPK at Academir?

11     A.   Yes.

12     Q.   And did she complete a full year of VPK at

13  Academir?

14     A.   It doesn't appear to me whether the grade that

15  she was doing, if she completed that through VPK.

16     Q.   And VPK is preschool, it's the year before

17  kindergarten.

18         Do you understand?

19     A.   Yes.

20     Q.   So your daughter went to VPK at Academir before

21  she went to kindergarten; is that true?

22     A.   Yes.

23     Q.   What was the name of her VPK teacher?

24     A.   I don't remember.

25     Q.   And I understand that your daughter for some



1   period also went to kindergarten at Academir?

2       A.   Yes.

3       Q.   And do you remember your daughter's

4   kindergarten teacher?

5       A.   Ms. Chaudry.

6       Q.   Is that Ms. Chaudry?

7       A.   Chaudry.

8       Q.   C-H-A-U-D-R-Y for the record.  And did your

9   daughter start kindergarten at Academir on the first day

10  of school?

11      A.   Yes.

12      Q.   And what day was her last day at the school?

13      A.   I don't remember the exact date.

14      Q.   I can represent to you that the incident that

15  has been alleged was a Friday, January 20th.

16           Does that help refresh your recollection as to

17  when her last day would have been?

18           MR. MACDONALD:  Objection, form.

19           You can answer.

20           THE WITNESS:  It was over the course of the

21      days.  I believe the next week.  It was either on a

22      Wednesday or a Tuesday.

23  BY MS. KARRON:

24      Q.   So if the incident happened on a Friday,

25  January 20th, you believe your daughter's last day of



 1  school would have been the following Tuesday or

 2  Wednesday; is that fair?

 3          MR. MACDONALD:  Objection, form.

 4          You can answer.

 5          THE WITNESS:  I don't remember on which day

 6     that was.

 7  BY MS. KARRON:

 8     Q.  And it was approximately within a week?

 9     A.  Yes.

10     Q.  Did your daughter miss any days of school

11  between leaving Academir and attending Kendale Lakes?

12     A.  Yes.

13     Q.  How many days did your daughter miss from

14  school?

15     A.  It occurred in between those days, but I don't

16  exactly remember.  I don't exactly remember.

17     Q.  And what I'm trying to ask is whether there was

18  any days that she didn't go to school at all in the

19  transition?

20     A.  Yes.

21     Q.  How many days did she miss from school where

22  did she did not go to school?

23     A.  I don't remember.  Maybe one or two days.

24     Q.  Regarding Academir, do you know what

25  supervision or safety measures the school has in place



 1   for kindergartners during school hours?

 2          MR. MACDONALD:  Objection, form.

 3          THE WITNESS:  I don't remember, no.

 4   BY MS. KARRON:

 5      Q.   And do you know what policies or procedures the

 6   school has in place regarding supervising children?

 7      A.   No.

 8      Q.   Before the sexual incident that we're here

 9   about, did your child have any issues or complaints with

10   the school?

11          MR. MACDONALD:  Objection, form.

12          You can answer.

13          THE WITNESS:  Please repeat the question.

14   BY MS. KARRON:

15      Q.   Did your daughter have any problems at school

16   before this incident happened?

17          MR. MACDONALD:  Objection, form.

18          THE WITNESS:  No.

19   BY MS. KARRON:

20      Q.   Prior to this incident, had you or anyone on

21   behalf of your daughter made any reports to the school

22   about issues with any other student?

23      A.   No.

24      Q.   Prior to the incident that we'll call the

25   sexual incident, did you know who L.R. was?  And for the



1   record, I'll just clarify that.  That's L.R., but I'm

2   going to refer to him as L.R.

3       A.   Repeat the question.

4       Q.   Did you know who L.R. was before the sexual

5   incident?

6       A.   Yes.  I knew all the children that were in

7   class and the girls too.

8       Q.   And did you ever have any -- did you or your

9   daughter have any problems with ███████ prior to the

10  sexual incident?

11      A.   No, I don't remember.

12      Q.   Did your daughter ever report to you -- other

13  than this sexual incident that we're here about, did

14  your daughter ever report to you any other instances of

15  inappropriate behavior that happened at school with

16  anyone?

17           MR. MACDONALD:  Objection, form.

18           THE WITNESS:  Repeat the question.

19           THE INTERPRETER:  I can repeat the question.

20           MR. MACDONALD:  Same objection.  Go ahead.

21           THE WITNESS:  No.

22  BY MS. KARRON:

23      Q.   So aside from the sexual incident, before that

24  happened, your daughter never made any reports to you of

25  any problems with inappropriate or sexual behavior at



```
 1  school; is that fair?
 2          MR. MACDONALD:  Objection, form.  And just for
 3      the record, I'm going to ask you to define the term
 4      sexual incident.  I don't know the foundation that
 5      you're asking this line of questioning.  You can
 6      answer if you know.
 7          THE WITNESS:  Repeat the question.
 8  BY MS. KARRON:
 9      Q.   Let me first give a definition.  When I refer
10  to sexual incident, I'm talking about what your
11  lawsuit -- the lawsuit that we're here about today is
12  based on about the allegation of L.R. touching your
13  daughter.  That is the sexual incident.  We're going to
14  call it sexual incident.  That's what I'm referring to.
15          And then my question was, before the sexual
16  incident, did your daughter ever report to you any other
17  instances where there were any inappropriate behaviors
18  while she was at school?
19          MR. MACDONALD:  Objection, form.  Go ahead.
20          THE WITNESS:  No.
21  BY MS. KARRON:
22      Q.   Before the sexual incident, did your child ever
23  report that she felt unsafe at school?
24      A.   No.
25      Q.   Before the sexual incident, did your daughter
```



```
 1  ever report that she was alone -- left alone at school

 2  where adults were not present?

 3          MR. MACDONALD:  Objection, form.  Go ahead.

 4          THE WITNESS:  No.

 5  BY MS. KARRON:

 6      Q.   At any time while your daughter was at

 7  Academir, did she ever report that she was left alone

 8  where there was no adult supervision?

 9          MR. MACDONALD:  Objection, form.

10          MS. KARRON:  What's wrong with the form?

11          MR. MACDONALD:  You're asking him a vague

12      question.

13          MS. KARRON:  I don't know what's vague.  I'll

14      clarify it.

15  BY MS. KARRON:

16      Q.   Did your daughter ever tell you at any time

17  that she was at school and there were no adults watching

18  her?

19      A.   No.

20      Q.   Now let's talk about the what I have been

21  referring to as the sexual incident.

22          What day is it that you believe the sexual

23  incident occurred?

24          MR. MACDONALD:  Objection, form.

25          MS. KARRON:  What's wrong with the form?
```



```
1            MR. MACDONALD:  It assumes that the incident
2      happened only once.
3  BY MS. KARRON:
4      Q.   What day or days do you allege that the sexual
5  incident occurred?
6      A.   We don't know the exact date.
7      Q.   Did anyone ever come home and tell you,
8  Something happened today?  And anyone, I'm talking about
9  your child.  Did your child ever tell you that she came
10 from school and said something happened today?
11     A.   Yes, my wife was called from the school.
12     Q.   And the records indicate that your wife was
13 initially called on January 20, 2023.
14          Do you have any reason to dispute that?
15     A.   No.
16     Q.   That January 20th, I will represent to you was
17 a Friday.
18          Do you know whether your daughter stayed in
19 school the entire day?
20     A.   Yes.  Yes, she stayed in school the whole day.
21     Q.   Did she also stay in the after care?
22     A.   It could be.  Friday I don't remember exactly
23 what hour we went to pick her up, but I believe that she
24 was there for the whole day.
25     Q.   When did you first learn that there was an
```



```
 1   allegation that your daughter was touched?
 2       A.   Well, my wife was called on a Friday, and then
 3   she spoke with my daughter and I believe that occurred
 4   on that same Friday.
 5       Q.   Were you in the room when they spoke?
 6       A.   No.
 7       Q.   When did you first learn that your daughter was
 8   alleging that she was touched?
 9       A.   On that same day after my wife spoke with my
10   girl.
11       Q.   And is that something that your wife told you?
12       A.   Yes.
13       Q.   Was there ever a time where you personally
14   spoke to your daughter about being touched?
15       A.   Not myself personally.  We were always there.
16   My wife, my daughter, and myself.
17       Q.   Okay.  So did you ever ask your daughter any
18   questions about the sexual incident?
19       A.   Yes.
20       Q.   When was that?
21       A.   I don't remember, but I know that it wasn't
22   over the course of those days.  I know that it was
23   sometime later that we spoke.
24       Q.   Was it after she was at the new school?
25       A.   Yes.
```



```
 1      Q.   So she was already at Kendale Lakes Elementary
 2  at the time you spoke with her about the incident?
 3          MR. MACDONALD:  Objection, form.
 4          THE WITNESS:  She brought up the subject
 5      several times.
 6  BY MS. KARRON:
 7      Q.   Tell me every time that you remember discussing
 8  the subject with her.
 9      A.   I don't remember.
10      Q.   Did you ever ask her any questions about the
11  sexual incident?
12      A.   My wife and I already knew what had occurred.
13  So when we -- on those occasions when we spoke about it,
14  it was when she was the one who brought it up.
15      Q.   How do you know what occurred?
16          MR. MACDONALD:  Objection, form.
17          MS. KARRON:  He's testified that he -- that it
18      was brought up, and that they already knew.  So I
19      want to know what they knew.
20          THE WITNESS:  Do I answer?
21  BY MS. KARRON:
22      Q.   Yes, you can answer every time unless someone
23  tells you no.
24      A.   I knew about if because on the day in which my
25  daughter and my wife had that conversation she shared
```



1  the conversation that she had had with my girl with me.

2  Then we called DCF.  We called the Department of Child

3  and Family Services, and the man that came over from DCF

4  spoke with my daughter.  Now, I wasn't present in the

5  room when he spoke with my daughter, but I was in an

6  earshot, and I was able to hear from the living room.  I

7  was able to hear in the room next door the conversation

8  they were having.

9  BY MS. KARRON:

10      Q.   Did your daughter -- well, at the time she was

11  still attending Academir, did she ever tell you about

12  the sexual incident directly?

