EXHIBIT "A"



████████████

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
 2

 3
    JANE DOE, a minor, by and through
 4  Her mother and next friend, MOTHER DOE,

 5       Plaintiff,

 6  vs.                   Case No: 1:23-cv-23004

 7  ACADEMIR CHARTER SCHOOLS, INC.
    And SUPERIOR CHARTER SCHOOL
 8  SERVICES, INC.,

 9       Defendants.

10  _____/

11  VOLUME I
    VIDEOCONFERENCE
12  DEPOSITION OF:        ████████████

13  DATE:                 MONDAY, AUGUST 26, 2024

14  TIME:                 4:28 P.M. - 5:14 P.M.

15  PLACE:                MIAMI, FLORIDA 33131

16
    STENOGRAPHICALLY
17  REPORTED BY:          AMBER PORTELLO

18

19

20

21

22

23

24

25
```



```
 1   A P P E A R A N C E S:

 2   KYLE MACDONALD, ESQUIRE
     OF: Derek Smith Law Group, PLLC
 3        520 Brickell Key Drive
          Suite O-301
 4        Miami, FL 33131-2433
          Office: 786-568-8120
 5        Kyle@dereksmithlaw.com
          APPEARING ON BEHALF OF THE PLAINTIFF
 6        (Via Videoconference)

 7   JULIE KARRON, ESQUIRE
     TAYLOR WHITE, ESQUIRE
 8   OF: Kelley Kronenberg
          10360 West State Road 84
 9        Fort Lauderdale, FL 33324-4236
          Office: 954-370-9970
10        Jkarron@kelleykronenberg.com
          Twhite@kklaw.com
11        APPEARING ON BEHALF OF THE DEFENDANT ACADEMIR
          (Via Videoconference)
12
     JULIE MARHEFKA, ESQUIRE
13   OF: Garrison, Yount, Forte & Mulcahy, L.L.C.
          601 Bayshore Boulevard
14        Suite 800
          Tampa, FL 33606-2760
15        Office: 813-515-0322
          Jmarhefka@garrisonyount.com
16        APPEARING ON BEHALF OF DEFENDANT SUPERIOR
          (Via Videoconference)
17

18   ALSO PRESENT:
          Carmen Quintana, Interpreter
19

20

21

22

23

24

25
```



```
 1                    I N D E X
 2  TESTIMONY OF ███████████
 3     DIRECT EXAMINATION BY MS. KARRON              4
 4  CERTIFICATE OF OATH...............................22
 5  CERTIFICATE OF DEPOSITION TRANSCRIPT.................23
 6
 7                  INDEX OF EXHIBITS
 8                   (NONE MARKED.)
 9
10
11
12                    ------
13            S T I P U L A T I O N S
14      It is hereby stipulated and agreed by and between
15  the counsel for the respective parties and the deponent
16  that the reading and signing of the deposition
17  transcript be waived.
18                    ------
19
20
21
22
23
24
25
```



███████████

```
 1                 P R O C E E D I N G S
 2                       *********
 3           COURT REPORTER:  Would you raise your right
 4      hand, please.
 5           Do you solemnly swear or affirm to translate
 6      Spanish to English and English to Spanish?
 7           THE INTERPRETER:  I do.
 8           COURT REPORTER:  Would you raise your right
 9      hand, please?
10           Do you solemnly swear or affirm that the
11      testimony you're about to give in this cause is the
12      truth, the whole truth and nothing but the truth?
13           THE WITNESS:  Yes.
14   THEREUPON
15                        ██████████████
16   was called as a witness and, having first been duly
17   sworn, testified as follows:
18                        DIRECT EXAMINATION
19   BY MS. KARRON:
20      Q.   Please state your full name for the record.
21      A.   ████████████████
22      Q.   Have you ever been known by any other names?
23      A.   Yes.  Before the citizenship, I was previously
24   known by my full name which was including my second last
25   name which was ████████████████
```



1    Q.   When were you born?

2    A.   April 15th of 1989.

3    Q.   And when did you become a U.S. citizen?

4    A.   It was around 2018.  Approximately June of

5  2018.

6    Q.   Have you ever been convicted of a crime?

7    A.   No.

8    Q.   Did you ever report any issues to the school

9  before the sexual incident that we're here about today?

10        MR. MACDONALD:  Objection, form.

11        THE WITNESS:  No.

12  BY MS. KARRON:

13    Q.   Did you have -- did your daughter ever report

14  that there was any inappropriate conduct at the school

15  before she told you about this incident?

16    A.   She told me that a boy by the name of L.R. had

17  already told her some ugly things to her, something

18  similar to bullying.  Something like he was the boss,

19  and I -- what I told her was that if him or any other

20  classmates treat her that way that she should run away,

21  report it over to an adult.  If anything like that were

22  to happen, that she should go ahead and report it to an

23  adult.

24    Q.   Did you ever make a report to the school about

25  your daughter being bullied or anything with L.R. before



1  this sexual incident?

2      A.   No, because I thought that the only thing that

3  was going on was just something minor.  I think that it

4  was simply something simple going on in between kids.  I

5  didn't think that it was something serious like this is.

6  So after something serious like this happened, I

7  immediately requested a meeting.

8      Q.   When is the first time that you learned about

9  the alleged sexual incident?

10     A.   The first time that she told me was on that

11 Friday the 20th.  Actually, right after I picked her up

12 from school when she got in the car she told me, Mom, we

13 have to talk about something that happened to me.  I'm

14 sorry, it was not in the car.  It was in the -- it was

15 not in the car.  It was in the reception area.  There is

16 a camera there, and I imagine that that was reported

17 when she told me, Mom, I have to tell you about

18 something that happened to me at school.  And I told

19 her -- I told her that we would talk about it once we

20 got home because there were other kids that were there

21 and you can see that recording how she is tell ing me,

22 Mom, I have to tell you about what happened to me.  And

23 I just tell her that we can talk about it once we get

24 home.

25     Q.   And did you end up talking about it with her



1   once you got home?

2        A.    In reality, that was the first time that I

3   actually spoke with her about it, and she told me,

4   Mom -- once we were already at home, she told me, Mom, I

5   need to tell you about what happened to me at school.  I

6   need to tell you about what a boy, L.R., did to me at

7   school.  And that's when she told me in her own words

8   that that boy had licked -- as she said it, that that

9   boy had licked her tits and her butt, and that that boy

10  had kissed her on the mouth.

11         I asked her, What do you mean by licking

12  because I didn't know the meaning of that word.  So she

13  signaled to me like this.  She signaled to me what he

14  did to her.  He signaled to her parts, and she touched

15  the parts of her body.  She touched her intimate area,

16  and she told me that he kissed her in the mouth.

17         I had gotten a call from school.  In that call

18  from the school, they told me that it was only verbal.

19  So I asked her, ▇▇▇▇, is that what happened?  Did he

20  really do that to you?  And she said -- and she

21  signaled -- as she could, she signaled using her tongue

22  and her hands.  She told me what had happened to her,

23  and she did tell me that she did that from underneath

24  her underwear.  She did tell me that he did it under her

25  underwear.



1      Q.   Did she tell you -- strike that.

2           Was your understanding that it had happened

3   that day, and that's why she was reporting it to you?

4      A.   She didn't say that, per se.  She didn't

5   exactly say it was on this day, on this exact day.  What

6   she told me is this is what happened to me which I

7   hadn't understood at first because when I had first

8   gotten the call I was told that it had happened in the

9   classroom and that she had run over to the PE teacher.

10  That she ran over to the PE teacher outside, and she

11  said that it occurred from underneath the table.

12          For a five-year-old girl she was very clear in

13  explaining to me what had happened to her as she could

14  using her hands, using her little hands, signaling with

15  her mouth.  She very smartly was able to tell me what

16  had happened to her, and this was very hard for me

17  hearing it from the school.  And then asking her and her

18  telling me, yes, this happened.  Yes, this happened.

19      Q.   Was there a time you made a video of your

20  daughter when you were interviewing her?

21      A.   Although I was going to tell you how everything

22  happened because I do remember every single moment of

23  this, this is something that I wouldn't be able to

24  forget.  Now, after that Friday, after we arrived home

25  from school, she told me all of this.  And then after



1  that was when I messaged the professor.  I messaged her

2  teacher asking if we could have a meeting to talk about

3  what happened to my daughter because my daughter was

4  telling me that something physical had occurred to her

5  when they had told me that it was only verbal.  So I

6  messaged her, and that Monday, it was a day that they

7  had off.  So we couldn't meet on that day, but we agreed

8  on meeting on Tuesday early at 8:00.

9          Okay.  On Tuesday when she answered and got

10 back to me, it was something in the morning, and we met

11 at 8:00 in the morning.  The ones that met there were

12 myself, her father, and the principal's assistant, and

13 Ms. Chaudry.  Up until then all of her communication had

14 always been in Spanish, however, that meeting was held

15 in English.

16          What I asked of them was if they could look

17 into it further, if they could investigate it a little

18 bit further, because my daughter had told me that it was

19 physical, not verbal, as they had told me.  I know for a

20 fact that I have great communication with my daughter.

21 My daughter tells me everything.  I don't even have to

22 ask her.  She is very talkative, and she shares

23 everything with me because they had told me that it was

24 just something verbal and not physical.  I asked if we

25 could look into the cameras, and if they could go ahead



```
 1  and separate the children.

 2          So as I told them that I wanted them to

 3  separate the children because I trust ███, I trust in

 4  what ███ told me, at that point it went -- both

 5  Ms. Chaudry and also the principal's assistant told me

 6  that it wasn't convenient in the middle of the school

 7  year for them to separate the children at that time, and

 8  then they began telling me that at that age it was

 9  normal for children to begin exploring each other's

10  bodies as if it was something normal.

11          They told me that it was normal for the

12  children to be exploring each other 's bodies.  Then

13  they also told me that in 24 hours they would check in

14  on the reporting, and then they would give me a response

15  on what had occurred.  I was completely positive.  I was

16  completely sure that ███ told me the truth, and I

17  trust in her.  It's very difficult for a five-year-old

18  little girl to go through something like that where she

19  is supposed to be supervised and supposed to be taken

20  care of properly.

