# EXHIBIT  A

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 23-CV-23004-JB
 3

 4   JANE DOE, a minor, by and              Miami, Florida
     through her mother and next
 5   friend, Mother Doe,

 6        Plaintiff,                        September 18, 2024

 7            vs.                           2:15 p.m. to 5:15 p.m.

 8   ACADEMIR CHARTER SCHOOLS, INC.         Pages 1 to 156

 9        Defendant.

10   _____

11                    EVIDENTIARY MOTION HEARING
                   BEFORE THE HONORABLE EDWIN G. TORRES
12                    UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14
     FOR THE PLAINTIFF:         KYLE T. MACDONALD, ESQ.
15                              DEREK SMITH LAW GROUP, PLLC
                                520 Brickell Key Drive
16                              Suite O-301
                                Miami, Florida 33131
17

18   FOR DEFENDANT ACADEMIR:    JULIE B. KARRON, ESQ.
                                KELLEY KRONENBERG
19                              10360 West State Road 84
                                Ft. Lauderdale, Florida 33324
20

21   FOR DEFENDANT SUPERIOR CHARTER:

22                              SCOTT YOUNT, ESQ.
                                GARRISON, YOUNT, FORTE & MULCAHY
23                              601 Bayshore Boulevard
                                Suite 800
24                              Tampa, Florida 33606

25
```

```
 1    STENOGRAPHICALLY REPORTED BY:

 2                                  PATRICIA DIAZ, FCRR, RPR, FPR
                                    Official Court Reporter
 3                                  United States District Court
                                    400 North Miami Avenue
 4                                  11th Floor
                                    Miami, Florida 33128
 5                                  (305) 523-5178

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2
                                  Direct   Cross   Redirect
 3
        WITNESS
 4
        OLIVIA BERNAL
 5      (Mr. Yount)                 6
        (Mr. MacDonald)                     17
 6

 7      JAMES LEE STAFFORD
        (Mr. MacDonald)            49                  65
 8      (Mr. Yount)                        55

 9      HABIB HASBUN
        (Mr. Yount)                67
10      (Mr. MacDonald)                    73

11

12
        EXHIBITS                        FOR ID    ADMITTED
13
14      Plaintiff's Exhibit No. 8         21

15      Plaintiff's Exhibit No. 3         26

16      Plaintiff's Exhibit No. 10        53

17
        Plaintiff's 2 Binders through 24            81
18

19

20

21

22

23

24

25
```

1          (Call to the Order of the Court.)

2          THE COURT:  Have a seat.

3          COURTROOM DEPUTY:  Calling case Jane Doe versus

4     Academir Charter Schools, Incorporated, case number

5     23-20034-Civil-Judge Becerra.

6          Counsel, your appearances for the record, starting with

7     the plaintiff.

8          MR. MACDONALD:  Good afternoon, Kyle MacDonald for the

9     plaintiff.

10          MR. YOUNT:  Good afternoon, Your Honor, Scott Yount for

11     the defendant, Superior Charter.

12          MS. KARRON:  Good afternoon, Your Honor, Julie Karron

13     on behalf of Academir Charter School, Inc.

14          THE COURT:  Good afternoon everybody.

15          We are here on a motion for sanctions that was filed, I

16     believe, by the plaintiff, and then the Court reviewed it and

17     decided that we may need an evidentiary hearing on it, so we

18     set it for this afternoon.

19          Let me first turn -- first, for housekeeping purposes,

20     I read your motion.  Is there anything that the plaintiff

21     wishes to introduce to supplement the motion?

22          MR. MACDONALD:  Thank you, Your Honor.

23          We have prepared a binder with exhibits for the Court.

24     Most of them are the exhibits included in the motion but a few

25     supplemental items, and counsel for the defendants have

1  informed us that they do not object to any of the exhibits with

2  the exception of the plaintiffs' expert report which they do

3  object to.  So, with Your Honor's permission, I'd like to

4  provide that to the Court and enter this into evidence.

5           THE COURT:  Sure.  Okay.

6           Did you intend to call any witnesses affirmatively on

7  your side of the case?

8           MR. MACDONALD:  We will be calling Ms. Olivia Bernal

9  and also Mr. Jim Stafford, the expert witness in the case as

10 well.

11          THE COURT:  Okay.  What is the name of the expert, I'm

12 sorry?

13          MR. MACDONALD:  Jim Stafford.

14          THE COURT:  Okay.  Turning to counsel for the

15 plaintiff.

16          MR. YOUNT:  Thank you, Your Honor.

17          We rely on the attachments to our response, our amended

18 response in opposition to plaintiff's motion.

19          We also will question Ms. Bernal.  We also have our

20 clients' outside IT consultant to testify, Mr. Habib Hasbun,

21 H-A-S-B-U-N.

22          THE COURT:  How do you spell that again, I'm sorry?

23          MR. YOUNT:  H-A-S-B-U-N as in Nancy.

24          THE COURT:  Hasbun.  And he works for the defendant?

25          MR. YOUNT:  He's a contractor.  He is a third-party

1    contractor who handles their IT.

2           THE COURT:  Okay.

3           MR. YOUNT:  Great.  Then we also do intend to call

4    Mr. MacDonald for a very brief question.

5           THE COURT:  Okay.  Mr. Who again?

6           MR. YOUNT:  Plaintiffs' counsel, Mr. MacDonald.

7           THE COURT:  Okay.  Well, we will deal with that when we

8    get there.

9           Well, it sounds like what we should do to maximize our

10   time is, let's get the evidence in the factual dispute in the

11   briefing from Ms. Bernal.

12          Do you wish to direct her first?

13          MR. YOUNT:  I'd be glad to.

14          THE COURT:  Okay.  Why don't we do it that way first

15   then.

16          Let's get that testimony in and see where we are.

17          (The witness, Olivia Bernal, was duly sworn.)

18          THE COURT:  Please have a seat, ma'am, and state and

19   spell your name for the record.

20          THE WITNESS:  Olivia Bernal, O-L-I-V-I-A, Bernal,

21   B-E-R-N-A-L.

22          THE COURT:  Thank you.

23          MR. YOUNT:  May we proceed, Your Honor?

24          THE COURT:  Yes, thank you.

25                           DIRECT EXAMINATION

1   BY MR. YOUNT:

2   Q.   Ms. Bernal, would you please introduce yourself to the

3   judge, tell him who you are, how far you went to school and

4   what you do?

5   A.   Olivia Bernal.  I am the Chief Operation Officer for

6   Academir Charter Schools and Superior Charter School Services.

7   I went to school for about eight years in education.  I have a

8   specialist degree.  I have two master's degree, a specialist

9   degree and leadership.  I have been in education for over

10   28 years.

11      I have served as a teacher, curriculum instructional coach,

12   assistant principal, principal, mentor teacher, and now chief

13   operating officer for a group of charters.

14   Q.   Will you tell -- explain to the Court what Academir is.

15      What is it?

16      I know it's a charter school, but if you would just explain

17   what age groups it is.

18   A.   We are a group of charter schools under the Academir

19   Schools, Inc.  We have 11 total campuses.  They range from

20   elementary to high school.

21      We predominantly started with the elementary schools and

22   moved onto K-8 centers and just this past year opened up our

23   first high school.

24   Q.   In the school that is the subject of this lawsuit where

25   Jane Doe was a student, what school was that?

1   A.   Academir Charter School west, a K-8 school in the West

2   Kendall area.

3   Q.   The student at issue was in what grade when the issue

4   allegedly happened?

5   A.   Kindergarten.

6   Q.   What is your role with respect to that specific school?

7   A.   With that particular school and all others I serve as

8   support, anything dealing with the day-to-day operations of the

9   school, guidance for the leadership team, particularly the

10  principal, to ensure that they are in compliance with their

11  regulations as regards to charter schools, the charter school

12  contract, the board rules and regulations, the state statutes

13  and just ensure that we are in compliance with all requests,

14  submissions, the charter contract in itself.

15  Q.   I know you do this every day, but this is all new to me.

16  So, would you explain to the Court the relationship between

17  your schools and the Miami-Dade County Schools?  How does that

18  interaction work?

19  A.   So, the charter schools operate under the sponsorship of

20  Miami-Dade County.  Our students are Miami-Dade Public School

21  students.  However, our employees are Academir Charter School,

22  Inc. employees.

23       When we apply for a charter school, the charter school goes

24  into an agreement with the sponsoring school district, in this

25  case Miami-Dade County Public Schools, and the agreeance is is

1    that we have to follow certain requirements in order to operate

2    and function in Miami-Dade.

3    Q.   Is one of the requirements that Miami-Dade imposes upon you

4    the obligation to establish certain policies and procedures?

5    A.   Yes, that's correct.

6    Q.   Explain to the Court how your school has adopted the

7    procedures and what the base of the -- what is the basis of the

8    procedures that have been adopted by your school?

9    A.   So, under our contract there are certain requirements for

10   safety of students, for reporting assessment, curriculum.

11        In this particular case, with regards to the

12   anti-discrimination policies, our students are Miami-Dade

13   County School students, so we have to abide by all those

14   policies and statutory requirements.

15   Q.   Okay.  So, the incident is alleged to have happened here on

16   January 20th, 2023.  Is that your understanding?

17   A.   That's correct.

18   Q.   So that would have been the 2022-2023 school year.

19        Is that right?

20   A.   Yes.

21   Q.   Did your school -- did the school that Jane Doe went to,

22   did it have written policies and procedures for that school

23   year?

24   A.   Yes, they did.

25   Q.   Did it have written policies and procedures for Title IX?

1    A.   Yes, we did.

2    Q.   I am going to show you, and I ask you to bring this -- what

3    is this?

4    A.   That's a policies and procedures binder that we keep in

5    house on a year-to-year basis to ensure that, you know, all of

6    the board-approved policies for that fiscal year are

7    maintained.

8    Q.   Does that book -- that's for the '24-'25 school year?

9    A.   That is correct.

10   Q.   Does that have Title IX Policies and Procedures?

11   A.   It does.

12   Q.   Did a book like that exist for the 2022-2023 school year?

13   A.   It did.

14   Q.   Okay.   And those were Academir's policies.   Correct?

15   A.   Correct.

16   Q.   Now, you are aware -- obviously, you were aware that there

17   are a lot of issues concerning the production of the documents,

18   and I will represent to you and represent to the Court that we

19   made a mistake when we made our initial production and did not

20   produce the Title IX documents.

21        Did you become aware of that at some point?

22   A.   When I actually had my deposition that was something that

23   was discussed, and prior to that nobody said, hey, give me your

24   document so I can send them to a lawyer.   Prior to that I had

25   no knowledge of that.

1   Q.   You were deposed in May of 2024.  Correct?

2   A.   Yes.

3   Q.   Okay.  And is that -- essentially, around the time of your

4   deposition was the first time that you really played an active

5   role in assisting in the defense of this case?

6   A.   Yes.

7   Q.   Okay.  Now, when we realized that we had not produced the

8   Title IX documents, what did you do?

9   A.   I provided my employer at the time -- well, my current

10  employer, I sent her the records and the attorney so that they

11  can submit what I had in my possession.

12  Q.   Did you make up --

13       THE COURT:  Who is "her"?

14       THE WITNESS:  Ms. Esther Mir, and Julie --

15       THE COURT:  Who is she?

16       THE WITNESS:  She is the president of Superior Charter

17  School Services.  She is my boss.

18       THE COURT:  I see.  Okay.

19  BY MR. YOUNT:

20  Q.   Did you create or make up or develop any documents that you

21  then presented as the Title IX Policies and Procedures?

22  A.   No, sir.

23  Q.   They existed at the time --

24  A.   They did.

25  Q.   -- of the incident?

1  A.  That is correct.

2       THE COURT:  Who was responsible for the management of

3  the litigation from your side of things?

4       THE WITNESS:  So, my boss, Rolando Mir and Esther Mir

5  were aware of the situation.  I didn't know that.  I was

6  deposed until later probably closer to May.  They are like, oh,

7  you are going to represent Academir in this case and so that

8  was pretty much it.

9       I knew that the incident had taken place the year

10  prior, but beyond me being involved in any of the litigation or

11  any of the going back and forth, I was not privy to that.

12       THE COURT:  How much daily interaction or regular

13  interaction were you having with counsel representing the

14  school?

15       THE WITNESS:  The only time I had the interaction was,

16  I think, literally the day before my deposition just to kind

17  of -- and it was via Zoom just to make sure that I was

18  prepared.  I was actually home at the time with Covid very sick

19  but I was -- I went in for the deposition on that day, and I

20  had just met with Julie and her team the day before the

21  deposition.

22       THE COURT:  Did there come a time when you were ever

23  asked to participate in a review of documents before your

24  deposition?

25       THE WITNESS:  No.

```
 1          THE COURT:  Were you aware that there had been a
 2   request for production of policies and procedures?
 3          THE WITNESS:  No.
 4   BY MR. YOUNT:
 5   Q.   Okay.  Let's take it past your deposition where you gave
 6   testimony on behalf of your employer.  Do you remember that?
 7   A.   Yes.
 8   Q.   And then you produced the documents?
 9   A.   Correct.
10   Q.   Now, you later became aware that there was a challenge to
11   the authenticity of those documents.
12          Correct?
13   A.   Correct.
14   Q.   And we made some requests to you to try to produce original
15   computer files with metadata.
16          Do you know what metadata is and do you know how it works?
17   A.   At the time, I did not know.  For that reason, I had to go
18   to my boss and say, "Okay.  I don't know what they're asking.
19   Can we call Habib?"
20          And my boss said, "Yes."
21          He said, "We are going to get Habib to come and get all the
22   data they need."
23   Q.   At any time from the day before your deposition when you
24   first became aware that there was an issue with respect to
25   policies and procedures through today, have you ever modified
```

1    the policies and procedures and then represented them as being

2    something other than what they were?

3    A.   No, sir.

4    Q.   Okay.  Have you falsified anything in connection with your

5    testimony or any documents in this case?

6    A.   No, sir.

7    Q.   All right.  You have been accused of perjury.  Have you

8    perjured yourself in this case?

9    A.   No.

10   Q.   Do you understand what that means?

11   A.   Not really.

12   Q.   Have you ever deliberately said anything false in

13   connection with this litigation when under oath?

14   A.   No, sir.

15   Q.   All right.

16        THE COURT:  When is the first time that you ever dealt

17   with the policy binder that counsel is referring to?

18        THE WITNESS:  When I first joined Academir, I was a

19   principal for six and a half years and I was promoted halfway

20   through the year.  That first summer, one of my job

21   responsibilities was to kind of revamp all of the systems that

22   were in place, including handbooks, manuals, student handbooks,

23   employee handbooks, and policies.

24        So at that time when I was developing all of those

25   policies and working with my team, that was one of the items.

1    So, the first time I engaged with that particular policy in

2    handling the revisions was the summer of '22.

3            Prior to that, I was a principal, and we just followed

4    the district process and whatever was handed down to us from

5    management.

6            THE COURT:  When did you ever see the binder, the

7    policies and procedures all in a binder like counsel showed

8    you?

9            THE WITNESS:  So, we have tons of binders.  My boss, in

10   particular, has to have everything in binders.  I prefer

11   digital, but she doesn't.  So, we have every single policy in

12   binders, and when I came there was a huge just binder of all

13   stuff together.  And my job was really to kind of organize and

14   make it, you know, and improve the system.  And every year we

15   have to just update and improve, whether it's the bylaws, the

16   parent/student handbooks, the faculty handbooks, the employee

17   handbooks.

18           All of the regulations now with the Marjory Stoneman

19   and the safety acts, those are all policies that have to be

20   adopted annually and revised or the board signed off on, yes,

21   we reviewed it, we're in agreeance and we submit it to the

22   district or the state regarding any compliance.

23           So, that's done annually.  Things are changed and

24   improved.  Every year as we continue to grow we can't run it

25   like a mom-and-pop show anymore.  There are other, you know,

1   requirements that we have, so every year we improve the system.

2        I mean, as a result of this, we have improved our

3   policies for Title IX.  Every year we have to come to the table

4   and improve systems.

5        This year, because of all of the safety issues and

6   concerns, not because of this case, just because of Marjorie

7   Stoneman and compliance, we have hired a director of safety and

8   security which is now overseeing Title IX, just because of the

9   magnitude of everything that we have learned through this

10  process and, obviously the process of, you know, school safety.

11  BY, MR. YOUNT:

12  Q.  To be clear, the binder that I refer to, that's your

13  binder.  Correct?

14  A.  Yes.

15  Q.  Do the individual principals also have binders with policy

16  manuals?

17  A.  Every principal has a set of binders in their building, and

18  I can speak from experience because as a principal that's one

19  of the things I had to do.

20       The district comes in or the state comes in and you have to

21  present your binder, and you have to have your safety binder,

22  your policy binder, your data binder.  All of those things have

23  to be tangible so they can review during their visits.

24  Q.  My last question is, once you recognized that there were

25  accusations being made by the plaintiff's counsel about

1  doctoring records and fraud, did you offer them to come and

2  inspect the computers of your business?

3  A.   Yes.  I actually learned about that this summer.  I not

4  only service Miami-Dade Schools, but I have a school in

5  Osceola, and at the time that they requested this I was running

6  a school in Osceola, opening it up, and I was there but that's

7  all I heard.

8       Nobody ever came to see me or to the office, not that I am

9  aware of.

10 Q.  As far as you are aware of, the only person who has

11 forensically examined your computer and the computers of your

12 business --

13 A.   Is Habib, yes.  That is correct.

14           MR. YOUNT:  Thank you, Your Honor.

15           That's all the questions I have of this witness.

16           THE COURT:  Cross-examination.

17           MR. MACDONALD:  Before I get into the questions, Your

18 Honor, I just want to point for clarification, the binder that

19 the defendants just alluded to a moment ago was not produced

20 until yesterday, last evening, and no similar binder has ever

21 been produced since litigation, despite discovery having closed

22 on August 29th.

23           MR. YOUNT:  May I respond briefly because there is a

24 pattern --

25           THE COURT:  Let him ask the questions.  We will get

1    into that more in depth later.

2           You will have plenty of time for that.

3                         CROSS-EXAMINATION

4    BY MR. MACDONALD:

5    Q.   Good afternoon, Ms. Bernal.

6    A.   Good afternoon.

7    Q.   You testified you were the chief operating officer for the

8    defendants.  Is that right?

9    A.   That's correct.

10   Q.   And you've been employed in that position since

11   approximately 2022.  Is that right?

12   A.   Yeah, February 2022.

13   Q.   As chief operating officer, you have a role or you are

14   responsible, rather, for overseeing compliance with laws like

15   Title IX.  Is that fair to say?

16   A.   Yes.

17   Q.   Now, you've claimed to be the Title IX coordinator for

18   Academir students since 2022, as well.  Right?

19   A.   Correct.

20   Q.   Do you recall being deposed on May 9th, 2024, in this case?

21   A.   Yes.

22   Q.   During that deposition --

23          MR. YOUNT:  Objection.  It's improper impeachment.

24          THE COURT:  Overruled.

25   BY MR. MACDONALD:

1  Q.  You testified that Academir had written policies for

2  Title IX that were in place that were unique and separate from

3  Miami-Dade County public schools.  Is that right?

4  A.  That is not accurate.

5  Q.  The entire testimony that I gave was that they were not

6  unique because our students are Miami-Dade County Public

7  students, and we have to follow the policies and procedures

8  with Miami-Dade, with the exception of certain contact

9  information and people that -- and steps that we have to follow

10  because we don't function under their Civil Rights Department.

11      We have our own contact.  We don't use the Miami-Dade

12  County Public Schools police officers.  We are not allowed to.

13  We have to go to the Miami-Dade County Public Schools with

14  regards to mandatory reporting, absolutely.

15      Any educator, whether you are a teacher or principal, or

16  school administrator, you have the duty, the obligation under

17  law to mandatory report any incident.

18      We have to call the police if in doubt of abuse or

19  negligence, a hundred percent.

20      If we have --

21          THE COURT:  The question was do you have any policy

22  separate from the school district?

23          THE WITNESS:  Our policies are, we follow the

24  Miami-Dade, but they have to be tailored to our organization

25  because the contact and some of the information that we have to

1    follow we can't follow the Miami-Dade because we are not a

2    Miami-Dade County Public Schools.

3           THE COURT:  All right.  Next question.

4    BY MR. MACDONALD:

5    Q.  I just want to make sure I understand you correctly that

6    the school did, in fact, have separate and unique Title IX

7    policies from those of Miami-Dade County?

8    A.  For our students we have to follow the Miami-Dade County

9    Schools.

10          Remember, these are students that belong to Miami-Dade and

11   the student code of conduct, the disciplinary process has to

12   follow those procedures.

13          THE COURT:  This is not about that.

14          The question I believe had to do with Title IX policies

15   that the school maintained.

16          THE WITNESS:  Yeah, we have them in place, and they're

17   unique to Academir Charter Schools under the preface for

18   students for Miami-Dade County.

19   BY MR. MACDONALD:

20   Q.  You said you recall being deposed in this case.

21          Is that right?

22   A.  That is correct.

23   Q.  And do you recall in that deposition that you were placed

24   under oath?

25   A.  Yes.

1    Q.  And do you recall that you were required to tell the truth?

2    A.  That is correct.

3    Q.  Now, I want to direct the Court's attention to what should

4    be Exhibit 8 in the binder that I provided, and that is the

5    witness's deposition transcript, specifically page 47 and line

6    16.

7         Permission to approach, Your Honor.

8         (Plaintiff's Exhibit 8 was marked for identification.)

9         THE COURT:  Yes.

10   BY MR. MACDONALD:

11   Q.  Now, I am going to read from this page here, and I need you

12   to follow along.

13        THE COURT:  Just give her a copy of the deposition and

14   then you can go or if you want to use the ELMO, that's fine

15   too.

16        MR. MACDONALD:  Yeah, let's use the ELMO.  That will

17   make it a little easier.

18        Thank you, Your Honor.

19   BY MR. MACDONALD:

20   Q.  Now, Ms. Bernal, I just want to draw your attention to line

21   16 where it says:

22        "Question:  And those policies and procedures are also

23   separate from the Miami-Dade County Schools policies?"

24        "Answer:  That is correct."

25        Did I read that correctly?

1    A.   You read that correctly.

2         Can I saying something?  Can I reply?

3              THE COURT:  Let him ask the question.

4              THE WITNESS:  Okay.  Okay.

5    BY MR. MACDONALD:

6    Q.   So, let me ask you again, did Academir Charter Schools have

7    Title IX policies in place that were separate and distinct from

8    the Miami-Dade County Public Schools' policy?

9    A.   As it relates to students, no.

10         The question, if you read above, says, "These procedures

11   are separate from the Academir employee handbook."

12         And you're referencing employee handbook.  Remember, our

13   employees are Academir Academir employees.  They are not

14   Miami-Dade County Public Schools' employee, so this question

15   and this response pertains to the question of the employee

16   handbook, not the student handbook or the policies that govern

17   our students.

18         That question, and if you keep reading a lot of the other

19   pages of the statements that I made throughout, I did reference

20   that we do follow the Miami-Dade County Public Schools for our

21   students.

22   Q.   So, it's your testimony that the employees of Academir

23   Charter School have a separate and distinct Title IX policy,

24   separate from the county, but students do not?

25   A.   Yes.  We don't -- we follow the -- the Academir has -- in

1   our Title IX policy you have employees.  You have vendors, and

2   have you students all in one handbook, so to speak.

3       The policies that we follow for students have to be

4   governed by the Dade County Public Schools, and, again, our

5   teachers and our employees do not belong to Miami-Dade County

6   Public Schools.

7   Q.  Now, Ms. Bernal, do you recall testifying that the Title IX

8   policies at Academir existed before your involvement in your

9   position?

10  A.  That is correct.

11  Q.  And you could not testify about when those policies were

12  created or how they were created.

13      Is that right?

14  A.  That is correct.

15  Q.  And is that still the case today?

16  A.  Before me moving to Superior Charter School Services

17  Offices, I don't know who initially created the policies.

18      I know that as a principal that was something that we had

19  to do on an annual basis because at the opening of schools,

20  that's one of the modules and presentations or trainings, so to

21  speak, for principals, given through Miami-Dade Public School

22  Charter Schools Office.

23  Q.  You claim you made updates to that same policy in 2022.  Is

24  that right?

25  A.  I'm sorry, say that again.

1    Q.   And you made updates to those same policies in 2022.

2         Is that right?

3    A.   Yes.

4    Q.   And you made those policies I believe with Xenia Mir and

5    Esther Mir?

6    A.   So, there is a team of us.  When we are -- and both Xenia

7    and Esther Mir are there because we are going over the student

8    handbooks, the employee handbooks.  That summer we had to

9    revamp a lot of things.

10        THE COURT:  When you revamp those policies, though, do

11   you have to run it by the districts, by the school?

12        THE WITNESS:  No, when I -- what happens because,

13   again, under the auspices of the sponsoring school district

14   there are certain things that we have to do on our own, so I

15   usually write it up, draft it, present it to my team.  They

16   have to review, make changes, tell me what needs to be edited

17   before we present it to the governing board, at which time the

18   governing board is presented with the policies and then they

19   make the approval or not and they sign off on it.

20   BY MR. MACDONALD:

21   Q.   When you say the "government board," you're referring to

22   the board of directors for Academir?

23   A.   We have to present these at any of the governing board

24   meetings, and particularly we work with Alexander Casas, which

25   is our governing board chair, for approvals.

1    Q.   But there is no record of those policies ever having been

2    approved by the Academir board of directors.  Isn't that right?

3    A.   That particular year, if you reference back, we put general

4    policies and procedures.  We were not specific about every

5    single policy that we approve.

6         Moving forward, I mean, and I know that we did this year

7    and last year, every year we improve.  For me, this is a fairly

8    new position and I have to make sure now, if you go back to our

9    previous governing board meeting, all of these policies -- and

10   they are required now by the district.

11        Did you approve the mental health plan?  Did you approve

12   the safety and security plan?  Did you approve the X, Y, Z,

13   including the Title IX?  You will see it's approved in the

14   governing board meeting and it states in the minutes.

15   Q.   But there is no record in any year of those policies having

16   been approved by the board of Academir.  Isn't that right?

17   A.   That particular policy, the Title IX doesn't say Title IX

18   approval, no, until this fiscal school year.

19   Q.   Now, previously you said that you edited those Title IX

20   policies.

21        At any point did you review the interrogatory responses for

22   Academir?

23   A.   I'm sorry, repeat that.  I'm not understanding.

24   Q.   At any point did you get a chance to review the

25   interrogatory responses for the Defendant Academir?

1    Do you recall reviewing them in your deposition, for

2    example?

3    A.   The situation that took place with the child, with Jane

4    Doe, is that what you are referring to?

5         THE COURT:  No, written interrogatories signed on

6    behalf of your company, the school, legal interrogatory

7    answers?

8         THE WITNESS:  No, I'm not aware.

9         THE COURT:  What exhibit number are you using?

10        MR. MACDONALD:  This has previously been marked as

11   Plaintiff's Exhibit 3 for identification.

12        (Plaintiff's Exhibit 3 was marked for identification.)

13   BY MR. MACDONALD:

14   Q.   Can you see what I am showing?

15   A.   I can.

16   Q.   Do you recall seeing this document during your deposition?

17   A.   I can't recall.

18   Q.   Do you recall when you were asked about the response to

19   number 12 where you detailed -- or where Academir, rather,

20   detailed any changes that were made to the Title IX or sexual

21   harassment policies within the past five years?

22   A.   Correct.

23   Q.   And that response was inaccurate; wasn't it?

24   A.   Can I read it?

25   Q.   Yeah, of course you can.

1        Take your time.

2   A.   The answer was just, "none."  I don't know...

3        THE COURT:  Well, first of all, is that correct, prior

4   to January 18 of 2024 had there been any changes made to the

5   Title IX or sexual harassment prevention policies within the

6   past five years?

7        The answer was none.  Is that correct?

8        THE WITNESS:  I didn't answer any of these questions.

9   BY MR. MACDONALD:

10  Q.   But is that accurate?

11  A.   You're asking -- I don't even know what the question -- I

12  want to be able to read what it says at the top and what is,

13  you know, in relation to this.  You are asking me for something

14  for 2017.  I joined the organization in 2015 as a principal.

15  Q.   Okay.  Well, what about for the time that you've been chief

16  operating officer, is it accurate to say that there have been

17  no changes to the Title IX policies of Academir Charter School?

18  A.   At the time, the 2022, when I first joined, the minor

19  changes was who was going to be responsible for what.

20       Prior to that, we just had Xenia Mir, which was the person

21  in charge of HR, and that's who we would go to.

22       Beyond that year, then we changed minor things like who is

23  responsible for what.

24       When I came aboard, I became responsible for matters

25  related to student and parent complaints, and the dates they

1    have to be changed on a yearly basis, and it wasn't until it

2    2022 and 2023 when we started looking at all the changes in the

3    policy that needed to be adjusted and put in place, minor

4    changes.

5            THE COURT:  So just then, the answer to question 12

6    that is none, is that answer correct or incorrect?

7            THE WITNESS:  Minor changes.  I can't say that there

8    weren't any changes because they had to have been minor changes

9    with the names and the dates of the year.

10           You have to change it.  You can't leave a policy from

11   2021 or '17 in the current year, so they have to have been

12   changed.  But substantial changes to the actual policy within

13   itself, no.  The steps, no, that doesn't change.

14   BY MR. MACDONALD:

15   Q.  Now, just a moment ago you said that you worked on those

16   policies with Esther Mir and Xenia Mir?

17   A.  We worked on the policies.  When I first joined the

18   organization that summer, we had to revise a lot of policies.

19   So, is everybody at the table, are we working to do things, you

20   know, together, who is going to be responsible.  I just don't

21   put somebody's name without changes.

22   Q.  Excuse me, Ms. Bernal, but those two individuals, Esther

23   Mir and Xenia Mir, did they participate with you in making the

24   changes to that policies?

25   A.  I wrote the policies, and I -- well, I didn't write the

1    policies because they were already in place but I adjusted the

2    policies with everybody at the table including --

3    Q.  And those individuals --

4    A.  They were at the --

5         THE COURT REPORTER:  I'm sorry.  I can't take both of

6    you at the same time.

7         THE COURT:  You need to let him finish the question.

8         THE WITNESS:  I'm sorry.

9         THE COURT:  Answer his question.

10        The question was, were those two individuals that he

11   identified part of the table as you're referring?

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.

14   BY MR. MACDONALD:

15   Q.  And you previously told the Court that Esther Mir was the

16   point of contact for this litigation.

17        Isn't that right?

18   A.  For this particular case, Rolando Mir was, her husband, so

19   Esther and Rolando Mir, which are my boss, yes.

20   Q.  And she was there in 2022 when you made these edits to this

21   Title IX Policies?

22   A.  That's correct.

23   Q.  But those policies were never produced or disclosed until

24   your deposition.  Is that right?

25   A.  Nobody told me I had to turn anything over until the

1   deposition with you when you asked me for several documents,

2   which was that, the Title IX policies.  You also asked me for

3   the student statement form and you also asked me for the

4   complaint form that I was referring to in my deposition, and

5   that's what I provided and I turned over.

6   Q.  Now, that complaint form that you mentioned, do you recall

7   telling me in your deposition that Academir had future plans to

8   make that Title IX complaint form an online accessible form?

9   A.  We did have the online accessible form.  We had a Google

10  form, which I gave your team access to, and that was actually

11  forwarded in an e-mail into an August 10th, 2022, to both Xenia

12  and Ms. Mir.

13      And if you look online we have updated the form completely

14  and it's a different -- it's a more user-friendly form online.

15  Q.  You are referring to the online Google form that was

16  produced after your deposition.

17      Is that right?

18  A.  That you asked me for, that is correct.

19  Q.  But during your deposition, did you state that it was a

20  future plan to make that form an online-accessible web form

21  that had not been done yet?

22  A.  I cannot recall, but I also provided you with the e-mail

23  that in 2022 that form was forwarded to both Xenia and Ms. Mir.

24  Q.  Okay.  I'd like to direct the Court's attention to the

25  witness's deposition transcript, and this is page 53, beginning

1    on line 18.

2         Can you see what I'm showing you?

3    A.   Yeah.

4    Q.   Do you see where it says starting with:

5         "Question:  And the form was made electronic this year, you

6    said?"

7         "Answer:  We're going to make it electronic."

8         "Question:  What have you done in regards to preparing the

9    form electronic."

10        "Answer:  I haven't started.  We have the hard copy of it.

11   We have a form, but to make it, we just convert it and make it

12   accessible as link --" and the beginning of the next page, "to

13   all of our staff and we put it on the websites."

14        "Question:  You have already put it on the websites or

15   that's your future plan?"

16        "Answer:  No, that's for this fiscal year.  We've discussed

17   it."

18   A.   And that is correct.  At the time that we had that

19   conversation they were not accessible online.  They were not.

20   If you go on, now you are going to see that they are a digital

21   easy-to-use format online, but at the time that we had that

22   conversation, no.

23        Had the Google form been created in 2022?  Absolutely.

24   Q.   But you produced that Google online form less than two

25   weeks after your deposition.

1       Is that right?

2   A.   No, that was done August 10th, 2022, of which we had

3   evidence, and we forwarded to you and your team and the

4   attorneys that that form was created.  That e-mail was sent to

5   Ms. Mir and to Xenia back on August 10th, 2022, which was our

6   first draft.

7       The form that you currently see online is a completely

8   different form because the Google Docs that was created was

9   not -- every time that somebody requested -- you had to give

10  them access, in essence, and the responses were never coming

11  back to us.

12      So, we had to revamp that entire form.  It was done over

13  the summer, and now you have a different format altogether, and

14  that's what I was referring there and on my statement.

15  Q.   What you were referring to a moment ago in August, you were

16  referring to an e-mail exchange with another individual.

17  Correct?

18  A.   With both Esther Mir and Xenia Yamir.

19  Q.   Not the form itself.  Correct?

20  A.   No, the form was attached to that e-mail and the link to

21  Google Docs was also produced in that previous e-mail from

22  August 2022.

23  Q.   That's not what I am asking you about.

24      I'm asking you about after your deposition a copy of the

25  Title IX form and a Google web form was produced less than two

1    weeks after your deposition.

2         Are you aware of that?

3    A.   Well, we had to download it to send you as evidence that

4    that was there as well.  And then you had the hard copy, which

5    was also produced there.

6         We had the paper copy, which is what I turned over.  The

7    paper copy, the policies and the statement that you requested

8    during my deposition you asked me for those documents, which is

9    what I combined and forwarded to my boss.

10   Q.   So, how is it possible that it was just a future plan to

11   create this Title IX complaint form into a future web form and

12   less than two weeks later you produced that same form?

13        How is that possible?

14   A.   You are confusing the matter because in 2022 that form was

15   already in place, but it was a none -- it wasn't -- it wasn't

16   the best template to use for this process of which we had to

17   revamp the actual form so that it would send us back

18   notification, somebody submitted this, please -- now we get the

19   alerts if somebody submits, and we've done it because we tested

20   it, to send it back to us.

21        The previous document, we would have to go back every

22   single week to check to see if somebody submitted something.

23   Q.   You said this Google form existed in 2022?

24   A.   That is correct.

25   Q.   Then why in this aspect of the deposition transcript that

1   we just read did you say that we are going to make it?

2   A.   Because it wasn't published on the websites like I said

3   there.  It was nowhere -- it was a Google form that we created,

4   but it wasn't published on the school websites.

5        If you go now, the Google form is not there, nor the Google

6   form was -- it was there, but it wasn't being utilized

7   effectively.

8             THE COURT:  When you say it was "there," what does that

9   mean?

10            THE WITNESS:  It was created, and if the parent needed

11   to submit something, then we would have them complete the form

12   there, but it's not something that was accessible and open to

13   the public of like what we have now, which is they just go to

14   the website, click on it, and it takes take them to just a

15   regular form, not a Google form.

16   BY MR. MACDONALD:

17   Q.   Now, do you recall testifying that you've conducted more

18   than five Title IX investigations during the time you've held

19   the title of chief operating officer?

20   A.   I didn't say Title IX.  I said sexual investigations or

21   allegations, something minor, and I remember I told you that it

22   was literally just one that ended up with, really, nothing

23   because it was a first grader and it was unfounded.  The police

24   couldn't do an investigation because it happened months prior

25   and it was something, you know, that the police determined

1    there is really no evidence of anything.

2        But a Title IX, and I recall telling you that as well

3    because I read all of my statements, and I did not say -- I

4    said, you know, there may be something that they complain about

5    but it hasn't been a Title IX, Title IX investigation.

6    Q.  So, I am not understanding your testimony here today.

7        Did you testify that you conducted more than five Title IX

8    investigations?

9    A.  I did not say that I conducted five.  If I might have said

10   it, I might have said it out of context, but, you know, they

11   can say -- they can make an allegation, but it doesn't become a

12   Title IX until it's, you know, actually an investigation that

13   is conducted.

14   Q.  I'd like to draw the Court's attention to the witness's

15   deposition transcript, and this is page 124, beginning on line

16   20.

17       Can you see what I'm showing, Ms. Bernal?

18   A.  Yes.

19           MR. YOUNT:  What page?

20           MR. MACDONALD:  Sorry, Your Honor, 124 is the page.

21   BY MR. MACDONALD:

22   Q.  "Question:  How many Title IX investigations have you and

23   your team handled in your tenure?"

24       "Answer:  I cannot recall.  I don't have a specific number

25   in my head.  I don't have that information.  I wasn't told I

1   had to bring that."

2       "Question:  Well, you didn't have to bring anything.  I am

3   asking you if you recall ever conducting a Title IX?"

4       "Answer:  I don't recall -- I do recall, but I don't recall

5   the number of times I have done them."

6       "Question:  Was it more than once?"

7       "Answer:  Yes.

8       "Question:  Was it more than five times?"

9       "Answer:  Yes."

10  A.   Can you continue reading because the context also tells

11  you, really, in all honestly there was one, and I explained all

12  of the different procedures.  And I recall the specific one

13  that we discussed which happened in Academir Charter School

14  East with a first grader.

15  Q.   So, as you sit here today, is it your testimony that you

16  have not conducted more than five Title IX investigations?

17  A.   That is correct.

18  Q.   In your tenure as chief operating officer have you ever

19  conducted a Title IX investigation?

20      MR. YOUNT:  Your Honor, object to relevancy.  We are

21  here to talk about document forgery and fraud and perjury, and

22  this has nothing to do with documents.

23      MR. MACDONALD:  Your Honor, I highly disagree.  I would

24  say this has a lot to do with perjury given that Ms. Bernal was

25  under oath and I'm trying to clarify the truthfulness of her

1   testimony here.

2          THE COURT:  But it's got to be relevant to the

3   discovery issue that you raised.

4          MR. MACDONALD:  Sure.

5          THE COURT:  Some of this may be overlapping at the

6   trial, I get that, but if it doesn't relate to the discovery

7   issue directly, you will just have to hold it.

8          MR. MACDONALD:  Understood.  I'll move on, Your Honor.

9   BY MR. MACDONALD:

10  Q.  Now, Ms. Bernal, do you recall at one point during your

11  deposition you were reading from a document?

12  A.  That is correct.

13  Q.  When you were asked the title of the document that you were

14  reading from, do you recall stating that it was titled, quote,

15  "fiscal policies and procedures"?

16  A.  Correct.

17  Q.  But when you were asked to show the document that you were

18  reading from to the camera because your deposition was

19  connected via Zoom?

20  A.  Yes.

21  Q.  You did not show the Fiscal Policies and Procedures

22  document that you described, did you?

23  A.  What I showed was the Miami-Dade County Public Schools

24  policy for students.  Correct?

25  Q.  So, it wasn't true when you testified that you were reading

1   from a document titled Fiscal Policies and Procedures, was it?

2   A.   In the binder you have Fiscal Policies and Procedures and

3   all under -- after that you have all of the policies.

4        If you can look at my binder today, the first one there is

5   Fiscal Policies and Procedures and all of the other policies

6   proceed.

7   Q.   But that's not what you had in front of you that day, was

8   it?

9   A.   That day, again, coming from Covid, just came in to do my

10  testimony, whatever I had available in my office, one was,

11  obviously, the binder with the fiscal policies, and there in

12  that one form I had the Miami-Dade one, and that's what I was

13  reading because we follow their procedures with the exception

14  of the contact information which is also what I shared with you

15  during my deposition.

16  Q.   Now, you testified that the Title IX policies for Academir

17  were compliance binders at each school with the principal.  Is

18  that right?

19  A.   That is correct.

20  Q.   And at one point you stated that the school principal, the

21  principal for which Jane attended that respective school

22  location, Ms. Susie Bello, that she actually helped collect

23  documents for this case.  Is that right?

24  A.   The school is the only one that collected all documents.

25       I don't have access to student personal records or academic

1   records.  They are the ones that collect the documentation.

2   Q.  I asked you, did Ms. Susie Bello help gather the documents

3   for this case in response to a discovery request?

4   A.  That is correct.

5   Q.  That same Susie Bello, per your testimony, had the Title IX

6   policy in the compliance binders.  Isn't that right?

7   A.  Yes.

8   Q.  But they were not produced in response to that discovery

9   request, were they?

10  A.  I don't know what was requested of Ms. Bello.

11  Q.  How do you know that Ms. Bello assisted with gathering

12  documents for the case?

13  A.  Because she is the principal in charge of the school and

14  the only one that can pull those records is Ms. Bello.  She can

15  go into the cumulative records, the online system for student

16  information, and I wouldn't ask anybody else but the principal,

17  if it were my responsibility to ask her to produce something.

18  Q.  Now, do you recall producing the document for 2022 to 2023,

19  the Title IX Policies and Procedures Handbook for Academir?

20  A.  Yes.

21  Q.  And you'd agree this that document is separate and distinct

22  from Miami-Dade County Public Schools.

23      Right?

24  A.  That is correct.

25  Q.  Now, isn't it true that that document specifically was

1   never published online anywhere?

2   A.   That was in the possession of the teachers -- not the

3   teachers, sorry, the school administrators.

4   Q.   And that document was also never distributed to students,

5   was it?

6   A.   No, nor is it anywhere in Miami-Dade County.  They just

7   have it on their websites, and they have the non-discrimination

8   policies, which they all have included in their Student Code of

9   Conduct.  They also have it in their parent and student

10  handbooks, at the end of the handbook, all of the

11  non-discrimination policies, including Title IX is located

12  there.

13  Q.   But that specific document that I'm referring to?

14  A.   No, sir, and that wouldn't be something that I would

15  distribute to families unless they requested --

16  Q.   Not to students?

17  A.   And not to students, no.  These are kindergarten students.

18  I can't give any policy --

19  Q.   Any policy?

20  A.   We don't give any of our policies to our students, no, sir.

21  Q.   You don't give the Title IX policy to any students?

22  A.   No, we do not.

23  Q.   How?

24  A.   They are available either online or if they have a concern

25  at that point then we would provide the guidance to parents and

1   the forms that they need to complete in order to submit a
2   request or a complaint, but I wouldn't give them the handbook
3   that we give to our staff or not our staff but our principals,
4   they wouldn't receive that.
5       I wouldn't give them any of our policies, the mental health
6   plan, the FSAT.  None of our policies are given to students.
7   That's not something we give.  We are there to educate students
8   and provide them with their educational, you know,
9   opportunities with regards to curriculum, not policies and
10  procedures.
11  Q.  Okay.  And that document specifically was never distributed
12  to students?
13  A.  No, sir.
14  Q.  You also said there is no record of those policies ever
15  being approved by the board of directors for Academir either.
16  Is that right?
17  A.  The policies on the record are on the -- not the handbook,
18  the meeting notes, so to speak, and the agenda which say
19  approval of parole policies.
20      It doesn't specifically say approval of Title IX policies
21  or any, you know, specific, you know, to some of our policies,
22  like unless it's something that we need by mandate with regards
23  to the bylaws were updated and need formal signature, other
24  than that we just say general policies.
25      Moving forward this fiscal year we added the names of

1   everything that we approve.

2   Q.   Okay.  For that document specifically, the 2022 to 2023

3   Title IX policies, did it exist anywhere besides your computer?

4   A.   They were in the binder.  That's where they exist.  It

5   wasn't in the notes for the governing board meeting minutes,

6   specifically with Title IX, I do not recall.  No.

7   Q.   So you are not aware of any other locations in which it

8   existed except your --

9   A.   No, and that of the principal's.  At the beginning of the

10  year when we approve all the policies, they get a copy.  So,

11  all of the approved policies should be in the binder at every

12  single campus because those are the policies that they have to

13  abide by.

14  Q.   You never produced that binder that you're describing

15  either in this litigation, did you?

16  A.   Nobody asked me for it.  You asked me for the policies.

17  You didn't ask me for a binder.  I provided the policies that

18  were created.  I provided the student statement form that I

19  mentioned and the formal complaint form.

20      Those were the things that were asked of me during my

21  deposition, and that is what I produced.  Nobody said, give me

22  your binder.

23      Now, if they asked Ms. Bello for her binder, I believe that

24  Bello provided that, whatever was in the binder.  And if you

25  would have said, Bernal, I need your entire binder, you would

1    have received what I provided the attorneys yesterday.

2         When they said, do you have a binder, I said absolutely.

3    They made copies of everything that was in that binder which

4    was produced to you yesterday.

5         Nobody asked me for a binder prior to yesterday.

6    Q.   So, it had not been produced prior to yesterday.  Correct?

7    A.   That particular binder when they asked for it, no.

8    Q.   Any binder?

9    A.   I'm not aware of Ms. Bello.  I'm sure Ms. Bello provided

10   you with a binder, with the covers.  I remember the covers and

11   the e-mail going back and forth, absolutely, and I know that

12   she did provide you a copy of the binder that she had in her

13   possession.

14   Q.   Now, when the issues came up relating to the authenticity

15   of the Title IX documents, do you recall testifying about that

16   previously?

17   A.   That is correct.

18   Q.   At one point you took screenshots of the document

19   properties for the 2022 to 2023 Title IX Policies and

20   Procedures.

21        Is that correct?

22   A.   I did not take screenshots.

23        Mr. Habib took screenshots, collated all of the information

24   that you needed.  I did not touch that because I didn't even

25   know what you guys were asking.  So, we called the specialist,

1    IT, to handle that and he was able to take all of the

2    screenshots of all of the documentation that you guys were

3    requesting.

4    Q.  Did you ever look at the document characteristics for those

5    screen screenshots, like the line count, the character count,

6    things like that in the screenshots you took?

7    A.  Whatever he provided to us that day.

8    Q.  So, you did review them or you did not review them?

9    A.  Yeah.  I didn't sit there and analyze everything, but it

10   was produced.  It was there, so that is what we have.  And that

11   is when what I have in just some the evidence documents that I

12   have or folders, just to keep everything with regards to the

13   case.

14   Q.  Are you aware that the characteristics of the line count,

15   character count, those items that are included in the images

16   you produced do not match a single document that was produced

17   in this litigation?

18   A.  No, I am not aware of that.

19   Q.  You are just learning that now?

20   A.  So, one of the -- I know that they mentioned yesterday the

21   difference, the only difference that I can attest to is that

22   when you guys requested it, I merged the documents that you

23   wanted and I forwarded it to my boss.

24       So, instead of it being just that one document, I added the

25   form, the completion -- the request form and the student's

1    statement form, and that's what I turned over.  So, I merged

2    the document to submit it to you guys.  That would be the only

3    word count change in the submission where before it was just a

4    single form and then I turned over everything that you

5    requested in one form, one document.

6    Q.   Those revisions that you just described a moment ago that

7    may have led to those discrepancies, did you ever produce that

8    revised document?

9    A.   What do you mean the revised document?

10        The PDF form I gave you guys with all of the documents?

11   Q.   Just a moment ago when I asked you about those

12   discrepancies and what may have explained it, you alluded to

13   some kind of editing that was done.

14   A.   There was no editing done.  All I did was just merge the

15   documents to submit them.  But did I edit the actual document?

16   There was no reason to.  I added the other two documents that

17   you questioned me on and you asked me to submit so I turned

18   that all together to you, not you but my boss to turn over to

19   the attorneys.

20   Q.   Did you turn over that merged file that you described?

21   A.   I did.  I sent everything in.

22   Q.   What was that document called that you turned over?

23   A.   Title IX policies.

24   Q.   Are you aware that those characteristics that I just

25   described, the character count line, did not match any of the

1    documents that were produced, including those merged documents

2    if they were produced.

3        Do you have any explanation as to that?

4    A.   I am not a specialist, I do not know.

5        MR. YOUNT:  Objection.  He is trying to testify to

6    facts that aren't true.

7        THE COURT:  Sustained as to the form of the question.

8        MR. MACDONALD:  I will move on.

9    BY MR. MACDONALD:

10   Q.   Now, given the discrepancies in the documents and the

11   statements that we just went over in regards to the

12   investigations and the revisions that were made to the

13   policies, do you have any credible explanation as to why those

14   items are so different from what you have testified to?

15   A.   What I do know is that the screenshot of one of the items

16   says the first original document was produced August 10th,

17   2022.  When you make the annual changes year to year, whatever

18   is saved is saved and whatever is added.

19       So, if you look at this year's documents, not only do I

20   have the statement form, I have the statement form for

21   teachers, for students, for vendors and other.  I have the

22   complaint form.  I have the digital form.  I have the parent

23   consent form.  I have the non-student consent form.  So every

24   year it just continues to grow because it changes.  Every year

25   that we learn something new we have to adjust and amend and you

1    will see that there are tons of other documents.

2        So, if you look at the metadata I'm assuming now for the

3    original document that was created it's not going to match.  It

4    can't, because every year you learn and get from this

5    experience.  I am, by no means, a Title IX, and I never claimed

6    to be a Title IX expert.  Do I have to ensure -- now this year

7    I'm not even a Title IX coordinator anymore.

8        You know, the Title IX was something that I had to do

9    because of default I'm working with the schools, but I have

10   never claimed to be a Title IX coordinator.  Again, but every

11   year we continue to grow and expand and improve our systems.

12   It's not something I'm lying.  I have no stakes.  There is

13   nothing that I have to lie about.  We just have to ensure that

14   our students are safe and that we do everything in our power to

15   make adjustments to improve the system.

16   Q.  Ms. Bernal, did you just testify a moment ago that you were

17   not the Title IX coordinator?

18   A.  I am no longer the Title IX coordinator, sir.

19   Q.  But you were a Title IX --

20   A.  At the time, yes, I was, and I am no longer the Title IX

21   coordinator.  That is correct.

22   Q.  And you'd agree that gives you some expertise in Title IX,

23   I imagine.  Right?

24   A.  I am not by any way, shape or form the Title IX specialist.

25   I am not.  That is not something I practiced all my career.  I

1   am an educator.  That was just another additional

2   responsibility that was added, but I am not an expert and nor

3   do I claim to be because I truly honestly am not.

4   Q.  You didn't have any special responsibilities as the

5   Title IX coordinator for the school?

6           MR. YOUNT:  Objection.  Relevance.

7           THE COURT:  Sustained.

8           THE WITNESS:  I don't know what special --

9           THE COURT:  Sustained.

10          THE WITNESS:  Okay.  Sorry.

11          THE COURT:  Any further questions on the discovery

12  issue?

13          MR. MACDONALD:  That's all I have at this time, Your

14  Honor.

15          Thank you, Ms. Bernal for your time.

16          THE COURT:  Any redirect?

17          MR. YOUNT:  No more questions, Your Honor.  Thank you.

18          THE COURT:  Thank you.  You may step down.

19          Back to the plaintiff, did you want to call any witness

20  on the plaintiff side?

21          MR. MACDONALD:  Yes, Your Honor.

22          We are going to call Jim Stafford to the stand.

23          COURTROOM DEPUTY:  Please raise your right hand.

24          (The witness, Jim Stafford, was duly sworn.)

25          COURTROOM DEPUTY:  Thank you, sir, please have a seat

1    and state and spell your name for the record.

2              THE WITNESS:  My name is James Lee Stafford, J-A-M-E-S,

3    L-E-E, S-T-A-F-F-O-R-D.

4              THE COURT:  Thank you.

5                       DIRECTION EXAMINATION

6    BY MR. MACDONALD:

7    Q.   Good afternoon, Mr. Stafford.

8    A.   Good afternoon.

9    Q.   Could you please state your name and profession for the

10   Court?

11   A.   I am James Lee Stafford.  I am a forensic examiner for

12   Eclipse Forensics, which is a d/b/a of Eclipse Recording

13   Company, a company I own.

14   Q.   Could you briefly describe your qualifications and

15   experience in digital forensics?

16   A.   I have many certifications.  I am an AccessData-certified

17   examiner and certified investigator.

18        I have probably 20 other certifications from different

19   digital forensic platforms, Oxygen, others from AccessData.

20             MR. YOUNT:  Your Honor, to the extent he is being

21   proffered as an expert in the field of computer forensics, we

22   don't object.

23             THE COURT:  Okay.

24   BY MR. MACDONALD:

25   Q.   Did you perform a forensic analysis related to electronic

1    files in this case?

2    A.  I did.

3    Q.  Can you describe the work that you performed in analyzing

4    those files?

5    A.  Yes.  It was to look at the metadata on the files that were

6    provided and compare them to -- there was a document that had

7    three screenshots on it, and it was to see whether or not any

8    of the files that were presented for my examination were

9    created prior to May 9th, and if any of these files matched the

10   metadata on the file from the screenshots.

11   Q.  What tools did you use to analyze those files?

12   A.  There were Word DOCX.  There were PDFs, and there was an

13   image file.  I used Microsoft Word to open the Word DOCX.  I

14   used Adobe Acrobat, of course, to open the PDFs, and then File

15   Viewer Plus Pro for analyzing the images.

16        But File Viewer also has a very detailed file info

17   function, which allows you to see metadata, a lot more metadata

18   that you get than just by right clicking and looking at file

19   properties.

20   Q.  At the time you completed your analysis, did you complete a

21   report with your findings?

22   A.  I did.

23   Q.  Was that report created to accurately reflect your

24   observations and findings at the time you did the analysis?

25   A.  Yes, it was.

1  Q.  Mr. Stafford, do you recall all the details of the report

2  that you generated?

3  A.  I recall all the salient details.  There were numbers in

4  there.  I don't recall the numbers, per se.

5  Q.  Now, can you describe the purpose of your investigation or

6  analysis?

7  A.  Yes.  Well, what I was asked to do was to compare those

8  documents that were presented to the, once again, the three

9  screenshots that represented a file that was created on

10  August 10th of 2022.

11      There were a number of characteristics that were shown in

12  the file data that was in those screenshots, and so I was

13  comparing the metadata that I observed from the documents that

14  were presented, the newer documents, and then to see if any of

15  them were created prior to May 9th.

16  Q.  What were your findings in regards to those two aspects

17  that you looked into, the creation date, and the images that

18  you looked at?

19  A.  Well, none of the documents that were presented were

20  created before May 9th.  There were some in May.  There were

21  some in June that had creation dates, but the interesting thing

22  was is that the file that was -- showed the three screenshots

23  that refers to that policies and procedures, you know, the

24  Title IX Policies and Procedures that showed an origin date of

25  August 10th, 2022, also showed that its content had been

1    modified on May 9th, at 6:47 in the evening and that

2    modifications took a period of five hours and that the modifier

3    was Olivia Bernal on her computer.

4    Q.   So, if I understood you correctly, the documents that you

5    looked at, did any of them support a creation date before

6    May 9th, 2024?

7    A.   They did not.

8            THE COURT:  How can you tell that from a screenshot,

9    though?

10           THE WITNESS:  I'm sorry?

11           THE COURT:  How can you tell that from a screenshot of

12   a document?

13           THE WITNESS:  The screenshot she provided showed the

14   creation date and showed modified date.

15           THE COURT:  Oh, I see.  In other words, the screenshot

16   was also a metadata?

17           THE WITNESS:  Yes, it had metadata on it.  Yes.

18           THE COURT:  Oh, I see.

19           MR. MACDONALD:  I have an exhibit to show the Court.

20           THE WITNESS:  Yeah, I'm sorry.  It was not an

21   examination of the metadata of the screenshot.  It was what was

22   actually printed on the caption.

23           THE COURT:  Oh, I see.

24   BY MR. MACDONALD:

25   Q.   And you also compared the properties in those images to the

1    actual PDF and Word document files that you received.  Is that

2    correct?

3    A.   Yes, I did.

4    Q.   Did any of the files you received, whether PDF or a

5    document, did any of them match those images?

6    A.   They did not.

7    Q.   What is the significance of that discrepancy?

8    A.   Well, you know, you had Word count.  You had a character

9    count.  You had a paragraph count, you had pages, obviously,

10   file size, that are all different.

11        So, what that means is that the files that were presented

12   are not the file that is represented in the screenshot.

13            MR. MACDONALD:  Okay.  Now, I'd like to show what's

14   been premarked as Plaintiff's Exhibit 10 for identification.

15            (Plaintiff's Exhibit 10 was marked for identification.)

16   BY MR. MACDONALD:

17   Q.   When you were referring to the images a moment ago,

18   Mr. Stafford, does this appear to be the document?

19   A.   It's the one that's underneath, that has the three

20   screenshots, but the one on top is referring to the same

21   document.  You see what it says there is -- if you pull it into

22   the screen just a little further, you will see that it shows

23   that this is the Title IX Policies and Procedures.  The subject

24   was 2023, 2024, and it says revision number two.  It shows the

25   content was created on May 9th, 2024, at 6:47, and that was the

 1   last time it was saved.  It also shows a total editing time of

 2   five hours.

 3   Q.  So, if I understood you correctly, you compared those

 4   characteristics shown in that image right there on the

 5   character count line count, and it appears to be on the

 6   left-hand side as well, you compared those to the actual

 7   electronic files?

 8   A.  I did, yes.

 9   Q.  That's what you were referring to when you said that they

10   don't?

11   A.  That's right.

12   Q.  In your expert opinion, do the properties shown in those

13   images belong to a document that you did not review?

14   A.  They do.

15   Q.  How did you reach that opinion?

16   A.  Well, the metadata is very different.  When you modify

17   something, you can modify it by changing its content or you can

18   modify it simply by changing its name.  So, the modified is

19   when it was last changed, but the creation date can also be

20   something that -- like if you send me a file and I save it to

21   my computer, it will have a new creation date, but the modified

22   date will still be whenever it was last changed.

23   Q.  And in your expert opinion, could any of those

24   discrepancies be caused by routine file handling like e-mailing

25   a file or saving it to a hard drive?

1    A.   No.  Saving it to a hard drive will give you a new creation

2    date, but it won't change the modified date, and as far as

3    being able to just do exchange files, no, it wouldn't do that.

4    Q.   As you sit here today, Mr. Stafford, do you stand by your

5    report and your analysis and the conclusions that you reached

6    in it?

7    A.   I do.

8              MR. MACDONALD:   Thank you.

9              No further questions for the witness at this time.

10             THE COURT:   Cross-examination.

11             MR. YOUNT:   May I proceed?

12             Thank you, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. YOUNT:

15   Q.   Good afternoon, Mr. Stafford.

16   A.   Good afternoon, Mr. Yount.  Good to see you again.

17   Q.   We had the pleasure of meeting that week just prior to

18   getting the note that we had to come to court here.

19   A.   We did.

20   Q.   At that deposition, Mr. MacDonald represented to everyone

21   that he was your attorney and was invoking the attorney-client

22   privilege with respect to my request for you to produce

23   information.  Is that correct?

24   A.   I don't recall specifically.  He is not my attorney.

25   Q.   Okay.  But you do recall that he said, and he filed

1    paperwork saying that he was invoking the attorney-client

2    privilege and telling you not to produce documents?

3              MR. MACDONALD:  Objection, Your Honor.  He is referring

4    to work-product privilege, which is covered under Rule 26.

5              THE WITNESS:  I don't recall that specific question.  I

6    know there was some back and forth between the two of you.

7    BY MR. MACDONALD:

8    Q.   Okay.  You were served a subpoena before your deposition.

9         Is that correct?

10   A.   I was.

11   Q.   One of the things that was requested that you produced was

12   your file.  Correct?

13   A.   That's correct.

14   Q.   And your file would have included the electronic PDFs, the

15   electronic Word documents and everything else that you had

16   concerning this case.

17        Is that correct?

18   A.   Yes, including scans of my notes.

19   Q.   And you refused to produce those documents?

20   A.   No, that's not true.  I gave them to a Mr. Milano.

21   Q.   Did you bring it to the deposition and show them to me at

22   the deposition?

23   A.   No.

24   Q.   So, you did not produce them at the deposition as commanded

25   by the subpoena.

1      Is that correct?

2    A.   Mr. MacDonald told me not to.

3         MR. MACDONALD:   Objection.   I'm going to instruct him

4    not to say anything that would be privileged of our

5    communication.   Of course, if it relates to your report or your

6    findings or any facts that you relied on, you can answer that

7    question.

8         THE COURT:   But you said that you weren't his lawyer,

9    though.

10        MR. MACDONALD:   So, when I was referring to the

11   privilege in the deposition I was referring just to

12   work-product privilege with him as the expert, not as his

13   personal attorney, which is the distinction that they are

14   missing.   I'm not his personal attorney.

15        THE COURT:   But you can't invoke privilege then.

16   Right?

17        In other words, you can't invoke a privilege as to what

18   you told him with respect to his file, for instance.

19        MR. MACDONALD:   Right.   Right.   I don't dispute that.

20        THE COURT:   Isn't that the question?

21        What was the question?

22        MR. YOUNT:   That was the question.   To be clear, he did

23   claim that he was Mr. Stafford's attorney until Mr. Stafford

24   said he wasn't and he instructed him not to produce his file.

25   So, I don't have the guy's file, including the electronic --

1          THE COURT:  What was your last question to keep it

2    simple?

3    BY MR. YOUNT:

4    Q.  He told you not to produce and you did, in fact, produce

5    those documents?

6          THE COURT:  You can answer that question.

7    A.  I did produce the documents.  I gave them to Mr. MacDonald.

8    At the time that I received the subpoena for deposition I

9    produced all the documents and gave them to him.

10   BY MR. YOUNT:

11   Q.  But you didn't produce them at the deposition when I was

12   asking you questions that would have been helpful for me to

13   examine you on?

14   A.  I defer to Mr. MacDonald.  He is the one that said not to

15   respond to that.

16   Q.  Okay.  Very good.

17         Let's talk about some of the work that you did in this

18   case.

19         Conceptually, you would agree that every time you take an

20   electronic file from one computer and put it on a flash drive

21   there runs a risk of the metadata changing?

22   A.  No.

23   Q.  No?

24         What about when you take that flash drive and you plug it

25   into another computer with a different operating system?

1    A.   When you talk about metadata, metadata is an awful lot of

2    data about whatever the file is.   What can change is the create

3    date.   There is nothing as you move something from one thing to

4    another that's going to change the background metadata.   It's

5    not going to change line counts.   It's not going to change file

6    size but -- and it won't change the modified date for the file.

7    Q.   But it will change the create date?

8    A.   If you save it to a new computer, yes.

9    Q.   Okay.   Depending on the type of file system that you're

10   changing the file from to the other, you could lose all of the

11   metadata.   Is that correct?

12   A.   I don't believe so.

13   Q.   You don't believe so?

14   A.   Can you explain that question?   I have never been asked

15   that before.

16   Q.   You are the expert.

17   A.   Can you repeat it, please?

18   Q.   I don't remember what it was.

19   A.   Okay.

20   Q.   At least you will agree that the create date can change no

21   matter whether you e-mail the file, put it on a flash drive,

22   upload it, download it, that can all change the create date?

23   A.   The create date is not going to change when you put it in

24   an e-mail.   The create date will change when you put it in your

25   computer.

1  Q.  Are you familiar with Microsoft One Drive?

2  A.  I am.

3  Q.  Does One Drive have an automatic backup on it?

4  A.  If you have it set for that, yes.

5  Q.  How does that affect the metadata?

6  A.  The backup?  It's not going to change or modify dates.

7  Q.  Is it going to change any of the dates on the metadata?

8       THE COURT:  From the original file you mean?

9       MR. YOUNT:  Yes.

10      THE WITNESS:  The original file, none of the metadata

11 is going to change.

12      When you save to a new location, then the create date

13 can change.

14 BY MR. YOUNT:

15 Q.  Now, you talked about this time period where there was a

16 five-hour window when presumably something was happening.

17      Do you know what was happening with this document during

18 this five-hour window that you are testifying about?

19 A.  I do not.

20 Q.  You would agree that the best way to determine whether a

21 document that you receive as an expert is the document that it

22 purports to be by the person who created it, would be to go

23 look at their computer system.

24      Is that correct?

25 A.  Imaging the hard drive of their computer will give me a

1   more complete view.

2   Q.   Okay.  So, that would be the best way to know whether there

3   was a document fraud or perjury going on in this case.  Is that

4   right?

5   A.   It would be helpful.

6   Q.   Did you -- you told Mr. MacDonald in the course of your

7   work that that's the best thing to do and that's what you

8   wanted to do?

9   A.   No.

10   Q.   You didn't?

11   A.   No.

12   Q.   Did you tell him that that would give him better

13   information?

14   A.   No.

15   Q.   Why didn't you tell him that?

16   A.   Because, what I was asked to do was to compare the

17   documents that I received with the images that showed the

18   August 10th, 2022, file.  And I was asked to see if any of

19   these show a create date or modified date for that matter prior

20   to May 9th.

21        So, the question never came up as far as going to the

22   computer.  My experience, though, just as an aside, is that

23   normally that is resisted, so it wasn't something I thought of

24   asking.

25   Q.   Not in this case it wasn't, because we offered.