13      A.   No.

14      Q.   Is it fair to say that you only knew of the

15  sexual incident because your wife told you what she and

16  your daughter spoke about?

17           MR. MACDONALD:  Objection, form.

18           THE WITNESS:  My wife shared the conversation

19      that she had with my daughter through the recording

20      that she had taken of that conversation she had with

21      my daughter.  And in addition to that, I overheard

22      the conversation that the man from DCF had with her.

23  BY MS. KARRON:

24      Q.   Did you ever ask your daughter any questions

25  about the sexual incident?



1    A.   Over the course of those days, my wife and I
2  tried not to bring up that subject.
3    Q.   So to answer my question, did you ever ask your
4  daughter any direct questions about the sexual incident?
5    A.   What was the direct question?
6    Q.   I'm asking you did you ask your daughter what
7  happened to her?
8    A.   It's just I already knew what occurred.
9    Q.   I understand you believe you knew what
10 occurred.  I'm asking if your daughter ever directly
11 told you what occurred?
12    A.   Yes.
13    Q.   What questions did you ask your daughter, and
14 what did she say?
15    A.   I didn't ask her any questions.  The times when
16 we did speak about it was because she was the one who
17 brought it up because she was the one who was talking
18 about it.
19    Q.   Okay.  What did she say about it?
20    A.   She spoke about the subject on many occasions.
21 Yes, she did.
22    Q.   What specifically did she tell you about the
23 subject?
24    A.   Well, after she was already over at the other
25 school, she, on many occasions mentioned the same thing,



```
 1  that she had left Academir because of what had occurred
 2  there.
 3      Q.   And what did she tell you had occurred there?
 4      A.   That a boy had touched her had kissed her, and
 5  she had to get away from there running.
 6      Q.   Did she give you any other specifics?
 7      A.   Yes.
 8      Q.   Tell me.
 9      A.   That he had kissed her breast and her butt.
10      Q.   Did you ask her any questions about that?
11      A.   No.
12      Q.   Did you ever -- were you ever present when
13  anyone else asked her questions about that allegation
14  that he kissed her breast and her butt?
15      A.   Yes.
16      Q.   Okay.  Tell me about that.
17      A.   With Gonzalo from DCF.
18      Q.   Okay.  Anybody other than DCF?
19      A.   Yes.  I don't remember the man's name, but it
20  was in Tampa with the psychiatrist.  We were present
21  there but not in the same room.
22      Q.   Is that the psychiatrist, Dr. --- I'm going to
23  mess up the name.  Was that the doctor that your
24  attorney hired, if you know?
25      A.   Yes.
```



1      Q.   Did you listen to the interview that your wife
2   conducted of your daughter?
3      A.   Yes.
4      Q.   Were you in the room at the time?
5      A.   No.
6      Q.   Do you know where the interview occurred?
7      A.   At the playground in the house.
8      Q.   So your wife interviewed your daughter at your
9   house playground?
10     A.   Yes.
11     Q.   Was there ever a time where your wife and
12  yourself made a videotaped interview while your daughter
13  was in the bath?
14     A.   No.
15     Q.   Did you ever interview your daughter on a
16  recording?
17     A.   No.
18     Q.   Tell me in your own words, what is your
19  understanding of the sexual incident?  And I'm going to
20  add a clarification to that, your understanding of when
21  your daughter was touched and where it occurred.
22     A.   My daughter's testimony -- I know my daughter's
23  testimony from what she told -- what my daughter told my
24  wife during the recording that my wife conducted.  I
25  know what my girl said to Gonzalo from DCF, and I know



```
1   what see told the psychiatrist that was provided by my
2   attorney.  Her testimony was always the same.
3        Q.   And what was her testimony?
4             MR. MACDONALD:  Object to form.
5             You can answer.
6   BY MS. KARRON:
7        Q.   What was what you're referring to as her
8   testimony?  What did she say that was always the same?
9        A.   The same thing that is in the recording.  The
10  same thing that was reported with the person from DCF.
11  The same thing that she stated during the recording that
12  my wife took and the same thing that stated in the
13  psychiatrist's report.
14       Q.   Well, I think you and I have a different
15  interpretation of the testimony because every testimony
16  or interview I have read has been completely different.
17  So I'm going to ask what you believe is -- what is the
18  same thing that was repeated?
19            MR. MACDONALD:  Objection, form.
20            You can answer.
21            THE WITNESS:  I don't want to speak about it.
22  BY MS. KARRON:
23       Q.   Well, that's what we're here for, so we're
24  going to speak about it.
25            MS. KARRON:  Can you repeat my question, court
```



```
 1     reporter?

 2             (The previous question was read back.)

 3             THE WITNESS:  She repeated that a boy from her

 4     class had physically touched her.  That he had done

 5     to her the things that I have already previously

 6     repeatedly stated that he did to her, and that's

 7     what she said and that's what occurred.  Now, I,

 8     myself, I know it from how it was in the -- that it

 9     was the same explanation in the recording that my

10     wife took in the recording that was taken by the man

11     from DCF and also on what's on the psychiatrist's

12     report.  It is always the same story.  Now, about

13     the location about where it took place, it was

14     inside the school.  I don't know of the exact date

15     when it occurred, but she always gave the same

16     explanation.

17             MR. MACDONALD:  Sorry, I have to take just --

18     whenever you reach a good point, I'd like to take a

19     break and get a drink of water.

20             MS. KARRON:  Yeah, you can go ahead and take a

21     break if you need to.

22             (A break was had.)

23  BY MS. KARRON:

24     Q.   You testified that your daughter told the same

25  things to your wife, to DCF, and to the psychiatrist
```



```
 1  about what happened to her; is that true?

 2      A.   Yes.

 3      Q.   Okay.  And before you told me when I asked you

 4  what it was that happened, that ██████ kissed her breast

 5  and her butt and she had to get away running; is that

 6  correct?

 7      A.   Yes.

 8      Q.   Okay.  Was there anything else that you heard

 9  that your daughter said happened to her?

10           MR. MACDONALD:  Objection, form.

11           THE WITNESS:  Yes.  So on that day, I heard the

12      recording from the questions that my wife had asked

13      her, and I also -- so I heard the recording.  I

14      heard the recording, and I also heard when other

15      people asked her questions.

16  BY MS. KARRON:

17      Q.   And as far as the recording from your wife's

18  questions, what did your daughter allege happened?

19      A.   She said that L.R. had sucked on her breast and

20  on her -- where she pees from.  That he had kissed her,

21  and that she had to get out of there running.

22      Q.   Before you said that he kissed her, so now

23  you're telling me that he sucked her breast and pee pee

24  as well?

25           MR. MACDONALD:  Objection, form.
```



1    Mischaracterizes testimony.

2          You can answer.

3          THE WITNESS:  Well, the words that my girl used

4    were he licks.  He licks.

5  BY MS. KARRON:

6      Q.   And do you know where she alleged this occurred

7  at, at school?

8      A.   We don't know, but she said that she went over

9  and that she told the PE teacher about it.

10     Q.   And you said that you listened to your wife's

11 interview of her, right?

12     A.   Yes.

13     Q.   And are you aware that she told your wife that

14 it happened in the school class?

15     A.   Yes, but then how was it that she went over and

16 told a PE teacher about it?  So we don't know the exact

17 place.

18     Q.   Do you think your daughter knows the exact

19 place?

20          MR. MACDONALD:  Objection, form.  Argumentive.

21          You can answer.

22          THE WITNESS:  I don't know whether she knows or

23    whether she remembers the exact location.

24 BY MS. KARRON:

25     Q.   At the time that your wife interviewed her, was



1   that shortly after the incident?

2       A.   I don't exactly remember, but I believe that

3   she asked my girl those questions.  I believe that it

4   was either that Friday or that it was by Saturday.  I

5   don't exactly remember on which exact day, but I know

6   that it was on the days immediately after.

7       Q.   Okay.  So during that interview with your wife,

8   your daughter had stated that it happened under the

9   table and in the chairs.

10          Is that what you recall?

11          MR. MACDONALD:  Objection, form.

12  BY MS. KARRON:

13      Q.   You can answer.

14      A.   I don't remember.

15      Q.   If your daughter told your wife that it

16  happened in the class on the chairs and under the table,

17  do you have any information that would tell me that that

18  is true or not true?

19          MR. MACDONALD:  Objection, form.

20          You can go ahead.

21          THE WITNESS:  I don't exactly remember, but my

22      girl did tell her.  But, yes, my girl said she did

23      mention there.  She did mention that.  She did

24      mention the chair, and she also mentioned that she

25      went over to the PE teacher.  So we don't know where



```
 1        she ran on just one occasion or several.
 2   BY MS. KARRON:
 3        Q.   And the first time that your daughter mentioned
 4   anything about anything happening at PE, do you know
 5   when that was?
 6        A.   I don't exactly remember, but I believe it was
 7   in my wife's report, and that's when she spoke about how
 8   she told the PE teacher.
 9        Q.   When did you or anyone on behalf of your
10   daughter first notify the school that you believe she
11   was physically touched?
12        A.   They notified us on a Friday.  They called us
13   by afternoon time.  Now, I don't quite remember.  I'm
14   not sure about this, but I believe that there wasn't any
15   class on Monday, so my wife and I went over to the
16   school, by the next Tuesday.  We went there on Tuesday
17   to talk about -- to talk about this to them about what
18   they knew had occurred there.  And then now, what the
19   school had stated wasn't exactly the same as what my
20   girl has said, and we trust her.
21        Q.   Okay.  Are you aware of what your daughter told
22   the school happened?
23             MR. MACDONALD:  Objection, form.
24             THE WITNESS:  Please repeat the question.
25   BY MS. KARRON:
```



1      Q.   You're saying that what your daughter said was

2   different from what the school said, and I'm asking if

3   you're aware of what your daughter reported to four

4   adults at the school happened?