21          I also asked for them not to speak with her

22  about the subject because myself, ever since that

23  conversation on Friday, hadn't brought up that subject

24  again since then.  So this whole meeting was at 8:00 in

25  the morning, and then I'll tell you now about Ms. Ruiz.
```



```
 1              MS. KARRON:  I'm going to move to strike as
 2      nonresponsive.
 3   BY MS. KARRON:
 4      Q.   All I asked was when you made the video?  I'm
 5   going to need you to listen to my questions and only
 6   answer my questions because if we're going to be able to
 7   finish this at any time today, it's never going to
 8   happen if we go on and on.  I understand you want to get
 9   the story out, and I want to hear it too, but just try
10   to answer the question that I'm asking.  There is no
11   question.  I didn't ask a question.  So my question --
12              THE INTERPRETER:  Counsel, I'm sorry, but I was
13      going to get to that.
14              MS. KARRON:  No problem.
15   BY MS. KARRON:
16      Q.   Could you just tell me when you made the video
17   of your daughter?
18      A.   So that afternoon the counselor spoke with my
19   daughter despite the fact that I had asked her not to
20   speak with my daughter about that subject again, so that
21   evening when she got home that's when I conducted the
22   conversation with her.  That's when I made that
23   recording.  I made that recording so that we wouldn't
24   have to speak about that subject ever again.  I figured
25   if I could record it that would be the one, and that
```



1  would be the last time we ever talked about that subject

2  again.  So I asked ███ if we could talk about it, and

3  she told me, No, mom I really don't want to talk about

4  the subject.  I have been talking about the subject all

5  day long with someone at school.  I have been talking to

6  them all day about what happened with the boy L.R.

7          MS. KARRON:  Again, move to strike as

8      nonresponsive.

9  BY MS. KARRON:

10     Q.   My only question was when did you do the video?

11 When I ask you a question, I just need you to answer

12 what I'm asking and not give the narrative responses

13 because it is making difficult for me to get the

14 questions in in the small amount of time that your

15 attorney is allowing.

16     A.   The recording is there, and you should have

17 seen it.

18     Q.   Where was your daughter when you made the

19 video?

20     A.   I believe that it was at home.  According to

21 what I remember, it was over by the play area in the

22 playground on Tuesday.

23     Q.   And did you ever make a video of your daughter

24 in the bath?

25     A.   She didn't know that she was being recorded.



1  It was not a video recording.  It was just a recording.

2  I don't believe that it was in the bath.  According to

3  what I remember, we got out of the car, and it should

4  have been in the playground.

5      Q.   Do you have any video interviews of your

6  daughter while she's in the bathtub?

7      A.   A video recording of my daughter in the bath,

8  no, of course not.  Why would I ever record a video of

9  my daughter in the bath?

10     Q.   You testified that your daughter told you that

11  ███████ touched her or licked her underneath her

12  underwear.

13          When did she first tell you that?

14     A.   She told me that ever since the first day she

15  told me that.  I think that it was while she was in --

16  while she was bathing, and I think I seem to remember

17  that that was after she got home from school.  I don't

18  remember the exact moment.

19     Q.   In the interview you recorded with your

20  daughter, did she say anything about it occurring

21  underneath her underwear?

22     A.   I don't remember, but I think she told me that

23  on Friday when she got home.

24     Q.   And I have not seen anything anywhere about

25  under the underwear.



1          Are you aware of if your daughter said that to

2    anyone other than you?

3        A.   Yes.  She told that exact same story to the

4    forensic psychiatrist.

5        Q.   That it happened underneath her underwear?

6        A.   Yes.

7        Q.   Did your daughter ever tell you whether her

8    pants or underwear were removed at any time?

9        A.   She didn't tell me to what point it was taken

10   off, but she did tell me that it occurred from

11   underneath her underwear.

12       Q.   And you believe that based on your -- strike

13   that.

14          Your interview with your daughter, she

15   discussed that it happened in the classroom under the

16   table, is that what you recall?

17       A.   She told me that once it had occurred

18   underneath the table.  She also told me that it occurred

19   on another occasion while they were outside, and that's

20   when she ran over to the PE teacher.  I really don't

21   know how many times this had occurred, but I do remember

22   this clearly.

23       Q.   And the first thing you heard of these

24   allegations was starting January 20th?

25       A.   Yes, the first time was in January 20th.



```
 1      Q.   And when did you first report it to the school?
 2      A.   Through that text message that I sent to
 3 Ms. Chaudry.  I wrote that all down in text message
 4 form, but I also requested to have a meeting, a school
 5 meeting, on Tuesday as soon as the school opened up.
 6 Now, they weren't the ones who offered me that meeting
 7 themselves.  I was the one who had to request to have
 8 that meeting on Tuesday that first hour of school.
 9      Q.   Did you ever make a written, signed complaint
10 of sexual harassment to the school?
11      A.   I thought that on that day when that meeting
12 was held, I thought that that was being recorded.  I
13 really believed that because I remember that Ms. Chaudry
14 herself told me, Sign here and sign here to attest that
15 this meeting was held.  So I thought they had that
16 report.
17      Q.   Did you ever fill out a form and make a written
18 report alleging sexual harassment that you signed and
19 gave to the school?
20      A.   I didn't even know that there was a form that
21 could be filled out for this.  I didn't even know of the
22 existence of a form for this, and no one told me about
23 it during the meeting.
24      Q.   Have you received any specialized training in
25 how to interview children that have been sexually
```



1   abused?

2       A.   No.

3       Q.   And are you aware that asking a child leading

4   questions that suggest the answer can impact their

5   memory?

6           MR. MACDONALD:  Objection, form.

7           THE WITNESS:  I haven't suggested anything to

8       her.  On Friday she was the one that wanted to tell

9       me about it herself, and on Tuesday the reason why I

10      made that recording was so that we could speak about

11      it on that one time and we wouldn't have to speak

12      about it ever again.  I did not influence her in any

13      way, and I didn't want to continue speaking about

14      the subject.  I was even surprised when that lady

15      continued talking with her about it with her when

16      she told me about it later.  The only thing I want

17      for her is to forget about this.

18          MS. KARRON:  I'm going to move to strike as

19      nonresponsive.

20  BY MS. KARRON:

21      Q.   And I'm going to ask that you try to focus on

22  the questions, and I ask that you try to focus on the

23  questions I ask of you and not throw in all of your

24  opinions just so we can get this done.

25          So is it fair to say that during your one



1 interview that you wanted to have with your daughter

2 that you recorded the entire content of it?

3     A.  No.  So when she arrived, she told me that she

4 had spent all day long speaking with someone else about

5 what had occurred with L.R.  I myself didn't want to

6 speak about the subject.  To this day I don't want to

7 speak about the subject.

8         MS. KARRON:  Okay.  Move to strike as

9     nonresponsive.  Court Reporter, can you read back my

10     question, please?

11         (The previous question was read back.)

12         THE WITNESS:  The recording of that, that

13     was -- that was what I recorded when she got out of

14     the car.  She began talking about it herself without

15     me asking about it.

16 BY MS. KARRON:

17     Q.  In the recording that you made of your daughter

18 or at any other time, did you ever ask your daughter how

19 it was that her pants were down during school?

20     A.  I don't remember.

21     Q.  You don't think it was important to ask your

22 daughter questions to find out if this actually happened

23 and to what extent it occurred?

24         MR. MACDONALD:  Objection, form.

25         THE WITNESS:  She told me about everything that



1    had occurred herself.  Once I asked her, Are you

2    sure that it was physical and not just verbal, and

3    she began speaking about all of it by herself.  Now,

4    me and my experience, I have tried to speak about it

5    as little as possible because I would just like for

6    this to be forgotten.

7   BY MS. KARRON:

8        Q.   So you never asked her where it happened or

9   when it happened?

10           MR. MACDONALD:  Objection, form.

11           THE WITNESS:  She told me -- she told me that

12       it was while in class.  She didn't tell me the exact

13       moment.  She didn't tell me the exact hour, but what

14       she did tell me is that, yes, that it was in class.

15       That it occurred once underneath the table and

16       another time outside.

17   BY MS. KARRON:

18       Q.   If you believed that your daughter's private

19   parts had been licked, why didn't you report that to the

20   police?

21       A.   We did.  We did that on Tuesday.  We did that

22   on Tuesday.  We reported it to the school, and we also

23   reported it to DCF thinking that DCF already had a

24   report.  We did as much as we possibly could.

25       Q.   When did you make the report to DCF?



```
 1      A.   At that time I remembered that I didn't even
 2  know that a report had to be filed with DCF.  I actually
 3  thought that the school itself had already filed that
 4  report with DCF.  As the days went by and I saw that
 5  there was no response and that also after we went
 6  through Rolando Mir leaving us hanging, by the next week
 7  was when I saw that nothing was getting done.  That's
 8  when I reported it over to DCF because we did want to
 9  work things through.  We wanted her to stay at that
10  school because her cousins were there, her little
11  friends were there that she had met since her first day
12  there.  So after that already by the next week was when
13  I called DCF.
14          MS. KARRON:  And I move to strike that as
15      nonresponsive.  My only question was when was the
16      report made to DCF?  And I just realized what time
17      it is.  I can't get a straight answer out of your
18      client when I'm asking questions, and there is no
19      way for us to finish today.  So I think we're going
20      to have to stop and reschedule the deposition for a
21      later date.  It's already 5:10.
22          MR. MACDONALD:  So in terms of her answers, I
23      believe she said a couple days went by when she
24      reported it to DCF.
25          MS. KARRON:  I don't need you to testify about
```



```
 1   it --
 2       MR. MACDONALD:  I think what you're trying to
 3   do is because you have to go at 5:00 p.m., you're
 4   trying to act like she's being nonresponsive.
 5       MS. KARRON:  I'm not trying to act like
 6   anything, Kyle.  Every single one of her answers
 7   have been nonresponsive as based on my objection.
 8   Go back and look at the transcript.  Everything I
 9   asked I get a runon sentence without an answer.  So
10   at this time, I'm going to stop asking questions,
11   and we'll take it up with the court.
12       MR. MACDONALD:  So you're stopping the
13   deposition because of how she is answering?
14       MS. KARRON:  I'm stopping the deposition
15   because as I told you had to leave at 5:00.  I
16   didn't realize it was past 5:00, and it's impossible
17   to get the answers in a timely manner.  There is no
18   way.
19       MR. MACDONALD:  Well, okay.  Like I said to
20   you, they don't have availability before the end of
21   the discovery period.
22       MS. KARRON:  We're going off the record.  I'm
23   done asking questions.  Thanks.  I mean, I can't
24   continue to ask questions.  I'm going to conclude it
25   to a later date.
```



1      MS. MARHEFKA:   Superior will order both

2   transcripts.

3       (The deposition was continued at 5:14 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                     CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF ORANGE:

 5

 6       I, AMBER PORTELLO, Notary Public, State of Florida,

 7   do hereby certify that CARMEN QUINTANA, INTERPRETER, and

 8   ██████████, Witness, personally appeared before me on

 9   August 26, 2024, and was duly sworn and produced a

10   Florida driver's license as identification.

11       Signed this 3rd day of September, 2024.

12

13

14

15
             _____
16
             AMBER PORTELLO
17
             Notary Public, State of Florida
18           My Commission No.:  HH124775
             Expires:  MAY 4, 2025
19

20

21

22

23

24

25
```



```
 1              CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA:
 3   COUNTY OF ORANGE:
 4
 5       I, AMBER PORTELLO, Notary Public, State of Florida,
 6   certify that I was authorized to and did
 7   stenographically report the deposition of ██████████;
 8   that a review of the transcript was requested; and that
 9   the foregoing transcript, pages 4 through 21, is a true
10   and accurate record of my stenographic notes.
11       I further certify that I am not a relative,
12   employee, or attorney, or counsel of any of the parties,
13   nor am I a relative or employee of any of the parties'
14   attorneys or counsel connected with the action, nor am I
15   financially interested in the action.
16
17       DATED this 3rd day of September, 2024.
18
19
20   _____
21   AMBER PORTELLO
22
23
24
25
```





800.211.DEPO (3376)
EsquireSolutions.com



1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2
   JANE DOE, a minor, by and
3   through her mother and next
   friend, MOTHER DOE,
4
       Plaintiff,
5
   v.                         CASE NO.:  1:23-cv-23004
6
   ACADEMIR CHARTER SCHOOLS, INC.,
7   and SUPERIOR CHARTER SCHOOL
   SERVICES, INC.,
8
       Defendants.
9
   * * * * * * * * * * * * * * * * * * * * * * * * *
10
   REMOTE
11  DEPOSITION OF:          ▮▮▮▮▮▮▮▮▮▮
                   (CONTINUATION)
12
   DATE TAKEN:        AUGUST 28, 2024
13
   TIME:             COMMENCED AT 3:03 P.M.
14                   CONCLUDED AT 6:18 P.M.

15  PLACE:            VIA VIDEOCONFERENCE

16  STENOGRAPHICALLY
   REPORTED BY:        CHRISTIE SAMMARO, RMR, CRR
17                   COURT REPORTER AND NOTARY PUBLIC

18  * * * * * * * * * * * * * * * * * * * * * * * * *

19

20

21

22

23

24            ESQUIRE DEPOSITION SOLUTIONS
              432 SOUTH BEACH STREET
25          DAYTONA BEACH, FLORIDA  32114
                   386-255-2150



```
 1  APPEARANCES:

 2
       KYLE T. MACDONALD, ESQUIRE
 3      Derek Smith Law Group, PLLC
       520 Brickell Key Drive, Suite O-301
 4      Miami, Florida 33131
       (786)568-8120
 5      kyle@dereksmithlaw.com

 6         Attorney for Plaintiff

 7
       SCOTT P. YOUNT, ESQUIRE
 8      JULIE C. MARHEFKA, ESQUIRE
       Garrison, Young, Forte & Mulcahy, L.L.C.
 9      601 Bayshore Boulevard, Suite 800
       Tampa, Florida 33606
10      (813)275-0404
       syount@garrisonyount.com
11      jmarhefka@garrisonyount.com

12         Attorneys for Superior Charter School
                    Services, Inc.
13

14      JULIE B. KARRON, ESQUIRE
       TAYLOR A. WHITE, ESQUIRE
15      Kelley Kronenberg
       10360 West State Road 84
16      Fort Lauderdale, Florida 33324-4236
       (954)370-9970
17      jkarron@kelleykronenberg.com

18         Attorneys for Academir Charter Schools, Inc.

19

20  ALSO PRESENT:

21      Carmen Quintana, interpreter
       Cassandra Cisneros
22      Jenny Llorens

23

24

25
```



CONTENTS

PAGE

1

2

TESTIMONY OF ▮▮▮▮▮▮▮▮

3
Direct Examination by Ms. Karron          27

4
Cross-Examination by Mr. Yount          66

5
CERTIFICATE OF OATH          97

6
CERTIFICATE OF OATH          98

7
REPORTER'S CERTIFICATE          99

8
ERRATA SHEET          100

9

10
S T I P U L A T I O N S

11
It is hereby agreed and so stipulated by and

12
between the parties hereto, through their respective

13
counsel, that the reading and signing of the

14
transcript are expressly reserved by the Deponent.