```
 1  A.  I was not aware of that.

 2  Q.  And you also understood that your opinion and your

 3  testimony here today was a hearing where Mr. MacDonald is

 4  accusing my client and Ms. Bernal of fraud and perjury.  Right?

 5  A.  Actually, I didn't know that until the deposition because

 6  you asked me if I had an opinion on that and I said I do not.

 7  Q.  So, you have no opinion as to whether or not Ms. Bernal

 8  committed fraud.  Right?

 9  A.  I do not know the nature of this case.

10  Q.  In fact, the date that you say that there was no document

11  created by a particular date, what was that date that no

12  document you saw was created before that date?

13  A.  May 9th.

14  Q.  May 9th of what year?

15  A.  2024.

16  Q.  Is it your opinion that my client had no documents, either

17  computer or paper, related to Title IX Policies and Procedures

18  before that date?

19  A.  I have no idea.

20  Q.  If, hypothetically, such a document existed on the computer

21  at Ms. Bernal's office and that she transmitted that document

22  to her boss which then in turn was sent to Ms. Karron or to me

23  which in turn was sent to Mr. MacDonald, could those things

24  change the create date of that document?

25  A.  Yes.
```

1    Q.   So, in that scenario, it's very consistent with

2    Ms. Bernal's testimony that there was a policy and procedure

3    for Title IX in 2022 and 2023 -- that's what her testimony

4    was -- on her computer and in paper.   Your testimony does not

5    refute that in any respect, does it?

6    A.   The question that you asked I think that there is a second

7    part to it.

8    Q.   Answer my question first, and then please explain to your

9    heart's content.

10   A.   I don't know.

11   Q.   Okay.

12   A.   When you were moving these things around, sending them to

13   her boss, sending them to you, it shouldn't change the modified

14   date.   The modified date was when the file last had a change

15   made to it, and that could be something as simple as changing

16   the name of the file or something of its content.   And in the

17   screenshot that you provided or that they provided, it said

18   that there was content that was modified, content created on

19   May 9th, 2024, at 6:47.   I don't know what that was.

20   Q.   So, it could be anything.   Right?

21   A.   That's correct.

22   Q.   It could be somebody merging documents, taking two PDFs and

23   merging them together and that would constitute a modification;

24   wouldn't it?

25   A.   Well, the merging of the documents would create an entirely

1  new file, and at that point you wouldn't have anything that

2  would go back to that August 10th, 2022.

3      So, you would have a new create date and you would have a

4  new modified date, because you are creating something entirely

5  new that didn't exist prior.

6  Q.  Even if you save it under the original document.  You bring

7  a document and you don't merge them separately when you bring

8  one to the other, you are not going to change the create date?

9  A.  I'm sorry?

10 Q.  You are suggesting to the Court that if you add content

11 from one PDF to another that you're creating a new document?

12 A.  Correct.

13 Q.  With a new create date?

14 A.  No.

15 Q.  But if you don't save as that it's going to be the same

16 create date; isn't it?

17 A.  Well, you have to save them if you are going to merge them

18 together.

19 Q.  I said "save as."  If you do "save as," that creates a new

20 create day.

21     Correct?

22 A.  That's correct.

23     THE COURT:  Just so I understand the document, the

24 exhibit on, Exhibit 10, which one of these four did you receive

25 from the defendant, or did you receive all four from the

1    defendant?

2           THE WITNESS:  I believe I received everything.  I'm

3    pretty sure.

4           I don't have my file in front of me, and I am not sure

5    what you are actually referring to.

6           THE COURT:  These two documents here, are these the

7    screenshots that you are referring to, all four of these?

8           THE WITNESS:  Yes, that's correct.

9           MR. YOUNT:  No more questions, Your Honor.

10          THE COURT:  Any redirect?

11          MR. MACDONALD:  Yes, Your Honor.  Briefly.

12                        REDIRECT EXAMINATION

13   BY MR. MACDONALD:

14   Q.  Now, Mr. Stafford, I'd like to show you the document that

15   we previously looked at that's been identified as Exhibit 10.

16          Do you recall seeing this document a moment ago?

17   A.  Yes, I do.

18   Q.  You were just asked questions a few moments ago about doing

19   an analysis of the computer on which a file is stored.  I

20   forgot the term that was used.

21   A.  Yes, it's called imaging the hard drive.  Yes.

22   Q.  And you referred to imaging a hard drive as being the most

23   comprehensive way to look at files?

24   A.  It would be, yes.

25   Q.  Would imaging the computer on which a file is stored

1    indicate any difference in the characteristics here that you've

2    identified in these images?

3    A.   No, not for those files.

4    Q.   You also were asked a lot of questions about creation dates

5    and modify dates.  Do you recall that?

6    A.   I do.

7    Q.   Would the creation dates or the modified dates have any

8    impact on these characteristics and discrepancies you have

9    identified in your analysis?

10   A.   No.

11   Q.   And you were also asked about sending a document via e-mail

12   or backups that could be used with a Microsoft One Drive it

13   sounded like.  Do you recall that?

14   A.   I do.

15   Q.   Could that affect any of the discrepancies identified in

16   these images?

17   A.   No.

18          MR. MACDONALD:  No further questions.

19          THE COURT:  Thank you.  You may step down.

20          Any further evidence from the plaintiff?

21          MR. MACDONALD:  That's all we have, Your Honor.  Thank

22   you.

23          THE COURT:  Okay.  Any additional evidence that the

24   defendant wishes to introduce?

25          MR. YOUNT:  Yes, Your Honor.  We would call Mr. Hasbun.

 1          (The witness, Habib Hasbun, was duly sworn.)

 2          COURTROOM DEPUTY:  Thank you, sir.  Please have a seat

 3     and state and spell your name for the record.

 4          THE WITNESS:  My name is Habib Hasbun.  First name

 5     H-A-B-I-B, last name H-A-S-B-U-N.

 6          COURTROOM DEPUTY:  Thank you.

 7          MR. YOUNT:  May he proceed, Your Honor?

 8          THE COURT:  Yes.

 9                    DIRECT EXAMINATION

10     BY MR. YOUNT:

11     Q.  Would you please introduce yourself to the Court and tell

12     Judge Torres what you do for a living.

13     A.  So, I'm an electronic engineer by profession.  I have a

14     major in robotics and artificial intelligence.  I have a

15     masters degree in telecommunications and network engineering,

16     and I have been programming since I'm ten years old.  I've been

17     around computers all my life.

18     Q.  What do you do for a living?

19     A.  I have an independent IT company.  I handle the IT

20     department for different companies here in South Florida, and

21     I'm also an engineering and technology professor for Miami-Dade

22     College.

23     Q.  Academir, is that a client of yours?

24     A.  They are.

25     Q.  Briefly, if you would, how did you first find out about

1    this issue of claims of fraud and forging documents and data?

2    How did you find out about this?

3    A.   I mean, about fraud in particular, I had no idea that they

4    were claiming fraud.  Originally, I found out about this

5    because Magdiel called me and said that they needed to meet

6    with me at the office around, I don't know, May of something.

7    I really forget the exact date.

8         I went to meet with them, and then when I got there they

9    explained to me that they were being sued and they needed my

10   help in finding certain files.

11   Q.   Okay.  What were you asked to do and then what did you do?

12   A.   So, at the time I met with Olivia -- well, I met first with

13   Magdiel and then with Olivia, and I sat in her computer.  And

14   she said there was a particular file that she was looking for

15   that she couldn't really find the original.  She could find a

16   file with the content but not the original file she had created

17   back in 2022.

18        So, at that point in time, I started looking in her hard

19   drive.  It turns out that she had done multiple backups of --

20   at the time it seemed to me that she was working out of her

21   desktop computer and her laptop computer, and she would

22   exchange files from desktop to laptop using USB drives.  And

23   she kept backups over backups over backups.  So, she had

24   multiple files in her hard drive.

25        It took me quite a while, maybe two or three hours to be

1    able to find the original file that had the create date of 08

2    of 2022, and that's when I took the screenshot of the file

3    itself, of the metadata.

4    Q.  You are the person that took the screenshots that we were

5    looking at earlier on the screen.  Is that correct, sir?

6    A.  Yes, it was.

7    Q.  For the purposes of the record, this is Document 41-3,

8    which has already been submitted to the Court, Your Honor, this

9    is -- these are the documents.  This is your affidavit just to

10   refer to where we are.

11       So, these are the documents -- these are the three

12   screenshots of metadata that you produced.  Is that correct?

13   A.  That is correct.

14   Q.  Now, you also produced the actual document.

15       Explain to the Court what this document is that follows.

16   A.  This was the document that I was asked to find in

17   Ms. Bernal's computer.

18   Q.  So, the document which starts on page 7 of 17 or 41-3,

19   which is titled, Title IX Policies and Procedures, dated

20   2022-2023, this is the actual -- this is a reproduction of the

21   Word document you found on Ms. Bernal's computer.  Is that

22   correct?

23   A.  That is correct.

24   Q.  And based on your review of the metadata, when was this

25   document created?

1    A.   At some point in 2022.

2    Q.   All right.  Can you explain to the Court why -- give us an

3    explanation as to why the date modified and the date accessed

4    might be 5/9/2024.  What does that mean?

5    A.   So, that is the date, the last date and time this document

6    was modified somehow.

7         Back a few years ago Academir was worried about maybe

8    losing information out of any of their computers, so they had

9    me go and make sure that all of their computers were constantly

10   backed up.  One of the things that I did was I changed their

11   complete e-mail exchange system to Microsoft, which included

12   One Drive.

13        I installed One Drive on each and every one of their

14   computers, and their documents and pictures and important

15   folder are being constantly backed up.  When you do this,

16   Microsoft Office applications has a feature that automatically

17   turns on that is auto save.  Auto save saves an open file every

18   five minutes in order to avoid losing any type of data.  So,

19   the fact that you have the file open, even without any

20   modification, would change the modified date.

21   Q.   Okay.  Just so I make sure I understand, if I open this

22   actual document from Ms. Bernal's computer on 5/9/2024, I open

23   it and don't touch the keys otherwise --

24   A.   Every five minutes you would get a new modified date.

25   Q.   Even though I'm not changing any of the non metadata,

1   whatever, the words on the page, I am not changing that?

2   A.   If you click on print, it would change the modified date.

3   Q.   Okay.  Now, you heard testimony about -- well, let me ask

4   it this way.

5        You would agree that the best way to analyze a document, an

6   electronic document to determine when it was created and when

7   it was modified, would be to go to the source and look at the

8   actual computer.  Is that correct?

9        MR. MACDONALD:  Objection.  He is a lay witness.  He

10  isn't here to testify as an expert.  He doesn't have any

11  firsthand knowledge.

12       THE COURT:  I will sustain to the form of the question.

13       MR. YOUNT:  Are you sustaining to re-ask or you want me

14  to qualify him?

15       THE COURT:  You can rephrase the question.

16  BY MR. YOUNT:

17  Q.   What is the best way to determine when documents, Word

18  documents were created and modified and things like that?

19       What's the best way to do that from a computer science

20  standpoint?

21       MR. MACDONALD:  I'm going to object to that.  From a

22  computer science standpoint, he is not here to testify as to

23  that.  He doesn't have any personal knowledge.  I ask that the

24  question be rephrased.

25       MR. YOUNT:  He is a computer science expert, and he

1   does have personal knowledge because he did it.

2           THE COURT:  I will allow it.  Overruled.

3           THE WITNESS:  The best way is to look at the file in

4   the original location that it was created.  So, you can

5   actually look to check when the file was created without the

6   create date being modified by the re-saving of the file.

7   BY MR. YOUNT:

8   Q.  What are the pitfalls and potential errors that could

9   develop if instead of you going and looking at the actual

10  computers somebody sends that and copies it or e-mails or sends

11  it by FTP, what could happen to the metadata in that docket

12  which would make it -- that metadata unreliable?

13  A.  So, what I heard before about the modified date not

14  changing, that is true.  It wouldn't change when the file is

15  moved.  However, the create date, which I think was one of the

16  issues that was being contested would definitely change.

17          So, the only way for you to actually see what was the real

18  create date of the document was to go into Ms. Bernal's

19  computer and look at the actual document.

20  Q.  So, the fact -- the last question is, the fact that the

21  document was opened for five hours, that doesn't necessarily

22  mean that any changes were being made to it, does it?

23  A.  No, you can be reading the file, just reading the content,

24  and it would change the modified date automatically.

25          MR. YOUNT:  No further questions.

1              Thank you, Your Honor.

2              THE COURT:  Do you know if -- do you, in fact, know if

3       Ms. Bernal's computer was set up to do automatic saving every

4       five minutes?

5              THE WITNESS:  I set it up, and I remember that that was

6       one of the things that they asked me, why is it giving me a

7       modified date of today.  I mean, I cannot testify as whether

8       there was any change in the document after I left, but I

9       remember that I was the one who found the actual document, did

10      the screenshots, and they asked me why is this showing a

11      modified date of today.  And I explained and I showed them

12      where the auto save was turned on.

13             THE COURT:  Cross-examination?

14             MR. MACDONALD:  Yes.

15                          CROSS-EXAMINATION

16      BY MR. MACDONALD:

17      Q.  Good afternoon, Mr. Hasbun.

18             Now, you are a consultant for the defendants.  Is that

19      correct?  Or at least Academir?

20      A.  I am.

21      Q.  And do you have any formal training in digital forensic?

22      A.  Not in digital forensics, per se.

23      Q.  And you are not certified as a forensic examiner, are you?

24      A.  I am not.

25      Q.  Have you ever been qualified in a court of law to testify

1  about metadata or any other computer forensic?

2  A.  No, I have not.

3  Q.  And you previously testified that on May 15th, 2024, you

4  went to help get those screenshots that we reviewed moments

5  ago.  Is that right?

6  A.  As I said, I really forget the exact date, but around that

7  time, yes.

8  Q.  Okay.  I am going to show you what's been previously marked

9  as Plaintiff's Exhibit 10 for identification.

10      Do you recall these images being shown?

11  A.  Yes, I do.

12  Q.  And you helped take these screenshots.

13      Is that correct?

14  A.  I didn't help.  I took them.

15  Q.  You took them.  Okay.

16      You previously testified about the creation date and the

17  modified date and how that might change.

18      Is that right?

19  A.  That is correct.

20  Q.  And when you are talking about the create date and modified

21  date, you are referring to these indicators in the file's

22  property.  Is that accurate?

23  A.  That is correct.

24  Q.  You testified about One Drive backups and how those could

25  alter those modified or create dates.  Is that accurate to

1   state?

2   A.   No, One Drive backups is one thing.  What I was referring

3   to that would change the modified date is the auto save feature

4   from the Microsoft Office applications, including Microsoft

5   Word.

6   Q.   So, you're referring to the auto save feature that could

7   change to the modify or create date of the file.  Is that

8   correct?

9   A.   Not the create date, the modify date.

10  Q.   The modify date, okay.

11       And when you were contacted by Academir, they were

12  requesting your assistance in regards to finding the file with

13  the proper date in those properties.  Is that fair to say?

14  A.   That is correct.  In that time, as I believe Ms. Bernal had

15  found a file that contained a Title IX, but she did not find

16  the original one.  And, as I said, she had, I mean, a lot of

17  copies.  I forget how many there were, but we had to search the

18  hard drive until we were able to find it.

19  Q.   You said it was called a One Drive backup?

20       I don't want to use an incorrect term.

21  A.   So, when the One Drive backup is configured on the

22  security -- so, Microsoft used to have this feature for

23  everybody, and a few years ago they decided to take out the

24  auto save feature from everybody, unless you were an actual

25  paying monthly or yearly customer from Microsoft Office 365.

1    So, if you have a Microsoft Office 365, then the auto save

2    feature starts to kick in.

3         This is a feature that whenever you have the document open

4    it saves your file every five minutes or unless you make any

5    modifications.  So, by having the file open, it would

6    automatically change the modified date.

7    Q.  With that auto save feature that you just described, would

8    that impact any of these characteristics such as character

9    count, line count, paragraph count?

10   A.  They would not.

11   Q.  How do you know that?  Is that based on your experience?

12   A.  So, I may not be a court-certified forensic computer

13   examiner, but I am an electronic engineer.  I am the type of

14   person that we are called on to create computers, so I have a

15   lot of experience in how computers work at the byte level.

16   Q.  And in your experience working on computers up to the byte

17   level, the auto save features would not have affected any of

18   those characteristics?

19   A.  They would not.

20        THE COURT:  What was the date that you were tasked

21   again to look for the file?

22        THE WITNESS:  I am not exactly sure on the date, but it

23   was probably May 9th, because this was the date that I opened

24   it to look at the actual metadata so I could take the

25   screenshots.