5           MR. MACDONALD:  Objection, form.

6           You can answer.

7           THE WITNESS:  I don't know exactly what it was

8      that my girl told the adults over at the school.  I

9      don't believe what she told them was different than

10      what she reported to the person from DCF, her mom,

11      and the psychiatrist.  Now, what the school told us

12      about it was completely different from what she told

13      us herself about it because what she told us was

14      that boy, that L.R., had physically touched her and

15      had done to her the things that I've already stated

16      that he did to her.

17           Now, I don't know what it was that she exactly

18      told the people from the school.  What I do know is

19      that I don't believe that she said anything

20      different.  I don't think that she said something

21      different from what she had already told, from what

22      she told the person from DCF, her mom, and the

23      psychiatrist.  Now, what the people from school told

24      us about it was that nothing physical had occurred.

25      They told us that it had been only verbal, but my



```
 1      girl's testimony was different.  My girl's testimony
 2      for both with DCF and with the psychiatrist was the
 3      same.
 4  BY MS. KARRON:
 5      Q.   You keep talking about DCF --
 6      A.   That's when we went to the school to clarify
 7  that was it.
 8      Q.   You keep talking about DCF and the
 9  psychiatrist, but DCF and the psychiatrist were not
10  involved until after you went to the school, right?
11           MR. MACDONALD:  Objection, form.
12           THE WITNESS:  DCF came that same week, I just
13      don't remember the exact date.
14  BY MS. KARRON:
15      Q.   I have a report from DCF that's dated January
16  31st.
17           Does that refresh your recollection as to the
18  timing?
19      A.   It was over the course of those days, I just
20  don't remember the exact date.
21      Q.   Okay.  And forgetting about what was told to
22  the psychiatrist because that happened months later, I
23  want to ask questions about what happened right after
24  the report was made to your wife.  Now, are you aware
25  that your daughter's PE teacher, kindergarten teacher,
```



```
1   the front desk receptionist, and the school counselor
2   were all told by your daughter that she was never
3   touched?
4           MR. MACDONALD:  Objection, form.
5       Mischaracterizes his testimony.
6           THE WITNESS:  Yes.
7   BY MS. KARRON:
8       Q.   And you're aware that what your daughter told
9   four adults at the school was completely different from
10  what she told your wife at home?
11          MR. MACDONALD:  Objection, form.
12      Mischaracterizes testimony.
13          THE WITNESS:  Can you repeat the question?
14          MS. KARRON:  Court reporter, can you repeat the
15      question?
16          (The previous question was read back.)
17          MR. MACDONALD:  Same objection.
18          THE WITNESS:  I am not aware of my daughter
19      having told the school something different than what
20      she told us from what --
21  BY MS. KARRON:
22      Q.   It was all different.
23          MR. MACDONALD:  Objection, form.
24  BY MS. KARRON:
25      Q.   So I will represent to you that the testimony
```



```
 1  was that your daughter told four different school

 2  employees that ████ said he wanted to kiss her on the

 3  mouth and touch her butt, that he never actually touched

 4  her.

 5          MR. MACDONALD:  Objection, form.

 6      Mischaracterizes testimony.

 7          THE WITNESS:  My daughter told my wife who

 8      recorded it, my daughter told the person from DCF,

 9      and my daughter told the psychiatrist when she was

10      asked to signal the parts where it occurred, she

11      indicated using her fingers.  She indicated with her

12      fingers where she had -- where the boy had either

13      licked her, as she said, kissed, or sucked.

14      Whatever you might call it.

15  BY MS. KARRON:

16      Q.   Did your daughter ever indicate whether her

17  pants were removed at any time?

18      A.   I don't remember.

19      Q.   Do you think that's something important to

20  know?

21          MR. MACDONALD:  Objection, form.  Argumentive.

22  BY MS. KARRON:

23      Q.   You can answer the question.

24      A.   What's the question?

25      Q.   You're alleging that a five year old either
```



```
 1  kissed or sucked or licked another five year old's
 2  genitals, and I'm asking you why is it that you didn't
 3  inquire as to whether or not her pants were ever
 4  removed?
 5          MR. MACDONALD:  Objection, form.  Argumentive
 6      and mischaracterizes his testimony.
 7          MS. KARRON:  Tell him every time I ask a
 8      question he needs to answer.
 9          THE WITNESS:  What is the question?  Whether I
10      knew that or whether I didn't want to ask?
11          MS. KARRON:  Read it back, please.  Kyle, if
12      could you do your objection after my question before
13      the interpreter interprets because I think that's
14      why he's not remembering my question?
15          MR. MACDONALD:  Well, I'm giving the
16      interpreter a chance to interpret the question so
17      that she can then interpret my objection.
18          MS. KARRON:  Well, he doesn't need to know the
19      objection.
20          MR. MACDONALD:  He has a right to know the
21      objection just like everyone else here.
22          MS. KARRON:  All right.  We'll just keep
23      reading them back and not finish today.
24          (The previous question was read back.
25          MR. MACDONALD:  Same objection.
```



```
 1            THE WITNESS:  Well, in order to get done what
 2       he said they did to her, you don't necessarily have
 3       to completely remove her pants for that.
 4   BY MS. KARRON:
 5       Q.   Do you know whether her pants were ever pulled
 6   down?
 7       A.   No.
 8       Q.   Did she ever tell you that her pants were
 9   pulled down?
10       A.   I don't remember.
11       Q.   Do you remember her telling anyone that her
12   pants were ever pulled down?
13       A.   I don't remember.
14       Q.   On January 20th, that was a Friday.  Did your
15   daughter wear jeans on Fridays?
16       A.   I don't remember, but we also can't say that
17   that was on a Friday.  What if it was on a Thursday or a
18   Wednesday?
19       Q.   Well, did you go to the school demanding to see
20   the surveillance video of that Friday's classroom?
21       A.   Yes.
22       Q.   And were you demanding to see multiple days of
23   video, or was it only that Friday's video that you were
24   demanding to see?
25       A.   When I went there, I went there wanting to only
```

ESQUIRE
DEPOSITION SOLUTIONS

```
 1  see it for Friday.
 2      Q.   Why did you decide that Friday was the day that
 3  you wanted to see?
 4      A.   Because that is the date when they told us that
 5  that had occurred.
 6      Q.   And your daughter reported to your wife that it
 7  had occurred under the table at school; is that correct?
 8          MR. MACDONALD:  Objection, form.  Go ahead.
 9          THE WITNESS:  Yes.
10          (Defendant's Exhibit A was marked for
11  identification.)
12  BY MS. KARRON:
13      Q.   And I'm going to show you what I'm going to
14  mark as Exhibit A.  Hopefully my screenshare still
15  works.
16          Can you tell me if you guys can see my screen?
17      A.   Yes.
18      Q.   Okay.  And I'll read it in English, and then
19  I'll leave it up for you to translate it into Spanish if
20  you would.  This appears to be a text between
21  Ms. Chaudry and either your wife or yourself, and it
22  states, Good morning.  I'm sorry if I'm bothering you
23  during the weekend, but we're very worried about
24  yesterday's incident because ████ told us that ████
25  touched her in her intimate areas and also kissed on the
```



1  tits and mouth.  We are very concerned because that is a

2  very serious incident.  When we talked yesterday about

3  that incident, it was supposedly just verbal aggression,

4  and I appreciate you letting me know quickly but it is

5  necessary for us to meet with you on Tuesday because

6  ██████ told us scary details about the incident under the

7  table at school where the kid maybe you are not aware.

8  I hope you understand ██████ is our only daughter, and we

9  want the best for her.  We will be at the school early

10 in the morning -- early in the morning at the school.

11 Thank you.

12         Is that your understanding of -- well, first of

13 all, are you the one that sent that text, or is that

14 from your wife?

15     A.   My wife.

16     Q.   And you agree that that text is talking about

17 something that allegedly happened under the table at

18 school with ██████

19     A.   Yes.

20     Q.   And the text was sent before you went to the

21 school and asked to see the video for Friday, January

22 20th?

23     A.   Yes.

24     Q.   And is it fair to say that the reason you asked

25 to see the video for Friday is because you believed that



```
1   the incident occurred on Friday in class?

2       A.   Yes.

3       Q.   And if the school had showed you the video and

4   it revealed that nothing happened in the classroom,

5   would that change your mind about your allegations?

6            MR. MACDONALD:  Objection, form.  Calls for

7        speculation.

8            You can answer.

9            THE WITNESS:  At this moment, I believe that we

10       asked the school to show us that video for that day,

11       and they never showed us that video.  Now, in

12       addition to this, we went to the police.  I, myself

13       went to the police, and the police -- we asked to be

14       shown that video, and they never showed us that

15       video.  Even if we asked to see it for Friday

16       because we trusted in what she -- they had told us

17       about it, we don't know for sure whether it did

18       occur on a Friday or whether it was a Thursday

19       before or Wednesday.  I just wanted to know what

20       happened.

21   BY MS. KARRON:

22       Q.   Did you or your wife ask your daughter when it

23   happened?

24            MR. MACDONALD:  Objection, form.  Asked and

25       answered.
```



```
 1            THE WITNESS:  I don't remember.
 2   BY MS. KARRON:
 3       Q.   Okay.  But you went to the school, and you
 4   demanded to see Friday's video, correct?
 5       A.   Yes.
 6       Q.   And are you aware that the entire video for
 7   Friday didn't show anyone licking anyone?
 8            MR. MACDONALD:  Objection, form.  Argumentive,
 9       mischaracterizes evidence.
10            MS. KARRON:  Stop the speaking objections.
11       Just say, Form, because you're confusing things.
12            MR. MACDONALD:  Well, you can have speaking
13       objections in a deposition, but okay.
14            THE INTERPRETER:  I can repeat the question.
15            MS. KARRON:  Thank you.
16            (The previous question was read back.)
17            THE WITNESS:  They did not show us the video
18       that day.
19   BY MS. KARRON:
20       Q.   That is not my question.  Are you aware that
21   the video doesn't show what you claim happened on
22   Friday, January 20th?
23            MR. MACDONALD:  Same objection.
24            THE WITNESS:  They didn't show it to us.  What
25       I'm saying is that they didn't show us that video
```



```
 1      that day.  And even when we went with the police

 2      there, even then they didn't want to show us the

 3      video.

 4  BY MS. KARRON:

 5      Q.   Yes, that is true because the video contained

 6  other students and is private and cannot be released.

 7  I'm going to show you the police report.

 8           MR. MACDONALD:  Object to form.

 9           (Defendant's Exhibit B was marked for

10  identification.)

11  BY MS. KARRON:

12      Q.   I'm showing you what I'm marking as Exhibit B.

13  You can look at this yourself or have the interpreter

14  interpret it for you.  This report is dated January 25,

15  2023, and it says that an incident occurred from January

16  20, 2023.

17           Do you see that?

18      A.   Yes.

19      Q.   And on section one here, it says, Reporting

20  person, ██████████████.

21           Is that you?

22      A.   Yes.

23      Q.   Okay.  And let's scroll down to the details.

24  And I am going to read it and ask you a question, and

25  then you can translate from what I'm reading.  It
```



1  says -- this is the narrative.  It says, I was

2  dispatched to incident address, Academir Preschool, 2636

3  Southwest 144th Avenue in reference to information.

4  Reporting person, ▮▮▮▮▮▮▮▮▮ is the father of

5  other, ▮▮▮▮▮▮   Other, Bello, Susie is the

6  principal of Academir School.