15

16

17

18

19

20

21

22

23

24

25



████████████

```
1              P R O C E E D I N G S
2   THEREUPON,
3         COURT REPORTER:  Raise your right hand,
4      please.  Do you swear you will well and truly
5      translate from English to Spanish and Spanish to
6      English the questions propounded and the answers
7      given, so help you God?
8         INTERPRETER:  I do.
9         CARMEN QUINTANA was duly sworn to well and
10  truly translate from English to Spanish, and from
11  Spanish to English, the questions propounded and the
12  answers given in this cause.
13        COURT REPORTER:  Raise your right hand,
14     please.  Do you swear or affirm the testimony
15     you're about to give will be the truth, so help you
16     God?
17        THE WITNESS:  Yes.
18             ████████████
19      having been first duly sworn, was examined
20        and testified upon her oath as follows:
21             DIRECT EXAMINATION
22  BY MS. KARRON:
23  Q    Please state your full name for the record.
24  A    ████████████
25  Q    And where were you born, ████████████
```



1      A    In Cuba.

2      Q    When did you come to the United States?

3      A    In 2012.

4      Q    Have you -- and I'm not sure if I asked you

5   this before.  Have you ever been convicted of a crime?

6      A    No.

7      Q    Aside from the case we're here for today, have

8   you ever sued anyone or been sued?

9      A    No.

10      Q    And I'm just going to go through some

11   questions to get back -- caught up to where we left off

12   on our last deposition.

13           During the time that your daughter was

14   enrolled at Academir, are you aware of what supervision

15   or safety measures Academir had in place during school

16   hours?

17      A    Yes.

18      Q    Okay.  And what measures were those?

19      A    According to my understanding, they had

20   cameras in each of the rooms.  According to my

21   understanding, they also had cameras outside.  And there

22   was always someone around.  According to what I know,

23   they always had to have a teacher present.

24      Q    And do you have any evidence that those

25   procedures that you just described were ever violated?



1        MR. MACDONALD:  Objection, form.

2    A    Well, in reality, I don't really know whether

3 they did have a camera outside because they didn't show

4 it to me.

5 BY MS. KARRON:

6    Q    Okay.  Do you know what policies or procedures

7 the school has in place regarding students interacting

8 with one another?

9    A    No.

10    Q    Had you ever made -- you, or anyone on behalf

11 of your daughter, made a complaint to the school for any

12 reason other than the case that we're here about today?

13        MR. MACDONALD:  Objection, form.

14    A    With this exception, no.

15 BY MS. KARRON:

16    Q    Did you ever tell Mr. Mir that you know that

17 him and his wife are good people?

18    A    I don't remember, but according to my

19 understanding, I -- from what I had understood, I

20 thought that they were both good principals.

21    Q    Prior to the reports that you made to the

22 school about the incident that we're here about, did the

23 school have any knowledge -- strike that.

24        Did you ever report any issues with L.R. prior

25 to the incident that we're here about today?



1     A    No.

2     Q    You mentioned something in our last deposition

3  about bullying.

4         Is it your opinion that your daughter was

5  bullied by L.R.?

6     A    According to what my daughter told me, she had

7  had some issues, things that happened with kids while

8  they were in class.  Now, but these things were nothing

9  serious like this.  They were just like minor things

10  that go on in between kids.  And what I told her was

11  that if anything happened, to just go ahead and tell a

12  teacher.

13     Q    Prior to the incident that we're here about

14  today, did Jane Doe ever report any incidents of

15  inappropriate behavior that happened at school?

16         MR. MACDONALD:  Objection, form.

17     A    Not something serious like this.

18  BY MS. KARRON:

19     Q    And before this incident, did your daughter

20  ever report feeling unsafe at the school?

21     A    No.

22     Q    Did your daughter ever tell you that she was

23  left unattended at any time at school, meaning that an

24  adult wasn't present?

25     A    I asked her -- in one of the portions of what



1 she told me, I asked her, and she signaled to me.  I

2 asked her was there any adult present, watching, and she

3 said no, not at that moment.

4     Q    Okay.  And what time frame was she referring

5 to?

6         MR. MACDONALD:  Objection, form.

7     A    She's a girl.  I don't know to what time frame

8 she was referring to.

9 BY MS. KARRON:

10     Q    Was she referring to the incident that we're

11 here about today that we'll refer to as the sexual

12 incident?

13     A    I imagine.  I imagine.  I believe that she was

14 referring to this incident.

15     Q    And referring to this incident, she also told

16 you that it occurred in the classroom; is that right?

17         MR. MACDONALD:  Objection, form.

18     A    Within the things that she told me, she told

19 me that it was in class.  She spoke about chairs and

20 also a table, and she also said that it occurred

21 outside.  That's what she told me.

22 BY MS. KARRON:

23     Q    Did you ever, at any time, report to anyone at

24 Academir that your daughter asserted that the incident

25 occurred outside in addition to the classroom?



1      MR. MACDONALD:  Objection, form.

2      A    When we -- when we had the meeting, I did want

3    to know why it was that the PE teacher was not

4    present -- was not present when -- she was not outside,

5    because she had to run all the way to her in order to

6    let her know about it.

7    BY MS. KARRON:

8      Q    Did you ever report to Academir that your

9    daughter was asserting that she was touched while she

10   was outside the classroom?

11     MR. MACDONALD:  Objection, form.

12     MS. KARRON:  What's wrong with the form?

13     MR. MACDONALD:  It's misleading, the way that

14     it's phrased.  Did she ever report that her

15     daughter asserted that it -- I mean, it doesn't

16     matter, we don't have to argue about it, but ...

17   BY MS. KARRON:

18     Q    You can answer.

19     A    I told them to check the cameras because my

20   daughter told me what had happened to her.  So I asked

21   them to check the cameras because I trusted in what my

22   daughter told me.

23     Q    And tell me again what your daughter told you

24   happened to her.

25     A    My daughter, ever since the first instance



1   when I picked her up from school, she told me I have to

2   speak to you about something.  I told her that we would

3   speak about it once we got home.

4          Once we were already at home, she told me what

5   that boy had done to her.  She signaled, using gestures

6   and pointing to her body parts and using her tongue to

7   signal what he had done to her, and she told me how this

8   happened in school.  She told me that it wasn't just

9   verbal, and that that boy did do that to her.  She

10  signaled it, using gestures, and she told me that he did

11  that.

12      Q    Did you ask for -- your daughter for details

13  to find out what she was stating was done to her, other

14  than hearing her and seeing her gesture?

15      A    Yes, I asked her small questions, but at that

16  time she just spoke about it herself the most.

17          Now, the second time when I recorded her

18  was -- she didn't realize that I was recording her at

19  the time.  That time I did ask her direct questions, but

20  she was upset at the time and didn't want to talk about

21  it because it seemed like that she had already been

22  talking about it all day long at school.

23      Q    Did your daughter ever tell you that her pants

24  were pulled down or removed at any time during the

25  sexual incident?



1    A    She told me that that was done from underneath

2   her clothes.

3    Q    And did she indicate that her clothes were

4   removed or pulled down in any way?

5    A    She told me that it was done to her underneath

6   her clothing.  I suppose that they had to take them off.

7   She told me that they pulled up her shirt and did that

8   to her on her breasts, underneath her clothing.

9    Q    Did your daughter wear jeans to Academir on

10   Fridays when she went there?

11        MR. MACDONALD:  Objection, form.

12    A    On Fridays they can wear civil clothes.  They

13   can wear civil clothes.

14   BY MS. KARRON:

15    Q    Did your daughter wear jeans on Fridays at

16   Academir?

17        MR. MACDONALD:  Objection, form.

18        MS. KARRON:  What's wrong with the form?

19        MR. MACDONALD:  You're asking if she wears

20        jeans on Friday.  You're not specifying if you're

21        asking about a specific Friday or typically.  It's

22        an ambiguous question.

23   BY MS. KARRON:

24    Q    Okay.  You can answer.

25    A    On Fridays they don't wear their uniform, so I



1   don't quite remember.  But I believe that on Friday she

2   was not wearing her uniform, so she -- on Friday, I

3   believe she was not wearing her uniform.

4       Q    If the school stated that your daughter was

5   wearing jeans on Friday, January 20th of 2023, the date

6   of the alleged incident, do you have any reason to

7   dispute that?

8            MR. MACDONALD:  Objection, form.

9       A    Well, it's just that on Fridays they always

10  wore civilian clothing, so, yes, she might have been

11  wearing either jeans or leggings, because on Fridays

12  they wear civilian clothing.  And I imagine also that at

13  school they have cameras for that.

14  BY MS. KARRON:

15      Q    Did you ever, at any time, report to anyone at

16  Academir that your daughter had been touched on more

17  than one occasion?

18      A    I only told them to check the cameras because

19  she told me that she had been touched.  She told me

20  that, and she still tells me to this day, she

21  occasionally still mentions it.  And I trust her.

22      Q    Had you ever, at any time, reported to anyone

23  at Academir that the behavior by L.R. was a pattern?

24           MR. MACDONALD:  Objection, form.

25      A    What is a pattern?  What would that be?



1      MS. KARRON:  Just -- I guess was the

2      translation an issue, or does she not know what a

3      pattern is?

4      A    Could you please formulate the question again?

5   BY MS. KARRON:

6      Q    Let me try.  Did you ever, at any time, report

7   to anyone at Academir that the issues with L.R. had been

8   happening repeatedly?  Or more than once, on different

9   occasions.

10     A    I only told them that my daughter had told me

11  that it wasn't physical --

12         INTERPRETER:  I'm sorry.  I'm going to start

13     over again.

14     A    I only told -- I only told them that my

15  daughter had told me that it was physical, that it was

16  physical, and that I didn't understand this boy's

17  behavior, but I didn't want them to be together because

18  I didn't want him to repeat the same thing.

19     Q    What was the last date that your daughter was

20  enrolled at Academir?

21     A    Well, I don't quite remember.  I know that I

22  received the call on Friday afternoon.  I know that on

23  Tuesday, when I reported it.  I know that I got her out

24  of school early on Wednesday.  So I think that it might

25  have been by the next Wednesday because there were no



1    classes on Monday.

2       Q    And when you said the next Wednesday, you mean

3    the Wednesday following January 20th, which was a

4    Friday?

5       A    Yes.  It was by the next week, because that

6    was a long weekend that they had, and I know that it was

7    on Wednesday.  Wednesday was the last day, because I was

8    still waiting for them to come to an agreement from part

9    of the school, but they never -- that never happened.

10       Q    Okay.  So I'll represent to you that the

11    Wednesday after January 20th was Wednesday, January 25th

12    of 2023.  I just looked at the calendar.

13          Have you ever reviewed the Miami-Dade County

14    Title IX Policies and Procedures Manual?

15       A    I did recently.

16       Q    Had you reviewed it at any time prior to

17    withdrawing your daughter from the school?

18       A    No.

19       Q    I might have asked you about this in the last

20    deposition, so if I did, forgive me.  But did you, or

21    anyone on behalf of your daughter, make a formal written

22    complaint of sexual harassment that you signed and

23    submitted?

24          INTERPRETER:  Counsel, when you say complaint,

25       are you talking about the legal term?



1        MS. KARRON:  No.  I'm talking about a written

2     complaint.

3        MR. MACDONALD:  Objection, form.

4     A    I didn't know that a formal complaint had to

5  be done.  I only signed for the meeting when they told

6  me "sign here, sign here" at 8:00 in the morning.  But I

7  didn't know that a form had to be made.  I didn't know

8  that.