```
 1              THE COURT:  And when you opened it, you opened it on

 2   what computer?

 3              THE WITNESS:  On Ms. Olivia's computer.

 4              THE COURT:  I see.

 5   BY MR. MACDONALD:

 6   Q.  Do you have any firsthand knowledge as to why any of those

 7   characteristics might have been altered or changed from the

 8   documents in this case?

 9   A.  No, I do not.

10              THE COURT:  At the time that you -- how long after you

11   found the document and you opened it -- is that what you're

12   saying?

13              THE WITNESS:  Yes.

14              THE COURT:  How long did it take you to take these

15   images?

16              THE WITNESS:  To take the actual images?

17              THE COURT:  Right.

18              THE WITNESS:  A couple of minutes.  So, however --

19   also, these images you don't need to actually open the document

20   itself to be able to take the pictures of the metadata.

21   However, we needed to see if the document was actually what she

22   was looking for.

23              THE COURT:  Sure.

24              THE WITNESS:  So the document was opened so she could

25   look at the metadata, and after she verified that was the
```

1   document we were looking at, then I took the pictures off the

2   screenshots.

3          THE COURT:  How did you find the document?

4          THE WITNESS:  Performing searches on the hard drive.

5          THE COURT:  Because what -- what searches did you look

6   for?

7          THE WITNESS:  The thing is, the way that Windows Find

8   or Windows Search works, it actually has to create a database

9   with key words and file names and things of that nature.

10  Usually, whatever you have access first goes on top of the

11  database, so whenever you perform a search, it tries to find

12  the latest documents that you have opened that fit that

13  criteria, and most people actually, they find the document and

14  they stay with that.

15         So, I had to go -- when I ran the search on the actual

16  hard drive, it found two or three documents, and none of them

17  were the ones that had the original 2022 date.  So, I had to go

18  and look at sub folders over sub folders.

19         THE COURT:  Were they also called Title IX Policies?

20         THE WITNESS:  Yes, the title never changed.  She had

21  multiple documents with the same --

22         THE COURT:  I see.

23         THE WITNESS:  It was like she was saving them onto the

24  USB, and then it said USB backup, and she copied everything

25  from the USB.  And she had multiple USB backup folders and all

1    of them had duplicated files on them.

2         MR. MACDONALD:  Did Ms. Bernal tell you why she had so

3    many duplicative files on the Title IX document?

4         THE WITNESS:  She was afraid of losing any of her data.

5    BY MR. MACDONALD:

6    Q.  Did you have any way of independently verifying the content

7    of the document and whether it existed in 2022?

8    A.  No.

9    Q.  And you didn't conduct any forensic analysis to determine

10   if the document you looked at was manipulated or altered, did

11   you?

12   A.  No.

13        MR. MACDONALD:  No further questions.  Thank you.

14        THE COURT:  Any redirect?

15        MR. YOUNT:  No.

16        THE COURT:  All right.  Thank you very much.

17        Any additional witnesses for today?

18        MR. YOUNT:  Just plaintiff's counsel, Your Honor.

19        And I will proffer and he may stipulate.  I will

20   proffer that the reason I want him to testify is that in May

21   and in June of 2024 he was aware that Ms. Karron was running

22   point on discovery and document production.  He was aware that

23   she was in the process of leaving one law firm and going to

24   another, so she didn't have full access to the file.

25        Further, that he was aware and, in fact, received an

1   e-mail from Ms. Karron's former associate who offered on June

2   the 12th of 2024 to come look at the data, that he ignored it,

3   made no further -- he initially requested to have access to the

4   computers.  We offered it to him.  He ignored it and then came

5   and filed this motion alleging perjury and fraud.

6       Those are the things that I would ask him if he were

7   called to testify in this case.  I think they're

8   uncontroverted.

9       MR. MACDONALD:  I am happy to talk about the specifics

10   of the case, but I would object to being called as a witness,

11   given I am counsel of record on the case and there is no

12   necessary reason for me to be called as a witness, especially

13   given the circumstances.  If anything, talking about the

14   creation and the exchange of documents then if anything I would

15   like to call the defense counsel as it stands if that's what we

16   are doing here.

17       THE COURT:  Right.  I think that that would be the

18   extension of it, but I don't think we need to do that.

19       MS. KARRON:  Could I just add to the proffer, Your

20   Honor, that I personally spoke to Mr. MacDonald in several

21   occasions and said my client has nothing to hide here.  I will

22   give you whatever you need.  Come look at the documents.  Come

23   yourself.  I offered to have other principals from other

24   schools informally just speak with him so he could ask them

25   about the policies they always had in their manual and none of

1   that was ever done.

2       THE COURT:  Whatever.  So then I won't require you to

3   call him, but other than that issue, do you have any additional

4   evidence?

5       MR. YOUNT:  No additional evidence other than the

6   documents that are attached to the response in opposition,

7   which we would ask for Your Honor to consider that as part of

8   this hearing.

9       THE COURT:  Okay.  That's part of the record.

10       All right.  Now you on behalf of the plaintiff, are you

11   admitting all the documents that are in these two binders?

12       MR. MACDONALD:  Yes, Your Honor.

13       THE COURT:  Okay.

14       MR. YOUNT:  We have no objection except for the expert

15   report, which is hearsay.

16       THE COURT:  The report?

17       MR. MACDONALD:  I believe it's 17 or 15, Your Honor.

18       MR. YOUNT:  15.

19       THE COURT:  The objection is overruled.  I will admit

20   it.  So, all those exhibits will be admitted as part of the

21   hearing, through 24, I guess.

22       (The two exhibit binders were admitted in evidence.)

23       MR. MacDonald:  Okay.

24       MS. KARRON:  Your Honor, if I may.

25       THE COURT:  Now, the next question is what is it

 1    that -- what do I make of it based on the record presented at

 2    this point?

 3              So, let me turn to counsel for the plaintiff.

 4              MR. MACDONALD:  Yes, Your Honor.

 5              You just want me to address the relief or would you

 6    like me to go further into the details and talk a little bit

 7    about --

 8              THE COURT:  Right.  What finding can I make based upon

 9    what I have heard?

10              MR. MACDONALD:  Yes.

11              So, I will keep it brief, Your Honor, but today we are

12    asking that the default judgment be entered against the

13    defendants, and we are aware that it's a very severe sanction

14    but given the circumstances of the evidence withheld in this

15    case, the false statements that you heard from Ms. Bernal

16    regarding the production of these documents, and even more

17    specifically, stepping back a little bit to believe the

18    defendant's version of events as to why these documents have

19    not been produced and why many of their responses were not

20    accurate, you would have to disregard the evidence from

21    Mr. Stafford about the document fabrication without any

22    reasonable explanation to the contrary.

23              We heard Mr. Hasbun say that there was no explanation

24    as to why those characteristics did not match anything they

25    have given us.  That is because it is not the same document.

```
 1              Even if you were to believe the Title IX policies

 2    existed at this time, you would also have to ignore the fact

 3    that they were not published online; they were not distributed

 4    to a single student; there is no mention of them in any school

 5    handbook, which are included on the exhibits.

 6              THE COURT:  Let me take it a step at a time, though.

 7              THE WITNESS:  Yes, Your Honor.

 8              THE COURT:  You may be jumping over a predicate that I

 9    need to understand before I get to the point you're asking me.

10              When you asked for production of -- I saw that the

11    interrogatory and their answer was none with respect to any

12    changes in the last five years.  Right?

13              So, with respect to the request for production of the

14    Title IX policy in effect at the time of the incident, which

15    was in 2023.  Right?

16              MR. MACDONALD:  Yes, that's correct, Your Honor.

17              THE COURT:  What documents did you get?

18              MR. MACDONALD:  So, we did not receive any school

19    policies or policies for the Miami-Dade County Title IX manual,

20    so no policies from the school as to Title IX.

21              THE COURT:  Just so I'm clear, the document that we

22    have been examining here, where did I put it -- which exhibit

23    is the one that you are focusing on?

24              MR. MACDONALD:  It's number 10.

25              MR. YOUNT:  It's number 10.
```

1            THE COURT:  Is it 16?

2            MR. MACDONALD:  Number 10 would be where it starts

3    after the screenshots that we reviewed.  That would be the

4    policies for that year.

5            THE COURT:  The attachments.  I see.

6            When did you first see this document?

7            MR. MACDONALD:  It was a week, give or take, after

8    Ms. Bernal's deposition is the first time we received it

9    despite propounding the request in November, 2023.

10           THE COURT:  In response to the original request in

11   November of 2023, what did you receive?

12           MR. MACDONALD:  No policy documents, but in the

13   response, which I can point you to Your Honor, in Exhibit 3.

14   So, in Exhibit 3 -- I'll point you to the exact number --

15   number 11, Your Honor, identify -- it asks that they describe

16   in detail any policies and procedures related to Title IX,

17   including but not limited to reporting and investigation

18   complaints that were in effect at any time during plaintiff's

19   enrollment.

20           THE COURT:  You need to slow it down.  Speak a little

21   slower because we have the court reporter.

22           MR. MACDONALD:  I apologize.

23           Your Honor, it requests the policies or procedures

24   related to Title IX compliance, including but not limited to

25   reporting and investigation of complaints that were in effect

```
1   at any time during plaintiff's enrollment as a student at

2   Defendant Academir.

3           THE COURT:  Then they describe a series of documents.

4   Is that document in 10 included in here?

5           MR. MACDONALD:  No, Your Honor.

6           THE COURT:  Did you have a separate request for

7   production for the same thing?

8           MR. MACDONALD:  That's correct, Your Honor.

9           THE COURT:  What was that?

10          MR. MACDONALD:  This would be Exhibit Number 4 in the

11  binder we provided, Your Honor.  Request for production number

12  17, 18, 19, there is a few others there, they request both

13  policies related to Title IX and then sexual harassment

14  generally, as well.

15          THE COURT:  Okay.  So, Bates 248 to 283 were produced.

16          THE WITNESS:  That's correct, Your Honor.

17          THE COURT:  Are those the documents referenced in

18  interrogatory -- what was it -- 11?

19          MR. MACDONALD:  That's my understanding, Your Honor.

20          THE COURT:  Okay.  So, then you didn't get this

21  particular document.  Is that what happened?

22          MR. MACDONALD:  That's correct, Your Honor.  In

23  addition, we did not receive any documents related to any of

24  the investigations that Ms. Bernal described, including

25  specific incidents related that she described in her
```

1    deposition.  There was no paperwork, no nothing ever produced

2    to us in addition to the revisions and the other items in the

3    interrogatories and request for production that we mentioned

4    earlier.

5          THE COURT:  Okay.  So then -- and other than the

6    corporate rep depo in May, were there any other depositions of

7    defendant people that were taken?

8          MR. MACDONALD:  Yes, Your Honor, several.

9          THE COURT:  Like who?

10          Who would be most knowledgeable in this issue, I guess?

11          MR. MACDONALD:  I would say Rolando Mir, who is the

12    Chief Executive Officer of Defendant Superior, if I am correct.

13    Correct me if I am wrong, please.

14          And he deferred to Ms. Bernal on these issues.

15          THE COURT:  Okay.

16          MR. MACDONALD:  And additionally, as to Mir, his wife

17    was deposed, who Ms. Bernal referenced to, and who is also

18    listed as a Title IX coordinator.

19          THE COURT:  I thought that was Xenia.

20          MR. MACDONALD:  All three of them are listed as

21    Title IX coordinators in the documents that we received after

22    Ms. Bernal's deposition.

23          THE COURT:  Oh, I see.  Okay.

24          Ms. Bernal was the Title IX coordinator at the time for

25    students?

1          MR. MACDONALD:  Yes, that is her testimony.

2          THE COURT:  Okay.  Did any of them refer to this

3    document?

4          MR. MACDONALD:  The policies document that we just

5    looked at?

6          THE COURT:  Exhibit 10.

7          MR. MACDONALD:  I introduced it to them because they

8    all took place after Ms. Bernal.

9          THE COURT:  So, the first deposition of the defendant

10   was Ms. Bernal's deposition as a corporate rep in May?

11         MR. MACDONALD:  That's correct, Your Honor.

12         THE COURT:  Okay.  So, then you received this document

13   when in the production, Exhibit 10?

14         MR. MACDONALD:  All right.  It would have been roughly

15   a few days after Ms. Bernal's deposition, which took place on

16   May 9th, 2024, so just a few days after that.

17         THE COURT:  I see.  Okay.

18         Now that I had that context, go ahead.

19         MR. MACDONALD:  Thank you, Your Honor.

20         Just a few other things I want to highlight.  They also

21   did not make any mention of these documents in the initial

22   disclosure.  They were never amended to reflect these documents

23   even after the disclosure.

24         THE COURT:  Do I have the disclosures in these

25   exhibits.

```
 1            MR. MACDONALD:  Yes, you do, Your Honor.

 2            MS. KARRON:  They have been amended.

 3            MR. MACDONALD:  Just to clarify, Ms. Karron is

 4    referring to Defendant Academir Charter School did amend their

 5    final disclosures after the close of discovery to add those

 6    documents but not within discovery.

 7            THE COURT:  Okay.

 8            Where do I have the disclosures?

 9            MR. MACDONALD:  Exhibits 22 through 24, Your Honor.

10            THE COURT:  Now, they do refer to Charter Schools

11    Title IX Policies and Procedures.  Is that the amendment you

12    are talking about?

13            MR. MACDONALD:  Yes, Your Honor.

14            THE COURT:  That was on September 11th.  That was last

15    week.

16            MR. MACDONALD:  That's correct, Your Honor.

17            THE COURT:  I see.  So the original one did not have

18    that.  Okay.