7         Upon arrival, contact was made with reporting

8  person, ▮▮▮▮▮▮▮ who stated his daughter,

9  other, ▮▮▮▮▮▮ is having issues with another

10 unknown male student, other unknown, and wanted the

11 unknown male removed from the class.  Reporting person,

12 ▮▮▮▮▮▮▮ stated he already spoke with the

13 principal, Bello, Susie about his concerns.  Reporting

14 person, ▮▮▮▮▮▮▮▮ further stated he was told he

15 could remove his daughter from the class or the school,

16 and he would like to do so.

17         So in that report that was just read to you,

18 was there anything about your daughter being touched

19 stated in there?

20         MR. MACDONALD:  Objection, form.

21         MS. KARRON:  What's wrong with the form?

22         MR. MACDONALD:  It's argumentive.

23         MS. KARRON:  Okay.  That's not an objection.

24     What is wrong with the form?  I'm asking him where

25     in there it says that she was touched or if he



```
 1      touched her.
 2          MR. MACDONALD:  You're welcome to proceed with
 3      the question, but it's argumentative.
 4          MS. KARRON:  Well, let's ask my argumentative
 5      question again, please.
 6          (The previous question was read back.)
 7          MR. MACDONALD:  Same objection.
 8          THE WITNESS:  May I speak?
 9  BY MS. KARRON:
10      Q.   Every time I ask a question, you can answer
11  unless your attorney says, Don't answer.
12      A.   Okay.  So that right there is the police
13  report.  Now, on the camera that the police officer has,
14  he took a video with that camera.  I'm talking about the
15  cameras that police officer have with them in front.
16  Now, on that video recording taken from the police
17  officer's camera, you can see there that I guess a full
18  detailed explanation of everything I explained to the
19  police officer, how it was that that boy had touched my
20  daughter in class, in the classroom.  And if you want to
21  see that video, you can look for it yourself, and you
22  can watch that video where I explained everything in
23  full detail.
24          Now, why it is the police officer decided to
25  write such a superficial report, that I do not know.  I
```



1  can't answer that.  What I do know is that in that video

2  you can see how I do give an in-detail explanation of

3  everything that had occurred, and I also mentioned the

4  problem that my daughter had encountered.  I mention in

5  that recording how it was that the school had denied

6  what had occurred.

7        In that same recording, you can see that I want

8  to see that video.  I want to see the recording from the

9  school cameras to know what occurred, and that if

10  something did indeed occur, I wanted that boy to be

11  removed from the class.  Now, that morning, the

12  principal from the school told me that if I didn't like

13  the school policies then I could go ahead and remove my

14  daughter and take her over to a different school.

15     Q.   Did the police offer to conduct an

16  investigation?

17     A.   I don't remember but all that occurred was that

18  we filed a report, and that was it.

19     Q.   Isn't it true that you told the police is all

20  you wanted was to see the cameras and have the boy

21  removed from the school?

22     A.   I wanted to see the cameras, and what I wanted

23  is if in those cameras that that was true, that what I

24  wanted was that boy to be removed from the classroom,

25  not from the school.



1    Q.   And did you decline for the police to have an

2  investigation launched?

3    A.   I don't remember.

4    Q.   Did the police tell you that the only way to

5  see the video would be if an investigation was launched

6  and a detective became involved?

7    A.   It's not clear to me, but the police officer

8  was always like telling me in this manner.  He would

9  always just tell me, Oh, this is something that is

10  normal.  Nothing happened here.  This is a very simple

11  affair, very superficial, which you can see yourself in

12  the final police report.

13    Q.   Okay.  So you believe that the police told you

14  that this was normal and nothing happened.

15        Is that your testimony?

16        MR. MACDONALD:  Objection, form.

17        MS. KARRON:  What's wrong with the form?

18        MR. MACDONALD:  It's argumentative and

19     mischaracterizes his testimony.

20        MS. KARRON:  We can read back his testimony if

21     you'd like.  Can you read it back, court reporter,

22     so we're not mischaracterizing anything?

23        (The previous answer was read back.)

24  BY MS. KARRON:

25    Q.   So I'll repeat my question so we're not



1   mischaracterizing testimony.

2          Did you or did you not just testify that the

3   police told you that this was something normal and

4   nothing happened here?

5          MR. MACDONALD:  Objection, form.

6          THE WITNESS:  The police tried to address it as

7      simply as possible.  In the police report, they

8      never mention sexual harassment.  The police didn't

9      mention sexual harassment which was the main reason

10     I called the police.  It was because of the sexual

11     harassment.  So why is it that sexual harassment is

12     not included in the report?  Why is it that instead

13     they just use the term issue instead of what it was,

14     sexual harassment, the reason why the dad called

15     them in the first place?

16  BY MS. KARRON:

17     Q.   So you testified the police told you that it

18  was normal and nothing happened.  I'm going to show you

19  now the video, and you can tell me where you hear the

20  police say that.  And I'm not sure that needs to be

21  translated to English because you're speaking in

22  English, but I don't have a preference.

23         MR. MACDONALD:  Objection, form.  And you're

24     welcome to show the video in certain parts, but I'm

25     going to object to any questions that you ask in



1   which the video is in English.

2       MS. KARRON:  He gave the testimony to the

3   police in English, so you can object to them too,

4   but we're going to play it.

5       MR. MACDONALD:  Okay.  You're welcome to play

6   it, but I'm going to object to the line of

7   questioning.  We have a translator here that --

8       MS. KARRON:  Well, the translator can translate

9   the video.  You can't have it both ways, Kyle.

10  We'll either translate the video or we won't, but

11  you're not objecting about it coming in.  So however

12  you want to do, you let me know.

13      MR. MACDONALD:  Again, if you want to do

14  certain parts and have it translated by the

15  translator, we're willing to do that.  I'm saying

16  for the entire video --

17      MS. KARRON:  He spoke to the police in English.

18  He didn't speak in Spanish to the police.

19      MR. MACDONALD:  Correct, right.  But for

20  example, what if the police are saying something

21  that he's not understanding what he's saying.