9     Q    Did anyone at Academir ever offer to move Jane

10 Doe to a different class?

11       INTERPRETER:  I believe my screen froze.

12     Counsel, would you please repeat the question?

13       MS. KARRON:  Of course.

14  BY MS. KARRON:

15     Q    Did anyone at Academir ever offer to you to

16  move Jane Doe to a different class?

17     A    During the meeting that was held at 8:00 in

18  the morning, I asked them to please separate them so

19  they could be in different classes because this had

20  happened right in front of their own eyes, and there was

21  no warranty that this wouldn't be happening again.  But

22  Ms. Chaudry and the other person who was there, whose

23  name I can't remember right now, told me that it was not

24  convenient to be changed to a different class at this

25  stage.  But I did ask them to do that.



1     Q     Could you explain to me what you mean by

2   convenient?  I want to make sure it's not lost in

3   translation.

4          MR. MACDONALD:  Objection, form.

5     A     They told me that it wasn't good for the

6   children to be separated in the middle of the school

7   year, and they told me that they would investigate it.

8          MR. YOUNT:  I object to the responsiveness of

9        the witness.  The question was very simple:  Did

10       they offer to move Jane Doe?  And that question was

11       never answered, and I'm going to ask the witness to

12       please answer the question.

13          MS. KARRON:  And I'll ask it again.

14   BY MS. KARRON:

15     Q     Did anyone at Academir offer to move Jane Doe

16   to a different classroom after the incident was reported

17   to them?

18     A     Not to me.

19     Q     Did they offer it to your husband, if you

20   know?

21     A     What my husband told me that they told him was

22   that if we didn't like the policy, that we could take

23   her out of the school.

24     Q     What do you think that Academir or Superior

25   could have done differently with regard to the handling



1  of the complaint that you made?

2      A    I believe that, as a mother, I would have felt

3  safer if they had heard what my little girl had told me,

4  if they had just listened to her saying that it was

5  something that was physical, but instead, they just kept

6  denying it again and again, saying that it was just

7  verbal.  Despite the fact that they heard my daughter's

8  reporting, they kept repeating again and again that it

9  was just verbal.  If they had separated the children and

10  put them in different classes.

11          But, despite that, I don't think that I would

12  have still felt as much trust in the safety of the

13  school.  I have trusted in the school because my

14  daughter had already been there since she was two years

15  old.  My daughter had been there since she was two years

16  old, and I had placed my trust in them.

17          If -- but they didn't change them to different

18  classes like I asked them to.  They didn't show the

19  cameras.  If they had changed them to different classes,

20  if they had showed us the cameras, and even -- even if

21  they had shown the cameras, I would have still liked for

22  them to change them to a different class, to put them in

23  different classes, because my daughter told me what had

24  happened to her, and I trust in her.

25          I think that maybe if they had looked a little



1   bit deeper into the case instead of not paying

2   importance to it.

3       Q    Are you aware that your husband told the

4   police that you guys did not want your daughter moved to

5   a different class because she would feel guilty?

6           MR. MACDONALD:  Objection, form.

7       A    Around those days he did mention something

8   similar to that.  I don't quite remember it, but he did

9   mention something along those lines.  And I remember

10  that he was very upset and very nervous.

11  BY MS. KARRON:

12      Q    Did your husband ever tell you that he went to

13  the school and yelled and cursed at the vice principal?

14      A    He never mentioned something like that, and I

15  doubt that he ever did that.

16      Q    Aside from what your daughter told you, do you

17  have any evidence that L.R. physically touched your

18  daughter?

19          MR. MACDONALD:  Objection, form.

20      A    No, but I trust in what my daughter told me.

21  My daughter always speaks the truth.

22  BY MS. KARRON:

23      Q    Do you know whether your daughter told the

24  truth to the four adults at the school that questioned

25  her about the incident?



1        MR. MACDONALD:  Objection, form.

2     A    She told me that she did tell them the truth.

3   She told me that she told them about what that boy had

4   done to her.  She told me that it wasn't verbal; that it

5   was physical.  And she told me that she did tell that to

6   the adults, and I believe in her.

7   BY MS. KARRON:

8     Q    Were you aware of any efforts that the school

9   made to address the behavior of L.R. after you made the

10  report?

11    A    When I requested to have that meeting with

12  them, when I went over to the school at 8:00 in the

13  morning, they told me that they had already had a

14  meeting with the boy's mother, and I don't know about

15  anything else.

16        Jane Doe also told me that they had given that

17  boy a bad color.  They -- over at the school they give

18  the children different colors, depending on their

19  behavior.  Jane Doe had been given a pink one, and I

20  think -- and that boy had been given a bad color, which

21  I think is red, but I'm not sure right now.

22    Q    On January 20th of 2023, do you know how many

23  staff members were at Academir Charter School West

24  supervising students?

25    A    All over the school?  I don't know.



1     Q     Are you aware of the training that the

2  school's employees receive with regard to supervising

3  children?

4     A     I thought that it was good.

5     Q     Aside from separating the children, what else

6  do you believe that Academir should have done in this

7  case?

8          MR. MACDONALD:  Objection, form.

9     A     I believe that they should have checked on all

10  of the cameras.  I believe that they should have began

11  an investigation into the matter.

12          I always gathered, from how they handled all

13  of this, that they didn't give any importance to this

14  case.  They -- I believe that they should have called

15  DCF because by the time that I called DCF, I thought

16  that by then the school had already reported this to

17  DCF, which wasn't the case.

18          I think that they should have listened to what

19  my daughter had to say because not only as a student of

20  that school, but also simply as her value as a human

21  being, they should have given importance what she had to

22  say, and also to us as her parents.

23  BY MS. KARRON:

24     Q     Do you believe that Academir treated Jane Doe

25  differently because she was a female?



```
 1        MR. MACDONALD:  Objection, form.

 2     A    I don't know.

 3  BY MS. KARRON:

 4     Q    Do you have any reason to believe that the

 5  school treated the incident differently than they would

 6  have been if it was a boy that reported it?

 7        MR. MACDONALD:  Objection, form.

 8     A    I don't know.

 9  BY MS. KARRON:

10     Q    Do you have any evidence that the school's

11  handling of the incident was based on the fact that your

12  daughter is a girl?

13        MR. MACDONALD:  Objection, form.

14     A    I don't know.

15  BY MS. KARRON:

16     Q    Aside from the doctor that was hired by your

17  attorney, have you taken your doctor [verbatim] to any

18  doctors or mental health professionals as a result of

19  this incident?

20     A    No, because I don't want her to be reminded of

21  this all the time.  What I want for her is for her to

22  forget.  What I want for her is for her to forget.

23     Q    Did you notice any changed in Jane Doe's

24  behavior after she told you about this incident?

25     A    Yes.  She had nightmares.  She also didn't
```



1  want to change to a different school.  She did complain

2  about why is it that they're changing me to a different

3  school.  She was sad about it.  She did struggle a

4  little bit with adjusting to the new school.  She didn't

5  want to be changed to the new school, I didn't want to

6  change her to a new school, and she had to suffer

7  through the change.

8      Q    Did her grades go down as a result of changing

9  to a different school?

10     A    No.  She has good grades.  By the end of the

11  course, her grades improved even more.

12     Q    By the end of kindergarten?

13     A    Yes, by the end of kindergarten.  At the

14  beginning of kindergarten she did have a hard time when

15  it came to reading.  She wasn't the most advantageous

16  when it came to that.  But by the end of kindergarten,

17  she already felt more comfortable with the new

18  kindergarten and she began improving in her reading by

19  the end.

20         MS. KARRON:  Okay.  Can we just take like a

21      three-minute break?

22         MR. MACDONALD:  Yeah.

23         (Recess was had from 3:51 p.m. to 3:54 p.m.)

24  BY MS. KARRON:

25     Q    Aside from the nightmares and not wanting to



1  change schools, are there any other symptoms that Jane

2  Doe displayed that you believe are related to the

3  incident?

4     A   Yes.  She cried quite a lot because of

5  changing over to a different school.  She didn't want to

6  be changed to a different school.  She wanted to

7  continue at the same school because she wanted to remain

8  with her friends that she had already known, the friends

9  that she already had there.

10         And, also, whenever private parts are

11  mentioned, when they mention that over at school, or

12  whenever anyone else mentions it, she repeats the same

13  story.  She's also come to the point where she's

14  mentioned the exact same story to family members, when

15  she really had no reason to be sharing it with them.

16         She had such a hard time from changing over to

17  a different school that she even came to tell me what if

18  L.R. is taken out of that school, then I could go back

19  there?

20         There's so many things that went on, but she

21  still remembers L.R.'s name.  When we were looking

22  together at a family photo album, we were looking at the

23  photos, and there were only two names that she could

24  remember.  She could remember her friend Elisa and she

25  could remember L.R.'s name, his full name.  And when she



1    saw him there, she said, what if that boy leaves the

2    school, then can I go back to the school again?  Because

3    she wants to be there with her cousins and with the

4    friends that she had there.

5           This has been very hard for me.  It's been

6    very hard for me because it worries me that this might

7    have AN impact on her in the future.  I -- this has been

8    very difficult for me because a five-year-old little

9    girl should have no reason to go through something like

10   this at a place that should have been supervised.

11       Q    You mentioned family photos.  Is Jane Doe in

12   any way related to L.R.?

13       A    Jane Doe has photos for each year of her life.

14   I have photos for each year of Jane Doe's life.  I have

15   photos of -- with family, I have photos from all of her

16   school courses that she's had, and I have the

17   kindergarten photos for her.  And when we were looking

18   at those photos from kindergarten, I was left with my

19   mouth wide open when the only one that she -- that she

20   signaled with her little finger was just L.R.  She

21   didn't remember any other child's name until I asked

22   her, Jane Doe, don't you remember any other kids' names?

23   And the only other one that she could remember was

24   Elisa's.  No one else.  But she can't forget that boy's

25   name.



1        MS. KARRON:  Move to strike as nonresponsive.

2    BY MS. KARRON:

3        Q    My question was:  Is Jane Doe related to L.R.?

4        A    No.

5        Q    I want to go through some of the allegations

6    made in the lawsuit that you filed and ask you some

7    questions about that now.

8        A    Okay.

9        Q    How did Academir or Superior engage in a

10   coverup of the alleged sexual assault?

11       MR. MACDONALD:  Objection, form.

12       MS. KARRON:  It's in your Complaint.

13       A    Could you please repeat the question?  I'm

14   sorry.

15   BY MS. KARRON:

16       Q    Your Complaint, paragraph two, states:  When

17   Jane reported the sexual assault she had experienced to

18   one of her teachers, the school officials learned of the

19   incident on or around January 20, 2023.

20       I'll pause so you can translate.

21       Rather than coming to Jane Doe's aid,

22   defendants failed to adequately and equitably respond

23   and investigate the allegations, engaged in a coverup of

24   the sexual assault, and refused to take any meaningful

25   corrective action.



1       And my question is:  How did the defendants

2   engage in a coverup of the sexual assault?

3       A    Okay.  They covered it up because when I went

4   over to the school, they said that it had only been

5   something verbal, that nothing of that had ever

6   happened.  They never addressed it as something that was

7   sexual in nature.  They said that it was simply kids

8   getting to know each other's bodies.

9       They didn't pay any heed to what my daughter

10  had said.  They never addressed it as a sexual incident,

11  even despite the fact that it involved her private parts

12  and that it was sexual in nature because it involved her

13  private parts.  They just kept maintaining it as if it

14  was just an issue in between kids, just an issue going

15  on in between kids, despite it involving her private

16  parts, it involving a mouth, and it involving -- the

17  fact it was sexual in nature.

18      They never addressed it as sexual harassment.

19  They simply kept saying that it was just an issue in

20  between kids.

21      Q    What's your understanding of the meaning of

22  sexual harassment?

23      A    It's something that has -- that is -- that has

24  to do with sexuality.  It's something that involves

25  mouth and it's something that involved your private



1  parts.  And it is also a person harassing another.

2     Q    Do you believe that sexual harassment is

3  something that could happen only one time?

4        MR. MACDONALD:  Objection, form.

5     A    No.  I'm sure that it occurred on more than

6  one occasion.

7  BY MS. KARRON:

8     Q    That wasn't what I asked you.  I asked you:

9  Do you believe that sexual harassment is something that

10  can happen only one time?