19            MR. MACDONALD:  That's correct, Your Honor.

20            THE COURT:  Okay.

21            MR. MACDONALD:  So, yes, the plaintiff operated under

22    that assumption that those policies did not exist until that

23    time, but because of the circumstances of how they've been

24    produced, like the descriptions, the physical policies and

25    procedures, it's created questions as to what, if any,
```

1    documents are legitimate, even after Ms. Bernal's deposition,

2    that document, Exhibit 10, it does not reflect any fiscal

3    policies and procedures language, which she described

4    repeatedly in her deposition, leaving the question as to what

5    those documents were.

6         Now, Ms. Karron provided a document that was -- could

7    best be described as fiscal policies and procedures with a

8    table of contents and an end page with Exhibit Number 10

9    affixed to the back, and that was given to us as the fiscal

10   policies and procedures, again, raising the questions as to

11   where these were.

12        Even yesterday we received over 800 pages of documents

13   never before seen that apparently are the binder that

14   Ms. Bernal referred to in her deposition that these principals

15   have as to compliance, and as to Title IX.  Again, never

16   received, and we were not able to utilize those in depositions

17   and throughout discovery.

18        But just to briefly highlight some of those elements I

19   was mentioning before, like I said, to believe that these

20   documents existed, you would have to believe that -- ignore the

21   fact, rather, that they were not distributed to students, were

22   not published online, and the school even publishes the board

23   of director meeting minutes online.  And you can see every

24   policy being approve.  There is no mention of Title IX ever

25   being approved on those documents.

1          This, on top of the forensic evidence from

2    Mr. Stafford, which still even today in this hearing we have

3    not received an explanation as to why the document shown in

4    those images does not match any document we've received, and

5    that kind of evidence is the kind that cannot be ignored when

6    we are talking about the authenticity of these documents and

7    the fact they were withheld for more than six months, and the

8    circumstances of their production.

9          And even assuming the authenticity of those policies,

10   we would need to disregard the fact that they were not produced

11   for that entire time period and weren't disclosed.

12         THE COURT:  Let me ask this question.

13         MR. MACDONALD:  Yes, Your Honor.

14         THE COURT:  In terms of the connection to your claim,

15   in terms of understanding the nature of the prejudice to you,

16   how is the document that's Exhibit 10 inconsistent with your

17   claim?

18         In other words, how is it something that has an effect

19   on your case?

20         MR. MACDONALD:  Yes.  So, in terms of the policies,

21   they are extremely critical to the plaintiffs' claims for two

22   reasons.  The first is the deliberate indifference standard

23   under Title IX.  So, the plaintiff has to show that under these

24   policies, how did they respond to what happened to the

25   plaintiff.  You know, did they handle things per their

1    procedures or did they deviate from those procedures, and

2    that's why it's so critical to know whether they were following

3    Miami-Dade County Schools policies, were they following this

4    different document that they had all these different versions.

5    That's very critical of that piece.

6         On top of it, on the negligence piece it's the same,

7    whether they are meeting the standard of care that they met for

8    other students, you know, what is the policy and procedure that

9    they are following in terms of investigation, the handling of

10   complaints, the notification of rights under Title IX, were

11   they given an opportunity for a hearing, whether they were

12   allowed to present evidence.  All of these things were dictated

13   by the policies and procedures so that's critical to

14   plaintiff's claims.

15        And as to some of the documents --

16        THE COURT:  So, in other words, I guess to some extent

17   is it more helpful for you now to have something with their

18   name on it as being policies from which you can then draw

19   contradictions in terms of what happened with the plaintiff?

20        Right?

21        In other words, you see my point, how useful is it

22   having now -- I understand the delay and all of that, but how

23   useful is having Exhibit 10 for you to use and how is that more

24   helpful than not?

25        MR. MACDONALD:  So, could you repeat the question, Your

  1  Honor?

  2          THE COURT:  Let me rephrase it this way.

  3          In other words, now that you have Exhibit 10,

  4  theoretically, you could pursue, as part of your negligence

  5  theory, that they didn't do X, Y, and Z, when their own

  6  policies required it.

  7          MR. MACDONALD:  Right.

  8          THE COURT:  Now, they've always referred to the

  9  Miami-Dade Title IX policy, that is correct.  Is that not

 10  right?

 11          MR. MACDONALD:  No, they have not always.  I mean, they

 12  have made references to it.

 13          THE COURT:  Prior to the May deposition, did they ever

 14  refer you to the Miami-Dade Title IX?

 15          MR. MACDONALD:  They referred to the Miami-Dade Student

 16  Code of Conduct.  I would have to check, I don't want to

 17  misspeak, as to specifically the Title IX.  My understanding is

 18  no.

 19          THE COURT:  Putting that aside for a moment, I take it

 20  you could use Exhibit 10 to highlight the contradictions versus

 21  what they were supposed to do versus what you claimed

 22  happened --

 23          MR. MACDONALD:  Yes.

 24          THE COURT:  -- or didn't happen, vis-à-vis, the

 25  investigation.

1          MR. MACDONALD:  Yes, that is absolutely true.  The

2     difficulty becomes when we don't know what policy was in effect

3     at that particular time.

4          THE COURT:  I understand that.  But assuming it was in

5     effect in 2023, could you do that?

6          MR. MACDONALD:  Yes.

7          THE COURT:  Are there, in fact, contradictions between

8     what they purport to be the policy versus what happened with

9     your client?

10          MR. MACDONALD:  Yes, absolutely.  If you look at the

11     Miami-Dade County Miami-Dade County Title IX policies, which

12     they've referenced, there is strict record keeping

13     requirements.

14          THE COURT:  Okay.

15          MR. MACDONALD:  There is almost no records of what

16     happened in this case, very minimal.  There is one or two case

17     management forms.  There is almost no records in compliance

18     with those requirements.  Students have to be given a notice of

19     rights.  They have to be given hearings.  It's comprehensive.

20     None of that took place in this case.

21          THE COURT:  And talk about the policies that are

22     identified in Exhibit 10 in particular, that document, are

23     there contradictions that you could make of that document?

24          MR. MACDONALD:  Yes.  Yes, Your Honor.  They are not

25     the same as the Miami-Dade County.  I would say it's less

1   stringent, probably, than Miami-Dade County, but they are

2   similar to some degree.

3           THE COURT:  Okay.  So, I guess assuming that they both

4   are legitimate, there is no challenge to authenticity of the

5   document, ostensibly, they're required to comply with both,

6   their own as well as the county's?

7           MR. MACDONALD:  No, they would not be required to

8   comply with both.  They are not subject to following the

9   Miami-Dade County Public School's policies.

10          THE COURT:  Says who?

11          MR. MACDONALD:  So, as a charter school, they are

12  not -- they're not required to follow those policies.  They can

13  have their own.  Obviously, they have to comply with federal

14  law, but they do not have to adopt those policies and that's

15  part of the issues that have come up.

16          THE COURT:  Okay.

17          MR. MACDONALD:  The question is did they voluntarily

18  adopt those policies or did they have their own, and that's an

19  important distinction from the plaintiff's perspective.

20          THE COURT:  Because, obviously, one potential solution

21  is to strike the policy, right, it was not produced back in

22  November, and it was not disclosed in the initial disclosures

23  and it only came -- and then we had this hullaballoo about what

24  this document was and all of that.

25          That's one potential remedy; is it not?

1        MR. MACDONALD:  Yes.

2        THE COURT:  But would you want that?

3        In other words, is that something that actually helps

4   your more than hurts you?

5        MR. MACDONALD:  So, that is something we included in

6   our alternative request for relief, which was a jury

7   instruction on the fabrication of the evidence.  I believe

8   there is the preclusion of those policies, at least their

9   introduction of it into evidence, and then an award of

10  attorneys' fees and costs in bringing the motion and addressing

11  the conduct.  That was the alternative request.

12       But that certainly is an objection.  The only comment I

13  would add is, assuming these haven't been produced and there

14  are these issues as we described as to those characteristics,

15  for example, just the failure to disclose investigations that

16  occurred, that alone, by itself, you're talking about deviating

17  from standard policies, we've never received any documents as

18  to any Title IX investigation despite Ms. Bernal's testimony

19  that multiple investigations have occurred.

20       In her deposition transcript, she described an incident

21  involving a first grade student with a teacher or an employee

22  who had their pants down in the bathroom, very explicit.  She

23  said that the police were even involved.  We have never

24  received any documentation to that effect, nothing.

25       THE COURT:  Yeah, but be that as it may -- in other

1    words, do you need Exhibit 10 to make that argument?

2        MR. MACDONALD:  So, not necessarily Exhibit 10, but I

3    would like to see, for example, how was that Title IX

4    investigation handled.

5        THE COURT:  You see my point.  That's a different

6    question.

7        MR. MACDONALD:  Yes, Your Honor.

8        THE COURT:  Remember, the focus here is on the effect

9    of Exhibit 10, assuming its authenticity because, obviously, if

10   it was not authenticity, if it was, as you are theorizing, then

11   that's a separate problem, but let's assume it's authenticity.

12   Then you have a secondary problem as to why it wasn't produced

13   until after that late in the day.

14       So, if you assume it's authentic, and your arguments

15   could be made about the failure to document things, for

16   example, strictly under title Title IX.  You don't even need

17   the policy.  Isn't that right?

18       MR. MACDONALD:  So, not quite because many of the

19   duties relate to their handling of it.  For example, the notice

20   of rights, the hearing, those we wouldn't know how the school

21   handled those without knowing what their policies were.

22       THE COURT:  Okay.  Let me ask you to focus --

23   obviously, your main theory is, as I understand it, that you do

24   this deposition, you examine the witness, they realize they

25   don't have any good policies, and you are making a big deal

1    about their failure of policies.  And then your theory, I take

2    it from reading your motion, is that they were trying to, you

3    know, say that this was the policy when it really wasn't and

4    then only after the deposition you get this document?

5              MR. MACDONALD:  That's correct, Your Honor.

6              THE COURT:  So, if you look at Exhibit 10, in

7    particular, your theory is that they generated this in the five

8    hours under which that document was open on May 9th.

9              MR. MACDONALD:  So, I'm not sure if they generated it

10   within that period, but that it was generated after

11   Ms. Bernal's deposition, because it wasn't produced that day.

12             THE COURT:  Now, how do you square that with -- there

13   are two things.

14             How do you square that with the nature of the document?

15   I'm pretty good on generating Word processing, but I don't know

16   that I could have done this in five hours.

17             Do you see my point?

18             MR. MACDONALD:  So, just so I understand correctly,

19   you're asking as to how it could have been created?

20             THE COURT:  Yeah.

21             MR. MACDONALD:  That document, specifically, was not

22   produced until several days, close to a week, from my memory

23   after Ms. Bernal's deposition.  And some of the documents, for

24   example, the complaint form that's in the production, and it

25   has references to another school or another school district,

1    almost like it was taken from something else.  It says Jeff Co

2    Public Schools, Jefferson County, I would imagine, but there is

3    references like that like it was put together hastily.

4         There are also some references that I can point out to

5    you in the actual Exhibit 10 in the following year that, for

6    example, it says -- I could walk you through it, but it says,

7    you know, things like "the academy of charter school" like they

8    replaced the words for the school, things along those lines.

9    That would indicate that it was hastily put together.

10        THE COURT:  So, you are saying they may have adapted it

11   from an existing document?

12        MR. MACDONALD:  Yes, Your Honor.  And I would guess

13   that's the case by the references to other school districts in

14   those documents.

15        THE COURT:  I see what you're saying.

16        Now, how do you square that with Mr. Hasbun's testimony

17   that he actually did look for this file, she had Title IX

18   documents already, he saw that, and then he kept searching and

19   then he found this document with this different creation date?

20        MR. MACDONALD:  So, there is two different points I

21   would make on that end.  The first is that he did not -- you

22   know, he searched for the file name, Title IX Policies and

23   Procedures.  He opened it up just to make sure at that that's

24   what he was looking for and he took the screenshot.

25        So, if she had created -- this was after all of these

1   events for deposition and the production of the document.  So,

2   that doesn't contradict anything as to whether that document

3   had just been included a week ago.  He didn't authenticate

4   whether it existed in 2022.  He opened up the document, took a

5   screenshot and sent it to us.

6         And, importantly, the very important piece is that in

7   Exhibit 10, those images, if you had taken a document that

8   existed in August of 2022, another policy document, any other

9   Word document, and you simply change the title of the document

10  to Title IX Policies and Procedures and took a screenshot, what

11  would happen is that it would show a creation date of the

12  August 2022, and the file properties would not match the

13  document.  And that's exactly what is the case here.

14        The line count, the character count is a different

15  document, and we have heard no explanation as to why are the

16  documents that we've received, 10 or otherwise, different from

17  what is shown there.

18        THE COURT:  Now, how do you address on that point their

19  offer to have you actually inspect the computer itself?  It's

20  actually a server, the server itself.

21        MR. MACDONALD:  Two points on that.  First, they only

22  agreed to a limited examination of the computers, right.

23        So, you have to image the entire disc to do it

24  properly.

25        THE COURT:  When was that offer made to you?

1          MR. MACDONALD:  It was within the weeks following the

2    deposition.

3          THE COURT:  Okay.

4          MR. MACDONALD:  When the concerns were raised about the

5    authenticity of the documents.

6          MR. YOUNT:  June 11, 2024.

7          THE COURT:  Early in June?

8          MR. MACDONALD:  Yeah, that sounds accurate.

9          THE COURT:  When did you file your motion?

10         MR. MACDONALD:  I don't know off the top of my head.

11         Let me find it.  July 2nd, Your Honor.

12         And the other aspect just that I will highlight is the

13   characteristics that we just discussed as well would not be

14   changed if we looked at them on the computer versus somewhere

15   else, right, because that's the actual content of the document.

16         THE COURT:  Have you deposed the principal, by the way?

17         MR. MACDONALD:  Yes.

18         THE COURT:  Did she authenticate this document?

19         MR. MACDONALD:  I don't recall specifically, so I don't

20   want to mischaracterize her testimony.  I believe she did

21   reference it in some regard, but I don't want to misstate it

22   without having the transcript in front of me.

23         But importantly, that same principal, per Ms. Bernal's

24   testimony, helped with gathering documents for this case.  So,

25   wouldn't the first thing that you would grab would be your

1    compliance binder?

2         THE COURT:  Oh, that's a good point.

3         What did she say with respect to that?

4         MR. MACDONALD:  So, I don't recall if she was asked

5    specifically about the gathering of documents.  I'm referring

6    to Ms. Bernal saying that she had helped gather documents in

7    the case.

8         THE COURT:  Right, but I take it you asked -- who is

9    it, Ms. Bello?

10        MR. MACDONALD:  Ms. Bello, that's correct.

11        THE COURT:  I take it you asked whether she contributed

12   to the review of the documents in the case?

13        MR. MACDONALD:  Yes, I believe I did, but I just don't

14   know off the top of my head, Your Honor.  I just don't want to

15   misstate it.

16        THE COURT:  I understand that but if, for example, her

17   testimony is corroborating of its existence, I guess that would

18   be something I probably would need to know.  No?

19        MR. MACDONALD:  Yes.  As to whether she says it existed

20   at the time?

21        THE COURT:  Right.

22        MR. MACDONALD:  Yeah, I would certainly agree that it's

23   relevant, but at the same time she was involved in the document

24   production responding to these issues initially, so then it

25   would beg the question as to why, if that's true, why wasn't it

1   produced, why wasn't it disclosed, and the same would go for

2   the person who verified these interrogatories who is the chair

3   of the board of directors of the school.

4         No one knew about these policies, evidently.

5         THE COURT:  Well, to that point, what did the other

6   officers or directors say about this document, Exhibit 10?

7         MR. MACDONALD:  So, when the Chairman of the board of

8   directors, Mr. Alex Casas was asked, he couldn't recall

9   anything about -- he testified that it did go before the board

10  but couldn't explain why it was never recorded.  He said maybe

11  it was a mistake and didn't really offer any testimony to those

12  policies other than that he didn't know, and the same as in

13  regards to Mr. Rolando Mir, whose deposition transcript is

14  before the Court as well.

15        THE COURT:  Didn't you ask them -- for example,

16  Mr. Casas is the one who signed the interrogatory.

17        MR. MACDONALD:  Yes, and he agreed that many of these

18  responses were not correct when confronted with the

19  discrepancies.

20        THE COURT:  Did he authenticate Exhibit 10?

21        Did he purport to authenticate Exhibit 10 as one of the

22  policies that should have been referenced?

23        MR. MACDONALD:  Yes.  Well, he stated that it had been

24  approved by the board of directors, could not tell me any

25  details as to it and agreed that it was not included in the

1    interrogatory response at least when he was confronted with the

2    lack of that information there.

3             THE COURT:  What was his explanation?

4             MR. MACDONALD:  Didn't have one.

5             THE COURT:  All right.  So, then I guess the bottom

6    line question then I have for you is, do I have enough to make

7    the finding that you're asking me to make given that there may

8    be corroborative evidence to support the defendant's position,

9    right, because even if you say that Ms. Bernal is tainted

10   because she is the alleged wrongdoer here, she is supported by

11   Mr. Hasbun's testimony that he actually did look for a file and

12   he found a file that was consistent.

13            MR. MACDONALD:  After her deposition.

14            THE COURT:  After her deposition.

15            MR. MACDONALD:  Right.  And he could also --

16            THE COURT:  If you take that at face value, what effect

17   does that have?

18            MR. MACDONALD:  Could you repeat the question, Your

19   Honor?

20            THE COURT:  In other words, if you take his testimony

21   at face value, what effect does that have on your request for

22   the sanction that you're seeking?

23            He attests that he did search for -- he was asked to

24   search for a file.  He was looking for Title IX policies, and

25   he found various forms of that document upon doing multiple

1    searches until he actually found an August 22nd version of it.

2         MR. MACDONALD:  My response to that would be that it

3    doesn't affect at least the fabrication for manipulation of the

4    evidence because he agreed that the saving, all of the things

5    he described has no impact on the actual characteristics of the

6    document outside of the creation date, like the paragraph

7    count.

8         Even the file size is not the same as the file we

9    received.  Then it would beg the question, what document is

10    that in those images, have we received it.  Again, given the

11    late production of these other elements, it's uncontroverted

12    that that is not the document, any of the documents that we've

13    received in this case.  Yet, it was produced to us as, look,

14    this existed in 2022.  Here is the proof.  Here are the images.

15         I don't think it's anything necessarily wrong by

16    Mr. Hasbun or that it contradicts his testimony.  He opened up

17    the document using the title.  He looked at it, took the

18    screenshots.  That could all be true, and it would not change

19    the fact that those characteristics do not match any evidence

20    they've given us, and we can't even get a reasonable

21    explanation, never mind a contradicting expert report as to

22    those aspects or even Mr. Hasbun's testimony to contradict

23    that.

24         So, that would be my response on that aspect, and if

25    true, even outside of that, let me step back, the other items

1    in interrogatory responses about revisions to the policies, why

2    wasn't that included, these other investigations, all of these

3    things.  It would be a far stretch to say that all of these

4    things were just a coincidence.

5         They had duties to produce these documents, to give

6    truthful responses and to have to go through all of this puts

7    the plaintiff at a disadvantage and makes you question, for

8    example, in those images, what is that document, have we been

9    given everything.

10        And to that point, before we received many of these

11   documents, they, at the request of the plaintiff to verify

12   these documents, signed declarations saying they produced

13   everything.  And then they produced, after they signed those

14   under penalties of perjury, have continued to produce

15   documents.  So, you know, it's just not taking, you know, the

16   oath seriously.  So that compounded with the withholding of the

17   evidence is -- I mean, that's discovery misconduct by any

18   measure.

19        THE COURT:  All right.  Let me turn to counsel.

20        MR. MACDONALD:  Okay, Your Honor.

21        MS. KARRON:  Your Honor, here the plaintiff has not met

22   the extreme burden of proof for the severely requested

23   sanction.

24        Here, the initial discovery responses, I was in charge

25   of gathering them with my associate, and the person that I was

1   given to talk to, in hindsight, was not Ms. Bernal and it

2   should have been.

3          So, we responded and referenced the Miami-Dade County

4   policy, and I think what's really important --

5          THE COURT:  Wait.  Who was it?

6          MS. KARRON:  I spoke to Ms. Bello and Mr. Mir.

7          THE COURT:  So, why would Ms. Bello not be the

8   appropriate person?

9          MS. KARRON:  So, she gave me some documents, but none

10  of them included the Title IX policy.  I think it could have

11  been the way I asked.  I requested the handbook.  She sent me

12  that.

13         THE COURT:  Did she show you her binder?

14         MS. KARRON:  She did not.  I did not know there was a

15  binder at that time.

16         THE COURT:  But you would have, obviously, gone to see

17  her.  Right?

18         MS. KARRON:  We did it all virtually but she didn't

19  mention that a binder existed.  She sent me all of the

20  policies, here is what I have, and they referenced Miami-Dade

21  County policy.  That's the discovery responses that reference

22  Miami-Dade County policy.

23         The critical distinction here is that the Miami-Dade

24  policy is the same.  The only difference is the date, the

25  title, and changing who the Title IX coordinator and the

1    contacts are.  The sum and substance of the policy has never

2    changed, and I'm going to get into some case law on why policy

3    doesn't even matter.

4         THE COURT:  If it doesn't matter, then why can't I just

5    solve my problem with striking it.  The defendant is not

6    opposed -- excuse me, the plaintiff apparently is willing to

7    take that.

8         MS. KARRON:  You could, Your Honor, and there is

9    Supreme Court case law that I have copies for you --

10        THE COURT:  So, you have no objection to me just

11   striking it?

12        MS. KARRON:  I mean, I don't have any basis to object

13   to striking it.  I think that the Miami-Dade policy is what

14   applies.  There is consistent testimony from the chief of

15   police of the Florida International University who's the board

16   director who signed the interrogatories and said, yeah, it was

17   a mistake.  I've seen this policy.  This policy is the same

18   Miami-Dade policy.  It's been around for years.

19        Susie Bello testified, yeah, I have the policy in my

20   binder.  Everyone testified that the policy language is the

21   same.  The only difference is that when they went to the --

22        THE COURT:  Now, when you prepared the interrogatory

23   response, who was the one who was the -- that was Mr. Casas?

24        MS. KARRON:  So, the chief of police for FIU is the one

25   who executed the interrogatories but he is not the one that

1   gathered the documents.

2        The recordkeeping, we're dealing with a small

3   mom-and-pop company.

4        THE COURT:  Now, why would the chief of the police of

5   FIU --

6        MS. KARRON:  Because he is the board chair, so he signs

7   interrogatory responses for Academir.  He sits on the board.

8        THE COURT:  Okay.

9        MS. KARRON:  It was a record-gathering problem.

10       THE COURT:  The question is simply what policies are

11  you governed by?  I mean, it wasn't like --

12       MS. KARRON:  We're governed by the Miami policies.

13  Forget whether we made changes, edited names, nothing major

14  changed, and everyone testified that the Miami-Dade policies

15  are what applied, except we are not going to tell them contact

16  the Miami-Dade Police because that's not who you contact.

17       We are not going to tell them contact the Miami-Dade

18  coordinator because --

19       THE COURT:  How would he have personal knowledge of

20  that as the defendant?

21       How would he have personal knowledge of the particular

22  documents that were in place at the time?

23       MS. KARRON:  How would Mr. Casas?

24       THE COURT:  Yes.

25       MS. KARRON:  Because he sits on the board and he

1  attends all the board of directors' meetings were he testified

2  they approve policies.  And he was clear, yes, this is the same

3  policy.  It's been in effect.  Ms. Bernal even in her

4  deposition was clear.

5       I was not aware that they took the same policy in a

6  Word document and re-titled it Academir and updated the contact

7  information.  I did not know that so --

8       THE COURT:  So from your point of view, there is no

9  material difference between the School Board policy and that

10  document?

11      MS. KARRON:  There is no difference.  And on top of

12  that, the plaintiffs have testified that they never made a

13  formal complaint under that policy.  Granted, students --

14      THE COURT:  Well, they don't know.

15      MS. KARRON:  Sure.  They don't have the policy,

16  although the policies are referenced and the Title IX

17  information is in the code of the handbook that we've produced,

18  and it's all there.  It refers to Title IX and gives reasons

19  for that with the City's Title IX coordinator.

20      So, what happened here is --

21      THE COURT:  The City?

22      MS. KARRON:  Miami-Dade County.  It's the county.  I'm

23  calling it a city, Miami-Dade County policy.

24      THE COURT:  You are confusing me by calling it the

25  City.

1          So, it's a Miami-Dade County policy.  That's what's

2    referenced in the handbook?

3          MS. KARRON:  The Miami-Dade County's policy is

4    referenced in the handbook referring to Title IX.

5          THE COURT:  Got it.

6          MS. KARRON:  So, when we answered the question, were

7    there any changes, we are operating under the belief that,

8    yeah, the policy is the same.

9          Technically, that was incorrect.  There were changes to

10   the title page and some minor things, but it's turning into a

11   mountain out of a molehill here.

12         The deposition of Ms. Bernal clarified that she created

13   a Word document from the Miami-Dade County policy and that only

14   had minor changes.  The reason the character counts don't

15   match --

16         THE COURT:  Now why -- let me ask you this question.

17   Did she reference that in her deposition directly by name?

18         MS. KARRON:  The Title IX policy?

19         THE COURT:  Yes.

20         MS. KARRON:  Yes.

21         THE COURT:  Did she have it in front of her at the time

22   of the deposition?

23         MS. KARRON:  What she had was she grabbed a few

24   printouts just to refer to, so she had the school's fiscal

25   policies, and behind that she had a copy of the Miami-Dade,

1    just the steps that say what you need to do because they were

2    the same steps that they followed.

3        So, when that was requested, I gave that to

4    Mr. MacDonald.  I actually went to Ms. Bernal's office -- I

5    don't think she knows this -- with Ms. Mir, and looked for what

6    she had so I could give it to him when we were there for

7    another deposition, and showed it to him and said, here is what

8    she was referring to.

9        THE COURT:  Now, in the preparation for her deposition,

10   though, how would the -- this is the other problem.  In the

11   preparation for her deposition, how would this not have come up

12   such that you would have learned about the existence of this

13   document?

14       MS. KARRON:  I don't know, Your Honor.  It didn't, and

15   I was, obviously, as surprised as counsel was to hear that they

16   had adapted it to their own policy, but nevertheless, the

17   substance is the same.

18       THE COURT:  Did you meet with Ms. Bernal prior to her

19   deposition?

20       MS. KARRON:  We did.  We had an extensive meeting.  All

21   the executives were involved, and without waiving privilege,

22   had discussions about policies and what we are handling in

23   deposition prep, but there was never any discussion that

24   Academir had taken the Miami-Dade policy and made a few changes

25   to the contact information.  That I never knew.

1          Of course, I would have disclosed it if I knew, and I

2     fell on the sword when I found out, you know, when Kyle brought

3     this up.  I said I had no idea, I'll get it for you

4     immediately, and I said to them go make copies.

5          Here is where the character count issue comes in.  When

6     Ms. Bernal was requested, as she testified, from Kyle certain

7     documents, she took them all and merged them all into one PDF

8     and sent them to me.  I didn't realize that.

9          So, I found out in my conversation --

10         THE COURT:  How would that change the Word document?

11         MS. KARRON:  Because the document is now pages and

12    pages longer because --

13         THE COURT:  Yes, but it's a PDF document, not a Word

14    document?

15         MS. KARRON:  Right, but that's the document that we

16    produced that they're comparing.

17         THE COURT:  But, see, they're using the Word metadata

18    screenshot.  They're not working off the PDF, which is a

19    different metadata.

20         MS. KARRON:  What we did was forwarded everything that

21    we had in the system.  Here is everything we've got and I just

22    wanted to open up the discovery and said I will give you

23    everything I can, come look, we will do whatever it takes so I

24    can show you that this has always existed and nothing has

25    changed.

 1          THE COURT:  That wouldn't explain why there is a

 2    difference in metadata of the Word content.

 3          MS. KARRON:  As Mr. Hasbun testified, if you took

 4    documents and merged them together, that would change the