22  That's why a translator is here.

23      MS. KARRON:  We'll go ahead and translate it

24  back then.  Let me get the video if I can make it

25  play.  My computer is not responding.  It's going to



```
 1      take a minute.
 2           MR. MACDONALD:  Do you mind if we take a break
 3      while you get that set up?
 4           MS. KARRON:  Yeah, go ahead.
 5           (A break was had.)
 6  BY MS. KARRON:
 7      Q.   Are you able to see my screen?
 8           MS. MARHEFKA:  We can't hear it or see it.  I
 9      can try and play it on mine.
10           MS. KARRON:  I think it'S at 13:06.
11           (A video was played.)
12           MS. KARRON:  Can you pause, Julie?
13           THE INTERPRETER:  For the interpreter, I
14      apologize, but I only will be able to translate some
15      portions of what was said just because there is some
16      voice of a woman speaking at the same time, and it's
17      very confusing.  So I can't hear what the police
18      officer is saying.
19           MS. MARHEFKA:  So maybe it's helpful to ask him
20      a question, and then we can replay if he wants to
21      hear it again.
22  BY MS. KARRON:
23      Q.   Sir, did you hear the police in that interview
24  offer to conduct an investigation?
25           MR. MACDONALD:  Objection on the grounds that's
```



```
 1        not translated.
 2             MS. KARRON:  We're going to translate if he
 3        needs it.
 4             MR. MACDONALD:  Same objection.
 5             THE WITNESS:  On that video, I can't even hear
 6        my own voice properly.  However, please remember
 7        that even if I did speak in English in that video,
 8        my native tongue, my main tongue, is Spanish.  And
 9        on that day, I had to do all of that, all of the
10        filing of that report in English.  I had to hold
11        that conversation for filing the report for an hour
12        or perhaps even over an hour because the officer did
13        not speak Spanish.
14   BY MS. KARRON:
15        Q.   Did you request to speak to a Spanish speaking
16   officer and give the report in Spanish?
17        A.   On that day, I only spoke in English with them.
18        Q.   Did you request -- my question was did you
19   request a Spanish speaking officer or to give the report
20   in Spanish?
21        A.   No.
22        Q.   Okay.  And toward the end of the video, you
23   were telling the police that there were prior incidents
24   with this boy?
25             MR. MACDONALD:  Same objection concerning the
```



```
1      language.
2  BY MS. KARRON:
3      Q.   Do you recall telling the police that there
4  were prior incidents with the same child, ████████
5      A.   Before that day, about talking about that
6  specific type of incident, I'm talking about sexual
7  harassment type of incidents that had never occurred
8  before then.  Now, maybe yes for other things.  That boy
9  wasn't really considered the best kid in class, but I
10 don't remember.  It could be that there were other
11 incidents with this same kid just not sexual harassment,
12 the other type of incident, but not the type of sexual
13 harassment.
14     Q.   When I asked you earlier, did you not testify
15 that there were no prior issues with this child?
16     A.   Not sexual harassment.
17     Q.   I asked you if there were any issues with the
18 child, and you told me there were no prior issues.
19          Were you telling the truth then, or are you
20 telling the truth now?
21          MR. MACDONALD:  Objection, form.
22          THE WITNESS:  As I was saying, I previously
23      answered no because I thought that you were
24      referring to sexual harassment or referring to what
25      had happened on that day or referring to something
```



```
 1      similar to what had happened on that day.
 2  BY MS. KARRON:
 3      Q.   So would you like to now change your testimony
 4  that there were other incidents with the same child?
 5           MR. MACDONALD:  Objection, form.
 6      Argumentative.
 7           THE WITNESS:  I'm not changing my testimony.
 8      What I'm saying is that not with this kid, not with
 9      any other kid had we previously had this type of
10      problem.
11           MS. KARRON:  Court reporter, can we go back if
12      I can narrow down where it was.  It would be around
13      the questions I asked, have you or your child had
14      any previous issues with the school?  Can you search
15      for that?
16           THE COURT REPORTER:  Give me just one second.
17           (A previous question and answer were read
18  back.)
19           MS. KARRON:  Thank you.  Now, Julie, can we
20      play the video, and then we can stop and interpret?
21           MS. MARHEFKA:  I'm going to press play.  It's
22      at 14:25.  Let me know if there is any issues.
23           (Video playing.)
24           MS. KARRON:  Pause, Julie.  I guess,
25      interpreter, if you could just interpret what you
```



```
 1      recall from that, and we can rewind if you need.
 2           THE INTERPRETER:  I'll interpret what I was
 3      able to hear.
 4 BY MS. KARRON:
 5      Q.   Is there anything, sir, that you need me to
 6 replay, or did you understand what the interpreter just
 7 said?
 8      A.   Yes, I understood her.
 9           MR. MACDONALD:  Same objection regarding the
10      language.
11           MS. KARRON:  She interpreted it.  What is your
12      objection?
13           MR. MACDONALD:  She said she interpreted what
14      she could hear, and that she was having trouble
15      hearing all of it.  I object on the grounds that he
16      is not able to hear it.
17           MS. KARRON:  Isn't it the same fundamental
18      fairness where you played the whole video when I
19      asked you to, or when you only played the parts that
20      showed what you wanted?
21           MR. MACDONALD:  I don't know anything of that
22      is necessary, Julie.  Continue with your
23      questioning.
24           MS. KARRON:  Let's go to section 20 minutes and
25      50 seconds, Julie.
```



```
 1            (Video playing.)
 2            MS. KARRON:  Pause.  Maybe just rewind a tiny
 3       bit further and play again, and I'll have them
 4       translate that question and answer so there is no
 5       confusion on fundamental fairness issues.
 6            (Video playing.)
 7            MR. KARRON:  Pause.
 8  BY MS. KARRON:
 9       Q.   Sir, what did you understand that question that
10  you were asked to mean?
11       A.   I don't remember.  I would have to watch
12  everything that is said before that on that same video.
13       Q.   You would have to watch everything to what?
14       A.   All of the conversation so I can know what it
15  was that I was talking about then because we were -- we
16  held that conversation for more than an hour.
17       Q.   All right.  Let's go to -- hold on.  Do you
18  remember telling the police that you didn't want your
19  daughter moved to another classroom because you didn't
20  want her to feel guilty?
21       A.   Yes.
22       Q.   Did you feel guilty about moving your daughter
23  to a different school?
24            MR. MACDONALD:  Objection, form.
25  BY MS. KARRON:
```



```
 1      Q.   Were you worried about your daughter being

 2 moved to a different school that that would be worse

 3 than moving her to a different class?

 4           MR. MACDONALD:  Objection, form.

 5           THE WITNESS:  Yes, we were concerned.

 6           MS. KARRON:  Okay.  Can you play 32 minutes?

 7           (Video playing.)

 8           MS. KARRON:  Can you please go back just to the

 9      last statement that he made, the last answer that he

10      gave in the video for just maybe 20 seconds or ten

11      seconds?

12           (Video playing.)

13 BY MS. KARRON:

14      Q.   In that clip of the interview that you heard,

15 did you hear the police ask to confirm what you were

16 looking for them to do?

17      A.   Yes.  I don't remember exactly how each and

18 every moment occurred, but I do know -- I do remember

19 that I told them -- I told the police that what I wanted

20 to see were the cameras.  I wanted to see the cameras.

21 And if in the cameras something indeed had occurred as

22 my daughter stated that it had occurred, then I wanted

23 that boy to be changed over to a different classroom.

24           Now, the police then went inside the school,

25 and I believe that they spoke to the principal, and I
```



1  don't remember who else they spoke with inside the

2  school while they were there.  I stayed parked outside.

3  I was maybe one to two blocks away from the school

4  waiting outside.  When they finally came out from the

5  school, they headed over to where I was at, and they

6  told me that the school had not approved showing the

7  recording, the camera recordings.  So they asked me, Do

8  you want to file a report?  And I said, Yes, I want to

9  file a report because they didn't want to show the

10  cameras.  That was it.

11        MS. KARRON:  Move to strike as nonresponsive.

12     Court reporter, can you read back my question?

13        (The previous question was read back.)

14        MR. MACDONALD:  Objection, form.

15        MS. KARRON:  What's wrong with the form?

16        MR. MACDONALD:  Asked and answered.

17        MS. KARRON:  That wasn't an answer.  I heard

18     five minutes of nonresponsive answers.  We can read

19     it back if you want to.

20        MR. MACDONALD:  That's your position, Julie.

21        MS. KARRON:  What's the answer?

22        MR. MACDONALD:  You can ask it again.

23        MS. KARRON:  Court reporter, can you read the

24     question again?

25        (The previous question was read back.)



```
 1            MR. MACDONALD:  Same objection.
 2            THE WITNESS:  Yes.
 3  BY MS. KARRON:
 4     Q.   Okay.  And did you tell them that you wanted
 5  them to launch an investigation at any time?
 6     A.   I don't remember.
 7            MS. KARRON:  Julie, can you play 36 minutes?
 8            (Video playing.)
 9            MS. KARRON:  Can you interpret that?
10  BY MS. KARRON:
11     Q.   Based on what you just heard, do you agree that
12  the reason the police wrote the report saying you wanted
13  the boy removed and there were issues from the school is
14  because that is what you agreed should be in the report
15  just now that we heard?
16            MR. MACDONALD:  Objection, form.
17            THE WITNESS:  Could you repeat the question?
18            MS. KARRON:  Yeah.  Can you read it back?
19            (The previous question was read back.)
20            MR. MACDONALD:  Same objection.
21            THE WITNESS:  I don't remember having spoken to
22        the police about anything about what was going to be
23        written on the report.
24            MS. MARHEFKA:  I think if you mute while he's
25        talking there will be less echo for the interpreter.
```



```
 1              MR. MACDONALD:  Okay.  Noted.
 2              THE WITNESS:  I was even expecting the report
 3         would show the reason I was calling the police in
 4         the first place which the reason that I was calling
 5         them because my girl had suffered from physical
 6         harassment from a kid in her class and because the
 7         school was hiding all of this.  That is why I wanted
 8         to speak to the police about the school.  That is
 9         why I went to speak to the school, and that is why I
10         wanted to see those videos and I wanted that boy
11         removed from the class not from the school.  I just
12         wanted him to be removed from the class, and that is
13         why I contacted the police.
14    BY MS. KARRON:
15         Q.   Isn't it true that you declined the police's
16    offer to have a formal investigation with a detective?
17              MR. MACDONALD:  Objection, form.
18              THE WITNESS:  I don't remember having declined
19         an offer.  And if I did, I just don't remember.
20         What I do remember is that they told me, If you
21         would like for us, we can go speak with the
22         principal and we can speak to the people from the
23         school and they can show us the cameras so we can
24         know what it was that happened and if something
25         didn't happen or if something did happen.  And they
```



```
 1      changed the boy over to a different class then we
 2      don't file a report, and I said, Okay.  But what
 3      happened was that they didn't -- they didn't show
 4      that.  So that's why the report was made, and that's
 5      all I remember.
 6   BY MS. KARRON:
 7      Q.   And after the school would not allow the police
 8   to show you the video, did you continue to make any
 9   further police reports?
10      A.   Yes.  Afterwards I did tell them to make the
11   report.
12      Q.   Did you make any other reports after you
13   received -- or did you make any other reports after this
14   report on January 25th of 2023?
15      A.   No.
16      Q.   Okay.  So the first report to the school was
17   January 20th, and the first report to the police was
18   January 25th.  In the time between January 20th and
19   January 25th, had you already talked to a lawyer?  And I
20   don't want to know what your lawyer told you.  I just
21   want to know if you had already talked to a lawyer.
22      A.   My wife and me had agreed on contacting an
23   attorney, but the one contacted and called an attorney
24   was my wife.  I don't remember the exact date for that.
25          MS. KARRON:  Julie, can you play at 20 minutes
```



```
 1     and 50 seconds, please?

 2          (Video playing.)

 3          MS. KARRON:  Okay.  You can pause.

 4   BY MS. KARRON:

 5     Q.   So on January 25, 2023, you just told the

 6   police in the video we saw that you were talking to your

 7   attorney today.

 8          Is that true or not true?

 9          MR. MACDONALD:  So I just want to instruct him,

10      he can answer the question but not to reveal any

11      communications that you may have had with an

12      attorney.

13          MS. KARRON:  So I would like to give a caveat

14      that he waived the privilege at that moment when he

15      disclosed what he spoke to his attorney about, and

16      we just heard it.

17          MR. MACDONALD:  He did not waive privilege, and

18      I'm going to instruct him not to answer.

19          MS. KARRON:  We can play it again, but I know

20      that he said he talked to -- his attorney told him

21      he could sue the school and, it could be a federal

22      civil rights case.  We can play it again if you need

23      to hear it again.

24          MR. MACDONALD:  And you don't know who he was

25      talking to and --
```



```
 1           MS. KARRON:  I'm not asking him -- okay.  I
 2      want to know about -- what was my last question?
 3      Did he talk to an attorney that day, yes or no?
 4           THE WITNESS:  Yes, but the attorneys, they were
 5      not the attorneys that we currently have.  As I said
 6      before, I work in IT; but while working in IT, I
 7      worked for attorney companies before.  So the one
 8      who I called was an attorney friend of mine, and I
 9      asked him about it.
10  BY MS. KARRON:
11      Q.   Okay.  Did you take your daughter to any type
12  of doctor or mental health professional before you
13  talked to a lawyer?
14      A.   No.
15      Q.   Okay.  Did you or anyone on your daughter's
16  behalf ever file a document or written electronic
17  submission making a formal complaint of sexual
18  harassment to Academir?
19           MR. MACDONALD:  Objection to form.
20           THE WITNESS:  When you say you, are you
21      referring to my wife and myself?
22  BY MS. KARRON:
23      Q.   Yes, or anyone else on behalf of your daughter.
24           MR. MACDONALD:  Same objection.
25           THE WITNESS:  Only that we filed with our
```



```
 1      current attorney.
 2  BY MS. KARRON:
 3      Q.   So is it true that you never made a written,
 4  formal, signed complaint alleging sexual harassment at
 5  Academir?
 6           MR. MACDONALD:  Objection, form.
 7           MS. KARRON:  What's wrong with the form?
 8           MR. MACDONALD:  It's misleading when you say a
 9      formal complaint.  It lacks a foundation for the
10      final question.
11           MS. KARRON:  Let me lay some foundation and ask
12      you to translate this for me.
13  BY MS. KARRON:
14      Q.   According to the Title Nine Policies and
15  Procedures of Miami-Dade County, a formal complaint of
16  sexual harassment requires that a document must be filed
17  by a complainant by a document or an electronic
18  submission that contains the complaint in physical or
19  digital signature or otherwise indicates that the
20  complainant is the person filing the formal complaint.
21  And I can read that again if you need to.
22           Was that ever done by you or anyone on your
23  daughter's behalf?
24      A.   No.
25           MR. MACDONALD:  Same objection.
```



```
 1  BY MS. KARRON:
 2      Q.   What do you think that Academir could have done
 3  differently in this case?
 4      A.   Saying the truth.
 5      Q.   Which truth?
 6      A.   What our girl told us.
 7      Q.   What your girl told the four adults at the
 8  school, or what your girl continued to say over time?
 9  Which one?
10          MR. MACDONALD:  Objection, form.
11      Argumentative.
12          THE WITNESS:  What my daughter said -- what my
13      daughter told us, what my daughter told us, the
14      parents, what my daughter told the DCF agent, what
15      my daughter told the psychiatrist, and what my
16      daughter keeps saying even to this day because she
17      has not forgotten about it.
18  BY MS. KARRON:
19      Q.   Do you have any evidence that your daughter was
20  physically touched other than what one of her stories
21  was?
22          MR. MACDONALD:  Objection, form.
23      Argumentative.
24          THE WITNESS:  No.
25  BY MS. KARRON:
```