11        MR. MACDONALD:  Objection, form.

12     A    No, I believe that it could happen more than

13  once.

14  BY MS. KARRON:

15     Q    You believe that for it to be sexual

16  harassment, it has to be something that occurs

17  repeatedly?  Yes or no.

18        MR. MACDONALD:  Objection, form.

19     A    I'm not really sure about the meaning, I'm not

20  really sure about the dictionary's meaning for it, but I

21  believe that it can occur on more than one occasion.

22  BY MS. KARRON:

23     Q    In your Complaint you allege that there was --

24  that the defendants unlawfully deprived Jane's personal

25  dignity.



1        How was her personal dignity deprived by

2   defendants?

3            MR. MACDONALD:  Objection, form.

4       A    I'm sorry, but what do you mean, deprived of

5   her dignity?  Could you formulate the question again?

6   BY MS. KARRON:

7       Q    Sure.  I'll read you your own Complaint.  It

8   says, paragraph four:  Jane seeks monetary relief to

9   redress defendants' unlawful deprivation of Jane's

10  personal dignities.

11           MR. MACDONALD:  Objection, form.

12      A    I believe that they did treat her as if she

13  had no dignities because they didn't pay any heed to

14  what she had to say despite the fact that they touched

15  her private parts.  They didn't listen to her when she

16  went through sexual assault.  And I believe that -- I

17  believe that this damaged her dignity and I don't know

18  how this will affect her in the future.

19  BY MS. KARRON:

20      Q    Did anyone at Academir tell you that you had

21  to withdraw your daughter from the school?

22      A    Not directly to me.  They told that to my

23  husband.

24      Q    And I just want to clarify, because I know

25  that you've mentioned, and I don't want to have to make



1  you keep repeating what your daughter told you, but I'm

2  trying to clarify because it went different ways in

3  different interviews.

4      My question is:  Did your daughter ever tell

5  you that her vagina was licked by L.R.?

6    A   She does not know the term vagina.  She

7  doesn't know the term vagina.  What she calls it is

8  pee-pee or coo-coo, which is a term that's used to

9  refer -- that they use to refer to vagina or to your

10  private parts.  That is how they call it in Spanish,

11  pee-pee or coo-coo.  And she touched it.

12    Q   Okay.  So coo-coo refers to vagina, not butt?

13      MR. MACDONALD:  Objection, form.

14    A   She touched it, so I'm referring -- so I

15  imagine that she was referring to her vagina.

16  BY MS. KARRON:

17    Q   Did she --

18    A   I don't know, but she touched it.

19    Q   Did your daughter ever tell you or gesture to

20  you that L.R. licked her butt?

21    A   She told me, using her gestures, even using

22  her little tongue to signal to it, that he did it just

23  like this.  And after that, she touched with -- using

24  her finger, she touched where he had touched her doing

25  that.  And I believe that she touched her vagina, her



1    private parts.

2          Now, I don't know if he touched her butt.

3    Q    Okay.  And did L.R. -- did your daughter ever

4    tell you or gesture to you that L.R. licked her breasts?

5    A    She didn't refer to it as breasts because she

6    doesn't really know that term.  What she -- the word

7    that she used was tits, and she touched herself using

8    her little fingers.  She touched herself there, using

9    her little fingers.

10    Q    And did your daughter ever tell you or gesture

11    to you that L.R. kissed her on the mouth?

12    A    She touched herself and she told me he kissed

13    me on the mouth, with those words.

14    Q    Did your daughter ever indicate to you that

15    L.R. used his hands to touch her in any way?

16    A    I'm not sure about his hands, but what is very

17    clear about -- what she did make very clear is that he

18    licked her.  Because she even stuck her tongue out to

19    tell me.  And he took -- she told me that he licked her.

20    Licked.  And she told me where he had done that.

21    Q    Do you know whether anyone at the school

22    viewed the video surveillance from January 20th of 2023?

23          MR. MACDONALD:  Objection, form.

24    A    I don't know whether they saw it on the 20th.

25    I know that on Tuesday, when I went there first thing on



1  Tuesday, they told me that they would check then, but I

2  don't know whether they had seen it.

3  BY MS. KARRON:

4      Q    Have you ever seen the video surveillance from

5  January 20th of 2023?

6          MR. MACDONALD:  Objection, form.  She can

7      answer if she's seen the video, but she should not

8      discuss any communications with me or our office.

9          MS. KARRON:  I asked her if she's seen the

10     video.  I didn't ask her for communications.

11         MR. MACDONALD:  I know.  I'm just clarifying

12     for my client.

13     A    A long time later I did see a portion of it.

14  BY MS. KARRON:

15     Q    And did you see anything on the video that

16  indicated that your daughter was touched by L.R. with

17  his tongue?

18     A    I did see a portion of that video for that

19  specific day, but they never showed me the ones for

20  outside, nor did they ever show me the ones for the rest

21  of the month.

22         What warranty do I have that this didn't occur

23  on a different day?  And, also, they didn't show it to

24  me for outside when she told me that she run over to the

25  PE teacher.  So where is that video?



1    Q    Well, there is no video of the outside.

2   That's why it wasn't shown to you.

3         Do you claim that you were not aware of your

4   rights under Title IX by the time that your husband

5   contacted the police on January 25th?

6         MR. MACDONALD:  Objection, form, calls for a

7    legal contention.

8    A    No.

9   BY MS. KARRON:

10   Q    When did you or anyone on Jane Doe's behalf

11   contact DCF?

12   A    We contacted them, I'm not sure, but it was

13   when she was already over at the new school.  I believe

14   it was on a Tuesday.  I believe it was on a Tuesday.

15   And by then I thought that the school had already

16   contacted DCF.  But it wasn't that way.  I was the first

17   one to do it.

18   Q    And I just saw -- according to your lawsuit,

19   you contacted DCF on January 31st of 2023.  Does that

20   sound right?

21   A    I'm not sure, but it could have been on that

22   date.  I'm just not sure about that exact date right

23   now.

24   Q    When you viewed the surveillance video for the

25   classroom on January 20th, did you see anything that



1  supports your claims in this case in any way?

2      MR. MACDONALD:  Objection, form, legal

3      contention.

4      A    I couldn't see anything on that video, but

5  what warranty do I have that they didn't change the

6  video to a different one?  Or what warranty do I have

7  that they didn't edit that video?  And they never showed

8  anything from outside.  And it also could have been done

9  on a different day.  I trust in Jane Doe.

10      MR. YOUNT:  Object to the responsiveness of

11      the witness.  It was a pretty straightforward

12      question.

13  BY MS. KARRON:

14      Q    So is it now your contention that someone has

15  edited the video or changed it in some sort of way?

16  And, if so, do you have any evidence to support that?

17      MR. MACDONALD:  Objection, form.

18      A    I have no evidence.  I don't know.  I simply

19  trust in my daughter.

20  BY MS. KARRON:

21      Q    So you think that the word of a five-year-old

22  is stronger than video evidence?

23      MR. MACDONALD:  Objection, form.

24      A    My daughter's words are what have -- are what

25  have the most worth.  I know that my daughter spoke the



1  truth, and I believe in her.

2  BY MS. KARRON:

3      Q    From the time that your daughter was withdrawn

4  from the school to the time that you contacted DCF, I'll

5  represent to you that six days passed.

6          I'll let you translate that part.

7          How did a delay in six days of the school

8  reporting it to DCF, versus you reporting it, impact the

9  case?

10          MR. MACDONALD:  Objection, form.

11          MS. KARRON:  No speaking objections.  Just say

12     form.

13          MR. MACDONALD:  Objection, form, legal

14     contention.

15          MS. KARRON:  Okay.  Stop doing speaking

16     objections.  We're in federal court, and I'm

17     objecting to you doing it, and I'm sure Scott does

18     as well.

19          MR. MACDONALD:  I'm saying legal contention

20     because that's outside of a form objection, so I'm

21     just noting --

22          MS. KARRON:  We're not in a trial deposition,

23     we're in a discovery deposition, Kyle.

24          MR. MACDONALD:  Okay.  And that's a proper

25     objection.  I don't know why you're arguing with me



1  about this.

2      I'm preserving the objection.  You can move on

3  with your questioning.

4      MS. KARRON:  All right.  We'll --

5      MR. YOUNT:  Legal contention is a proper

6  objection?

7      MS. KARRON:  For a discovery deposition.

8      MR. MACDONALD:  Yes.  She is asking her to

9  apply facts to law, how did it affect the case.

10  She is a lay witness, and you're asking her to

11  apply facts to law --

12      MS. KARRON:  It's a discovery deposition.

13      MR. YOUNT:  I didn't hear her ask that

14  question, so -- but, in any event.

15      MR. MACDONALD:  Okay.

16 BY MS. KARRON:

17      Q    All right.  You can answer the question.

18      A    Could you repeat it again?

19      Q    Sure.  How did a delay of six days in

20  notifying DCF impact DCF's investigation?

21      MR. MACDONALD:  Objection, form.

22      A    In which way did this affect DCF?  I'm sorry,

23  but I still don't understand.  Could you maybe say it in

24  simpler terms?

25



1   BY MS. KARRON:

2       Q    What was the outcome of DCF's investigation of

3   your daughter's case?

4       A    She again told the story to DCF just as she

5   had told it to us, and the DCF agent asked her how many

6   times did this happen to you, and she said more than

7   once, which supported what she had already told us.

8           MS. KARRON:  Move to strike as nonresponsive.

9   BY MS. KARRON:

10      Q    I asked you what the outcome of the

11  investigation was.

12      A    What was the result of it?  That they filed a

13  report.

14      Q    Okay.  Did DCF do anything other than filing a

15  report?

16          MR. MACDONALD:  Objection, form.

17      A    I don't know what else DCF might have done.  I

18  really don't know what else they did.

19  BY MS. KARRON:

20      Q    In your lawsuit you allege that Jane Doe

21  suffered significant academic harm.

22          Do you know how she suffered significant

23  academic harm if her grades did not go down at all?

24      A    Her grades began going up by the end of the

25  school year, but by the beginning of the school year she



1   wasn't the best student when it came to reading, and she

2   was also not the best student when it came to math.

3         The transition did pay a toll on her.

4      Q    Okay.  And again I'm going to ask you:  How

5   did she suffer significant academic harm if her grades

6   didn't go down?

7         MR. MACDONALD:  Objection, form.

8      A    Her grades weren't the best in the beginning.

9   She wasn't getting the same grades that she always got

10   before then.  She was also not the best when it came to

11   reading.  She was actually the last one to be able to

12   read the words that were the goal for the reading class.

13   She was also not doing great when it came to math.  She

14   didn't get any Fs, but her grades should have been

15   better, being that she's always been a very intelligent

16   girl.

17   BY MS. KARRON:

18      Q    But her grades, by the end of the year, had

19   improved since they were at at Academir; is that fair?

20      A    By the -- she did by the end of the year, but

21   she didn't even get a medal, and she was one of the

22   girls that would get a medal.

23      Q    A medal for what?

24      A    For the best grades in the class.

25      Q    She was in kindergarten.  How do you know she



1  would have gotten a medal?

2        MR. MACDONALD:  Objection, form.

3     A    Because she's a very intelligent little girl.

4  Because this year she's already getting better grades.

5  And she's always been very intelligent, so I was

6  expecting better performance from her throughout the

7  whole year.

8  BY MS. KARRON:

9     Q    Okay.  She didn't get a medal.  Anything else?

10        MR. MACDONALD:  Objection, form.

11     A    What more regarding academics?

12  BY MS. KARRON:

13     Q    Yes.  Regarding significant academic harm.

14     A    She wouldn't speak in class.  The teacher told

15  me that she was very shy.  She also got some bad grades,

16  like a D, which is not something that I was used to

17  seeing when it came to my daughter.

18        She wasn't achieving the goals when it came to

19  reading.  And this I'm saying when I -- when the other

20  kids did achieve them, being that I know that the other

21  kids are not as intelligent as my daughter.  And she

22  couldn't achieve that goal -- knowing that she's very

23  intelligent, she couldn't achieve that goal, and she

24  didn't -- because she wasn't as fast as the other kids.

25



1    MR. MACDONALD:  When we reach a good stopping

2    point, could we take a break, Julie?