 5    count.  It would affect the -- and the date.  Like, we have the

 6    document that says it was created in May of 2022.

 7          For the Court to believe what's going on you would have

 8    to believe that Ms. Bernal and Mr. Hasbun decided to

 9    surreptitiously go find another document and call it our -- for

10    what reason?

11          We changed nothing substantive.  There is no need to do

12    that.  Nothing has changed here.

13          THE COURT:  Do we have a copy of the Miami-Dade one?

14          Does somebody have it?

15          MR. MACDONALD:  We did, Your Honor, Exhibit 19 is the

16    Miami-Dade --

17          THE COURT:  Exhibit 19?

18          MR. MACDONALD:  Sorry, 20, Your Honor, is the

19    Miami-Dade Title IX manual.

20          THE COURT:  Okay.

21          MS. KARRON:  And the depositions, you asked about

22    Ms. Bello's deposition, and we can share it with the Court.  We

23    have copies of the transcripts digitally here, and she very

24    clearly testified, yes, it was in her binder and it exists.

25    Why it wasn't given to me on the firsthand is just sloppy

1    recordkeeping.  But, Your Honor --

2           THE COURT:  But she was designated as the corporate

3    rep.

4           MS. KARRON:  Not until right before the deposition.  I

5    didn't even know she existed until before her deposition,

6    unfortunately.

7           She would have been the best person to talk to.

8           THE COURT:  Why wouldn't it have been the FIU guy?

9           MS. KARRON:  I did not know he existed.

10          THE COURT:  Because, apparently, he had the most

11   knowledge with the interrogatories.

12          MS. KARRON:  Yeah, I don't make the rules,

13   unfortunately, Your Honor.

14          THE COURT:  But you are the counsel who is telling them

15   that this is what we need to do to comply with the Court's

16   orders.

17          MS. KARRON:  They told me that the board of directors

18   requires that he is the one that signs the interrogatories.

19          THE COURT:  So, why wasn't he the corporate rep?

20          MS. KARRON:  Because he is not the one with the most

21   knowledge, and as you know, he can designate whoever we wish as

22   corporate rep, and the person that had the most knowledge as to

23   Academir --

24          THE COURT:  So, who was the person who had the most

25   knowledge who was consulted at the time of the interrogatory?

1          Obviously, just because he signed it -- I see your

2     point, he signed it, but he is not the person with the most

3     knowledge.

4          MS. KARRON:  Right.  No, I mean, I talked to Ms. Mir

5     --I had not talked to Ms. Mir.  I talked to Mr. Mir, and I

6     spoke with Susie Bello, briefly, who forwarded me some of the

7     documents that she had.

8          THE COURT:  Okay.

9          MS. KARRON:  Had I known there was a manual --

10          THE COURT:  Well, according to Ms. Bernal didn't she

11     testify that she should have been a person with knowledge

12     because she actually had the binder?

13          MS. KARRON:  I didn't know that at the time, Your

14     Honor, yes.  And in hindsight, absolutely, she was the best

15     person for it.

16          Your Honor asked the plaintiff how the policy impacts

17     the case, and there is pretty clear case law on point, and I

18     can give Your Honor copies if I could approach.

19          THE COURT:  Just make your point.

20          MS. KARRON:  Supreme Court case of Gebser versus Lago

21     Vista, and the Court talks about -- it says, "Lago Vista's

22     alleged failure to comply with regulations did not establish

23     the required actual notice and deliberate indifference, and in

24     any event, failure to --"

25          THE COURT STENOGRAPHER:  I'm sorry, can you slow down?

1          THE COURT:  You need to slow down.

2          MS. KARRON:  Sorry, I'm a fast talker.  I'll start

3     over.

4          "Lago Vista's alleged failure to comply with the

5     regulations, however, does not establish the requisite actual

6     notice and deliberate indifference, and in any event, the

7     failure to promulgate a grievance procedure does not, itself,

8     constitute discrimination under Title IX."

9          And then I also gave you another case out of the Ninth

10    Circuit which talks about ordinarily a school's failure to

11    comply with DOE regulations does not establish deliberate

12    indifference, and the same is true of a school's violation of

13    its own policies.

14         So whether the school violated the policy or even had

15    one doesn't change anything in this case.  It doesn't change

16    the deliberate indifference standard under Title IX.  This is a

17    case of after-the-fact harassment where the girl to the school

18    alleged that she was told by a boy that he wanted to touch her.

19    She told this to three school officials on that day.

20         She went home for the long weekend, and by the time

21    that she returned, the report was that now she's been licked by

22    the boy.  So, at that point -- within a week she was withdrawn

23    from the school, so the investigation was very, very

24    short-lived and any depravation of educational opportunity was

25    very, very short-lived because they asked the child, then they

1   called the children in with the school counselor and the same

2   thing was repeated.

3        So, there was never any thought in my client's mind

4   that this was a Title IX investigation.  It was, Little Johnny

5   repeats to Little Susy X, Y and Z.  Little Johnny's mom says it

6   came from his house and that's where they heard it, I'm sorry.

7        THE COURT:  How old are the children we're talking

8   about?

9        MS. KARRON:  Five years old.

10       So, there is no prejudice to the plaintiff in this

11   case.  The testimony has always been consistent that there was

12   an existing policy and that it mirrors the Title IX policy.

13   The investigation, obviously, couldn't continue because of the

14   time frame.

15       The parent went to the police and said I want the

16   little boy taken out of the class right now, and the school

17   said, we don't have the authority to remove him.  We could

18   switch your daughter to another class.  We separated them in

19   the class.  No, I want him kicked out and I want to see the

20   surveillance tapes.  That's what the case is about.

21       The father, himself, did not initiate an investigation

22   with the police.

23       So, I think in this case while we made errors in

24   producing the documents and it took longer to get the official

25   copy of that document, the same referenced Miami-Dade policy in

1     the interrogatory answers from the outset hasn't changed.

2             I will let Mr. Yount have in.

3             MR. YOUNT:  Thank you, Your Honor.  I will be very

4     brief.  I just want to back up and try to put a big picture

5     perspective on what's going on here.

6             This is a case with very questionable merits, and we

7     are litigating by the weaponization of judicial system with

8     discovery practice to try to win a case.

9             We made a mistake.  We've admitted it.  We said at the

10    outset, an interrogatory answer was inaccurate.  It could have

11    been better done.  We said Miami-Dade and it should have been

12    our own policy.

13            We didn't produce the document.  We produced a bunch of

14    other policies, and then there was a time delay.  The first

15    deposition, he finds out about the document.  We produced it

16    immediately.

17            That's a mistake that, regrettably happens a lot in

18    litigation.  We don't always get the documents the first time,

19    but we get them the second time, at least we try to.  We do the

20    best we can.  Here we made a mistake.  But what's the harm?

21            There is none.

22            He had the document and was able to question everybody

23    about it who had any information about it, so there is no harm

24    or prejudice, but what we instead get is a motion to strike our

25    pleadings because we make a mistake in discovery and then he

1    creates this theory of perjury and fraud, misrepresentation.

2         That motion that was presented by the plaintiff

3    personally was one of the most offensive motions I have ever

4    seen.  Perjury is what is being alleged of Ms. Bernal.  It's

5    wrong.  It's inappropriate, and it shouldn't have happened.  It

6    shouldn't have happened that we made the mistake.

7         THE COURT:  But then aren't there also inconsistencies

8    based upon what she said in her deposition versus what you

9    disclosed after?

10        MR. YOUNT:  No.  No, maybe inconsistencies on a hyper

11   technical level, but no, because one of the problems is we talk

12   about policy.  And what is a policy?

13        It's like people say what is a church; is a church a

14   building or is it a context of people getting together.

15        Well, what's the policy?

16        I think of it --

17        THE COURT:  For a school, for a school, it's very well

18   understood what a policy is.

19        MR. YOUNT:  It is to you.

20        I bet you my understanding is different, and I bet you

21   Ms. Bernal's is probably different.

22        To me a policy is a piece of paper.

23        THE COURT:  Right.

24        MR. YOUNT:  It's not what they do.  It's a piece of

25   paper.

1      I suspect that to Ms. Bernal, there is a policy that is

2  a piece of paper, but if she is asked what is a policy, it's

3  what they do.  It's conceptually what they do or are supposed

4  to do.

5      THE COURT:  I don't understand that argument.

6      In other words, at the time that the request for

7  production and interrogatory was made, they weren't asking for

8  an esoteric answer.  They were asking for the document.

9      MR. YOUNT:  They asked for a lot of documents, and we

10  gave them a lot of documents.  So, we went through what we had,

11  what we considered or thought to be a complete set of the

12  relevant policies, and we missed that.  We missed it.

13      But we didn't go back and create it after the fact.

14      THE COURT:  Well, I guess the issue though is, it

15  happened on multiple occasions because it would have been also

16  required in the initial disclosure.  Based upon Ms. Bernal's

17  testimony, that document was the focus of attention when she

18  first started, she said, about needing to update it and she

19  needed to work on it.  She testified to all of that.

20      MR. YOUNT:  Right.

21      THE COURT:  That's in 2022-2023.

22      The initial disclosures are made -- the lawsuit is

23  filed in 2023.  The initial disclosures are in 2023.  Right?

24      MR. YOUNT:  Yeah.

25      THE COURT:  I fail to see how, if you prepared the

 1    initial disclosures with some semblance of attention, that

 2    somebody who would have been talked to along the line would

 3    have said, oh, by the way, you're missing the actual policy.

 4         It's hard to believe, frankly.

 5         MR. YOUNT:  But when you have the point person and you

 6    rely on that one person, for the most part, you are limited to

 7    the direction that they send you in.

 8         THE COURT:  Yeah, but she said that she talked to

 9    Ms. Bello, who is the principal of the school.  It wasn't just

10    a low-level person.

11         MR. YOUNT:  Our point person initially was the

12    principal.

13         THE COURT:  Right.

14         MR. YOUNT:  And we didn't get the information.

15         THE COURT:  So, in other words, I'm not necessarily

16    being critical of the lawyer.  The issue is what the defendant

17    was obligated to do.  How is it not disclosed -- in other

18    words, the reason why I think, to some extent, your offense at

19    being targeted by this motion is somewhat -- I can understand

20    it to some level, because it's a very serious accusation.

21    They're basically accusing your client of committing a fraud,

22    right.  But on the other hand, it's just hard to believe that

23    despite multiple times when this should have been disclosed

24    well before May of 2024, that the defendant and the defendant's

25    people who are working with their law enforcement officers

1  wouldn't have said, oh, by the way, there is the main one here

2  in this binder.

3       That's the reason -- that just seems -- it's hard to

4  believe and so, therefore, it generated -- now, maybe they're

5  wrong, and that hasn't been decided, but it generated a lot of

6  skepticism as to how all of a sudden after the deposition when

7  she's being cross-examined about the absence of policies, you

8  end up with a 15-page document that says, "Academir, Title IX

9  Policies Effective 2022-2023."

10       That's highly suspicious, isn't it?

11       MR. YOUNT:  I can answer it this way.  I would think if

12  I were a juror and didn't understand litigation, I might agree

13  with you, but in reality, from my standpoint I don't find this

14  suspicious.

15       THE COURT:  I am a judge and I understand the law.

16       MR. YOUNT:  It happens all the time.  From my

17  standpoint, I see it all the time that unless you drive over

18  there, you sit in their office and you get everybody who has

19  remotely touched the incident to say, guys, we got to get it

20  all, you are going to miss stuff and stuff gets missed, but

21  it's not intentional.  It's not intentional and certainly,

22  there is no prejudice.

23       So, we shouldn't be having a significant substantive

24  argument about the consequences of a failure to disclose a

25  document which caused no prejudice whatsoever.  If they didn't

1    have it for Ms. Bello's deposition and they wanted to

2    re-question her about it, that's okay.  That's a reasonable

3    remedy.

4         All the other witnesses I believe that they had the

5    document for.  So, to seek to strike pleadings and to call

6    people perjurors when there is really no harm, it's the whole

7    litigation strategy of we caught you in a discovery thing and

8    we're going to make you pay for it.  And that's not right.

9    It's just not right, and that's why I think this motion should

10   be denied in its entirety.

11        If there were any prejudice, we could cure it by

12   allowing another deposition.  We can pay for the deposition and

13   the court reporter, but to suggest that anything should be

14   stricken, a document, an exhibit, a pleading, it's just -- that

15   would far exceed, be far excessive relief than is warranted as

16   to what happened here.

17        That's all I have.  Thank you, Your Honor.

18        THE COURT:  I will let you reply on the prejudice

19   argument.

20        MR. MACDONALD:  Thank you, Your Honor.

21        I will keep it brief.

22        So, on the prejudice point, I just -- I have to address

23   the merits because it was -- as the claim was described, and I

24   understand from their perspective it might be different, but to

25   call it Little Johnny and those kinds of terms, you know, what

 1    really happened from the plaintiff's perspective, what has been

 2    alleged is that a child was molested.  And that's very

 3    important in Title IX, and the distinctions that result in

 4    prejudice that are just being breezed over are the changes that

 5    were made to this Academir policy.

 6          Let me step back.  First, this document is titled

 7    Academir Charter School.  It is unique to the school, but it

 8    seems that the defendants are trying to blend the two policies

 9    to try and seem like they were the same document.  They were

10    not the same document.  And importantly, there are material

11    distinctions, right.

12          Number one --

13    THE COURT:  What is the most prejudicial distinction?

14    MR. MACDONALD:  I would say, one, who is the Title IX

15    coordinator, and, two, how are complaints reported.  If a child

16    is molested, how is it reported.

17          Those are distinctions that were made in those

18    policies.  They changed -- and by their own admission, they

19    changed the coordinators who they should be reported to, a web

20    form to report these type of incidences.  All of those

21    distinctions are very important when you're saying, for

22    example, that the plaintiff, you know, she didn't report it.

23    That's part of the merits issue here.

24    THE COURT:  How is the method of complaint relevant to

25    your case?

1          The mother complained to the principal and -- in other

2     words, how does that play into this case?

3          MR. MACDONALD:  Because of notice, right.

4          The defendants have said that they were not made aware

5     of an allegation of physical sexual assault, that it was verbal

6     as Mr. Karron described.  So, how they are notified of these

7     things is very important, right.

8          Was the teacher notified?

9          Was Ms. Bello, the principal, was she someone for

10    Title IX purposes someone that could receive those complaints

11    and had a responsibility from that point to initiate an

12    investigation?

13         THE COURT:  But is it true that there was this initial

14    allegation and then a withdrawal of the student in a week?

15         MR. MACDONALD:  From when it was reported, yes, she was

16    withdrawn a week thereafter because they were told, you know,

17    take it or leave it, we're not going to do any -- you know,

18    it's part of the merits issues but they said, we're not going

19    to do any remedial measures.  We're not going to separate the

20    kids.  If you don't like what we're doing, tough luck.  You can

21    take your kid out.

22         Obviously, they are going to disagree with that, which

23    I understand, but that's the issues.

24         THE COURT:  I understand that issue, but with respect

25    to the complaint and the mechanism for complaint, how is that

1   proximately related to this case because we all agree they

2   received notice?

3          The issue isn't the notice.  The issue is what they did

4   about it and your dissatisfaction with that, but how is the

5   notice mechanism for something having to do with particular

6   following of a policy language relevant to the case?

7          MR. MACDONALD:  So, as to the first point, there is a

8   dispute as to the notice issue, because they described

9   different reporting and what was alleged by the student.  That

10  includes how the student was interviewed by the guidance

11  counselor.

12         All of those things are material facts that are in

13  dispute that would be impacted by how Title IX complaints are

14  handled.

15         Now, as to the aspect of her being withdrawn, well, the

16  question is, first, were law enforcement authorities contacted,

17  which they were not.  The parents contacted them several days

18  thereafter because the school did nothing.

19         Did they contact the Florida Department of Children and

20  Families?  They did not.

21         And all of these things --

22         THE COURT:  Now, wouldn't the Miami-Dade policy require

23  them to contact law enforcement?

24         MR. MACDONALD:  That's absolutely right.

25         THE COURT:  So, therefore, to that point, their

1    argument is there is no prejudice because they wouldn't need to

2    create that document because they would already be bound by

3    that same requirement anyway, so they are not giving themselves

4    or absolving themselves of some duty that they didn't otherwise

5    have.

6         MR. MACDONALD:  But I would say that they are, in the

7    sense, if they would have followed Miami-Dade policies they

8    would have reported it to the Miami-Dade County Office Civil

9    Rights Compliance.

10        There would be records of those complaints.  What have

11   they alleged?  What is happening with the case?  Was there a

12   hearing initiated?  Was there supported measures?

13        All of those things we would be able to access from the

14   county if what they are saying is true versus if it's through

15   the school, there is a different coordinator, it's Ms. Bernal,

16   or it's someone different.

17        Also the training, we have also brought claims for

18   failure to train properly under negligence theory.  That's the

19   same thing, and the policy documents that they produced, it

20   describes the coordinators and the responsible individuals

21   going through certain trainings.  All of those things differ

22   between Miami-Dade County and the school's policy itself.

23        THE COURT:  Now, with respect to the issue of the other

24   prejudice arguments being made that, yes, it was disclosed late

25   but it was disclosed well in time for other depositions

1   including Ms. Bello, including the other witnesses that you

2   asked about who may or may not have -- it's a little

3   speculative to me -- corroborated the existence of that

4   document prior to May 9th.

5         So, the argument being, what prejudice have you really

6   suffered?

7         MR. MACDONALD:  So, in response to that I would say

8   that that would be true assuming that the only issue was that

9   single document in the depositions, but it's much broader than

10  that, right, especially considering the fact -- I mean, the

11  corporate representative signed declarations saying that

12  everything had been produced.  You know, we received 800

13  documents yesterday of policies and procedures -- and there is

14  case law to this point, but describing that the prejudice

15  occurs when a litigant is forced to question whether any of

16  these things are legitimate because they're willing to sign a

17  declaration under oath, saying this is accurate, we've given

18  you everything, but we actually have more documents, more

19  policies, and that actually wasn't true.

20        And with all due respect to defendant's counsel,

21  stating, well, you know, it's something that can happen very

22  often in litigation, well, that material impacts how we are

23  able to litigate the case.

24        And, you know, with documents still being produced

25  after the close of discovery, despite the fact that they swore

1    under oath that they had been produced, well then, what else

2    would they be willing to swear under oath about falsely?

3           That's the question that's raised.

4           There is significant evidence that, you know, they

5    provided these statements that were not true, under oath,

6    signed declarations under oath that were not true, and

7    continued to produce new documents throughout the case.

8           THE COURT:  And out of the 800 documents that you got

9    very recently, which I understand it's because some of that is

10   from this binder that you may not have gotten before, and

11   apparently they had no clue existed, does any of that make a

12   difference in terms of your case, really, other than that you

13   now have it?

14          In other words, other than this policy, does anything

15   in that 800 documents make a difference?

16          MR. MACDONALD:  I would say yes, Your Honor, because

17   they go to student conduct.  They go to -- it's over 800

18   hundred pages, so to be frank, I haven't gone through it

19   meticulously, but the policies relating to students, you know,

20   goes to the training of these individuals.  And then outside of

21   the 800 documents we were given, we were also given, for

22   example, in late August the fiscal policies and procedures

23   document I tried to describe earlier.

24          Again, all of these things have bearing on plaintiff's

25   claims and we are getting them right before the close of

1    discovery after depositions have been taken.

2         That's fundamentally unfair and it can't be shrugged

3    off as, oh, well, it happens.  You know, that's prejudicial.

4         THE COURT:  On that score, don't I need to let you

5    evaluate how prejudicial it really is and whether or not it

6    requires me reopening any deposition?

7         MR. MACDONALD:  I mean, I definitely think that that's

8    fair, and that's why I acknowledged, you know, if it was just

9    with respect to the policies, that would be true, because we

10   did get to ask questions in those depositions, but it's much

11   broader than that in terms of these policies and the different

12   versions we've received.

13        Still, is it -- the question still lingers, right, is

14   it the fiscal policies and procedures documents that we

15   received in late August or is it Exhibit 10.  Genuinely, it is

16   an open question as to what was in effect at that time.

17        Of course, just the prejudice in bringing these

18   proceedings before the Court and, obviously, its impact on the

19   remainder of the evidence as I described previously.

20        MR. YOUNT:  Your Honor, can I clarify one thing about

21   the documents produced yesterday?

22        THE COURT:  Sure.

23        MR. YOUNT:  Those were not produced as part of a

24   discovery response or for discovery.  They were produced in

25   connection with this hearing because I asked Ms. Bernal to

1    bring her binder to show to the Court, when we say, it was in

2    this book with the financial, just for a demonstrative aid and

3    just as a matter of courtesy, I send it to them and say, look,

4    this is what she is bringing.  This is current.  This is for

5    the current year, and to the extent that any of the other

6    documents in that binder were discoverable in this case, we

7    produced them for the relevant time.

8            That's the only thing I wanted to say.

9            THE COURT:  When you say you produced them, in other

10   words, some of what's in that binder was produced at the time.

11   Is that what you're saying?

12           MR. YOUNT:  Yes.  For the year, yes.  Absolutely.

13           THE COURT:  And how would you have done that without

14   looking at the binder?

15           MR. YOUNT:  I didn't know the questions to ask.

16           So, we asked for policies on this, policies on this and

17   that's what we got.

18           I didn't say, where did you get it from, let me see the

19   binder, and I will decide what's in there.  Bad communication.

20           THE COURT:  Okay.

21           MR. YOUNT:  But, for example, the student handbook is

22   in there.  In that binder we produced the one from the relevant

23   school year, etcetera, etcetera, etcetera.

24           THE COURT:  Right.  Okay.

25           All right.  Well, I guess what I want to do is, number

1    one, I do need to tie that down.  I don't want to create

2    another process.  So, I hear what he is saying so you need to

3    go through those 800 documents and tell me, A, was anything

4    responsive that should have been produced before?

5         B, his answer is some of that was produced it just

6    happens to be the one relevant back then as opposed to her

7    current one, right.

8         So, you kind of have to need to supplement this to tell

9    me if really there is anything prejudicial in there.

10        MR. MACDONALD:  Well, I can tell you that they are

11   responsive to our request, and that's something I did clarify.

12        THE COURT:  Right.  But he is saying that you got

13   versions of those that were responsive because they were

14   relevant at the time because he is saying that 800-page binder

15   is the current binder.

16        At the time of the production, that wasn't the current

17   binder.  It would have been a different series of documents.

18        MR. MACDONALD:  Okay.  I understand.  My only response

19   to that would be, we haven't received the binder for that

20   applicable year, so that's the only one we received.

21        And then secondly, we requested policies up until the

22   present, and they would be under a continuing duty to

23   supplement in discovery to those specific documents, and they

24   were not produced.

25        THE COURT:  But you understand the focus.  I understand

1   that, but the focus on this is what they should have done back

2   before.

3        So, you kind of need to tell me how prejudicial it is.

4   So, I will let you -- since you now have them, tell me, if

5   anything, you can make a prejudice argument as to any of it.

6   So, I will let you supplement your motion.

7        MR. MACDONALD:  Thank you, Your Honor.

8        Just to clarify, does that go for other documents that

9   were produced later on throughout the case?

10       THE COURT:  Anything that was produced following the

11  filing of your motion I guess would be relevant to this point.

12  Because when was the discovery cutoff?

13       MR. MACDONALD:  August 29th, I believe, Your Honor.

14       THE COURT:  Oh, August 29th.

15       Oh, okay.  So then -- all right.  Well, August 29th

16  then it would be a different story.

17       In other words, if they are supplementing things, for

18  example, in August, A, they can supplement; but, B, you can

19  then raise, wait, this should have been produced when I deposed

20  Ms. Bello.  So that's, I guess, included but that's the

21  analysis.  Would it make a difference in terms of how you would

22  have responded had you known that prior to some of these

23  depositions?

24       MR. MACDONALD:  Okay.

25       THE COURT:  So it has to be more specific, but, again,

1    I won't limit it in time because some it -- some of that

2    supplemental is entirely appropriate.  It's not necessarily

3    inappropriate to make sure that we have everything, in fairness

4    to the defendant, right.

5         So, you need to tell me if there is anything

6    prejudicial beyond what we've already talked about.

7         MR. MACDONALD:  Understood, Your Honor.

8         Thank you.

9         THE COURT:  Okay.  I will wait to see what that is

10   because I don't want to do this multiple times, and then I will

11   enter an order on the evidentiary hearing once I get that, and

12   if I direct a response, obviously, I will need a response.

13        And then I will decide.

14        I will say that all your concerns are entirely valid.

15   The problem I am having is is it prejudicial enough to warrant

16   the case-dispositive sanctions.  That's a tougher nut to crack.

17        And do you want me to strike the document, that's

18   something I can easily do, right, but you may not want me to

19   strike.  So, I guess to some extent, in your supplemental, if I

20   grant alternative relief, do you want that as part of the

21   relief?

22        MR. MACDONALD:  Okay.

23        THE COURT:  So, why don't you think that through.

24        MR. MACDONALD:  Okay, Your Honor.  We will make sure we

25   address that as well.

1          THE COURT:  Right, because you have it if you want it,

2     but you may not want it.  It may not help your client's case,

3     in which case then that goes to their point that it's not

4     really prejudicial because their disclosure of that actually

5     could be something you could use, so that's all related.

6          So, in your supplement I want you to supplement your

7     request for alternative relief.

8          MR. MACDONALD:  I guess it's kind of tied together, but

9     do you want us to address the rising to the level of a

10    Draconian sanction to file a judgment, as you mentioned before

11    in the supplemental finding?

12         THE COURT:  No, I want you to address the more narrow

13    question to this because I think you already briefed and

14    presented that very well, so just limit it to that.

15         Then I will hold my fire until I get that.

16         MR. MACDONALD:  Okay.

17         THE COURT:  All right.  Then, in the future, remember

18    to tell your clients about this story so that way you won't

19    have this problem, because I don't necessarily think there is a

20    problem with the lawyering.  But I'm not necessarily making a

21    finding one way or the other, but this is what happens, when,

22    for example, you needed to go and see -- I always tell people,

23    go and see their client when they are doing their review

24    because you may see just walking into somebody's office, what's

25    that, what's that.  And everybody -- we do everything now

1    remote and everything is done by virtual and you can't do that

2    anymore.

3              Okay.  All right.  Thank you.

4              COURT SECURITY OFFICER:  All rise.

5              COURTROOM DEPUTY:  All rise.  Court is now adjourned.

6              (Proceedings were concluded at 5:15 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8

9    October 28, 2024        /s/Patricia Diaz
     DATE                    PATRICIA DIAZ, FCRR, RPR, FPR
10                           Official Court Reporter
                             United States District Court
11                           400 North Miami Avenue, 11th Floor
                             Miami, Florida 33128
12                           (305) 523-5178

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'17** [1] - 28:11
**'22** [1] - 15:2
**'24-'25** [1] - 10:8

**/**

**/s/Patricia** [1] - 137:9

**0**

**08** [1] - 69:1

**1**

**1** [1] - 1:8
**10** [30] - 3:16, 53:14,
53:15, 64:24, 65:15,
74:9, 83:24, 83:25,
84:2, 85:4, 87:6,
87:13, 89:2, 89:8,
90:16, 91:23, 92:3,
92:20, 93:22, 96:1,
96:2, 96:9, 97:6, 98:5,
99:7, 99:16, 102:6,
102:20, 102:21,
130:15
**10360** [1] - 1:19
**10th** [8] - 30:11,
32:2, 32:5, 46:16,
51:10, 51:25, 61:18,
64:2
**11** [4] - 7:19, 84:15,
85:18, 100:6
**11th** [3] - 2:4, 88:14,
137:11
**12** [2] - 26:19, 28:5
**124** [2] - 35:15, 35:20
**12th** [1] - 80:2
**15** [2] - 81:17, 81:18
**15-page** [1] - 122:8
**15th** [1] - 74:3
**16** [3] - 21:6, 21:21,
84:1
**17** [4] - 3:5, 69:18,
81:17, 85:12
**18** [4] - 1:6, 27:4,
31:1, 85:12
**19** [3] - 85:12,
113:15, 113:17

**2**

**2** [1] - 3:17
**20** [3] - 35:16, 49:18,
113:18
**2015** [1] - 27:14
**2017** [1] - 27:14
**2021** [1] - 28:11

**2022** [35] - 18:11,
18:12, 18:18, 23:23,
24:1, 27:18, 28:2,
29:20, 30:11, 30:23,
31:23, 32:2, 32:5,
32:22, 33:14, 33:23,
39:18, 42:2, 43:19,
46:17, 51:10, 51:25,