1    Q.   At the time of the sexual incident, did your

2  daughter know the difference between telling the truth

3  and telling a lie?

4         MR. MACDONALD:  Objection, form.

5         THE WITNESS:  Can I answer?

6  BY MS. KARRON:

7    Q.   You ask answer every single question.  You

8  don't have to ask your attorney if you can answer.

9    A.   Yes, she does know what a lie is versus what

10  the truth is because mom and dad have taught her -- all

11  the way until she was five years old until now have

12  taught her to speak the truth always, and that is the

13  same reason why we're taking this case all the way to

14  the end because we believe in her.  She's a girl that

15  always speaks the truth.  Now, we used to trust the

16  school until we realized that they were lying.

17  BY MS. KARRON:

18    Q.   If your daughter always speaks the truths then

19  why did she tell a different story to four adults at the

20  school?

21         MR. MACDONALD:  Objection, form.  Argumentive,

22     and harassing.

23         MS. KARRON:  She's an opposing side.  This is

24     not about argumentative.  He is an adverse witness.

25         MR. MACDONALD:  Same objection.



```
 1          THE WITNESS:  I don't know what it was that she
 2     told the school.  What I do know is what she spoke
 3     to people in front of me, what I, myself, heard.
 4     Why would I believe what the school says that that's
 5     what they spoke about with her when the reason why I
 6     decided to take her out of the school is because she
 7     would always speak about what had occurred to her?
 8     So why would it be any different what she told them
 9     to what she told us immediately after what she told
10     the psychiatrist?  Why would it be different than
11     what she told the person from DCF right there in the
12     room next to me?  How would it be any different than
13     what she told mom and dad in the record?
14  BY MS. KARRON:
15     Q.   You keep talking about the psychiatrist, but
16  that's an expert that was hired -- or a purported expert
17  that was hired by your attorney who talked to your
18  daughter months after the incident.  I'm talking about
19  people that talked to your daughter immediately after
20  the incident was alleged.
21          Are you aware that your daughter's former
22  kindergarten teacher, Ms. Chaudry, testified that your
23  daughter clearly stated to her that it was only a verbal
24  comment and told her that no one touched her?
25          MR. MACDONALD:  Objection, form.
```



```
 1            THE WITNESS:  Over the course of those same
 2       days, she spoke with mom and dad, and she also spoke
 3       with DCF.  We, ourselves, are not experts, and she
 4       always spoke the truth.
 5  BY MS. KARRON:
 6       Q.   Was she speaking the truth to Ms. Chaudry when
 7  she told her that nobody touched her?
 8            MR. MACDONALD:  Objection, form.
 9            THE WITNESS:  I don't know what it was that she
10       told Ms. Chaudry.  What I do know is what she told
11       mom and dad, and I trust in her truth.  She told us
12       her truth.  The truth that I have kept hearing, the
13       truth that she's always repeated again and again.
14       What we believe is that the school wanted to hide
15       everything, that the school even attempted which on
16       several occasions which is why we ended up changing
17       her to a different school.
18            They attempted to talk to her again and again
19       about the same subject to try and make her change
20       her perspective even when we asked the school to
21       stop talking about the subject with her.  They still
22       kept talking to her about it which is why we ended
23       up removing her from the school.
24  BY MS. KARRON:
25       Q.   When did you ask the school to stop speaking to
```



```
 1  your daughter about it?

 2      A.   My wife was the one who did it.  It was over

 3  the course of those days.  I don't remember.

 4      Q.   Isn't it true that Ms. Ruiz, the school

 5  counselor, interviewed both your daughter and ▮▮▮▮ and

 6  that occurred before anyone spoke to the school about

 7  not speaking to your daughter?

 8           MR. MACDONALD:  Objection, form.

 9           THE WITNESS:  Yes, but Ms. Ruiz spoke to her --

10      spoke with her about it again after that too after

11      that.  Even after that we had already asked her not

12      to do that because Ms. Ruiz later on called my wife

13      and told my wife that she had spoken about the

14      subject with our daughter again, and my wife told

15      her -- told her that she had already asked her not

16      to talk about the subject with her again.

17  BY MS. KARRON:

18      Q.   Was that before or after you went screaming at

19  the school and called Ms. Valladares a cunt?

20           MR. MACDONALD:  Objection, form.  Argumentive,

21      harassing.

22           MS. KARRON:  Okay.

23           THE WITNESS:  Could you repeat it again?

24  BY MS. KARRON:

25      Q.   Yeah.  Did you go to the school screaming and
```



```
 1  call Ms. Valladares, the assistant principal, a cunt in
 2  front of students?
 3            MR. MACDONALD:  Object to form.
 4            THE WITNESS:  That never occurred.  That's a
 5       lie.
 6  BY MS. KARRON:
 7       Q.  You never went to the school and cursed in
 8  front of children and yelled?
 9       A.  No.
10       Q.  And if witnesses said they heard you, then
11  everybody's lying and not you?
12            MR. MACDONALD:  Objection, form.
13            THE WITNESS:  They're lying.
14  BY MS. KARRON:
15       Q.  Everybody is lying in this case.  The teachers
16  are all lying, the teachers that don't work there
17  anymore, right, and the school teacher that doesn't work
18  there anymore, Ms. Chaudry, she must be lying in order
19  for this to be true.  And the counselor that doesn't
20  work there anymore must also be lying and also the PE
21  teacher that doesn't work there anymore.  According to
22  you, everyone has to be lying except for your daughter
23  and you; is that right?
24            MR. MACDONALD:  Objection, form.  That's
25       argumentative, harassing, and --
```



```
 1            MS. KARRON:  Hold on.  No speaking objections.
 2            MR. MACDONALD:  Please let me finish my
 3       objection.
 4            MS. KARRON:  Form.  You can say, Form.
 5            MR. MACDONALD:  Please let me finish my
 6       objection.
 7            MS. KARRON:  Your objection is improper.
 8       You're trying to lead your witness into talking.
 9            MR. MACDONALD:  Again, I would like to finish
10       my objection.
11            MS. KARRON:  Your objection is form.  It's
12       noted.
13            MR. MACDONALD:  Again, I would like to finish
14       my objection.  It assumes facts not in evidence, and
15       it mischaracterizes his testimony.
16  BY MS. KARRON:
17       Q.   You can answer the question.
18       A.   Not everyone is lying, but what my girl told us
19  is not a lie.  What she told DCF is not a lie.  What my
20  girl told the psychiatrist is not a lie.
21       Q.   Isn't it true that you influenced your
22  daughter's testimony by you or your wife asking her
23  leading questions that you weren't trained to ask and
24  creating false memories and only then did her story
25  evolve over time and change?
```



```
 1            THE INTERPRETER:  Counsel, please repeat the
 2       question.
 3            MS. KARRON:  Isn't it true that -- court
 4       reporter, can you read it back?  I don't remember.
 5            (The previous question was read back.)
 6            MR. MACDONALD:  Objection, form.  Harassing.
 7            THE WITNESS:  The fact that our daughter spoke
 8       the truth is not her being influenced.  The fact
 9       that when she was asked what happened she told the
10       full truth.  It's not her being influenced.  She is
11       not -- she was not being influenced.  No one
12       influenced anyone else.  And we, as parents, are
13       very saddened by this.
14  BY MS. KARRON:
15       Q.  If you believe that your daughter was sexually
16  touched, then why did you tell the police on January
17  25th, just a few days later, that you just wanted to see
18  the video to know the truth?
19            MR. MACDONALD:  Objection, form.
20       Mischaracterizes testimony.
21            THE WITNESS:  We had put our trust in the
22       school, and we just wanted them to show us the
23       cameras.  That's what we wanted.
24  BY MS. KARRON:
25       Q.  Okay.  And if the school showed you the cameras
```



```
 1  and the cameras didn't show you anything, what would
 2  that have changed?
 3          MR. MACDONALD:  Objection, form.  Asked and
 4      answered.
 5          THE WITNESS:  If the day the police went there,
 6      if the police, by them going there, if they had
 7      allowed to show the cameras, then if they had
 8      authorized that and if by doing that the cameras had
 9      not shown anything on them, then we wouldn't have
10      done anything about this.  But they did not show
11      those cameras, and they did not agree to change that
12      boy over to a different class.  And I'm talking
13      about changing him to a different class, not to a
14      different school.  They did nothing, and the only
15      thing that they told us is if we didn't like the
16      school then we could go ahead and change our
17      daughter to a different one.
18  BY MS. KARRON:
19      Q.   And if the eight hours of video surveillance
20  show that no bit of clothes were removed and no one was
21  licked or touched, do you agree that this could be a
22  mistake by your daughter?
23          MR. MACDONALD:  Objection, form.
24          THE WITNESS:  My daughter always speaks the
25      truth.  She always told us the truth.  And in
```



```
 1        addition to that, how would we know exactly on which
 2        day it occurred?  How would we know that they didn't
 3        modify what's being -- the information being shown
 4        on the cameras?
 5   BY MS. KARRON:
 6        Q.   Okay.  So now you believe that if the videos
 7   don't show what you're saying that the cameras were
 8   modified?  Is that what you're saying?
 9             MR. MACDONALD:  Objection, form.
10        Argumentative.
11             THE WITNESS:  What I believe is that we do not
12        trust the school because they have hidden the truth
13        from us because they denied -- because they didn't
14        want to show us the cameras.  Even when we went
15        there with the police they didn't want to show the
16        cameras then, and when we spoke with the professors
17        there the only option that they gave us was just to
18        change our daughter over to a different school.
19        This whole situation has proven very difficult for
20        mom and dad in addition to our little girl because
21        we have to change her over to a different school
22        because after all everything that happened.
23             MR. MACDONALD:  Whenever you finish your line
24        of questioning, can we take a break, please?
25   BY MS. KARRON:
```



```
 1     Q.   Didn't you tell the police that the school
 2  offered to move your daughter to a different classroom
 3  within the school?
 4     A.   I don't remember, but I know that Susie Bello
 5  who I spoke with over the phone, what she told us was
 6  that if we didn't like the school's policy then we could
 7  just go ahead and change our girl over to a different
 8  school.  That's what she told us, and that's what we had
 9  to do.
10     Q.   How many medical professionals did you take
11  your daughter to see before you called the police and
12  contacted a lawyer?
13     A.   None.
14          MS. KARRON:  All right.  You can go ahead and
15      take a break now, Kyle.
16          (A break was had.)
17  BY MS. KARRON:
18     Q.   Do you believe that the police discouraged you
19  from requesting an investigation in any way?
20     A.   The police were very -- they were very passive.
21  In reality, they told me that we could just speak --
22  they told me that at first we could just speak about it.
23  And then when -- after that, I remember that the female
24  officer then told me that because of how it came to be
25  that the only option that I had was to open an
```