3    MS. KARRON:  Sure.  We can do it now.

4    MR. MACDONALD:  Okay.

5    (Recess was had from 4:37 p.m. to 4:48 p.m.)

6  BY MS. KARRON:

7    Q    Aside from yourself and your husband and

8  people at Academir, is there anyone else that is a

9  witness to this case that you know of?

10    A    I imagine that also the police, even if the

11  report that they made was completely unfair, and the

12  psychiatrist.

13    Q    Did you ever make any reports to the police

14  yourself?

15    A    No.  Me, personally, I didn't.

16    Q    And did you, yourself, ever follow up with the

17  police to see if an investigation was being done?

18    A    They gave us a ticket, and I have it right

19  there, I could even bring it over here if you want to

20  see it, and that ticket has a number on it.  My husband

21  did ask for a follow-up by February, and what they gave

22  him was a report.

23    Q    Are you aware that the reason that there was

24  no follow-up was because your husband told them he did

25  not want an investigation to be launched?



1      MR. MACDONALD:  Objection, form.

2      A    I doubt that, because after the school didn't

3  show us the cameras and the school did not separate the

4  children, he did request an investigation, and that

5  should be in the report.

6  BY MS. KARRON:

7      Q    How many times did you speak with the school

8  regarding the allegations in this case, regarding this

9  incident?

10      A    Right after my girl told me about this, first

11  thing in the morning by the next day I told the teacher

12  about it.  I also requested to have a meeting as soon as

13  possible at the school at 8:00 in the morning on that --

14  on the next school day.

15          Now, I also called the counselor.  After I had

16  requested for them to stop talking about the subject

17  with my little girl, I called them after that to tell

18  them about that, and I called them again and again.

19          I even wrote to Rolando Mir.  I even wrote to

20  Rolando Mir, the one who's in charge of Superior and

21  also of Academir, to request that we -- that we could

22  talk about the situation, and he hung up on me.

23          I also asked him, if he had a conscience, to

24  please look into what had happened to my daughter.  I

25  called -- I remember that on one day I called two to



1 three times, and Soleil, the lady from the front desk,

2 told me that she didn't know that a meeting was being

3 held with Mr. Mir.

4      I did call the school as many times as I

5 could.  I couldn't have called the school more times

6 than I did.

7      The reason why I called two to three times on

8 that day was because I was trying to have a meeting with

9 that man so I could explain to him my daughter's

10 situation.  I called many times.

11      MS. KARRON:  We can take two minutes off the

12   record.

13      INTERPRETER:  She said my battery's running

14   low.

15      (A discussion was held off the record from

16 4:56 p.m. to 4:56 p.m.)

17 BY MS. KARRON:

18   Q   Did Jane -- I'm sorry.  We call her Jane, but

19 I know you know her as Jane Doe.

20      Did Jane Doe ever miss any days from Academir

21 before you withdrew her from school?

22   A   Before that Monday, yes, because I didn't feel

23 that it was a safe option to take my daughter to that

24 school when they didn't want to resolve anything.

25   Q   How many days of school did your daughter miss



1    from the time that you reported the incident to them

2    until the time you withdrew her?

3        A    She missed Thursday, Friday, so two days.

4    Because on Monday I was going to have a meeting with

5    Rolando Mir to see if we could work out a resolution to

6    this, but he never showed up for it.  And that's the day

7    when I made my final decision to take her out of the

8    school.  So she missed Thursday, Friday and Monday.  I

9    believe that would be three days.

10       Q    When did she begin school at Kendale Lakes

11   Elementary?

12       A    That same day, in the evening, we began

13   looking for schools.  So I believe that it was by the

14   next day, on Tuesday.  Yes, on Tuesday, I believe.

15       Q    Did your daughter suffer any physical injuries

16   as a result of the sexual incident?  Like was she hurt

17   physically?

18       A    Physical, like her being hit?  I don't know --

19       Q    Like physically hurt, injured.  Sorry.

20       A    I don't know, but you couldn't visibly see

21   anything.  Nothing like her receiving a blow.

22       Q    How many recordings do you have of Jane Doe

23   speaking of the incident?

24       A    Just one.  Just once.  I only spoke with her

25   about it twice because she brought up the subject.  She



1  brought it up in conversation, and I only recorded it

2  once because I didn't want to speak about the subject

3  again.

4      Q    Have you posted anything about this case on

5  social media?

6      A    Of course not, being that I don't even want to

7  know -- my daughter's identity to be known.

8          MS. KARRON:  Understood.  Okay.  Thank you for

9      your time.  That's all the questions I have.  I

10     believe that counsel for Superior has some

11     questions.

12         THE WITNESS:  Thank you.

13             CROSS-EXAMINATION

14  BY MR. YOUNT:

15     Q    Good evening, ██████    My name is Scott

16  Yount and I'm the attorney representing Superior Charter

17  Schools.

18     A    Hi.

19     Q    I have a few follow-up questions, so I'm going

20  to jump around a bit.  Many of my questions are going to

21  call for a yes or a no answer.  When I ask you a

22  question like that, please answer yes or no, and then if

23  you feel you need to explain, please do so.  Okay?

24     A    Okay.

25     Q    And another potential response to one of my



1   questions might be "I don't know."  So if you don't

2   know, just tell me you don't know and I'll move on.

3   Okay?

4         Please answer verbally to my questions.  Okay?

5     A   You didn't hear me, but I did say okay.

6     Q   And if you don't understand what I'm asking

7   you, please let me know so I can clarify.

8     A   Okay.

9     Q   On what date did you and your husband retain

10  an attorney for this claim?

11    A   It was once we received the police report

12  which made it seem like no one was going to do anything

13  about this.

14    Q   How long, after you and your husband spoke to

15  the police, did you receive the police report?

16    A   I don't quite remember, but he called them

17  several times and he was told that it wasn't ready yet.

18  I know that it was around the month of February.  I

19  don't remember the date, but I know that it was a

20  February day when he called, and they told him that they

21  would get it to him by the next day.  But he had already

22  been calling them several times before then.

23    Q   Is it accurate that you hired an attorney

24  after you switched Jane Doe to a different school?

25    A   Yes.



1    Q   Have you or your husband spoken to the parents

2 of L.R. about the incident or about this lawsuit?

3    A   No.  I even mentioned it during the meeting.

4 I told them I don't understand why that woman hasn't

5 contacted me.

6    Q   When you say "that woman," who are you

7 referring to?

8    A   The woman, I believe -- that I believe to be

9 the boy's mother, they told me during the meeting that

10 they had already met with the boy's mother, but she

11 never contacted me.

12    Q   Did you make any efforts to contact the boy's

13 mother?

14    A   No.  I didn't have her number.

15    Q   Have you filed a lawsuit against the parents

16 of L.R.?

17    A   A lawsuit against that boy?  No.  The lawsuit

18 is against the school, which is the one that acted

19 improperly.

20       My husband did mention to DCF that it would be

21 a good idea for them to investigate on why it was that

22 this boy was doing those things.

23    Q   ████████  my question is very simply:  Have

24 you filed a lawsuit against the boys' parents?

25    A   No.



1   Q    Have you made a claim and asked them for

2   money, either the parents or their insurance company?

3   A    No.

4   Q    Why not?

5   A    The boy?

6   Q    The parents of the child.

7   A    It's just -- I don't -- it's because, in

8   reality, what the boy did is the parents'

9   responsibility.

10        Now, my girl wasn't going to be in the same

11   class with that boy.  Just know that I, myself, wouldn't

12   have my girl in the same class as that boy.

13        But, no, I didn't place a lawsuit against the

14   parents.

15   Q    How much money are you seeking to recover from

16   my client, which is Superior Charter Schools?

17        MR. MACDONALD:  Objection, form.

18   A    I believe the exact amount is $3.2 million.

19   BY MR. YOUNT:

20   Q    Do you distinguish that dollar amount from my

21   client, which is Superior Charter Schools, and

22   Ms. Karron's client, which is Academir?

23        MR. MACDONALD:  Objection, form, legal

24   contention.

25   A    May I not answer this question?



1   BY MR. YOUNT:

2       Q    If you know the answer, you need to answer the

3   question.

4       A    It's not clear to me.  I'm not sure about it

5   right now.  It's unclear to me.  I don't remember the

6   amounts right now.

7       Q    Is it accurate that you and your husband have

8   spent no money in medical care or psychological care or

9   treatment for your daughter which you relate to this

10  accident?

11          MR. MACDONALD:  Objection, form.

12      A    We did hire a psychiatrist who evaluated our

13  little girl, and we -- while he did that, we were

14  present on the -- over on the other side, listening to

15  what she had to say.  But what I want for her is for her

16  to forget about this.  That's why I haven't looked for

17  another psychiatrist.

18  BY MR. YOUNT:

19      Q    Have you read the report that was issued by

20  the psychiatrist who examined your daughter for this

21  litigation?

22      A    Yes.

23      Q    And you are aware that that doctor is not

24  going to treat your daughter for any problems she may

25  have experienced from this accident?



1    A   Yes.

2    Q   It says it in his report; correct?

3    A   Yes.

4    Q   And the only reason you had your daughter

5  speak to this individual is for this litigation;

6  correct?

7        MR. MACDONALD:  Objection, form.

8    A   I also wanted to hear a professional's

9  opinion.

10  BY MR. YOUNT:

11    Q   Who is Jane Doe's pediatrician?

12    A   It's at Center for Pediatric Care.

13    Q   Is there one particular doctor or physician's

14  assistant that she sees more frequently than another?

15    A   She has -- over at the Center there's like

16  three physicians.  She sometimes seen by Alicia, she's

17  sometimes seen by the nurse practitioner, or sometimes

18  it's Lorena.  One of those three are the ones who see

19  her.

20    Q   Do you attend all of your daughter's

21  pediatrician visits?

22    A   She has her follow-up appointment every year.

23    Q   ██████, my question is:  Do you, Jane Doe's

24  mother, attend Jane Doe's pediatrician's visits with

25  her?



1     A    Yes.

2     Q    Did you ever talk to the pediatrician or the

3   nurses about this alleged incident?

4     A    No.

5     Q    Did Jane Doe?

6     A    No.

7     Q    If this case goes to trial, is Jane Doe going

8   to testify?

9         MR. MACDONALD:  Objection, form.

10     A    I want for her to forget about this.  I don't

11   want for anyone to talk with her about the subject

12   again.  I really wouldn't want anyone to interview her

13   about this again.

14   BY MR. YOUNT:

15     Q    Does that mean that, as the decision maker for

16   your claim, you are not going to have Jane Doe testify

17   at the trial?

18         MR. MACDONALD:  I'm going to object to the

19     form and instruct her not to answer.  That

20     encroaches on --

21         MR. YOUNT:  What's wrong with the form of the

22     question?  And, number two, what's the basis for

23     not answering?

24         MR. MACDONALD:  Yes.  I'm instructing her not

25     to answer on the grounds that it encroaches on



1    attorney-client privilege and work product

2    privilege by asking her about the mental

3    impressions of counsel as to trial strategy by

4    asking her who is going to testify at a trial.

5        MR. YOUNT:  All right.  I'll try one more

6    time.

7    BY MR. YOUNT:

8        Q    ████████████

9        INTERPRETER:  Sorry.  Counsel, do you want me

10    to interpret your objection?

11        MR. MACDONALD:  Yes, please.

12        INTERPRETER:  Okay.

13    BY MR. YOUNT:

14        Q    ████████, do you believe that -- as Jane Doe's

15    mother, that she is capable of going into a courtroom

16    and telling the truth to a jury of six people or seven

17    people?

18        A    She's seven years old.  I really wouldn't want

19    for her to speak about the subject again.

20        Q    Have you ever read your Complaint or had the

21    Complaint read to you?

22        A    I read it.

23        Q    Are you able to read English?

24        A    English is not my first language, but I can

25    read in English.



1    Q    If I were to show you a paragraph in the

2   Complaint, could you read it and then answer questions

3   in Spanish about it?

4    A    For this reason, I would prefer if it were

5   translated to me.

6    Q    Okay.  When you read the Complaint, did

7   everything contained in the complaint -- strike that.

8         Was everything in the Complaint that you read

9   true and correct?

10   A    Yes.

11   Q    In the Complaint, at paragraph 14, you state

12   that on January 20th, 2023, one of Jane's classmates,

13   who you identify as L.R., which we know to be L.R.,

14   kissed and otherwise touched your daughter; is that

15   correct?