61:18, 63:3, 64:2,
68:17, 69:2, 70:1,
78:17, 79:7, 99:4,
99:8, 99:12, 104:14,
113:6
**2022-2023** [5] - 9:18,
10:12, 69:20, 120:21,
122:9
**2023** [13] - 9:16,
28:2, 39:18, 42:2,
43:19, 53:24, 63:3,
83:15, 84:9, 84:11,
93:5, 120:23
**2024** [16] - 1:6, 11:1,
18:20, 27:4, 52:6,
53:24, 53:25, 62:15,
63:19, 74:3, 79:21,
80:2, 87:16, 100:6,
121:24, 137:9
**20th** [1] - 9:16
**21** [1] - 3:14
**22** [1] - 88:9
**22nd** [1] - 104:1
**23-20034-Civil-
Judge** [1] - 4:5
**23-CV-23004-JB** [1] -
1:2
**24** [3] - 3:17, 81:21,
88:9
**248** [1] - 85:15
**26** [2] - 3:15, 56:4
**28** [2] - 7:10, 137:9
**283** [1] - 85:15
**29th** [4] - 17:22,
133:13, 133:14,
133:15
**2:15** [1] - 1:7
**2nd** [1] - 100:11

**3**

**3** [5] - 3:15, 26:11,
26:12, 84:13, 84:14
**305** [2] - 2:5, 137:12
**33128** [2] - 2:4,
137:11
**33131** [1] - 1:16
**33324** [1] - 1:19
**33606** [1] - 1:24
**365** [2] - 75:25, 76:1

**4**

**4** [1] - 85:10
**400** [2] - 2:3, 137:11
**41-3** [2] - 69:7, 69:18
**47** [1] - 21:5
**49** [1] - 3:7

**5**

**5/9/2024** [2] - 70:4,
70:22
**520** [1] - 1:15
**523-5178** [2] - 2:5,
137:12
**53** [2] - 3:16, 30:25
**55** [1] - 3:8
**5:15** [2] - 1:7, 136:6

**6**

**6** [1] - 3:5
**601** [1] - 1:23
**65** [1] - 3:7
**67** [1] - 3:9
**6:47** [3] - 52:1, 53:25,
63:19

**7**

**7** [1] - 69:18
**73** [1] - 3:10

**8**

**8** [3] - 3:14, 21:4,
21:8
**800** [8] - 1:23, 89:12,
128:12, 129:8,
129:15, 129:17,
129:21, 132:3
**800-page** [1] -
132:14
**81** [1] - 3:17
**84** [1] - 1:19

**9**

**9th** [15] - 18:20, 50:9,
51:15, 51:20, 52:1,
52:6, 53:25, 61:20,
62:13, 62:14, 63:19,
76:23, 87:16, 97:8,
128:4

**A**

**abide** [2] - 9:13,
42:13
**able** [10] - 27:12,

44:1, 55:3, 69:1,
75:18, 77:20, 89:16,
118:22, 127:13,
128:23
**aboard** [1] - 27:24
**above-entitled** [1] -
137:5
**absence** [1] - 122:7
**absolutely** [9] -
19:14, 31:23, 43:2,
43:11, 93:1, 93:10,
115:14, 126:24,
131:12
**absolving** [1] - 127:4
**abuse** [1] - 19:18
**academic** [1] - 38:25
**ACADEMIR** [2] - 1:8,
1:18
**Academir** [44] - 4:4,
4:13, 7:6, 7:14, 7:18,
8:1, 8:21, 12:7, 14:18,
18:18, 19:1, 20:17,
22:6, 22:11, 22:13,
22:22, 22:25, 23:8,
24:22, 25:2, 25:16,
25:22, 25:25, 26:19,
27:17, 30:7, 36:13,
38:16, 39:19, 41:15,
67:23, 70:7, 73:19,
75:11, 85:2, 88:4,
108:7, 109:6, 111:24,
114:23, 122:8, 124:5,
124:7
**Academir's** [1] -
10:14
**academy** [1] - 98:7
**access** [7] - 30:10,
32:10, 38:25, 78:10,
79:24, 80:3, 127:13
**AccessData** [2] -
49:16, 49:19
**AccessData-
certified** [1] - 49:16
**accessed** [1] - 70:3
**accessible** [6] - 30:8,
30:9, 30:20, 31:12,
31:19, 34:12
**according** [1] -
115:10
**accurate** [9] - 19:4,
27:10, 27:16, 74:22,
74:25, 82:20, 100:8,
128:17, 137:4
**accurately** [1] -
50:23
**accusation** [1] -
121:20
**accusations** [1] -
16:25
**accused** [1] - 14:7

**accusing** [2] - 62:4,
121:21
**acknowledged** [1] -
130:8
**Acrobat** [1] - 50:14
**active** [1] - 11:4
**acts** [1] - 15:19
**actual** [22] - 28:12,
33:17, 45:15, 53:1,
54:6, 69:14, 69:20,
70:22, 71:8, 72:9,
72:19, 73:9, 75:24,
76:24, 77:16, 78:15,
98:5, 100:15, 104:5,
115:23, 116:5, 121:3
**adapted** [2] - 98:10,
111:16
**add** [4] - 64:10,
80:19, 88:5, 95:13
**added** [5] - 41:25,
44:24, 45:16, 46:18,
48:2
**addition** [2] - 85:23,
86:2
**additional** [5] - 48:1,
66:23, 79:17, 81:3,
81:5
**additionally** [1] -
86:16
**address** [6] - 82:5,
99:18, 123:22,
134:25, 135:9, 135:12
**addressing** [1] -
95:10
**adjourned** [1] -
136:5
**adjust** [1] - 46:25
**adjusted** [2] - 28:3,
29:1
**adjustments** [1] -
47:15
**administrator** [1] -
19:16
**administrators** [1] -
40:3
**admission** [1] -
124:18
**admit** [1] - 81:19
**ADMITTED** [1] - 3:12
**admitted** [3] - 81:20,
81:22, 118:9
**admitting** [1] - 81:11
**Adobe** [1] - 50:14
**adopt** [2] - 94:14,
94:18
**adopted** [3] - 9:6,
9:8, 15:20
**affect** [4] - 60:5,
66:15, 104:3, 113:5
**affected** [1] - 76:17

**affidavit** [1] - 69:9
**affirmatively** [1] - 5:6
**affixed** [1] - 89:9
**afraid** [1] - 79:4
**after-the-fact** [1] - 116:17
**afternoon** [12] - 4:8, 4:10, 4:12, 4:14, 4:18, 18:5, 18:6, 49:7, 49:8, 55:15, 55:16, 73:17
**age** [1] - 7:17
**agenda** [1] - 41:18
**ago** [13] - 19:17, 28:15, 32:15, 45:6, 45:11, 47:16, 53:17, 65:16, 65:18, 70:7, 74:5, 75:23, 99:3
**agree** [9] - 39:21, 47:22, 58:19, 59:20, 60:20, 71:5, 101:22, 122:12, 126:1
**agreeance** [2] - 8:25, 15:21
**agreed** [4] - 99:22, 102:17, 102:25, 104:4
**agreement** [1] - 8:24
**ahead** [1] - 87:18
**aid** [1] - 131:2
**alerts** [1] - 33:19
**Alex** [1] - 102:8
**Alexander** [1] - 24:24
**allegation** [3] - 35:11, 125:5, 125:14
**allegations** [1] - 34:21
**alleged** [9] - 9:15, 103:10, 115:22, 116:4, 116:18, 119:4, 124:2, 126:9, 127:11
**allegedly** [1] - 8:4
**alleging** [1] - 80:5
**allow** [1] - 72:2
**allowed** [2] - 19:12, 91:12
**allowing** [1] - 123:12
**allows** [1] - 50:17
**alluded** [2] - 17:19, 45:12
**almost** [3] - 93:15, 93:17, 98:1
**alone** [1] - 95:16
**alter** [1] - 74:25
**altered** [2] - 77:7, 79:10
**alternative** [4] - 95:6, 95:11, 134:20, 135:7
**altogether** [1] - 32:13
**amend** [2] - 46:25, 88:4

**amended** [3] - 5:17, 87:22, 88:2
**amendment** [1] - 88:11
**analysis** [9] - 49:25, 50:20, 50:24, 51:6, 55:5, 65:19, 66:9, 79:9, 133:21
**analyze** [3] - 44:9, 50:11, 71:5
**analyzing** [2] - 50:3, 50:15
**annual** [2] - 23:19, 46:17
**annually** [2] - 15:20, 15:23
**Answer** [2] - 29:9, 35:24
**answer** [20] - 21:24, 27:2, 27:7, 27:8, 28:5, 28:6, 31:7, 31:10, 31:16, 36:4, 36:7, 36:9, 57:6, 58:6, 63:8, 83:11, 118:10, 120:8, 122:11, 132:5
**answered** [1] - 110:6
**answers** [2] - 26:7, 118:1
**anti** [1] - 9:12
**anti-discrimination** [1] - 9:12
**anyway** [1] - 127:3
**apologize** [1] - 84:22
**appear** [1] - 53:18
**APPEARANCES** [1] - 1:13
**appearances** [1] - 4:6
**applicable** [1] - 132:20
**applications** [2] - 70:16, 75:4
**applied** [1] - 108:15
**applies** [1] - 107:14
**apply** [1] - 8:23
**approach** [2] - 21:7, 115:18
**appropriate** [2] - 106:8, 134:2
**approval** [4] - 24:19, 25:18, 41:19, 41:20
**approvals** [1] - 24:25
**approve** [8] - 25:5, 25:11, 25:12, 42:1, 42:10, 89:24, 109:2
**approved** [8] - 10:6, 25:2, 25:13, 25:16, 41:15, 42:11, 89:25, 102:24
**area** [1] - 8:2

**argument** [7] - 96:1, 120:5, 122:24, 123:19, 127:1, 128:5, 133:5
**arguments** [2] - 96:14, 127:24
**artificial** [1] - 67:14
**aside** [2] - 61:22, 92:19
**aspect** [4] - 33:25, 100:12, 104:24, 126:15
**aspects** [2] - 51:16, 104:22
**assault** [1] - 125:5
**assessment** [1] - 9:10
**assistance** [1] - 75:12
**assistant** [1] - 7:12
**assisted** [1] - 39:11
**assisting** [1] - 11:5
**associate** [2] - 80:1, 105:25
**assume** [2] - 96:11, 96:14
**assuming** [7] - 47:2, 90:9, 93:4, 94:3, 95:13, 96:9, 128:8
**assumption** [1] - 88:22
**attached** [2] - 32:20, 81:6
**attachments** [2] - 5:17, 84:5
**attended** [1] - 38:21
**attends** [1] - 109:1
**attention** [6] - 21:3, 21:20, 30:24, 35:14, 120:17, 121:1
**attest** [1] - 44:21
**attests** [1] - 103:23
**attorney** [8] - 11:10, 55:21, 55:24, 56:1, 57:13, 57:14, 57:23
**attorney-client** [2] - 55:21, 56:1
**attorneys** [3] - 32:4, 43:1, 45:19
**attorneys'** [1] - 95:10
**August** [20] - 17:22, 30:11, 32:2, 32:5, 32:15, 32:22, 46:16, 51:10, 51:25, 61:18, 64:2, 99:8, 99:12, 104:1, 129:22, 130:15, 133:13, 133:14, 133:15, 133:18
**auspices** [1] - 24:13

**authentic** [1] - 96:14
**authenticate** [4] - 99:3, 100:18, 102:20, 102:21
**authenticity** [9] - 13:11, 43:14, 90:6, 90:9, 94:4, 96:9, 96:10, 96:11, 100:5
**authorities** [1] - 126:16
**authority** [1] - 117:17
**auto** [1] - 70:17, 73:12, 75:3, 75:6, 75:24, 76:1, 76:7, 76:17
**automatic** [2] - 60:3, 73:3
**automatically** [3] - 70:16, 72:24, 76:6
**available** [2] - 38:10, 40:24
**Avenue** [2] - 2:3, 137:11
**avoid** [1] - 70:18
**award** [1] - 95:9
**aware** [23] - 10:16, 10:21, 12:5, 13:1, 13:10, 13:24, 17:9, 17:10, 26:8, 33:2, 42:7, 43:9, 44:14, 44:18, 45:24, 62:1, 79:21, 79:22, 79:25, 82:13, 109:5, 125:4
**awful** [1] - 59:1

## B

**B-E-R-N-A-L** [1] - 6:21
**backed** [2] - 70:10, 70:15
**background** [1] - 59:4
**backup** [6] - 60:3, 60:6, 75:19, 75:21, 78:24, 78:25
**backups** [7] - 66:12, 68:19, 68:23, 74:24, 75:2
**bad** [1] - 131:19
**base** [1] - 9:7
**based** [6] - 69:24, 76:11, 82:1, 82:8, 119:8, 120:16
**basis** [5] - 9:7, 10:5, 23:19, 28:1, 107:12
**Bates** [1] - 85:15
**bathroom** [1] - 95:22
**Bayshore** [1] - 1:23

**bearing** [1] - 129:24
**became** [3] - 13:10, 13:24, 27:24
**Becerra** [1] - 4:5
**become** [2] - 10:21, 35:11
**becomes** [1] - 93:2
**BEFORE** [1] - 1:11
**beg** [2] - 101:25, 104:9
**beginning** [4] - 30:25, 31:12, 35:15, 42:9
**behalf** [4] - 4:13, 13:6, 26:6, 81:10
**behind** [1] - 110:25
**belief** [1] - 110:7
**Bello** [20] - 38:22, 39:2, 39:5, 39:10, 39:11, 39:14, 42:23, 42:24, 43:9, 101:9, 101:10, 106:6, 106:7, 107:19, 115:6, 121:9, 125:9, 128:1, 133:20
**Bello's** [2] - 113:22, 123:1
**belong** [3] - 20:10, 23:5, 54:13
**BERNAL** [1] - 3:4
**Bernal** [43] - 5:8, 5:19, 6:11, 6:17, 6:20, 7:2, 7:5, 18:5, 21:20, 23:7, 28:22, 35:17, 36:24, 37:10, 42:25, 47:16, 48:15, 52:3, 62:4, 62:7, 75:14, 79:2, 82:15, 85:24, 86:14, 86:17, 86:24, 87:8, 89:14, 101:6, 103:9, 106:1, 109:3, 110:12, 111:18, 112:6, 113:8, 115:10, 119:4, 120:1, 127:15, 130:25
**Bernal's** [19] - 62:21, 63:2, 69:17, 69:21, 70:22, 72:18, 73:3, 84:8, 86:22, 87:10, 87:15, 89:1, 95:18, 97:11, 97:23, 100:23, 111:4, 119:21, 120:16
**best** [12] - 33:16, 60:20, 61:2, 61:7, 71:5, 71:17, 71:19, 72:3, 89:7, 114:7, 115:14, 118:20
**bet** [2] - 119:20
**better** [2] - 61:12, 118:11
**between** [5] - 8:16,

56:6, 93:7, 109:9, 127:22

**beyond** [3] - 12:10, 27:22, 134:6

**big** [2] - 96:25, 118:4

**binder** [54] - 4:23, 10:4, 14:17, 15:6, 15:7, 15:12, 16:12, 16:13, 16:21, 16:22, 17:18, 17:20, 21:4, 38:2, 38:4, 38:11, 42:4, 42:11, 42:14, 42:17, 42:22, 42:23, 42:24, 42:25, 43:2, 43:3, 43:5, 43:7, 43:8, 43:10, 43:12, 85:11, 89:13, 101:1, 106:13, 106:15, 106:19, 107:20, 113:24, 115:12, 122:2, 129:10, 131:1, 131:6, 131:10, 131:14, 131:19, 131:22, 132:14, 132:15, 132:17, 132:19

**binders** [9] - 15:9, 15:10, 15:12, 16:15, 16:17, 38:17, 39:6, 81:11, 81:22

**Binders** [1] - 3:17

**bit** [2] - 82:6, 82:17

**blend** [1] - 124:8

**Board** [1] - 109:9

**board** [26] - 8:12, 10:6, 15:20, 24:17, 24:18, 24:21, 24:22, 24:23, 24:25, 25:2, 25:9, 25:14, 25:16, 41:15, 42:5, 89:22, 102:3, 102:7, 102:9, 102:24, 107:15, 108:6, 108:7, 108:25, 109:1, 114:17

**board-approved** [1] - 10:6

**book** [3] - 10:8, 10:12, 131:2

**boss** [11] - 11:17, 12:4, 13:18, 13:20, 15:9, 29:19, 33:9, 44:23, 45:18, 62:22, 63:13

**bottom** [1] - 103:5

**Boulevard** [1] - 1:23

**bound** [1] - 127:2

**boy** [3] - 116:18, 116:22, 117:16

**breezed** [1] - 124:4

**Brickell** [1] - 1:15

**brief** [4] - 6:4, 82:11,

118:4, 123:21

**briefed** [1] - 135:13

**briefing** [1] - 6:11

**briefly** [6] - 17:23, 49:14, 65:11, 67:25, 89:18, 115:6

**bring** [7] - 10:2, 36:1, 36:2, 56:21, 64:6, 64:7, 131:1

**bringing** [3] - 95:10, 130:17, 131:4

**broader** [2] - 128:9, 130:11

**brought** [2] - 112:2, 127:17

**building** [2] - 16:17, 119:14

**bunch** [1] - 118:13

**burden** [1] - 105:22

**business** [2] - 17:2, 17:12

**BY** [37] - 2:1, 7:1, 11:19, 13:4, 16:11, 18:4, 18:25, 20:4, 20:19, 21:10, 21:19, 22:5, 24:20, 26:13, 27:9, 28:14, 29:14, 34:16, 35:21, 37:9, 46:9, 49:6, 49:24, 52:24, 53:16, 55:14, 56:7, 58:3, 58:10, 60:14, 65:13, 67:10, 71:16, 72:7, 73:16, 77:5, 79:5

**bylaws** [2] - 15:15, 41:23

**byte** [2] - 76:15, 76:16

## C

**camera** [1] - 37:18

**campus** [1] - 42:12

**campuses** [1] - 7:19

**cannot** [4] - 30:22, 35:24, 73:7, 90:5

**caption** [1] - 52:22

**care** [1] - 91:7

**career** [1] - 47:25

**Casas** [5] - 24:24, 102:8, 102:16, 107:23, 108:23

**case** [67] - 4:3, 4:4, 5:7, 5:9, 8:25, 9:11, 11:5, 12:7, 14:5, 14:8, 16:6, 18:20, 20:20, 23:15, 29:18, 38:23, 39:3, 39:12, 44:13, 50:1, 56:16, 58:18, 61:3, 61:25, 62:9,

77:8, 80:7, 80:10, 80:11, 82:15, 90:19, 93:16, 93:20, 98:13, 99:13, 100:24, 101:7, 101:12, 104:13, 107:2, 107:9, 115:17, 115:20, 116:9, 116:15, 116:17, 117:11, 117:20, 117:23, 118:6, 118:8, 124:25, 125:2, 126:1, 126:6, 127:11, 128:14, 128:23, 129:7, 129:12, 131:6, 133:9, 134:16, 135:2, 135:3

**CASE** [1] - 1:2

**case-dispositive** [1] - 134:16

**caught** [1] - 123:7

**caused** [1] - 54:24, 122:25

**centers** [1] - 7:22

**certain** [8] - 9:1, 9:4, 9:9, 19:8, 24:14, 68:10, 112:6, 127:21

**certainly** [3] - 95:12, 101:22, 122:21

**certifications** [1] - 49:16, 49:18

**certified** [4] - 49:16, 49:17, 73:23, 76:12

**certify** [1] - 137:3

**chair** [3] - 24:25, 102:2, 108:6

**Chairman** [1] - 102:7

**challenge** [2] - 13:10, 94:4

**chance** [1] - 25:24

**change** [38] - 28:10, 28:13, 45:3, 55:2, 59:2, 59:4, 59:5, 59:6, 59:7, 59:20, 59:22, 59:23, 59:24, 60:6, 60:7, 60:11, 60:13, 62:24, 63:13, 63:14, 64:8, 70:20, 71:2, 72:14, 72:16, 72:24, 73:8, 74:17, 75:3, 75:7, 76:6, 99:9, 104:18, 112:10, 113:4, 116:15

**changed** [18] - 15:23, 27:22, 28:1, 28:12, 54:19, 54:22, 70:10, 77:7, 78:20, 100:14, 107:2, 108:14, 112:25, 113:11, 113:12, 118:1, 124:18, 124:19

**changes** [23] - 24:16, 26:20, 27:4, 27:17, 27:19, 28:2, 28:4, 28:7, 28:8, 28:12, 28:21, 28:24, 46:17, 46:24, 72:22, 83:12, 108:13, 110:7, 110:9, 110:14, 111:24, 124:4

**changing** [9] - 54:17, 54:18, 58:21, 59:10, 63:15, 70:25, 71:1, 72:14, 106:25

**character** [9] - 44:5, 44:15, 45:25, 53:8, 54:5, 76:8, 99:14, 110:14, 112:5

**characteristics** [15] - 44:4, 44:14, 45:24, 51:11, 54:4, 66:1, 66:8, 76:8, 76:18, 77:7, 82:24, 95:14, 100:13, 104:5, 104:19

**charge** [3] - 27:21, 39:13, 105:24

**charter** [10] - 7:16, 7:18, 8:11, 8:14, 8:19, 8:23, 94:11, 98:7

**Charter** [18] - 4:4, 4:11, 4:13, 7:6, 8:1, 8:21, 11:16, 20:17, 22:6, 22:23, 23:16, 23:22, 27:17, 36:13, 88:4, 88:10, 124:7

**CHARTER** [2] - 1:8, 1:21

**charters** [1] - 7:13

**check** [3] - 33:22, 72:5, 92:16

**Chief** [2] - 7:5, 86:12

**chief** [9] - 7:12, 18:7, 18:13, 27:15, 34:19, 36:18, 107:14, 107:24, 108:4

**child** [4] - 26:3, 116:25, 124:2, 124:15

**children** [2] - 117:1, 117:7

**Children** [1] - 126:19

**church** [2] - 119:13

**Circuit** [1] - 116:10

**circumstances** [4] - 80:13, 82:14, 88:23, 90:8

**City** [2] - 109:21, 109:25

**city** [1] - 109:23

**City's** [1] - 109:19

**Civil** [2] - 19:10, 127:8

**claim** [6] - 23:23,

48:3, 57:23, 90:14, 90:17, 123:23

**claimed** [4] - 18:17, 47:5, 47:10, 92:21

**claiming** [1] - 68:4

**claims** [5] - 68:1, 90:21, 91:14, 127:17, 129:25

**clarification** [1] - 17:18

**clarified** [1] - 110:12

**clarify** [5] - 36:25, 88:3, 130:20, 132:11, 133:8

**class** [3] - 117:16, 117:18, 117:19

**clear** [6] - 16:12, 57:22, 83:21, 109:2, 109:4, 115:17

**clearly** [1] - 113:24

**click** [2] - 34:14, 71:2

**clicking** [1] - 50:18

**client** [9] - 55:21, 56:1, 62:4, 62:16, 67:23, 80:21, 93:9, 121:21, 135:23

**client's** [2] - 117:3, 135:2

**clients** [1] - 135:18

**clients'** [1] - 5:20

**close** [4] - 88:5, 97:22, 128:25, 129:25

**closed** [1] - 17:21

**closer** [1] - 12:6

**clue** [1] - 129:11

**Co** [1] - 98:1

**coach** [1] - 7:11

**Code** [2] - 40:8, 92:16

**code** [2] - 20:11, 109:17

**coincidence** [1] - 104:4

**collated** [1] - 43:23

**collect** [2] - 38:22, 39:1

**collected** [1] - 38:24

**College** [1] - 67:22

**combined** [1] - 33:9

**coming** [2] - 32:10, 38:9

**commanded** [1] - 56:24

**comment** [1] - 95:12

**committed** [1] - 62:8

**committing** [1] - 121:21

**communication** [2] - 57:5, 131:19

**companies** [1] -

67:20

**Company** [1] - 49:13

**company** [4] - 26:6, 49:13, 67:19, 108:3

**compare** [3] - 50:6, 51:7, 61:16

**compared** [3] - 52:25, 54:3, 54:6

**comparing** [2] - 51:13, 112:16

**complain** [1] - 35:4

**complained** [1] - 125:1

**complaint** [12] - 30:4, 30:6, 30:8, 33:11, 41:2, 42:19, 46:22, 97:24, 109:13, 124:24, 125:25

**complaints** [8] - 27:25, 84:18, 84:25, 91:10, 124:15, 125:10, 126:13, 127:10

**complete** [6] - 34:11, 41:1, 50:20, 61:1, 70:11, 120:11

**completed** [1] - 50:20

**completely** [2] - 30:13, 32:7

**completion** [1] - 44:25

**compliance** [11] - 8:10, 8:13, 15:22, 16:7, 18:14, 38:17, 39:6, 84:24, 89:15, 93:17, 101:1

**Compliance** [1] - 127:9

**comply** [7] - 94:5, 94:8, 94:13, 114:15, 115:22, 116:4, 116:11

**compounded** [1] - 105:16

**comprehensive** [2] - 65:23, 93:19

**computer** [36] - 13:15, 17:11, 42:3, 49:21, 52:3, 54:21, 58:20, 58:25, 59:8, 59:25, 60:23, 60:25, 61:22, 62:17, 62:20, 63:4, 65:19, 65:25, 68:13, 68:21, 69:17, 69:21, 70:22, 71:8, 71:19, 71:22, 71:25, 72:19, 73:3, 74:1, 76:12, 77:2, 77:3, 99:19, 100:14

**computers** [12] -

17:2, 17:11, 67:17, 70:8, 70:9, 70:14, 72:10, 76:14, 76:15, 76:16, 80:4, 99:22

**conceptually** [2] - 58:19, 120:3

**concern** [1] - 40:24

**concerning** [2] - 10:17, 56:16

**concerns** [3] - 16:6, 100:4, 134:14

**concluded** [1] - 136:6

**conclusions** [1] - 55:5

**Conduct** [2] - 40:9, 92:16

**conduct** [4] - 20:11, 79:9, 95:11, 129:17

**conducted** [6] - 34:17, 35:7, 35:9, 35:13, 36:16, 36:19

**conducting** [1] - 36:3

**configured** [1] - 75:21

**confronted** [2] - 102:18, 103:1

**confusing** [2] - 33:14, 109:24

**connected** [1] - 37:19

**connection** [4] - 14:4, 14:13, 90:14, 130:25

**consent** [2] - 46:23

**consequences** [1] - 122:24

**consider** [1] - 81:7

**considered** [1] - 120:11

**considering** [1] - 128:10

**consistent** [4] - 63:1, 103:12, 107:14, 117:11

**constantly** [1] - 70:9, 70:15

**constitute** [2] - 63:23, 116:8

**consultant** [2] - 5:20, 73:18

**consulted** [1] - 114:25

**contact** [12] - 19:8, 19:11, 19:25, 29:16, 38:14, 108:15, 108:16, 108:17, 109:6, 111:25, 126:19, 126:23

**contacted** [3] - 75:11, 126:16, 126:17

**contacts** [1] - 107:1

**contained** [1] - 75:15

**content** [13] - 51:25, 53:25, 54:17, 63:9, 63:16, 63:18, 64:10, 68:16, 72:23, 79:6, 100:15, 113:2

**contents** [1] - 89:8

**contested** [1] - 72:16

**context** [4] - 35:10, 36:10, 87:18, 119:14

**continue** [4] - 15:24, 36:10, 47:11, 117:13

**continued** [2] - 105:14, 129:7

**continues** [1] - 46:24

**continuing** [1] - 132:22

**contract** [3] - 8:12, 8:14, 9:9

**contractor** [2] - 5:25, 6:1

**contradict** [2] - 99:2, 104:22

**contradicting** [1] - 104:21

**contradictions** [4] - 91:19, 92:20, 93:7, 93:23

**contradicts** [1] - 104:16

**contrary** [1] - 82:22

**contributed** [1] - 101:11

**conversation** [3] - 31:19, 31:22, 112:9

**convert** [1] - 31:11

**coordinator** [14] - 18:17, 47:7, 47:10, 47:17, 47:18, 47:21, 48:5, 86:18, 86:24, 106:25, 108:18, 109:19, 124:15, 127:15

**coordinators** [3] - 86:21, 124:19, 127:20

**copied** [1] - 78:24

**copies** [7] - 43:3, 72:10, 75:17, 107:9, 112:4, 113:23, 115:18

**copy** [11] - 21:13, 31:10, 32:24, 33:4, 33:6, 33:7, 42:10, 43:12, 110:25, 113:13, 117:25

**corporate** [6] - 86:6, 87:10, 114:2, 114:19, 114:22, 128:11

**correct** [79] - 9:5, 9:17, 10:9, 10:14, 10:15, 11:1, 12:1, 13:9, 13:12, 13:13, 16:13, 17:13, 18:9, 18:19, 20:22, 21:2, 21:24, 23:10, 23:14, 26:22, 27:3, 27:7, 28:6, 29:22, 30:18, 31:18, 32:17, 32:19, 33:24, 36:17, 37:12, 37:16, 37:24, 38:19, 39:4, 39:24, 43:6, 43:17, 43:21, 47:21, 53:2, 55:23, 56:9, 56:12, 56:13, 56:17, 57:1, 59:11, 60:24, 63:21, 64:12, 64:21, 64:22, 65:8, 69:5, 69:12, 69:13, 69:22, 69:23, 71:8, 73:19, 74:13, 74:19, 74:23, 75:8, 75:14, 83:16, 85:8, 85:16, 85:22, 86:12, 86:13, 87:11, 88:16, 88:19, 92:9, 97:5, 101:10, 102:18

**correctly** [6] - 20:5, 21:25, 22:1, 52:4, 54:3, 97:18

**corroborated** [1] - 128:3

**corroborating** [1] - 101:17

**corroborative** [1] - 103:8

**costs** [1] - 95:10

**counsel** [16] - 4:6, 4:25, 5:14, 6:6, 12:13, 14:17, 15:7, 16:25, 79:18, 80:11, 80:15, 82:3, 105:19, 111:15, 114:14, 128:20

**counselor** [2] - 117:1, 126:11

**count** [19] - 44:5, 44:14, 44:15, 45:3, 45:25, 53:8, 53:9, 54:5, 76:9, 99:14, 104:7, 112:5, 113:5

**counts** [2] - 59:5, 110:14

**County** [38] - 8:17, 8:20, 8:25, 9:13, 19:3, 19:6, 19:12, 19:13, 20:2, 20:7, 20:8, 20:18, 21:23, 22:8, 22:14, 22:20, 23:4, 23:5, 37:23, 39:22, 40:6, 83:19, 91:3,

93:11, 93:25, 94:1, 94:9, 98:2, 106:3, 106:21, 106:22, 109:22, 109:23, 110:1, 110:13, 127:8, 127:22

**county** [3] - 22:24, 109:22, 127:14

**county's** [1] - 94:6

**County's** [1] - 110:3

**couple** [1] - 77:18

**course** [6] - 26:25, 50:14, 57:5, 61:6, 112:1, 130:17

**COURT** [252] - 1:1, 4:2, 4:14, 5:5, 5:11, 5:14, 5:22, 5:24, 6:2, 6:5, 6:7, 6:14, 6:18, 6:22, 6:24, 11:13, 11:15, 11:18, 12:2, 12:12, 12:22, 13:1, 14:16, 15:6, 17:16, 17:25, 18:24, 19:21, 20:3, 20:13, 21:9, 21:13, 22:3, 24:10, 26:5, 26:9, 27:3, 28:5, 29:5, 29:7, 29:9, 29:13, 34:8, 37:2, 37:5, 46:7, 48:7, 48:9, 48:11, 48:16, 48:18, 49:4, 49:23, 52:8, 52:11, 52:15, 52:18, 52:23, 55:10, 57:8, 57:15, 57:20, 58:1, 58:6, 60:8, 64:23, 65:6, 65:10, 66:19, 66:23, 67:8, 71:12, 71:15, 72:2, 73:2, 73:13, 76:20, 77:1, 77:4, 77:10, 77:14, 77:17, 77:23, 78:3, 78:5, 78:19, 78:22, 79:14, 79:16, 80:17, 81:2, 81:9, 81:13, 81:16, 81:19, 81:25, 82:8, 83:6, 83:8, 83:17, 83:21, 84:1, 84:5, 84:10, 84:20, 85:3, 85:6, 85:9, 85:15, 85:17, 85:20, 86:5, 86:9, 86:15, 86:19, 86:23, 87:2, 87:6, 87:9, 87:12, 87:17, 87:24, 88:7, 88:10, 88:14, 88:17, 88:20, 90:12, 90:14, 91:16, 92:2, 92:8, 92:13, 92:19, 92:24, 93:4, 93:7, 93:14, 93:21, 94:3, 94:10,

Court's [4] - 21:3, 30:24, 35:14, 114:15
court-certified [1] - 76:12
courtesy [1] - 131:3
COURTROOM [6] - 4:3, 48:23, 48:25, 67:2, 67:6, 136:5
covered [1] - 56:4
covers [2] - 43:10
Covid [2] - 12:18, 38:9
crack [1] - 134:16
create [30] - 11:20, 33:11, 59:2, 59:7, 59:20, 59:22, 59:23, 59:24, 60:12, 61:19, 62:24, 63:25, 64:3, 64:8, 64:13, 64:16, 64:20, 69:1, 72:6, 72:15, 72:18, 74:20, 74:25, 75:7, 75:9, 76:14, 78:8, 120:13, 127:2, 132:1
created [31] - 23:12, 23:17, 31:23, 32:4, 32:8, 34:3, 34:10, 42:18, 47:3, 50:9, 50:23, 51:9, 51:15, 51:20, 53:25, 60:22, 62:11, 62:12, 63:18, 68:16, 69:25, 71:6, 71:18, 72:4, 72:5, 88:25, 97:19, 98:25, 110:12, 113:6
creates [2] - 64:19, 119:1
creating [2] - 64:4, 64:11
creation [14] - 51:17, 51:21, 52:5, 52:14, 54:19, 54:21, 55:1, 66:4, 66:7, 74:16, 80:14, 98:19, 99:11, 104:6
credible [1] - 46:13
criteria [1] - 78:13
critical [6] - 90:21, 91:2, 91:5, 91:13, 106:23, 121:16
cross [4] - 17:16, 55:10, 73:13, 122:7
Cross [1] - 3:2
CROSS [3] - 18:3, 55:13, 73:15
cross-examination [3] - 17:16, 55:10, 73:13
CROSS-EXAMINATION [3] -

94:16, 94:20, 95:2, 95:25, 96:5, 96:8, 96:22, 97:6, 97:12, 97:20, 98:10, 98:15, 99:18, 99:25, 100:3, 100:7, 100:9, 100:16, 100:18, 101:2, 101:8, 101:11, 101:16, 101:21, 102:5, 102:15, 102:20, 103:3, 103:5, 103:14, 103:16, 103:20, 105:19, 106:5, 106:7, 106:13, 106:16, 107:4, 107:10, 107:22, 108:4, 108:8, 108:10, 108:19, 108:24, 109:8, 109:14, 109:21, 109:24, 110:5, 110:16, 110:19, 110:21, 111:9, 111:18, 112:10, 112:13, 112:17, 113:1, 113:13, 113:17, 113:20, 114:2, 114:8, 114:10, 114:14, 114:19, 114:24, 115:8, 115:10, 115:19, 115:25, 116:1, 117:7, 119:7, 119:17, 119:23, 120:5, 120:14, 120:21, 120:25, 121:8, 121:13, 121:15, 122:15, 123:18, 124:13, 124:24, 125:13, 125:24, 126:22, 126:25, 127:23, 129:8, 130:4, 130:22, 131:9, 131:13, 131:20, 131:24, 132:12, 132:25, 133:10, 133:14, 133:25, 134:9, 134:23, 135:1, 135:12, 135:17, 136:4
court [6] - 55:18, 73:25, 76:12, 84:21, 123:13, 136:5
Court [28] - 2:2, 2:3, 4:1, 4:16, 4:23, 5:4, 7:14, 8:16, 9:6, 10:18, 29:15, 49:10, 52:19, 64:10, 67:11, 69:8, 69:15, 70:2, 102:14, 107:9, 113:7, 113:22, 115:20, 115:21, 130:18, 131:1, 137:10, 137:10

18:3, 55:13, 73:15
cross-examined [1] - 122:7
cumulative [1] - 39:15
cure [1] - 123:11
current [7] - 11:9, 28:11, 131:4, 131:5, 132:7, 132:15, 132:16
curriculum [3] - 7:11, 9:10, 41:9
customer [1] - 75:25
cutoff [1] - 133:12

**D**

d/b/a [1] - 49:12
Dade [67] - 8:17, 8:20, 8:25, 9:2, 9:3, 9:12, 17:4, 19:3, 19:6, 19:8, 19:11, 19:13, 19:24, 20:1, 20:2, 20:7, 20:8, 20:10, 20:18, 21:23, 22:8, 22:14, 22:20, 23:4, 23:5, 23:21, 37:23, 38:12, 39:22, 40:6, 67:21, 83:19, 91:3, 92:9, 92:14, 92:15, 93:11, 93:25, 94:1, 94:9, 106:3, 106:20, 106:22, 106:23, 107:13, 107:18, 108:14, 108:16, 108:17, 109:22, 109:23, 110:1, 110:3, 110:13, 110:25, 111:24, 113:13, 113:16, 113:19, 117:25, 118:11, 126:22, 127:7, 127:8, 127:22
daily [1] - 12:12
data [8] - 13:22, 16:22, 51:12, 59:2, 68:1, 70:18, 79:4, 80:2
database [2] - 78:8, 78:11
DATE [1] - 137:9
date [70] - 51:17, 51:24, 52:5, 52:14, 54:19, 54:21, 54:22, 55:2, 59:3, 59:6, 59:7, 59:20, 59:22, 59:23, 59:24, 60:12, 61:19, 62:10, 62:11, 62:12, 62:18, 62:24, 63:14, 64:3, 64:4, 64:8, 64:13, 64:16, 68:7,

18:3, 55:13, 73:15
cross-examined [1] - 122:7
cumulative [1] - 39:15

69:1, 70:3, 70:5, 70:20, 70:24, 71:2, 72:6, 72:13, 72:15, 72:18, 72:24, 73:7, 73:11, 74:6, 74:16, 74:17, 74:20, 74:21, 75:3, 75:7, 75:9, 75:10, 75:13, 76:6, 76:20, 76:22, 76:23, 78:17, 98:19, 99:11, 104:6, 106:24, 113:15
dated [1] - 69:19
dates [10] - 27:25, 28:9, 51:21, 60:6, 60:7, 64:4, 66:5, 66:7, 74:25
daughter [1] - 117:18
day-to-day [1] - 8:8
days [4] - 87:15, 87:16, 97:22, 126:17
deal [2] - 6:7, 96:25
dealing [2] - 8:8, 108:2
dealt [1] - 14:16
decide [2] - 131:19, 134:13
decided [4] - 4:17, 75:23, 113:8, 122:5
declaration [1] - 128:17
declarations [3] - 105:12, 128:11, 129:6
default [2] - 47:9, 82:12
defendant [13] - 1:9, 4:11, 5:24, 64:25, 65:1, 66:24, 86:7, 87:9, 107:5, 108:20, 121:16, 121:24, 134:4
Defendant [4] - 25:25, 85:2, 86:12, 88:4
DEFENDANT [2] - 1:18, 1:21
defendant's [4] - 82:18, 103:8, 121:24, 128:20
defendants [7] - 4:25, 17:19, 18:8, 73:18, 82:13, 124:8, 125:4
defense [2] - 11:5, 80:15
defer [1] - 58:14
deferred [1] - 86:14
definitely [2] - 72:16, 130:7
degree [5] - 7:8, 7:9, 67:15, 94:2

delay [2] - 91:22, 118:14
deliberate [5] - 90:22, 115:23, 116:6, 116:11, 116:16
deliberately [1] - 14:12
demonstrative [1] - 131:2
denied [1] - 123:10
department [1] - 67:20
Department [2] - 19:10, 126:19
depo [1] - 86:6
deposed [7] - 11:1, 12:6, 18:20, 20:20, 86:17, 100:16, 133:19
deposition [79] - 10:22, 11:4, 12:16, 12:19, 12:21, 12:24, 13:5, 13:23, 18:22, 20:23, 21:5, 21:13, 26:1, 26:16, 29:24, 30:1, 30:4, 30:7, 30:16, 30:19, 30:25, 31:25, 32:24, 33:1, 33:8, 33:25, 35:15, 37:11, 37:18, 38:15, 42:21, 55:20, 56:8, 56:21, 56:22, 56:24, 57:11, 58:8, 58:11, 62:5, 84:8, 86:1, 86:22, 87:9, 87:10, 87:15, 89:1, 89:4, 89:14, 92:13, 95:20, 96:24, 97:4, 97:11, 97:23, 99:1, 100:2, 102:13, 103:13, 103:14, 109:4, 110:12, 110:17, 110:22, 111:7, 111:9, 111:11, 111:19, 111:23, 113:22, 114:4, 114:5, 118:15, 119:8, 122:6, 123:1, 123:12, 130:6
depositions [8] - 86:6, 89:16, 113:21, 127:25, 128:9, 130:1, 130:10, 133:23
depravation [1] - 116:24
depth [1] - 18:1
DEPUTY [6] - 4:3, 48:23, 48:25, 67:2, 67:6, 136:5
DEREK [1] - 1:15
describe [6] - 49:14, 50:3, 51:5, 84:15,

85:3, 129:23
**described** [16] - 37:22, 45:6, 45:20, 45:25, 76:7, 85:24, 85:25, 89:3, 89:7, 95:14, 95:20, 104:5, 123:23, 125:6, 126:8, 130:19
**describes** [1] - 127:20
**describing** [2] - 42:14, 128:14
**descriptions** [1] - 88:24
**designate** [1] - 114:21
**designated** [1] - 114:2
**desktop** [2] - 68:21, 68:22
**despite** [5] - 17:21, 84:9, 95:18, 121:23, 128:25
**detail** [1] - 84:16
**detailed** [3] - 26:19, 26:20, 50:16
**details** [4] - 51:1, 51:3, 82:6, 102:25
**determine** [4] - 60:20, 71:6, 71:17, 79:9
**determined** [1] - 34:25
**develop** [2] - 11:20, 72:9
**developing** [1] - 14:24
**deviate** [1] - 91:1
**deviating** [1] - 95:16
**DIAZ** [2] - 2:2, 137:9
**Diaz** [1] - 137:9
**dictated** [1] - 91:12
**differ** [1] - 127:21
**difference** [11] - 44:21, 66:1, 106:24, 107:21, 109:9, 109:11, 113:2, 129:12, 129:15, 133:21
**different** [27] - 30:14, 32:8, 32:13, 36:12, 46:14, 49:18, 53:10, 54:16, 58:25, 67:20, 91:4, 96:5, 98:19, 98:20, 99:14, 99:16, 112:19, 119:20, 119:21, 123:24, 126:9, 127:15, 127:16, 130:11, 132:17, 133:16

**difficulty** [1] - 93:2
**digital** [7] - 15:11, 31:20, 46:22, 49:15, 49:19, 73:21, 73:22
**digitally** [1] - 113:23
**Direct** [1] - 3:2
**direct** [4] - 6:12, 21:3, 30:24, 134:12
**DIRECT** [2] - 6:25, 67:9
**direction** [1] - 121:7
**DIRECTION** [1] - 49:5
**directly** [2] - 37:7, 110:17
**director** [3] - 16:7, 89:23, 107:16
**directors** [8] - 24:22, 25:2, 41:15, 102:3, 102:6, 102:8, 102:24, 114:17
**directors'** [1] - 109:1
**disadvantage** [1] - 105:7
**disagree** [1] - 36:23, 125:22
**disc** [1] - 99:23
**disciplinary** [1] - 20:11
**disclose** [2] - 95:15, 122:24
**disclosed** [10] - 29:23, 90:11, 94:22, 102:1, 112:1, 119:9, 121:17, 121:23, 127:24, 127:25
**disclosure** [4] - 87:22, 87:23, 120:16, 135:4
**disclosures** [7] - 87:24, 88:5, 88:8, 94:22, 120:22, 120:23, 121:1
**discoverable** [1] - 131:6
**discovery** [23] - 17:21, 37:3, 37:6, 39:3, 39:8, 48:11, 79:22, 88:5, 88:6, 89:17, 105:17, 105:24, 106:21, 112:22, 118:8, 118:25, 123:7, 128:25, 130:1, 130:24, 132:23, 133:12
**discrepancies** [7] - 45:7, 45:12, 46:10, 54:24, 66:8, 66:15, 102:19

**discrepancy** [1] - 53:7
**discrimination** [4] - 9:12, 40:7, 40:11, 116:8
**discussed** [4] - 10:23, 31:16, 36:13, 100:13
**discussion** [1] - 111:23
**discussions** [1] - 111:22
**dispositive** [1] - 134:16
**dispute** [4] - 6:10, 57:19, 126:8, 126:13
**disregard** [2] - 82:20, 90:10
**dissatisfaction** [1] - 126:4
**distinct** [3] - 22:7, 22:23, 39:21
**distinction** [4] - 57:13, 94:19, 106:23, 124:13
**distinctions** [4] - 124:3, 124:11, 124:17, 124:21
**distribute** [1] - 40:15
**distributed** [4] - 40:4, 41:11, 83:3, 89:21
**District** [2] - 2:3, 137:10
**district** [8] - 8:24, 15:4, 15:22, 16:20, 19:22, 24:13, 25:10, 97:25
**DISTRICT** [3] - 1:1, 1:1, 1:12
**districts** [2] - 24:11, 98:13
**DIVISION** [1] - 1:2
**docket** [1] - 72:11
**Docs** [2] - 32:8, 32:21
**doctoring** [1] - 17:1
**document** [152] - 10:24, 26:16, 33:21, 36:21, 37:11, 37:13, 37:17, 37:22, 38:1, 39:18, 39:21, 39:25, 40:4, 40:13, 41:11, 42:2, 43:18, 44:4, 44:16, 44:24, 45:2, 45:5, 45:8, 45:9, 45:15, 45:22, 46:16, 47:3, 50:6, 52:12, 53:1, 53:5, 53:18, 53:21, 54:13, 60:17,

60:21, 61:3, 62:10, 62:12, 62:20, 62:21, 62:24, 64:6, 64:7, 64:11, 64:23, 65:14, 65:16, 66:11, 69:14, 69:15, 69:16, 69:18, 69:21, 69:25, 70:5, 70:22, 71:5, 71:6, 72:18, 72:19, 72:21, 73:8, 73:9, 76:3, 77:11, 77:19, 77:21, 77:24, 78:1, 78:3, 78:13, 79:3, 79:7, 79:10, 79:22, 82:21, 82:25, 83:21, 84:6, 85:4, 85:21, 87:3, 87:4, 87:12, 89:2, 89:6, 90:3, 90:4, 90:16, 91:4, 93:22, 93:23, 94:5, 94:24, 96:15, 97:4, 97:8, 97:14, 97:21, 98:11, 98:19, 99:1, 99:2, 99:4, 99:7, 99:8, 99:9, 99:13, 99:15, 100:15, 100:18, 101:23, 102:6, 103:25, 104:6, 104:9, 104:12, 104:17, 105:8, 109:6, 109:10, 110:13, 111:13, 112:10, 112:11, 112:13, 112:14, 112:15, 113:6, 113:9, 117:25, 118:13, 118:15, 118:22, 120:8, 120:17, 122:8, 122:25, 123:5, 123:14, 124:6, 124:9, 124:10, 127:2, 128:4, 128:9, 129:23, 134:17
**Document** [1] - 69:7
**documentation** [3] - 39:1, 44:2, 95:24
**documents** [114] - 10:17, 10:20, 11:8, 11:20, 12:23, 13:8, 13:11, 14:5, 30:1, 33:8, 36:22, 38:23, 38:24, 39:2, 39:12, 43:15, 44:11, 44:22, 45:10, 45:15, 45:16, 46:1, 46:10, 46:19, 47:1, 51:8, 51:13, 51:14, 51:19, 52:4, 56:2, 56:15, 56:19, 58:5, 58:7, 58:9, 61:17, 62:16, 63:22, 63:25, 65:6, 68:1, 69:9, 69:11, 70:14, 71:17, 71:18, 77:8,

78:12, 78:16, 78:21, 80:14, 80:22, 81:6, 81:11, 82:16, 82:18, 83:17, 84:12, 85:3, 85:17, 85:23, 86:21, 87:21, 87:22, 88:6, 89:1, 89:5, 89:12, 89:20, 89:25, 90:6, 91:15, 95:17, 97:23, 98:14, 98:18, 99:16, 100:5, 100:24, 101:5, 101:6, 101:12, 104:12, 105:5, 105:11, 105:12, 105:15, 106:9, 108:1, 108:22, 112:7, 113:4, 115:7, 117:24, 118:18, 120:9, 120:10, 127:19, 128:13, 128:18, 128:24, 129:7, 129:8, 129:15, 129:21, 130:14, 130:21, 131:6, 132:3, 132:17, 132:23, 133:8
**DOCX** [2] - 50:12, 50:13
**DOE** [2] - 1:4, 116:11
**Doe** [5] - 1:5, 4:3, 7:25, 9:21, 26:4
**done** [16] - 15:23, 30:21, 31:8, 32:2, 32:12, 33:19, 36:5, 45:13, 45:14, 68:19, 81:1, 97:16, 118:11, 131:13, 133:1, 136:1
**doubt** [1] - 19:18
**down** [8] - 15:4, 48:18, 66:19, 84:20, 95:22, 115:25, 116:1, 132:1
**download** [2] - 33:3, 59:22
**Draconian** [1] - 135:10
**draft** [2] - 24:15, 32:6
**draw** [3] - 21:20, 35:14, 91:18
**drive** [14] - 54:25, 55:1, 58:20, 58:24, 59:21, 60:25, 65:21, 65:22, 68:19, 68:24, 75:18, 78:4, 78:16, 122:17
**Drive** [10] - 1:15, 60:1, 60:3, 66:12, 70:12, 70:13, 74:24, 75:2, 75:19, 75:21
**drives** [1] - 68:22
**due** [1] - 128:20

**duly** [3] - 6:17, 48:24, 67:1
**duplicated** [1] - 79:1
**duplicative** [1] - 79:3
**during** [12] - 16:23, 18:22, 26:16, 30:19, 33:8, 34:18, 37:10, 38:15, 42:20, 60:17, 84:18, 85:1
**duties** [2] - 96:19, 105:5
**duty** [3] - 19:16, 127:4, 132:22

## E

**e-mail** [12] - 30:11, 30:22, 32:4, 32:16, 32:20, 32:21, 43:11, 59:21, 59:24, 66:11, 70:11, 80:1
**e-mailing** [1] - 54:24
**e-mails** [1] - 72:10
**early** [1] - 100:7
**easier** [1] - 21:17
**easily** [1] - 134:18
**East** [1] - 36:14
**easy** [1] - 31:21
**easy-to-use** [1] - 31:21
**Eclipse** [2] - 49:12
**edit** [1] - 45:15
**edited** [3] - 24:16, 25:19, 108:13
**editing** [3] - 45:13, 45:14, 54:1
**edits** [1] - 29:20
**educate** [1] - 41:7
**education** [2] - 7:7, 7:9
**educational** [2] - 41:8, 116:24
**educator** [2] - 19:15, 48:1
**EDWIN** [1] - 1:11
**effect** [12] - 83:14, 84:18, 84:25, 90:18, 93:2, 93:5, 95:24, 96:8, 103:16, 103:21, 109:3, 130:16
**Effective** [1] - 122:9
**effectively** [1] - 34:7
**eight** [1] - 7:7
**either** [4] - 40:24, 41:15, 42:15, 62:16
**electronic** [12] - 31:5, 31:7, 31:9, 49:25, 54:7, 56:14, 56:15, 57:25, 58:20, 67:13, 71:6, 76:13

**elementary** [2] - 7:20, 7:21
**elements** [2] - 89:18, 104:11
**ELMO** [2] - 21:14, 21:16
**employed** [1] - 18:10
**employee** [8] - 14:23, 15:16, 22:11, 22:12, 22:14, 22:15, 24:8, 95:21
**employees** [7] - 8:21, 8:22, 22:13, 22:22, 23:1, 23:5
**employer** [3] - 11:9, 11:10, 13:6
**end** [4] - 40:10, 89:8, 98:21, 122:8
**ended** [1] - 34:22
**enforcement** [3] - 121:25, 126:16, 126:23
**engaged** [1] - 15:1
**engineer** [2] - 67:13, 76:13
**engineering** [2] - 67:15, 67:21
**enrollment** [2] - 84:19, 85:1
**ensure** [5] - 8:10, 8:13, 10:5, 47:6, 47:13
**enter** [2] - 5:4, 134:11
**entered** [1] - 82:12
**entire** [5] - 19:5, 32:12, 42:25, 90:11, 99:23
**entirely** [4] - 63:25, 64:4, 134:2, 134:14
**entirety** [1] - 123:10
**entitled** [1] - 137:5
**errors** [2] - 72:8, 117:23
**esoteric** [1] - 120:8
**especially** [2] - 80:12, 128:10
**ESQ** [3] - 1:14, 1:18, 1:22
**essence** [1] - 32:10
**essentially** [1] - 11:3
**establish** [4] - 9:4, 115:22, 116:5, 116:11
**Esther** [9] - 11:14, 12:4, 24:5, 24:7, 28:16, 28:22, 29:15, 29:19, 32:18
**etcetera** [3] - 131:23
**evaluate** [1] - 130:5
**evening** [2] - 17:20,

52:1