1   investigation.

2      Q.   And did you open an investigation?

3      A.   Well, not an investigation.  I'm talking about

4   opening and making the police report.  I really don't

5   know much when it comes to the police terminology.  They

6   just told me, Do you want to open a report?  And I said,

7   Yes, let's do the report.

8      Q.   Well, we'll let the video speak for itself

9   about what you said, and what they said.

10          Are you aware of what efforts Academir took to

11  address the behavior of ███████

12          MR. MACDONALD:  Objection, form.

13          THE WITNESS:  No.

14  BY MS. KARRON:

15     Q.   So you don't know one way or the other whether

16  they disciplined him or gave him a referral that's in

17  his permanent record?

18          MR. MACDONALD:  Objection, form.

19          THE WITNESS:  No.

20  BY MS. KARRON:

21     Q.   Have you ever discussed concerns about

22  supervision or safety with the school administration at

23  any time?

24     A.   We did pull the conversation with the school in

25  regards to our daughter, not in regards to the school



1  safety.

2      Q.   Are you aware that the school supervises

3  students -- at all times, students are never left

4  without an adult?

5          MR. MACDONALD:  Objection, form.

6          THE WITNESS:  We had to take our daughter over

7      to a different school.  I'm not aware of anything in

8      regards to what's going on at the school.

9  BY MS. KARRON:

10     Q.   You sent your daughter back to school the

11 Tuesday after the incident, didn't you?

12     A.   Yes.  She went to school with us.

13     Q.   She went to school and stayed through the after

14 care on Tuesday, didn't she?

15     A.   Yes.

16     Q.   And you weren't concerned about her safety,

17 were you?

18         MR. MACDONALD:  Objection to form.

19         THE WITNESS:  That day we went to the school

20     together with our daughter.  She stayed at school

21     while mom and dad were trying to clarify the

22     situation with the school.  Now, I don't remember if

23     it was by the next day, but I do remember that she

24     went to school, but I do remember that the reason we

25     removed our daughter from the school and changed her



```
1        to a different one was because of Ms. Ruiz'
2        insistence on speaking with our daughter about that
3        subject despite us already asking of her not to
4        speak about the subject with her again.
5   BY MS. KARRON:
6        Q.   Since the time of the sexual incident, what
7   professionals has your daughter seen?  Not talking about
8   the expert your attorney hired that you went to see in
9   Tampa, what professionals have you taken your daughter
10  to see?
11       A.   We're trying for our daughter to forget what
12  happened.
13       Q.   So is the answer that you haven't taken your
14  daughter to see a psychiatrist or a psychologist or any
15  other professional?
16       A.   No.
17       Q.   Do you have any evidence that Academir's
18  handling of the incident had anything to do with your
19  daughter's gender?
20            MR. MACDONALD:  Objection, form.  Calls for a
21       legal conclusion.
22            THE WITNESS:  No.
23  BY MS. KARRON:
24       Q.   Has your child had any behavioral issues or
25  issues with her grades in school as a result of the
```



1  sexual incident?

2      A.   She's always had good grades.  Now, whenever

3  she hears the word bully, whenever she hears the word

4  bully mentioned, she remembers that.  And she not only

5  remembers that without her parents, she also remembers

6  it when she is speaking with her little friends' parents

7  or when it's mentioned at school.

8      Q.   Has your daughter had a decline in her grades

9  since she has been at Kendale Lakes Elementary?

10      A.   No.

11      Q.   Is your child experiencing any behavioral

12  issues?

13          MR. MACDONALD:  Objection, form.

14          THE WITNESS:  No.

15  BY MS. KARRON:

16      Q.   Did you meet with Dr. Gregory Iannuzzi, the

17  expert, in Tampa?  Did you personally speak with him?

18      A.   Yes.

19      Q.   How many times did you speak with him?

20      A.   Twice:  Once before getting there, and the

21  second time was we met there in person.

22      Q.   And what did you discuss with him when you

23  spoke with him before the interview?

24      A.   Before the interview, we spoke -- I believe it

25  was only about the date in which we were meeting, and I



1  think that was it.  I don't remember.

2     Q.   And did you hear the interview as your daughter

3  was giving it to the Dr. Iannuzzi?

4     A.   Yes.

5     Q.   And do you believe that your daughter said

6  anything to the expert about being touched while in her

7  classroom?

8          MR. MACDONALD:  Objection, form.

9          THE WITNESS:  Yes.

10  BY MS. KARRON:

11     Q.   And you also believe that she told him that

12  something happened to her in the classroom under the

13  table?

14     A.   Yes.

15     Q.   Her story was consistent with everyone she

16  talked to, right?

17          MR. MACDONALD:  Objection, form.

18     Argumentative.

19          THE WITNESS:  I don't understand the question.

20  BY MS. KARRON:

21     Q.   If I have you -- so you told me that you were

22  present during your daughter's interview with the

23  therapist.

24     A.   Yes.

25     Q.   So if the transcripts of that interview didn't

 1  say anything about the classroom or under the table from

 2  your daughter, what would be your response?

 3          MR. MACDONALD:  Objection to form.

 4          THE WITNESS:  I don't remember the transcript,

 5      but she did mention that to him during the day of

 6      the interview.

 7  BY MS. KARRON:

 8      Q.   Are there any relatives of your daughter that

 9  still go to Academir?

10      A.   Her cousins.

11      Q.   Do her cousins have any problems at the school

12  that you know of?

13      A.   No.

14      Q.   What's your understanding of the term sexual

15  harassment that you kept using throughout the

16  deposition?

17      A.   When someone touches or does something sexual,

18  does something of a sexual nature to you without your

19  consent.

20      Q.   And can sexual harassment, by your definition,

21  happen only one time?

22      A.   Well, she told Dr. Iannuzzi that that had

23  occurred on more than one occasion, and she said the

24  same thing to DCF.

25      Q.   After this incident, the sexual incident, how



```
 1  was your daughter exposed to future potential harm?
 2         MR. MACDONALD:  Objection, form.  Legal
 3     conclusion.
 4         THE WITNESS:  Repeat the question.
 5         MS. KARRON:  Court reporter?
 6         (The previous question was read back.)
 7         MR. MACDONALD:  Same objection.
 8         THE WITNESS:  Our daughter has never been
 9     exposed.  We have always taken care of her, and that
10     is what we were expecting would be the case when she
11     was inside Academir.
12  BY MS. KARRON:
13     Q.  Do you know what the results of the DCF
14  investigation was?
15         MR. MACDONALD:  I just don't want you to say
16     anything that we have talked about, but you can
17     answer if you know.
18         THE WITNESS:  I don't know.  I didn't get to
19     read it -- yes.
20  BY MS. KARRON:
21     Q.  If you reported to the school a sexual incident
22  on January 24th and DCF was notified by January 31st, in
23  the time that a week elapsed, what would have changed
24  had the school notified DCF on the same day you told
25  them?  And I'm going to ask that in a better way.
```



1           So you reported the incident to the school on

2   January 24th.  You reported it to DCF January 31st.

3   What change do you believe would have occurred in the

4   DCF investigation if it had been reported to them one

5   week sooner?