16   A    Yes.  That's the day that she reported to us.

17   Q    January 20, 2023, is the date that she

18   reported it, and that's also the date that you claim the

19   assault occurred; is that correct?

20        MR. MACDONALD:  Objection, form.

21   A    That's the day that she reported it, and I'm

22   almost sure that's the day when it occurred, but I don't

23   know how many other times it also occurred.

24   BY MR. YOUNT:

25   Q    Now, ████████ I want to talk about what you



1   state in your Complaint, and in that Complaint you

2   allege one incident on January 20, 2023; is that

3   correct?

4        MR. MACDONALD:  Objection, form.

5     A   One incident did occur on that day.  I know

6   that something did occur on that day.  Now, I don't --

7   what I don't know is on how many other days or on how

8   many other different occasions something else occurred.

9   That, I don't know.

10  BY MR. YOUNT:

11    Q   You found out about the alleged incident

12  because somebody with the school told you; is that

13  correct?

14    A   The school called me that afternoon to let me

15  know that something verbal had occurred.  The one who

16  called me was Soleil, with Ms. Chaudry being next to

17  her.  But I learned about the incident from my

18  daughter's own mouth, and I believe in her and I know

19  that what she told me is true.

20    Q   ████████ who told you about any incident

21  first?  Who was the first person to tell you about any

22  incident?

23    A   The one -- it was the receptionist that first

24  told me over the phone.  But the first one to tell me in

25  person was my own daughter.  First thing when I opened



████████

 1  that door, she told me, Mom, I have something to tell

 2  you.

 3      Q    ████████  this occurred on January 20, 2023;

 4  correct?

 5          MR. MACDONALD:  Objection, form.

 6      A    The day in which I was told, the day when they

 7  reported it to me, yes, it was on that date, on

 8  January 20th.

 9  BY MR. YOUNT:

10      Q    When you dropped your daughter off at school

11  that day on January 20th, when you dropped her off, did

12  you have any suspicion whatsoever that your daughter had

13  ever been spoken to inappropriately or touched

14  inappropriately by another student?

15      A    Not up to that moment.

16      Q    Because if you would have had such a

17  suspicion, you wouldn't have dropped your daughter off

18  at school; is that correct?

19      A    Of course not.

20      Q    And before January 20, 2023, Jane Doe seemed

21  completely happy with everything that was going on at

22  the school, from what you could tell as her mother;

23  correct?

24          MR. MACDONALD:  Objection, form.

25      A    She was always -- she was not always happy at



1   that school.  There were some occasions when she didn't

2   want to go to school, but I imagined that it was just

3   something normal in kids not wanting to go to school

4   sometimes.  But she was not always happy happy.

5   BY MR. YOUNT:

6       Q    If Jane Doe had been subjected to either

7   verbal or physical sexual assault prior to January 20,

8   2023, would you have expected her to tell you when it

9   happened?

10          MR. MACDONALD:  Objection, form.

11      A    Whether I would have expected her to tell me?

12   I am sorry, but I don't understand.  Whether I would

13   have thought that she would have told me?

14   BY MR. YOUNT:

15      Q    Correct.

16          MR. MACDONALD:  Same objection.

17      A    Could you please formulate the question again?

18   I didn't understand it.

19   BY MR. YOUNT:

20      Q    Something happened to Jane Doe on January 20

21   and she told you about it on January 20; correct?

22          MR. MACDONALD:  Objection, form.

23      A    Yes.

24   BY MR. YOUNT:

25      Q    If something had happened on January 10th at



1  school, would you have expected her to tell you about it

2  on January 10th?

3          MR. MACDONALD:  Objection, form.

4      A    I don't know what's going on in her mind.  I

5  just know that when she told me about it, it had

6  happened then.

7  BY MR. YOUNT:

8      Q    If Jane Doe had been subjected to verbal or

9  sexual assault prior to January 20, 2023, would you have

10  expected her to tell you around the time that it

11  happened?

12          MR. MACDONALD:  Objection, form.

13      A    I don't know if she might have not told me if

14  something had happened to her previously.  What I do

15  know is that when she told me about the incident, it had

16  occurred.

17  BY MR. YOUNT:

18      Q    When she told you about the incident that

19  occurred on January 20th, she volunteered the

20  information before you asked her about it; correct?

21      A    Yes.

22      Q    Do you understand the difference between

23  Academir and Superior Charter Schools, which are the two

24  defendants you sued in this case?

25          MR. MACDONALD:  Objection, form.



1    A    Yes.

2   BY MR. YOUNT:

3    Q    Explain the difference between the two

4   entities.

5         MR. MACDONALD:  Objection, form.

6    A    Okay.  So Superior's the one that does, like,

7   the management for all of the Academirs.

8   BY MR. YOUNT:

9    Q    In connection with your -- with Jane Doe's

10   attendance at Academir, did you ever make payments

11   directly to Superior for anything?

12        INTERPRETER:  Payment directly to Superior?

13        MR. YOUNT:  Correct.

14    A    The payment, when it was for day care, was

15   made to the school.  I don't know what portion of it was

16   for Superior.  That, I don't know.

17   BY MR. YOUNT:

18    Q    Did you pay by check?

19    A    I don't remember how it was back when it was a

20   day care.

21    Q    Was the day care Academir?

22    A    Yes.  They used to have a day care there, and

23   my girl has been at Academir ever since she was two

24   years old.

25        Now over at VPK, I know that you pay the



1  school too.  So, yes, I believe so, it's made to the

2  school.

3      Q   The school being Academir; correct?

4      A   Yes.  What I don't know is what portion of it

5  was made to Superior.  I really don't know how that

6  money is divided in between them.  That, I don't know.

7      Q   In your Complaint, ████████ you allege that

8  Superior Charter Schools receives federal funding.  Are

9  you aware of that allegation in your Complaint?

10        MR. MACDONALD:  Objection, form.

11      A   Yes.

12  BY MR. YOUNT:

13      Q   Without telling me anything that you've spoken

14  with your attorney, what information do you have that

15  Superior Charter Schools has received federal funding?

16        MR. MACDONALD:  Objection, form, legal

17     contention.

18      A   I'm not sure about this, but I believe that

19  that school is a charter, which is that a part of it is

20  private and another part of it they receive funding from

21  the government.

22  BY MR. YOUNT:

23      Q   In the response, ████████, you used the phrase

24  "that school."  What is "that school"?

25        MR. MACDONALD:  Objection, form.



1    A    Well, to Academir, which also includes

2  Superior, because they're a part of the school; right?

3  BY MR. YOUNT:

4    Q    ████████, you've sued two separate companies

5  here.  You've sued Academir and Superior.  You

6  understand that; correct?

7    A    Yes.

8    Q    So you understand they're separate entities;

9  correct?

10       MR. MACDONALD:  Objection, form.

11    A    Yes.

12  BY MR. YOUNT:

13    Q    And your daughter attended Academir; is that

14  correct?

15    A    Yes.

16    Q    And you told me earlier that Superior was the

17  management company that worked with Academir and other

18  schools; is that correct?

19       MR. MACDONALD:  Objection, form.

20    A    Yes.

21  BY MR. YOUNT:

22    Q    What information do you have which supports

23  the allegation of your Complaint that Superior received

24  federal funding?

25       MR. MACDONALD:  Objection, form, legal



1    contention.

2    A    Could you formulate the question once again?

3    I didn't quite understand it.

4    BY MR. YOUNT:

5    Q    Do you understand that you have alleged in

6    your Complaint that my client, Superior, receives

7    federal funding?

8        MR. MACDONALD:  Objection, form.

9    A    Yes.

10   BY MR. YOUNT:

11   Q    What evidence do you have to support that

12   claim?

13       MR. MACDONALD:  Objection, form, legal

14    contention.

15   A    Evidence to show that?  Well, I don't know.  I

16   looked online and I informed myself about that.

17   BY MR. YOUNT:

18   Q    Okay.  Can you tell me where online can I look

19   up to see whether Superior receives federal funding?

20       MR. MACDONALD:  Objection, form, legal

21    contention.

22       MR. YOUNT:  Kyle, your objections are starting

23    to get a little bit too much.  I asked her to tell

24    me where it is online.  There's no legal conclusion

25    or contention about that.  It's a very simple



1    factual request.

2       You're trying to coach your witness, and I'm

3    going to ask you to stop.  Please don't do it

4    again.

5       MR. MACDONALD:  I just want to clarify.  I'm

6    not trying to coach her, but you're asking her

7    where online she can find evidence to support her

8    claim.  You're asking her where online she can find

9    evidence to support her legal claims.  That's why

10   I'm objecting on the basis of a legal contention.

11      MR. YOUNT:  That's an invalid objection based

12   on the question asked, but I don't want to argue

13   about it.

14   BY MR. YOUNT:

15   Q       please answer the question.

16   A    I'm sorry, but with this conversation going

17   on, I disassociated.  So could you please repeat the

18   question?  Sorry.

19   Q    Where online can I find evidence that Superior

20   Charter Schools receives federal funding?

21      MR. MACDONALD:  Same objections.

22   A    Right now I'm not sure.  In reality, I know

23   that Rolando is part of Superior because I looked him

24   up, and I know that he's part of the management for all

25   of Academirs.



1    BY MR. YOUNT:

2        Q    ███████ I appreciate your answer, but my

3    question is very simple.  Where online can I look up

4    that Superior receives federal funds?

5            MR. MACDONALD:  Same objections.

6        A    I can't remember right now.

7    BY MR. YOUNT:

8        Q    Okay.  Do you associate Mr. Mir with Superior?

9        A    In some way, yes.

10       Q    The first time you communicated with Mr. Mir

11   about the incident was on January the 27th, 2023; is

12   that correct?

13       A    It must have been around those dates.  I can't

14   remember the exact date.

15       Q    It was by text; correct?

16       A    I also called him and he hanged up on me, and

17   I wrote to him, thinking that the call had been lost.

18       Q    Did you text him first or did you call him

19   first?

20       A    I called him first and he hung up on me.

21       Q    Did you identify yourself before he hung up on

22   you?

23       A    Yes.

24       Q    What did you say to him?

25       A    I don't quite remember, but I told him my name



1   is ███████, I'm the mother of Jane Doe, and I wanted

2   to talk to you about an incident that occurred at the

3   school.  Perhaps you are not -- then I began to tell him

4   more about the incident and I told him the story about

5   the incident, and that he's when he hung up on me.  Now,

6   I'm thinking that the call had just been dropped.

7           I wrote to him and I told him I know that

8   you're a good person, and I just would like for you to

9   work with me in finding a solution to this.  Sorry.

10  Maybe you're not aware.

11          (The court reporter asked for clarification.)

12          MR. YOUNT:  Ms. Court Reporter, how are you

13      doing?  Did you get all that?  Can you read it

14      back, please?

15          (The answer was read by the reporter.)

16          MR. YOUNT:  And that's the end of the

17      translation?

18          INTERPRETER:  For the interpreter, yes.

19          MR. YOUNT:  Okay.  Thank you.

20  BY MR. YOUNT:

21      Q   ███████, did you text Mr. Mir the same day

22  that you called and gave this information to him and he

23  hung up?

24      A   No, I don't quite remember, but I believe so.

25      Q   Because we have your text message, and it's



1   sent Friday, January 27, at 8:41 a.m.

2          Was the call you placed to Mr. Mir just before

3   then?

4          MR. MACDONALD:  Objection, form.

5      A    I don't quite remember, but I believe that it

6   was like on a Thursday because I wanted to have a

7   meeting with him as soon as possible, and I don't know

8   why he delayed it all the way till Monday.  I thought

9   maybe he was busy doing things.

10          It's hard for me to remember because it's

11  already been more than a year since then, but I know

12  that we agreed to have a meeting on Monday at 3:00 in

13  the afternoon, or something like that.

14  BY MR. YOUNT:

15      Q    In fact, ███████, Mr. Mir told you, when he

16  responded to your text, that he was out of town; is that

17  correct?

18      A    I don't remember and I don't have those

19  messages right now.

20      Q    When you say Mr. Mir hung up on you, did you

21  get the impression that he was hanging up on you to be

22  rude, or do you think the call was dropped, or do you

23  think that it was an accident, or do you just not know?