**event** [2] - 115:24, 116:6
**events** [2] - 82:18, 99:1
**evidence** [24] - 5:4, 6:10, 32:3, 33:3, 35:1, 44:11, 66:20, 66:23, 81:4, 81:5, 81:22, 82:14, 82:20, 90:1, 90:5, 91:12, 95:7, 95:9, 103:8, 104:4, 104:19, 105:17, 129:4, 130:19
**evidentiary** [2] - 4:17, 134:11
**EVIDENTIARY** [1] - 1:11
**evidently** [1] - 102:4
**exact** [3] - 68:7, 74:6, 84:14
**exactly** [2] - 76:22, 99:13
**EXAMINATION** [7] - 6:25, 18:3, 49:5, 55:13, 65:12, 67:9, 73:15
**examination** [6] - 17:16, 50:8, 52:21, 55:10, 73:13, 99:22
**examine** [2] - 58:13, 96:24
**examined** [2] - 17:11, 122:7
**examiner** [4] - 49:11, 49:17, 73:23, 76:13
**examining** [1] - 83:22
**example** [15] - 26:2, 95:15, 96:3, 96:16, 96:19, 97:24, 98:6, 101:16, 102:15, 105:8, 124:22, 129:22, 131:21, 133:18, 135:22
**exceed** [1] - 123:15
**except** [3] - 42:8, 81:14, 108:15
**exception** [3] - 5:2, 19:8, 38:13
**excessive** [1] - 123:15
**exchange** [5] - 32:16, 55:3, 68:22, 70:11, 80:14
**excuse** [2] - 28:22, 107:6
**executed** [1] - 107:25
**Executive** [1] - 86:12

**executives** [1] - 111:21
**Exhibit** [36] - 3:14, 3:15, 3:16, 21:4, 21:8, 26:11, 26:12, 53:14, 53:15, 64:24, 65:15, 74:9, 84:13, 84:14, 85:10, 87:6, 87:13, 89:2, 89:8, 90:16, 91:23, 92:3, 92:20, 93:22, 96:1, 96:2, 96:9, 97:6, 98:5, 99:7, 102:6, 102:20, 102:21, 113:15, 113:17, 130:15
**exhibit** [6] - 26:9, 52:19, 64:24, 81:22, 83:22, 123:14
**exhibits** [7] - 4:23, 4:24, 5:1, 81:20, 83:5, 87:25, 88:9
**EXHIBITS** [1] - 3:12
**exist** [5] - 10:12, 42:3, 42:4, 64:5, 88:22
**existed** [17] - 11:23, 23:8, 33:23, 42:8, 62:20, 79:7, 83:2, 89:20, 99:4, 99:8, 101:19, 104:14, 106:19, 112:24, 114:5, 114:9, 129:11
**existence** [3] - 101:17, 111:12, 128:3
**existing** [2] - 98:11, 117:12
**exists** [1] - 113:24
**expand** [1] - 47:11
**experience** [7] - 16:18, 47:5, 49:15, 61:22, 76:11, 76:15, 76:16
**expert** [15] - 5:2, 5:9, 5:11, 47:6, 48:2, 49:21, 54:12, 54:23, 57:12, 59:16, 60:21, 71:10, 71:25, 81:14, 104:21
**expertise** [1] - 47:22
**explain** [10] - 7:14, 7:16, 8:16, 9:6, 59:14, 63:8, 69:15, 70:2, 102:10, 113:1
**explained** [4] - 36:11, 45:12, 68:9, 73:11
**explanation** [9] - 46:3, 46:13, 70:3, 82:22, 82:23, 90:3, 99:15, 103:3, 104:21

**explicit** [1] - 95:22
**extension** [1] - 80:18
**extensive** [1] - 111:20
**extent** [5] - 49:20, 91:16, 121:18, 131:5, 134:19
**extreme** [1] - 105:22
**extremely** [1] - 90:21

## F

**fabrication** [3] - 82:21, 95:7, 104:3
**face** [2] - 103:16, 103:21
**fact** [18] - 20:6, 58:4, 62:10, 70:19, 72:20, 73:2, 79:25, 83:2, 89:21, 90:7, 90:10, 93:7, 104:19, 116:17, 120:13, 128:10, 128:25
**facts** [3] - 46:6, 57:6, 126:12
**factual** [1] - 6:10
**faculty** [1] - 15:16
**fail** [1] - 120:25
**failure** [10] - 95:15, 96:15, 97:1, 115:22, 115:24, 116:4, 116:7, 116:10, 122:24, 127:18
**fair** [3] - 18:15, 75:13, 130:8
**fairly** [1] - 25:7
**fairness** [1] - 134:3
**false** [2] - 14:12, 82:15
**falsely** [1] - 129:2
**falsified** [1] - 14:4
**familiar** [1] - 60:1
**families** [1] - 40:15
**Families** [1] - 126:20
**far** [7] - 7:3, 17:10, 55:2, 61:21, 105:3, 123:15
**fast** [1] - 116:2
**father** [1] - 117:21
**FCRR** [2] - 2:2, 137:9
**feature** [8] - 70:16, 75:3, 75:6, 75:22, 75:24, 76:2, 76:3, 76:7
**features** [1] - 76:17
**February** [1] - 18:12
**federal** [1] - 94:13
**fees** [1] - 95:10
**fell** [1] - 112:2
**few** [10] - 4:24,

65:18, 70:7, 75:23, 85:12, 87:15, 87:16, 87:20, 110:23, 111:24
**field** [1] - 49:21
**file** [64] - 45:20, 50:10, 50:13, 50:16, 50:18, 51:9, 51:12, 51:22, 53:10, 53:12, 54:20, 54:24, 54:25, 56:12, 56:14, 57:18, 57:24, 57:25, 58:20, 59:2, 59:5, 59:6, 59:9, 59:10, 59:21, 60:8, 60:10, 61:18, 63:14, 63:16, 64:1, 65:4, 65:19, 65:25, 68:14, 68:16, 69:1, 69:2, 70:17, 70:19, 72:3, 72:5, 72:6, 72:14, 72:23, 75:7, 75:12, 75:15, 76:4, 76:5, 76:21, 78:9, 79:24, 98:17, 98:22, 99:12, 100:9, 103:11, 103:12, 103:24, 104:8, 135:10
**File** [2] - 50:14, 50:16
**file's** [1] - 74:21
**filed** [4] - 4:15, 55:25, 80:5, 120:23
**files** [19] - 13:15, 50:1, 50:4, 50:5, 50:8, 50:9, 50:11, 53:1, 53:4, 53:11, 54:7, 55:3, 65:23, 66:3, 68:10, 68:22, 68:24, 79:1, 79:3
**filing** [1] - 133:11
**final** [1] - 88:5
**financial** [1] - 131:2
**findings** [4] - 50:21, 50:24, 51:16, 57:6
**fine** [1] - 21:14
**finish** [1] - 29:7
**fire** [1] - 135:15
**firm** [1] - 79:23
**first** [38] - 4:19, 6:12, 6:14, 7:23, 11:4, 13:24, 14:16, 14:18, 14:20, 15:1, 27:3, 27:18, 28:17, 32:6, 34:23, 36:14, 38:4, 46:16, 63:8, 67:4, 67:25, 68:12, 78:10, 84:6, 84:8, 87:9, 90:22, 95:21, 98:21, 99:21, 100:25, 118:14, 118:18, 120:18, 124:6, 126:7, 126:16

**firsthand** [3] - 71:11, 77:6, 113:25
**fiscal** [12] - 10:6, 25:18, 31:16, 37:15, 38:11, 41:25, 89:2, 89:7, 89:9, 110:24, 129:22, 130:14
**Fiscal** [4] - 37:21, 38:1, 38:2, 38:5
**fit** [1] - 78:12
**FIU** [3] - 107:24, 108:5, 114:8
**five** [20] - 26:21, 27:6, 34:18, 35:7, 35:9, 36:8, 36:16, 52:2, 54:2, 60:16, 60:18, 70:18, 70:24, 72:21, 73:4, 76:4, 83:12, 97:7, 97:16, 117:9
**five-hour** [2] - 60:16, 60:18
**flash** [3] - 58:20, 58:24, 59:21
**Floor** [2] - 2:4, 137:11
**FLORIDA** [1] - 1:1
**Florida** [14] - 1:1, 1:16, 1:19, 1:24, 2:4, 67:20, 107:15, 126:19, 137:11
**focus** [5] - 96:8, 96:22, 120:17, 132:25, 133:1
**focusing** [1] - 83:23
**folder** [1] - 70:15
**folders** [4] - 44:12, 78:18, 78:25
**follow** [14] - 9:1, 19:7, 19:9, 19:23, 20:1, 20:8, 20:12, 21:12, 22:20, 22:25, 23:3, 38:13, 94:12
**followed** [2] - 15:3, 111:2, 127:7
**following** [8] - 91:2, 91:3, 91:9, 94:8, 98:5, 100:1, 126:6, 133:10
**follows** [4] - 1:14, 1:18, 1:21, 3:12
**forced** [1] - 128:15
**foregoing** [1] - 137:3
**forensic** [9] - 49:11, 49:19, 49:25, 73:21, 73:23, 74:1, 76:12, 79:9, 90:1
**forensically** [1] - 17:11
**Forensics** [1] - 49:12

**forensics** [3] - 49:15, 49:21, 73:22
**forgery** [1] - 36:21
**forget** [4] - 68:7, 74:6, 75:17, 108:13
**forging** [1] - 68:1
**forgot** [1] - 65:20
**form** [58] - 30:3, 30:4, 30:6, 30:8, 30:9, 30:10, 30:13, 30:14, 30:15, 30:20, 30:23, 31:5, 31:9, 31:11, 31:23, 31:24, 32:4, 32:7, 32:8, 32:12, 32:19, 32:20, 32:25, 33:11, 33:12, 33:14, 33:17, 33:23, 34:3, 34:5, 34:6, 34:11, 34:15, 38:12, 42:18, 42:19, 44:25, 45:1, 45:4, 45:5, 45:10, 46:7, 46:20, 46:22, 46:23, 47:24, 71:12, 97:24, 124:20
**formal** [4] - 41:23, 42:19, 73:21, 109:13
**format** [2] - 31:21, 32:13
**former** [1] - 80:1
**forms** [3] - 41:1, 93:17, 103:25
**FORTE** [1] - 1:22
**forth** [3] - 12:11, 43:11, 56:6
**forward** [2] - 25:6, 41:25
**forwarded** [7] - 30:11, 30:23, 32:3, 33:9, 44:23, 112:20, 115:6
**four** [3] - 64:24, 64:25, 65:7
**FPR** [2] - 2:2, 137:9
**frame** [1] - 117:14
**frank** [1] - 129:18
**frankly** [1] - 121:4
**fraud** [11] - 17:1, 36:21, 61:3, 62:4, 62:8, 68:1, 68:3, 68:4, 80:5, 119:1, 121:21
**friend** [1] - 1:5
**friendly** [1] - 30:14
**front** [4] - 38:7, 65:4, 100:22, 110:21
**FSAT** [1] - 41:6
**Ft** [1] - 1:19
**FTP** [1] - 72:11
**full** [1] - 79:24
**function** [3] - 9:2, 19:10, 50:17

**fundamentally** [1] - 130:2
**future** [6] - 30:7, 30:20, 31:15, 33:10, 33:11, 135:17

## G

**GARRISON** [1] - 1:22
**gather** [2] - 39:2, 101:6
**gathered** [1] - 108:1
**gathering** [5] - 39:11, 100:24, 101:5, 105:25, 108:9
**Gebser** [1] - 115:20
**general** [2] - 25:3, 41:24
**generally** [1] - 85:14
**generated** [5] - 51:2, 97:7, 97:9, 97:10, 122:4, 122:5
**generating** [1] - 97:15
**genuinely** [1] - 130:15
**girl** [1] - 116:17
**given** [21] - 23:21, 36:24, 41:6, 46:10, 80:11, 80:13, 82:14, 82:25, 89:9, 91:11, 93:18, 93:19, 103:7, 104:10, 104:20, 105:9, 106:1, 113:25, 128:17, 129:21
**glad** [1] - 6:13
**Google** [12] - 30:9, 30:15, 31:23, 31:24, 32:8, 32:21, 32:25, 33:23, 34:3, 34:5, 34:15
**govern** [1] - 22:16
**governed** [3] - 23:4, 108:11, 108:12
**governing** [7] - 24:17, 24:18, 24:23, 24:25, 25:9, 25:14, 42:5
**government** [1] - 24:21
**grab** [1] - 100:25
**grabbed** [1] - 110:23
**grade** [2] - 8:3, 95:21
**grader** [2] - 34:23, 36:14
**grant** [1] - 134:20
**Granted** [1] - 109:13
**great** [1] - 6:3
**grievance** [1] - 116:7

**GROUP** [1] - 1:15
**group** [2] - 7:13, 7:18
**groups** [1] - 7:17
**grow** [3] - 15:24, 46:24, 47:11
**guess** [13] - 81:21, 86:10, 91:16, 94:3, 98:12, 101:17, 103:5, 120:14, 131:25, 133:11, 133:20, 134:19, 135:8
**guidance** [3] - 8:9, 40:25, 126:10
**guy** [1] - 114:8
**guys** [6] - 43:25, 44:2, 44:22, 45:2, 45:10, 122:19

## H

**H-A-S-B-U-N** [2] - 5:21, 67:5
**HABIB** [2] - 3:9, 67:5
**Habib** [7] - 5:20, 13:19, 13:21, 17:13, 43:23, 67:1, 67:4
**half** [1] - 14:19
**halfway** [1] - 14:19
**hand** [3] - 48:23, 54:6, 121:22
**handbook** [14] - 22:11, 22:12, 22:16, 23:2, 40:10, 41:2, 41:17, 83:5, 106:11, 109:17, 110:2, 110:4, 131:21
**Handbook** [1] - 39:19
**handbooks** [9] - 14:22, 14:23, 15:16, 15:17, 24:8, 40:10
**handed** [1] - 15:4
**handle** [3] - 44:1, 67:19, 90:25
**handled** [4] - 35:23, 96:4, 96:21, 126:14
**handles** [1] - 6:1
**handling** [5] - 15:2, 54:24, 91:9, 96:19, 111:22
**happy** [1] - 80:9
**harassment** [4] - 26:21, 27:5, 85:13, 116:17
**hard** [15] - 31:10, 33:4, 54:25, 55:1, 60:25, 65:21, 65:22, 68:18, 68:24, 75:18, 78:4, 78:16, 121:4, 121:22, 122:3

**harm** [3] - 118:20, 118:23, 123:6
**Hasbun** [10] - 5:20, 5:24, 66:25, 67:1, 67:4, 73:17, 82:23, 104:16, 113:3, 113:8
**HASBUN** [2] - 3:9, 5:23
**Hasbun's** [3] - 98:16, 103:11, 104:22
**hastily** [1] - 98:3, 98:9
**head** [1] - 35:25, 100:10, 101:14
**health** [2] - 25:11, 41:5
**hear** [2] - 111:15, 132:2
**heard** [8] - 17:7, 71:3, 72:13, 82:9, 82:15, 82:23, 99:15, 117:6
**hearing** [10] - 4:17, 62:3, 81:8, 81:21, 90:2, 91:11, 96:20, 127:12, 130:25, 134:11
**HEARING** [1] - 1:11
**hearings** [1] - 93:19
**hearsay** [1] - 81:15
**heart's** [1] - 63:9
**held** [1] - 34:18
**help** [5] - 39:2, 68:10, 74:4, 74:14, 135:2
**helped** [4] - 38:22, 74:12, 100:24, 101:6
**helpful** [4] - 58:12, 61:5, 91:17, 91:24
**helps** [1] - 95:3
**hereby** [1] - 137:3
**hide** [1] - 80:21
**high** [2] - 7:20, 7:23
**highlight** [4] - 87:20, 89:18, 92:20, 100:12
**highly** [2] - 36:23, 122:10
**himself** [1] - 117:21
**hindsight** [2] - 106:1, 115:14
**hired** [1] - 16:7
**hold** [2] - 37:7, 135:15
**home** [2] - 12:18, 116:20
**honestly** [2] - 36:11, 48:3
**Honor** [82] - 4:10, 4:12, 4:22, 5:16, 6:23, 17:14, 17:18, 21:7,

21:18, 35:20, 36:20, 36:23, 37:8, 48:14, 48:17, 48:21, 49:20, 55:12, 56:3, 65:9, 65:11, 66:21, 66:25, 67:7, 69:8, 73:1, 79:18, 80:20, 81:7, 81:12, 81:17, 81:24, 82:4, 82:11, 83:7, 83:16, 84:13, 84:15, 84:23, 85:5, 85:8, 85:11, 85:16, 85:19, 85:22, 86:8, 87:11, 87:19, 88:1, 88:9, 88:13, 88:16, 88:19, 90:13, 92:1, 93:24, 96:7, 97:5, 98:12, 100:11, 101:14, 103:19, 105:20, 105:21, 107:8, 111:14, 113:15, 113:18, 114:1, 114:13, 115:14, 115:16, 115:18, 118:3, 123:17, 123:20, 129:16, 130:20, 133:7, 133:13, 134:7, 134:24
**Honor's** [1] - 5:3
**HONORABLE** [1] - 1:11
**hour** [2] - 60:16, 60:18
**hours** [6] - 52:2, 54:2, 68:25, 72:21, 97:8, 97:16
**house** [2] - 10:5, 117:6
**housekeeping** [1] - 4:19
**HR** [1] - 27:21
**huge** [1] - 15:12
**hullaballoo** [1] - 94:23
**hundred** [2] - 19:19, 129:18
**hurts** [1] - 95:4
**husband** [1] - 29:18
**hyper** [1] - 119:10
**hypothetically** [1] - 62:20

## I

**ID** [1] - 3:12
**idea** [3] - 62:19, 68:3, 112:3
**identification** [6] - 21:8, 26:11, 26:12, 53:14, 53:15, 74:9

**identified** [6] - 29:11, 65:15, 66:2, 66:9, 66:15, 93:22
**identify** [1] - 84:15
**ignore** [2] - 83:2, 89:20
**ignored** [1] - 80:2, 80:4, 90:5
**image** [3] - 50:13, 54:4, 99:23
**images** [19] - 44:15, 50:15, 51:17, 52:25, 53:5, 53:17, 54:13, 61:17, 66:2, 66:16, 74:10, 77:15, 77:16, 77:19, 90:4, 99:7, 104:10, 104:14, 105:8
**imagine** [2] - 47:23, 98:2
**imaging** [4] - 60:25, 65:21, 65:22, 65:25
**immediately** [2] - 112:4, 118:16
**impact** [4] - 66:8, 76:8, 104:5, 130:18
**impacted** [1] - 126:13
**impacts** [2] - 115:16, 128:22
**impeachment** [1] - 18:23
**important** [7] - 70:14, 94:19, 99:6, 106:4, 124:3, 124:21, 125:7
**importantly** [3] - 99:6, 100:23, 124:10
**imposes** [1] - 9:3
**improper** [1] - 18:23
**improve** [7] - 15:14, 15:15, 16:1, 16:4, 25:7, 47:11, 47:15
**improved** [2] - 15:24, 16:2
**inaccurate** [2] - 26:23, 118:10
**inappropriate** [2] - 119:5, 134:3
**INC** [1] - 1:8
**Inc** [3] - 4:13, 7:19, 8:22
**incidences** [1] - 124:20
**incident** [7] - 9:15, 11:25, 12:9, 19:17, 83:14, 95:20, 122:19
**incidents** [1] - 85:25
**included** [13] - 4:24, 40:8, 44:15, 56:14, 70:11, 83:5, 85:4,

95:5, 99:3, 102:25, 105:2, 106:10, 133:20
**includes** [1] - 126:10
**including** [13] - 14:22, 25:13, 29:2, 40:11, 46:1, 56:18, 57:25, 75:4, 84:17, 84:24, 85:24, 128:1
**inconsistencies** [2] - 119:7, 119:10
**inconsistent** [1] - 90:16
**Incorporated** [1] - 4:4
**incorrect** [3] - 28:6, 75:20, 110:9
**independent** [1] - 67:19
**independently** [1] - 79:6
**indicate** [2] - 66:1, 98:9
**indicators** [1] - 74:21
**indifference** [5] - 90:22, 115:23, 116:6, 116:12, 116:16
**individual** [2] - 16:15, 32:16
**individuals** [5] - 28:22, 29:3, 29:10, 127:20, 129:20
**info** [1] - 50:16
**informally** [1] - 80:24
**information** [15] - 19:9, 19:25, 35:25, 38:14, 39:16, 43:23, 55:23, 61:13, 70:8, 103:2, 109:7, 109:17, 111:25, 118:23, 121:14
**informed** [1] - 5:1
**initial** [9] - 10:19, 87:21, 94:22, 105:24, 120:16, 120:22, 120:23, 121:1, 125:13
**initiate** [2] - 117:21, 125:11
**initiated** [1] - 127:12
**inspect** [2] - 17:2, 99:19
**installed** [1] - 70:13
**instance** [1] - 57:18
**instead** [3] - 44:24, 72:9, 118:24
**instruct** [1] - 57:3
**instructed** [1] - 57:24
**instruction** [1] - 95:7
**instructional** [1] - 7:11

**intelligence** [1] - 67:14
**intend** [2] - 5:6, 6:3
**intentional** [2] - 122:21
**interaction** [4] - 8:18, 12:12, 12:13, 12:15
**interesting** [1] - 51:21
**International** [1] - 107:15
**interrogatories** [7] - 26:5, 86:3, 102:2, 107:16, 107:25, 114:11, 114:18
**interrogatory** [14] - 25:21, 25:25, 26:6, 83:11, 85:18, 102:16, 103:1, 105:1, 107:22, 108:7, 114:25, 118:1, 118:10, 120:7
**interviewed** [1] - 126:10
**introduce** [4] - 4:21, 7:2, 66:24, 67:11
**introduced** [1] - 87:7
**introduction** [1] - 95:9
**investigation** [16] - 34:24, 35:5, 35:12, 36:19, 51:5, 84:17, 84:25, 91:9, 92:25, 95:18, 96:4, 116:23, 117:4, 117:13, 117:21, 125:12
**investigations** [10] - 34:18, 34:20, 35:8, 35:22, 36:16, 46:12, 85:24, 95:15, 95:19, 105:2
**investigator** [1] - 49:17
**invoke** [2] - 57:15, 57:17
**invoking** [2] - 55:21, 56:1
**involved** [4] - 12:10, 95:23, 101:23, 111:21
**involvement** [1] - 23:8
**involving** [1] - 95:21
**issue** [19] - 8:3, 13:24, 37:3, 37:7, 48:12, 68:1, 81:3, 86:10, 112:5, 120:14, 121:16, 124:23, 125:24, 126:3, 126:8, 127:23, 128:8
**issues** [10] - 10:17,

16:5, 43:14, 72:16, 86:14, 94:15, 95:14, 101:24, 125:18, 125:23

**IT** [5] - 5:20, 6:1, 44:1, 67:19

**items** [7] - 4:25, 14:25, 44:15, 46:14, 46:15, 86:2, 104:25

**itself** [10] - 8:14, 28:13, 32:19, 69:3, 77:20, 95:16, 99:19, 99:20, 116:7, 127:22

**IX** [113] - 9:25, 10:10, 10:20, 11:8, 11:21, 16:3, 16:8, 18:15, 18:17, 19:2, 20:6, 20:14, 22:7, 22:23, 23:1, 23:7, 25:13, 25:17, 25:19, 26:20, 27:5, 27:17, 29:21, 30:2, 30:8, 32:25, 33:11, 34:18, 34:20, 35:2, 35:5, 35:7, 35:12, 35:22, 36:3, 36:16, 36:19, 38:16, 39:5, 39:19, 40:11, 40:21, 41:20, 42:3, 42:6, 43:15, 43:19, 45:23, 47:5, 47:6, 47:7, 47:8, 47:10, 47:17, 47:18, 47:19, 47:20, 47:22, 47:24, 48:5, 51:24, 53:23, 62:17, 63:3, 69:19, 75:15, 78:19, 79:3, 83:1, 83:14, 83:19, 83:20, 84:16, 84:24, 85:13, 86:18, 86:21, 86:24, 88:11, 89:15, 89:24, 90:23, 91:10, 92:9, 92:14, 92:17, 93:11, 95:18, 96:3, 96:16, 98:17, 98:22, 99:10, 103:24, 106:10, 106:25, 109:16, 109:18, 109:19, 110:4, 110:18, 113:19, 116:8, 116:16, 117:4, 117:12, 122:8, 124:3, 124:14, 125:10, 126:13

**J**

**James** [2] - 49:2, 49:11

**JAMES** [2] - 3:7, 49:2

**Jane** [5] - 4:3, 7:25, 9:21, 26:3, 38:21

**JANE** [1] - 1:4

**January** [2] - 9:16, 27:4

**Jeff** [1] - 98:1

**Jefferson** [1] - 98:2

**Jim** [4] - 5:9, 5:13, 48:22, 48:24

**job** [2] - 14:20, 15:13

**Johnny** [2] - 117:4, 123:25

**Johnny's** [1] - 117:5

**joined** [4] - 14:18, 27:14, 27:18, 28:17

**judge** [2] - 7:3, 122:15

**JUDGE** [1] - 1:12

**Judge** [1] - 67:12

**judgment** [2] - 82:12, 135:10

**judicial** [1] - 118:7

**JULIE** [1] - 1:18

**Julie** [3] - 4:12, 11:14, 12:20

**July** [1] - 100:11

**jumping** [1] - 83:8

**June** [5] - 51:21, 79:21, 80:1, 100:6, 100:7

**juror** [1] - 122:12

**jury** [1] - 95:6

**K**

**K-8** [2] - 7:22, 8:1

**KARRON** [44] - 1:18, 4:12, 80:19, 81:24, 88:2, 105:21, 106:6, 106:9, 106:14, 106:18, 107:8, 107:12, 107:24, 108:6, 108:9, 108:12, 108:23, 108:25, 109:11, 109:15, 109:22, 110:3, 110:6, 110:18, 110:20, 110:23, 111:14, 111:20, 112:11, 112:15, 112:20, 113:3, 113:21, 114:4, 114:9, 114:12, 114:17, 114:20, 115:4, 115:9, 115:13, 115:20, 116:2, 117:9

**Karron** [6] - 4:12, 62:22, 79:21, 88:3, 89:6, 125:6

**Karron's** [1] - 80:1

**keep** [6] - 10:4, 22:18, 44:12, 58:1, 82:11, 123:21

**keeping** [1] - 93:12

**KELLEY** [1] - 1:18

**Kendall** [1] - 8:2

**kept** [2] - 68:23, 98:18

**Key** [1] - 1:15

**key** [1] - 78:9

**keys** [1] - 70:23

**kick** [1] - 76:2

**kicked** [1] - 117:19

**kid** [1] - 125:21

**kids** [1] - 125:20

**kind** [9] - 12:16, 14:21, 15:13, 45:13, 90:5, 132:8, 133:3, 135:8

**kindergarten** [2] - 8:5, 40:17

**kinds** [1] - 123:25

**know..** [1] - 27:2

**knowing** [1] - 96:21

**knowledge** [13] - 10:25, 71:11, 71:23, 72:1, 77:6, 108:19, 108:21, 114:11, 114:21, 114:22, 114:25, 115:3, 115:11

**knowledgeable** [1] - 86:10

**known** [2] - 115:9, 133:22

**knows** [1] - 111:5

**KRONENBERG** [1] - 1:18

**Kyle** [3] - 4:8, 112:2, 112:6

**KYLE** [1] - 1:14

**L**

**lack** [1] - 103:2

**Lago** [3] - 115:20, 115:21, 116:4

**language** [3] - 89:3, 107:20, 126:6

**laptop** [2] - 68:21, 68:22

**last** [13] - 16:24, 17:20, 25:7, 54:1, 54:19, 54:22, 58:1, 63:14, 67:5, 70:5, 72:20, 83:12, 88:14

**late** [5] - 96:13, 104:11, 127:24, 129:22, 130:15

**latest** [1] - 78:12

**Lauderdale** [1] - 1:19

**LAW** [1] - 1:15

**law** [12] - 19:17, 73:25, 79:23, 94:14,

107:2, 107:9, 115:17, 121:25, 122:15, 126:16, 126:23, 128:14

**laws** [1] - 18:14

**lawsuit** [2] - 7:24, 120:22

**lawyer** [3] - 10:24, 57:8, 121:16

**lawyering** [1] - 135:20

**lay** [1] - 71:9

**leadership** [2] - 7:9, 8:9

**learn** [2] - 46:25, 47:4

**learned** [3] - 16:9, 17:3, 111:12

**learning** [1] - 44:19

**least** [6] - 59:20, 73:19, 95:8, 103:1, 104:3, 118:19

**leave** [2] - 28:10, 125:17

**leaving** [2] - 79:23, 89:4

**led** [1] - 45:7

**LEE** [2] - 3:7, 49:3

**Lee** [2] - 49:2, 49:11

**left** [2] - 54:6, 73:8

**left-hand** [1] - 54:6

**legal** [1] - 26:6

**legitimate** [2] - 89:1, 94:4, 128:16

**less** [4] - 31:24, 32:25, 33:12, 93:25

**level** [6] - 76:15, 76:17, 119:11, 121:10, 121:20, 135:9

**licked** [1] - 116:21

**lie** [1] - 47:13

**life** [1] - 67:17

**limit** [2] - 134:1, 135:14

**limited** [4] - 84:17, 84:24, 99:22, 121:6

**line** [13] - 21:5, 21:20, 31:1, 35:15, 44:5, 44:14, 45:25, 54:5, 59:5, 76:9, 99:14, 103:6, 121:2

**lines** [1] - 98:8

**lingers** [1] - 130:13

**link** [2] - 31:12, 32:20

**listed** [2] - 86:18, 86:20

**literally** [2] - 12:16, 34:22

**litigant** [1] - 128:15

**litigate** [1] - 128:23

**litigating** [1] - 118:7

**litigation** [11] - 12:3, 12:10, 14:13, 17:21, 29:16, 42:15, 44:17, 118:18, 122:12, 123:7, 128:22

**lived** [2] - 116:24, 116:25

**living** [2] - 67:12, 67:18

**located** [1] - 40:11

**location** [3] - 38:22, 60:12, 72:4

**locations** [1] - 42:7

**look** [26] - 30:13, 38:4, 44:4, 46:19, 47:2, 50:5, 60:23, 65:23, 71:7, 72:3, 72:5, 72:19, 76:21, 76:24, 77:25, 78:5, 78:18, 80:2, 80:22, 93:10, 97:6, 98:17, 103:11, 104:13, 112:23, 131:3

**looked** [9] - 51:17, 51:18, 52:5, 65:15, 79:10, 87:5, 100:14, 104:17, 111:5

**looking** [1] - 28:2, 50:18, 68:14, 68:18, 69:5, 72:9, 77:22, 78:1, 98:24, 103:24, 131:14

**lose** [1] - 59:10

**losing** [3] - 70:8, 70:18, 79:4

**low** [1] - 121:10

**low-level** [1] - 121:10

**luck** [1] - 125:20

**lying** [1] - 47:12

**M**

**ma'am** [1] - 6:18

**MacDonald** [16] - 3:5, 3:7, 3:10, 4:8, 6:4, 6:6, 55:20, 57:2, 58:7, 58:14, 61:6, 62:3, 62:23, 80:20, 81:23, 111:4

**MACDONALD** [158] - 1:14, 4:8, 4:22, 5:8, 5:13, 17:17, 18:4, 18:25, 20:4, 20:19, 21:10, 21:16, 21:19, 22:5, 24:20, 26:10, 26:13, 27:9, 28:14, 29:14, 34:16, 35:20, 35:21, 36:23, 37:4, 37:8, 37:9, 46:8, 46:9,

48:13, 48:21, 49:6, 49:24, 52:19, 52:24, 53:13, 53:16, 55:8, 56:3, 56:7, 57:3, 57:10, 57:19, 65:11, 65:13, 66:18, 66:21, 71:9, 71:21, 73:14, 73:16, 77:5, 79:2, 79:5, 79:13, 80:9, 81:12, 81:17, 82:4, 82:10, 83:16, 83:18, 83:24, 84:2, 84:7, 84:12, 84:22, 85:5, 85:8, 85:10, 85:19, 85:22, 86:8, 86:11, 86:16, 86:20, 87:1, 87:4, 87:7, 87:11, 87:14, 87:19, 88:1, 88:3, 88:9, 88:13, 88:16, 88:19, 88:21, 90:13, 90:20, 91:25, 92:7, 92:11, 92:15, 92:23, 93:1, 93:6, 93:10, 93:15, 93:24, 94:7, 94:11, 94:17, 95:1, 95:5, 96:2, 96:7, 96:18, 97:5, 97:9, 97:18, 97:21, 98:12, 98:20, 99:21, 100:1, 100:4, 100:8, 100:10, 100:17, 100:19, 101:4, 101:10, 101:13, 101:19, 101:22, 102:7, 102:17, 102:23, 103:4, 103:13, 103:15, 103:18, 104:2, 105:20, 113:15, 113:18, 123:20, 124:14, 125:3, 125:15, 126:7, 126:24, 127:6, 128:7, 129:16, 130:7, 132:10, 132:18, 133:7, 133:13, 133:24, 134:7, 134:22, 134:24, 135:8, 135:16

**Magdiel** [2] - 68:5, 68:13

**magnitude** [1] - 16:9

**mail** [12] - 30:11, 30:22, 32:4, 32:16, 32:20, 32:21, 43:11, 59:21, 59:24, 66:11, 70:11, 80:1

**mailing** [1] - 54:24

**mails** [1] - 72:10

**main** [2] - 96:23, 122:1

**maintained** [2] - 10:7, 20:15

**major** [2] - 67:14, 108:13

**management** [3] - 12:2, 15:5, 93:17

**mandate** [1] - 41:22

**mandatory** [2] - 19:14, 19:17

**manipulated** [1] - 79:10

**manipulation** [1] - 104:3

**manual** [4] - 80:25, 83:19, 113:19, 115:9

**manuals** [2] - 14:22, 16:16

**Marjorie** [1] - 16:6

**Marjory** [1] - 15:18

**marked** [5] - 21:8, 26:10, 26:12, 53:15, 74:8

**master's** [1] - 7:8

**masters** [1] - 67:15

**match** [9] - 44:16, 45:25, 47:3, 53:5, 82:24, 90:4, 99:12, 104:19, 110:15

**matched** [1] - 50:9

**material** [4] - 109:9, 124:10, 126:12, 128:22

**matter** [7] - 33:14, 59:21, 61:19, 107:3, 107:4, 131:3, 137:5

**matters** [1] - 27:24

**maximize** [1] - 6:9

**mean** [17] - 16:2, 25:6, 34:9, 45:9, 60:8, 68:3, 70:4, 72:22, 73:7, 75:16, 92:11, 105:17, 107:12, 108:11, 115:4, 128:10, 130:7

**means** [3] - 14:10, 47:5, 53:11

**measure** [1] - 105:18

**measures** [2] - 125:19, 127:12

**mechanism** [2] - 125:25, 126:5

**meet** [3] - 68:5, 68:8, 111:18

**meeting** [8] - 25:9, 25:14, 41:18, 42:5, 55:17, 89:23, 91:7, 111:20

**meetings** [2] - 24:24, 109:1

**memory** [1] - 97:22

**mental** [2] - 25:11, 41:5

**mention** [4] - 83:4, 87:21, 89:24, 106:19

**mentioned** [5] - 30:6, 42:19, 44:20, 86:3, 135:10

**mentioning** [1] - 89:19

**mentor** [1] - 7:12

**merge** [3] - 45:14, 64:7, 64:17

**merged** [6] - 44:22, 45:1, 45:20, 46:1, 112:7, 113:4

**merging** [3] - 63:22, 63:23, 63:25

**merits** [4] - 118:6, 123:23, 124:23, 125:18

**met** [5] - 12:20, 68:12, 91:7, 105:21

**metadata** [33] - 13:15, 13:16, 47:2, 50:5, 50:10, 50:17, 51:13, 52:16, 52:17, 52:21, 54:16, 58:21, 59:1, 59:4, 59:11, 60:5, 60:7, 60:10, 69:3, 69:12, 69:24, 70:25, 72:11, 72:12, 74:1, 76:24, 77:20, 77:25, 112:17, 112:19, 113:2

**method** [1] - 124:24

**meticulously** [1] - 129:19

**MIAMI** [1] - 1:2

**Miami** [73] - 1:4, 1:16, 2:3, 2:4, 8:17, 8:20, 8:25, 9:2, 9:3, 9:12, 17:4, 19:3, 19:6, 19:8, 19:11, 19:13, 19:24, 20:1, 20:2, 20:7, 20:8, 20:10, 20:18, 21:23, 22:8, 22:14, 22:20, 23:5, 23:21, 37:23, 38:12, 39:22, 40:6, 67:21, 83:19, 91:3, 92:9, 92:14, 92:15, 93:11, 93:25, 94:1, 94:9, 106:3, 106:20, 106:22, 106:23, 107:13, 107:18, 108:12, 108:14, 108:16, 108:17, 109:22, 109:23, 110:1, 110:3, 110:13, 110:25, 111:24, 113:13, 113:16, 113:19, 117:25, 118:11, 126:22, 127:7, 127:8, 127:22, 137:11, 137:11

**Miami-Dade** [66] - 8:17, 8:20, 8:25, 9:2, 9:3, 9:12, 17:4, 19:3, 19:6, 19:8, 19:11, 19:13, 19:24, 20:1, 20:2, 20:7, 20:8, 20:10, 20:18, 21:23, 22:8, 22:14, 22:20, 23:5, 23:21, 37:23, 38:12, 39:22, 40:6, 67:21, 83:19, 91:3, 92:9, 92:14, 92:15, 93:11, 93:25, 94:1, 94:9, 106:3, 106:20, 106:22, 106:23, 107:13, 107:18, 108:14, 108:16, 108:17, 109:22, 109:23, 110:1, 110:3, 110:13, 110:25, 111:24, 113:13, 113:16, 113:19, 117:25, 118:11, 126:22, 127:7, 127:8, 127:22

**Microsoft** [10] - 50:13, 60:1, 66:12, 70:11, 70:16, 75:4, 75:22, 75:25, 76:1

**might** [7] - 35:9, 35:10, 70:4, 74:17, 77:7, 122:12, 123:24

**Milano** [1] - 56:20

**mind** [2] - 104:21, 117:3

**minimal** [1] - 93:16

**minor** [9] - 1:4, 27:18, 27:22, 28:3, 28:7, 28:8, 34:21, 110:10, 110:14

**minutes** [8] - 25:14, 42:5, 70:18, 70:24, 73:4, 76:4, 77:18, 89:23

**Mir** [26] - 11:14, 12:4, 24:4, 24:5, 24:7, 27:20, 28:16, 28:23, 29:15, 29:18, 29:19, 30:12, 30:23, 32:5, 32:18, 86:11, 86:16, 102:13, 106:6, 111:5, 115:4, 115:9

**mirrors** [1] - 117:12

**mischaracterize** [1] - 100:20

**misconduct** [1] - 105:17

**misrepresentation** [1] - 119:1

**miss** [1] - 122:20

**missed** [3] - 120:12, 122:20

**missing** [2] - 57:14, 121:3

**misspeak** [1] - 92:17

**misstate** [2] - 100:21, 101:15

**mistake** [8] - 10:19, 102:11, 107:17, 118:9, 118:17, 118:20, 118:25, 119:6

**modification** [2] - 63:23, 70:20

**modifications** [2] - 52:2, 76:5

**modified** [30] - 13:25, 52:1, 52:14, 54:18, 54:21, 55:2, 59:6, 61:19, 63:13, 63:14, 63:18, 64:4, 66:7, 70:3, 70:6, 70:20, 70:24, 71:2, 71:7, 71:18, 72:6, 72:13, 72:24, 73:7, 73:11, 74:17, 74:20, 74:25, 75:3, 76:6

**modifier** [1] - 52:2

**modify** [8] - 54:16, 54:17, 54:18, 60:6, 66:5, 75:7, 75:9, 75:10

**modules** [1] - 23:20

**molehill** [1] - 110:11

**molested** [2] - 124:2, 124:16

**mom** [3] - 15:25, 108:3, 117:5

**mom-and-pop** [2] - 15:25, 108:3

**moment** [9] - 17:19, 28:15, 32:15, 45:6, 45:11, 47:16, 53:17, 65:16, 92:19

**moments** [2] - 65:18, 74:4

**monthly** [1] - 75:25

**months** [2] - 34:24, 90:7

**most** [12] - 4:24, 65:22, 78:13, 86:10, 114:10, 114:20, 114:22, 114:24, 115:2, 119:3, 121:6, 124:13

**mother** [2] - 1:4,

125:1
**Mother** [1] - 1:5
**motion** [15] - 4:15, 4:20, 4:21, 4:24, 5:18, 80:5, 95:10, 97:2, 100:9, 118:24, 119:2, 121:19, 123:9, 133:6, 133:11
**MOTION** [1] - 1:11
**motions** [1] - 119:3
**mountain** [1] - 110:11
**move** [3] - 37:8, 46:8, 59:3
**moved** [2] - 7:22, 72:15
**moving** [4] - 23:16, 25:6, 41:25, 63:12
**MR** [219] - 4:8, 4:10, 4:22, 5:8, 5:13, 5:16, 5:23, 5:25, 6:3, 6:6, 6:13, 6:23, 7:1, 11:19, 13:4, 16:11, 17:14, 17:17, 17:23, 18:4, 18:23, 18:25, 20:4, 20:19, 21:10, 21:16, 21:19, 22:5, 24:20, 26:10, 26:13, 27:9, 28:14, 29:14, 34:16, 35:19, 35:20, 35:21, 36:20, 36:23, 37:4, 37:8, 37:9, 46:5, 46:8, 46:9, 48:6, 48:13, 48:17, 48:21, 49:6, 49:20, 49:24, 52:19, 52:24, 53:13, 53:16, 55:8, 55:11, 55:14, 56:3, 56:7, 57:3, 57:10, 57:19, 57:22, 58:3, 58:10, 60:9, 60:14, 65:9, 65:11, 65:13, 66:18, 66:21, 66:25, 67:7, 67:10, 71:9, 71:13, 71:16, 71:21, 71:25, 72:7, 72:25, 73:14, 73:16, 77:5, 79:2, 79:5, 79:13, 79:15, 79:18, 80:9, 81:5, 81:12, 81:14, 81:17, 81:18, 81:23, 82:4, 82:10, 83:16, 83:18, 83:24, 83:25, 84:2, 84:7, 84:12, 84:22, 85:5, 85:8, 85:10, 85:19, 85:22, 86:8, 86:11, 86:16, 86:20, 87:1, 87:4, 87:7, 87:11, 87:14, 87:19, 88:1, 88:3, 88:9, 88:13,

88:16, 88:19, 88:21, 90:13, 90:20, 91:25, 92:7, 92:11, 92:15, 92:23, 93:1, 93:6, 93:10, 93:15, 93:24, 94:7, 94:11, 94:17, 95:1, 95:5, 96:2, 96:7, 96:18, 97:5, 97:9, 97:18, 97:21, 98:12, 98:20, 99:21, 100:1, 100:4, 100:6, 100:8, 100:10, 100:17, 100:19, 101:4, 101:10, 101:13, 101:19, 101:22, 102:7, 102:17, 102:23, 103:4, 103:13, 103:15, 103:18, 104:2, 105:20, 113:15, 113:18, 118:3, 119:10, 119:19, 119:24, 120:9, 120:20, 120:24, 121:5, 121:11, 121:14, 122:11, 122:16, 123:20, 124:14, 125:3, 125:15, 126:7, 126:24, 127:6, 128:7, 129:16, 130:7, 130:20, 130:23, 131:12, 131:15, 131:21, 132:10, 132:18, 133:7, 133:13, 133:24, 134:7, 134:22, 134:24, 135:8, 135:16
**MS** [43] - 4:12, 80:19, 81:24, 88:22, 105:21, 106:6, 106:9, 106:14, 106:18, 107:8, 107:12, 107:24, 108:6, 108:9, 108:12, 108:23, 108:25, 109:11, 109:15, 109:22, 110:3, 110:6, 110:18, 110:20, 110:23, 111:14, 111:20, 112:11, 112:15, 112:20, 113:3, 113:21, 114:4, 114:9, 114:12, 114:17, 114:20, 115:4, 115:9, 115:13, 115:20, 116:2, 117:9
**MULCAHY** [1] - 1:22
**multiple** [9] - 68:19, 68:24, 78:21, 78:25, 95:19, 103:25, 120:15, 121:23,

134:10

## N

**name** [15] - 5:11, 6:19, 28:21, 49:1, 49:2, 49:9, 54:18, 63:16, 67:3, 67:4, 67:5, 91:18, 98:22, 110:17
**names** [4] - 28:9, 41:25, 78:9, 108:13
**Nancy** [1] - 5:23
**narrow** [1] - 135:12
**nature** [4] - 62:9, 78:9, 90:15, 97:14
**necessarily** [7] - 72:21, 96:2, 104:15, 121:15, 134:2, 135:19, 135:20
**necessary** [1] - 80:12
**need** [29] - 4:17, 13:22, 21:11, 29:7, 41:1, 41:22, 41:23, 42:25, 77:19, 80:18, 80:22, 83:9, 84:20, 90:10, 96:1, 96:16, 101:18, 111:1, 113:11, 114:15, 116:1, 127:1, 130:4, 132:1, 132:2, 132:8, 133:3, 134:5, 134:12
**needed** [8] - 28:3, 34:10, 43:24, 68:5, 68:9, 77:21, 120:19, 135:22
**needing** [1] - 120:18
**needs** [1] - 24:16
**negligence** [4] - 19:19, 91:6, 92:4, 127:18
**network** [1] - 67:15
**never** [23] - 29:23, 32:10, 40:1, 40:4, 41:11, 42:14, 47:5, 47:10, 59:14, 61:21, 78:20, 87:22, 89:13, 89:15, 95:17, 95:23, 102:10, 104:21, 107:1, 109:12, 111:23, 111:25, 117:3
**nevertheless** [1] - 111:16
**new** [16] - 8:15, 25:8, 46:25, 54:21, 55:1, 59:8, 60:12, 64:1, 64:3, 64:4, 64:5, 64:11, 64:13, 64:19, 70:24, 129:7

**newer** [1] - 51:14
**next** [4] - 1:4, 20:3, 31:12, 81:25
**Ninth** [1] - 116:9
**NO** [1] - 1:2
**nobody** [6] - 10:23, 17:8, 29:25, 42:16, 42:21, 43:5
**non** [4] - 40:7, 40:11, 46:23, 70:25
**non-discrimination** [2] - 40:7, 40:11
**non-student** [1] - 46:23
**none** [13] - 27:2, 27:7, 28:6, 33:15, 41:6, 51:19, 60:10, 78:16, 80:25, 83:11, 93:20, 106:9, 118:21
**normally** [1] - 61:23
**North** [2] - 2:3, 137:11
**note** [1] - 55:18
**notes** [3] - 41:18, 42:5, 56:18
**Nothing** [1] - 113:12
**nothing** [11] - 34:22, 36:22, 47:13, 59:3, 80:21, 86:1, 95:24, 108:13, 112:24, 113:11, 126:18
**notice** [9] - 93:18, 96:19, 115:23, 116:6, 125:3, 126:2, 126:3, 126:5, 126:8
**notification** [2] - 33:18, 91:10
**notified** [2] - 125:6, 125:8
**November** [3] - 84:9, 84:11, 94:22
**nowhere** [1] - 34:3
**number** [14] - 4:4, 26:9, 26:19, 35:24, 36:5, 51:11, 53:24, 83:24, 83:25, 84:2, 84:14, 84:15, 85:11, 131:25
**Number** [3] - 85:10, 89:8, 124:12
**numbers** [2] - 51:3, 51:4
**nut** [1] - 134:16

## O

**O-301** [1] - 1:16
**oath** [9] - 14:13, 20:24, 36:25, 105:16, 128:17, 129:1, 129:2,

129:5, 129:6
**object** [7] - 5:1, 5:3, 36:20, 49:22, 71:21, 80:10, 107:12
**objection** [10] - 18:23, 46:5, 48:6, 56:3, 57:3, 71:9, 81:14, 81:19, 95:12, 107:10
**obligated** [1] - 121:17
**obligation** [2] - 9:4, 9:16
**observations** [1] - 50:24
**observed** [1] - 51:13
**obviously** [15] - 10:16, 16:10, 38:11, 53:9, 94:13, 94:20, 96:9, 96:23, 106:16, 111:15, 115:1, 117:13, 125:22, 130:18, 134:12
**occasions** [2] - 80:21, 120:15
**occurred** [2] - 95:16, 95:19
**occurs** [1] - 128:15
**October** [1] - 137:9
**OF** [1] - 1:1
**offense** [1] - 121:18
**offensive** [1] - 119:3
**offer** [4] - 17:1, 99:19, 99:25, 102:11
**offered** [4] - 61:25, 80:1, 80:4, 80:23
**Office** [6] - 23:22, 70:16, 75:4, 75:25, 76:1, 127:8
**office** [7] - 17:8, 38:10, 62:21, 68:6, 111:4, 122:18, 135:24
**Officer** [2] - 7:5, 86:12
**OFFICER** [1] - 136:4
**officer** [6] - 7:13, 18:7, 18:13, 27:16, 34:19, 36:18
**officers** [3] - 19:12, 102:6, 121:25
**Offices** [1] - 23:17
**Official** [1] - 137:10
**official** [2] - 2:2, 117:24
**officials** [1] - 116:19
**often** [1] - 128:22
**old** [3] - 67:16, 117:7, 117:9
**Olivia** [7] - 5:8, 6:17, 6:20, 7:5, 52:3, 68:12,

68:13
**OLIVIA** [2] - 3:4, 6:20
**Olivia's** [1] - 77:3
**once** [4] - 16:24, 36:6, 51:8, 134:11
**One** [9] - 60:1, 60:3, 66:12, 70:12, 70:13, 74:24, 75:2, 75:19, 75:21
**one** [70] - 9:3, 14:20, 14:25, 16:18, 23:2, 23:20, 34:22, 36:11, 36:12, 37:10, 38:4, 38:10, 38:12, 38:20, 38:24, 39:14, 43:18, 44:20, 44:24, 45:5, 46:15, 53:19, 53:20, 56:11, 58:14, 58:20, 59:3, 64:8, 64:11, 64:24, 70:10, 70:13, 72:15, 73:6, 73:9, 75:2, 75:16, 79:23, 83:23, 88:17, 93:16, 94:20, 94:25, 102:4, 102:16, 102:21, 103:4, 107:23, 107:24, 107:25, 112:7, 113:13, 114:18, 114:20, 116:15, 119:3, 119:11, 121:6, 122:1, 124:12, 124:14, 130:20, 131:22, 132:1, 132:6, 132:7, 132:20, 135:21
**ones** [2] - 39:1, 78:17
**online** [16] - 30:8, 30:9, 30:13, 30:14, 30:15, 30:20, 31:19, 31:21, 31:24, 32:7, 39:15, 40:1, 40:24, 83:3, 89:22, 89:23
**online-accessible** [1] - 30:20
**open** [13] - 34:12, 50:13, 50:14, 70:17, 70:19, 70:21, 70:22, 76:3, 76:5, 77:19, 97:8, 112:22, 130:16
**opened** [11] - 7:22, 72:21, 76:23, 77:1, 77:11, 77:24, 78:12, 98:23, 99:4, 104:16
**opening** [2] - 17:6, 23:19
**operate** [2] - 8:19, 9:1
**operated** [1] - 88:21
**operating** [8] - 7:13,

18:7, 18:13, 27:16, 34:19, 36:18, 58:25, 110:7
**Operation** [1] - 7:5
**operations** [1] - 8:8
**opinion** [7] - 54:12, 54:15, 54:23, 62:2, 62:6, 62:7, 62:16
**opportunities** [1] - 41:9
**opportunity** [2] - 91:11, 116:24
**opposed** [2] - 107:6, 132:6
**opposition** [2] - 5:18, 81:6
**Order** [1] - 4:1
**order** [4] - 9:1, 41:1, 70:18, 134:11
**orders** [1] - 114:16
**ordinarily** [1] - 116:10
**organization** [3] - 19:24, 27:14, 28:18
**organize** [1] - 15:13
**origin** [1] - 51:24
**original** [14] - 13:14, 46:16, 47:3, 60:8, 60:10, 64:6, 68:15, 68:16, 69:1, 72:4, 75:16, 78:17, 84:10, 88:17
**originally** [1] - 68:4
**Osceola** [2] - 17:5, 17:6
**ostensibly** [1] - 94:5
**otherwise** [3] - 70:23, 99:16, 127:4
**outset** [2] - 118:1, 118:10
**outside** [4] - 5:20, 104:6, 104:25, 129:20
**overlapping** [1] - 37:5
**overruled** [3] - 18:24, 72:2, 81:19
**overseeing** [2] - 16:8, 18:14
**own** [11] - 19:11, 24:14, 49:13, 92:5, 94:6, 94:13, 94:18, 111:16, 116:13, 118:12, 124:18
**Oxygen** [1] - 49:19

# P

**p.m** [3] - 1:7, 136:6
**page** [11] - 21:5, 21:11, 30:25, 31:12,

35:15, 35:19, 35:20, 69:18, 71:1, 89:8, 110:10
**Pages** [1] - 1:8
**pages** [6] - 22:19, 53:9, 89:12, 112:11, 112:12, 129:18
**pants** [1] - 95:22
**paper** [7] - 33:6, 33:7, 62:17, 63:4, 119:22, 119:25, 120:2
**paperwork** [2] - 56:1, 86:1
**paragraph** [3] - 53:9, 76:9, 104:6
**parent** [5] - 27:25, 34:10, 40:9, 46:22, 117:15
**parent/student** [1] - 15:16
**parents** [2] - 40:25, 126:17
**parole** [1] - 41:19
**part** [12] - 29:11, 63:7, 81:7, 81:9, 81:20, 92:4, 94:15, 121:6, 124:23, 125:18, 130:23, 134:20
**participate** [2] - 12:23, 28:23
**particular** [17] - 8:7, 9:11, 15:1, 15:10, 25:3, 25:17, 29:18, 43:7, 62:11, 68:3, 68:14, 85:21, 93:3, 93:22, 97:7, 108:21, 126:5
**particularly** [2] - 8:9, 24:24
**party** [1] - 5:25
**past** [4] - 7:22, 13:5, 26:21, 27:6
**PATRICIA** [2] - 2:2, 137:9
**pattern** [1] - 17:24
**pay** [2] - 123:8, 123:12
**paying** [1] - 75:25
**PDF** [7] - 45:10, 53:1, 53:4, 64:11, 112:7, 112:13, 112:18
**PDFs** [4] - 50:12, 50:14, 56:14, 63:22
**penalties** [1] - 105:14
**people** [8] - 19:9, 78:13, 86:7, 119:13, 119:14, 121:25, 123:6, 135:22

**per** [5] - 39:5, 51:4, 73:22, 90:25, 100:23
**percent** [1] - 19:19
**perform** [2] - 49:25, 78:11
**performed** [1] - 50:3
**performing** [1] - 78:4
**period** [4] - 52:2, 60:15, 90:11, 97:10
**perjured** [1] - 14:8
**perjurors** [1] - 123:6
**perjury** [9] - 14:7, 36:21, 36:24, 61:3, 62:4, 80:5, 105:14, 119:1, 119:4
**permission** [2] - 5:3, 21:7
**person** [18] - 17:10, 27:20, 60:22, 69:4, 76:14, 102:2, 105:25, 106:8, 114:7, 114:22, 114:24, 115:2, 115:11, 115:15, 121:5, 121:6, 121:10, 121:11
**personal** [7] - 38:25, 57:13, 57:14, 71:23, 72:1, 108:19, 108:21
**personally** [2] - 80:20, 119:3
**perspective** [4] - 94:19, 118:5, 123:24, 124:1
**pertains** [1] - 22:15
**physical** [2] - 88:24, 125:5
**picture** [1] - 118:4
**pictures** [3] - 70:14, 77:20, 78:1
**piece** [6] - 91:5, 91:6, 99:6, 119:22, 119:24, 120:2
**pitfalls** [1] - 72:8
**place** [13] - 12:9, 14:22, 19:2, 20:16, 22:7, 26:3, 28:3, 29:1, 33:15, 87:8, 87:15, 93:20, 108:22
**placed** [1] - 20:23
**plaintiff** [22] - 4:7, 4:9, 4:16, 4:20, 5:15, 48:19, 48:20, 66:20, 81:10, 82:3, 88:21, 90:23, 90:25, 91:19, 105:7, 105:11, 105:21, 107:6, 115:16, 117:10, 119:2, 124:22
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 1:14