6           MR. MACDONALD:  Objection, form.

7           THE WITNESS:  I believe nothing would have

8       because what she told DCF was the same thing she had

9       told mom and the same thing she had told the

10      psychiatrist.

11          MS. KARRON:  I have no further questions.

12          MS. MARHEFKA:  I just have a couple of

13      questions, counsel for Superior.  And, Kyle, I just

14      want to say for the record, we had requested these

15      depos in July.  So, you know, we're over a month

16      from when it was noticed, and you gave us the

17      availability for them starting at noon today.  So we

18      didn't have much to work with.  So I just want to

19      throw that out there.

20          MR. MACDONALD:  I understand --

21                  FURTHER DIRECT EXAMINATION

22   BY MS. MARHEFKA:

23      Q.  Good evening, sir.

24          MR. MACDONALD:  If you are going to say

25      something on the record to me, I would like to



```
 1   respond.  I just want to say that while I
 2   understand -- I just want to respond briefly.  While
 3   I understand what you're saying, you didn't tell me
 4   that you had a had a hard stop time and/or tell them
 5   that.  So it's not fair for them to make them appear
 6   for a deposition --
 7        MS. MARHEFKA:  If you don't --
 8        MS. KARRON:  In federal court, I've never heard
 9   of anybody going on after 5:00 --
10        MR. MACDONALD:  They have taken the day off.
11   So it's just not fair to them to say that they have
12   to reset it because you said you have a hard stop at
13   5:00 p.m.  We didn't know that.  They didn't know
14   that.  They assumed they were having their
15   depositions taken today.
16        MS. KARRON:  So you would go to 10:00 p.m. if
17   we want to go to 10:00 p.m.?
18        MR. MACDONALD:  If that's what we have to do.
19   They would prefer that as opposed to having to make
20   arrangements for childcare and for getting time off
21   work.
22        MS. KARRON:  What if we could do it after their
23   work hours?  Then they -- she doesn't have to get
24   time off of work, and childcare can be taken care of
25   by her husband after work, right?  Maybe we can work
```



```
 1   something out like that.
 2        MR. MACDONALD:  Okay.  Again, I mean, we can
 3   just agree to disagree; but, you know, I explained
 4   it that we could keep going --
 5        MS. MARHEFKA:  She she's shaking her head.
 6   Does she not agree to make time for us?  I don't
 7   understand.
 8        MR. MACDONALD:  Again, I have shared with you
 9   why they don't feel comfortable resetting it because
10   they had to make arrangements to be here, and it's
11   unfair to them to say that we're no longer going to
12   take it because there is some of arrangement --
13        MS. KARRON:  Well, maybe we can do it during
14   the mediation instead of push the mediation back if
15   they're available for that day.
16        MR. MACDONALD:  Again, if you're able to get
17   leave from the court to do that, we certainly can do
18   that.
19        MS. KARRON:  We still have time to -- the
20   mediation doesn't have to happen until mid September
21   I think.
22        MR. MACDONALD:  Okay.  That's your position.
23        MS. MARHEFKA:  What about after hours this
24   week, after work hours?  If it's on Zoom they don't
25   have to travel anywhere.  Does that work?
```



```
1        MR. MACDONALD:  Again, I've gone over this with
2   you guys, and we don't need to go back and forth on
3   the record about it.  I have shared with you why
4   they cannot do --
5        MS. MARHEFKA:  You didn't answer my question.
6   You said it has to do with work hours.
7        MR. MACDONALD:  I'm not being deposed, Julie.
8   Again, it's my --
9        MS. MARHEFKA:  That's why I'm talking to you.
10       MS. KARRON:  Fine.  Fine.  It's fine, Julie.
11  We'll just take it up with the court because we're
12  getting thwarted on discovery and trying to play
13  gotcha and focused on all kinds of things that have
14  nothing to do with this case and wasted time instead
15  of trying to get to the actual testimony that
16  matters.
17       MR. MACDONALD:  No one is trying to thwart you
18  in discovery.  We are here today --
19       MS. MARHEFKA:  That is the absolute opposite of
20  what you're doing.
21       MR. MACDONALD:  Okay.  Well, you set the
22  deposition for today, and you now are trying to
23  cancel because you have a commitment at 5:00 p.m.
24  that none of us knew about.  That is not up for
25  discovery, that is you not scheduling it
```



```
1   appropriately.
2        MS. KARRON:  I didn't schedule it.  I
3   cross-noticed it based on the date that you gave to
4   cocounsel.
5        MR. MACDONALD:  Well, don't you think you
6   should have told us that you have to go at 5:00 p.m.
7   so we can accommodate --
8        MS. KARRON:  I'm sorry, 5:00 is when the day
9   typically ends.
10       MS. MARHEFKA:  So I'm asking you to accommodate
11  it right now after work hours and the discovery
12  period, and you're not responding.
13       MR. MACDONALD:  Again, we're available today.
14  They took time off, and they don't have time within
15  the same week because the discovery period ends on
16  August 29th.  So they do not have availability prior
17  to three days from now to reschedule their
18  deposition --
19       MS. KARRON:  We're asking for availability
20  after that.  We're asking for their availability
21  after that just like we're taking your expert
22  deposition after that.
23       MR. MACDONALD:  I understand that.  And after
24  speaking with them, they want to continue today.
25  They do not want to set it for a later date.
```



```
 1          MS. KARRON:  I'm sure that's the case, but if
 2     we don't finish this today, we're going to need to
 3     reset it.
 4          MR. MACDONALD:  Okay.  We don't need to argue.
 5  BY MS. MARHEFKA:
 6     Q.   Okay.  Sir, are you ready to go?
 7     A.   Yes.
 8     Q.   Okay.  Good evening, sir.  My name is Julie
 9  Marhefka.  I represent Superior Charter Schools in this
10  case.
11          Do you know who Superior Charter Schools is?
12     A.   It's part of Academir.
13     Q.   Okay.  And before this case, were you aware of
14  what Superior Charter Schools was?
15     A.   Yes.  Superior is the one who administrates the
16  schools; is it not?
17     Q.   Okay.  And when did you first become aware that
18  Superior administrates the schools, as you say?
19     A.   Two days ago.
20     Q.   So you just became aware that Superior manages
21  Academir two days ago?
22          MR. MACDONALD:  Objection, form.
23  BY MS. MARHEFKA:
24     Q.   You can answer the question.
25     A.   Some days ago.  I don't remember exactly when,
```

1   but it was some days ago.

2       Q.   Well, a few minutes ago I asked if before this

3   lawsuit, before this case, if you knew who Superior was,

4   and you said, Yes.  And now you're telling me a few days

5   ago you figured out who they are.

6           Which is it?

7       A.   I'm telling you that, yes, that I do know who

8   Superior is because I learned about that some days ago.

9       Q.   Okay.  Do you have an understanding of

10  Superior's role in managing Academir?

11      A.   I know that Superior is the one that

12  administrates the Academirs, but I don't know any

13  specifics.

14      Q.   Okay.  Do you believe that Superior had any

15  influence on Academir's handling of the incidents

16  involving your child?

17          MR. MACDONALD:  Objection, form.

18          THE WITNESS:  I don't know.

19  BY MS. MARHEFKA:

20      Q.   Do you have any reason to believe that

21  Superior, as the management company, was directly

22  involved in the incident involving your child?

23          MR. MACDONALD:  Objection, form.

24          THE WITNESS:  I don't know how they work.

25  BY MS. MARHEFKA:



1    Q.   To your knowledge, did you ever communicate
2  with anyone at Superior about this incident?
3         MR. MACDONALD:  Objection, form.
4         MS. MARHEFKA:  Why are you objecting?  I'm
5      asking if to his knowledge he communicated with
6      anyone.
7         MR. MACDONALD:  It's a legal contention.  He is
8      not going to know how to distinguish between who
9      works for the management company versus the school.
10 BY MS. MARHEFKA:
11    Q.   You can answer.
12    A.   I know that my wife communicated with Mr.
13 Rolando Mir, and he never answered the calls.  I know --
14 I don't exactly remember it, but I know that my wife
15 attempted to communicate with him, but he never
16 answered.  He never gave a solution either.
17    Q.   Did you ever personally speak with Mr. Rolando
18 Mir?
19    A.   No.
20         MS. MARHEFKA:  I don't have any more questions.
21         MR. MACDONALD:  I'm sorry, I don't have any
22      questions for him, but he'll read.
23         (The deposition concluded at 4:25 p.m.)
24
25



```
 1                       CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF ORANGE:

 5

 6       I, AMBER PORTELLO, Notary Public, State of Florida,

 7   do hereby certify that ████████████ personally

 8   appeared before me on August 26, 2024, and was duly

 9   sworn and produced a Florida driver's license as

10   identification.

11       Signed this 3rd day of September, 2024.

12

13

14

15

16   _____

17   AMBER PORTELLO

     Notary Public, State of Florida
18   My Commission No.:  HH124775
     Expires:  MAY 4, 2025
19

20

21

22

23

24

25
```



```
 1              CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA:
 3   COUNTY OF ORANGE:
 4
 5       I, AMBER PORTELLO, Notary Public, State of Florida,
 6   certify that I was authorized to and did
 7   stenographically report the deposition of ████████
 8   ████████   that a review of the transcript was requested;
 9   and that the foregoing transcript, pages 4 through 91,
10   is a true and accurate record of my stenographic notes.
11       I further certify that I am not a relative,
12   employee, or attorney, or counsel of any of the parties,
13   nor am I a relative or employee of any of the parties'
14   attorneys or counsel connected with the action, nor am I
15   financially interested in the action.
16
17       DATED this 3rd day of September, 2024.
18
19
20   _____
21         AMBER PORTELLO
22
23
24
25
```