24      A    I don't know.

25      Q    So the first time that you communicated with



1  Mr. Mir was a short call before you texted him; correct?

2   A   Yes.  Yes.

3   Q   Before that telephone communication, did you

4  have any communications with anybody associated with

5  Superior Charter Schools about the alleged incident?

6       MR. MACDONALD:  Objection, form.

7   A   Well, I really don't know whether Bello

8  [phonetic] is also part of them, but we were at school.

9  I just don't know who, at school, was part of them.

10  BY MR. YOUNT:

11   Q   ████████ will you please name every person

12  who communicated with at the school prior to your

13  conversation with Mr. Mir?

14   A   According to what I remember, Soleil,

15  Ms. Chaudry, the principal's assistant, I know that

16  Jordani spoke with the principal, the counselor, the

17  person from the school when -- when this person did not

18  appear when I removed Jane Doe from the school, and I

19  spoke with quite -- several people.  Those are the ones

20  that I can remember.

21   Q   To your knowledge, are all of those people

22  employees of Academir?

23       MR. MACDONALD:  Objection, form.

24   A   I don't know.  I suppose so.  It's not clear

25  to me.



1    BY MR. YOUNT:

2       Q    Now, you and Jane Doe's father decided to

3    transfer Jane Doe to another school on January 31, 2023;

4    is that correct?

5       A    I don't quite remember the date, but it was

6    around a Monday, approximately.

7       Q    Your Complaint, at paragraph 69, says that the

8    transfer occurred on January 31, 2023, which is a

9    Tuesday.

10           Are you able to clarify whether the transfer

11   happened on Tuesday, the 31st of January, or whether it

12   happened on the Monday, which would have been the 30th,

13   or do you just not know?

14      A    I don't remember.  What I do remember is that

15   when that final decision was made to take her out of the

16   school, that was after we realized that the school

17   wasn't going to take matters into this.  When we

18   realized that they weren't going to work into finding a

19   solution to this, that's when we decided to take her out

20   of the school.

21      Q    And you would agree that nobody forced you to

22   transfer Jane Doe to another school; is that correct?

23           MR. MACDONALD:  Objection, form.

24      A    No.  They told us that if we didn't like the

25   school policy, that we could take our girl over to a



1   different school.  They told us that they wouldn't

2   change the boy over to a different class.  They told us

3   that they weren't going to check on the cameras.  And

4   they told us that they weren't going to look into a

5   solution for this.  They told us that if we didn't like

6   how the school was handling it, that we could just take

7   our daughter to a different school.  So, yes, they did

8   force us.

9   BY MR. YOUNT:

10       Q    When you communicated with Mr. Mir by text on

11   January 27th, 2023, you-all agreed to meet the following

12   Monday, which would have been January 30, 2023; is that

13   correct?

14       A    That was the final agreement, but I believe

15   that I had communicated to him that I wanted the meeting

16   to be held before then, but he didn't give it to me

17   until Monday.  And I remember that that was under the

18   pretext that he had something else going on and that's

19   why he couldn't hold the meeting before then.

20            Now that I recall, I believe that he had

21   actually offered a different date to me, but then he,

22   himself, changed it to that day at 3:00.

23            MR. MACDONALD:  She has a hard stop at 6:00,

24       just so you know.

25            THE WITNESS:  I have my girl's open house



1    today and I don't want to miss it because it's the

2    open house.

3        MR. YOUNT:  Kyle, I've got probably 30 more

4    minutes.  What do you want to do?  Let's go off the

5    record.

6        (A discussion was held off the record from

7   5:59 p.m. to 6:01 p.m.)

8        (Ms. Karron left the videoconference.)

9        MR. YOUNT:  Let's go back on the record.

10  BY MR. YOUNT:

11    Q    ██████    I'm showing you a document produced

12  by your attorney which is Bates labeled JD000089 and it

13  goes through 98.

14        My first question is:  Can you read this

15  document sufficient where you can answer questions about

16  it?

17        MR. MACDONALD:  Scott, if you want to ask her

18    specific questions about text messages, I don't

19    mind that as long as it's translated, but I just

20    wanted that to be clear.

21        MR. YOUNT:  Kyle, I've been trying.  I just

22    need to get her to confirm that she texted Mir on

23    the 27th, and that the meeting was on Monday, but I

24    can't get that from her.  So I don't know how else

25    to do it other than to show her the text.



███████████

```
 1        MR. MACDONALD:  Okay.  Yeah, as long as it can
 2   be translated, that's fine, you can ask about it.
 3        INTERPRETER:  Would you like for me to
 4   translate it, Counsel?
 5        MR. YOUNT:  Let's just try to go and see how
 6   this goes.
 7   BY MR. YOUNT:
 8   Q    ██████  will you agree with me that this is
 9   the first text that you sent to Mr. Mir, which was on
10   January 27th at 8:41 a.m.?
11   A    Honestly, I don't really remember whether this
12   was the first one.  And, honestly, I also don't remember
13   how much more I communicated with him by phone.  So I
14   really don't remember whether this was the first one.
15   Q    ██████  did you produce all of your texts
16   with Mr. Mir to your attorney with respect to this case?
17   A    Yes.  Yes, I believe so.  I believe that I
18   submitted everything that I had.  I might have missed
19   something because that was in January and this was in
20   February, but I gave them as much as I could -- as much
21   as I had.
22   Q    With respect to dates and timing, will you
23   defer to what the texts state?
24   A    Well, there's those text messages right there
25   and I imagine that they have the dates there; right?
```



1   And I also imagine that over with the phone company you

2   can also check on the dates; right?

3       Q    Correct.  Do you agree that -- never mind.

4            ████████ since this incident, has Jane Doe

5   experienced issues with bedwetting?

6       A    With bedwetting?  She did have an accident

7   where she did pee her bed.  I don't know whether it was

8   once or twice, but she did have an incident where she

9   peed her bed.

10      Q    Did that ever happen before the incident that

11  you filed this lawsuit about?

12      A    I don't remember, but it could be.

13      Q    Have you described to us, over the course of

14  your testimony today and yesterday, all of the issues

15  that you have seen Jane Doe experience which you relate

16  to the accident in terms of behavior changes?

17          MR. MACDONALD:  Objection, form.

18      A    They're not all of them because they told me

19  that I have to be faster when it comes to my answers.

20  BY MR. YOUNT:

21      Q    Okay.  Describe for me then all of the issues

22  that you've seen that Jane Doe has had since this

23  incident which you relate to the incident.

24      A    I really don't have enough time to tell you

25  everything in just three minutes.



1        What I can say is that my little girl has been

2    telling the same thing that happened to her both to

3    family members, she's been bringing it up with family

4    members, with family friends.  She keeps bringing it up

5    and she still hasn't forgotten about it, even to this

6    day, after some -- much time had passed.

7        Whenever the word bullying is mentioned, she

8    mentions this boy.  And she mentions this boy not only

9    by his first name.  She mentions both his first name and

10   his last name.

11       My girl has -- still, to this day, whenever we

12   look at our family tree, whenever we look at our

13   pictures, whenever she sees herself when she -- because

14   we have pictures of her ever since she was very small,

15   we have pictures of her from pre-K, from kinder, and

16   whenever she looks at the photos, she signals

17   specifically towards that boy.  In addition to her

18   cousin, it is the only other name that she can remember

19   from that class.

20       Whenever she is -- she is asked whenever

21   anything -- she's been asking me about private parts,

22   and whenever she asks me about private parts, she refers

23   to that incident, she mentions that incident again.

24       Now, she's been talking about it again and

25   again.  She's mentioned it several times, even after



1   this incident occurred already a long time ago, and she

2   still hasn't forgotten about it.

3          And I also forgot to mention that she also

4   recently told me that she wanted to go back to that same

5   school once that boy left that school, and that happened

6   just a short while ago.  That wasn't long ago.  That was

7   recent.

8          She still -- even after time has passed,

9   she -- people still come to me sometimes telling me that

10  my little girl had told them about what happened to her

11  in kinder, and they come to me, asking me questions

12  about it.

13         Also, she had the nightmares, she wetted her

14  sheets and she still cries.  And when she cried, it was

15  not only crying about being changed over to a different

16  school.  She still cries when remembering this same

17  incident, the same story, the same subject.  And the

18  nightmares and the wetting her sheets was corroborated

19  by the psychiatrist.

20         She hasn't stopped remembering.

21         Now, her grades have barely began improving,

22  because when she first began at school again after this

23  happened, her grades, when it came to reading and when

24  it came to math, weren't the best -- weren't her best.

25         And the teacher has mentioned things like



█████████████

1    she's a quiet girl, she's a shy girl, she's a mature

2    girl.

3         And we also have to be listening to what she

4    tells me from her memories of this, what she tells both

5    me, what she's been telling her father again.

6         And a five-year-old shouldn't have gone

7    through something like this.  It has been very difficult

8    for both a little girl such as herself at four, her

9    parents to go through something like this.

10   Q    ███████ is there anything else significant

11   that you'd like to tell us about how this incident --

12   alleged incident has impacted your daughter?

13   A    Right now, as I already said, I really can't.

14   As I said, I have -- I'm already late for the open

15   house, and I have to go right now because I really don't

16   want to miss the open house at the new school.  I can't.

17   Q    I have one more question for you.  During the

18   course of today's deposition have you texted anybody at

19   all?

20   A    Throughout the course of this session?  Yes.

21   It has been during the breaks.  During the breaks.  Only

22   breaks.

23   Q    You've texted a representative?

24   A    Not my attorney, no.

25   Q    Have you texted anybody affiliated with your



1    attorney's office during the course of this deposition?

2        A    To tell them that I began -- that it began at

3    3:00.  Before.

4        Q    This is a one-word answer.  After 3:00 today

5    and before now, have you texted anybody with your

6    attorney's office?

7        A    No.

8            MR. YOUNT:  Okay.  Thank you.  I have no more

9        questions.

10           MR. MACDONALD:  No questions.  She'll read.

11           COURT REPORTER:  Are you ordering?

12           MS. WHITE:  No, we're not ordering.

13           MR. YOUNT:  Yes, we're ordering.

14           COURT REPORTER:  The original?

15           MR. YOUNT:  Sure.

16           COURT REPORTER:  Do you want a copy, Kyle?

17           MR. MACDONALD:  We're okay for now.

18           MR. YOUNT:  How quickly can we get the depo

19        transcript?

20           COURT REPORTER:  It's up to you.

21           MR. YOUNT:  Get it to me in a week.

22           (The deposition was concluded at 6:18 p.m.)

23

24

25



CERTIFICATE OF OATH

STATE OF FLORIDA   )
COUNTY OF VOLUSIA  )

   I, the undersigned authority, certify that
CARMEN QUINTANA personally appeared before me via
videoconference and was duly sworn August 28, 2024.

   WITNESS my hand and official seal this 29th day
of August 2024.

_____
  Christie Sammaro
  Notary Public - State of Florida
  My Commission No.:  HH 027526
  Expires:  August 31, 2024

          Personally Known
   OR Produced Identification  X
  Type of Identification Produced  PA DL



1        CERTIFICATE OF OATH

2
 STATE OF FLORIDA   )
3  COUNTY OF VOLUSIA  )

4     I, the undersigned authority, certify that
   ███████████ personally appeared before me via
5  videoconference and was duly sworn August 28, 2024.

6
     WITNESS my hand and official seal this 29th day
7  of August 2024.

8                        _Christie Sammaro_
                     _____
9                     Christie Sammaro
                      Notary Public - State of Florida
10                     My Commission No.:  HH 027526
                      Expires:  August 31, 2024
11

12

13

14

15

16              Personally Known
         OR Produced Identification   X
17        Type of Identification Produced  FL DL

18

19

20

21

22

23

24

25



1          REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA    )

4    COUNTY OF VOLUSIA   )

5

6        I, CHRISTIE SAMMARO, RMR, CRR, certify that I

7    was authorized to and did stenographically report

8    the deposition of ████████████; that a review of the

9    transcript was requested; that the transcript is a

10   true and complete record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the

13   parties, nor am I a relative or employee of any of

14   the parties' attorneys or counsel connected with the

15   action, nor am I financially interested in the

16   action.

17       Dated this 29th day of August 2024.

18

19       _____

20               CHRISTIE SAMMARO, RMR, CRR

21

22

23

24

25