**plaintiff's** [9] - 5:18, 16:25, 79:18, 84:18, 85:1, 91:14, 94:19, 124:1, 129:24
**Plaintiff's** [10] - 3:14, 3:15, 3:16, 3:17, 21:8, 26:11, 26:12, 53:14, 53:15, 74:9
**plaintiffs** [1] - 109:12
**plaintiffs'** [3] - 5:2, 6:6, 90:21
**plan** [6] - 25:11, 25:12, 30:20, 31:15, 33:10, 41:6
**plans** [1] - 30:7
**platforms** [1] - 49:19
**play** [1] - 125:2
**played** [1] - 11:4
**pleading** [1] - 123:14
**pleadings** [2] - 118:25, 123:5
**pleasure** [1] - 55:17
**plenty** [1] - 18:2
**PLLC** [1] - 1:15
**plug** [1] - 58:24
**Plus** [1] - 50:15
**point** [39] - 10:21, 17:18, 25:21, 25:24, 29:16, 37:10, 38:20, 40:25, 43:18, 64:1, 68:18, 70:1, 79:22, 82:2, 83:9, 84:13, 84:14, 91:21, 96:5, 97:17, 98:4, 99:18, 101:2, 102:5, 105:10, 109:8, 115:2, 115:17, 115:19, 116:22, 121:5, 121:11, 123:22, 125:11, 126:7, 126:25, 128:14, 133:11, 135:3
**points** [2] - 98:20, 99:21
**police** [10] - 19:12, 19:18, 34:23, 34:25, 95:23, 107:15, 107:24, 108:4, 117:15, 117:22
**Police** [1] - 108:16
**policies** [140] - 9:4, 9:12, 9:14, 9:22, 9:25, 10:4, 10:6, 10:14, 13:2, 13:25, 14:1, 14:23, 14:25, 15:7, 15:19, 16:3, 19:1, 19:7, 19:23, 20:7, 20:14, 21:22, 21:23, 22:7, 22:16, 23:3, 23:8, 23:11, 23:17, 24:1, 24:4, 24:10,

24:18, 25:1, 25:4, 25:9, 25:15, 25:20, 26:21, 27:5, 27:17, 28:16, 28:17, 28:18, 28:24, 28:25, 29:1, 29:2, 29:23, 30:2, 33:7, 37:15, 38:3, 38:5, 38:11, 38:16, 40:8, 40:11, 40:20, 41:5, 41:6, 41:9, 41:14, 41:17, 41:19, 41:20, 41:21, 41:24, 42:3, 42:10, 42:11, 42:12, 42:16, 42:17, 45:23, 46:13, 51:23, 80:25, 83:1, 83:19, 83:20, 84:4, 84:16, 84:23, 85:13, 87:4, 88:22, 88:24, 89:3, 89:7, 89:10, 90:9, 90:20, 90:24, 91:3, 91:13, 91:18, 92:6, 93:11, 93:21, 94:9, 94:12, 94:14, 94:18, 95:8, 95:17, 96:21, 96:25, 97:1, 102:4, 102:12, 102:22, 103:24, 105:1, 106:20, 108:10, 108:12, 108:14, 109:2, 109:16, 110:25, 111:22, 116:13, 118:14, 120:12, 122:7, 124:8, 124:18, 127:7, 128:13, 128:19, 129:19, 129:22, 130:9, 130:11, 130:14, 131:16, 132:21

**Policies** [18] - 10:10, 11:21, 29:21, 37:21, 38:1, 38:2, 38:5, 39:19, 43:19, 51:24, 53:23, 62:17, 69:19, 78:19, 88:11, 98:22, 99:10, 122:9

**policy** [78] - 14:17, 15:1, 15:11, 16:15, 16:22, 19:21, 22:8, 22:23, 23:1, 23:23, 25:5, 25:17, 28:3, 28:10, 28:12, 37:24, 39:6, 40:18, 40:19, 40:21, 63:2, 83:14, 84:12, 89:24, 91:8, 92:9, 93:2, 93:8, 94:21, 96:17, 97:3, 99:8, 106:4, 106:10, 106:21, 106:22, 106:24, 107:1, 107:2,

107:13, 107:17, 107:18, 107:19, 107:20, 109:3, 109:5, 109:9, 109:13, 109:15, 109:23, 110:1, 110:3, 110:8, 110:13, 110:18, 111:16, 111:24, 115:16, 116:14, 117:12, 117:25, 118:12, 119:12, 119:15, 119:18, 119:22, 120:1, 120:2, 121:3, 124:5, 126:6, 126:22, 127:19, 127:22, 129:14

**pop** [2] - 15:25, 108:3

**position** [4] - 18:10, 23:9, 25:8, 103:8

**possession** [2] - 11:11, 40:2, 43:13

**possible** [2] - 33:10, 33:13

**potential** [3] - 72:8, 94:20, 94:25

**power** [1] - 47:14

**practice** [1] - 118:8

**practiced** [1] - 47:25

**preclusion** [1] - 95:8

**predicate** [1] - 83:8

**predominantly** [1] - 7:21

**preface** [1] - 20:17

**prefer** [1] - 15:10

**prejudice** [15] - 90:15, 117:10, 118:24, 122:22, 122:25, 123:11, 123:18, 123:22, 124:4, 127:1, 127:24, 128:5, 128:14, 130:17, 133:5

**prejudicial** [8] - 124:13, 130:3, 130:5, 132:9, 133:3, 134:6, 134:15, 135:4

**premarked** [1] - 53:14

**prep** [1] - 111:23

**preparation** [2] - 111:9, 111:11

**prepared** [4] - 4:23, 12:18, 107:22, 120:25

**preparing** [1] - 31:8

**present** [6] - 16:21, 24:15, 24:17, 24:23, 91:12, 132:22

**presentations** [1] - 23:20

**presented** [10] - 11:21, 24:18, 50:8, 51:8, 51:14, 51:19, 53:11, 82:1, 119:2, 135:14

**president** [1] - 11:16

**presumably** [1] - 60:16

**pretty** [4] - 12:8, 65:3, 97:15, 115:17

**prevention** [1] - 27:5

**previous** [3] - 25:9, 32:21, 33:21

**previously** [9] - 25:19, 26:10, 29:15, 43:16, 65:15, 74:3, 74:8, 74:16, 130:19

**principal** [21] - 7:12, 8:10, 14:19, 15:3, 16:17, 16:18, 19:15, 23:18, 27:14, 38:17, 38:20, 38:21, 39:13, 39:16, 100:16, 100:23, 121:9, 121:12, 125:1, 125:9

**principal's** [1] - 42:9

**principals** [5] - 16:15, 23:21, 41:3, 80:23, 89:14

**print** [1] - 71:2

**printed** [1] - 52:22

**printouts** [1] - 110:24

**privilege** [8] - 55:22, 56:2, 56:4, 57:11, 57:12, 57:15, 57:17, 111:21

**privileged** [1] - 57:4

**privy** [1] - 12:11

**Pro** [1] - 50:15

**problem** [8] - 96:11, 96:12, 107:5, 108:9, 111:10, 134:15, 135:19, 135:20

**problems** [1] - 119:11

**procedure** [3] - 63:2, 91:8, 116:7

**Procedures** [15] - 10:10, 11:21, 37:21, 38:1, 38:2, 38:5, 39:19, 43:20, 51:24, 53:23, 62:17, 69:19, 88:11, 98:23, 99:10

**procedures** [32] - 9:4, 9:7, 9:8, 9:22, 9:25, 10:4, 13:2, 13:25, 14:1, 15:7, 19:7, 20:12, 21:22, 22:10, 25:4, 36:12,

37:15, 38:13, 41:10, 51:23, 84:16, 84:23, 88:25, 89:3, 89:7, 89:10, 91:1, 91:13, 128:13, 129:22, 130:14

**proceed** [4] - 6:23, 38:6, 55:11, 67:7

**proceedings** [3] - 130:18, 136:6, 137:4

**process** [7] - 15:4, 16:10, 20:11, 33:16, 79:23, 132:2

**processing** [1] - 97:15

**produce** [17] - 10:20, 13:14, 39:17, 45:7, 55:22, 56:2, 56:19, 56:24, 57:24, 58:4, 58:7, 58:11, 105:5, 105:14, 118:13, 129:7

**produced** [61] - 11:7, 13:8, 17:19, 17:21, 29:23, 30:16, 31:24, 32:21, 32:25, 33:5, 33:12, 39:8, 42:14, 42:21, 43:4, 43:6, 44:10, 44:16, 46:1, 46:2, 46:16, 56:11, 58:9, 69:12, 69:14, 82:19, 85:15, 86:1, 88:24, 90:10, 94:21, 95:13, 96:12, 97:11, 97:22, 102:1, 104:13, 105:12, 105:13, 109:17, 112:16, 118:13, 118:15, 127:19, 128:12, 128:24, 129:1, 130:21, 130:23, 130:24, 131:7, 131:9, 131:10, 131:22, 132:4, 132:5, 132:24, 133:9, 133:10, 133:19

**producing** [2] - 39:18, 117:24

**product** [2] - 56:4, 57:12

**production** [18] - 10:17, 10:19, 13:2, 79:22, 82:16, 83:10, 83:13, 85:7, 85:11, 86:3, 87:13, 90:8, 97:24, 99:1, 101:24, 104:11, 120:7, 132:16

**profession** [2] - 49:9, 67:13

**professor** [1] - 67:21

**proffer** [3] - 79:19, 79:20, 80:19

**proffered** [1] - 49:21

**programming** [1] - 67:16

**promoted** [1] - 14:19

**promulgate** [1] - 116:7

**proof** [2] - 104:14, 105:22

**proper** [1] - 75:13

**properly** [2] - 99:24, 127:18

**properties** [6] - 43:19, 50:19, 52:25, 54:12, 75:13, 99:12

**property** [1] - 74:22

**propounding** [1] - 84:9

**provide** [4] - 5:4, 40:25, 41:8, 43:12

**provided** [17] - 11:9, 21:4, 30:5, 30:22, 42:17, 42:18, 42:24, 43:1, 43:9, 44:7, 50:6, 52:13, 63:17, 85:11, 89:6, 129:5

**proximately** [1] - 126:1

**public** [2] - 19:3, 34:13

**Public** [16] - 8:20, 8:25, 19:6, 19:12, 19:13, 20:2, 22:8, 22:14, 22:20, 23:4, 23:6, 23:21, 37:23, 39:22, 94:9, 98:2

**published** [5] - 34:2, 34:4, 40:1, 83:3, 89:22

**publishes** [1] - 89:22

**pull** [2] - 39:14, 53:21

**purport** [2] - 93:8, 102:21

**purports** [1] - 60:22

**purpose** [1] - 51:5

**purposes** [3] - 4:19, 69:7, 125:10

**pursue** [1] - 92:4

**put** [13] - 25:3, 28:3, 28:21, 31:13, 31:14, 58:20, 59:21, 59:23, 59:24, 83:22, 98:3, 98:9, 118:4

**puts** [1] - 105:6

**putting** [1] - 92:19

## Q

**qualifications** [1] - 49:14

**qualified** [1] - 73:25
**qualify** [1] - 71:14
**questionable** [1] - 118:6
**questioned** [1] - 45:17
**questions** [18] - 17:15, 17:17, 17:25, 27:8, 48:11, 48:17, 55:9, 58:12, 65:9, 65:18, 66:4, 66:18, 72:25, 79:13, 88:25, 89:10, 130:10, 131:15
**quite** [2] - 68:25, 96:18
**quote** [1] - 37:14

**R**

**raise** [2] - 48:23, 133:19
**raised** [3] - 37:3, 100:4, 129:3
**raising** [1] - 89:10
**ran** [1] - 78:15
**range** [1] - 7:19
**rather** [3] - 18:14, 26:19, 89:21
**re** [4] - 71:13, 72:6, 109:6, 123:2
**re-ask** [1] - 71:13
**re-question** [1] - 123:2
**re-saving** [1] - 72:6
**re-titled** [1] - 109:6
**reach** [1] - 54:15
**reached** [1] - 55:5
**read** [9] - 4:20, 21:11, 21:25, 22:1, 22:10, 26:24, 27:12, 34:1, 35:3
**reading** [10] - 22:18, 36:10, 37:11, 37:14, 37:18, 37:25, 38:13, 72:23, 97:2
**real** [1] - 72:17
**reality** [1] - 122:13
**realize** [2] - 96:24, 112:8
**realized** [1] - 11:7
**really** [19] - 11:4, 14:11, 15:13, 34:22, 35:1, 36:11, 68:7, 68:15, 74:6, 97:3, 102:11, 106:4, 123:6, 124:1, 128:5, 129:12, 130:5, 132:9, 135:4
**reason** [8] - 13:17, 45:16, 79:20, 80:12, 110:14, 113:10,

121:18, 122:3
**reasonable** [3] - 82:22, 104:20, 123:2
**reasons** [2] - 90:22, 109:18
**receive** [8] - 41:4, 60:21, 64:24, 64:25, 83:18, 84:11, 85:23, 125:10
**received** [27] - 43:1, 53:1, 53:4, 58:8, 61:17, 65:2, 79:25, 84:8, 86:21, 87:12, 89:12, 89:16, 90:3, 90:4, 95:17, 95:24, 99:16, 104:9, 104:10, 104:13, 105:10, 126:2, 128:12, 130:12, 130:15, 132:19, 132:20
**recently** [1] - 129:9
**recognized** [1] - 16:24
**record** [14] - 4:6, 6:19, 25:1, 25:15, 41:14, 41:17, 49:1, 67:3, 69:7, 80:11, 81:9, 82:1, 93:12, 108:9
**record-gathering** [1] - 108:9
**recorded** [1] - 102:10
**Recording** [1] - 49:12
**recordkeeping** [2] - 108:2, 114:1
**records** [9] - 11:10, 17:1, 38:25, 39:1, 39:14, 39:15, 93:15, 93:17, 127:10
**REDIRECT** [1] - 65:12
**redirect** [3] - 48:16, 65:10, 79:14
**Redirect** [1] - 3:2
**refer** [8] - 16:12, 69:10, 87:2, 88:10, 92:14, 110:24
**reference** [5] - 22:19, 25:3, 100:21, 106:21, 110:17
**referenced** [10] - 85:17, 86:17, 93:12, 102:22, 106:3, 106:20, 109:16, 110:2, 110:4, 117:25
**references** [5] - 92:12, 97:25, 98:3, 98:4, 98:13

**referencing** [1] - 22:12
**referred** [4] - 65:22, 89:14, 92:8, 92:15
**referring** [25] - 14:17, 24:21, 26:4, 29:11, 30:4, 30:15, 32:14, 32:15, 32:16, 40:13, 53:17, 53:20, 54:9, 56:3, 57:10, 57:11, 65:5, 65:7, 74:21, 75:2, 75:6, 88:4, 101:5, 110:4, 111:8
**refers** [1] - 51:23, 109:18
**reflect** [3] - 50:23, 87:22, 89:2
**refused** [1] - 56:19
**refute** [1] - 63:5
**regard** [1] - 100:21
**regarding** [2] - 15:22, 82:16
**regards** [11] - 8:11, 9:11, 19:14, 31:8, 41:9, 41:22, 44:12, 46:11, 51:16, 75:12, 102:13
**regrettably** [1] - 118:17
**regular** [2] - 12:12, 34:15
**regulations** [6] - 8:11, 8:12, 15:18, 115:22, 116:5, 116:11
**relate** [2] - 37:6, 96:19
**related** [10] - 27:25, 49:25, 62:17, 84:16, 84:24, 85:13, 85:23, 85:25, 126:1, 135:5
**relates** [2] - 22:9, 57:5
**relating** [2] - 43:14, 129:19
**relation** [1] - 27:13
**relationship** [1] - 8:16
**relevance** [1] - 48:6
**relevancy** [1] - 36:20
**relevant** [10] - 37:2, 101:23, 120:12, 124:24, 126:6, 131:7, 131:22, 132:6, 132:14, 133:11
**relied** [1] - 57:6
**relief** [6] - 82:5, 95:6, 123:15, 134:20, 134:21, 135:7
**rely** [2] - 5:17, 121:6
**remainder** [1] -

130:19
**remedial** [1] - 125:19
**remedy** [2] - 94:25, 123:3
**remember** [10] - 13:6, 20:10, 22:12, 34:21, 43:10, 59:18, 73:5, 73:9, 96:8, 135:17
**remote** [1] - 136:1
**remotely** [1] - 122:19
**remove** [1] - 117:17
**reopening** [1] - 130:6
**rep** [5] - 86:6, 87:10, 114:3, 114:19, 114:22
**repeat** [4] - 25:23, 59:17, 91:25, 103:18
**repeated** [1] - 117:2
**repeatedly** [1] - 89:4
**repeats** [1] - 117:5
**rephrase** [2] - 71:15, 92:2
**rephrased** [1] - 71:24
**replaced** [1] - 98:8
**reply** [2] - 22:2, 123:18
**report** [13] - 5:2, 19:17, 50:21, 50:23, 51:1, 55:5, 57:5, 81:15, 81:16, 104:21, 116:21, 124:20, 124:22
**reported** [5] - 124:15, 124:16, 124:19, 125:15, 127:8
**REPORTED** [1] - 2:1
**REPORTER** [1] - 29:5
**Reporter** [2] - 2:2, 137:10
**reporter** [2] - 84:21, 123:13
**reporting** [5] - 9:10, 19:14, 84:17, 84:25, 126:9
**represent** [3] - 10:18, 12:7
**representative** [1] - 128:11
**represented** [4] - 14:1, 51:9, 53:12, 55:20
**representing** [1] - 12:13
**reproduction** [1] - 69:20
**request** [20] - 13:2, 39:3, 39:9, 41:2,

44:25, 55:22, 83:13, 84:9, 84:10, 85:6, 85:11, 85:12, 86:3, 95:6, 95:11, 103:21, 105:11, 120:6, 132:11, 135:7
**requested** [14] - 17:5, 32:9, 33:7, 39:10, 40:15, 44:22, 45:5, 56:11, 80:3, 105:22, 106:11, 111:3, 112:6, 132:21
**requesting** [2] - 44:3, 75:12
**requests** [3] - 8:13, 13:14, 84:23
**require** [2] - 81:2, 126:22
**required** [8] - 21:1, 25:10, 92:6, 94:5, 94:7, 94:12, 115:23, 120:16
**requirement** [1] - 127:3
**requirements** [7] - 9:1, 9:3, 9:9, 9:14, 16:1, 93:13, 93:18
**requires** [2] - 114:18, 130:6
**requisite** [1] - 116:5
**resisted** [1] - 61:23
**respect** [12] - 8:6, 13:24, 55:22, 57:18, 63:5, 83:11, 83:13, 101:3, 125:24, 127:23, 128:20, 130:9
**respective** [1] - 38:21
**respond** [3] - 17:23, 58:15, 90:24
**responded** [2] - 106:3, 133:22
**responding** [1] - 101:24
**response** [19] - 5:17, 5:18, 22:15, 26:18, 26:23, 39:3, 39:8, 81:6, 84:10, 84:13, 103:1, 104:2, 104:24, 107:23, 128:7, 130:24, 132:18, 134:12
**responses** [10] - 25:21, 25:25, 32:10, 82:19, 102:18, 105:1, 105:6, 105:24, 106:21, 108:7
**responsibilities** [2] - 14:21, 48:4
**responsibility** [3] -

39:17, 48:2, 125:11

**responsible** [7] -
12:2, 18:14, 27:19,
27:23, 27:24, 28:20,
127:20

**responsive** [3] -
132:4, 132:11, 132:13

**result** [2] - 16:2,
124:3

**returned** [1] - 116:21

**revamp** [5] - 14:21,
24:9, 24:10, 32:12,
33:17

**review** [11] - 12:23,
16:23, 24:16, 25:21,
25:24, 44:8, 54:13,
69:24, 101:12, 135:23

**reviewed** [4] - 4:16,
15:21, 74:4, 84:3

**reviewing** [1] - 26:1

**revise** [1] - 28:18

**revised** [3] - 15:20,
45:8, 45:9

**revision** [1] - 53:24

**revisions** [5] - 15:2,
45:6, 46:12, 86:2,
105:1

**rights** [3] - 91:10,
93:19, 96:20

**Rights** [2] - 19:10,
127:9

**rise** [2] - 136:4,
136:5

**rising** [1] - 135:9

**risk** [1] - 58:21

**Road** [1] - 1:19

**robotics** [1] - 67:14

**Rolando** [5] - 12:4,
29:18, 29:19, 86:11,
102:13

**role** [3] - 8:6, 11:5,
18:13

**roughly** [1] - 87:14

**routine** [1] - 54:24

**RPR** [2] - 2:2, 137:9

**Rule** [1] - 56:4

**rules** [2] - 8:12,
114:12

**run** [2] - 15:24, 24:11

**running** [2] - 17:5,
79:21

**runs** [1] - 58:21

**S**

**S-T-A-F-F-O-R-D** [1]
- 49:3

**safe** [1] - 47:14

**safety** [7] - 9:10,
15:19, 16:5, 16:7,

16:10, 16:21, 25:12

**salient** [1] - 51:3

**sanction** [4] - 82:13,
103:22, 105:23,
135:10

**sanctions** [2] - 4:15,
134:16

**sat** [1] - 68:13

**save** [17] - 54:20,
59:8, 60:12, 64:6,
64:15, 64:17, 64:19,
70:17, 73:12, 75:3,
75:6, 75:24, 76:1,
76:7, 76:17

**saved** [3] - 46:18,
54:1

**saves** [2] - 70:17,
76:4

**saving** [6] - 54:25,
55:1, 72:6, 73:3,
78:23, 104:4

**saw** [3] - 62:12,
83:10, 98:18

**scans** [1] - 56:18

**scenario** [1] - 63:1

**school** [68] - 7:3, 7:7,
7:16, 7:20, 7:23, 7:24,
7:25, 8:1, 8:6, 8:7,
8:9, 8:11, 8:23, 8:24,
9:6, 9:8, 9:18, 9:21,
9:22, 10:8, 10:12,
12:14, 16:10, 17:4,
17:6, 19:16, 19:22,
20:6, 20:15, 24:11,
24:13, 25:18, 26:6,
34:4, 38:17, 38:20,
38:21, 38:24, 39:13,
40:3, 48:5, 83:4,
83:18, 83:20, 89:22,
94:11, 96:20, 97:25,
98:7, 98:8, 98:13,
102:3, 116:14,
116:17, 116:19,
116:23, 117:1,
117:16, 119:17,
121:9, 124:7, 126:18,
127:15, 131:23

**School** [15] - 4:13,
7:6, 8:1, 8:20, 8:21,
9:13, 11:17, 22:23,
23:16, 23:21, 27:17,
36:13, 88:4, 109:9,
124:7

**School's** [1] - 94:9

**school's** [4] -
110:24, 116:10,
116:12, 127:22

**Schools** [22] - 4:4,
7:6, 7:19, 8:17, 8:25,
17:4, 19:12, 19:13,

20:2, 20:9, 20:17,
21:23, 22:6, 22:20,
23:4, 23:6, 23:22,
37:23, 39:22, 88:10,
91:3, 98:2

**SCHOOLS** [1] - 1:8

**schools** [9] - 7:18,
7:21, 8:11, 8:17, 8:19,
19:3, 23:19, 47:9,
80:24

**Schools'** [2] - 22:8,
22:14

**science** [3] - 71:19,
71:22, 71:25

**score** [1] - 130:4

**SCOTT** [1] - 1:22

**Scott** [1] - 4:10

**screen** [3] - 44:5,
53:22, 69:5

**screenshot** [13] -
46:15, 52:8, 52:11,
52:13, 52:15, 52:21,
53:12, 63:17, 69:2,
98:24, 99:5, 99:10,
112:18

**screenshots** [22] -
43:18, 43:22, 43:23,
44:2, 44:5, 44:6, 50:7,
50:10, 51:9, 51:12,
51:22, 53:20, 65:7,
69:4, 69:12, 73:10,
74:4, 74:12, 76:25,
78:2, 84:3, 104:18

**se** [2] - 51:4, 73:22

**search** [5] - 75:17,
78:11, 78:15, 103:23,
103:24

**Search** [1] - 78:8

**searched** [1] - 98:22

**searches** [2] - 78:4,
78:5, 104:1

**searching** [1] - 98:18

**seat** [4] - 4:2, 6:18,
48:25, 67:2

**second** [2] - 63:6,
118:19

**secondary** [1] -
96:12

**secondly** [1] -
132:21

**security** [3] - 16:8,
25:12, 75:22

**SECURITY** [1] -
136:4

**see** [49] - 6:16,
11:18, 15:6, 17:8,
25:13, 26:14, 31:2,
31:4, 31:20, 32:7,
33:22, 35:17, 47:1,
50:7, 50:17, 51:14,

52:15, 52:18, 52:23,
53:21, 53:22, 55:16,
61:18, 72:17, 77:4,
77:21, 78:22, 84:5,
84:6, 86:23, 87:17,
88:17, 89:23, 91:21,
96:3, 96:5, 97:17,
98:15, 106:16,
112:17, 115:1,
117:19, 120:25,
122:17, 131:18,
134:9, 135:22,
135:23, 135:24

**seeing** [2] - 26:16,
65:16

**seek** [1] - 123:5

**seeking** [1] - 103:22

**seem** [1] - 124:9

**semblance** [1] -
121:1

**send** [7] - 10:24,
33:3, 33:17, 33:20,
54:20, 121:7, 131:3

**sending** [3] - 63:12,
63:13, 66:11

**sends** [2] - 72:10

**sense** [1] - 127:7

**sent** [9] - 11:10,
32:4, 45:21, 62:22,
62:23, 99:5, 106:11,
106:19, 112:8

**separate** [12] - 19:2,
19:22, 20:6, 21:23,
22:7, 22:11, 22:23,
22:24, 39:21, 85:6,
96:11, 125:19

**separated** [1] -
117:18

**separately** [1] - 64:7

**September** [2] - 1:6,
88:14

**series** [2] - 85:3,
132:17

**serious** [1] - 121:20

**seriously** [1] -
105:16

**serve** [1] - 8:7

**served** [2] - 7:11,
56:8

**server** [2] - 99:20

**service** [1] - 17:4

**Services** [3] - 7:6,
11:17, 23:16

**set** [6] - 4:18, 16:17,
60:4, 73:3, 73:5,
120:11

**several** [5] - 30:1,
80:20, 86:8, 97:22,
126:17

**severe** [1] - 82:13

**severely** [1] - 105:22

**sexual** [5] - 26:20,
27:5, 34:20, 85:13,
125:5

**shape** [1] - 47:24

**share** [1] - 113:22

**shared** [1] - 38:14

**short** [2] - 116:24,
116:25

**short-lived** [2] -
116:24, 116:25

**show** [15] - 10:2,
15:25, 37:17, 37:21,
52:19, 53:13, 56:21,
61:19, 65:14, 74:8,
90:23, 99:11, 106:13,
112:24, 131:1

**showed** [10] - 15:7,
37:23, 51:22, 51:24,
51:25, 52:13, 52:14,
61:17, 73:11, 111:7

**showing** [4] - 26:14,
31:2, 35:17, 73:10

**shown** [6] - 51:11,
54:4, 54:12, 74:10,
90:3, 99:17

**shows** [3] - 53:22,
53:24, 54:1

**shrugged** [1] - 130:2

**sick** [1] - 12:18

**side** [4] - 5:7, 12:3,
48:20, 54:6

**sign** [2] - 24:19,
128:16

**signature** [1] - 41:23

**signed** [10] - 15:20,
26:5, 102:16, 105:12,
105:13, 107:16,
115:1, 115:2, 128:11,
129:6

**significance** [1] -
53:7

**significant** [2] -
122:23, 129:4

**signs** [2] - 108:6,
114:18

**similar** [2] - 17:20,
94:2

**simple** [2] - 58:2,
63:15

**simply** [3] - 54:18,
99:9, 108:10

**single** [8] - 15:11,
25:5, 33:22, 42:12,
44:16, 45:4, 83:4,
128:9

**sit** [4] - 36:15, 44:9,
55:4, 122:18

**sits** [2] - 108:7,
108:25

**situation** [2] - 12:5, 26:3

**six** [2] - 14:19, 90:7

**size** [3] - 53:10, 59:6, 104:8

**skepticism** [1] - 122:6

**sloppy** [1] - 113:25

**slow** [3] - 84:20, 115:25, 116:1

**slower** [1] - 84:21

**small** [1] - 108:2

**SMITH** [1] - 1:15

**solution** [1] - 94:20

**solve** [1] - 107:5

**someone** [3] - 125:9, 125:10, 127:16

**somewhat** [1] - 121:19

**somewhere** [1] - 100:14

**Sorry** [2] - 48:10, 116:2

**sorry** [14] - 5:12, 5:22, 23:25, 25:23, 29:5, 29:8, 35:20, 40:3, 52:10, 52:20, 64:9, 113:18, 115:25, 117:6

**sounded** [1] - 66:13

**sounds** [2] - 6:9, 100:8

**source** [1] - 71:7

**South** [1] - 67:20

**SOUTHERN** [1] - 1:1

**special** [2] - 48:4, 48:8

**specialist** [2] - 7:8, 43:25, 46:4, 47:24

**specific** [10] - 8:6, 25:4, 35:24, 36:12, 40:13, 41:21, 56:5, 85:25, 132:23, 133:25

**specifically** [12] - 21:5, 39:25, 41:11, 41:20, 42:2, 42:6, 55:24, 82:17, 92:17, 97:21, 100:19, 101:5

**specifics** [1] - 80:9

**speculative** [1] - 128:3

**spell** [4] - 5:22, 6:19, 49:1, 67:3

**sponsoring** [2] - 8:24, 24:13

**sponsorship** [1] - 8:19

**square** [3] - 97:12, 97:14, 98:16

**staff** [3] - 31:13, 41:3

**STAFFORD** [1] - 3:7

**Stafford** [15] - 5:9, 5:13, 48:22, 48:24, 49:2, 49:7, 49:11, 51:1, 53:18, 55:4, 55:15, 57:23, 65:14, 82:21, 90:2

**Stafford's** [1] - 57:23

**stakes** [1] - 47:12

**stand** [2] - 48:22, 55:4

**standard** [4] - 90:22, 91:7, 95:17, 116:16

**standpoint** [4] - 71:20, 71:22, 122:13, 122:17

**stands** [1] - 80:15

**start** [1] - 116:2

**started** [5] - 7:21, 28:2, 31:10, 68:18, 120:18

**starting** [2] - 4:6, 31:4

**starts** [3] - 69:18, 76:2, 84:2

**state** [6] - 6:18, 8:12, 15:22, 16:20, 30:19, 49:1, 49:9, 67:3, 75:1

**State** [1] - 1:19

**statement** [7] - 30:3, 32:14, 33:7, 42:18, 45:1, 46:20

**statements** [5] - 22:19, 35:3, 46:11, 82:15, 129:5

**States** [2] - 2:3, 137:10

**states** [1] - 25:14

**STATES** [2] - 1:1, 1:12

**stating** [2] - 37:14, 128:21

**statutes** [1] - 8:12

**statutory** [1] - 9:14

**stay** [1] - 78:14

**STENOGRAPHER** [1] - 115:25

**STENOGRAPHICALLY** [1] - 2:1

**step** [5] - 48:18, 66:19, 83:6, 104:25, 124:6

**stepping** [1] - 82:17

**steps** [4] - 19:9, 28:13, 111:1, 111:2

**still** [6] - 23:15, 54:22, 90:2, 128:24, 130:13

**stipulate** [1] - 79:19

**Stoneman** [2] -

15:18, 16:7

**stored** [2] - 65:19, 65:25

**story** [2] - 133:16, 135:18

**strategy** [1] - 123:7

**stretch** [1] - 105:3

**stricken** [1] - 123:14

**strict** [1] - 93:12

**strictly** [1] - 96:16

**strike** [5] - 94:21, 118:24, 123:5, 134:17, 134:19

**striking** [3] - 107:5, 107:11, 107:13

**stringent** [1] - 94:1

**Student** [2] - 40:8, 92:15

**student** [21] - 7:25, 8:3, 14:22, 20:11, 22:16, 24:7, 27:25, 30:3, 38:25, 39:15, 40:9, 42:18, 46:23, 83:4, 85:1, 95:21, 125:14, 126:9, 126:10, 129:17, 131:21

**student's** [1] - 44:25

**students** [35] - 8:20, 8:21, 9:10, 9:12, 9:13, 18:18, 19:6, 19:7, 20:8, 20:10, 20:18, 22:9, 22:17, 22:21, 22:24, 23:2, 23:3, 37:24, 40:4, 40:16, 40:17, 40:20, 40:21, 41:6, 41:7, 41:12, 46:21, 47:14, 86:25, 89:21, 91:8, 93:18, 109:13, 129:19

**stuff** [3] - 15:13, 122:20

**sub** [2] - 78:18

**subject** [3] - 7:24, 53:23, 94:8

**submission** [1] - 45:3

**submissions** [1] - 8:14

**submit** [7] - 11:11, 15:21, 34:11, 41:1, 45:2, 45:15, 45:17

**submits** [1] - 33:19

**submitted** [2] - 33:18, 33:22, 69:8

**subpoena** [2] - 56:8, 56:25, 58:8

**substance** [2] - 107:1, 111:17

**substantial** [1] -

28:12

**substantive** [2] - 113:11, 122:23

**sudden** [1] - 122:6

**sued** [1] - 68:9

**suffered** [1] - 128:6

**suggest** [1] - 123:13

**suggesting** [1] - 64:10

**Suite** [2] - 1:16, 1:23

**sum** [1] - 107:1

**summer** [4] - 14:20, 15:2, 17:3, 24:8, 28:18, 32:13

**SUPERIOR** [1] - 1:21

**Superior** [5] - 4:11, 7:6, 11:16, 23:16, 86:12

**supplement** [7] - 4:21, 132:8, 132:23, 133:6, 133:18, 135:6

**supplemental** [4] - 4:25, 134:2, 134:19, 135:11

**supplementing** [1] - 133:17

**support** [3] - 8:8, 52:5, 103:8

**supported** [2] - 103:10, 127:12

**supposed** [2] - 92:21, 120:3

**Supreme** [2] - 107:9, 115:20

**surprised** [1] - 111:15

**surreptitiously** [1] - 113:9

**surveillance** [1] - 117:20

**Susie** [5] - 38:22, 39:2, 39:5, 107:19, 115:6

**suspect** [1] - 120:1

**suspicious** [2] - 122:10, 122:14

**sustain** [1] - 71:12

**sustained** [3] - 46:7, 48:7, 48:9

**sustaining** [1] - 71:13

**Susy** [1] - 117:5

**swear** [1] - 129:2

**switch** [1] - 117:18

**sword** [1] - 112:2

**swore** [1] - 128:25

**sworn** [3] - 6:17, 48:24, 67:1

**system** [10] - 15:14, 16:1, 39:15, 47:15,

58:25, 59:9, 60:23, 70:11, 112:21, 118:7

**systems** [3] - 14:21, 16:4, 47:11

---

## T

**table** [5] - 16:3, 28:19, 29:2, 29:11, 89:8

**tailored** [1] - 19:24

**tainted** [1] - 103:9

**talker** [1] - 116:2

**talks** [2] - 115:21, 116:10

**Tampa** [1] - 1:24

**tangible** [1] - 16:23

**tapes** [1] - 117:20

**targeted** [1] - 121:19

**tasked** [1] - 76:20

**teacher** [5] - 7:11, 7:12, 19:15, 95:21, 125:8

**teachers** [4] - 23:5, 40:2, 40:3, 46:21

**team** [8] - 8:9, 12:20, 14:25, 24:6, 24:15, 30:10, 32:3, 35:23

**technical** [1] - 119:11

**technically** [1] - 110:9

**technology** [1] - 67:21

**telecommunications** [1] - 67:15

**template** [1] - 33:16

**ten** [1] - 67:16

**tenure** [2] - 35:23, 36:18

**term** [2] - 65:20, 75:20

**terms** [9] - 90:14, 90:15, 90:20, 91:9, 91:19, 123:25, 129:12, 130:11, 133:21

**tested** [1] - 33:19

**testified** [18] - 18:7, 19:1, 37:25, 38:16, 46:14, 74:3, 74:16, 74:24, 102:9, 107:19, 107:20, 108:14, 109:1, 109:12, 112:6, 113:3, 113:24, 120:19

**testify** [12] - 5:20, 23:11, 35:7, 46:5, 47:16, 71:10, 71:22, 73:7, 73:25, 79:20, 80:7, 115:11

**testifying** [4] - 23:7, 34:17, 43:15, 60:18

**testimony** [29] - 6:16, 13:6, 14:5, 19:5, 22:22, 35:6, 36:15, 37:1, 38:10, 39:5, 62:3, 63:2, 63:3, 63:4, 71:3, 87:1, 95:18, 98:16, 100:20, 100:24, 101:17, 102:11, 103:11, 103:20, 104:16, 104:22, 107:14, 117:11, 120:17

**THE** [298] - 1:11, 1:14, 4:2, 4:14, 5:5, 5:11, 5:14, 5:22, 5:24, 6:2, 6:5, 6:7, 6:14, 6:18, 6:20, 6:22, 6:24, 11:13, 11:14, 11:15, 11:16, 11:18, 12:2, 12:4, 12:12, 12:15, 12:22, 12:25, 13:1, 13:3, 14:16, 14:18, 15:6, 15:9, 17:16, 17:25, 18:24, 19:21, 19:23, 20:3, 20:13, 20:16, 21:9, 21:13, 22:3, 22:4, 24:10, 24:12, 26:5, 26:8, 26:9, 27:3, 27:8, 28:5, 28:7, 29:5, 29:7, 29:8, 29:9, 29:12, 29:13, 34:8, 34:10, 37:2, 37:5, 46:7, 48:7, 48:8, 48:9, 48:10, 48:11, 48:16, 48:18, 49:2, 49:4, 49:23, 52:8, 52:10, 52:11, 52:13, 52:15, 52:17, 52:18, 52:20, 52:23, 55:10, 56:5, 57:8, 57:15, 57:20, 58:1, 58:6, 60:8, 60:10, 64:23, 65:2, 65:6, 65:8, 65:10, 66:19, 66:23, 67:4, 67:8, 71:12, 71:15, 72:2, 72:3, 73:2, 73:5, 73:13, 76:20, 76:22, 77:1, 77:3, 77:4, 77:10, 77:13, 77:14, 77:16, 77:17, 77:18, 77:23, 77:24, 78:3, 78:4, 78:5, 78:7, 78:19, 78:20, 78:22, 78:23, 79:4, 79:14, 79:16, 80:17, 81:2, 81:9, 81:13, 81:16, 81:19, 81:25, 82:8, 83:6, 83:7, 83:8, 83:17,

83:21, 84:1, 84:5, 84:10, 84:20, 85:3, 85:6, 85:9, 85:15, 85:16, 85:17, 85:20, 86:5, 86:9, 86:15, 86:19, 86:23, 87:2, 87:6, 87:9, 87:12, 87:17, 87:24, 88:7, 88:10, 88:14, 88:17, 88:20, 90:12, 90:14, 91:16, 92:2, 92:8, 92:13, 92:19, 92:24, 93:4, 93:7, 93:14, 93:21, 94:3, 94:10, 94:16, 94:20, 95:2, 95:25, 96:5, 96:8, 96:22, 97:6, 97:12, 97:20, 98:10, 98:15, 99:18, 99:25, 100:3, 100:7, 100:9, 100:16, 100:18, 101:2, 101:8, 101:11, 101:16, 101:21, 102:5, 102:15, 102:20, 103:3, 103:5, 103:14, 103:16, 103:20, 105:19, 106:5, 106:7, 106:13, 106:16, 107:4, 107:10, 107:22, 108:4, 108:8, 108:10, 108:19, 108:24, 109:8, 109:14, 109:21, 109:24, 110:5, 110:16, 110:19, 110:21, 111:9, 111:18, 112:10, 112:13, 112:17, 113:1, 113:13, 113:17, 113:20, 114:2, 114:8, 114:10, 114:14, 114:19, 114:24, 115:8, 115:10, 115:19, 115:25, 116:1, 117:7, 119:7, 119:17, 119:23, 120:5, 120:14, 120:21, 120:25, 121:8, 121:13, 121:15, 122:15, 123:18, 124:13, 124:24, 125:13, 125:24, 126:22, 126:25, 127:23, 129:8, 130:4, 130:22, 131:9, 131:13, 131:20, 131:24, 132:12, 132:25, 133:10, 133:14, 133:25, 134:9, 134:23, 135:1,

135:12, 135:17

**themselves** [2] - 127:3, 127:4

**theoretically** [1] - 92:4

**theorizing** [1] - 96:10

**theory** [6] - 92:5, 96:23, 97:1, 97:7, 119:1, 127:18

**thereafter** [2] - 125:16, 126:18

**therefore** [2] - 122:4, 126:25

**they've** [4] - 88:23, 92:8, 93:12, 104:20

**third** [1] - 5:25

**third-party** [1] - 5:25

**three** [9] - 50:7, 51:8, 51:22, 53:19, 68:25, 69:11, 78:16, 86:20, 116:19

**throughout** [4] - 22:19, 89:17, 129:7, 133:9

**tie** [1] - 132:1

**tied** [1] - 135:8

**Title** [113] - 9:25, 10:10, 10:20, 11:8, 11:21, 16:3, 16:8, 18:15, 18:17, 19:2, 20:6, 20:14, 22:7, 22:23, 23:1, 23:7, 25:13, 25:17, 25:19, 26:20, 27:5, 27:17, 29:21, 30:2, 30:8, 32:25, 33:11, 34:18, 34:20, 35:2, 35:5, 35:7, 35:12, 35:22, 36:3, 36:16, 36:19, 38:16, 39:5, 39:19, 40:11, 40:21, 41:20, 42:3, 42:6, 43:15, 43:19, 45:23, 47:5, 47:6, 47:7, 47:8, 47:10, 47:17, 47:18, 47:19, 47:20, 47:22, 47:24, 48:5, 51:24, 53:23, 62:17, 63:3, 69:19, 75:15, 78:19, 79:3, 83:1, 83:14, 83:19, 83:20, 84:16, 84:24, 85:13, 86:18, 86:21, 86:24, 88:11, 89:15, 89:24, 90:23, 91:10, 92:9, 92:14, 92:17, 93:11, 95:18, 96:3, 96:16, 98:17, 98:22, 99:10, 103:24, 106:10, 106:25, 109:16, 109:18,

109:19, 110:4, 110:18, 113:19, 116:8, 116:16, 117:4, 117:12, 122:8, 124:3, 124:14, 125:10, 126:13

**title** [8] - 34:19, 37:13, 78:20, 96:16, 99:9, 104:17, 106:25, 110:10

**titled** [5] - 37:14, 38:1, 69:19, 109:6, 124:6

**today** [12] - 13:25, 23:15, 35:6, 36:15, 38:4, 55:4, 62:3, 73:7, 73:11, 79:17, 82:11, 90:2

**together** [10] - 15:13, 28:20, 45:18, 63:23, 64:18, 98:3, 98:9, 113:4, 119:14, 135:8

**tons** [2] - 15:9, 47:1

**took** [22] - 26:3, 43:18, 43:23, 44:6, 52:2, 68:25, 69:2, 69:4, 74:14, 74:15, 78:1, 87:8, 87:15, 93:20, 98:24, 99:4, 99:10, 104:17, 109:5, 112:7, 113:3, 117:24

**tools** [1] - 50:11

**top** [8] - 27:12, 53:20, 78:10, 90:1, 91:6, 100:10, 101:14, 109:11

**Torres** [1] - 67:12

**TORRES** [1] - 1:11

**total** [2] - 7:19, 54:1

**touch** [3] - 43:24, 70:23, 116:18

**touched** [1] - 122:19

**tough** [1] - 125:20

**tougher** [1] - 134:16

**train** [1] - 127:18

**training** [3] - 73:21, 127:17, 129:20

**trainings** [2] - 23:20, 127:21

**transcript** [7] - 21:5, 30:25, 33:25, 35:15, 95:20, 100:22, 102:13

**transcription** [1] - 137:4

**transcripts** [1] - 113:23

**transmitted** [1] - 62:21

**trial** [1] - 37:6

**tried** [1] - 129:23

**tries** [1] - 78:11

**true** [17] - 37:25, 39:25, 46:6, 56:20, 72:14, 93:1, 101:25, 104:18, 104:25, 116:12, 125:13, 127:14, 128:8, 128:19, 129:5, 129:6, 130:9

**truly** [1] - 48:3

**truth** [1] - 21:1

**truthful** [1] - 105:6

**truthfulness** [1] - 36:25

**try** [5] - 13:14, 118:4, 118:8, 118:19, 124:9

**trying** [4] - 36:25, 46:5, 97:2, 124:8

**turn** [8] - 4:19, 29:25, 45:18, 45:20, 62:22, 62:23, 82:3, 105:19

**turned** [7] - 30:5, 33:6, 45:1, 45:4, 45:17, 45:22, 73:12

**turning** [2] - 5:14, 110:10

**turns** [2] - 68:19, 70:17

**two** [23] - 7:8, 28:22, 29:10, 31:24, 32:25, 33:12, 45:16, 51:16, 53:24, 56:6, 63:22, 65:6, 68:25, 78:16, 81:11, 81:22, 90:21, 93:16, 97:13, 98:20, 99:21, 124:8, 124:15

**type** [4] - 59:9, 70:18, 76:13, 124:20

## U

**uncontroverted** [2] - 80:8, 104:11

**under** [31] - 7:18, 8:19, 9:9, 14:13, 19:10, 19:16, 20:17, 20:24, 24:13, 36:25, 38:3, 56:4, 64:6, 88:21, 90:23, 91:10, 96:16, 97:8, 105:14, 109:13, 110:7, 116:8, 116:16, 127:18, 128:17, 129:1, 129:2, 129:5, 129:6, 132:22

**underneath** [1] - 53:19

**understood** [6] - 37:8, 52:4, 54:3, 62:2, 119:18, 134:7

**unfair** [1] - 130:2

**unfortunately** [2] - 114:6, 114:13
**unfounded** [1] - 34:23
**unique** [5] - 19:2, 19:6, 20:6, 20:17, 124:7
**UNITED** [2] - 1:1, 1:12
**United** [1] - 137:10
**united** [1] - 2:3
**University** [1] - 107:15
**unless** [5] - 40:15, 41:22, 75:24, 76:4, 122:17
**unreliable** [1] - 72:12
**up** [23] - 7:22, 11:12, 11:20, 17:6, 24:15, 34:22, 43:14, 61:21, 70:10, 70:15, 73:3, 73:5, 76:16, 94:15, 98:23, 99:4, 104:16, 111:11, 112:3, 112:22, 118:4, 122:8, 132:21
**update** [2] - 15:15, 120:18
**updated** [3] - 30:13, 41:23, 109:6
**updates** [2] - 23:23, 24:1
**upload** [1] - 59:22
**USB** [5] - 68:22, 78:24, 78:25
**useful** [2] - 91:21, 91:23
**user** [1] - 30:14
**user-friendly** [1] - 30:14
**utilize** [1] - 89:16
**utilized** [1] - 34:6

**V**

**valid** [1] - 134:14
**value** [2] - 103:16, 103:21
**various** [1] - 103:25
**vendors** [2] - 23:1, 46:21
**verbal** [1] - 125:5
**verified** [2] - 77:25, 102:2
**verify** [1] - 105:11
**verifying** [1] - 79:6
**version** [2] - 82:18, 104:1
**versions** [3] - 91:4, 130:12, 132:13

**versus** [8] - 4:3, 92:20, 92:21, 93:8, 100:14, 115:20, 119:8, 127:14
**via** [3] - 12:17, 37:19, 66:11
**view** [2] - 61:1, 109:8
**Viewer** [2] - 50:15, 50:16
**violated** [1] - 116:14
**violation** [1] - 116:12
**virtual** [1] - 136:1
**virtually** [1] - 106:18
**vis-à-vis** [1] - 92:24
**visits** [1] - 16:23
**Vista** [1] - 115:21
**Vista's** [2] - 115:21, 116:4
**voluntarily** [1] - 94:17
**vs** [1] - 1:7

**W**

**wait** [3] - 106:5, 133:19, 134:9
**waiving** [1] - 111:21
**walk** [1] - 98:6
**walking** [1] - 135:24
**warrant** [1] - 134:15
**warranted** [1] - 123:15
**weaponization** [1] - 118:7
**web** [4] - 30:20, 32:25, 33:11, 124:19
**website** [1] - 34:14
**websites** [5] - 31:13, 31:14, 34:2, 34:4, 40:7
**week** [9] - 33:22, 55:17, 84:7, 88:15, 97:22, 99:3, 116:22, 125:14, 125:16
**weekend** [1] - 116:20
**weeks** [4] - 31:25, 33:1, 33:12, 100:1
**west** [1] - 8:1
**West** [2] - 1:19, 8:1
**whatsoever** [1] - 122:25
**whole** [1] - 123:6
**wife** [1] - 86:16
**willing** [3] - 107:6, 128:16, 129:2
**win** [1] - 118:8
**window** [2] - 60:16, 60:18
**Windows** [2] - 78:7, 78:8

**wish** [2] - 6:12, 114:21
**wishes** [2] - 4:21, 66:24
**withdrawal** [1] - 125:14
**withdrawn** [3] - 116:22, 125:16, 126:15
**withheld** [2] - 82:14, 90:7
**withholding** [1] - 105:16
**WITNESS** [47] - 3:3, 6:20, 11:14, 11:16, 12:4, 12:15, 12:25, 13:3, 14:18, 15:9, 19:23, 20:16, 22:4, 24:12, 26:8, 27:8, 28:7, 29:8, 29:12, 34:10, 48:8, 48:10, 49:2, 52:10, 52:13, 52:17, 52:20, 56:5, 60:10, 65:2, 65:8, 67:4, 72:3, 73:5, 76:22, 77:3, 77:13, 77:16, 77:18, 77:24, 78:4, 78:7, 78:20, 78:23, 79:4, 83:7, 85:16
**witness** [11] - 5:9, 6:17, 17:15, 48:19, 48:24, 55:9, 67:1, 71:9, 80:10, 80:12, 96:24
**witness's** [3] - 21:5, 30:25, 35:14
**witnesses** [4] - 5:6, 79:17, 123:4, 128:1
**Word** [17] - 50:12, 50:13, 53:1, 53:8, 56:15, 69:21, 71:17, 75:5, 97:15, 99:9, 109:6, 110:13, 112:10, 112:13, 112:17, 113:2
**word** [1] - 45:3
**words** [19] - 52:15, 57:17, 71:1, 78:9, 90:18, 91:16, 91:21, 92:3, 95:3, 96:1, 98:8, 103:20, 120:6, 121:15, 121:18, 125:2, 129:14, 131:10, 133:17
**work-product** [2] - 56:4, 57:12
**works** [3] - 5:24, 13:16, 78:8
**worried** [1] - 70:7

**write** [2] - 24:15, 28:25
**written** [4] - 9:22, 9:25, 19:1, 26:5
**wrongdoer** [1] - 103:10
**wrote** [1] - 28:25

**X**

**Xenia** [10] - 24:4, 24:6, 27:20, 28:16, 28:23, 30:11, 30:23, 32:5, 32:18, 86:19

**Y**

**Yamir** [1] - 32:18
**year** [42] - 7:22, 9:18, 9:23, 10:5, 10:6, 10:8, 10:12, 12:9, 14:20, 15:14, 15:24, 16:1, 16:3, 16:5, 25:3, 25:6, 25:7, 25:15, 25:18, 27:22, 28:9, 28:11, 31:5, 31:16, 41:25, 42:10, 46:17, 46:24, 47:4, 47:6, 47:11, 62:14, 84:4, 98:5, 131:5, 131:12, 131:23, 132:20
**year's** [1] - 46:19
**year-to-year** [1] - 10:5
**yearly** [2] - 28:1, 75:25
**years** [11] - 7:7, 7:10, 14:19, 26:21, 27:6, 67:16, 70:7, 75:23, 83:12, 107:18, 117:9
**yesterday** [9] - 17:20, 43:1, 43:4, 43:5, 43:6, 44:20, 89:12, 128:13, 130:21
**YOUNT** [63] - 1:22, 1:22, 4:10, 5:16, 5:23, 5:25, 6:3, 6:6, 6:13, 6:23, 7:1, 11:19, 13:4, 16:11, 17:14, 17:23, 18:23, 35:19, 36:20, 46:5, 48:6, 48:17, 49:20, 55:11, 55:14, 57:22, 58:3, 58:10, 60:9, 60:14, 65:9, 66:25, 67:7, 67:10, 71:13, 71:16, 71:25, 72:7, 72:25, 79:15, 79:18, 81:5, 81:14, 81:18, 83:25, 100:6, 118:3, 119:10,

119:19, 119:24, 120:9, 120:20, 120:24, 121:5, 121:11, 121:14, 122:11, 122:16, 130:20, 130:23, 131:12, 131:15, 131:21
**Yount** [6] - 3:5, 3:8, 3:9, 4:10, 55:16, 118:2
**yourself** [4] - 7:2, 14:8, 67:11, 80:23

**Z**

**Zoom** [2] - 12:17, 37:19